**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLUESTEM BRANDS, INC., *et al.*,[1] | Case No. 20-10566 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN**
**POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS**
**TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION**
**TERM LOAN LENDERS, (V) MODIFYING THE AUTOMATIC STAY,**
**(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion.[2]

**Preliminary Statement**[3]

1. Unlike so many retailers in recent years, the Debtors enter into the chapter 11 cases

with a viable, going-concern transaction in hand. The DIP financing sought herein is an essential

component to ensuring that path is a success.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Bluestem Brands, Inc. (5164); Appleseed's Holdings, Inc. (9117); Blair LLC (1670); Bluestem Enterprises, Inc. (1237); Bluestem Fulfillment, Inc. (5931); Bluestem Sales, Inc. (1539); Draper's & Damon's LLC (2759); Gold Violin LLC (0873); Haband Company LLC (8496); Home Forever LLC (2324); Johnny Appleseed's, Inc. (5560); Norm Thompson Outfitters LLC (8344); Northstar Holdings Inc. (6823); Orchard Brands Corporation (6322); Orchard Brands International, Inc. (8962); Orchard Brands Sales Agency, LLC (8855); Value Showcase LLC (2920); WinterSilks, LLC (0688). The service address for each of the above Debtors is 7075 Flying Cloud Drive, Eden Prairie, Minnesota 55344.

[2] A detailed description of the Debtors' businesses, capital structure and the events leading to these chapter 11 cases is set forth in the *Declaration of Thomas L. Fairfield in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the Interim Order (as defined below), as applicable.

[3] Capitalized terms used in this section but not otherwise defined shall have the meaning ascribed to them below.

2.     On March 8, 2020, the Debtors and BLST Acquisition Company LLC (the "Stalking Horse Purchaser")[4] entered into that certain stalking horse purchase agreement (the "Stalking Horse APA").  Under the Stalking Horse APA, the Stalking Horse Purchaser will buy substantially all of the Debtors assets in a going-concern transaction, to the benefit of the Debtors' employees, customers, vendors, landlords, and other stakeholders.

3.     To ensure that the Stalking Horse APA is the highest or otherwise best alternative available, the Debtors sought and negotiated for a debtor in possession financing facility (the "DIP Facility") that will provide sufficient runway to close the transaction and allow for a robust postpetition marketing process.

4.     The DIP Facility will provide commitments up to $125 million, including the provision of up to $80 million of additional liquidity.  The DIP Facility will fund the ongoing operations during these chapter 11 cases and thereby preserve the value of the Debtors' assets as the Debtors work expeditiously toward consummating the sale.  The DIP Facility will also provide a clear, strong message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and the bankruptcy filing will not materially impact the Debtors' operations.  More specifically, the DIP Facility will communicate that the Debtors are able to continue meeting the needs of their customers, compensating their employees, paying their vendors, and otherwise managing their businesses as close to the ordinary course as possible.

5.     As more fully set forth in the Burns Declaration and below, the Debtors believe the DIP Facility is fair and reasonable, will maximize value for the Debtors' stakeholders, and is a

---

[4]    BLST Acquisition Company LLC is an acquisition vehicle created by the Prepetition Term Loan Lenders (as defined below).

sound exercise of the Debtors' business judgment.  The Debtors believe the DIP Facility is the best

financing available and have been unable to secure any other financing on more favorable terms.

6.      If the DIP Facility is not approved, then there will be immediate and irreparable

harm to the Debtors and their estates.  Absent funds available from the DIP Facility, the Debtors

may lose the cooperation of key business partners at this critical early stage and face a value-

destructive interruption to their businesses.

7.      Accordingly, the Debtors respectfully request that the Court approve the Debtors'

entry into the DIP Facility.

### Relief Requested

8.      The Debtors seek entry of an interim order, substantially in the form attached hereto

as **Exhibit A** ((the "Interim Order"), and a final order (the "Final Order,") and, together with the

Interim Order, the "DIP Orders"):[5]

      a.      authorizing the Debtors to obtain (a) a senior secured revolving postpetition financing on a superpriority basis in the aggregate principal amount of up to $100 million (the "DIP ABL Facility") and (b) senior secured term loan postpetition financing on a superpriority basis in the aggregate principal amount of up to $25 million (the "DIP Term Loan," and together with the DIP ABL Facility, the "DIP Facility"), which shall be used in part to pay in full the $45 million outstanding under the Prepetition ABL Facility, both pursuant to that certain *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement*, by and among the Borrowers, the Guarantors, Cerberus Business Finance, LLC, as administrative agent and collateral agent (in such capacity, the "DIP Agent") for and on behalf of the lenders that have executed signature pages thereto (the "DIP Lenders"), substantially in the form as attached hereto as **Exhibit B** (the "DIP Credit Agreement");

      b.      authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, and other DIP Credit Documents (as defined in the DIP Credit Agreement) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified

---

[5]      The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

from time to time, and collectively, with the DIP Credit Agreement, the "<u>DIP Credit Documents</u>") and to perform such other acts as may be necessary or desirable in connection with the DIP Credit Documents;

c. granting the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Credit Documents to the DIP Agent and the DIP Lenders (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>") allowed superpriority administrative expense claim status in each of these chapter 11 cases (collectively, the "<u>Cases</u>") and in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>");

d. granting to the DIP Agent, for the benefit of itself and the DIP Lenders under the applicable DIP Credit Documents, automatically perfected security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), which liens shall be subject to the priorities set forth herein;

e. authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Credit Documents as such become earned, due, and payable to the extent provided in, and in accordance with, the DIP Credit Documents;

f. authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), including the Cash Collateral of the Prepetition Term Loan Lenders under the Prepetition Term Loan Documents (each as defined in the Interim Order), in accordance with the DIP Credit Documents and providing adequate protection to the Prepetition Term Loan Lenders for any diminution in value of their interests in the Prepetition Collateral, including the Cash Collateral, resulting from the imposition of the automatic stay, or the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral;

g. modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Documents and the Interim Order;

h. scheduling a final hearing (the "<u>Final Hearing</u>") within 25 days of the Petition Date to consider the relief requested herein and approving the form of notice with respect to the Final Hearing; and

i. granting related relief.

9.      In support of this motion, the Debtors respectfully proffer the *Declaration of David E. Burns in Support of the Debtors' Expedited Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Term Loan Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Burns Declaration") filed contemporaneously herewith.

## Jurisdiction and Venue

10.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

## Background

13.     The Debtors are a direct-to-consumer retailer that offers fashion, home, and entertainment merchandise through internet, direct mail, and telephonic channels under the Orchard and Northstar brand portfolios.  The Debtors have approximately two million customers, the majority of which are U.S.-based and transact at less than $250 on a per order basis.  Headquartered in Eden Prairie, Minnesota, the Debtors employ approximately 2,200 individuals and own and/or lease warehouses, distribution centers, and call centers in 10 other states, including New Jersey, Massachusetts, Georgia, and California.  The Debtors' supply chain consists of name-brand vendors—*e.g.*, Michael Kors, Samsung, Keurig, and Dyson—as well as private label and non-branded sources based in the United States and abroad.  For fiscal year 2019, the Debtors reported gross revenue of approximately $1.8 billion.

14.     On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[6]

### I.    Concise Statement Regarding the DIP Facility.

15.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
| --- | --- |
| **Borrowers and Gaurantors** <br> Bankruptcy Rule 4001(c)(1)(B) | All of the Debtors <br><br> *See* DIP Credit Agreement, Preamble |
| **DIP Financing Lenders** <br> Bankruptcy Rule 4001(c)(1)(B) | Cerberus Business Finance, LLC as Administrative Agent <br><br> Lenders <br> Cerberus Levered Loan Opportunities Fund II, L.P. <br> Cerberus Levered Loan Opportunities Fund III, L.P. <br> Cerberus NJ Credit Opportunities Fund, L.P. <br> Cerberus ASRS Holdings LLC <br> Cerberus KRS Levered Loan Opportunities Fund, L.P. <br> Cerberus PSERS Levered Loan Opportunities Fund, L.P. <br> Cerberus FSBA Holdings LLC <br> Cerberus ND Credit Holdings LLC <br> Cerberus ICQ Levered Loan Opportunities Fund, L.P. <br> Cerberus Offshore Levered III Holdings II LP <br> Cerberus Offshore Levered Loan Opportunities Maser Fund II, LLP <br> Cerberus SWC Levered Holdings II, LP <br> Cerberus ICO Offshore Loan Opportunities Master Fund, L.P. <br> Cerberus AUS Levered Holdings LP <br> Cerberus AUS Levered Holdings III LP <br> Cerberus Redwood Levered Loan Opportunities Fund A, L.P. <br> Cerberus Redwood Levered Loan Opportunities Fund B, L.P. <br> Cerberus Cavaliers Levered Loan Opportunities Fund, LLC <br> Cerberus StepStone Credit Holdings LLC <br> Safety National Casualty Corporation <br> MGG Funding II, LLC <br> MGG Offshore Funding I LLC <br> Capitala Finance Corp. <br> WebBank <br> Knighthead Annuity & Life Assurance Company |

---

[6]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement and the Interim Order.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Main Street Capital Corporation<br>HG Vora Special Opportunities Master Fund Ltd.<br><br>*See* DIP Credit Agreement, Preamble, Commitment Schedule. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earliest of (a) the date which is 35 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the date that is six (6) months following the Petition Date, (c) the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of any plan of reorganization or liquidation in the Chapter 11 Cases which is confirmed by an order of the Bankruptcy Court; (d) the date on which the Sale is consummated or any other sale of all or substantially all of the Loan Parties' assets and/or Capital Stock is consummated under Section 363 and/or Section 1129 of the Bankruptcy Code; and (e) the date of termination of the Commitments by the Administrative Agent pursuant to Section 7.01 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Commitments.<br><br>Aggregate Revolving Commitments of $100,000,000.<br><br>Aggregate Term Loan Commitments of $25,000,000.<br><br>*See* DIP Credit Agreement, Commitment Schedules and § 2.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Conditions Precedent to Effectiveness of DIP Credit Agreement.<br><br>• Customary Closing Deliverables.  Delivery of customary closing deliverables and requisite DIP Credit Documents, evidence of insurance, UCC and tax lien searches, USA PATRIOT Act information, a closing certification, good standing certificates, receipt of borrowing base certificates, a borrowing base request, the Approved Budget, certificates of Capital Stock pledged, any requested Promissory Notes, each Material Debt Instrument (if any) properly endorsed and an executed Borrowing Base Certificate.<br><br>• Fees.  The Administrative Agent shall have received (i) the Closing Fee and (ii) all accrued fees, costs and expenses of the Administrative Agent's professionals (including legal counsel) in connection with the negotiation and preparation of the DIP Credit Agreement and the other DIP Credit Documentss.<br><br>• ABL Obligations.  The Loan Parties shall pay in full in cash the Prepetition ABL Obligations, with proceeds from the initial Borrowings, to the Prepetition ABL Agent, on its behalf and on behalf of the Prepetition ABL Lenders, and shall obtain a full and final release of all Liens securing the Prepetition ABL Obligations.<br><br>• Approved Budget.  The Administrative Agent and the Lenders shall have received the initial Approved Budget, attached to the DIP Credit Agreement as Exhibit A, together with a certificate of the CRO of Holdings stating that such Approved Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties.<br><br>• Legality.  The making of the initial Loans shall not contravene any law, rule or regulation applicable to the Administrative Agent or any Lender.<br><br>• Security Interest.  The Administrative Agent shall be satisfied that it has been granted, and holds for the benefit of the Secured Parties, a perfected, first priority Lien on, and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | security interest in, all of the Collateral, subject only to Permitted Priority Liens and the Carve-Out. <br><br> • Legal Due Diligence.  There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the Loans, this Agreement, any other Loan Document, the Prepetition ABL Obligations or the Prepetition Term Loan Obligations.. <br><br> • Material Adverse Effect.  No Material Adverse Effect. <br><br> • Insolvency Matters – Chapter 11 Cases.  (i) The Bankruptcy Court shall have entered an Interim Order by no later than (3) days after the Petition Date; (ii) the Interim Order shall find and conclude that the  DIP Credit Agreement and any other DIP Credit Documents were negotiated in good faith and that the Administrative Agent and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and order that, as of the Petition Date, the Liens and security interests in favor of the Administrative Agent referred to in Section 2.22 of the DIP Credit Agreement shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens and payment of the Carve-Out; (iii) the Administrative Agent shall have received on or before the Petition Date, copies of the "first day" motions, including the orders attached thereto, to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent, and the orders of the Bankruptcy Court approving such motions (including the order with respect to the Loan Parties' cash management systems), in form and substance reasonably satisfactory to the Administrative Agent, shall have been entered by the Bankruptcy Court on or before the third (3rd) Business Day after the Petition Date; and (iii) no trustee, examiner or receiver with expanded powers shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral with an aggregate value in excess of $1,000,000. <br><br> • Representations and Warranties.  The following statements shall be true and correct: (i) the representations and warranties contained in Article III of the DIP Credit Agreement and in each other DIP Credit Document are true and correct in all material respects (without duplication of other materiality qualifiers) on and as of the Closing Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (without duplication of other materiality qualifiers)) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Closing Date or would result from the DIP Credit Agreement or the other DIP Credit Documents becoming effective in accordance with its or their respective terms. <br><br> *See* DIP Credit Agreement, Art. 4. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | • Libor + 6% or ABR + 5%, at the Debtors' election <br><br> *See* DIP Credit Agreement, § 2.13 |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Financing Facility and Cash Collateral**<br><br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The Loan Parties shall use the proceeds of the Loans in accordance with the Approved Budget (within the variances from budgeted amounts permitted under this Agreement) to:<br><br>(a)  repay the outstanding Prepetition ABL Obligations;<br><br>(b) pay fees and expenses related to this Agreement and the other DIP Credit Documents; and<br><br>(c) fund working capital in the ordinary course of business of the Loan Parties (and out of the ordinary course as approved by the Administrative Agent and the Bankruptcy Court or to the extent set forth in the Approved Budget subject to permitted variances) and for other general corporate purposes.<br><br>The Loan proceeds may not be used for any purpose prohibited by the Interim Order or the Final Order, as applicable, or for any purpose that entails a violation of any of the regulations of the Board of Governors, including Regulations T, U and X.<br><br>*See* DIP Credit Agreement, § 5.11 |
| **"Roll-Up" Provisions** Local Rule 4001-2(a)(i)(E) | The DIP Facility will be used to pay down the Prepetition ABL<br><br>*See* Interim Order ¶2.4.1 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | "Adequate Protection Liens" has the meaning assigned to the term "Adequate Protection Replacement Liens" in the Interim Order (or the Final Order, when applicable).<br><br>"Adequate Protection Claims" has the meaning assigned to the term "Adequate Protection Claims" in the Interim Order (or the Final Order, when applicable). |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | Repayment of Loans; Evidence of Debt.<br><br>• The Borrowers jointly and severally hereby unconditionally promise to pay on the Maturity Date (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan and (ii) to the Administrative Agent for the account of each Term Lender, Lender the then unpaid principal amount of each Term Loan on the Maturity Date.<br><br>• Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.<br><br>• The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.<br><br>• The entries made in the accounts maintained pursuant to Section 2.10(c) or (d) of the DIP Credit Agreement shall be prima facie evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any manifest error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement; provided, further, that in the event of any inconsistency between the accounts maintained by the Administrative Agent pursuant to Section 2.10(d) of the DIP |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Credit Agreement and any Lender's records, the accounts of the Administrative Agent shall govern. |

- Any Lender may request that any Loan made by it be evidenced by a Promissory Note. In such event, the Borrowers shall prepare, execute and deliver a Promissory Note payable to such Lender and its registered assigns; it being understood and agreed that such Lender (and/or its applicable assign) shall be required to return such Promissory Note to the Borrowers in accordance with Section 9.05(b)(iii) of the DIP Credit Agreement and upon the occurrence of the Termination Date (or as promptly thereafter as practicable. If any Lender loses the original copy of its Promissory Note, it shall execute an affidavit of loss containing an indemnification provision reasonably satisfactory to the Borrowers.

*See* DIP Credit Agreement, § 2.10.

Optional Prepayment of Loans.

- Upon prior notice in accordance with Section 2.11 (a)(ii) of the DIP Credit Agreement of this Section, the Borrowers shall have the right at any time and from time to time to prepay any Borrowing of Loans of any Class in whole or in part without premium or penalty (but subject, if applicable, to Section 2.16 of the DIP Credit Agreement). Each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

- The Borrower Representative shall notify the Administrative Agent by telephone (promptly confirmed in writing) of any prepayment under this Section 2.11(a) of the DIP Credit Agreement (i) in the case of any prepayment of a Eurocurrency Rate Borrowing, not later than 10:00 a.m. three Business Days before the date of prepayment or (ii) in the case of any prepayment of an ABR Borrowing, not later than 11:00 a.m. on the day of prepayment (or, in the case of clauses (i) and (ii), such later time as to which the Administrative Agent may agree). Each such notice shall be irrevocable (except as set forth in the proviso to this sentence) and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that any notice of prepayment delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of a Borrowing of the same Type and Class as provided in Section 2.02(c) of the DIP Credit Agreement or such lesser amount that is then outstanding with respect to such Borrowing being repaid. Each prepayment of Loans shall be applied ratably to the Loans specified in the applicable prepayment notice.

*See* DIP Credit Agreement, § 2.11(a).

Mandatory Prepayment of Loans.

- In the event and within one Business Day of knowledge of the Borrower Representative or notice by the Administrative Agent, on such occasion that the total outstanding Revolving Loans exceed the lesser of (A) the aggregate Revolving Commitments and (B) the Borrowing Base, the Borrowers shall prepay the Revolving Loans in an aggregate amount equal to such excess.

- No later than two Business Days following the receipt of Net Proceeds in respect of any Disposition (other than Dispositions permitted under Sections 6.07(c), (d), (e),

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (f), (j), (l), (m) of the DIP Credit Agreement or Extraordinary Receipts (other than the Tennessee Tornado Inventory Loss subject to the provisos below) in excess of $1,000,000 in the aggregate during the term of this Agreement, the Loan Parties shall apply an amount equal to 100% of the Net Proceeds of such Dispositions or such Extraordinary Receipts received with respect thereto in excess of such threshold to prepay the outstanding principal amount of Loans in accordance with Section 2.11(b)(vi) of the DIP Credit Agreement (<u>provided</u>, that, for the avoidance of doubt, any amount of Net Cash Proceeds below such threshold shall be retained by the Loan Parties; provided, <u>further</u> that the Borrowers and their Subsidiaries may use up to $2,000,000 of the Net Proceeds received from insurance in connection with the Tennessee Tornado Inventory Loss to acquire replacement inventory of the Borrowers of the same or similar type that was lost within 90 days of such receipt, and such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 90 days of such receipt, so used or committed to be so used; provided further than any amount in excess of $2,000,000 received as Net Proceeds from the Tennessee Tornado Inventory Loss plus any amounts not reinvested as provided in the immediately foregoing proviso shall be used to repay the Loans in accordance with Section 2.11(b)(vi) of the DIP Credit Agreement). Nothing contained in this clause (ii) shall permit any Loan Party or any of its Subsidiaries to make any Disposition other than a Disposition permitted under Section 6.07 of the DIP Credit Agreement. <br><br> • No later than two Business Days following the receipt of Net Proceeds in respect of any Disposition (other than Dispositions permitted under Sections 6.07(b), (c) and (e)) of the DIP Credit Agreement or Extraordinary Receipts in excess of $1,000,000 in the aggregate during the term of this Agreement, the Loan Parties shall apply an amount equal to 100% of the Net Proceeds or Extraordinary Receipts received with respect thereto in excess of such threshold to prepay the outstanding principal amount of Loans in accordance with clause (vi) (provided, that, for the avoidance of doubt, any amount of Net Cash Proceeds below such threshold shall be retained by the Loan Parties). Nothing contained in this clause (ii) shall permit any Loan Party or any of its Subsidiaries to make any Disposition other than a Disposition permitted under Section 6.07 of the DIP Credit Agreement. <br><br> • In the event that the Loan Parties or any of their Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by any of the Loan Parties or any of their Subsidiaries (other than Indebtedness that is permitted under Section 6.01 of the DIP Credit Agreement) the Loan Parties shall, not later than the next succeeding Business Day of the receipt of such Net Proceeds by the Loan Parties or their applicable Subsidiaries, apply an amount equal to 100% of such Net Proceeds to prepay the outstanding principal amount of the Loans in accordance with clause (vi) below.  The provisions of this clause (iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement. <br><br> • Without limiting any other provision of this Agreement or any other DIP Credit Document permitting or requiring prepayment of the Loans in whole or in part, the Loan Parties shall prepay the Obligations in full in accordance with clause (vi) below on the date which is thirty-five (35) days following the entry of the Interim Order in the event that the Final Order shall not have been entered on or before such date. <br><br> • Notwithstanding any provision under this Section 2.11(b) of the DIP Credit Agreement to the contrary: |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| |       o   the Loan Parties shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(ii) or (iii) of the DIP Credit Agreement to the extent that the relevant Disposition is consummated by any Foreign Subsidiary or the relevant Extraordinary Receipts are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Loan Parties of any such amount would be prohibited under any Requirement of Law or conflict with the fiduciary duties of such Foreign Subsidiary's directors, or result in, or could reasonably be expected to result in, a risk of personal or criminal liability for any officer, director, employee, manager, member of management or consultant of such Foreign Subsidiary (the Loan Parties hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions required by applicable Requirements of Law to permit such repatriation); and <br><br>      o   if the Loan Parties determine in good faith that the repatriation to the Loan Parties as a distribution or dividend, or otherwise, of any amounts required to mandatorily prepay the Loans pursuant to Sections 2.11(b)(ii) or (iii) of the DIP Credit Agreement that are attributable to Foreign Subsidiaries could reasonably result in a material and adverse Tax liability or consequence (including any withholding Tax) (such amount that would otherwise be required to mandatorily prepay the Loans, a "Restricted Amount"), as reasonably determined by the Loan Parties, the amount that the Loan  Parties shall be required to mandatorily prepay pursuant to Sections 2.11(b)(ii) or (iii) of the DIP Credit Agreement, as applicable, shall be reduced by the Restricted Amount until such time as it may repatriate to the Loan Parties the Restricted Amount without incurring such material and adverse Tax liability or consequence; provided that when the repatriation of any such proceeds, from the relevant Foreign Subsidiary could no longer reasonably be expected to result in a material and adverse Tax consequence, an amount equal to such proceeds to the extent available, not previously applied pursuant to this clause (B), shall be promptly applied to the repayment of the Loans pursuant to Section 2.11(b) of the DIP Credit Agreement as otherwise required above (without regard to this clause (v)); provided, for the avoidance of doubt, nothing in this Agreement shall require the repatriation of any cash to the United States.. <br><br>•   Each prepayment of Loans pursuant to Section 2.11(b)(ii), (iii) and (iv) of the DIP Credit Agreement shall be applied ratably to each Class of Loans then outstanding; provided that each such prepayment of Revolving Loans will also result in a corresponding permanent reduction of the Revolving Commitments, applied ratably with respect to each Lender's Revolving Commitment.  With respect to each Class of Loans, all accepted prepayments under this Section 2.11(b) of the DIP Credit Agreement shall be paid to the Lenders in accordance with their respective applicable Pro Rata Share of the applicable Class.  The amount of such mandatory prepayments shall be applied within each Class first to the then outstanding Loans that are ABR Loans and then to the then outstanding Loans that are Eurocurrency Rate Loans in a manner that minimizes the amount of any payments required to be made by the Loan Parties pursuant to Section 2.16 of the DIP Credit Agreement. <br><br>•   Prepayments made under this Section 2.11 of the DIP Credit Agreement shall be (A) accompanied by accrued interest as required by Section 2.13 of the DIP Credit |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Agreement and (B) subject to Section 2.16 of the DIP Credit Agreement, but shall otherwise be without premium or penalty.<br><br>*See* DIP Credit Agreement, § 2.11(b) |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | • Unused Line Fee.  0.50% on the average daily Available Revolving Commitment of such Lender for the preceding month.<br><br>• Closing Fee.  1.75% on $125,000,000, which shall be fully earned, non-refundable and payable on the Closing Date<br><br>*See* DIP Credit Agreement, § 2.12. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br><br>**Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Approved Budget. (b)     The initial Approved Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions the Loan Parties reasonably believe, in their good faith business judgment, were fair in light of the conditions existing at the time of delivery, of Holdings and its Subsidiaries' forecasts of future financial performance.<br><br>*See* DIP Credit Agreement, § 3.04.<br><br>Variance Report. (ii)     Beginning with the third Business Day after the first full week following the Petition Date and on the third Business Day of each week thereafter, no later than 5:00 p.m. (Eastern time) on such day (A) a Variance Report, in substantially the form attached hereto as Exhibit H showing the comparison of, and the variances between, actual performance to projections for each line item of the Approved Budget and reconciling the sources, uses and disbursements of cash, for the Measurement Period most recently ended and (B) a certificate from the CRO (1) certifying the calculation and compliance of the variances and other requirements under Section 6.18 for the DIP Credit Agreement for the Measurement Period most recently ended  and (2) including explanations for all unfavorable variances in excess of fifteen percent (15%); provided that in the event the Approved Budget applicable to such Measurement Period has been updated and approved such that it is the "Approved Budget", the Variance Report shall be determined with reference to such updated Approved Budget.<br><br>*See* DIP Credit Agreement, § 5.01(a)(ii). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Events of Default.  Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, cross-defaults to other indebtedness, attachment defaults, judgment defaults, invalidity of loan documents, change of control, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of pre-petition loan documents, the occurrence of any number of adverse actions or consequences in any of the chapter 11 cases.<br><br>Related Agreement Defaults.  Any event or condition occurs that enables or permits (with or without the giving of notice) SCUSA or WebBank to terminate any Related Agreement prior to its scheduled termination (or otherwise results in a termination of any Related Agreement), and, to the extent the relevant Related Agreement permits the cure of such event or condition, such event or condition shall continue uncured for a period of 30 consecutive days (any such period, a "SCUSA/WebBank Grace Period"); provided, however, that no Event of Default shall occur if within the applicable SCUSA/WebBank Grace Period (or prior to or simultaneously with such termination) the Related Agreements are replaced by a Replacement WebBank/SCUSA Sale Agreement; provided further that no SCUSA/WebBank Grace Period shall apply to this clause (m) if at any time prior to or during a SCUSA/WebBank Grace Period either |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | SCUSA or WebBank shall cease to purchase Receivables pursuant to the relevant Related Agreements. |
| | *See* DIP Credit Agreement, Art. 7. |
| | **Additional Events of Default** |
| | • the Interim Order shall not have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date; |
| | • the Final Order shall not have been entered by the Bankruptcy Court within thirty-five (35) days after the Petition Date; |
| | • the Interim Order or the Final Order, as the case may be, shall have been revoked, reversed, vacated, stayed, modified, extended, supplemented or amended without the express prior written consent of the Administrative Agent and the Required Lenders; |
| | • an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) a responsible officer or an examiner with enlarged powers relating to the operating of the Loan Parties' business (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106 of the Bankruptcy Code; |
| | • an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Required Lenders, other than with respect to Permitted Priority Liens and the Carve-Out, (A) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties pari passu or superior to the priority of (1) the Administrative Agent and the Lenders in respect of the Obligations, or (2) the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in respect of the Adequate Protection Replacement Liens or Adequate Protection Claim, or (B) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien; |
| | • an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; |
| | • an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other DIP Credit Documents on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Administrative Agent for the benefit of the Secured Parties, and the priority thereof until such plan effective date; |
| | • an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other DIP Credit Documents on dismissal; |
| | • an order shall be entered by the Bankruptcy Court terminating, or the termination, of the exclusivity period of the Loan Parties under Section 1121 of the Bankruptcy Code to file a plan in the Chapter 11 Cases; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | • any Loan Party shall file an application, motion or other pleading, in support of any of the events or actions set forth under clauses (i) through (ix) above, or any other Person (other than any of the Loan Parties) shall do so and such application, motion or pleading is not contested in good faith by the Loan Parties; |
|  | • an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor of any Loan Party with respect to any claim (other than a claim for personal injury that is covered by liability insurance) against one or more of the Loan Parties in an amount equal to or exceeding the Threshold Amount in the aggregate; |
|  | • if any material property of any Loan Party, other than Dispositions permitted under Section 6.07, is sold without the express written consent of the Administrative Agent and the Required Lenders; |
|  | • without the prior written consent of the Administrative Agent and the Required Lenders, any Loan Party shall take any action, including the filing of an application, motion or other pleading, requesting or seeking authority for any Loan Party (A) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon any Collateral; (C) except as provided in the Interim Order and the Final Order or herein, as applicable, to use, or grant any Lien on (other than Permitted Liens), cash collateral of the Administrative Agent and the Lenders under Section 363(c) of the Bankruptcy Code; or (D) the entry of any order by the Bankruptcy Court in any Chapter 11 Case granting relief as described in subclauses (A) through (C) of this clause (xiii); |
|  | • (A) any Loan Party, or representative of the Loan Parties, shall attempt to (1) invalidate, reduce or otherwise impair the Liens or security interests of the Administrative Agent and/or any Lender's claims or rights against any Loan Party or (2) subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (B) any Collateral becoming subject to surcharge, to marshaling or to assessment pursuant to Section 506(c) of the Bankruptcy Code, (C) any Lien or security interest created by this Agreement, the Interim Order and the Final Order or herein, as applicable, or any other DIP Credit Document shall, for any reason, cease to be a valid first priority Lien, subject only to Permitted Priority Liens and the Carve-Out or (D) any action is commenced by any Loan Party which contests the validity, perfection, enforceability or priority of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by this Agreement, any of the Interim Order and the Final Order, as applicable, or any other DIP Credit Document; |
|  | • if any Loan Party, or representative of the Loan Parties, commences, or seeks leave to commence, any action against any of the Prepetition Term Loan Agent, Prepetition Term Loan Lenders or their respective agents, advisors or employees, challenging the validity, perfection, priority, extent or enforceability of any Prepetition Term Loan Document or claims that arose in connection with the Prepetition Term Loan Documents, or seeking to avoid, modify, dispute, challenge or subordinate any Lien or claim thereunder; |
|  | • the determination of any Loan Party, whether by vote of such Loan Party's Board of Directors or otherwise, to employ an agent or other third party to conduct any sales of all or substantially all of such Loan Party's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do the foregoing, in each case without the prior written consent of the Administrative Agent and the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Required Lenders; provided, the appointment of an investment banker will not result in an Event of Default pursuant to this clause (xvi); <br><br> • any Loan Party shall fail to timely achieve any Sale Milestone in accordance with each of the terms therein; <br><br> • immediately upon consummation of the Sale, the Obligations are not paid in full; <br><br> • any Loan Party makes any disbursement not in accordance with or set forth in the Approved Budget; <br><br> • an order shall be entered by the Bankruptcy Court amending, supplementing or otherwise modifying, or the filing by any Loan Party of an application, motion, pleading or notice seeking the amendment, supplement or other modification of or appeal against, in each case, the Interim Order and the Final Order, as applicable, or any of the First Day Orders in respect of cash management or critical vendors or suppliers, in each instance, without the consent of the Administrative Agent and the Required Lenders; <br><br> • except with respect to payments as permitted by any order of the Bankruptcy Court approving a "first day" motion (and included in the Approved Budget), an order shall be entered by the Bankruptcy Court permitting the payment of, or granting adequate protection with respect to, the Prepetition Term Loan Obligations (other than the Adequate Protection Claim) or the filing of any motion seeking the same by any of the Loan Parties, in each case, without the consent of the Administrative Agent and the Required Lenders; <br><br> • the DIP Credit Agreement, the Interim Order and the Final Order, as applicable, or any other DIP Credit Document, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Administrative Agent for the benefit of the Secured Parties on any Collateral purported to be covered thereby; or <br><br> • any other "Event of Default" under and as defined in the Interim Order or the Final Order, as the case may be, shall have occurred. <br><br> *See* DIP Credit Agreement, Art. 7. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | <u>Indemnity</u>.  The Borrowers jointly and severally shall indemnify the Administrative Agent, each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, and related expenses arising out of, in connection with, or as a result of the transactions as more fully set forth in the DIP Credit Agreement. <br><br> *See* DIP Credit Agreement, § 9.03(b) |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | <u>DIP Milestones</u>. <br><br> • within 30 days after the Petition Date, the Bankruptcy Court shall have, (i) approved the (A) bid procedures for the Sale (the "<u>Bid Procedures</u>") which shall be in form and substance reasonably acceptable to the Administrative Agent, and (B) the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases, and (ii) approved the scheduled auction and Sale hearing; <br><br> • the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be a date within 60 days after the Petition Date (the "<u>Bid Deadline</u>"); |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • so long as at least one qualified bid has been received (other than the "stalking horse" bidder under the Asset Purchase Agreement) the date for the auction for the Sale shall be a date within 5 Business Days after the Bid Deadline (the "Auction Date"); <br><br> • subject to the Bankruptcy Court's calendar and availability, within 10 days after the Auction Date (or if an auction is not necessary, within 10 days after the Bid Deadline), the Sale hearing (the "Sale Hearing") shall have occurred and the Bankruptcy Court shall have approved the Sale; and <br><br> • the Sale shall have been consummated within 5 Business Days after the Sale Hearing; provided, such timeframe shall be extended by up to (but no more than) 30 days to the extent antitrust regulatory filings or requirements are required to consummate the Sale and until such filing or requirements are satisfied. <br><br> *See* DIP Credit Agreement, Art. 1. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition Term Loan Lenders under the Prepetition Term Loan Documents <br><br> *See* Interim Order ¶ D(i) |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(f) | *See* Interim Order ¶ 2.3 |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) <br><br> Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | *See* Interim Order ¶ 2.1 |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br><br> Local Rule 4001-2(a)(i)(C) | Subject to the entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, their respective claims or interests, the Collateral and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Agent and Prepetition Term Loan Agent in their sole and absolute discretion, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, any DIP Lender, the Prepetition Term Loan Agent, or any Prepetition Term Loan Lender. <br><br> *See* Interim Order ¶ 9.3 |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(h) | Subject to entry of the Final Order, none of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, or the Prepetition Term Loan Lenders shall be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral or the Prepetition Collateral. The DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and (subject to entry of a Final Order) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, the Prepetition Term Loan |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Agent or Prepetition Term Loan Lenders with respect to proceeds, products, offspring or profits of any of the Collateral and/or Prepetition Collateral<br><br>*See* Interim Order ¶ 10.7 |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | <u>Debtors' Stipulations</u>.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Lenders' and Prepetition Term Loan Lenders' claims and liens.<br><br>*See* Interim Order ¶ D, E |
| **Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | *See* Interim Order ¶ 2.1.5 |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B) | Any action, claim or defense (hereinafter, an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, subordination, disgorgement, cure, reinstatement or claim of any kind: (a) the existence, validity, non-avoidability, priority or amount of the Prepetition Term Loan Obligations, or (b) the extent, legality, validity, priority, perfection, non-avoidability or enforceability of the Prepetition Term Loan Liens, shall be filed with the Court (x) if a Committee is appointed by the U.S. Trustee within twenty (20) days following the Petition Date, by such Committee (subject to establishing requisite standing), and no other party, within sixty (60) days from the date of appointment of the Committee by the U.S. Trustee, or (y) in the event no Committee is appointed within twenty (20) days following the Petition Date, by any party in interest with requisite standing within seventy-five (75) days from the date of entry of this Interim Order; provided, however, that the deadlines set forth in clauses (x) and (y) may be extended, in writing, by the Prepetition Term Loan Agent in its sole discretion.  If any such Objection is timely filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Prepetition Term Loan Obligations or the Prepetition Term Loan Liens in the Prepetition Collateral. If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the Prepetition Term Loan Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, avoidance, subordination, deduction, cure, reinstatement or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Term Loan Liens in favor of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in the Prepetition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject and subordinate to only the Carve Out, the Permitted Priority Liens, and the DIP Liens, and (b) the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and each of their agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Prepetition Term Loan Documents and shall not be subject to any further objection or challenge by any party at any time.<br><br>*See* Interim Order ¶ 9.1 |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | <u>Modification of Automatic Stay.</u>  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Agent, acting on behalf of itself and the DIP Lenders, to perform any act authorized or permitted under or by virtue of this Interim Order or the DIP Credit Documents, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Credit  Documents, and (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral.  In addition, and without limiting the foregoing, upon the occurrence and continuance of an Event of Default and after providing five (5) Business Days prior written notice to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee (the "***Enforcement Notice***"), the DIP Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Credit  Documents, or applicable law as the DIP Agent may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of Loan Party Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations.<br><br>*See* Interim Order ¶ 7.4 |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(D) | Grant of liens on the proceeds of avoidance actions.<br><br>*See* Interim Order ¶ 2.1 |

## **Background**

## I.    **Prepetition Capital Structure.**

16.    As of the Petition Date, the Debtors' prepetition capital structure includes approximately $460.6 million in outstanding debt, consisting of: (a) approximately $416.7 million in secured debt under the term loan facility (the "Prepetition Term Loan") and (b) approximately $43.9 million in secured debt under the asset-backed revolving credit facility (the "Prepetition ABL Facility").  The Prepetition Term Loan and the Prepetition ABL Facility are secured by liens on substantially all of the Debtors' assets.  The relative contractual rights and priorities of the lenders under the Prepetition Term Loan and Prepetition ABL Facility are governed by an

26132031.1

amended and restated intercreditor agreement, dated February 19, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), by and among the Prepetition Term Loan Agent (as defined below), the Prepetition ABL Agent (as defined below), and Bluestem Brands, Inc. ("BBI").

17.    The following table summarizes the Debtors' outstanding funded debt obligations as of the Petition Date.

| Funded Debt | Lenders | Maturity | Amount Outstanding |
|---|---|---|---|
| Prepetition ABL Facility $220 million | Syndicate of lenders with Cerberus Business Finance, LLC as administrative agent Association as administrative agent | July 10, 2020 | $43.9 million (exclusive of interest, fees, costs and expenses) |
| Prepetition Term Loan $580 million | Syndicate of lenders with Cerberus Business Finance, LLC as administrative agent | November 7, 2020 | $416.7 million (exclusive of fees, costs, and expenses) |
| Total Outstanding Funded Debt | | | $460.6 million |

**A.    Prepetition Term Loan.**

18.    On November 7, 2014, BBI and Northstar Holdings, Inc. ("Northstar") entered into a Term Loan Agreement (the "Initial Prepetition Term Loan"), with Cerberus Business Finance, LLC, as administrative agent and collateral agent (as successor in interest by assignment to Credit Suisse AG, Cayman Islands Branch, in such capacities and together with any successors thereto, as administrative agent, the "Prepetition Term Loan Agent"), and certain lenders (each, a "Prepetition Term Loan Lender"). All other Debtors (other than BFI and Bluestem Enterprises, Inc. ("BEI")), are guarantors under the Initial Prepetition Term Loan Agreement. Pursuant to the Initial Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders initially lent $300

million to the Debtors.  On July 10, 2015, BBI entered into an amendment to the Initial Prepetition

Term Loan Agreement pursuant to which the Prepetition Term Loan Lenders provided an

additional $280 million in borrowings, which was used, in part, to purchase the Orchard Portfolio

(the "Incremental Prepetition Term Loan" and, as amended, amended and restated, supplemented

or otherwise modified, refinanced or replaced prior to the Petition Date, the "Prepetition

Term Loan").  The Prepetition Term Loan matures in full on November 7, 2020.

19.    The Debtors' obligations under the Prepetition Term Loan Agreement are secured

by second priority liens granted to the Prepetition Term Loan Agent for its benefit and the benefit

of the Prepetition Term Loan Lenders on substantially all of the property of the applicable Debtors

(the "Prepetition Collateral").  Following an early retirement of $21.5 million of the Prepetition

Term Loan in fiscal year 2016, BBI is required to repay the outstanding principal balance of the

Prepetition Term Loan in quarterly installments of $7.5 million, with the balance due at maturity.

**B.    Prepetition ABL Facility.**

20.    On July, 10, 2015, the Debtors (other than Bluestem Fulfillment, Inc. and Bluestem

Enterprises, Inc.) and Northstar entered into an asset-backed line of credit (as amended, amended

and restated, supplemented, or otherwise modified, refinanced or replaced from time to time, the

"Prepetition ABL Facility") provided by a syndicate of lenders (each, a "Prepetition ABL Lender,"

and together with the Prepetition Term Loan Lenders, the "Prepetition Lenders").  Cerberus

Business Finance, LLC, is the administrative agent (the "Prepetition ABL Agent," and, together

with the Prepetition Term Loan Agent, the "Prepetition Agents").  Each Debtor except for BFI and

BEI is a borrower and Northstar Holdings, Inc. is a guarantor.  The Prepetition ABL Facility

currently has a total facility size of $125 million, subject to borrowing base availability, and a

maturity date of July 10, 2020.  The Debtors' obligations under the Prepetition ABL Agreement

are secured by first priority liens granted to the Prepetition ABL Agent, for its benefit and on behalf of the Prepetition ABL Lenders on the Prepetition Collateral.

21.     The Debtors' borrowing base calculation under the Prepetition ABL Facility is adjusted seasonally.  The percentage credited to eligible inventory in the borrowing base calculation is higher from October through December each year (the Debtors' high period) and lower during the remaining months of the year (the Debtors' low period).  The borrowing capacity is based on a borrowing base calculation of eligible inventory (including up to $20 million eligible in-transit inventory) and cash held in a collateral deposit account subject to a first lien in favor of the ABL Agent.  Moreover, the ABL requires payment of an unused commitment fee of 0.375% if the average utilization is less than 50%, and 0.25% if the average utilization is greater than or equal to 50%.

### C.     Letters of Credit.

22.     The Debtors are party to nine letters of credit with US Bank in an aggregate amount of approximately $11.2 million.  Additionally, the Debtors are party to twelve letters of credit with PNC in an aggregate amount of $5.6 million.  These letters of credit are cash collateralized at 105%.  Under the DIP Facility, these arrangements will continue in the ordinary course.  To the extent authority is required to do so, the Debtors seek approval to continue them in the ordinary course in connection with the Court's approval of the DIP Facility.

### II.     The Need to Use Cash Collateral and For Accesses to Financing.

23.     Without access to incremental liquidity to fund these chapter 11 cases, the Debtors will be unable to make inventory purchases and cover their operating expenses in the ordinary course of business, let alone fund the projected costs of these cases.  The Debtors need access to financing imminently to ensure their ongoing viability.  The Debtors' ability to continue funding

ongoing operations during these chapter 11 cases is essential to the preservation of the Debtors' assets and the Debtors' ability to consummate a going concern transaction that will maximize the value of those assets, whether through a sale or reorganization.

24.      The Debtors also believe that the DIP Facility and access to Cash Collateral will provide a clear, strong message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and the bankruptcy filing will not materially impact the Debtors' businesses operationally.

**III.    Alternative Sources of Financing Are Not Readily Available.**

25.      The Debtors do not have alternative sources of financing readily available with terms better than those included in the DIP Facility—or, for that matter, any alternatives at all.

26.      The Debtors and their advisors commenced an expedited marketing process to identify possible DIP financing alternatives.  The Debtors advisors contacted 15 parties that are in the business of extending post-petition financing under similar circumstances.  To date, none of these institutions has proposed competing financing facilities on any terms.  Moreover, none of these institutions are willing to lend on a junior or unsecured basis.

27.      In addition to the above parties, in early March 2020, the Debtors and their advisors contacted non-Debtor Bluestem Group Inc. ("BGI") to inquire into BGI's willingness to provide a DIP financing proposal.  As of the Petition Date, the Debtors have not received a DIP financing proposal from BGI—or any indication that BGI intends to make a DIP financing proposal.

**Basis for Relief**

IV.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Credit Documents.**

    A.    **Entry into the DIP Credit Documents Is an Exercise of the Debtors' Sound Business Judgment.**

28.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Credit Agreement, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

29.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under

the [Bankruptcy] Code").

30.    Furthermore, in considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003)

("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be

extreme or even unreasonable.  Certainly, many of them favor the DIP Lenders.  But, taken in

context, and considering the relative circumstances of the parties, the Court does not believe that

the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l*

*Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986)

(recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its

reorganization).  Courts may also appropriately take into consideration noneconomic benefits to a

debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks.*

*Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms.  *Relevant features of the*
> *financing must be evaluated, including non-economic elements such*
> *as the timing and certainty of closing, the impact on creditor*
> *constituencies and the likelihood of a successful reorganization.*
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan.  That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

26132031.1

31.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these Cases and provide sufficient runway to effectuate a going-concern transaction.  The Debtors negotiated the DIP Credit Agreement and other DIP Credit Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Documents, as it is a sound exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

32.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Credit Documents pursuant to section 364(c) of the Bankruptcy Code.  More specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the Collateral (as defined in the Interim Order), which include substantially all of the Debtors' assets.

33.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also In re Los Angeles Dodgers LLC*, 457 B.R. 312–13 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

34.    As described above and as set forth in the Burn Declaration, no party was willing to provide postpetition DIP financing on an unsecured or administrative priority basis.  Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided at least in part by, the Debtors' existing lenders.  As such, the Debtors, subject to Court approval, entered into the DIP Facility with the Prepetition Lenders, who were granted, among others, superpriority status and a senior lien on substantially all of the Debtors' assets.

35.    Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these Cases and effectuate a going-concern transaction, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

36.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court may do the following:

> authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

37.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the

debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38.     The Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals.   Substantially all of the Debtors' existing assets, including Cash Collateral, are encumbered under the Prepetition ABL Facility and Prepetition Term Loan.   Moreover, the Debtors have searched for actionable alternative proposals and, in this regard, the market has spoken.   There are no other better options.   Thus, the Debtors have determined that the DIP Facility provides the most favorable terms whereby the DIP Facility provided by the Prepetition Lenders offer the most efficient transaction costs while reducing execution risks and providing the incremental liquidity necessary to operate the business during the Cases on reasonable terms.   Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful reorganization of their business enterprise.   Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### D.     The Proposed "Roll-Up" of Prepetition Indebtedness Should Be Approved.

39.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.   It is well-settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Culp*, 545 B.R. 827, 844 (Bankr. D. Del. 2016) ("Transactions under section 363 must be based upon the sound business judgement of the [debtor in possession]"), *aff'd In re Culp*, 681 Fe. Appx. 140 (3d Cir. 2017); *In re Filene's Basement, LLC*, 2014 WL 1713416,

at \*12 (Bankr. D. Del. Apr. 29, 2014); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. De. 1991) (explaining that Third Circuit case law courts to the conclusion that the Third Circuit follows the "sound business purpose" rule, and applying such standing to the case). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

40.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar debtor in possession financing features on the first day of the case.  *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing an approximately $240 million DIP that included a roll-up of $70 million in prepetition term loans debt and up to $82 million of prepetition ABL debt pursuant to interim order); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP which included a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million which included a full ABL roll-up of $114 million pursuant to interim order); *In re Cenveo*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 6, 2018) (authorizing repayment of $50 million of outstanding revolving obligations and conversion of all remaining outstanding prepetition revolving obligations on an interim basis).[7]

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

41.     Moreover, "roll-ups" of prepetition debt have been approved in several recent retail cases in this and other jurisdictions.  *See In re Forever 21, Inc.*, No. 19-12122 (KG) (approving the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (authorizing a "creeping" roll up of prepetition ABL facility of $9.5 million pursuant to interim order and a final roll up of remaining amounts pursuant to final order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. Oct. 6, 2017) (approving on an interim basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Toys "R" Us. Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (approving use of debtor in possession financing to pay down or "roll-up" prepetition debt); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. D. Del. Oct. 6, 2017) (same); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aéropostale,*

*Inc.*, No. 16 11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

42.     As set forth above, the DIP Credit Agreement provides that, subject to entry of the Interim Order, the outstanding amount under the Prepetition ABL Facility will be fully paid down by the DIP Facility.  The repayment of the Prepetition ABL Facility is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP ABL Facility. Without continued access to an asset-based lending facility and the up to $80 million in additional liquidity provided under the DIP Facility necessary to fund the administration of these chapter 11 cases and the sale process, the Debtors' would not be able to continue to operate on a go forward basis.  Maintaining the ability to continue as a going concern on the other side of a deleveraging restructuring transaction is of immense benefit to all of the Debtors' stakeholders.

43.     The simple economic reality is that a peaceful, going-concern transition in to chapter 11 comes at a price, which in this case the Debtors believe to be eminently reasonable given the circumstances.  The Prepetition ABL Lenders were unlikely to continue to lend postpetition without some assurance regarding their prepetition claims.  Absent the Prepetition ABL Lenders' support under the DIP Facility, the Debtors' ability to ultimately exit as a going concern would be put in serious jeopardy.  In contrast, the roll-up of the Prepetition ABL Facility merely affects the timing, not the amount or certainty, of the Prepetition ABL Lenders' recovery— the secured claims arising under the Prepetition ABL Facility are required by section 1129 of the Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have).

44.     Given these circumstances, the roll-up of the existing Prepetition ABL Facility upon entry of the Interim Order is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interest of all stakeholders given the alternatives.

**V.     The Debtors Should Be Authorized to Use the Cash Collateral.**

45.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Term Loan Lenders consent to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral), subject to the terms and limitations set forth in the Interim Order.

46.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

47.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Term Loan Lenders with a variety of adequate protection to protect against the potential postpetition diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

    a.    valid and automatically perfected replacement liens and security interests in and upon the DIP Collateral;

    b.    superpriority administrative claims under section 507(b) of the Bankruptcy Code; and

    c.    certain fees and expenses.

48.     Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Term Loan Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral.  Moreover, the Prepetition Term Loan Lenders agree that the proposed Adequate Protection Obligations to be provided is appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of the Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## VI.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Credit Documents.

49.     Under the DIP Credit Agreement, the Debtors have agreed, subject to Court approval, to pay certain fees to each of the DIP Agent and DIP Lenders.  These fees are customary and reasonable under the circumstances.  Additionally, they are comparable to fees agreed upon in similar DIP financings.

50.     The Debtors submit there is ample justification for this Court to approve the payment of such fees.  The fees are part of the DIP Credit Agreement.  Thus, they should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility.

**VII.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

51.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

52.     As explained herein, the First Day Declaration, and the Burns Declaration, the DIP Credit Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors and the DIP Agent and DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Credit Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Credit Documents other than as described herein.

53.     Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded therein.

**VIII.    The Automatic Stay Should Be Modified on a Limited Basis.**

54.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow each of the DIP Agent and Prepetition Agents to file financing statements, security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens (as defined in the Interim Order) and the Adequate Protection Replacement Liens.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens, Adequate Protection Replacement Liens, Superpriority Claim (as defined in the Interim Order), and Adequate Protection Claim.  Finally, the proposed Interim Order provides that, five (5) business days after the date an Enforcement Notice is delivered, in connection with an Event of Default, the automatic stay is be vacated and modified to the extent necessary to permit each of the DIP Agent and the applicable DIP Lenders to exercise all rights and remedies in accordance with the DIP Credit Documents or the Interim Order.

55.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Cases.  *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re ATD Corp.*, No. 18-12221 (KJC)

(Bankr. D. Del. Oct. 26, 2018) (same); *In re Charming Charlie, LLC*, No. 17-12906 (CSS)

(Bankr. D. Del. Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG)

(Bankr. D. Del. Dec. 15, 2015) (same).

**IX.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

56.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

57.    For the reasons noted above and in the Burns Declaration, the Debtors have an immediate postpetition need to use Cash Collateral, including advances under the DIP Facility. The Debtors cannot maintain the value of their estates during the pendency of these Cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these Cases, the operation of their business, and the consummation of their sale process.  The Debtors believe that substantially all of their available cash constitutes the Prepetition Lenders' Cash Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these Cases without access to the Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

58.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final

Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

60.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

61.     The Debtors will provide notice of this motion to:  (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the Term Loan Agent; (e) counsel to Bluestem Group Inc.; (f) SCUSA and its counsel; (g) WebBank; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; (l) Debtors' taxing authorities; (m) all other parties asserting a lien or security interest in the Debtors' assets to the extent reasonably known to the Debtors; and (n) any party that requests service pursuant to Bankruptcy Rule 2002.  Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the

nature of the relief requested herein, the Debtors respectfully submit that no other or further notice

is required or necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,

(a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  March 9, 2020
Wilmington, Delaware

*/s/ Joseph M. Mulvihill*

M. Blake Cleary (DE Bar No. 3614)
Jaime Luton Chapman (DE Bar No. 4936)
Joseph M. Mulvihill (DE Bar No. 6061)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 652-4400
Email:           mbcleary@ycst.com
                      jchapman@ycst.com
                      jmulvihill@ycst.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Patrick J. Nash, P.C. (*pro hac vice* admission pending)
W. Benjamin Winger (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

26132031.1

## EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BLUESTEM BRANDS, INC., *et al.*,[1] | ) | Case No. 20-10566 (___) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **RE: Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION TERM LOAN LENDERS; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***"), dated March 9, 2020, of Bluestem Brands, Inc. ("***BBI***") and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (collectively, the "***Cases***"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), seeking, among other things:

(1)    authorization for the Debtors to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Bluestem Brands, Inc. (5164); Appleseed's Holdings, Inc. (9117); Blair LLC (1670); Bluestem Enterprises, Inc. (1237); Bluestem Fulfillment, Inc. (5931)]; Bluestem Sales, Inc. (1539); Draper's & Damon's LLC (2759); Gold Violin LLC (0873); Haband Company LLC (8496); Home Forever LLC (2324); Johnny Appleseed's, Inc. (5560); Norm Thompson Outfitters LLC (8344); Northstar Holdings Inc. (6823); Orchard Brands Corporation (6322); Orchard Brands International, Inc. (8962); Orchard Brands Sales Agency, LLC (8855); Value Showcase LLC (2920); WinterSilks, LLC (0688).  The service address for each of the above Debtors is 7075 Flying Cloud Drive, Eden Prairie, Minnesota 55344.

date of the Final Hearing (as defined below) from Cerberus Business Finance, LLC, in its capacities as administrative agent and collateral agent (the "*DIP Agent*") for itself and the DIP Lenders (as defined below) and the DIP Lenders in accordance with all of the lending formulae, sublimits, terms and conditions set forth in the DIP Credit Agreement (as defined below), and in accordance with this Order, secured by security interests in and liens upon all of the Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

(2)     authorization for the Debtors to enter into, be bound by, and perform under the debtor-in-possession credit facility (the "*DIP Facility*"), entitled "Senior Secured, Superpriority Debtor-in-Possession Credit Agreement", dated as of March [8], 2020, by and among the Debtors, the DIP Agent, and the lenders from time to time party thereto (the "*DIP Lenders*") which agreement is attached to the Motion as <u>Exhibit B</u> (as it may be modified, supplemented, amended or restated from time to time, the "*DIP Credit Agreement*", and together with the other Loan Documents, as defined in the DIP Credit Agreement, the "*DIP Loan Documents*");

(3)     modification of the automatic stay to the extent hereinafter set forth;

(4)     the grant to the DIP Agent, for its benefit and the benefit of the DIP Lenders, of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Credit Agreement and DIP Loan Documents (the "*DIP Obligations*");

(5)     authorization for the Debtors to use the Collateral (including Cash Collateral (as defined below), in accordance with the Budget (as defined below) (subject to permitted variances) and subject to the terms, restrictions, and other conditions of the DIP Credit Agreement, that is subject to the existing liens and security interests in favor of the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Lenders (as each of those terms is defined below), and granting adequate protection to these parties as set forth herein;

(6)     authorization for the Debtors to use the proceeds of the Loans (as defined in the DIP Credit Agreement, the "*DIP Loans*"), subject to the terms, restrictions, and

26132032.1

other conditions of the DIP Credit Agreement, to (a) repay the outstanding Prepetition ABL Obligations (as defined below), (b) pay fees and expenses related to the DIP Credit Agreement and the Cases, and (c) fund working capital in the ordinary course of business of the Debtors (and out of the ordinary course as approved by the DIP Agent and this Court or as otherwise consistent with the Budget (subject to permitted variances), and for other general corporate purposes, in each case subject to the terms, restrictions, and other conditions of the DIP Credit Agreement); and

(7)    the setting of a final hearing on the Motion; and

The initial hearing on the Motion having been held by this Court on March [•], 2020 (the "***Interim Hearing***"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "***Notice***") was served by the Debtors in accordance with Bankruptcy Rule 4001(c) and Local Rule 4001-2 on (i) the Prepetition ABL Agent (as defined below), (ii) counsel to the Prepetition ABL Agent, (iii) the Prepetition ABL Lenders (as defined below), (iv) the DIP Agent, (v) counsel to the DIP Agent, (vi) the DIP Lenders, (vii) the Prepetition Term Loan Agent (as defined below), (viii) counsel to the Prepetition Term Loan Agent, (ix) the Prepetition Term Loan Lenders (as defined below), (x) the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"), (xi) the holders of the thirty (30) largest unsecured claims against the Debtors' Estates (on a consolidated basis) (the "***30 Largest Unsecured Creditors***"), (xii) the United States Attorney's Office for the District of Delaware, (xiii) the Internal Revenue Service, (xiv) the Securities and Exchange Commission, (xv) the office of the attorneys general for the states in which the Debtors operate, and (xvi) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Noticed Parties***"); and

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of Thomas L. Fairfield in Support of Chapter 11 Petitions and First Day Motions* [Docket No. [●]] (the "***First Day Declaration***") and the *Declaration of David E. Burns in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens*

26132032.1

3

*and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. [●]] (the "***Burns Declaration***"), the other filings and pleadings made by the Debtors, the evidence and testimony presented at the Interim Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.      <u>Petition</u>.  On March [8], 2020 (the "***Petition Date***"), each Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue in this Court over the Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Notice</u>.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and Local Rule 4001-2.

D.      <u>Findings Regarding the Prepetition Term Loan Lenders, the Prepetition Collateral and the Prepetition Term Loan Obligations</u>.  Without prejudice to the rights of any other non-Debtor party in interest as provided in Section 9.1 of this Order, the Debtors admit, stipulate, acknowledge and agree that:

(i)      *Prepetition Term Loan Agreement*: As of the Petition Date, BBI, the other "Loan Parties" identified in the Prepetition Term Loan Agreement (as defined below) (collectively, with BBI, the "***Prepetition Term Loan Debtor Obligors***"), the financial institutions parties thereto from time to time as lenders (the "***Prepetition Term Loan Lenders***"), and Cerberus

Business Finance, LLC, as administrative agent and collateral agent (as successor in interest by assignment to Credit Suisse AG, Cayman Islands Branch, in such capacities and together with any successors thereto, the "***Prepetition Term Loan Agent***") are parties to that certain Term Loan Agreement dated as of November 7, 2014 (as amended, amended and restated, supplemented or otherwise modified, refinanced or replaced prior to the Petition Date, including, without limitation by that certain First Amendment and Incremental Agreement, dated as of July 10, 2015 and that certain Amendment to Credit Agreement, dated as of January 3, 2020, and that certain Third Amendment to Term Loan Agreement, dated as of February 19, 2020, the "***Prepetition Term Loan Agreement***" and together with the other Loan Documents (as defined in the Prepetition Term Loan Agreement), in each case as amended, amended and restated, supplemented or otherwise modified, refinanced or replaced prior to the Petition Date, collectively, the "***Prepetition Term Loan Documents***").  The Prepetition Term Loan Documents provide that (a) the Prepetition Term Loan Debtor Obligors are obligated for principal, accrued and unpaid interest, fees, costs, expenses, indemnities, and other amounts arising under, or reimbursable pursuant to, the Prepetition Term Loan Documents (the "***Prepetition Term Loan Obligations***"), and (b) all of the Prepetition Term Loan Obligations are secured by second priority liens granted to the Prepetition Term Loan Agent for its benefit and the benefit of the Prepetition Term Loan Lenders (the "***Prepetition Term Loan Liens***") on substantially all of the property of the Prepetition Term Loan Debtor Obligors, as described and defined in the Prepetition Term Loan Documents (the "***Prepetition Collateral***"), which includes cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("***Cash Collateral***").

(ii)        *Prepetition Term Loan Obligations and the Prepetition Term Loan Liens*: As of the Petition Date, the outstanding Prepetition Term Loan Obligations totaled no less than $[416,652,903.88], inclusive of principal and all accrued and unpaid interest, exclusive of costs, expenses, and fees owed to the Prepetition Term Loan Agent and Prepetition Term Loan Lenders.  The Debtors further acknowledge, agree and stipulate that (a) the Prepetition Term Loan Liens (1) are valid, binding, enforceable and perfected liens in the Prepetition Collateral, (2) were

granted to the Prepetition Term Loan Agent for its benefit and for the benefit of the Prepetition Term Loan Lenders for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) are subject and subordinate only to valid, perfected and unavoidable liens permitted under the applicable Prepetition Term Loan Documents (including the Prepetition ABL Liens but only until repayment in full of the Prepetition ABL Obligations), but only to the extent that (x) such liens are permitted by the applicable  Prepetition Term Loan Documents to be senior to the applicable Prepetition Term Loan Liens and (y) such liens are actually senior to the applicable Prepetition Term Loan Liens under applicable law, and (b)(1) all of the Prepetition Term Loan Obligations constitute legal, valid and binding obligations of the Prepetition Term Loan Debtor Obligors, enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents, (2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition Term Loan Obligations exist, and (3) no portion of the Prepetition Term Loan Obligations or any payments made to or for the benefit of the Prepetition Term Loan Agent or any of the Prepetition Term Loan Lenders are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    *Proof of Claim*.  The foregoing acknowledgment by Debtors of the Prepetition Term Loan Obligations and the rights, priorities and protections granted to the Prepetition Term Loan Agent for its benefit and the benefit of the Prepetition Term Loan Lenders pursuant to the Prepetition Term Loan Documents shall be deemed a timely filed proof of claim on behalf of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in these Cases and neither the Prepetition Term Loan Agent nor the Prepetition Term Loan Lenders shall be required to file any additional proofs of claim with respect to the Prepetition Term Loan Obligations.

E.     Findings Regarding the Debtors' Other Prepetition Secured Debt.

(i)     *Prepetition ABL Agreement*:   As of the Petition Date, the "Loan Parties" identified in the Prepetition ABL Agreement (as defined below) (collectively, the "***Prepetition ABL Debtor Obligors***") as borrowers, the financial institutions parties thereto from time to time as lenders (the "***Prepetition ABL Lenders***"), and Cerberus Business Finance, LLC, as administrative agent and collateral agent (as successor in interest by assignment to U.S. Bank National Association, in such capacities, including any successor agent(s), the "***Prepetition ABL Agent***") were parties to that certain Third Amended and Restated Credit Agreement, dated as of July 10, 2015 (as amended, amended and restated, supplemented or otherwise modified, refinanced or replaced prior to the Petition Date, including pursuant to that certain Amendment No. 1 to Third Amended and Restated Credit Agreement, dated as of October 5, 2018, that certain Amendment No. 2 to Third Amended and Restated Credit Agreement, dated as of February 19, 2020, and that certain Amendment No. 3 to Third Amended and Restated Credit Agreement, dated as of February 19, 2020, the "***Prepetition ABL Agreement***" and together with the other Loan Documents (as defined in the Prepetition ABL Agreement), in each case as amended, amended and restated, supplemented or otherwise modified, refinanced or replaced prior to the Petition Date, collectively, the "***Prepetition ABL Loan Documents***").  The Prepetition ABL Loan Documents provided that (a) the Prepetition ABL Debtor Obligors were obligated for principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Prepetition ABL Agreement (collectively the "***Prepetition ABL Obligations***"); and (b) all of the Prepetition ABL Obligations were secured by first priority liens granted to the Prepetition ABL Agent, for its benefit and on behalf of the Prepetition ABL Lenders (the "***Prepetition ABL Liens***"), on the Prepetition Collateral, as more fully described in the Prepetition ABL Loan Documents.

(ii)     *Prepetition ABL Obligations and the Prepetition ABL Liens*: As of the Petition Date, the outstanding Prepetition ABL Obligations totaled no less than $[43,858,678.62], exclusive of all accrued and unpaid interest, costs, expenses, and fees owed to the Prepetition ABL Agent and Prepetition ABL Lenders.  The Debtors further acknowledge, agree

26132032.1

7

and stipulate that (a) the Prepetition ABL Liens (1) are valid, binding, enforceable and perfected liens in the Prepetition Collateral, (2) were granted to the Prepetition ABL Agent for its benefit and the benefit of the Prepetition ABL Lenders for fair consideration and reasonably equivalent value, (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) are subject and subordinate only to valid, perfected and unavoidable liens permitted under the applicable Prepetition ABL Loan Documents, but only to the extent that (x) such liens are permitted by the applicable Prepetition ABL Loan Documents to be senior to the applicable Prepetition ABL Liens and (y) such liens are actually senior to the applicable Prepetition ABL Liens under applicable law, and (b)(1) all of the Prepetition ABL Obligations constitute legal, valid and binding obligations of the Prepetition ABL Debtor Obligors, enforceable in accordance with the terms of the applicable Prepetition ABL Loan Documents, (2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition ABL Obligations exist, and (3) no portion of the Prepetition ABL Obligations or any payments made to or for the benefit of the Prepetition ABL Agent or any of the Prepetition ABL Lenders are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  As set forth below, in accordance with the DIP Credit Agreement and this Order, the Debtors are authorized to use proceeds of the DIP Loans made during the Availability Period (as defined in the DIP Credit Agreement), *inter alia*, to repay the outstanding Prepetition ABL Obligations in full.

        (iii)    *Proof of Claim*.  The foregoing acknowledgment by Debtors of the Prepetition ABL Obligations and the rights, priorities and protections granted to the Prepetition ABL Agent for its benefit and the benefit of the Prepetition ABL Lenders pursuant to the Prepetition ABL Loan Documents shall be deemed a timely filed proof of claim on behalf of the Prepetition ABL Agent and the Prepetition ABL Lenders in these Cases and neither the Prepetition ABL Agent nor the Prepetition ABL Lenders shall be required to file any additional proofs of claim with respect to the Prepetition ABL Obligations.

26132032.1

8

F.    Findings Regarding the Post-Petition Financing.

(i)    *Post-Petition Financing*.  The Debtors have requested from the DIP Agent and the DIP Lenders, and the DIP Agent and the DIP Lenders are willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth in this Order and the DIP Loan Documents.

(ii)    *Need for Post-Petition Financing*.  The Debtors do not have sufficient available sources of working capital, including cash collateral, to continue to operate their businesses without the financing requested under the Motion.  As of the Petition Date, the Debtors continue to operate their businesses and are actively marketing their assets for sale.  The Debtors have filed these cases with a proposed purchaser of substantially all of their assets, subject to receipt of a higher or otherwise better bid, and need financing to administer the Cases.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Agent and DIP Lenders as set forth in this Order and the DIP Loan Documents is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "***Estates***") through a going-concern transaction.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, continue their ordinary-course business operations pending the proposed sale and preserve and maximize the value of the assets of their Estates.

(iii)    *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code.  The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement.

26132032.1

(iv)     *Budget*.  The Debtors have prepared and delivered to the DIP Agent and the DIP Lenders an initial thirteen-week budget, a copy of which is attached hereto as **Exhibit 1** (the "Initial DIP Budget").  The Initial DIP Budget has been approved by the DIP Agent and the required DIP Lenders pursuant to the terms of the DIP Credit Agreement and constitutes an "Approved Budget" under the terms of and as defined in the DIP Credit Agreement.  The Initial DIP Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, projections for the periods covered thereby.  The DIP Agent and the DIP Lenders are relying upon the Debtors' compliance with the Budget in accordance with the terms of the DIP Credit Agreement, the other DIP Loan Documents and this Order in determining to enter into the post-petition financing arrangements provided for herein.

(v)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms of the DIP Loan Documents and this Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Loan Documents and this Order have been negotiated in good faith and at arms' length by and among the Debtors, on the one hand, and the DIP Agent, the DIP Lenders, the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent, on the other hand, with all parties being represented by counsel.  Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the DIP Agent and the DIP Lenders as that term is used in section 364(e) of the Bankruptcy Code.

(vi)     *Good Cause*.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interests of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

26132032.1

(vii)    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn or resolved) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.    <u>Authorization and Conditions to Financing</u>.

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.  This Order shall hereinafter be referred to as the "***Interim Order***."

1.2    <u>Authorization to Borrow and Use Loan Proceeds</u>.  The Debtors are hereby authorized to enter into, be bound by, and perform under the DIP Facility and all DIP Loan Documents and to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount of Term Loans (as defined in the DIP Credit Agreement) not to exceed $25 million and an aggregate amount of Revolving Loans (as defined in the DIP Credit Agreement) not to exceed $49 million during the Availability Period, provided that disbursements of such amount are in accordance with the Initial DIP Budget or any subsequent Approved Budget (any such budget, whether the Initial DIP Budget or a subsequent Approved Budget, to the extent currently in force, the "<u>Budget</u>") (subject to permitted variances) and comply with the terms, restrictions, and other conditions of the DIP Credit Agreement, the DIP Loan Documents and this Interim Order.  Upon the entry of this Interim Order, the Debtors shall be authorized to use the Collateral, including Cash Collateral, and to draw on the DIP Facility to make any disbursement as provided in the Budget (subject to the permitted variances) and permitted under the terms, restrictions, and other conditions of the DIP Credit Agreement, but solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  The Prepetition ABL Debtor Obligors

26132032.1

are hereby authorized and directed to pay, immediately upon the Closing Date (as defined in the DIP Credit Agreement), the Prepetition ABL Obligations in full in cash with proceeds of the DIP Loans made during the Availability Period, to the Prepetition ABL Agent, on its behalf and on behalf of the Prepetition ABL Lenders, upon which payment the Prepetition ABL Debtor Obligors shall receive a full and final release of all Prepetition ABL Liens and Prepetition ABL Obligations.

    1.3    <u>DIP Loan Documents</u>

    1.3.1    <u>Approval</u>.  The DIP Loan Documents and each term, condition and covenant set forth therein are approved.  All of such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors, the DIP Agent and the DIP Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Credit Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and such fees and expenses, including, without limitation, all of the DIP Agent's and the DIP Lenders' consultant fees, professional fees, (including attorney fees and expenses) as more fully set forth in the DIP Loan Documents.

    1.3.2    <u>Amendment</u>.  Subject to the terms and conditions of the DIP Credit Agreement and the other DIP Loan Documents, the Debtors, the DIP Agent and the DIP Lenders may amend, modify, supplement or waive any provision of the DIP Loan Documents (an "***Amendment***") without further approval or order of the Court.

Section 2.    <u>Liens; Superpriority Administrative Claim Status</u>.

    2.1    <u>Priority and Liens</u>.

    2.1.1    <u>Lien Grant</u>.  To secure the prompt payment and performance of any and all Obligations (as defined in the DIP Credit Agreement) of the Debtors to the DIP Agent and the DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the other DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority security

26132032.1

interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have (but subject and subordinate to the Carve Out (as defined below) and the Permitted Priority Liens (as defined in the DIP Credit Agreement) in and upon all of the Collateral (collectively, the "***DIP Liens***") (which DIP Liens are subordinate to the Carve Out). Notwithstanding the foregoing or anything to the contrary contained in the DIP Credit Agreement, the grant to the DIP Agent and the DIP Lenders of liens on and security interests in proceeds of Avoidance Actions (as hereinafter defined) to secure the payment and performance of all DIP Obligations in accordance with the DIP Loan Documents shall be subject to the entry of an order, acceptable in form and substance to the DIP Agent and the Debtors, approving the Motion and granting the relief sought therein (including such relief identified herein as being subject to entry of a final order) on a final basis (the "***Final Order***" and together with this Interim Order, the "***Financing Orders***") granting such relief.

            2.1.2  <u>Collateral</u>.    For purposes of this Interim Order, the term "***Collateral***" shall have the meaning ascribed to such term in the DIP Credit Agreement, which term includes the following: all of the existing and after-acquired real and personal, tangible and intangible, property and assets of the Debtors, including, but not limited to, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, payment intangibles, and all other property or "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, investment property, supporting obligations, letter of credit rights, licenses, operating certificates, permits, causes of action (excluding causes of action, claims, objections and defenses arising under or deriving from sections 506(d), 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, or any similar state or federal law ("***Avoidance Actions***") but including the proceeds of such Avoidance Actions) and all rents, products, substitutions, accessions, and proceeds of all of the foregoing, wherever located, including insurance proceeds, noncash proceeds or any other

26132032.1

proceeds of the foregoing (collectively, the "**Collateral**"); provided, however, that, the Collateral shall not include any (i) Avoidance Actions, (ii) any agreements, permits, licenses, or the like solely in the event and to the extent that a grant of a DIP Lien on such license, contract, or agreement results in a termination of any such license, contract, or agreement or would render such license, contract or agreement non-assumable or non-assignable under the Bankruptcy Code (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, or 9-408 of the Uniform Commercial Code (or any successor provision or provisions)) and, in any event, immediately upon the ineffectiveness, lapse or termination of any such terms or default under such license, contract or agreement, the Collateral shall include, and the applicable Debtor shall be deemed to have granted a security interest in, all such licenses, contracts, or agreements as if such terms had never been in effect, or (iii) any other Excluded Assets (as defined in the DIP Credit Agreement); provided, however, that the Collateral shall include any and all proceeds of any of such property and assets described in the foregoing clauses (i) through (iii) (except to the extent such proceeds themselves constitute Excluded Assets); provided, further, that, any agreement, permit, license, or the like not constituting Collateral under this clause shall constitute Collateral from and after such time as the lessor, licensor, grantor or other party to such agreement, permit, license, or the like consents to the grant of a DIP Lien in favor of the DIP Agent in such agreement, permit, license, or the like or the prohibition against granting a Lien therein in favor of Administrative Agent shall cease to be effective.   Notwithstanding the foregoing or anything to the contrary contained in the DIP Loan Documents, the attachment of the DIP Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order.

2.1.3   Lien Priority.  The DIP Liens shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with section 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Liens shall be subject and subordinate to the Carve Out and to the Permitted Priority Liens.  The DIP Liens and the

Superpriority Claim (as defined below) (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, (subject to entry of the Final Order) the "equities of the case" exception of section 552 of the Bankruptcy Code, or (subject to Section 9.3 of this Interim Order) section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise and (y) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases or any Successor Case.

2.1.4    Enforceable Obligations.    The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or based on any Avoidance Actions), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

2.1.5    Post-Petition Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien (each, a "**Perfection Act**").

26132032.1

Notwithstanding the foregoing, if the DIP Agent shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Agent, which act or acts shall be deemed to have been accomplished as of the Petition Date, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law.  The DIP Agent, on behalf of the DIP Lenders, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.  For the avoidance of doubt, the existing Control Agreements (as defined in the DIP Loan Agreement) and the Existing Freight Forward Agreements (as defined in the DIP Loan Agreements), in each case, shall be considered "DIP Loan Documents" and Perfection Acts for all purposes hereunder and thereunder.

2.2     Superpriority Administrative Expense.  For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 or any other provision of the Bankruptcy Code,

whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "***Superpriority Claim***"); <u>provided</u>, <u>however</u>, that the Superpriority Claim shall be subject and subordinate only to the Carve Out.  The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, subject and subordinate only to the Carve Out.  Other than as expressly provided in the DIP Credit Agreement and this Interim Order with respect to the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Agent or DIP Lenders arising hereunder.

> 2.3    <u>Carve Out</u>.

> 2.3.1    As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a  Trigger Notice (as defined below), whether allowed by the Court

26132032.1

prior to or after delivery of a Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent of the Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post- Trigger Notice Cap").[2]  For purposes of the foregoing, "Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Loan Documents stating that the Post- Trigger Notice Cap has been invoked.

        2.3.2    Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, *that* within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement

---

[2]    Notwithstanding the foregoing, up to $500,000 of the Post- Trigger Notice Cap may be used to pay Allowed Professional Fees of Professional Persons incurred prior to the delivery of a Trigger Notice to the extent such Allowed Professional Fees exceed the ABL Professional Fee Cap (as defined below).

within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the DIP Credit Agreement, the "Budget") for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 2.3.3 below. Solely as it relates to the DIP Agent, any deemed draw and borrowing pursuant to paragraph 2.3.3 (i)(x) for amounts under paragraph 2.3.1 (iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "ABL Professional Fee Cap"). For the avoidance of doubt, the DIP Agent and DIP Lenders shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post- Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph 2.3.1(i) and 2.3.1 (ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the

most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "Budgeted Cushion Amount"). Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to the DIP Agent and DIP Lenders a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the DIP Agent and DIP Lenders shall be entitled to rely upon such reports in accordance with the DIP Credit Agreement.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the DIP Agent and DIP Lenders shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

2.3.3    Reserves.  On the day on which a  Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the  Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Credit Agreement in an amount equal to the sum of (x) the amounts set forth in paragraphs 2.3.1(i) and 2.3.1(ii) above, and (y) the then unpaid amounts of the Allowed Professional Fees up to the ABL Professional Fee  Cap (any such amounts actually advanced shall constitute DIP Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs 2.3.1(i), 2.3.1(ii), and then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP ABL Loans and DIP Term Loans pursuant to the foregoing of this sentence of this paragraph 2.3.3).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre- Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the  Trigger Notice shall also be deemed a request by the Debtors for DIP Loans under the DIP Credit Agreement in an amount equal to the Post  Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available

26132032.1

cash thereafter held by any Debtor, after funding the Pre- Trigger Notice Reserve, to fund a reserve in an amount equal to the Post- Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Loans pursuant to the foregoing of this sentence of this paragraph 2.3.3).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post- Trigger Notice Cap (the "Post- Trigger Notice Reserve" and, together with the Pre- Trigger Notice Reserve, the "Reserves") prior to any and all other claims.  On the first business day following the Termination Declaration Date and the deemed requests for the making of DIP Loans as provided in this paragraph 2.3.3, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to (1) the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for the making of any DIP Loan under the DIP Credit Agreement, (3) any termination of the Commitments following an Event of Default, or (4) the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment shall make available to the DIP Agent such DIP Lender's pro rata share of such DIP Loans.

2.3.4    Application of Reserves.

i    All funds in the Pre- Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses 2.3.1(i) through 2.3.1(iii) of the definition of  set forth above (the "Pre- Amounts"), but not, for the avoidance of doubt, the Post- Trigger Notice Cap, until paid in full.  If the Pre- Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP Agent on account of the applicable DIP Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and *thereafter* to the Prepetition Term Loan Lenders in accordance with their rights and priorities as of the Petition Date.

ii    All funds in the Post- Trigger Notice Reserve (other than up to $500,000, which may be used to pay Pre- Amounts to the extent they exceed the ABL Professional Fee Cap) shall be used first to pay the obligations set forth in clause (iv) of the definition of set forth above (the "Post-Amounts").  If the Post- Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP Agent on account of the applicable DIP Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and *thereafter* to the Prepetition Term Loan Lenders in accordance with their rights and priorities as of the Petition Date.

iii    Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Reserves is not funded in full in the amounts set forth in this paragraph 2.3.4(iii), then, any excess funds in one of the Reserves following the payment of the Pre- Amounts and Post- Amounts, respectively, shall be used to fund the other Reserve to the extent of any shortfall in funding prior to making any payments to the DIP Agent or the Prepetition Term Loan Lenders, as applicable.

iv    Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Trigger Notice, the DIP Agent and the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Reserves have been fully funded, but shall have a security interest in any residual interest in the Reserves, with any excess paid as provided in paragraphs (i), (ii), and (iii) above.

v    Notwithstanding anything to the contrary in this Interim Order, (A) the failure of the Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the with respect to any shortfall (as described below), and (B) subject to the limitations with respect to the DIP Agent, DIP Lenders, Prepetition Term Loan Agent, and Prepetition Term Loan Lenders set forth in paragraph (b), above, in no way shall any Budget, Post- Trigger Notice

26132032.1

Cap, or  Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Oder, or in the DIP Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Credit Agreement, the Adequate Protection Liens, and the Adequate Protection Claim, the Superpriority Claim, and any and all other forms of adequate protections, liens, or claims securing the DIP Obligations or the Prepetition Term Loan Obligations.

      2.3.5    No Direct Obligation to Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the Prepetition Term Loan Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Term Loan Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

      2.3.6    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

      2.3.7    Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

26132032.1

2.4     Use of Cash Collateral; Adequate Protection.

2.4.1     Authorization to Use Cash Collateral.    Subject to the terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Loan Documents, the Debtors shall be and are hereby authorized to use, in accordance with the Budget (subject to permitted variances) and the terms, restrictions, and other conditions of the DIP Credit Agreement, Cash Collateral subject to the Prepetition Term Loan Liens to fund (a) working capital, (b) general corporate purposes, (c) the repayment in full of the Prepetition ABL Obligations, (d) the payment of fees and expenses related to the DIP Credit Agreement and other DIP Loan Documents, (e) restructuring expenses, and (f) professional fees, in each case pursuant to the Budget (subject to permitted variances as set forth in the DIP Loan Documents).  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business (except with respect to the authorization herein to use the proceeds of the DIP Loans made during the Availability Period to repay the outstanding Prepetition ABL Obligations), or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Credit Agreement, the other DIP Loan Documents, or the Budget. In accordance with the provisions of the DIP Credit Agreement (and without limiting the Debtors' obligations thereunder), the Debtors shall timely deliver to the DIP Agent updated cash flow forecasts, Variance Reports (as defined in the DIP Credit Agreement), and CRO certificates described in Sections 5.01(a)(i) and 5.01(a)(ii) of the DIP Credit Agreement and comply with all other reporting covenants described in Section 5.01 of the DIP Credit Agreement and its subsections.

2.4.2     Prepetition Adequate Protection.

a.     *Adequate Protection Replacement Liens.*    As adequate protection for the diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of such Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, the incurrence of the DIP Obligations, and the subordination to the Carve Out, the Prepetition Term Loan Agent, for

its benefit and the benefit of the Prepetition Term Loan Lenders, in respect of the Prepetition Term Loan Obligations, is hereby granted, solely to the extent of any such diminution in value and pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "*Adequate Protection Replacement Liens*"); provided, however, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the Prepetition Term Loan Agent shall be granted an Adequate Protection Replacement Lien only on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests.   The Adequate Protection Replacement Liens shall be junior and subordinate only to (i) the Carve Out, (ii) the Permitted Priority Liens, (iii) the DIP Liens, and (iv) any other liens permitted to be senior to the DIP Liens by the DIP Loan Documents. The Adequate Protection Replacement Liens and the Adequate Protection Claim (as defined below) (A) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, (subject to entry of a Final Order) the "equities of the case" exception of section 552 of the Bankruptcy Code or, subject to Section 9.3 or this Interim Order, (subject to entry of a Final Order) section 506(c) of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be continuing, binding, valid, perfected, unavoidable, and enforceable against any trustee or any other estate representative appointed or elected in the Cases or any Successor Case, and/or upon the dismissal of any of the Cases or any Successor Case.  Notwithstanding any of the foregoing, the attachment of the Adequate Protection Replacement Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order.

       b.     *Pre-Petition Section 507(b) Priority Claim*.  To the extent that the Adequate Protection Replacement Liens are insufficient protection against the

diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) on account of the Debtors' use of such Prepetition Collateral (including Cash Collateral), the incurrence of the DIP Obligations, the imposition of the automatic stay, and the subordination to the Carve Out, the Prepetition Term Loan Agent, for its benefit and the benefit of the Prepetition Term Loan Lenders, in respect of the Prepetition Term Loan Obligations, is hereby granted, solely to the extent of any such diminution of value and pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases with priority over all administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 and any other provision of the Bankruptcy Code (the "***Adequate Protection Claim***"); provided, however, that the Adequate Protection Claim shall be junior and subordinate only to (i) the Carve Out, (ii) the right of payment of the DIP Obligations owing to the DIP Lenders, and (iii) the Superpriority Claim granted in favor of DIP Agent, for its benefit and the benefit of the DIP Lenders, pursuant to this Interim Order.  The Adequate Protection Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, including Avoidance Actions, subject and subordinate only to (i) the Carve Out, (ii) the right of payment of the DIP Obligations owing to the DIP Agent and DIP Lenders, and (iii) the Superpriority Claim granted in favor of DIP Agent, for its benefit and the benefit of the DIP Lenders, pursuant to this Interim Order.

26132032.1

c.      *Payment of Fees, Costs and Expenses*:  The Debtors shall pay, no later than ten (10) days following receipt by the Debtors of any invoice (which may be provided in summary fashion or redacted to protect privilege) therefore, with a copy to the Committee (or the 30 Largest Creditors if no Committee has been appointed) and United States Trustee: the reasonable and documented fees and out-of-pocket expenses for the professionals advising the DIP Agent and Prepetition Term Loan Agent, including KTBS Law LLP and Pachulski Stang Ziehl & Jones LLP, and any other advisors to the DIP Agent and the Prepetition Term Loan Agent; provided, however, that no payment shall be made by the Debtors if an objection is made by the Debtors, the Committee, or the United States Trustee within such ten (10) day period (except to the extent such fees and expenses are not subject to the objection) unless consensually resolved by the affected professional and objecting party or approved by the Court.  The fees and expenses paid hereunder shall not otherwise be subject to separate approval by the Court or to the United States Trustee Guidelines.

d.      *Payment of Post-Petition Interest*.  To the extent it is later determined by an order of the Court that the Prepetition Term Loan Obligations were oversecured, accrual of interest on all of the outstanding Prepetition Term Loan Obligations at the default rate from and after the Petition Date

e.      *Reservation of Rights*.  Notwithstanding any other provision hereof, the grant of adequate protection pursuant to the terms of this Interim Order is without prejudice to the right of the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors, the Committee, or any other party in interest to contest any such modification.

26132032.1

Section 3.    <u>Authorization to Pay Professional Fees of DIP Agent and DIP Lenders</u>.

       3.1    Any and all fees paid or required to be paid in connection with the DIP Loan Documents (including, but not limited to, the fees and expenses of the DIP Agent and the DIP Lenders) are hereby authorized and shall be paid as set forth in the DIP Credit Agreement and Section 2.4.2.d, above.

Section 4.    <u>Sale Process</u>.

       4.1    <u>Sale Process</u>.  The Debtors have indicated that they intend to conduct a process to sell (the "**Sale**") substantially all of their assets (the "***Acquired Assets***").  Subject to the entry of the Final Order, the Debtors are authorized and directed to immediately and indefeasibly distribute directly (or cause any purchaser of the Acquired Assets to immediately and indefeasibly distribute directly) to the DIP Agent for its benefit and the benefit of the DIP Lenders, and the Prepetition Term Loan Agent for its benefit and the benefit of the Prepetition Term Loan Lenders, as the case may be, the proceeds from the Sale of the Acquired Assets, up to the amount of the DIP Obligations and Prepetition Term Loan Obligations, respectively, outstanding as of the closing of the Sale, including, but not limited to, principal, accrued and unpaid interest, and all outstanding fees and expenses (except to the extent such Prepetition Term Loan Obligations are credit bid as part of a purchase of the Acquired Assets as authorized, subject to entry of the Final Order, by Section 4.3 below).

       4.2    <u>Sale Milestones</u>.  As a condition to funding under the DIP Facility, the Debtors shall achieve the following timeline milestones (the "***Sale Milestone***s") in connection with the Sale of the Acquired Assets:

       a.    entry, no later than 30 days after the Petition Date, of an order of the Court, reasonably satisfactory to the DIP Agent, the Prepetition Term Loan Agent and the Required Lenders as defined in the Prepetition Term Loan Agreement (the "***Prepetition Required Term Loan Lenders***"), approving certain bid protections and sale procedures, approving the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases in connection therewith, and

26132032.1

scheduling (i) the Bid Deadline (as defined in the DIP Credit Agreement) for a date that is no later than 60 days after the Petition Date, (ii) the Auction Date (as defined in the DIP Credit Agreement) for a date that is no later than 5 Business Days after the Bid Deadline, and (iii) the Sale Hearing (as defined in the DIP Credit Agreement) for a date that is no later than 10 days after the Auction Date (or, if no auction is held, 10 days after the Bid Deadline);

b.    [RESERVED];

c.    entry of an order of the Court, satisfactory to the DIP Agent, the Prepetition Term Loan Agent and Prepetition Required Term Loan Lenders, approving the Sale (the "**_Sale Order_**") no later than 10 days after the Auction Date (or, if no auction is held, 5 days after the Bid Deadline) or such later date agreed to by the DIP Agent and Prepetition Term Loan Agent in their sole and absolute discretion; and

d.    consummation of the Sale within five (5) Business Days after the Sale Hearing or such later date agreed to by the DIP Agent and Prepetition Term Loan Agent in their sole and absolute discretion.

4.3    <u>Credit Bid Rights</u>.  Subject to entry of the Final Order, in connection with any sale of all or substantially all of the Collateral, the Prepetition Term Loan Agent shall have the absolute right to credit bid any portion or all of the Prepetition Term Loan Debtor Obligors' outstanding obligations under the Prepetition Term Loan Agreement pursuant to Bankruptcy Code section 363(k), and the bid submitted by BLST Acquisition Company LLC under that certain Asset Purchase Agreement, dated March 8, 2020, shall be deemed a "qualified bid" under the Bid Protections Order.

Section 5.    <u>Cash Management System; Control Over Debtors' Accounts</u>.  The Debtors shall maintain their existing cash management system in accordance with those certain orders approving the Debtors' first-day cash management motion unless the DIP Agent, in its sole and absolute discretion, consents in writing to any proposed modification to such cash management system. From and after the date of the entry of this Interim Order, all collections and proceeds of any

26132032.1

Collateral or merchandise sold by any Debtor and all Cash Collateral which shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which collections and collateral proceeds were deposited under the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time).  In addition, the DIP Agent shall be deemed, on account of itself and the Prepetition Term Loan Agent, without any further action of any kind, to have "control" over all of the Debtors' bank accounts within the meaning of Sections 8-106, 9-104, 9-105, 9-106, 9-107 and 9-314 of the New York Commercial Code.  For the avoidance of doubt, the existing Control Agreements shall be considered DIP Loan Documents and Perfection Acts for all purposes hereunder.

Section 6.    Proof of Claim.  Any order entered, or to be entered, by the Court concerning the establishment of a bar date in any of the Cases or in any Successor Cases shall not apply to the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition ABL Agent, and the Prepetition ABL Lenders.

6.1    Prepetition Term Loans.  The Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Lenders, shall be deemed to have filed a timely proof of claim in the Cases in an amount equal to no less than $[416,652,903.88], inclusive of principal and all accrued and unpaid interest, exclusive of costs, expenses, and fees, owed to the Prepetition Term Loan Agent and Prepetition Term Loan Lenders.  The Prepetition Term Loan Agent shall not be required to file any other proof of claim in the Cases on behalf of itself or the Prepetition Term Loan Lenders setting forth the Prepetition Term Loan Obligations, or any portion thereof. Notwithstanding any provision to the contrary in any order to be entered by the Court concerning the establishment of a bar date in any of the Cases or in any successor cases, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Lenders, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it deems appropriate) one or more proofs of claim in each of the Cases or in any successor cases for any

26132032.1

claim allowed herein.  Subject to Section 9.1 hereof, any and all payments made to and accepted by the Prepetition Term Loan Agent on behalf of the Prepetition Term Loan Lenders or made directly to the Prepetition Term Loan Lenders, whether pre-petition or post-petition, in connection with the Prepetition Term Loan Obligations or this Interim Order are final and not subject to avoidance or recovery by the Debtor or any other entity under chapter 5 of the Bankruptcy Code or otherwise.

6.2     Prepetition ABL Loans.   The Prepetition ABL Agent shall not be required to file any other proof of claim in the Cases on behalf of itself or the Prepetition ABL Lenders setting forth the Prepetition ABL Obligations, or any portion thereof.  Subject to Section 9.1 hereof, any and all payments made to and accepted by the Prepetition ABL Agent on behalf of the Prepetition ABL Lenders or made directly to the Prepetition ABL Lenders, whether pre-petition or post-petition, in connection with the Prepetition ABL Obligations or this Interim Order are final and not subject to avoidance or recovery by the Debtor or any other entity under chapter 5 of the Bankruptcy Code or otherwise.

Section 7.     Default; Rights and Remedies; Relief from Stay.

7.1     Events of Default.   The occurrence and continuation of any of the following events, unless waived by the DIP Required Lenders (as defined in the DIP Credit Agreement) in their sole discretion, shall constitute an "***Event of Default***" under this Interim Order and the DIP Loan Documents, and the DIP Agent shall provide notice of any such Event of Default to the Debtors, the U.S. Trustee and lead counsel to the Committee (if a Committee has been appointed):

a.     the Debtors' failure to obtain entry of a Final Order within 35 days after the Petition Date;

b.     the Debtors' failure to timely achieve any of the Sale Milestones;

c.     a plan of reorganization or liquidation is confirmed that does not provide for termination of the commitment under the DIP Facility and payment in full

of the DIP Obligations and the Prepetition Term Loan Obligations in cash on the effective date of such plan;

      d.      except as and to the extent set forth in this Interim Order, any other superpriority administrative expense claim or lien senior to or *pari passu* with the DIP Obligations, the DIP Liens, the Adequate Protection Claim or the Adequate Protection Replacement Liens shall be granted, approved, imposed, or otherwise created;

      e.      any of the Debtors seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens expressly permitted under the DIP Credit Agreement without the prior written consent of the DIP Required Lenders;

      f.      any Debtor files, or any representative of any Debtors' Estate files, any action challenging the validity, perfection, priority, extent, or enforceability of the DIP Loan Documents or the DIP Liens and claims granted thereunder;

      g.      any Debtor commences any action against any of the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders with respect to the Prepetition Term Loan Obligations including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the Prepetition Term Loan Obligations or any Prepetition Term Loan Liens, or entry of an order in any action by any other party granting such relief;

      h.      the entry of an order of the Court granting relief from the automatic stay with respect to any Collateral or assets of any Debtor that have an aggregate value equal to or exceeding $1,500,000;

      i.      if any material contract of the Debtors is rejected or otherwise terminated (other than in accordance with its terms) by the Debtors or any material property of the Debtors is sold (other than pursuant to the Sale), in each instance, other than as expressly permitted under the terms of the DIP Credit Agreement, without the express written consent of the DIP Agent and the DIP Required Lenders;

j.       any Debtor seeks relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would directly restrict or impair the rights and remedies of the DIP Agent or the DIP Lenders under this Interim Order and the DIP Loan Documents or the DIP Agent's and the DIP Lenders' exercise of such rights or remedies;

k.       any Debtor proposes, supports, or files, without the DIP Agent's consent, a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all DIP Obligations and Prepetition Term Loan Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Credit Agreement; *provided* that if any Debtor proposes, supports, or files a plan of reorganization or liquidation that provides for (i) an equitization of the Term Loan Obligations, (ii) the indefeasible payment in cash in full of the Term Loan Obligations in final satisfaction thereof, or (iii) such other acceptable treatment, all at the Prepetition Term Loan Lenders' election, it shall not constitute a default under this section 7.1(k);

l.       entry of an order (other than the Final Order) in any of the Cases, or in any Successor Case, which (a) authorizes the use of Cash Collateral of the Debtors in which the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate subject to a lien or security interest granted to the Prepetition Term Loan Agent for its benefit and the benefit of Prepetition Term Loan Lenders, except as expressly permitted hereunder or in the DIP Loan Documents, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Agent, for its benefit and the benefit of the DIP Lenders, holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Agent, for its benefit and the benefit of the DIP Lenders,

herein unless, in each instance (i) the DIP Agent shall have given its express prior written consent with respect thereto (such consent to be in the DIP Agent's absolute and sole discretion and no such consent being implied from any other action, inaction or acquiescence by the DIP Agent or any DIP Lender), or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents, including, without limitation, all debts and obligations of the Debtors to the DIP Agent and the DIP Lenders which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to the DIP Agent and the DIP Required Lenders;

m.      the security interests and liens granted to or for the benefit of the DIP Lenders hereunder and the rights of the DIP Agent and the DIP Lenders pursuant to this Interim Order are altered, modified, extended, impaired, or affected in any way by any plan of reorganization or liquidation of Debtors without the express prior written consent of the DIP Agent and the DIP Required Lenders  (such consent to be in the DIP Agent's and the DIP Required Lenders' absolute and sole discretion);

n.      any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this Interim Order; or

o.      any other "Event of Default" as defined in and under the DIP Credit Agreement or any of the other DIP Loan Documents.

7.2    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order, the DIP Credit Agreement and the other DIP Loan Documents and (ii) following five (5) Business Days after delivery of an Enforcement Notice (as defined below) by the DIP Agent and unless an order of the Court is entered to the contrary, the DIP Agent, on behalf of itself and the DIP Lenders, shall be entitled to take any act or exercise any right or remedy (subject to Section 7.4 below) as provided in this

26132032.1

Interim Order or the DIP Loan Documents, including, without limitation, immediately suspending or immediately terminating the DIP Facility pending further order of the Court and (iii) the Debtors' right to use Cash Collateral shall thereupon immediately and without further action of any kind terminate pending further order of the Court; provided, however, that none of the foregoing shall restrict the payment of the Carve Out or payroll expenses due and owing as of the date of such Event of Default.  The DIP Agent and the DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

    7.3 <u>Expiration of Commitment</u>.  Upon the earlier of (i) expiration of the Debtors' authority to borrow and obtain other credit accommodations from the DIP Agent and the DIP Lenders pursuant to the terms of this Interim Order and the DIP Loan Documents (except if such authority shall be extended with the prior written consent of the DIP Agent and the applicable (as provided in the DIP Loan Documents) DIP Lenders in their sole and absolute discretion, which consent shall not be implied or construed from any action, inaction or acquiescence by the DIP Agent or any DIP Lender) and (ii) the exercise of remedies by the DIP Agent, all of the DIP Obligations shall automatically become due and payable and the DIP Agent and the DIP Lenders shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the Collateral or any other rights granted to the DIP Agent and the DIP Lenders pursuant to the terms and conditions of the DIP Loan Documents or this Interim Order, and the DIP Agent, acting on behalf of itself and the other DIP Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the DIP Loan Documents or applicable law which the DIP Agent may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtors' Estates, in all cases

following five (5) Business Days after delivery of an Enforcement Notice by the DIP Agent, and unless an order of the Court is entered to the contrary.

7.4    Relief from Automatic Stay.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit the DIP Agent, acting on behalf of itself and the DIP Lenders, to perform any act authorized or permitted under or by virtue of this Interim Order or the DIP Loan Documents, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Loan Documents, and (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral.  In addition, and without limiting the foregoing, upon the occurrence and continuance of an Event of Default and after providing five (5) Business Days prior written notice to counsel for the Debtors, counsel for the Committee and the U.S. Trustee (the "**_Enforcement Notice_**"), the DIP Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents, or applicable law as the DIP Agent may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations.  For the avoidance of doubt, during the five (5) Business Day period referenced above, in each case other than with respect to the Carve Out, the DIP Agent and DIP Lenders shall have no obligation to make any additional advances under the DIP Loan Documents and shall further be permitted to exercise control over the Debtors' cash and bank accounts (excluding the right to sweep and apply cash) in accordance with the DIP Loan Documents.

Section 8.    Good Faith.  The terms of this Interim Order were negotiated in good faith and at arm's length by and among the Debtors, the Prepetition Term Loan Agent, the Prepetition Term

26132032.1

Loan Lenders, the DIP Agent, and the DIP Lenders.  The DIP Agent and the DIP Lenders shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. Accordingly, if any or all of the provisions of this Interim Order are hereafter modified, vacated, or stayed, such modification, vacation, or stay shall not affect, prejudice or impair (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Agent and the DIP Lenders under the DIP Loan Documents before the effective date of such modification, vacation or stay, or (b) the validity or enforceability of any security interest, lien, priority, or other protection authorized or created by this Interim Order.  Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations or liabilities incurred by the Debtors to the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the DIP Agent, and the DIP Lenders before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the DIP Agent, and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations or liabilities.

Section 9.    <u>Representations; Covenants; and Waivers</u>.

9.1    <u>Objections to Prepetition Term Loan Obligations</u>.  Any action, claim or defense (hereinafter, an "***Objection***") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, subordination, disgorgement, cure, reinstatement or claim of any kind: (a) the existence, validity, nonavoidability, priority or amount of the Prepetition Term Loan Obligations, or (b) the extent, legality, validity, priority, perfection, nonavoidability or enforceability of the Prepetition Term Loan Liens, shall be filed with the Court (x) if a Committee is appointed by the U.S. Trustee within twenty (20) days following the Petition Date, by such Committee (subject to establishing requisite standing), and no other party, within sixty (60) days from the date of appointment of the Committee by the U.S. Trustee, or (y) in the event no Committee is appointed within twenty (20) days following the

Petition Date, by any party in interest with requisite standing within seventy-five (75) days from the date of entry of this Interim Order; provided, however, that the deadlines set forth in clauses (x) and (y) may be extended, in writing, by the Prepetition Term Loan Agent in its sole discretion. If any such Objection is timely filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Prepetition Term Loan Obligations or the Prepetition Term Loan Liens in the Prepetition Collateral. If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the Prepetition Term Loan Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, avoidance, subordination, deduction, cure, reinstatement or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Term Loan Liens in favor of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in the Prepetition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject and subordinate to only the Carve Out, the Permitted Priority Liens, and the DIP Liens, and (b) the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and each of their agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Term Loan Documents and shall not be subject to any further objection or challenge by any party at any time.

9.2    Debtors' Waivers. It shall be an immediate event of default under the DIP Facility if, at any time during the Cases, the Debtors seek authority to use Cash Collateral of the DIP Agent and the DIP Lenders under section 363 of the Bankruptcy Code for any purpose not permitted by the DIP Credit Documents without the written consent of the DIP Agent in its sole and absolute discretion; provided, however, that no such consent shall be implied from any action, inaction, or acquiescence by the DIP Agent or any DIP Lender. At any time prior to the indefeasible payment in full in cash of all DIP Obligations, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to challenge the application of any payments authorized by this Interim Order; provided, however, that the DIP

Agent, in its sole and absolute discretion, may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any DIP Lender.

9.3    Section 506(c) Claims.  Subject to the entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, their respective claims or interests, the Collateral and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Agent and Prepetition Term Loan Agent in their sole and absolute discretion, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, any DIP Lender, the Prepetition Term Loan Agent, or any Prepetition Term Loan Lender.

9.4    Collateral Rights.    Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full:

9.4.1    no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral; and

9.4.2    upon and after the occurrence of an Event of Default, and subject to the DIP Agent providing five (5) Business Days prior written notice as set forth in Section 7.4, above, the DIP Agent (or any of its employees, agents, consultants, contractors or other professionals), on behalf of itself and the DIP Lenders, shall have the right, at the sole cost and expense of Debtors, to: (a) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors, and (b) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by any of the Debtors in their businesses.

26132032.1

Section 10.    <u>Other Rights and Obligations</u>.

10.1    <u>No Modification or Stay of This Interim Order</u>.  Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Interim Order, any of the DIP Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "***Subject Event***"), (i) the acts taken by the DIP Agent and the DIP Lenders in accordance with this Interim Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Agent's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by the DIP Agent and the DIP Lenders in accordance with this Interim Order, and the liens granted to the DIP Agent and the DIP Lenders in the Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Agent and the DIP Lenders pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

10.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  The DIP Agent and the applicable DIP Lenders (as provided in the DIP Credit Agreement), in their sole and absolute discretion, shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of the DIP Agent and the DIP Lenders (the "***DIP Lender Rights***"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by the DIP Agent or any DIP Lender of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any

other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

10.3    Setoff and Return of Goods.  The Debtors shall not, without the express consent of the DIP Agent in its sole and absolute discretion or order from the Court, (a) enter into any agreement to return any goods to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return of goods pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

10.4    Reservation of Rights.  The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of the DIP Lenders and the DIP Agent, on behalf of itself and the DIP Lenders, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

10.5    Binding Effect of Interim Order.

10.5.1  Immediately upon entry by this Court, this Interim Order shall be valid and binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Debtors and the property of the Debtors' Estates, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Cases, any Successor Cases, or upon dismissal of any Case or any Successor Case.

26132032.1

10.5.2  Notwithstanding the dismissal of one or more of the Cases or any Successor Case under section 1112 or otherwise, (a) the Superpriority Claim, the DIP Liens, the Prepetition Term Loan Liens, the Adequate Protection Replacement Liens and the Adequate Protection Claim shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Term Loan Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim, the DIP Liens, the Prepetition Term Loan Liens, the Adequate Protection Replacement Liens and the Adequate Protection Claim.  In the event any Court modifies any of the provisions of this Interim Order or the DIP Loan Documents following a Final Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, or the Prepetition Term Loan Lenders pursuant to this Interim Order with respect to the Collateral and/or Prepetition Collateral, or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications, and (ii) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

10.6  No Owner/Operator Liability.  In determining to make any loan under the DIP Credit Agreement or any Financing Order, or in exercising any rights or remedies as and when permitted pursuant to the DIP Credit Agreement or any Financing Order, none of the DIP Agent or the DIP Lenders shall be deemed to be in control of the operations of any of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

10.7  Marshalling.  Subject to entry of the Final Order, none of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, or the Prepetition Term Loan Lenders shall be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral or the Prepetition Collateral.  The DIP Agent, the DIP Lenders, the Prepetition Term

26132032.1

Loan Agent, and the Prepetition Term Loan Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and (subject to entry of a Final Order) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent or Prepetition Term Loan Lenders with respect to proceeds, products, offspring or profits of any of the Collateral and/or Prepetition Collateral.

10.8    Letters of Credit.  All of the Debtors' existing letters of credit shall continue on an uninterrupted basis and the parties thereto shall be entitled to take all actions reasonably appropriate with respect thereto in a manner consistent with the DIP Credit Documents and the Financing Orders.

10.9    Objections Overruled.  All objections to the entry of this Interim Order are, to the extent not withdrawn or resolved, hereby overruled.

Section 11.    Findings and Conclusions.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable, as of the Petition Date, immediately upon execution hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

Section 12.    Interim Order Governs.  In the event that any provision of this Interim Order conflicts with any term of the DIP Loan Documents this Interim Order shall govern.

Section 13.    No Prejudice.  This Interim Order shall not prejudice, impair or adversely affect any of the Prepetition Term Loan Agent's and the Prepetition Term Loan Lenders' rights in connection with any of the Prepetition Term Loan Documents, except as specifically set forth herein.

Section 14.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to interpret and enforce the provisions of this Interim Order.

26132032.1

Section 15.     Final Hearing and Response Dates.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____, 2020, at _____ (prevailing Eastern time) before this Court (the "***Final Hearing***").  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or Committee counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel for the Debtors, Kirkland & Ellis LLP, 300 N. LaSalle Street, Chicago, IL 60654, Attn: Patrick J. Nash and Benjamin W. Winger, Email: patrick.nash@kirkland.com and benjamin.winger@kirkland.com and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary and Jaime Luton Chapman (mbcleary@ycst.com and jchapman@ycst.com); (b) counsel for the DIP Agent, KTBS Law LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067, Attn: Michael L. Tuchin, Jonathan Weiss and Ariella Thal Simonds, Email: mtuchin@ktbslaw.com, jweiss@ktbslaw.com and asimonds@ktbslaw.com and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones and Peter J. Keane, Email: ljones@pszjlaw.com and pkeane@pszjlaw.com; (c) counsel to any Committee or if no Committee has been appointed, the 30 Largest Creditors; and (d) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case, to allow actual receipt of the foregoing no later than _____, 2020, at _____ (prevailing Eastern time).

Dated: _____, 2020
   Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Initial DIP Budget**

**Project Frozen BBI**
**Consolidated BBI**
**Weekly Cash Flow Forecast**
*($ in thousands USD)*

| | Fiscal Year --> | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fiscal Month --> | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | |
| | Week of FY --> | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | |
| | Weeks / Month --> | 5 | 5 | 5 | 5 | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | |
| | Forecast Week --> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 |
| | Period Type --> | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Week |
| | Week Ending --> | 3/6/2020 | 3/13/2020 | 3/20/2020 | 3/27/2020 | 4/3/2020 | 4/10/2020 | 4/17/2020 | 4/24/2020 | 5/1/2020 | 5/8/2020 | 5/15/2020 | 5/22/2020 | 5/29/2020 | Total |
| **Net Cash Flow** | | | | | | | | | | | | | | | |
| 1) Net Purchase & Sale of Originations | | $ 12,293 | $ 9,559 | $ 8,708 | $ 9,859 | $ 12,184 | $ 15,962 | $ 12,926 | $ 13,240 | $ 13,862 | $ 16,817 | $ 15,279 | $ 14,340 | $ 16,237 | $ 171,267 |
| 2) Servicing Fee | | | | 2,331 | | | | 2,402 | | | | 2,402 | | | 7,136 |
| 3) Cash Collection from Direct Sales | | 9,334 | 8,354 | 10,586 | 9,999 | 12,778 | 13,077 | 12,701 | 12,531 | 11,756 | 12,726 | 10,948 | 10,734 | 10,904 | 146,427 |
| 4) Other Revenue | | 1,093 | 1,352 | 987 | 881 | 1,013 | 1,177 | 1,073 | 944 | 916 | 932 | 909 | 786 | 758 | 12,821 |
| **Total Receipts** | | $ 22,721 | $ 19,266 | $ 22,612 | $ 20,739 | $ 25,976 | $ 30,216 | $ 29,102 | $ 26,714 | $ 26,534 | $ 30,475 | $ 29,538 | $ 25,860 | $ 27,899 | $ 337,651 |
| 5) Merchandise | | $ (9,257) | $ (7,456) | $ (7,538) | $ (10,231) | $ (9,693) | $ (8,936) | $ (9,359) | $ (9,667) | $ (9,092) | $ (11,437) | $ (9,606) | $ (8,648) | $ (7,325) | $ (118,246) |
| 6) Marketing & Postage | | (4,387) | (5,731) | (5,518) | (5,332) | (4,917) | (5,435) | (5,488) | (5,544) | (5,551) | (5,447) | (5,505) | (5,475) | (5,480) | (69,810) |
| 7) Payroll & Benefits | | (389) | (6,342) | (389) | (6,342) | (389) | (6,342) | (389) | (6,342) | (389) | (6,342) | (389) | (6,342) | (389) | (40,774) |
| 8) Other Disbursements | | (5,923) | (12,245) | (13,186) | (7,049) | (6,016) | (5,152) | (11,733) | (9,177) | (7,222) | (5,769) | (11,944) | (11,081) | (6,868) | (113,364) |
| 9) **Total Operating Disbursements** | | $ (19,955) | $ (31,774) | $ (26,632) | $ (28,954) | $ (21,015) | $ (25,864) | $ (26,970) | $ (30,731) | $ (22,254) | $ (28,994) | $ (27,444) | $ (31,545) | $ (20,062) | $ (342,193) |
| 10) DIP Fees & Interest | | $ (264) | $ (2,188) | $ - | $ - | $ (528) | $ - | $ - | $ - | $ (786) | $ - | $ - | $ - | $ (448) | $ (4,213) |
| 11) Professional Fees | | (1,972) | | | | | (412) | (480) | | (2,554) | (412) | (600) | | (2,095) | (8,525) |
| 12) **Total Other Disbursements** | | $ (2,236) | $ (2,188) | $ - | $ - | $ (528) | $ (412) | $ (480) | $ - | $ (3,340) | $ (412) | $ (600) | $ - | $ (2,543) | $ (12,738) |
| 13) **Total Net Cash Flow** | | $ 530 | $ (14,696) | $ (4,020) | $ (8,215) | $ 4,433 | $ 3,940 | $ 1,652 | $ (4,017) | $ 940 | $ 1,069 | $ 1,494 | $ (5,685) | $ 5,295 | $ (17,280) |
| **Liquidity** | | | | | | | | | | | | | | | |
| 14) Beginning Cash – Book Balance | | $ 4,618 | $ 11,147 | $ 12,593 | $ 13,573 | $ 14,358 | $ 12,791 | $ 12,731 | $ 12,383 | $ 13,366 | $ 12,306 | $ 12,375 | $ 14,869 | $ 13,184 | 4,618 |
| 15) Total Net Cash Flow | | 530 | (14,696) | (4,020) | (8,215) | 4,433 | 3,940 | 1,652 | (4,017) | 940 | 1,069 | 1,494 | (5,685) | 5,295 | (17,280) |
| 16) ABL Borrowing / (Repayment) | | 6,000 | (8,859) | 5,000 | 9,000 | (6,000) | (4,000) | (2,000) | 5,000 | (2,000) | (1,000) | 1,000 | 4,000 | (5,000) | 1,141 |
| 17) Delay Draw Term Loan Borrowing / (Repayment) | | - | 25,000 | | | | | | | | | | | | 25,000 |
| 18) Ending Cash – Book Balance | | $ 11,147 | $ 12,593 | $ 13,573 | $ 14,358 | $ 12,791 | $ 12,731 | $ 12,383 | $ 13,366 | $ 12,306 | $ 12,375 | $ 14,869 | $ 13,184 | $ 13,479 | $ 13,479 |
| 19) Outstanding Checks | | 2,810 | 5,076 | 6,219 | 6,197 | 6,176 | 5,857 | 6,671 | 6,402 | 6,341 | 6,558 | 6,072 | 6,570 | 5,576 | 5,576 |
| 20) Ending Cash – Bank Balance | | $ 13,957 | $ 17,669 | $ 19,792 | $ 20,555 | $ 18,967 | $ 18,588 | $ 19,054 | $ 19,769 | $ 18,648 | $ 18,933 | $ 20,940 | $ 19,754 | $ 19,055 | $ 19,055 |
| **ABL Facility** | | | | | | | | | | | | | | | |
| 21) Collateral Net of Reserves | | 83,315 | 85,365 | 84,772 | 84,257 | 84,434 | 83,171 | 81,256 | 80,137 | 79,399 | 79,979 | 76,974 | 75,913 | 74,800 | $ 74,800 |
| 22) Less: Outstanding ABL | | (37,859) | (43,859) | (35,000) | (40,000) | (49,000) | (43,000) | (39,000) | (37,000) | (42,000) | (40,000) | (39,000) | (40,000) | (44,000) | (44,000) |
| 23) Less: (Draw)/Paydown | | (6,000) | 8,859 | (5,000) | (9,000) | 6,000 | 4,000 | 2,000 | (5,000) | 2,000 | 1,000 | (1,000) | (4,000) | 5,000 | 5,000 |
| 24) Availability (after Draw/(Paydown)) | | $ 39,456 | $ 50,365 | $ 44,772 | $ 35,257 | $ 41,434 | $ 44,171 | $ 44,256 | $ 38,137 | $ 39,399 | $ 40,979 | $ 36,974 | $ 31,913 | $ 35,800 | $ 35,800 |
| **Liquidity** | | | | | | | | | | | | | | | |
| 25) Ending Cash – Bank Balance | | 13,957 | 17,669 | 19,792 | 20,555 | 18,967 | 18,588 | 19,054 | 19,769 | 18,648 | 18,933 | 20,940 | 19,754 | 19,055 | 19,055 |
| 26) ABL Availability | | 39,456 | 50,365 | 44,772 | 35,257 | 41,434 | 44,171 | 44,256 | 38,137 | 39,399 | 40,979 | 36,974 | 31,913 | 35,800 | 35,800 |
| 27) **Total Ending Liquidity** | | $ 53,413 | $ 68,035 | $ 64,564 | $ 55,812 | $ 60,401 | $ 62,758 | $ 63,310 | $ 57,905 | $ 58,046 | $ 59,912 | $ 57,914 | $ 51,666 | $ 54,855 | $ 54,855 |

**<u>EXHIBIT B</u>**

**DIP Credit Agreement**

*EXECUTION VERSION*

**SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of March 8, 2020**

**among**

**NORTHSTAR HOLDINGS INC.,**
as Holdings,

**BLUESTEM BRANDS, INC. AND CERTAIN SUBSIDIARIES THEREOF,**
as the Borrowers,

**THE FINANCIAL INSTITUTIONS PARTY HERETO,**
as Lenders,

**and**

**CERBERUS BUSINESS FINANCE, LLC,**
as Administrative Agent

## Table of Contents

Page

**ARTICLE 1    DEFINITIONS** ................................................................... 2

    **Section 1.01    Defined Terms** ................................................................. 2

    **Section 1.02    Classification of Loans and Borrowings** ........................... 42

    **Section 1.03    Terms Generally** ............................................................ 42

    **Section 1.04    Accounting Terms; GAAP; UCC Terms** ......................... 42

    **Section 1.05    Timing of Payment of Performance** .............................. 43

    **Section 1.06    Times of Day** ................................................................ 43

    **Section 1.07    Compliance with Certain Sections** ................................ 43

    **Section 1.08    Rounding** ...................................................................... 44

    **Section 1.09    Currency Equivalents Generally** .................................. 44

    **Section 1.10    References to Agreements, Laws, Etc.** .......................... 44

**ARTICLE 2    THE CREDITS AND SECURITY** ................................... 45

    **Section 2.01    Commitments** ................................................................ 45

    **Section 2.02    Loans and Borrowings** ................................................. 45

    **Section 2.03    Requests for Borrowings** .............................................. 46

    **Section 2.04    [Reserved]** .................................................................... 47

    **Section 2.05    [Reserved]** .................................................................... 47

    **Section 2.06    [Reserved]** .................................................................... 47

    **Section 2.07    Funding of Borrowings** ................................................ 47

    **Section 2.08    Type; Interest Elections** ............................................... 47

    **Section 2.09    Termination and Reduction of Commitments** ............... 48

    **Section 2.10    Repayment of Loans; Evidence of Debt** ....................... 49

    **Section 2.11    Prepayment of Loans** ................................................... 49

    **Section 2.12    Fees** .............................................................................. 52

    **Section 2.13    Interest** ......................................................................... 53

    **Section 2.14    Alternate Rate of Interest** ............................................ 54

    **Section 2.15    Increased Costs** ............................................................ 54

    **Section 2.16    Break Funding Payments** ............................................. 55

    **Section 2.17    Taxes** ............................................................................ 56

    **Section 2.18    Payments Generally; Allocation of Proceeds; Sharing of Payments** ..................................................................... 61

    **Section 2.19    Mitigation Obligations; Replacement of Lenders** ......... 63

i

Section 2.20 **Illegality** ............................................................. 64

Section 2.21 **Defaulting Lenders** .............................................. 65

Section 2.22 **Security Interests in Collateral** ........................... 66

Section 2.23 **Administrative Priority** ....................................... 67

Section 2.24 **Grants, Rights and Remedies** .............................. 67

Section 2.25 **No Filings Required** ............................................. 68

Section 2.26 **Survival** ................................................................. 68

Section 2.27 **Further Assurances** .............................................. 69

**ARTICLE 3    REPRESENTATIONS AND WARRANTIES** ............................... 69

Section 3.01 **Organization; Powers** .......................................... 69

Section 3.02 **Authorization; Enforceability** ............................. 70

Section 3.03 **Governmental Approvals; No Conflicts** ............... 70

Section 3.04 **Financial Condition; No Material Adverse Effect** ......... 70

Section 3.05 **Properties; Licenses; Intellectual Property** ......... 71

Section 3.06 **Litigation and Environmental Matters** ................ 71

Section 3.07 **Compliance with Laws** ......................................... 72

Section 3.08 **Investment Company Status** ................................ 72

Section 3.09 **Taxes** ..................................................................... 72

Section 3.10 **ERISA** .................................................................... 72

Section 3.11 **Disclosure** .............................................................. 72

Section 3.12 **Security Interest in Collateral** ............................. 73

Section 3.13 **Labor Disputes** ..................................................... 73

Section 3.14 **Federal Reserve Regulations** ............................... 74

Section 3.15 **Anti-Terrorism Laws** ........................................... 74

Section 3.16 **[Reserved]** ............................................................. 74

Section 3.17 **Capitalization and Subsidiaries** .......................... 74

Section 3.18 **Deposit Accounts; Credit Card Agreements** ....... 75

Section 3.19 **Customer and Trade Relations** ............................ 75

Section 3.20 **Material Contracts** ............................................... 75

Section 3.21 **Bankruptcy Matters** ............................................ 75

**ARTICLE 4    CONDITIONS** ............................................................... 76

Section 4.01 **Closing Date** .......................................................... 76

ii

**Section 4.02** **Conditions Precedent to the Making of All Loans** ......................... 79

**ARTICLE 5** **AFFIRMATIVE COVENANTS** .................................................. 80

**Section 5.01** **Approved Budget, Financial Statements, Borrowing Base and Other Reports** ........................................................ 80

**Section 5.02** **Existence** .......................................................................... 84

**Section 5.03** **Payment of Taxes and Other Obligations** ....................... 85

**Section 5.04** **Maintenance of Properties** .............................................. 85

**Section 5.05** **Insurance** .......................................................................... 85

**Section 5.06** **Inspections** ........................................................................ 85

**Section 5.07** **Maintenance of Book and Records** .................................. 86

**Section 5.08** **Compliance with Laws** ..................................................... 86

**Section 5.09** **Environmental** .................................................................. 86

**Section 5.10** **Sale Milestones** ................................................................ 87

**Section 5.11** **Use of Proceeds** ................................................................ 87

**Section 5.12** **[Reserved]** ......................................................................... 88

**Section 5.13** **Status Calls; Financial Advisors** ..................................... 88

**Section 5.14** **Further Assurances** .......................................................... 89

**Section 5.15** **Post-Closing Obligations** ................................................. 89

**Section 5.16** **Appraisals; Field Exams** .................................................. 89

**Section 5.17** **Cash Management; Collection of Accounts** ...................... 89

**Section 5.18** **Freight Forwarding Agreements** ...................................... 90

**Section 5.19** **Existing Credit Card Agreements** .................................... 91

**ARTICLE 6** **NEGATIVE COVENANTS** ......................................................... 91

**Section 6.01** **Indebtedness** ..................................................................... 91

**Section 6.02** **Liens** ................................................................................. 93

**Section 6.03** **No Further Negative Pledges; Burdensome Agreements** ............. 96

**Section 6.04** **Restricted Payments; Other Payments** ............................ 97

**Section 6.05** **Subsidiaries** ...................................................................... 97

**Section 6.06** **Investments** ....................................................................... 98

**Section 6.07** **Fundamental Changes; Disposition of Assets** .................. 98

**Section 6.08** **Transactions with Affiliates** ............................................. 99

iii

Section 6.09    **Amendments or Waivers of Organizational Documents** ............ 100

Section 6.10    **Amendments of or Waivers with to Material Contracts** ............ 100

Section 6.11    **Fiscal Year** ...................................................................... 100

Section 6.12    **Permitted Activities of Holdings** ...................................... 101

Section 6.13    **Minimum Liquidity Covenant** .......................................... 101

Section 6.14    **Conduct of Business** ........................................................ 101

Section 6.15    **Amendments to the SCUSA Sale Agreement** .................... 101

Section 6.16    **CRO** ................................................................................ 102

Section 6.17    **Bankruptcy Provisions** .................................................... 102

Section 6.18    **Budget Compliance** ......................................................... 103

ARTICLE 7        EVENTS OF DEFAULT ............................................... 104

Section 7.01    **Events of Default** ............................................................ 104

Section 7.02    **Remedies on Default** ....................................................... 110

ARTICLE 8        THE ADMINISTRATIVE AGENT ............................. 110

ARTICLE 9        MISCELLANEOUS ..................................................... 117

Section 9.01    **Notices** ........................................................................... 117

Section 9.02    **Waivers; Amendments** ..................................................... 119

Section 9.03    **Expenses; Indemnity** ....................................................... 121

Section 9.04    **Waiver of Claim** .............................................................. 124

Section 9.05    **Successors and Assigns** ................................................... 124

Section 9.06    **Survival** .......................................................................... 129

Section 9.07    **Counterparts; Integration; Effectiveness** ......................... 130

Section 9.08    **Severability** .................................................................... 130

Section 9.09    **Right of Setoff** ................................................................ 130

Section 9.10    **Governing Law; Jurisdiction; Consent to Service of Process** ..... 131

Section 9.11    **Waiver of Jury Trial** ........................................................ 132

Section 9.12    **Headings** ......................................................................... 132

Section 9.13    **Confidentiality** ................................................................ 132

Section 9.14    **No Fiduciary Duty** ........................................................... 133

Section 9.15    **Several Obligations** .......................................................... 134

Section 9.16    **USA PATRIOT Act** .......................................................... 134

Section 9.17    **Disclosure of Agent Conflicts** .......................................... 134

iv

**Section 9.18**    **Appointment for Perfection** ................................................ 134

**Section 9.19**    **Interest Rate Limitation** ................................................. 134

**Section 9.20**    **Conflicts** ................................................................. 135

**Section 9.21**    **Reinstatement; Certain Payments** .............................. 135

**Section 9.22**    **Parties Including Trustees; Bankruptcy Court Proceedings** ...... 135

**ARTICLE 10**    **BORROWER REPRESENTATIVE** ...................................... 136

**Section 10.01**    **Appointment; Nature of Relationship** ......................... 136

**Section 10.02**    **Powers** .................................................................. 136

**Section 10.03**    **Employment of Agents** ............................................ 136

**Section 10.04**    **Notices** ................................................................. 136

**Section 10.05**    **Successor Borrower Representative** ............................ 136

**Section 10.06**    **Execution of Loan Documents; Borrowing Base Certificates** ..... 136

**Section 10.07**    **Reporting** .............................................................. 137

**ARTICLE 11**    **GUARANTY** ................................................................ 137

**Section 11.01**    **Guaranty** ............................................................... 137

**Section 11.02**    **Guaranty Absolute** ................................................. 137

**Section 11.03**    **Waiver** .................................................................. 138

**Section 11.04**    **Continuing Guaranty; Assignments** ........................... 139

**Section 11.05**    **Subrogation** ........................................................... 140

SCHEDULES:

Schedule 1.01(a)    –    Commitments
Schedule 1.01(c)    –    Real Estate Assets
Schedule 3.05    –    IP Rights
Schedule 3.17    –    Capitalization and Subsidiaries
Schedule 3.18    –    Deposit Accounts; Credit Card Agreements
Schedule 5.15    –    Post-Closing Requirements
Schedule 6.01    –    Existing Indebtedness
Schedule 6.02    –    Existing Liens
Schedule 6.06    –    Existing Investments
Schedule 6.07    –    Dispositions
Schedule 6.08    –    Employee Arrangements
Schedule 9.01    –    Electronic Document Delivery

EXHIBITS:

Exhibit A    –    Approved Budget
Exhibit B    –    Form of Interim Order
Exhibit C    –    Form of Borrowing Request
Exhibit D    –    Form of Interest Election Request
Exhibit E    –    Form of Assignment and Assumption
Exhibit F    –    Form of Promissory Note
Exhibit G    –    Form of Borrowing Base Certificate
Exhibit H    –    Form of Variance Report
Exhibit I-1    –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit I-2    –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit I-3    –    Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit I-4    –    Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

# SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of March 8, 2020 (this "**Agreement**"), by and among Northstar Holdings Inc., a Delaware corporation ("**Holdings**"), as a guarantor, debtor and debtor in possession, Bluestem Brands, Inc., a Delaware corporation ("**Bluestem**"), as a borrower, debtor and debtor in possession, certain Subsidiaries of Bluestem as identified herein from time to time as "Borrowers", each as a borrower, debtor and debtor in possession (together with Bluestem, collectively, the "**Borrowers**" and, individually, a "**Borrower**"), certain Subsidiaries of Bluestem as identified herein from time to time as "Guarantors", each as a guarantor, debtor and debtor in possession (together with Holdings, collectively, the "**Guarantors**" and, individually, a "**Guarantor**"), the Lenders from time to time party hereto, and Cerberus Business Finance, LLC ("**CBF**"), as administrative agent and collateral agent for the Lenders (in its capacity as administrative and collateral agent, together with its successors and assigns, the "**Administrative Agent**").

## RECITALS

**WHEREAS**, on March 8, 2020 (the "**Petition Date**"), each Borrower and each Guarantor (each also referred to herein as a "**Debtor**" and, collectively, the "**Debtors**") filed a voluntary bankruptcy petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") commencing cases thereunder (the "**Chapter 11 Cases**"), and such Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers and the Guarantors have asked the Lenders to make post-petition loans and advances to the Loan Parties consisting of senior secured priming and superpriority (a) revolving loans in an aggregate principal amount not to exceed $100,000,000 at any time outstanding and (b) term loans in an aggregate principal amount not to exceed $25,000,000 at any time outstanding, in each case, on the terms and conditions provided herein. The proceeds of such loans shall be used, subject to the other terms and conditions of this Agreement, to (a) repay the outstanding Prepetition ABL Obligations, (b) pay fees and expenses related to this Agreement and the Chapter 11 Cases and (c) fund working capital in the ordinary course of business of the Debtors (and out of the ordinary course as approved by the Administrative Agent and the Bankruptcy Court or as otherwise set forth in the Approved Budget (subject to permitted variances)) and for other general corporate purposes;

**WHEREAS**, the Lenders are severally, and not jointly, willing to extend such credit to the Loan Parties subject to the terms and conditions hereinafter set forth;

**WHEREAS**, the Loan Parties have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, on its behalf and on behalf of the Lenders, security interests in, and liens upon, all or substantially all of their respective existing and after-acquired personal and real property as more fully provided for herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

## ARTICLE 1    DEFINITIONS

**Section 1.01    Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"**ABR**" means, when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"**Acceptable Appraiser**" means the Administrative Agent's internal auditors and any other appraiser or consultant appointed by the Administrative Agent in its discretion.

"**Account Control Agreement**" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among any Loan Party, a banking institution holding such Loan Party's funds, and the Administrative Agent granting the Administrative Agent "control" pursuant to the UCC of an account maintained by any Loan Party with such banking institution.

"**Account Debtor**" means any Person obligated on an Account.

"**ACH**" means automated clearing house transfers.

"**Adequate Protection Claim**" has the meaning provided in the Interim Order and the Final Order, as applicable.

"**Adequate Protection Replacement Liens**" has the meaning provided in the Interim Order and the Final Order, as applicable.

"**Adjusted Eurocurrency Rate**" means, with respect to any Eurocurrency Rate Borrowing for any Interest Period, an interest rate per annum equal to the greater of (i) the Eurocurrency Rate determined under <u>clause (a)</u> of the definition of "Eurocurrency Rate" for such Interest Period, multiplied by the Statutory Reserve Rate and (ii) 1.00% per annum.  The Adjusted Eurocurrency Rate for any Eurocurrency Rate Borrowing that includes the Statutory Reserve Rate as a component of the calculation will be adjusted automatically with respect to all such Eurocurrency Rate Borrowings then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"**Administrative Agent**" has the meaning assigned to such term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an administrative questionnaire in the form provided by the Administrative Agent.

"**Adverse Proceeding**" means any action, suit, order, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Loan Party or any of their Subsidiaries), whether at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claim), whether pending or, to the knowledge of any Loan Party or any of their Subsidiaries, threatened in writing, against or affecting any Loan Party or their Subsidiaries or any property of any Loan Party or any of their Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.  None of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any subsidiary thereof.

 "**Agreement**" has the meaning assigned to such term in the preamble hereto.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the highest of (a) 0%, (b) the Federal Funds Effective Rate in effect on such day plus 0.50%, (c)  the Eurocurrency Rate (as determined under clause (b) of the definition of "Eurocurrency Rate") plus 1.00% and (d) the Prime Rate.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurocurrency Rate, as the case may be.

"**Applicable Rate**" means, for any date of determination, with respect to the interest on (a) any Eurocurrency Rate Borrowing or any portion thereof, 6.00%, and (b) any ABR Borrowing or any portion thereof, 5.00%.

"**Approved Budget**" means (a) a thirteen-week cash flow forecast, prepared in form and substance satisfactory to the Administrative Agent and the Required Lenders and as approved by the Administrative Agent and the Required Lenders, in their sole and absolute discretion (provided that the Loan Parties will provide the Administrative Agent with any back-up detail, as requested by the Administrative Agent from time to time), setting forth the cash receipts and disbursements of the Loan Parties, which will include, among other things, available cash, total cash receipts, total cash expenditures (including payment of trade payables and expenses, fees and expenses of professionals, and working capital and other general corporate needs for the period covered thereby) and (b) pursuant to Section 5.01(a), an updated rolling thirteen-week cash flow forecast in substantially the same form and which such updated cash flow forecast shall constitute the "Approved Budget" once approved by the Administrative Agent and the Required Lenders (provided, that, until the Administrative Agent and the Required Lenders approve any such updated cash flow forecast, the most recent thirteen-week cash flow forecast  approved by the Administrative Agent and the Required Lenders shall continue to be the Approved Budget).

 "**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such

Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender.

"**Asset Purchase Agreement**" means an asset purchase agreement approved by the Bankruptcy Court, and consented to by the Administrative Agent and the Required Lenders, as the stalking-horse purchase agreement (or other purchase agreement approved by the Bankruptcy Court pursuant to Section 363 and/or, with the prior consent of the Administrative Agent (which may be withheld in its sole discretion), Section 1129 of the Bankruptcy Code and consented to by the Administrative Agent and the Required Lenders) in respect of the proposed sale of substantially all of the assets of the Loan Parties pursuant to Section 363 and/or, with the prior consent of the Administrative Agent (which may be withheld in its sole discretion), Section 1129 of the Bankruptcy Code, as the same may be amended or otherwise modified from time to time with the consent of the Administrative Agent and the Required Lenders.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent in the form of Exhibit E or any other form approved by the Administrative Agent and the Borrower Representative.

"**Availability Period**" means the period commencing on the satisfaction (or waiver) of the conditions in Section 4.01 and ending on the Maturity Date; provided that no Borrowing shall be permitted on the Maturity Date.

"**Available Revolving Commitment**" means, at any time, the aggregate Revolving Commitments of all Lenders then in effect minus the aggregate outstanding Revolving Loans of all Lenders at such time.

"**Avoidance Actions**" has the meaning provided in the interim Order and the Final Order, as applicable.

"**Bank Financial Agreement**" means the Bank Financial Agreement, dated as of April 18, 2013, by and among Bluestem, BSI and WebBank, as may be amended, modified, supplemented, replaced or extended from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.).

"**Bankruptcy Court**" has the meaning provided in the recitals to this Agreement, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"**Bluestem Borrowing Base Entities**" means Bluestem and each of its Subsidiaries whose assets are included in the Borrowing Base; provided, however, that Orchard and its Subsidiaries shall not constitute Bluestem Borrowing Base Entities.

"**Borrower**" and "**Borrowers**" have the meanings assigned to such terms in the preamble to this Agreement.

"**Borrower Representative**" has the meaning set forth in Section 10.01.

4

"**Borrowing**" means (a) Revolving Loans of the same Type made, converted or continued on the same date and, in the case of Eurocurrency Rate Loans, as to which a single Interest Period is in effect and (b) Term Loans of the same Type made, on the same date and, in the case of Eurocurrency Rate Loans, as to which a single Interest Period is in effect.

"**Borrowing Base**" means, at any time, the sum of the following as set forth in the most recently delivered Borrowing Base Certificate:

(a) 90% of the Borrowers' Eligible Credit Card Receivables;

plus

(b) 85% of the Borrowers' Eligible Other Receivables;

plus

(c) the following:

(i) during any Seasonal Low Period, the lesser of:

(A) 65% of the Borrowers' Eligible Inventory (valued at the lower of cost (FIFO) or market value);and

(B) the sum of (x) the product of 90% *multiplied by* the Seasonal Low NOLV percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Inventory of the Bluestem Borrowing Base Entities, and (y) the product of 90% *multiplied by* the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Inventory of Orchard and its Subsidiaries, in the case of each of the foregoing clauses (x) and (y), net of ineligible categories consistent with the most recent appraisal (valued at the lower of cost (FIFO) or market);

or

(ii) during any Seasonal High Period, the lesser of:

(A) 70% of the Borrowers' Eligible Inventory (valued at the lower of cost (FIFO) or market value); and

(B) the sum of (x) the product of 90% *multiplied by* the Seasonal High NOLV percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Inventory of the Bluestem Borrowing Base Entities, and (y) the product of 90% *multiplied by* the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Inventory of Orchard and its Subsidiaries, in the case of each of the foregoing clauses (x)

and (y), net of ineligible categories consistent with the most recent appraisal (valued at the lower of cost (FIFO) or market);

plus

(d) the lesser of:

(i) $25,000,000; and

(ii) the following:

(A) during any Seasonal Low Period, the lesser of:

(x) the sum of (1) the product of 65% *multiplied by* the Seasonal Low NOLV percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Eligible In-Transit Inventory of the Bluestem Borrowing Base Entities and (2) the product of 65% *multiplied by* the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Eligible In-Transit Inventory of Orchard and its Subsidiaries; and

(y) 50% of the Borrowers' Eligible In-Transit Inventory (valued at the lower of cost (FIFO) or market value);

or

(B) during any Seasonal High Period, the lesser of:

(x) the sum of (1) the product of 65% *multiplied by* the Seasonal High NOLV percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Eligible In-Transit Inventory of the Bluestem Borrowing Base Entities and (2) the product of 65% *multiplied by* the Net Orderly Liquidation Value percentage identified in the most recent inventory appraisal ordered by the Administrative Agent *multiplied by* an amount equal to the sum of all Eligible In-Transit Inventory of Orchard and its Subsidiaries; and

(y) 55% of the Borrowers' Eligible In-Transit Inventory (valued at the lower of cost (FIFO) or market value);

plus

(e) 100% of the unrestricted cash of the Borrowers held in any account subject to a first priority perfected Lien in favor of the Administrative Agent as set forth herein(other than, for the avoidance of doubt, any cash maintained in any deposit and lockbox accounts that are (x) subject to Liens in favor of WebBank or SCUSA (or any similar counterparty under any Replacement WebBank/SCUSA Agreement or Other Receivables Facility), (y) maintained by a Borrower as a

servicer under the Related Agreements (or any agreements with respect to any Replacement WebBank/SCUSA Agreement or Other Receivables Facility) or (z) maintained by a Borrower to cash collateralize any letters of credit);

minus

(f) Reserves.

"**Borrowing Base Certificate**" means a certificate, signed and certified as accurate and complete by the CRO of the Borrower Representative, in substantially the form of Exhibit G or another form which is acceptable to the Administrative Agent in its Permitted Discretion.

"**Borrowing Request**" means a request by the Borrower Representative on behalf of one or more Borrowers for a Borrowing in accordance with Section 2.03 and substantially in the form attached hereto as Exhibit C or such other form that is reasonably acceptable to the Administrative Agent.

"**BSI**" means Bluestem Sales, Inc., a Delaware corporation.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York or Minneapolis, Minnesota are authorized or required by law to remain closed; provided that when used in connection with a Eurocurrency Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollars in the London interbank market.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations, preferred equity certificates or other equivalents (however designated) of capital stock of a corporation or limited liability company (if applicable), any and all equivalent ownership interests in a Person (other than a corporation or limited liability company, if applicable), including partnership interests and membership interests, and any and all warrants, profit participation interests, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding, for the avoidance of doubt, any Indebtedness convertible into or exchangeable for any of the foregoing.

"**Carve-Out**" has the meaning set forth in the Interim Order and Final Order, as applicable.

"**Carve-Out Trigger Date**" has the meaning set forth in the Interim Order and Final Order, as applicable.

"**Carve-Out Trigger Notice**" has the meaning set forth in the Interim Order and Final Order, as applicable.

"**Cash Dominion Period**" means upon the occurrence of and during the continuation of any Event of Default.

"**Cash Equivalents**" means, as at any date of determination, (a) securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the U.S. government or (ii) issued by any agency or instrumentality of the U.S., the obligations of which are backed by the full faith and credit of the U.S., in each case maturing within one year after such date and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (b) direct obligations issued by any state of the U.S., or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating organization) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); (d) deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within one year after such date and issued or accepted by any Lender or by any bank or trust company organized under, or authorized to operate as a bank or trust company under, the laws of the U.S., any state thereof or the District of Columbia or any political subdivision thereof and that has capital and surplus of not less than $500,000,000 and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; and (e) shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in clauses (a) through (d) above, (ii) net assets of not less than $500,000,000 and (iii) a rating of at least A-2 from S&P or at least P-2 from Moody's. "Cash Equivalents" shall also include (x) investments of the type and maturity described in clauses (a) through (f) above of foreign obligors, which investments or obligors (or the parent companies thereof) have the ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments described in clauses (a) through (f) and in this paragraph.

"**Change in Law**" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date (other than any such request, guideline or directive to comply with any law, rule or regulation that was in effect on the Closing Date).  For purposes of this definition and Section 2.15, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or U.S. regulatory authorities, in each case pursuant to Basel III, shall in each case described in clauses (a), (b) and (c) above, be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

"**Change of Control**" means Holdings ceasing to own, directly or indirectly, 100% of the Capital Stock of each of the Borrowers and their respective Subsidiaries.

"**Chapter 11 Cases**" has the meaning provided in the recitals to this Agreement.

"**Charged Amounts**" has the meaning assigned to such term in Section 9.19.

"**Class**" means, when used with respect to any Loan or Borrowing, as to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Term Loans.

"**Closing Date**" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"**Closing Fee**" has the meaning assigned to such term in Section 2.12(a).

"**Collateral**" has the meaning specified therefor in Section 2.22(a).

"**Collateral Access Agreement**" means any landlord waiver, collateral access agreement or other similar agreement, in form and substance reasonably satisfactory to the Administrative Agent, between the Administrative Agent and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Loan Party for any real property where any Collateral is located, as such landlord waiver, collateral access agreement or other similar agreement may be amended, restated, or otherwise modified from time to time.

"**Committee**" means, collectively, any official committee of unsecured creditors and any other official committee appointed in any of the Chapter 11 Cases under Section 1102 of the Bankruptcy Code.

"**Commitment**" means, with respect to each Lender, such Lender's Revolving Commitment, if any, and such Lender's Term Loan Commitment, if any.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Company Competitor**" means any competitor of a Borrower and/or any of its subsidiaries.

"**Competitor Debt Fund Affiliate**" means, with respect to any Company Competitor or any Affiliate thereof, any debt fund, investment vehicle, regulated bank entity or unregulated lending entity that is (i) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business (other than in distressed or opportunistic situations) and (ii) managed, sponsored or advised by any Person that is controlling, controlled by or under common control with the relevant Company Competitor or Affiliate thereof, but only to the extent that no personnel involved with the investment in the relevant Company Competitor (A) makes (or has the right to make or participate with others in making) investment decisions on behalf of, or otherwise cause the direction of the investment policies of, such debt fund, investment vehicle, regulated bank entity or unregulated entity or (B) has access to any information (other than information that is publicly available) relating to

Holdings, a Borrower and/or any entity that forms part of any of their respective businesses (including any of their respective subsidiaries).

"**Confidential Information**" has the meaning assigned to such term in Section 9.13.

"**Contractual Obligation**" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Controlled Account**" means each Deposit Account, securities account or commodities accounts subject to an Existing Control Agreement or which has been, or required to be, subject to a Control Agreement.

"**Control Agreement**" means with respect to a Deposit Account, securities account or commodities account established by a Loan Party, an account control agreement, in form and substance reasonably satisfactory to the Administrative Agent, establishing control (as defined in the UCC) of such account by the Administrative Agent.

"**Controlled Account Bank**" means each bank with whom accounts are maintained in which any funds of any of the Loan Parties from one or more Deposit Accounts, securities accounts or commodities are maintained and with whom an Existing Control Agreement or a Control Agreement has been, or is required to be, executed in accordance with the terms hereof.

"**Copyright**" means the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations and copyright applications, (b) all renewals of any of the foregoing, (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing, (d) the right to sue for past present and future infringement of any of the foregoing, and (e) all rights corresponding to any of the foregoing.

"**Credit Card Agreements**" means, all agreements now or hereafter entered into by Loan Parties with any credit card issuer or any credit card processor for the extension of credit to customers of one or more Loan Parties, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"**Credit Card Receivables**" means, collectively, all Accounts owing to Loan Parties from Alliance Data Systems, Inc. and its affiliates, or any other financial institution acceptable to the Administrative Agent in its Permitted Discretion, American Express, Diners Club, Shopper's Charge, Visa, Mastercard or Discover (a) arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card, or (b) in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit

card, including, but not limited to, all amounts at any time due or to become due under the Credit Card Agreements or otherwise.

"**Credit Facility**" means the credit facility evidenced by this Agreement.

"**CRO**" means a chief restructuring officer appointed by the Loan Parties who will have primary responsibility for the Loan Parties' restructuring, including overseeing the Loan Parties' liquidity, cash management process and budgeting process under the oversight, approval and direction of the Board of Directors of the Borrower Representative, in each case, to be acceptable to the Administrative Agent and the Required Lenders. In addition, the CRO will be a member of the Loan Parties' executive leadership team and have input into the operations and material management actions of the Loan Parties together with the chief executive officer, chief financial officer and general counsel. Notwithstanding any of the foregoing, the CRO shall report directly to the Board of Directors of the Borrower Representative which shall be the only governing body with oversight over the CRO. For the avoidance of doubt, the "CRO" shall be Robert Warshauer of Imperial Capital, LLC or any replacement thereof as permitted under the terms of this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition which upon notice, lapse of time or both hereunder would become an Event of Default.

"**Defaulting Lender**" means any Lender that has (a) failed to fund all or any portion of its Loans within two Business Days of the date required to be funded by it hereunder, (b) notified the Administrative Agent or the Borrowers in writing that it does not intend to satisfy any such funding obligation or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (c) failed, within two Business Days after the request of Administrative Agent or the Borrowers, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrowers, (d) become (or any parent company thereof has become) insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority or (e) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment, unless in the case of any Lender subject to this clause (e), the Borrowers and the Administrative Agent have each determined that such Lender intends, and has all approvals required to enable it (in form and substance satisfactory to each of the Borrowers and the Administrative Agent), to continue to perform its obligations as a Lender

hereunder; provided that no Lender shall be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in such Lender or its parent by any Governmental Authority; provided that such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contract or agreement to which such Lender is a party.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disposition**" or "**Dispose**" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, subleases (including any sale-lease back transaction) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"**Disqualified Capital Stock**" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to 91 days following the Maturity Date shall constitute Disqualified Capital Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof or (d) provides for the scheduled payments of dividends in cash on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued.

"**Disqualified Institution**" means: (i) any Company Competitor and/or any Affiliate of any Company Competitor, in each case identified to the Administrative Agent on or prior to March 8, 2020, (ii) any Company Competitor that is identified in writing and reasonably acceptable to the Administrative Agent, (iii) any reasonably identifiable Affiliate of any Person described in clauses (i) and/or (ii) above (other than any Competitor Debt Fund Affiliate) and (iv) any other Affiliate of any Person described in clauses (i) and/or (iii) above that is identified by a written notice to the Administrative Agent after March 8, 2020 (it being understood and agreed that no Competitor Debt Fund Affiliate of any Company Competitor may be designated as Disqualified Institution pursuant to this clause (iv)).

"**Dollars**" or "**$**" refers to lawful money of the U.S.

"**Domestic Subsidiary**" means any Subsidiary incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"**Eligible Assignee**" means (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender and (d) any Approved Fund of any Lender; provided that in any event, "Eligible Assignee" shall not include (i) any natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, (ii) any Disqualified Institution or (iii) a Loan Party or any of its Affiliates.

"**Eligible Credit Card Receivables**" means, on any date of determination, all of the Credit Card Receivables of the Borrowers as arise in the ordinary course of business, which have been earned by performance, that are not excluded as ineligible by virtue of one or more of the criteria set forth below and are reflected in the most recent Borrowing Base Certificate delivered by the Borrower Representative to the Administrative Agent.  None of the following shall be deemed to be Eligible Credit Card Receivables:

(a)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale, or for such longer period(s) as may be approved by the Administrative Agent;

(b)     Credit Card Receivables with respect to which a Borrower does not have good, valid and marketable title thereto;

(c)     Credit Card Receivables that are not subject to a first priority perfected Lien (subject to Permitted Liens) interest in favor of the Administrative Agent for its own benefit and the benefit of the other Secured Parties

(d)     Credit Card Receivables which are subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Lien that does not have priority over the Lien in favor of the Administrative Agent  (unless a Reserve has been taken in accordance with the terms herewith);

(e)     Credit Card Receivables which are disputed, or with respect to which a claim, counterclaim, offset or chargeback has been asserted, by the related credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback) (it being the intent that chargebacks in the ordinary course by the credit card processors as contemplated by the applicable Credit Card Agreement shall not be deemed violative of this clause);

(f)     Except as otherwise approved by the Administrative Agent, Credit Card Receivables as to which the credit card processor has the right under certain circumstances to require the applicable Borrower to repurchase such Credit Card Receivables from such credit card processor;

(g)     Credit Card Receivables other than from Alliance Data Systems, Inc. and its Affiliates, Visa, Mastercard, Diners Club, American Express, Shopper's Charge or Discover, which the Administrative Agent determines in its commercially reasonable discretion, acting in good faith, to be unlikely to be collected;

(h)     Credit Card Receivables as to which any of the applicable representations or warranties in the Loan Documents are untrue in any material respect (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects); or

(i)     Credit Card Receivables as to which the related credit card processor or the issuer of the related credit card is the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment.

Notwithstanding the above, the Administrative Agent reserves the right (without duplication of other criteria and Reserves), at any time and from time to time after the Closing Date, upon at least three (3) Business Days prior written notice to the Borrower Representative, to adjust the criteria set forth above and to establish new criteria with respect to Eligible Credit Card Receivables (including, without limitation, for estimates, chargeback or other accrued liabilities or offsets by credit card processors and amounts to adjust for material claims, offsets, defenses or counterclaims or other material disputes) from time to time in its Permitted Discretion.  The Administrative Agent agrees to engage in good faith discussions with the Borrower Representative regarding its rationale for taking any action under this paragraph promptly after taking such action.

"**Eligible In-Transit Inventory**" means, as of any date of determination, without duplication of other Eligible Inventory,  Inventory located outside of the United States (a) which has been shipped by or on behalf of a supplier from any location for receipt by a Borrower within sixty (60) days of the date of determination (or such longer period of time as the Administrative Agent shall determine in the case of any Inventory that has been delayed because of a customs audit or inspection), but which has not yet been received by such Borrower; (b) for which the purchase order is in the name of a Borrower, and title has passed to a Borrower, (c) for which the document of title, to the extent applicable, reflects a Borrower as consignee (along with delivery to such Borrower of the documents of title, to the extent applicable, with respect thereto), (d)  as to which the Administrative Agent has control over the documents of title, to the extent applicable, which evidence ownership of the subject Inventory (such as by the delivery of a Freight Forwarding Agreement) or the goods covered by such document of title are expected to be delivered to a distribution center operated by a Borrower or any of its Subsidiaries within 30 days of the date such goods become the subject of such document of title, (e) is covered by insurance reasonably acceptable to the Administrative Agent, and (f) which otherwise is not excluded from the definition of Eligible Inventory.  Notwithstanding the above, the Administrative Agent reserves the right (without duplication of other criteria and Reserves), at any time and from time to time after the Closing Date, upon at least three (3) Business Days prior written notice to the Borrower Representative, (x) to adjust the criteria set forth above and to establish new criteria with respect to Eligible In-Transit Inventory, in its Permitted Discretion, and (y) to establish, modify or eliminate Reserves against Eligible In-Transit Inventory from time to time in its Permitted Discretion.  The Administrative Agent agrees to engage in good faith discussions with the Borrower Representative regarding its rationale for taking any action under this paragraph promptly after taking such action.

"**Eligible Inventory**" means, at any time, the Inventory of any Borrower which the Administrative Agent determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans.  Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Administrative Agent (other a Landlord Lien as to which a Landlord Lien Reserve applies and other Permitted Liens);

(b)     which is subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Lien that does not have priority over the Lien in favor of the Administrative Agent (unless a Reserve has been taken in accordance herewith);

(c)     which is slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity; provided, that Inventory shall be deemed obsolete if such Inventory is being liquidated;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement has been breached or is not true in any material respects and which does not conform in all material respects to all standards imposed by any Governmental Authority;

(e)     in which any Person other than a Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have a prior perfected security interest therein;

(f)     which is not finished goods or which constitutes work-in-process, raw materials, spare or replacement parts, subassemblies, promotional materials (so called "premium inventory"), packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return (unless Administrative Agent shall otherwise consent in its Permitted Discretion), repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)     which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers, provided that the foregoing may constitute Eligible In-Transit Inventory in accordance with the definition thereof;

(h)     which is located in any Specified Location leased by any Borrower unless (i) the lessor has delivered to the Administrative Agent a Collateral Access Agreement as to such Specified Location or (ii) a Landlord Lien Reserve with respect to such Specified Location has been established by the Administrative Agent in its Permitted Discretion;

(i)     which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) at a Specified Location and is not evidenced by

a Document (other than bills of lading to the extent permitted pursuant to clause (g) above), unless (i) such warehouseman or bailee has delivered to the Administrative Agent a Collateral Access Agreement and such other documentation as the Administrative Agent may reasonably require or (ii) a Landlord Lien Reserve has been established by the Administrative Agent in its Permitted Discretion;

(j)    which is being processed offsite at a third party location or outside processor, or is in-transit to or from said third party location or outside processor (unless, in each case, such third party or outside processor has submitted a form of acknowledgement of the Administrative Agent's security interest in such Inventory;

(k)    which is the subject of a consignment by any Borrower as consignor;

(l)    which contains or bears any intellectual property rights licensed to any Borrower unless the Administrative Agent is reasonably satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(m)    which is not reflected in a current perpetual inventory report of any Borrower (unless such Inventory is reflected in a report to the Administrative Agent as "in transit" Inventory);

(n)    which is not the type held for sale in the ordinary course of a Borrower's business;

(o)    for which reclamation rights have been asserted by the seller; or

(p)    which the Administrative Agent otherwise determines is unacceptable for any reason whatsoever, in its Permitted Discretion.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower Representative shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate.  The Administrative Agent retains the right (without duplication of other criteria and Reserves), from time to time, in its Permitted Discretion, upon at least three (3) Business Days prior written notice to the Borrower Representative, to establish additional standards of eligibility and Reserves against eligibility, adjust Reserves and to reduce advance rates.

"**Eligible Other Receivables**" means, on any date of determination, all of the Other Receivables of the Loan Parties that are not excluded as ineligible by virtue of one or more of the criteria set forth below and are reflected in the most recent Borrowing Base Certificate delivered by the Borrower Representative to the Administrative Agent.  None of the following shall be deemed to be Eligible Other Receivables:

(a)    Other Receivables with respect to which the applicable Borrower does not have good title thereto;

16

(b)      Other Receivables that are not subject to a first priority perfected Lien in favor of the Administrative Agent for its own benefit and the benefit of the other Secured Parties (unless a Reserve has been taken in accordance herewith);

(c) Other Receivables which are subject to any Lien other than (i) a Lien in favor of the Administrative Agent and (ii) a Permitted Lien that does not have priority over the Lien in favor of the Administrative Agent;

(d)      Other Receivables due from an Account Debtor that is not domiciled in the United States and (if not a natural Person) organized under the laws of the United States or any political subdivision thereof, unless (A) such Other Receivable (or portion thereof that is reasonably acceptable to the Administrative Agent) is backed by a letter of credit, guarantee or eligible bankers' acceptance reasonably acceptable to the Administrative Agent and if required by the Administrative Agent, the original of such letter of credit has been delivered to the Administrative Agent or its agent, and such Borrower has assigned the proceeds of such letter of credit to the Administrative Agent or naming the Administrative Agent as transferee beneficiary thereunder or (B) such Other Receivable is otherwise acceptable in all respects to the Administrative Agent (subject to such lending formula with respect thereto as the Administrative Agent shall reasonably determine);

(e)      Other Receivables payable in any currency other than Dollars;

(f)      any Other Receivable that does not arise from the sale of goods (including gift cards and gift certificates for which terms have been extended), licensing of intellectual property or the performance of services by such Borrower in the ordinary course of its business;

(g)      any Other Receivable that does not comply in all material respects with all applicable legal requirements, including, without limitation, all laws, rules, regulations and orders of any Governmental Authority;

(h)      any Other Receivable (i) to the extent that a Borrower's right to receive payment is contingent upon the fulfillment of any condition whatsoever unless such condition is satisfied or (ii) as to which a Loan Party is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial or administrative process or (iii) that represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to a Loan Party's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

(i)      to the extent that any defense, counterclaim, rescission, recoupment, setoff or dispute is asserted as to such Other Receivable, it being understood that the remaining balance of the Other Receivables shall be eligible;

(j)      any Other Receivable that is not a true and correct statement of bona fide indebtedness incurred in the amount of such Other Receivable for merchandise sold or intellectual property licensed to or services rendered and accepted by the applicable Account Debtor;

(k)    any Other Receivable that arises from a sale to any Affiliate of a Borrower, or to any entity that has any common officer with any Borrower;

(l)    to the extent a Borrower is liable for goods sold or services rendered by the applicable Account Debtor to such Borrower but only to the extent of the potential offset;

(m)    any Other Receivable that arises with respect to goods that are delivered on a bill-and-hold, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional;

(n)    any Other Receivable that is in default as evidenced by a written notice of default; provided that, without limiting the generality of the foregoing, an Other Receivable shall be deemed in default (whether or not there has been any written notice) upon the occurrence of any of the following:

(i)    such Other Receivable is not paid within 90 days following its original invoice date or is more than 60 days past due according to its original terms of sale; or

(ii)    the Account Debtor obligated upon such Other Receivable suspends business, make a general assignment for the benefit of creditor or fails to pay its debts generally as they come due; or

(iii)    a petition is filed by or against any Account Debtor obligated upon such Other Receivables under any bankruptcy law or any other federal, state or foreign receivership, insolvency relief or other law or laws for the relief of debtors;

(o)    any Other Receivable that is the obligation of an Account Debtor (other than an individual) if 50% or more of the dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth in this definition other than a failure to satisfy clause (q) below;

(p)    any Other Receivable as to which any of the applicable representations or warranties in the Loan Documents are untrue in any material respect (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects);

(q)    to the extent any such Other Receivable is evidenced by a judgment, instrument or chattel paper;

(r)    to the extent any such Other Receivable exceeds any credit limit established by the Administrative Agent, in its Permitted Discretion, following prior notice of such limit by the Administrative Agent to the Loan Parties as forth in the last paragraph of this definition;

(s)    any Other Receivable, in the aggregate in excess of $200,000, on which the Account Debtor is a Governmental Authority, unless the applicable Borrower has assigned its rights to payment of such Account to the Administrative Agent, on behalf of the Secured

Parties, pursuant to the Assignment of Claims Act of 1940, as amended, in the case of a federal United States Governmental Authority, and pursuant to any applicable law, if any, in the case of any Governmental Authority, and such assignment has been accepted and acknowledged by the appropriate government authorities;

Notwithstanding the above, the Administrative Agent reserves the right (without duplication of other criteria and Reserves), at any time and from time to time after the Closing Date, upon at least three (3) Business Days prior written notice to the Borrower Representative, (x) to adjust the criteria set forth above and to establish new criteria with respect to Eligible Other Receivable, in its Permitted Discretion, and (y) to establish, modify or eliminate Reserves against Eligible Other Receivables from time to time in their Permitted Discretion. The Administrative Agent agrees to engage in good faith discussions with the Borrower Representative regarding its rationale for taking any action under this paragraph promptly after taking such action.

"**Enforcement Notice**" has the meaning provided for in the Interim Order and the Final Order, as applicable.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law or actual or alleged Environmental Liability; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all applicable Requirements of Law and Governmental Authorizations relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; or (b) the generation, use, storage, transportation or disposal of or exposure to Hazardous Materials.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) any Hazardous Material Activities, (c) exposure to any Hazardous Materials, or (d) any contract pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the 30-day notice period has been waived); (b) the failure to meet the minimum funding standard of Sections 412 or 430 of the Internal Revenue Code or Sections 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code); (c) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Internal Revenue Code or Section 406 of ERISA with respect to a Pension Plan; (d) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) or Section 302 of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (e) the withdrawal by a Borrower or any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to a Borrower or any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (f) the institution by the PBGC of proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (g) the imposition of liability on a Borrower or any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (h) a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) of a Borrower or any of its Subsidiaries or any of their respective ERISA Affiliates from any Multiemployer Plan if there is any potential liability therefor under Title IV of ERISA, or the receipt by a Borrower or any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; or (i) the incurrence of liability or the imposition of a Lien pursuant to Section 436 or 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Rate**" means, for any Interest Period:

      (a)    in the case of any Eurocurrency Rate Loan denominated in Dollars:

      (i)    the rate per annum equal to the offered rate that appears on the applicable Reuters Screen (or any successor thereto) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period; or

      (ii)    if the rate referenced in the preceding clause (a)(i) does not appear on such page or service or such page or service shall not be available, the rate per annum equal to the rate reasonably determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average ICE Benchmark Administration rate for deposits in Dollars offered in the London interbank market (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period; or

(iii)   if the rates referenced in the preceding clauses (a)(i) and (a)(ii) are not available, the rate per annum reasonably determined by the Administrative Agent as the rate of interest at which deposits in Dollars for delivery on the first day of such Interest Period in immediately available funds in the approximate amount of the Eurocurrency Rate Loan being made, continued or converted by the Administrative Agent and with a term equivalent to such Interest Period would be offered by a London-based Affiliate of the Administrative Agent to major banks in the London interbank market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period; and

(b)   for any interest calculation with respect to an ABR Loan on any date:

(i)   the rate per annum equal to the offered rate that appears on the applicable Reuters Screen (or any successor thereto) for one-month deposits in Dollars offered in the London interbank market (for delivery on the first day of such Interest Period) commencing on such date, determined as of approximately 11:00 a.m. (London time) two Business Days prior to such date; or

(ii)   if the rate referenced in preceding clause (b)(i) does not appear on such page or service or such page or service shall not be available, the rate per annum equal to the rate reasonably determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average ICE Benchmark Administration rate for one-month deposits in Dollars offered in the London interbank market (for delivery on the first day of such Interest Period) commencing on such date, determined as of approximately 11:00 a.m. (London time) two Business Days prior to such date; or

(iii)   if the rates referenced in preceding clauses (b)(i) and (b)(ii) are not available, the rate per annum reasonably determined by the Administrative Agent as the rate of interest at which deposits in Dollars for delivery on the date of determination in immediately available funds in the approximate amount of the ABR Loan being made and with a term equal to one month would be offered by a London-based Affiliate of the Administrative Agent to major banks in the London interbank market at their request at the date and time of such determination;

provided that, notwithstanding the foregoing, if the Eurocurrency Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Event of Default**" has the meaning assigned to such term in Article 7.

"**Exchange Act**" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Assets**" means each of the following:

(a)       any intent-to-use (or similar) Trademark application prior to the filing and acceptance of a "Statement of Use", "Amendment to Allege Use" or similar filing with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein may impair the validity or enforceability of such intent-to-use Trademark application under applicable law;

(b)       (i) all Purchased Assets and any other Receivables and related assets sold by a Borrower and its Subsidiaries to SCUSA under the SCUSA Sale Agreement to the extent in accordance with the terms thereof, (ii) any deposit and lockbox accounts that are (x) subject to Liens in favor of WebBank or SCUSA (or any similar counterparty under any Replacement WebBank/SCUSA Agreement or Other Receivables Facility) in accordance with the terms of the Program Agreement or (y) maintained by a Borrower or any Subsidiary as a servicer under and accordance with the Related Agreements, and (iii) the "Letter of Credit" and "Collateral Account" (as each such term is defined in the Bank Financial Agreement);

(c)       any Avoidance Actions; provided that, subject to entry of the Final Order, the proceeds of Avoidance Actions shall no longer be considered Excluded Assets; and

(d)       means any agreements, permits, licenses, or the like solely in the event and to the extent that a grant of a Lien on such license, contract, or agreement results in a termination of any such license, contract, or agreement or would render such license, contract or agreement non-assumable or non-assignable under the Bankruptcy Code (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, or 9-408 of the Uniform Commercial Code (or any successor provision or provisions)) and, in any event, immediately upon the ineffectiveness, lapse or termination of any such terms or default under such license, contract or agreement, the Collateral shall include, and the applicable Loan Party shall be deemed to have granted a security interest in, all such licenses, contracts, or agreements as if such terms had never been in effect.

"**Excluded Taxes**" means, with respect to the Administrative Agent, or any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on (or measured by) its net or overall gross income or franchise Taxes (i) imposed as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, the applicable taxing jurisdiction or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed under Section 884(a) of the Internal Revenue Code or any similar Tax imposed by any jurisdiction described in underline clause (a), (c) any withholding tax that is imposed on amounts payable to the relevant recipient pursuant to a Requirement of Law in effect at the time the relevant recipient becomes a party to this Agreement (or designates a new lending office), except (i) in the case of a recipient that became a recipient pursuant to an assignment under Section 2.19 or a recipient that designates a new lending office under Section 2.19 and (ii) to the extent that the relevant recipient (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts from any Loan Party with respect to such withholding tax pursuant to Section 2.17, (d) any tax imposed as a result of a failure by the Administrative Agent or the applicable Lender to comply with Section 2.17(f), (e) any withholding tax under FATCA, and (f) any tax imposed as a result of a failure by the Administrative Agent to comply with Section 2.17(j).

"**Existing Control Agreements**" means each of the deposit account control agreements in effect as of the Petition Date between the applicable Loan Parties, the Prepetition ABL Agent, the Prepetition Term Loan Agent and the applicable Controlled Account Banks in respect of the Controlled Accounts.  For the avoidance of doubt, each Existing Control Agreement is deemed to apply for the benefit of the Administrative Agent, on behalf of the Lenders under this Agreement, the Interim Order and the Final Order, as applicable.

"**Existing Credit Card Agreements**" means the credit card arrangements listed on Schedule 3.18.

"**Extraordinary Receipts**" means any cash received by Holdings or any of its Subsidiaries not in the ordinary course of business (other than Dispositions, incurrence of Indebtedness or the issuance of Capital Stock), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of Holdings or any of its Subsidiaries or (ii) received by Holdings or any of its Subsidiaries as reimbursement for any costs previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement (other than working capital purchase price adjustments).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now or hereafter owned or leased by a Loan Party or any of its subsidiaries or any of their respective predecessors.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code (or any amended or successor version described above), and any treaty, law, regulation or other official guidance enacted in any other jurisdiction pursuant to an intergovernmental agreement between the U.S. and such jurisdiction that facilitates the implementation of such sections of the Internal Revenue Code.

"**FCPA**" has the meaning assigned to such term in Section 3.15(c).

"**Federal Funds Effective Rate**" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it; provided, that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Administrative Agent and the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to enter into and perform under this Agreement and any other Loan Documents, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the superpriority claims as further set forth herein and therein.

"**Final Order Entry Date**" means the date on which the Final Order shall have been entered by the Bankruptcy Court.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings for financial reporting purposes hereunder ending on or about January 31 of each calendar year.

"**Flood Hazard Property**" means any parcel of any owned Real Estate Asset subject to a Mortgage located in the U.S. in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Lender**" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Freight Forwarding Agreement**" means a multi-party agreement in a form and substance reasonably satisfactory to the Administrative Agent among a Loan Party, a customs broker, freight forwarder, or other carrier, and the Administrative Agent in which the customs broker, freight forwarder, or other carrier acknowledges that it has control over (in the case of persons other than carriers which are issuing non-negotiable bills of lading) and holds the documents evidencing ownership of the subject inventory or other property for the benefit of the Administrative Agent and agrees, upon notice from the Administrative Agent to hold and dispose of the subject Inventory and other property solely as directed by the Administrative Agent. For the avoidance of doubt, each Existing Freight Forwarding Agreement is deemed to apply for the benefit of the Loan Parties under this Agreement, the Interim Order and the Final Order, as applicable.

"**GAAP**" means generally accepted accounting principles in the U.S. in effect and applicable to the accounting period in respect of which reference to GAAP is made.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the U.S. or a foreign government.

"**Governmental Authorization**" means any permit, license, approval, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guarantee**" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, underlined provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"**Guaranteed Obligations**" has the meaning specified therefor in Section 11.01.

"**Guarantor**" and "**Guarantors**" means Holdings, the Borrowers, each Subsidiary of the Borrowers and each other Person which guarantees all or any part of the Obligations; provided, no Foreign Subsidiary or any Subsidiary of a Foreign Subsidiary shall be a Guarantor.

"**Guaranty**" means the guaranty of each Guarantor party hereto contained in Article 11 hereof.

"**Hazardous Materials**" means any chemical, material, substance or waste, or any constituent thereof, (i) that is defined, listed or regulated as hazardous, toxic, a pollutant or a contaminant under applicable Environmental Law or (ii) exposure to which is prohibited, limited or regulated by any Environmental Law or any Governmental Authority.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Material, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, import, export, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Material, and any corrective action or response action with respect to any of the foregoing.

"**Holdings**" has the meaning assigned to such term in the preamble to this Agreement.

"**Indebtedness**" as applied to any Person means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; (c) all obligations of such Person evidenced by bonds, debentures,

notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding (i) any earn out obligation or purchase price adjustment until such obligation (A) becomes a liability on the statement of financial position or balance sheet (excluding the footnotes thereto) in accordance with GAAP and (B) has not been paid within 30 days after becoming due and payable, (ii) any such obligations incurred under ERISA, (iii) accrued expenses and trade accounts payable in the ordinary course of business (including on an inter-company basis) and (iv) liabilities associated with customer prepayments and deposits), which purchase price is (A) due more than six months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument; (e) all Indebtedness of others secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person; (f) the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings (except to the extent the relevant reimbursement obligations relate to trade payables and are satisfied within 20 days following the incurrence thereof); (g) the Guarantee by such Person of the Indebtedness (as described in clauses (a) through (f), and (h) and (i)) of another Person; (h) all obligations of such Person in respect of any Disqualified Capital Stock and (i) all net obligations of such Person in respect of any hedge agreement, interest rate swap or similar arrangement, whether or not entered into for hedging or speculative purposes; provided that the amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable Requirements of Law or any agreement or instrument by virtue of such Person's ownership interest in such Person, except to the extent the terms of such Indebtedness provided that such Person is not liable therefor.

"**Indemnified Taxes**" means all Taxes, other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnitee**" has the meaning assigned to such term in Section 9.03(b).

"**Interest Election Request**" means a request by the Borrower Representative in the form of Exhibit D or such other form reasonably acceptable to the Administrative Agent to convert or continue a Borrowing in accordance with Section 2.08.

"**Interest Payment Date**" means (a) with respect to any ABR Loan, the first Business Day of each calendar month, upon any prepayment due to acceleration and the Maturity Date, and (b) with respect to any Eurocurrency Rate Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" means with respect to any Eurocurrency Rate Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in

the calendar month that is one, two or three months thereafter, as the Borrower Representative may elect; <u>provided</u> that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interim Order**" means an order of the Bankruptcy Court in the Chapter 11 Cases authorizing the Loan Parties to enter into and perform under this Agreement and any other Loan Documents, to incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the superpriority claims, as set forth herein, for an interim period, under, *inter alia*, Sections 364(c) of the Bankruptcy Code and entered at or after an interim hearing, substantially in the form attached hereto as Exhibit B or otherwise in form and substance satisfactory to the Administrative Agent and the Required Lenders, together with all extensions, modifications, and amendments thereto approved by the Administrative Agent and the Required Lenders.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986.

"**Investment**" means (a) any purchase or other acquisition by a Borrower or any of its Subsidiaries of any of the Securities of any other Person, (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance or capital contribution by a Borrower or any of its Subsidiaries to any other Person.  The amount of any Investment shall be the original cost of such Investment, plus the cost of any addition thereto that would otherwise constitute an Investment, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto, but giving effect to any repayments of principal in the case of any Investment in the form of a loan and any return of capital or return on Investment in the case of any equity Investment (whether as a distribution, dividend, redemption or sale but not in excess of the amount of the relevant initial Investment).

"**IP Rights**" has the meaning assigned to such term in Section 3.05(c).

"**IRS**" means the U.S. Internal Revenue Service.

"**Landlord Lien**" means any Lien of a landlord on any Loan Party's property, granted by statute.

"**Landlord Lien Reserve**" means, with respect to any location at which Inventory of a Loan Party is located in a Landlord Lien State (a "**Specified Location**") of any Loan Party, an amount determined by the Administrative Agent in its Permitted Discretion (not to exceed up to

three (3) month's rent for each such Specified Location), other than any such Specified Location with respect to which the Administrative Agent shall have received a Collateral Access Agreement (it being understood that upon receipt of any such Collateral Access Agreement with respect to any such Specified Location, any Landlord Lien Reserve shall be released; provided that the foregoing shall not limit the ability of the Administrative Agent to apply other Reserves otherwise permitted by this Agreement).

"**Landlord Lien State**" means any state in which, at any time, a landlord's claim for rent or the claims of the owner of a warehouse or other storage facility for rent, fees or other charges has priority by operation of law over the Lien of the Administrative Agent in any of the Collateral consisting of Eligible Inventory as reasonably determined by the Administrative Agent.

"**Legal Reservations**" means the application of relevant Debtor Relief Laws, general principles of equity and/or principles of good faith and fair dealing.

"**Lenders**" means the Persons holding a Commitment and listed on Schedule 1.01(a) and any other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption, or, if the Commitments have terminated or expired, a Lender holding Loans.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall an operating lease in and of itself be deemed to constitute a Lien.

"**Liquidity**" means at any given time, the sum of (i) unrestricted cash and Cash Equivalents maintained by the Loan Parties and their Subsidiaries in the United States at such time subject to a first priority Lien of the Administrative Agent pursuant to the Interim Order and Final Order, as applicable, plus (ii) the aggregate Available Revolving Commitment .

"**Loan Documents**" means this Agreement, the Interim Order, the Final Order, any Promissory Note, any Mortgage, any guarantee on account of the Obligations, any security agreement or any pledge agreement entered into by any Loan Party with respect to the Obligations, any supplement thereto and any other instruments and documents pursuant to which any Loan Party grants a Lien on any Collateral as security for payment of the Obligations.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto.

"**Loan Parties**" means Holdings, the Borrowers and each Subsidiary Guarantor.

"**Loans**" means the loans and advances made by the Lenders pursuant to this Agreement, including Revolving Loans and Term Loans,

"**Margin Stock**" has the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities or condition (financial or otherwise) of the Loan Parties and their Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under this Agreement or any other Loan Document; or (c) a material impairment of the rights and remedies of the Administrative Agent or any Lender under this Agreement or any other Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of this Agreement or any other Loan Document.  In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case, including, for the avoidance of doubt, all events leading up to the filing and any results from the filing (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court) and (ii) the incurrence of any claim or liability that is prepetition, unsecured and junior in priority to the Obligations will, individually and collectively, not be deemed to have a Material Adverse Effect.

"**Material Contract**" means any Contractual Obligation to which any Loan Party is a party (other than this Agreement and the Loan Documents) for which material breach or termination could reasonably be expected to have a Material Adverse Effect.

"**Material Debt Instrument**" means any note evidencing any Indebtedness for borrowed money in which a Lien has been granted to the Administrative Agent and delivered to the Administrative Agent (or its bailee) hereunder.

"**Maturity Date**" means the date which is the earliest of (a) the date which is 35 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the date that is six (6) months following the Petition Date, (c) the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of any plan of reorganization or liquidation in the Chapter 11 Cases which is confirmed by an order of the Bankruptcy Court; (d) the date on which the Sale is consummated or any other sale of all or substantially all of the Loan Parties' assets and/or Capital Stock is consummated under Section 363 and/or Section 1129 of the Bankruptcy Code; and (e) the date of termination of the Commitments by the Administrative Agent pursuant to Section 7.01;

"**Maximum Rate**" has the meaning assigned to such term in Section 9.19.

"**Measurement Period**" means the trailing four-week period ending on Friday of each week; provided, that, with respect to the Measurement Periods ending on the second, third and fourth Fridays of each full week following the Petition Date, the Measurement Period shall mean the period from the Petition Date to such Friday, as applicable; provided that, for the avoidance of doubt, there shall be no Measurement Period ending on the first Friday following the Petition Date.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgages**" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the relevant Secured Parties, on any owned Real Estate Asset constituting Collateral.

"**Multiemployer Plan**" means any employee benefit plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA, that is subject to the provisions of Title IV of ERISA, and in respect of which a Borrower or any of its Subsidiaries, or any of their respective ERISA Affiliates, makes or is obligated to make contributions or with respect to which any of them has any ongoing obligation or liability, contingent or otherwise.

"**Narrative Report**" means, with respect to the financial statements in respect of which it is delivered, a customary narrative report describing the operations of the Borrowers and their Subsidiaries for the relevant Fiscal Quarter or Fiscal Year and for the period from the beginning of the then-current Fiscal Year to the end of the period to which the relevant financial statements relate.

"**Net Orderly Liquidation Value**" means, with respect to Inventory of any Person, the orderly liquidation value thereof as determined by an Acceptable Appraiser, net of all costs of liquidation thereof; provided that, for the avoidance of doubt, for purposes of calculating the Borrowing Base, the Net Orderly Liquidation Value may be determined differently with respect to the Bluestem Borrowing Base Entities than with respect to Orchard and its Subsidiaries.

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event, including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) all reasonable fees and out-of-pocket expenses and fees (including appraisal, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party or a Subsidiary to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale or other Disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by any Loan Party or Subsidiary as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness (other than the Obligations) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, or a Permitted Lien that is senior to the Lien of the Administrative Agent, (iii) amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustment associated with such Disposition (provided that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds), and (iv) all Taxes incurred in connection therewith.

"**Non-Consenting Lender**" has the meaning assigned to such term in Section 2.19(b).

"**Obligations**" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents and, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by the Chapter 11 Cases. Without limiting the generality of the foregoing, the Obligations

of each Loan Party under this Agreement and the other Loan Documents include (a) the obligation to pay principal, interest, charges, fees, expenses, indemnities and other amounts payable by such Person under this Agreement and the other Loan Documents, and (b) the obligation of such Person pursuant to this Agreement and the other Loan Documents to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender may elect to pay or advance on behalf of such Person.

"**OFAC**" has the meaning assigned to such term in <u>Section 3.15</u>.

"**Orchard**" means Orchard Brands Corporation, a Delaware corporation.

"**Organizational Documents**" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement and (e) with respect to any other form of entity, such other organizational documents required by local Requirements of Law or customary under such jurisdiction to document the formation and governance principles of such type of entity.  In the event that any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any Lender or Administrative Agent, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document or sold or assigned an interest in any Loan or Loan Document).

"**Other Receivables**" means all non-consumer Accounts owing to Loan Parties (other than Credit Card Receivables) (a) arising from sales of goods (including gift cards and gift certificates for which terms have been extended) or rendition of services to customers or (b) arising from the licensing of intellectual property to third-party licensees.

"**Other Taxes**" means all present or future stamp, court or documentary Taxes or any intangible, recording, filing or other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any Excluded Taxes.

"**Participant**" has the meaning assigned to such term in <u>Section 9.05(c)</u>.

"**Participant Register**" has the meaning assigned to such term in <u>Section 9.05(c)(iii)</u>.

"**Patent**" means the following:  (a) any and all patents and patent applications; (b) all inventions described and claimed therein, (c) all reissues, divisions, continuations, renewals,

extensions, and continuations-in-part thereof, (d) all income, royalties, damages, claims and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof, (e) all rights to sue for past, present and future infringements thereof, and (f) all rights corresponding to any of the foregoing.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code or Sections 302 or 303 of ERISA, in which a Borrower or any of its Subsidiaries, or any of their respective ERISA Affiliates, maintains or contributes to or has an obligation to contribute to, or otherwise has any liability, contingent or otherwise.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) credit judgment.

"**Permitted Liens**" means Liens permitted pursuant to Section 6.02.

"**Permitted Priority Liens**" means valid, enforceable, properly perfected, non-avoidable security interests in existence as of the Petition Date that are senior to both the Liens securing the Prepetition Term Loan Obligations (the "**Prepetition Term Loan Liens**") and the Liens securing the Prepetition ABL Obligations (the "**Prepetition ABL Liens**"); provided that Permitted Priority Liens shall not include the Prepetition ABL Liens.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"**Petition Date**" has the meaning provided in the recitals to this Agreement.

"**Plan**" means an "**employee benefit plan**" as defined in Section 3 of ERISA (other than a Multiemployer Plan), that is subject to ERISA that a Borrower or any of its Subsidiaries maintains or contributes to or has an obligation to contribute to, or otherwise has liability, contingent or otherwise.

"**Prepetition ABL Agent**" means the administrative and collateral agent under the Prepetition ABL Agreement.

"**Prepetition ABL Agreement**" means the Third Amended and Restated Credit Agreement, dated as of July 10, 2015, among, *inter alios*, Holdings, Bluestem, Orchard, CBF (as successor in interest by assignment to U.S. Bank National Association), as administrative and collateral agent, and the lenders from time to time party thereto, as amended, restated or otherwise modified from to time.

"**Prepetition ABL Lenders**" means, the lenders under the Prepetition ABL Agreement.

"**Prepetition ABL Liens**" has the meaning provided in the definition of Permitted Priority Liens.

"**Prepetition ABL Loan Documents**" means the "Loan Documents" as defined in the Prepetition ABL Agreement.

"**Prepetition ABL Obligations**" means, the "Obligations" under and as defined in the Prepetition ABL Agreement.

"**Prepetition Liabilities**" means all indebtedness, obligations (including obligations in respect of any letters of credit but excluding the Prepetition Term Loan Obligations) and liabilities of the Loan Parties incurred prior to the Petition Date plus fees, expenses, and indemnities due thereunder and interest thereon accruing both before and after the Petition Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance.

"**Prepetition Term Loan Agent**" means the administrative and collateral agent under the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Agreement**" means the Term Loan Agreement, dated as of November 7, 2014, among, *inter alios*, Holdings, Bluestem, CBF (as successor in interest by assignment to Credit Suisse AG, Cayman Islands Branch), as administrative and collateral agent, and the lenders from time to time party thereto, as amended, restated or otherwise modified from to time.

"**Prepetition Term Loan Documents**" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Lenders**" means, the lenders under the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Liens**" has the meaning provided in the definition of Permitted Priority Liens.

"**Prepetition Term Loan Obligations**" means, the "Obligations" under and as defined in the Prepetition Term Loan Agreement.

"**Prime Rate**" means the prime rate announced by JPMorgan Chase Bank N.A. from time to time. The "Prime Rate" hereunder will be adjusted each time that such announced prime rate changes. The prime rate announced by JPMorgan Chase Bank N.A. is determined solely by JPMorgan Chase Bank N.A. pursuant to market factors and its own operating needs and is not necessarily JPMorgan Chase Bank N.A.'s best or most favorable rate for commercial or other loans.

"**Proceeding**" has the meaning assigned to such term in Section 9.03(b).

"**Program Agreement**" means the Program Agreement, dated as of April 18, 2013, by and among WebBank, SCUSA, BSI and Bluestem, as amended prior to the date hereof and as the same may be further amended, modified, waived, extended, replaced or supplemented from time to time with the consent of the Administrative Agent and the Required Lenders.

"**Promissory Note**" means a promissory note of a Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit F hereto, evidencing the aggregate outstanding principal amount of Loans of such Borrower to such Lender resulting from the Loans made by such Lender.

"**Pro Rata Share**" means, with respect to:

(a)     a Lender's obligation to make Revolving Loans and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Revolving Commitment, by (ii) the total Revolving Commitments of all the Lenders; provided, that, if the total Revolving Commitments of all the Lenders have been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving Loans and the denominator shall be the aggregate unpaid principal amount of all Revolving Loans held by al the Lenders;

(b)     a Lender's obligation to make the Term Loans and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Term Loan Commitment, by (ii) the total Term Loan Commitments of all the Lenders; provided that if the total Term Loan Commitments of all the Lenders have been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Term Loans and the denominator shall be the aggregate unpaid principal amount of all Term Loans held by all the Lenders; and

(c)     all other matters (including, without limitation, the indemnification obligations arising under Section 9.03) with respect to any Lender, the percentage obtained by dividing (i) the sum of such Lender's Revolving Commitment plus the unpaid principal amount of such Lender's portion of the Term Loans, by (ii) the sum of the total Revolving Commitments of all the Lenders plus the aggregate unpaid principal amount of the Term Loans held by all the Lenders; provided, that, if such Lender's Revolving Commitment shall have been reduced to zero, such Lender's Revolving Commitment shall be deemed to be the aggregate unpaid principal amount of such Lender's Revolving Loans and if the total Revolving Commitments of the Lenders shall have been reduced to zero, the total Revolving Commitments of the Revolving Lenders shall be deemed to be the aggregate unpaid principal amount of all Revolving Loans held by the Lenders.

"**Purchased Assets**" means, to the extent sold pursuant to the SCUSA Sale Agreement, the "Purchased Assets" as such term is defined in the SCUSA Sale Agreement, together with the underlying consumer credit accounts under which such Purchased Assets arise, and all books, records (including electronic records), documents, instruments, ledger cards, files, correspondence, computer programs, tapes, disks and related data that evidence or contain information relating to such Purchased Assets and such consumer credit accounts; provided, however, that to the extent any asset ceases to be a "Purchased Asset" pursuant to the terms of the

SCUSA Sale Agreement and is returned or otherwise transferred back to a Borrower or any of its applicable subsidiaries, such asset and any related assets described in this definition shall no longer be "Purchased Assets".

"**Qualified Capital Stock**" of any Person means any Capital Stock of such Person that is not Disqualified Capital Stock.

"**Real Estate Asset**" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any Loan Party in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"**Receivables**" means all accounts receivable and property relating thereto (including, without limitation, all rights to payment created by or arising from sales of goods, leases of goods or the rendition of services rendered no matter how evidenced whether or not earned by performance).

"**Register**" has the meaning assigned to such term in Section 9.05(b).

"**Regulation D**" means Regulation D of the Federal Reserve Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" means Regulation T of the Federal Reserve Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Federal Reserve Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Federal Reserve Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Agreements**" means, collectively, (a) the SCUSA Sale Agreement, (b) the Receivables Sale Agreement, dated as of April 18, 2013, by and between WebBank and Bluestem, as amended prior to the date hereof and as may be further amended, modified, waived, extended, replaced or supplemented from time to time with the consent of the Administrative Agent and the Required Lenders, (c) the Program Agreement, (d) the Bank Financial Agreement and (e) the SCUSA Financial Agreement, dated as of April 18, 2013, by and between Bluestem and SCUSA, as amended prior to the date hereof and as the same may be further amended, modified, waived, extended, replaced or supplemented from time to time with the consent of the Administrative Agent and the Required Lenders.

"**Related Funds**" means with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, managers, officers, trustees, employees, partners, agents, advisors and other representatives of such Person and such Person's Affiliates (other than, in any case, any Disqualified Institution).

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, sediment, surface water or groundwater.

"**Replacement WebBank/SCUSA Sale Agreement**" or "**Replacement WebBank/SCUSA Agreement**" means any receivable financing agreement or arrangement (and related documentation) that replaces, in whole or in part, or supplements the SCUSA Sale Agreement and/or one or more Related Agreements on terms satisfactory to the Administrative Agent, the Required Lenders and the Loan Parties.

"**Report**" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Loan Parties' assets from information furnished by or on behalf of the Borrowers, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent.

"**Representative**" has the meaning assigned to such term in Section 9.13.

"**Required Lenders**" means, at any time, Lenders having unused Commitments plus outstanding Loans representing more than 50% of the sum of the total  unused Commitments plus total outstanding Loans at such time.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Reserves**" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion, (i) to reflect items that could reasonably be expected to adversely affect the value of any Eligible Inventory or Eligible In-Transit Inventory (including reserves in respect of returned merchandise, potential return liabilities, landed costs including, without limitation, reserves in respect of amounts due and payable to shippers and freight forwarders, and up to 100% of all customer deposits) and (ii) to reflect items that could reasonably be expected to adversely affect the enforceability or priority of the Administrative Agent's Liens on the Collateral (including Landlord Lien Reserves); provided that, other than in respect of the reserves referenced in clause (i), no reserves may be taken after the Closing Date based on circumstances, conditions, events or contingencies disclosed in writing (including, without limitation, in the borrowing base certificates, field examinations and appraisals provided under the Prepetition ABL Agreement) to the Administrative Agent as of the Closing Date and for which no reserves were imposed on the Closing Date, unless such circumstances, conditions, events or contingencies shall have changed

in any material adverse respect since the Closing Date.  After the Closing Date, the Administrative Agent reserves (without duplication of other criteria and other Reserves) the right to establish or modify reserves against the Borrowing Base, acting in its Permitted Discretion, upon at least two (2) Business Days' prior written notice to the Borrower Representative (which notice shall include a reasonably detailed description of such reserve being established).  During such two (2) Business Day period, the Administrative Agent shall, if requested, discuss any such reserve or change with the Borrower Representative and the Borrower Representative may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the Administrative Agent.  Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change and (b) no reserves or changes shall be duplicative of reserves or changes already accounted for through eligibility criteria (including collection/advance rates).

"**Responsible Officer**" means, with respect to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, the CRO, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement, and, as to any document delivered on the Closing Date, shall include any secretary or assistant secretary or any other individual or similar official thereof with substantially equivalent responsibilities of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of any Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Responsible Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of a Responsible Officer of Holdings that such financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of Holdings as at the dates indicated and its consolidated income and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Restricted Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any Capital Stock of any Person, (ii) any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock of any Person, (iii) any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Capital Stock of any Person, and (iv) any return to any shareholders or other equity holders of any Person on account of their Capital Stock.

"**Revolving Availability**" means, at any time, an amount equal to (a) the Revolving Availability Cap at such time *minus* (b) the outstanding Revolving Loans of all Lenders at such time.

"**Revolving Availability Cap**" means, at any time, an amount equal to the lesser of (a) the aggregate Revolving Commitments of all Lenders in effect at such time and (b) the Borrowing Base at such time.

"**Revolving Availability Percentage**" means, at any time, a percentage equal to a fraction the numerator of which is the Revolving Availability at such time and the denominator of which is the Revolving Availability Cap at such time.

"**Revolving Borrowing**" means a Borrowing comprised of Revolving Loans.

"**Revolving Commitment**" means, with respect to each Lender, such Lender's Revolving Commitment as set forth on Schedule 1.01(a), or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable.

"**Revolving Lender**" means a Lender with a Revolving Commitment or Revolving Loan.

"**Revolving Loans**" means the loans made to the Borrowers pursuant to Section 2.01(a).

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of the McGraw-Hill Companies, Inc.

"**Sale**" means the sale of substantially all of the assets of the Loan Parties pursuant to the Asset Purchase Agreement.

"**Sale Milestones**" means

(a) within 30 days after the Petition Date, the Bankruptcy Court shall have, (i) approved the (A) bid procedures for the Sale (the "**Bid Procedures**") which shall be in form and substance reasonably acceptable to the Administrative Agent, and (B) the form and manner of notice of the Sale and assumption and assignment of executory contracts and unexpired leases, and (ii) approved the scheduled auction and Sale hearing;

(b) the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be a date within 60 days after the Petition Date (the "**Bid Deadline**");

(c) so long as at least one qualified bid has been received (other than the "stalking horse" bidder under the Asset Purchas Agreement) the date for the auction for the Sale shall be a date within 5 Business Days after the Bid Deadline (the "**Auction Date**");

(d) subject to the Bankruptcy Court's calendar and availability, within 10 days after the Auction Date (or if an auction is not necessary, within 10 days after the Bid Deadline), the Sale hearing (the "**Sale Hearing**") shall have occurred and the Bankruptcy Court shall have approved the Sale; and

(e) the Sale shall have been consummated within 5 Business Days after the Sale Hearing; provided, such timeframe shall be extended by up to (but no more than) 30 days to the extent antitrust regulatory filings or requirements are required to consummate the Sale and until such filing or requirements are satisfied.

"**SCUSA**" means Santander Consumer USA Inc.

"**SCUSA Sale Agreement**" means that certain Standard Receivables Sale Agreement, dated as of April 18, 2013, by and between Bluestem and SCUSA, as amended prior to the date hereof and as the same may be further amended, modified, waived, extended, replaced or otherwise supplemented from time to time with the consent of the Administrative Agent and the Required Lenders.

"**Seasonal High NOLV**" means, with respect to Inventory of any Person, the Net Orderly Liquidation Value applicable to any Seasonal High Period.

"**Seasonal High Period**" means, with respect to any calendar year, the period commencing on the first day of October and ending on the last day of December.

"**Seasonal Low NOLV**" means, with respect to Inventory of any Person, the Net Orderly Liquidation Value applicable to any Seasonal Low Period.

"**Seasonal Low Period**" means, with respect to any calendar year, the period commencing on the first day of January and ending on the last day of September.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions.

"**Secured Parties**" means (i) the Lenders, (ii) the Administrative Agent  and (iii) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing; provided that "Securities" shall not include any earn-out agreement or obligation or any employee bonus or other incentive compensation plan or agreement or any convertible indebtedness until such indebtedness is actually converted.

"**Securities Act**" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"**Specified Location**" has the meaning assigned to such term in the definition of "Landlord Lien Reserve".

"**Sponsor**" means Bluestem Group Inc. (formerly known as Capmark Financial Group Inc.), together with its subsidiaries and controlled Affiliates.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of

the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted Eurocurrency Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurocurrency Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; <u>provided</u> that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "Subsidiary" shall mean any subsidiary of a Borrower.

"**Subsidiary Guarantor**" means each direct and indirect Domestic Subsidiary of Bluestem.

"**Taxes**" means any and all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**Tennessee Tornado Inventory Loss**" means the loss of inventory and other assets by the Borrowers located at the Tennessee distribution center on March 3, 2020, with an estimated total loss valued at $2,000,000.

"**Termination Date**" has the meaning assigned to such term in the lead-in to <u>Article 5</u>.

"**Term Loan Commitment**" means, with respect to each Lender, such Lender's Term Loan Commitment as set forth on <u>Schedule 1.01(a)</u>, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Loan Commitment, as applicable.

"**Term Lender**" means a lender with a Term Loan Commitment or a Term Loan.

"**Term Loans**" means the loans made to the Borrowers pursuant to <u>Section 2.01(b)</u>.

"**Threshold Amount**" means $2,000,000.

"**Trademark**" means the following:  (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Laws of any jurisdiction in the world, and the registrations and applications for

registration thereof and the goodwill of the business symbolized by the foregoing, (b) all renewals of the foregoing, (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof, (d) all rights to sue for past, present and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing, and (e) all domestic rights corresponding to any of the foregoing.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted Eurocurrency Rate or the Alternate Base Rate.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"**Unused Line Fee**" has the meaning assigned to such term in Section 2.12(b).

"**U.S.**" means the United States of America.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 2.17(f).

"**U.S. Trustee**" means the United States Trustee for the District of Delaware.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**Variance Report**" has the meaning provided in Section 5.01(a).

"**WebBank**" means WebBank, a Utah-chartered industrial bank.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness; *provided* that for purposes of the Weighted Average Life to Maturity of such Indebtedness, the effects of any prepayments or amortization made on such Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"**Wholly-Owned Subsidiary**" of any Person means a subsidiary of such Person, 100% of the Capital Stock of which (other than directors' qualifying shares or shares required by Requirements of Law to be owned by a resident of the relevant jurisdiction) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

**Section 1.02    Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, a "Revolving Loan") or by Type (*e.g.,* a "Eurocurrency Rate Loan") or by Class and Type (*e.g.*, a "Eurocurrency Rate Revolving Loan"). Borrowings also may be classified and referred to by Class (*e.g.*, a "Revolving Loan Borrowing") or by Type (*e.g.*, a "Eurocurrency Rate Borrowing") or by Class and Type (*e.g.*, a "Eurocurrency Rate Revolving Loan Borrowing").

**Section 1.03    Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified or extended, replaced or refinanced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications or extensions, replacements or refinancings set forth herein), (b) any reference to any Requirement of Law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law, (c) any reference herein or in any Loan Document to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision hereof, (e) all references herein or in any Loan Document to Articles, Sections, clauses, paragraphs, Exhibits and Schedules shall be construed to refer to Articles, Sections, clauses and paragraphs of, and Exhibits and Schedules to, such Loan Document, (f) in the computation of periods of time in any Loan Document from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" mean "to but excluding" and the word "through" means "to and including" and (g) the words "asset" and "property", when used in any Loan Document, shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Cash Equivalents, securities, accounts and contract rights.  All references to "knowledge" of any Loan Party or a Subsidiary of Parent means the knowledge, after reasonable investigation, of any Responsible Officer.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

**Section 1.04    Accounting Terms; GAAP; UCC Terms**.

(a)    All financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and, except as otherwise

expressly provided herein.  All terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrowers or any subsidiary at "<u>fair value</u>," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)    Notwithstanding anything to the contrary contained in <u>paragraph (a)</u> above or in the definition of "Capital Lease" in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute Capital Leases in conformity with GAAP on the date hereof shall be considered Capital Leases and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

(c)    To the extent not otherwise defined herein, the following terms shall have the respective meanings provided for in the UCC: "accounts", "account debtor", "cash proceeds", "certificate of title", "chattel paper", "commercial tort claim", "commodity account", "commodity contracts", "deposit account", "documents", "electronic chattel paper", "equipment", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "noncash proceeds", "payment intangibles", "proceeds", "promissory notes", "record", "security account" "software", "supporting obligations" and "tangible chattel paper"; provided that such terms which are defined in the UCC shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Administrative Agent may otherwise determine

**Section 1.05    <u>Timing of Payment of Performance</u>**.  When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

**Section 1.06    <u>Times of Day</u>**.  Unless otherwise specified herein, all references herein to times of day shall be references to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.

**Section 1.07    <u>Compliance with Certain Sections</u>**.    For purposes of determining compliance with any of <u>Article VI</u>, in the event that any Lien, Investment, Indebtedness (whether at the time of incurrence or upon application of all or a portion of the proceeds thereof), Disposition, Affiliate transaction, Contractual Obligation, Restricted Payment or prepayment of junior financing meets the criteria of one, or more than one, of the "baskets" or categories of transactions then permitted pursuant to any clause or subsection of any such section of <u>Article VI</u>, such transaction

(or portion thereof) at any time shall be permitted under one or more of such clauses of such Section at the time of such transaction or any later time from time to time, in each case, as determined by the Borrower Representative in its sole discretion at such time and thereafter may be reclassified within such section by the Borrower Representative in any manner not expressly prohibited by this Agreement.

Section 1.08   **Rounding**.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.09   **Currency Equivalents Generally**.

(a)      For purposes of any determination under Section 2.22, Article V, Article VI or Article VII with respect to the amount of any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition, Sale and Lease-Back Transaction, affiliate transaction or other transaction, event or circumstance, or any determination under any other provision of this Agreement, (any of the foregoing, a "specified transaction"), in a currency other than Dollars, (i) the Dollar equivalent amount of a specified transaction in a currency other than Dollars shall be calculated based on the rate of exchange quoted by the Bloomberg Foreign Exchange Rates & World Currencies Page (or any successor page thereto, or in the event such rate does not appear on any Bloomberg Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower Representative) for such foreign currency, as in effect at 11:00 a.m. (London time) on the date of such specified transaction (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed) and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in clause (i).

(b)      Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrowers' consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.10   **References to Agreements, Laws, Etc.**.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, refinancings, restatements, renewals, restructurings, extensions, supplements and other modifications thereto, but only to the extent that such amendments, refinancings, restatements, renewals, restructuring, extensions, supplements and other modifications are not prohibited by the Loan Documents and (b) references to any Requirements of Law shall include

all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirements of Law.

## ARTICLE 2    THE CREDITS AND SECURITY

**Section 2.01    Commitments**.    Subject to the terms and conditions set forth herein (including, but not limited to, the conditions in Article IV, as applicable) the Interim Order and the Final Order, as applicable, and the Approved Budget (including all permitted variances):

(a)    each Revolving Lender severally, and not jointly, agrees to make revolving loans ("**Revolving Loans**") to the Borrowers from time to time during the Availability Period then in effect in an aggregate principal amount that will not result in (i) such Lender's outstanding Revolving Loans exceeding such Lender's Revolving Commitment then in effect and (ii) the total outstanding Revolving Loans exceeding the lesser of (x) the sum of the total Revolving Commitments then in effect and (y) the Borrowing Base.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.  The Borrowers shall be jointly and severally liable for all amounts owing in respect of and in connection with Revolving Loans and all other Obligations owing under or in connection herewith.

(b)    each Term Lender severally, not jointly, agrees to make term loans ("**Terms Loans**") to the Borrowers on or about the Closing Date in an aggregate principal amount that will not result in (i) such Lender's outstanding Term Loans exceeding such Lender's Term Loan Commitment and (ii) the total outstanding Term Loans exceeding the sum of the total Term Loan Commitments .  Any principal amount of the Term Loans which is repaid or prepaid may not be reborrowed.  The Borrowers shall be jointly and severally liable for all amounts owing in respect of and in connection with the Term Loans and all other Obligations owing under or in connection herewith.

**Section 2.02    Loans and Borrowings**.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments.

(b)    Subject to Section 2.01 and Section 2.14, each Revolving Borrowing and each Term Loan Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Rate Loans as the Borrower Representative, on behalf of the applicable Borrower, may request in accordance herewith.  Each Lender at its option may make any Eurocurrency Rate Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement, (ii) such Eurocurrency Rate Loan shall be deemed to have been made and held by such Lender, and the obligation of the Borrowers to repay such Loan shall nevertheless be to such Lender for the account of such domestic or foreign branch or Affiliate of such Lender and (iii) in exercising such option, such Lender shall use reasonable efforts to minimize increased costs to the Borrowers resulting therefrom (which obligation of such

Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it otherwise determines would be disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of <u>Section 2.15</u> shall apply); <u>provided</u>, <u>further</u>, that no such domestic or foreign branch or Affiliate of such Lender shall be entitled to any greater indemnification under <u>Section 2.17</u> with respect to such Eurocurrency Rate Loan than that to which the applicable Lender was entitled on the date on which such Loan was made (except in connection with any indemnification entitlement arising as a result of any Change in Law after the date on which such Loan was made).

(c)     At the commencement of each Interest Period for any Eurocurrency Rate Borrowing, such Borrowing shall comprise an aggregate principal amount that is an integral multiple of $100,000 and not less than $500,000.  Each ABR Borrowing when made shall be in an aggregate principal amount that is an integral multiple of $100,000 and not less than $500,000. Borrowings of more than one Type and Class may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of 5 different Interest Periods in effect for Eurocurrency Rate Borrowings at any time outstanding (or such greater number of different Interest Periods as the Administrative Agent may agree from time to time).

(d)     Notwithstanding any other provision of this Agreement, the Borrowers and the Borrower Representative shall not, nor shall they be entitled to, request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

**Section 2.03   <u>Requests for Borrowings</u>**.  Each Revolving Borrowing, each Term Loan Borrowing each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon irrevocable notice by the Borrower Representative, on behalf of the applicable Borrower, to the Administrative Agent.  Each such notice must be (x) in the form of a written Borrowing Request, appropriately completed and signed by the CRO of the Borrower Representative or by telephone (and promptly confirmed by delivery of a written Borrowing Request, appropriately completed and signed by the CRO of the Borrower Representative) or (y) or in any other manner acceptable to the Administrative Agent, and in each case must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including "<u>.pdf</u>" or "<u>.tif</u>")) not later than 10:00 a.m. (i) three Business Days prior to the requested day of any Revolving Borrowing or Term Loan Borrowing, conversion or continuation of Eurocurrency Rate Loans (or two Business Days in the case of any Eurocurrency Rate Loans to be made on the Closing Date) and (ii) 12:00 noon two Business Days prior to the date of any Revolving Borrowing of ABR Loans or Term Loan Borrowing of ABR Loans (or, in each case, such later time as shall be acceptable to the Administrative Agent).

If no election as to the Type of Revolving Borrowing or Term Loan Borrowing is specified, then the requested Revolving Borrowing or Term Loan Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurocurrency Rate Borrowing, then the applicable Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall advise each Lender of the details and amount of any Loan to be made as part of the relevant requested Borrowing (x) in the case of any ABR Borrowing, on the same Business Day of receipt of a Borrowing Request (or such other form of request acceptable

to the Administrative Agent) in accordance with this <u>Section 2.03</u> or (y) in the case of any Eurocurrency Rate Borrowing, no later than one Business Day following receipt of a Borrowing Request (or such other form of request acceptable to the Administrative Agent) in accordance with this Section.

**Section 2.04**    **[Reserved]**.

**Section 2.05**    **[Reserved]**.

**Section 2.06**    **[Reserved]**

**Section 2.07**    **Funding of Borrowings**.

(a)    Each Lender shall make each Loan to be made by it hereunder not later than 10:00 a.m. on the Business Day specified in the applicable Borrowing Request by wire transfer of immediately available funds to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's applicable Pro Rata Share.  The Administrative Agent will make such Loans available to the Borrowers by promptly crediting the amounts so received, in like funds, to the account designated in the relevant Borrowing Request or as otherwise directed by a Borrower.

(b)    Unless the Administrative Agent has received notice from any Lender that such Lender will not make available to the Administrative Agent such Lender's share of any Borrowing prior to the proposed date of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.07(a)</u> and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount.  In such event, if any Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrowers, the interest rate applicable to Loans comprising such Borrowing at such time.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing and the obligation of the Borrowers to repay the Administrative Agent such corresponding amount pursuant to this <u>Section 2.07(b)</u> shall cease.   If the Borrowers pay such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrowers or any other Loan Party may have against any Lender as a result of any default by such Lender hereunder.

**Section 2.08**    **Type; Interest Elections**.

(a)    Each Revolving Borrowing shall initially be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Rate Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Each Term Loan Borrowing shall

initially be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Rate Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower Representative may elect to convert any Borrowing to a Borrowing of a different Type (but not Class) or to continue such Borrowing and, in the case of a Eurocurrency Rate Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower Representative may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders, based upon their applicable Pro Rata Share and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this <u>Section 2.08</u>, the Borrower Representative shall (i) deliver an Interest Election Request, appropriately completed and signed by the CRO of the Borrower Representative or (ii) provide telephonic notice (promptly confirmed in writing by delivery of a written Interest Election Request, appropriately completed and signed by the CRO of the Borrower Representative) of the applicable election to the Administrative Agent.  If any such Interest Election Request requests a Eurocurrency Rate Borrowing but does not specify an Interest Period, then the Borrower Representative shall be deemed to have selected an Interest Period of one month's duration.

(c)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(d)    If the Borrower Representative fails to deliver a timely Interest Election Request with respect to a Eurocurrency Rate Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, such Borrowing shall be converted at the end of such Interest Period to a Eurocurrency Rate Borrowing with an Interest Period of one month.  Notwithstanding anything to the contrary herein, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower Representative, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurocurrency Rate Borrowing and (ii) unless repaid, each Eurocurrency Rate Borrowing shall be converted to an ABR Borrowing at the end of the then-current Interest Period applicable thereto.

**Section 2.09    <u>Termination and Reduction of Commitments</u>.**

(a)    Upon the making of the Term Loans, the total Term Loan Commitments shall automatically terminate. Unless previously terminated, all Commitments shall terminate on the Maturity Date.

(b)    The Borrowers may at any time terminate the Commitments in whole or in part, provided that such termination in whole will only be effective upon (i) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (ii) [reserved] and (iii) the payment in full of all reimbursable expenses and other Obligations together with accrued and unpaid interest thereon.

(c)    The Borrower Representative shall notify the Administrative Agent of any election to terminate the Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower Representative pursuant to this Section shall be irrevocable. Any termination of the Commitments shall be permanent.

**Section 2.10    Repayment of Loans; Evidence of Debt**.

(a)    The Borrowers jointly and severally hereby unconditionally promise to pay on the Maturity Date (i) to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan and (ii) to the Administrative Agent for the account of each Term Lender the then unpaid principal amount of each Term Loan on the Maturity Date.

(b)    [Reserved].

(c)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)    The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any manifest error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement; provided, further, that in the event of any inconsistency between the accounts maintained by the Administrative Agent pursuant to paragraph (d) of this Section and any Lender's records, the accounts of the Administrative Agent shall govern.

(f)    Any Lender may request that any Loan made by it be evidenced by a Promissory Note.  In such event, the Borrowers shall prepare, execute and deliver a Promissory Note payable to such Lender and its registered assigns; it being understood and agreed that such Lender (and/or its applicable assign) shall be required to return such Promissory Note to the Borrowers in accordance with Section 9.05(b)(iii) and upon the occurrence of the Termination Date (or as promptly thereafter as practicable).  If any Lender loses the original copy of its Promissory Note, it shall execute an affidavit of loss containing an indemnification provision reasonably satisfactory to the Borrowers.

**Section 2.11    Prepayment of Loans**.

49

(a)    Optional Prepayments.

(i)    Upon prior notice in accordance with paragraph (a)(ii) of this Section, the Borrowers shall have the right at any time and from time to time to prepay any Borrowing of Loans of any Class in whole or in part without premium or penalty (but subject, if applicable, to Section 2.16).  Each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(ii)    The Borrower Representative shall notify the Administrative Agent by telephone (promptly confirmed in writing) of any prepayment under this Section 2.11(a) (i) in the case of any prepayment of a Eurocurrency Rate Borrowing, not later than 10:00 a.m. three Business Days before the date of prepayment or (ii) in the case of any prepayment of an ABR Borrowing, not later than 11:00 a.m. on the day of prepayment (or, in the case of clauses (i) and (ii), such later time as to which the Administrative Agent may agree).  Each such notice shall be irrevocable (except as set forth in the proviso to this sentence) and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that any notice of prepayment delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of a Borrowing of the same Type and Class as provided in Section 2.02(c) or such lesser amount that is then outstanding with respect to such Borrowing being repaid.  Each prepayment of Loans shall be applied ratably to the Loans specified in the applicable prepayment notice.

(b)    Mandatory Prepayments.  Subject in all respects to the Interim Order and Final Order, as applicable:

(i)    In the event and within one Business Day of knowledge of the Borrower Representative or notice by the Administrative Agent, on such occasion that the total outstanding Revolving Loans exceed the lesser of (A) the aggregate Revolving Commitments and (B) the Borrowing Base, the Borrowers shall prepay the Revolving Loans in an aggregate amount equal to such excess.

(ii)    No later than two Business Days following the receipt of Net Proceeds in respect of any Disposition (other than Dispositions permitted under Sections 6.07(c), (d), (e), (f), (j), (l), (m) and (p)) or Extraordinary Receipts (other than the Tennessee Tornado Inventory Loss subject to the provisos below) in excess of $1,000,000 in the aggregate during the term of this Agreement, the Loan Parties shall apply an amount equal to 100% of the Net Proceeds of such Dispositions or such Extraordinary Receipts received with respect thereto in excess of such threshold to prepay the outstanding principal amount of Loans in accordance with Section 2.11(b)(vi) (provided, that, for the avoidance of doubt, any amount of Net Cash Proceeds below such threshold shall be retained by the Loan Parties); provided, that the Borrowers and their Subsidiaries may use up to

50

$2,000,000 of the Net Proceeds received from insurance in connection with the Tennessee Tornado Inventory Loss to acquire replacement inventory of the Borrowers of the same or similar type that was lost within 90 days of such receipt, and such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 90 days of such receipt, so used or committed to be so used; provided further than any amount in excess of $2,000,000 received as Net Proceeds from the Tennessee Tornado Inventory Loss plus any amounts not reinvested as provided in the immediately foregoing proviso shall be used to repay the Loans in accordance with Section 2.11(b)(vi).  Nothing contained in this clause (ii) shall permit any Loan Party or any of its Subsidiaries to make any Disposition other than a Disposition permitted under Section 6.07.

(iii)    In the event that the Loan Parties or any of their Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by any of the Loan Parties or any of their Subsidiaries (other than Indebtedness that is permitted under Section 6.01) the Loan Parties shall, not later than the next succeeding Business Day of the receipt of such Net Proceeds by the Loan Parties or their applicable Subsidiaries, apply an amount equal to 100% of such Net Proceeds to prepay the outstanding principal amount of the Loans in accordance with clause (vi) below.  The provisions of this clause (iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)    Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the Loans in whole or in part, the Loan Parties shall prepay the Obligations in full in accordance with clause (vi) below on the date which is thirty-five (35) days following the entry of the Interim Order in the event that the Final  Order shall not have been entered on or before such date.

(v)    Notwithstanding any provision under this Section 2.11(b) to the contrary:

(A)    the Loan Parties shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(ii) or (iii) above to the extent that the relevant Disposition is consummated by any Foreign Subsidiary or the relevant Extraordinary Receipts are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Loan Parties of any such amount would be prohibited under any Requirement of Law or conflict with the fiduciary duties of such Foreign Subsidiary's directors, or result in, or could reasonably be expected to result in, a risk of personal or criminal liability for any officer, director, employee, manager, member of management or consultant of such Foreign Subsidiary (the Loan Parties hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions required by applicable Requirements of Law to permit such repatriation); and

(B)    if the Loan Parties determine in good faith that the repatriation to the Loan Parties as a distribution or dividend, or otherwise, of any amounts required to mandatorily prepay the Loans pursuant to Sections 2.11(b)(ii) or (iii) above that are attributable to Foreign Subsidiaries could reasonably result in

a material and adverse Tax liability or consequence (including any withholding Tax) (such amount that would otherwise be required to mandatorily prepay the Loans, a "**Restricted Amount**"), as reasonably determined by the Loan Parties, the amount that the Loan  Parties shall be required to mandatorily prepay pursuant to Sections 2.11(b)(ii) or (iii) above, as applicable, shall be reduced by the Restricted Amount until such time as it may repatriate to the Loan Parties the Restricted Amount without incurring such material and adverse Tax liability or consequence; provided that when the repatriation of any such proceeds, from the relevant Foreign Subsidiary could no longer reasonably be expected to result in a material and adverse Tax consequence, an amount equal to such proceeds to the extent available, not previously applied pursuant to this clause (B), shall be promptly applied to the repayment of the Loans pursuant to Section 2.11(b) as otherwise required above (without regard to this clause (v)); provided, for the avoidance of doubt, nothing in this Agreement shall require the repatriation of any cash to the United States.

(vi)    Each prepayment of Loans pursuant to Section 2.11(b)(ii), (iii) and (iv) shall be applied ratably to each Class of Loans then outstanding; provided that each such prepayment of Revolving Loans will also result in a corresponding permanent reduction of the Revolving Commitments, applied ratably with respect to each Lender's Revolving Commitment.  With respect to each Class of Loans, all accepted prepayments under this Section 2.11(b) shall be paid to the Lenders in accordance with their respective applicable Pro Rata Share of the applicable Class.  The amount of such mandatory prepayments shall be applied within each Class first to the then outstanding Loans that are ABR Loans and then to the then outstanding Loans that are Eurocurrency Rate Loans in a manner that minimizes the amount of any payments required to be made by the Loan Parties pursuant to Section 2.16.

(c)    Prepayments made under this Section 2.11 shall be (A) accompanied by accrued interest as required by Section 2.13 and (B) subject to Section 2.16, but shall otherwise be without premium or penalty.

**Section 2.12    Fees**.

(a)    From and after the Closing Date through the Termination Date, the Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Revolving Lender (other than any Defaulting Lender), in accordance with each such Lender's Pro Rata Share, monthly in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitments terminate, an unused line fee (the "**Unused Line Fee**"), which shall accrue at the rate per annum of 0.50% on the average daily Available Revolving Commitment of such Lender for the preceding month.  All Unused Line Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

(b)    The Borrowers shall pay to the Administrative Agent for the account of the Lenders, in accordance with each Lender's Pro Rata Share, a closing fee (the "**Closing Fee**") in an amount equal to 1.75% on $125,000,000, which shall be fully earned, non-refundable and payable on the Closing Date.

(c)     All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent for distribution to the applicable Lenders.  Fees paid shall not be refundable under any circumstances.

(d)     Unless otherwise indicated herein, all computations of fees shall be made on the basis of a 360-day year and shall be payable for the actual days elapsed (including the first day but excluding the last day).  Each determination by the Administrative Agent of a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.13    <u>Interest</u>.**

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate <u>plus</u> the Applicable Rate.

(b)     The Loans comprising each Eurocurrency Rate Borrowing shall bear interest at the Adjusted Eurocurrency Rate for the Interest Period in effect for such Borrowing <u>plus</u> the Applicable Rate.

(c)     [Reserved]

(d)     Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee payable by the Borrowers hereunder is not, in each case, paid or reimbursed when due, whether at stated maturity, upon acceleration or otherwise, all outstanding Obligations shall bear interest, to the fullest extent permitted by applicable Requirements of Law, after as well as before judgment, at a rate per annum equal to (i) in the case of  principal or interest of any Loan, 2.00% <u>plus</u> the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any fees and any other amounts, 2.00% <u>plus</u> the rate applicable to ABR Borrowings as provided in <u>paragraph (a)</u> of this Section.

(e)     Accrued interest on each Term Loan or Revolving Loan shall be payable in arrears on each Interest Payment Date for such Term Loan or Revolving Loan and (i) on the Maturity Date applicable to such Loan and (ii) in the case of a Revolving Loan, upon termination of the Revolving Commitments; <u>provided</u> that (A) interest accrued pursuant to <u>paragraph (d)</u> of this Section shall be payable on demand, (B) in the event of any repayment or prepayment of any Term Loan or Revolving Loan (other than an ABR Revolving Loan prior to the termination of the Revolving Commitments ), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (C) in the event of any conversion of any Eurocurrency Rate Loan prior to the end of the current Interest Period therefor, accrued interest on such Term Loan or Revolving Loan shall be payable on the effective date of such conversion.

(f)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted Eurocurrency Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the

Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

Section 2.14    **Alternate Rate of Interest**.  If prior to the commencement of any Interest Period for a Eurocurrency Rate Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted Eurocurrency Rate for such Interest Period; or

(b)    the Administrative Agent is advised by the Required Lenders that the Adjusted Eurocurrency Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall promptly give notice thereof to the Borrower Representative and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower Representative and the Lenders that the circumstances giving rise to such notice no longer exist, which the Administrative Agent agrees promptly to do, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Rate Borrowing shall be ineffective and such Borrowing shall be converted to an ABR Borrowing on the last day of the Interest Period applicable thereto, and (ii) if any Borrowing Request requests a Eurocurrency Rate Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 2.15    **Increased Costs**.

(a)    If any Change in Law:

(i)    imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted Eurocurrency Rate; or

(ii)    imposes on any Lender or the London interbank market any other condition affecting this Agreement or Eurocurrency Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing is to increase the cost to the relevant Lender of making or maintaining any Eurocurrency Rate Loan (or of maintaining its obligation to make any such Loan), then, within 30 days after the Borrower Representative's receipt of the certificate contemplated by paragraph (c) of this Section, the Borrowers will pay to such Lender for such additional costs incurred or reduction suffered (except for any Tax imposed in respect of any payments of principal, interest, fees or any other amount payable hereunder, which, for the avoidance of doubt, is covered exclusively by Section 2.17); provided that the Borrowers shall not be liable for such compensation if (w) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto, (x) such Lender invokes Section 2.20, (y) in the case of requests for reimbursement under clause (ii) above resulting from a market disruption, (A) the relevant circumstances are not

54

generally affecting the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders or (z) such Lender is not generally charging such amounts to similarly situated borrowers under comparable syndicated credit facilities.

(b)     If any Lender determines that any Change in Law regarding liquidity or capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law other than due to Taxes (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then within 30 days of receipt by the Borrower Representative of the certificate contemplated by paragraph (c) of this Section, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; provided that the Borrowers shall not be liable for such compensation if (x) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto or (y) such Lender is not generally charging such amounts to similarly situated borrowers under comparable syndicated credit facilities.

(c)     Any Lender requesting compensation under this Section 2.15 shall be required to deliver a certificate to the Borrowers that (i) sets forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section and (ii) sets forth in reasonable detail the manner in which such amount or amounts was determined and (iii) certifies that such Lender is generally charging such amounts to similarly situated borrowers, which shall be conclusive absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, however, that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

**Section 2.16  Break Funding Payments**.   In the event of (a) the conversion or prepayment of any principal of any Eurocurrency Rate Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), (b) the failure to borrow, convert, continue or prepay any Eurocurrency Rate Loan on the date or in the amount specified in any notice delivered pursuant hereto or (c) the assignment of any Eurocurrency Rate Loan of any Lender other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower Representative pursuant to Section 2.19, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense incurred by such Lender that is attributable to such event (other than loss of profit).  In the case of a Eurocurrency Rate Loan, the loss, cost or expense of any Lender shall be the amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have

accrued on the principal amount of such Loan had such event not occurred, at the Eurocurrency Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in the applicable currency of a comparable amount and period from other banks in the Eurodollar market; it being understood that such loss, cost or expense shall in any case exclude any interest rate floor and all administrative, processing or similar fees.  Any Lender requesting compensation under this Section 2.16 shall be required to deliver a certificate to the Borrower Representative that (i) sets forth any amount or amounts that such Lender is entitled to receive pursuant to this Section, the basis therefor and, in reasonable detail, the manner in which such amount or amounts were determined and (ii) certifies that such Lender is generally charging the relevant amounts to similarly situated borrowers under comparable syndicated credit facilities, which certificate shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

Section 2.17   Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party hereunder shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirements of Law.  If any applicable Requirement of Law requires the deduction or withholding of any Tax from any such payment, then (i) if such Tax is an Indemnified Tax and/or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions and withholdings applicable to additional sums payable under this Section 2.17) each Lender (or, in the case of payments made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall make such deductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.  If at any time any applicable withholding agent is required by any applicable Requirements of Law to make any deduction or withholding from any amount payable hereunder, the Borrower Representative shall promptly notify the relevant Lender and the Administrative Agent upon any Responsible Officer becoming aware of the same.  In addition, each Lender or the Administrative Agent, as applicable, shall promptly notify the Borrower Representative upon becoming aware of any circumstances as a result of which any Loan Party is or would be required to make any deduction or withholding from any amount payable hereunder.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender within 30 days after receipt of written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), other than any penalties determined by a

final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement) to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender, and, in each case, any reasonable expenses arising therefrom or with respect thereto, whether or not correctly or legally imposed or asserted); provided, that if the Borrowers reasonably believe that such Taxes were not correctly or legally asserted, the Administrative Agent or such Lender, as applicable, will use reasonable efforts to cooperate with the Borrowers to obtain a refund of such Taxes (which shall be repaid to the Borrowers in accordance with Section 2.17(g)) so long as such efforts would not, in the sole determination of the Administrative Agent or such Lender result in any additional out-of-pocket costs or expenses not reimbursed by such Loan Party or be otherwise materially disadvantageous to the Administrative Agent or such Lender.   A certificate to the Borrower Representative setting forth, in reasonable detail, the basis and calculation of the amount of the relevant payment or liability shall be conclusive absent manifest error.   Notwithstanding anything to the contrary contained in this Section 2.17(c), the Borrowers shall not be required to indemnify the Administrative Agent or any Lender pursuant to this Section 2.17(c) in respect of penalties, interest and other liabilities attributable to any Indemnified Taxes or Other Taxes to the extent such penalties, interest or other liabilities are attributable to the failure of such Administrative Agent or Lender to provide written demand therefor within 180 days from the date on which the Administrative Agent or such Lender knew of the imposition of Indemnified Taxes or Other Taxes by the relevant Governmental Authority.

(d)     (i) Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes or Other Taxes imposed on or with respect to any payment under any Loan Document that is attributable to such Lender (but only to the extent that no Loan Party has already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.05(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes that are attributable to such Lender that are payable or paid by the Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender from any other source against any amount due to the Administrative Agent under this clause (d)(i).

(ii)     Each Lender shall severally and not jointly indemnify each Loan Party, within 30 days after demand therefor, for any Excluded Taxes attributable to such Lender that are paid by the Loan Party in connection with any Loan Document (and any reasonable expenses arising therefrom or with respect), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided, that the Loan Parties will cooperate with such Lender to obtain a refund of such Excluded Taxes (which shall be repaid to such Lender).   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent or the Borrowers

shall be conclusive absent manifest error.  If any Loan Party receives a refund, including a refund that such Loan Party decided to apply to future Taxes, as to which it has been indemnified pursuant to this <u>Section 2.17(d)(ii)</u>, such Loan Party shall pay over such refund to the appropriate Lender (including interest paid by the relevant Governmental Authority with respect to such refund).  Each Lender hereby authorizes the Loan Parties to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender under any Loan Document or otherwise payable by the Loan Parties to such Lender from any other sources against any amount due to the Loan Parties under this <u>clause (d)(ii)</u>.

(e)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as contemplated in this <u>Section 2.17</u>, the Borrower Representative shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment that is reasonably satisfactory to the Administrative Agent.

(f)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation as the Borrower Representative or the Administrative Agent may reasonably request to permit such payments to be made without withholding or at a reduced rate of withholding or any Loan Party to make any filings required by law.  In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing,

(A)    each Lender that is not a Foreign Lender shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), two executed copies of IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    each Foreign Lender shall deliver to the Borrower Representative and the Administrative Agent (in such number as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable

request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(1)      (x) with respect to payments of interest under any Loan Document, in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, executed copies of IRS Form W-8BEN or IRS W-8BEN-E (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, IRS Form W-8BEN or IRS W-8BEN-E (or any successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI or W-8EXP (or any successor form);

(3)      in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit I-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS W-8BEN-E (or any successor form); or

(4)      to the extent any Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY (or any successor form), accompanied by IRS Form W-8ECI or W-8EXP (or any successor form), IRS Form W-8BEN or IRS W-8BEN-E (or any successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-2 or Exhibit I-3, IRS Form W-9 (or any successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if such Foreign Lender is a partnership and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-4 on behalf of each such partner;

(C)      each Foreign Lender shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), two executed original copies of any other form prescribed

by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to the Administrative Agent or any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if the Administrative Agent or such Lender, as applicable, were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), the Administrative Agent or such Lender, as applicable, shall deliver to the Borrower Representative and the Administrative Agent (or, in the case of documentation delivered by the Administrative Agent, to the Borrower Representative) at the time or times prescribed by applicable Requirements of Law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation as is prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that the Administrative Agent or such Lender, as applicable, has complied with the Administrative Agent's or such Lender's obligations, as applicable, under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for the purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement;

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in this Section 2.17(f), no Lender shall be required to provide any form or certification that such Lender is not legally entitled to deliver.

(g)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or any Lender be required to pay any amount to any Loan Party pursuant to

this paragraph (g) to the extent that the payment thereof would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the position that the Administrative Agent or such Lender would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This Section 2.17 shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the relevant Loan Party or any other Person.

(h)     References.  For purposes of this Section 2.17, the term "Requirements of Law" includes FATCA.

(i)     Certain FATCA Matters.  For purposes of determining withholding Taxes imposed under FATCA, the Borrowers and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) the Loans as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.471-2(b)(2)(i).

(j)     Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

### Section 2.18     Payments Generally; Allocation of Proceeds; Sharing of Payments.

(a)     Unless otherwise specified, the Borrowers shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 2:00 p.m. on the date when due, in immediately available funds, without set-off (except as otherwise provided in Section 2.17) or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated by the Administrative Agent to the Borrowers, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Person or Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans of a given Class, each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type (and of the same Class) shall be allocated among the Lenders in accordance with their respective Pro Rata Shares.  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.  All payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     Subject in all respects to the terms of the Interim Order or Final Order, as applicable, all proceeds of Collateral received by the Administrative Agent during a Cash Dominion Period or while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to <u>Section 7.01</u>, shall be applied, <u>first</u>, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Administrative Agent from the Borrowers), <u>second</u>, to pay any fees or expense reimbursements then due to the Lenders from the Borrowers, <u>third</u>, to pay interest then due and payable on the Loans ratably, <u>fourth</u>, to prepay principal on the Loans ratably, <u>fifth</u>, to the payment of any other Obligation due to the Administrative Agent or any Lender by any Loan Party, and <u>sixth</u>, to, or at the direction of, the Borrowers or as a court of competent jurisdiction may otherwise direct.

(c)     If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with <u>Section 2.22</u>.  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.18(c)</u> and will, in each case, notify the Lenders following any such purchases or repayments.   Each Lender that purchases a participation pursuant to this <u>Section 2.18(c)</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

(d)     Unless the Administrative Agent has received notice from the Borrower Representative prior to the date on which any payment is due to the Administrative Agent for the account of any Lender that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lender the amount due.  In such event, if the Borrowers have not in fact made such payment, then each Lender severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal

Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender fails to make any payment required to be made by it pursuant to Section 2.07(b) or Section 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)    At the election of the Administrative Agent, all payments of principal and interest pursuant to Section 2.13 may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower Representative pursuant to Section 2.03 or a deemed request as provided in this Section 2.18(f). The Borrowers hereby irrevocably authorizes the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest pursuant to Section 2.13 and fees pursuant to Section 2.12 as it becomes due hereunder and agrees that all such amounts charged shall constitute Loans and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.03.

### Section 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15 or such Lender determines it can no longer make or maintain Eurocurrency Rate Loans pursuant to Section 2.20, or any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future or mitigate the impact of Section 2.20, as the case may be, and (ii) would not subject such Lender to any unreimbursed out-of-pocket cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests compensation under Section 2.15 or such Lender determines it can no longer make or maintain Eurocurrency Rate Loans pursuant to Section 2.20, (ii) any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender is a Defaulting Lender or (iv) in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly affected thereby" (or any other group of Lenders other than the Required Lenders) with respect to which Required Lenders (or the consent of Lenders holding loans or commitments of such group representing more than 50% of the sum of the total loans and unused commitments of such group at such time) has been obtained, as applicable, any Lender is a non-consenting Lender (each such Lender described in this clause (iv), a "**Non-Consenting Lender**"), then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all Obligations of the Borrowers owing to such Lender relating to the

applicable Loans and participations held by such Lender as of such termination date or (y) replace such Lender by requiring such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if any Lender accepts such assignment); provided that (A) such Lender has received payment of an amount equal to the outstanding principal amount of its Loans and/or Commitments, accrued interest thereon, accrued fees and all other amounts payable to it hereunder with respect to such Class of Loans and/or the Commitments, (B) in the case of any assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment would result in a reduction in such compensation or payments and (C) such assignment does not conflict with applicable Requirements of Law.  No Lender (other than a Defaulting Lender) shall be required to make any such assignment and delegation, and the Borrowers may not repay the Obligations of such Lender or terminate its Commitments, if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  Each Lender agrees that if it is replaced pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and shall deliver to the Administrative Agent any Promissory Note (if the assigning Lender's Loans are evidenced by one or more Promissory Notes) subject to such Assignment and Assumption (provided that the failure of any Lender replaced pursuant to this Section 2.19 to execute an Assignment and Assumption or deliver any such Promissory Note shall not render such sale and purchase (and the corresponding assignment) invalid), such assignment shall be recorded in the Register and any such Promissory Note shall be deemed cancelled.  Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment and Assumption or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this clause (b).

    **Section 2.20    Illegality**.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to Adjusted Eurocurrency Rate, or to determine or charge interest rates based upon the Adjusted Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Borrower Representative through the Administrative Agent, (i) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert ABR Loans to Eurocurrency Rate Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Alternate Base Rate, the interest rate on which ABR Loans of such Lender, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower Representative that the circumstances

giving rise to such determination no longer exist (which notice such Lender agrees to give promptly). Upon receipt of such notice, (x) the Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, convert all of such Lender's Eurocurrency Rate Loans to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Alternate Base Rate) either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans (in which case the Borrowers shall not be required to make payments pursuant to Section 2.16 in connection with such payment) and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.21  **Defaulting Lenders**.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)  Fees shall cease to accrue on the unfunded portion of any Commitment of such Defaulting Lender pursuant to Section 2.12(a) and pursuant to any other provisions of this Agreement or other Loan Document.

(b)  The Commitments such Defaulting Lender shall not be included in determining whether all Lenders, each affected Lender, the Required Lenders or such other number of Lenders as may be required hereby or under any other Loan Document have taken or may take any action hereunder (including any consent to any waiver, amendment or modification pursuant to Section 9.02); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately and adversely relative to other affected Lenders shall require the consent of such Defaulting Lender; provided, further, that the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender.

(c)  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.11, Section 2.15, Section 2.16, Section 2.17, Section 2.18, Article 7, Section 9.05 or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 9.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Borrowers as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, so long as no Default or Event of Default exists, as the Borrowers may request, to the funding of any Loan in respect of which such Defaulting Lender

has failed to fund its portion thereof as required by this Agreement; third, as the Administrative Agent or the Borrowers may elect, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender or to post cash collateral pursuant to this Section 2.21(c) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.22    **Security Interests in Collateral**.

(a)    As security for the full and timely payment and performance of all of the Obligations, upon entry of the Interim Order but retroactive to the Petition Date, each of the Loan Parties hereby pledges and grants to the Administrative Agent, for the benefit of the Secured Parties, pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d) of the Bankruptcy Code, under this Agreement, the other Loan Documents and the Interim Order and the Final Order, as applicable, a fully perfected first priority security interest and Liens, superior to all other Liens, claims or security interests that any creditor of the Loan Parties' and their estates may have (but subject only to the Carve-Out and the Permitted Priority Liens, as and to the extent expressly provided in Interim Order or the Final Order, as the case may be), in all of the existing and after acquired real and personal, tangible and intangible, property and assets of the Loan Parties, including, but not limited to, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, payment intangibles, subject to entry of the Final Order, the proceeds of any Avoidance Actions, rights under Section 506(c) of the Bankruptcy Code, and all other property or "property of the estate" (as defined in Section 541 of the Bankruptcy Code) of any kind or nature, investment property, supporting obligations, letter of credit rights, licenses, operating certificates, permits, causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance proceeds, noncash proceeds or any other proceeds of the foregoing (collectively, the "**Collateral**"); provided that, the Collateral shall not include any Excluded Assets; provided, however, that the Collateral shall include any and all proceeds of any of such property and assets described in this clause (unless constituting Excluded Assets); provided, further, that, any agreement, permit, license, or the like not constituting Collateral under this clause shall constitute Collateral from and after such time as the lessor, licensor, grantor or other party to such agreement, permit, license, or the like consents to the grant of a Lien in favor of Administrative Agent in such agreement, permit, license, or the

like or the prohibition against granting a Lien therein in favor of Administrative Agent shall cease to be effective.

(b)     Upon entry of the Interim Order or Final Order, as applicable, the Liens and security interests in favor of the Administrative Agent referred to in Section 2.22 shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than Permitted Priority Liens and subject to the Carve-Out.  Such Liens and security interests and their priority shall remain in effect until the Termination Date.

(c)     Notwithstanding anything herein to the contrary, all proceeds received by the Administrative Agent and the Lenders from the Collateral subject to the Liens granted in Section 2.22 or in any other Loan Document or by the Interim Order and the Final Order, as applicable, shall be subject to the prior payment of Carve-Out; provided, that no Person entitled to such Carve-Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other Disposition, of any Collateral.

(d)     Subject to entry of the Final Order, except for the Carve-Out, no costs or expenses of administration shall be imposed against the Administrative Agent, the Lenders or any of the Collateral or any of the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition ABL Lenders or the Prepetition Term Loan Lenders under the Prepetition ABL Loan Documents or the Prepetition Term Loan Documents, as applicable, or the "Collateral" (as defined therein) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Loan Parties hereby waive for themselves and on behalf of each of their estates in bankruptcy, any and all rights under Sections 105, 506(c) (subject to entry of the Final Order) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Administrative Agent, the Lenders or any of the Collateral or any of the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition ABL Lenders or the Prepetition Term Loan Lenders under the Prepetition ABL Loan Documents or the Prepetition Term Loan Documents, as applicable.

**Section 2.23    Administrative Priority**.  Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out.

**Section 2.24    Grants, Rights and Remedies**.  The Liens and security interests granted pursuant to Section 2.22 and the administrative priority granted pursuant to Section 2.23 may be independently granted by the Interim Order and the Final Order, as applicable, and by other Loan Documents hereafter entered into.  This Agreement, the Interim Order and the Final Order, as applicable, and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

**Section 2.25   No Filings Required**.  The Liens and security interests referred to herein shall be deemed valid and perfected solely by and upon entry of the Interim Order and the Final Order, as applicable, and entry of the Interim Order shall have occurred on or before the date of any Loan.  No Agent, Lender or other Person shall be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect any Lien and security interest granted by or pursuant to this Agreement, the Interim Order or the Final Order, as applicable, or any other Loan Document; provided, that the Administrative Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office and to take any other action with respect to the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or the Final Order, as applicable, or any other Loan Document; provided, further that should the Administrative Agent so choose and attempt to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office and to take any other action with respect to such Lien or security interest, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the any Liens and security interests granted herein by virtue of the entry of the Interim Order or the Final Order.

**Section 2.26   Survival**.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Interim Order and the Final Order, as applicable, and the other Loan Documents (specifically including the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or any successor bankruptcy case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, successor bankruptcy case act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent and the Lenders against any Loan Party in respect of any Obligation;

(b)    upon entry of the Interim Order or Final Order, as applicable, but retroactive to the Petition Date in each case, the Liens in favor of the Administrative Agent and the Lenders set forth in Section 2.22 shall constitute valid and perfected first priority Liens and security interests to which all other Liens and security interests shall be subordinate and junior, subject only to Permitted Priority Liens, and which Liens and security interests shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever;

(c)    the Liens in favor of the Administrative Agent and the Lenders set forth herein, in the Interim Order and the Final Order, as applicable, and in the other Loan Documents

shall continue to be valid and perfected without the necessity that the Administrative Agent file financing statements, mortgages, certificates of title, notices of Lien or other similar instruments or otherwise perfect its Lien under applicable non-bankruptcy law; and

(d)      (i) the Obligations and all other rights, remedies, interests, liens, priorities, privileges, protections, and benefits granted hereunder shall not be altered, modified, impaired, or discharged by, the entry of any order confirming any chapter 11 plan (and each Loan Party pursuant to Section 1041(d)(4) of the Bankruptcy Code, waives any such discharge) and (ii) the super priority administrative claim granted to the Administrative Agent and the Lenders pursuant, the Interim Order and the Final Order, as applicable, and described in this Agreement and the Liens granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Interim Order and the Final Order, as applicable, shall not be altered, modified, impaired, or discharged by, the entry of any order confirming any chapter 11 plan.

**Section 2.27   Further Assurances**.  The Loan Parties shall take any other customary actions reasonably requested by the Administrative Agent from time to time to cause the attachment, perfection and first priority of, and the ability of the Administrative Agent and the Lenders to enforce, the security interest of the Administrative Agent and the Lenders in any and all of the Collateral, including, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation would be a condition, if not for the Chapter 11 Cases, to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision would be a condition, if not for the Chapter 11 Cases, to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, (e) using commercially reasonable efforts to obtain the consent and approval of any Governmental Authority or third party, including any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction, and (f) complying with any changing requirements to effectuate the provisions of Section 9.10.

## ARTICLE 3    REPRESENTATIONS AND WARRANTIES

On the dates and to the extent required pursuant to Sections 4.01 and 4.02, the Loan Parties, represent and warrant to the Lenders that:

**Section 3.01   Organization; Powers**.  Each Loan Party and each of their Subsidiaries (a) is (i) duly organized and validly existing and (ii) in good standing (to the extent such concept exists in the relevant jurisdiction) under the Requirements of Law of its jurisdiction of organization, (b) subject to the entry and terms of the Interim Order and the Final Order and the Chapter 11 Cases, as applicable, has all requisite organizational power and authority to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is

in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where the ownership, lease or operation of its properties or conduct of its business requires such qualification, except, in each case referred to in this Section 3.01 (other than clause (a)(i)) with respect to the Borrowers, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02    Authorization; Enforceability**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Loan Party is a party are within such Loan Party's corporate or other organizational power and have been duly authorized by all necessary corporate or other organizational action of such Loan Party.  Subject to entry to the entry of the Interim Order and the Final Order, as applicable, each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party is a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the Legal Reservations.

**Section 3.03    Governmental Approvals; No Conflicts**.  Subject to entry to the entry of the Interim Order and the Final Order, as applicable,  the execution and delivery of each Loan Document by each Loan Party, party thereto and the performance by such Loan Party thereof (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) entry of the Interim Order and the Final Order, as applicable, and (iii) such consents, approvals, registrations, filings, or other actions the failure to obtain or make which could not be reasonably be expected to have a Material Adverse Effect, (b) will not violate any (i) of such Loan Party's Organizational Documents or (ii) Requirement of Law applicable to such Loan Party which violation, in the case of this clause (b)(ii), could reasonably be expected to have a Material Adverse Effect and (c) will not violate or result in a default under any Contractual Obligation to which such Loan Party is a party which violation (other than violations and defaults, the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Case), in the case of this clause (c), could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04    Financial Condition; No Material Adverse Effect**.

(a)    The financial statements most recently provided pursuant to Section 5.01(a) or (b), as applicable, present fairly, in all material respects, the financial position and results of operations and cash flows of Bluestem on a consolidated basis as of such dates and for such periods in accordance with GAAP, subject, in the case of financial statements provided pursuant to Section 5.01(a), to the absence of footnotes and normal year-end adjustments.

(b)    The initial Approved Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions the Loan Parties reasonably believe, in their good faith business judgment, were fair in light of the conditions existing at the time of delivery, of Holdings and its Subsidiaries' forecasts of future financial performance.

(c)    Other than the filing of Chapter 11 Cases, since the Petition Date there have been no events, developments or circumstances that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 3.05    Properties; Licenses; Intellectual Property**.

(a)    As of the Petition Date, Schedule 1.01(c) sets forth the address of each Real Estate Asset (or each set of such assets that collectively comprise one operating property) that is owned in fee simple or leased by any Loan Party.

(b)    Each Loan Party and each of its Subsidiaries have good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all of their respective Real Estate Assets and have good title to their personal property and assets, in each case, except (i) for defects in title that do not materially interfere with their ability to conduct their business as currently conducted or to utilize such properties and assets for their intended purposes or (ii)  where the failure to have such title or rights would not reasonably be expected to have a Material Adverse Effect.

(c)    Set forth on Schedule 3.05 is a complete and accurate list as of the Petition Date of all material licenses, permits, Patents, Trademarks, and Copyrights of each Loan Party. Each Loan Party and its Subsidiaries own or otherwise have a license or right to use all rights in Patents, Trademarks, Copyrights and other similar intellectual property rights (the foregoing, collectively, "**IP Rights**") necessary for their respective businesses as presently conducted without, to the knowledge of the Loan Parties, any infringement or misappropriation of the IP Rights of third parties, except to the extent the failure to own or have a license or have rights to use would not, or where such infringement or misappropriation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each Loan Party has obtained all material permits, licenses and other authorizations which are required with respect to the ownership and operations of their respective businesses as presently conducted and each Loan Party is in compliance with all terms and conditions of such permits, licenses and other authorizations, and is also in compliance with Requirements of Law, except where the failure to comply with such permits, licenses or other authorizations, or Requirements of Law, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06    Litigation and Environmental Matters**.

(a)    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Loan Parties, threatened in writing against any Loan Party or any of its Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) neither the Loan Parties nor any of their Subsidiaries have received notice of any Environmental Claim or knows of any basis for any Environmental Claim against the Loan Parties or their Subsidiaries and (ii) neither the Loan Parties nor any of their Subsidiaries (A) have failed to comply with any Environmental Law or to obtain, maintain or comply with any Governmental Authorization required under any Environmental Law or (B) have become subject to, or knows of any basis for, any Environmental Liability.

(c)     Neither the Loan Parties nor any of their subsidiaries have conducted any Hazardous Materials Activities on, at, under, or from any Facility in a manner that would reasonably be expected to have a Material Adverse Effect.

**Section 3.07    Compliance with Laws**.  Subject to the filing of the Chapter 11 Cases, each of the Loan Parties and each of their Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except, in each case, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; it being understood and agreed that this Section 3.07 shall not apply to the Requirements of Law covered by Section 3.15.

**Section 3.08    Investment Company Status**.  None of the Loan Parties or any of their Subsidiaries is an "investment company" as defined in, or is required to be registered under, the Investment Company Act of 1940.

**Section 3.09    Taxes**.  Each of the Loan Parties and each of their Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it that are due and payable (including in its capacity as a withholding agent), except (a) Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Loan Parties or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP, (b) such obligations constituting Prepetition Liabilities, (c) Taxes the non-payment of which is permitted or required by the Bankruptcy Code or (d) Taxes in an aggregate amount not to exceed $500,000 at any time.  For the avoidance of doubt, nothing in this Agreement requires payment of any Prepetition Liabilities subject to the automatic stay of the Bankruptcy Code.

**Section 3.10    ERISA**.

(a)     Each Plan is in compliance in form and operation with its terms and with ERISA and the Internal Revenue Code and all other applicable Requirements of Law, except where any failure to comply would not reasonably be expected to result in a Material Adverse Effect. There are no pending, or to the knowledge of the Loan Parties or any of their Subsidiaries, threatened material claims (other than claims for benefits in the ordinary course), sanctions, actions, suits, or proceedings asserted or instituted by any Person against any Plan or any Person as fiduciary or sponsor of any Plan, except as would not result in a Material Adverse Effect.

(b)     In the five-year period prior to the date on which this representation is made, no ERISA Event has occurred and is continuing or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to result in a Material Adverse Effect.

**Section 3.11    Disclosure.**

(a)     Each Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No written report, financial statement,

certificate or other information furnished (in writing) by or on behalf of any Loan Party or any Subsidiary to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) (other than budgets, estimates, forward-looking statements, projections, Approved Budgets, and general market or industry data) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information and the Approved Budget, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time made.

Section 3.12 **Security Interest in Collateral**.

(a) Upon entry of and subject to the terms of the Interim Order, this Agreement (together with the Interim Order and the other Loan Documents) will create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, continuing and enforceable security interest in the Collateral. Upon entry of the Interim Order (and the subsequent entry of the Final Order), the Administrative Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document or by obtaining control under the UCC (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC), which, in all cases, shall be prior and superior in right to any other Person, subject to the Carve-Out and Permitted Priority Liens. Assuming the entry of the Interim Order, filings of UCC-1 financing statements and/or the obtaining of "control" (as defined in the UCC and the Final Order, as applicable) of Collateral are not, and will not be, required to create or perfect a legal, valid, continuing and enforceable security interest in the Collateral under U.S. law.

(b) Subject to the entry of the Interim Order and the Final Order, as applicable, the Administrative Agent will have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the IP Rights in which a security interest may be perfected by filings of UCC-1 financing statements and/or filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case, prior and superior in right to any other Person, subject to the Carve-Out and Permitted Priority Liens; it being understood that the Administrative Agent may request subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office to reflect the Liens on intellectual property acquired by the Loan Parties after the Closing Date.

Section 3.13 **Labor Disputes**. As of the Closing Date, except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts or slowdowns against the Loan Parties or any of their Subsidiaries pending or, to the knowledge of the Loan Parties, threatened and (b) the hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirements of Law dealing with such matters. The consummation of the transactions contemplated by this Agreement and any other Loan Documents

will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**Section 3.14    Federal Reserve Regulations**.

(a)    None of Loan Parties or any of their Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan has been or will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulations T, U or X.

**Section 3.15    Anti-Terrorism Laws**.

(a)    None of the Loan Parties or any of their Subsidiaries nor, to the knowledge of the Loan Parties, any director, officer, agent, employee or Affiliate of any of the foregoing is (i) a person on the list of "Specially Designated Nationals and Blocked Persons" or (ii) currently the subject of any sanctions administered or enforced by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") (any such sanctions referred to as "**Sanctions**"); and the Loan Parties will not use the proceeds of the Loans or otherwise make available such proceeds to fund any activities or business of or with any Person, or in any country or territory that, at the time of such funding  is the subject of OFAC sanctions, except to the extent licensed or otherwise approved by OFAC.

(b)    To the extent applicable, each Loan Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act and each of the foreign assets control regulations of the U.S. Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(c)    No part of the proceeds of any Loan will be used, directly or, to the knowledge of the Loan Parties, indirectly (i) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of (A) the U.S. Foreign Corrupt Practices Act of 1977 (the "**FCPA**") or (B) to the knowledge of the Loan Parties, any other applicable anti-corruption laws or (ii) in violation of any anti-money laundering laws or anti-terrorism finance laws (clauses (i) and (ii) being referred to as "**Anti-Corruption Laws**").

(d)    The Loan Parties, their Subsidiaries and, to the knowledge of the Loan Parties, their respective officers, employees, directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

**Section 3.16    [Reserved]**.

**Section 3.17    Capitalization and Subsidiaries**.  Schedule 3.17 sets forth as of the Closing Date, a correct and complete list containing (a) the name of each Subsidiary of Holdings

and the ownership interest therein held by Holdings or its applicable subsidiary, and (b) the type of entity of Holdings and each of its Subsidiaries.

Section 3.18  **Deposit Accounts; Credit Card Agreements**.  As of the Closing Date, Schedule 3.18 sets forth each of the Deposit Accounts maintained by the Loan Parties (including all such accounts subject to an Existing Control Agreement as so indicated) and which Schedule includes (a) the name and address of owner of such account, (b) the account number(s) maintained with the depositary bank, (c) a contact person at each such depositary bank, and (d) the identification of each depositary bank, including name and address. As of the Closing Date, Schedule 3.18 sets forth all of the Credit Card Agreements to which Loan Parties or their Subsidiaries are subject.

Section 3.19  **Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship, of any Loan Party or any Subsidiary with any supplier material to its operations, except (i) as a result of the filing of the Chapter 11 Cases and (ii) as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 3.20  **Material Contracts**.  The Loan Parties and their Subsidiaries are not in breach or in default in any material respect of or under any Material Contract and have not received any written notice of the intention of any other party thereto to terminate any Material Contract (other than any notice as to a termination that would be voided or invalidated under the Bankruptcy Code).  The Loan Parties are current on all premiums and other amounts due in respect of the insurance coverage required by Section 5.05.

Section 3.21  **Bankruptcy Matters**.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with Requirements of Law and notice of (i) the motion seeking approval of this Agreement and the other Loan Documents and the Interim Order and the Final Order, as applicable, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order has been or will be given. The Loan Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    Upon entry of the Interim Order but retroactive to the Petition Date or the Final Order Entry Date, as the case may be, the Obligations of the Loan Parties will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out.

(c)    Upon entry of the Interim Order or the Final Order, as the case may be, the Liens and security interests of the Administrative Agent on the Collateral referred to in Section

2.22 shall be valid and perfected first priority Liens, subject only to Permitted Priority Liens and the Carve-Out.

(d)        On and after the Closing Date and prior to the Final Order Entry Date, the Interim Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal in a manner adverse to the Lenders, absent the written consent of the Administrative Agent, the Required Lenders and the Borrowers, and on and after the Final Order Entry Date, the Final Order is in full force and effect, and has not been reversed, modified, amended, stayed, or vacated in a manner adverse to the Lenders or subject to appeal absent the written consent of the Administrative Agent, the Required Lenders and the Borrowers.

(e)        No order has been entered, and no Loan Party has filed a motion, in any Chapter 11 Case (A) for the appointment of a Chapter 11 trustee, (B) for the appointment of a responsible officer or an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (C) to convert any of the Chapter 11 Cases to a Chapter 7 case or to dismiss any of the Chapter 11 Cases.

## ARTICLE 4    CONDITIONS

**Section 4.01   Closing Date**.  The obligations of each Lender to make Loans hereunder during the Availability Period shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)        Credit Agreement and Loan Documents.  The Administrative Agent (or its counsel) shall have received (i) from each Loan Party, party thereto, a counterpart signed by such Loan Party (or written evidence satisfactory to the Administrative Agent (which may include a facsimile or other electronic transmission) that such party has signed a counterpart) of (A) this Agreement, (B) any Loan Document, as requested by the Administrative Agent prior to the Petition Date, and (C) each Promissory Note requested by a Lender at least three Business Days prior to the Closing Date, (ii) a Borrowing Base Certificate dated the Closing Date, relating to the immediately preceding Saturday, and executed by the CRO. and (iii) a Borrowing Request as required by Section 2.03.

(b)        Commencement of Chapter 11 Cases; Interim Order.

(i)        The Loan Parties shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver with expanded powers shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral with an aggregate value in excess of $1,000,000.

(ii)        The Interim Order shall have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date, and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated, absent prior written consent of the Administrative Agent, the Required Lenders and the

Borrowers.  The Interim Order shall (i) find and conclude that this Agreement and any other Loan Documents were negotiated in good faith and that the Administrative Agent and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, as of the Petition Date, the Liens and security interests in favor of the Administrative Agent referred to in Section 2.22 shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens and payment of the Carve-Out.

(c)    Approved Budget.  The Administrative Agent and the Lenders shall have received the initial Approved Budget, attached hereto as Exhibit A, together with a certificate of the CRO of Holdings stating that such Approved Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties.

(d)    Secretary's Certificate and Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Petition Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that attached thereto are (x) a true and complete copy of the certificate or articles of incorporation, formation or organization of such Loan Party certified by the relevant authority of its jurisdiction of organization, which certificate or articles of incorporation, formation or organization of such Loan Party attached thereto have not been amended (except as attached thereto) since the date reflected thereon, (y) a true and correct copy of the by-laws or operating, management, partnership or similar agreement of such Loan Party, together with all amendments thereto as of the Petition Date and such by-laws or operating, management, partnership or similar agreement are in full force and effect and (z) a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution, delivery and performance of the Loan Documents, and, in the case of the Borrowers, the borrowings and other obligations thereunder, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party on the Petition Date and (ii) a good standing (or equivalent) certificate as of a recent date not more than 30 days prior to the Petition Date for such Loan Party from the relevant authority of its jurisdiction of organization certifying as to the subsistence in good standing of such Loan Party in such jurisdiction.

(e)    Representations and Warranties; No Event of Default.  The following statements shall be true and correct:  (i) the representations and warranties contained in Article III and in each other Loan Document are true and correct in all material respects (without duplication of other materiality qualifiers) on and as of the Closing Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (without duplication of other materiality qualifiers)) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Closing Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(f) <u>Fees</u>.  Prior to or on the Closing Date, the Administrative Agent shall have received (i) the Closing Fee and (ii) all accrued fees, costs and expenses of the Administrative Agent's professionals (including legal counsel) in connection with the negotiation and preparation of this Agreement and the other Loan Documents.

(g) <u>Insurance</u>.  The Administrative Agent shall have received evidence of the insurance coverage required by <u>Section 5.05</u>.

(h) <u>Legality</u>.  The making of the initial Loans shall not contravene any law, rule or regulation applicable to the Administrative  Agent or any Lender.

(i) <u>Pledged Stock and Pledged Notes</u>.  Subject to the final paragraph of this <u>Section 4.01</u>, the Administrative Agent shall have received (i) the certificates representing the Capital Stock pledged hereunder, together with an undated stock power or similar instrument of transfer for each such certificate endorsed in blank by a duly authorized officer of the pledgor thereof, and (ii) each Material Debt Instrument (if any) endorsed (without recourse) in blank (or accompanied by a transfer form endorsed in blank) by the pledgor thereof .

(j) <u>First Day Motions and Orders</u>.  The Administrative Agent shall have received on or before the Petition Date, copies of the "first day" motions, including the orders attached thereto, to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent, and the orders of the Bankruptcy Court approving such motions (including the order with respect to the Loan Parties' cash management systems), in form and substance reasonably satisfactory to the Administrative Agent, shall have been entered by the Bankruptcy Court on or before the third (3rd) Business Day after the Petition Date (such orders, the "**First Day Orders**").

(k) [Reserved].

(l) <u>Existing Liens</u>.  The Administrative Agent shall have received UCC, tax and judgment Lien searches and title reports with respect to Real Estate Assets and other appropriate evidence, evidencing the absence of any Liens or mortgages on the Collateral, except for Permitted Liens.

(m) <u>Priority</u>.  The Administrative Agent shall be satisfied that it has been granted, and holds for the benefit of the Secured Parties, a perfected, first priority Lien on, and security interest in, all of the Collateral, subject only to Permitted Priority Liens and the Carve-Out.

(n) <u>Material Adverse Effect</u>.  No event or development shall have occurred since the Petition Date, which could reasonably be expected to have a Material Adverse Effect.

(o) <u>ABL Obligations</u>.  The Loan Parties shall pay in full in cash the Prepetition ABL Obligations, with proceeds from the initial Borrowings, to the Prepetition ABL Agent, on its behalf and on behalf of the Prepetition ABL Lenders, and shall obtain a full and final release of all Liens securing the Prepetition ABL Obligations.

(p)      USA PATRIOT Act.  No later than three Business Days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested by it in writing at least ten Business Days in advance of the Closing Date, which documentation or other information has been reasonably determined by the Administrative Agent to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(q)      Litigation.  There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the Loans, this Agreement, any other Loan Document, the Prepetition ABL Obligations or the Prepetition Term Loan Obligations.

(r)      [Reserved].

(s)      Proceedings; Receipt of Documents.  All proceedings in connection with the making of the initial Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Administrative Agent and their counsel, and the Administrative Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Administrative Agent or such counsel may reasonably request.

(t)      Closing Certificate.  The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower Representative attesting to the matters set forth in Sections 4.01(e) and (n).

**Section 4.02    Conditions Precedent to the Making of All Loans**.  The obligation of any Lender to make any Loan on any date after the Closing Date is subject to the fulfillment, in a manner satisfactory to the Administrative Agent, of each of the following conditions precedent:

(a)      Representations and Warranties; No Event of Default. The following statements shall be true and correct:  (i) the representations and warranties contained in Article III and in each other Loan Document are true and correct in all material respects (without duplication of other materiality qualifiers), except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (without duplication of other materiality qualifiers)) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on and as of the date of such Loan or would result from the making of such Loan on such date.

(b)      Payment of Fees, Etc.  The Borrowers shall have paid on or before the date of such Loan all invoiced fees, costs and expenses then earned due and payable.

(c)      Material Adverse Effect.  No event or development shall have occurred since the Closing Date, which could reasonably be expected to have a Material Adverse Effect.

(d)      [Reserved].

(e)     <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of the Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Administrative Agent and their counsel, and the Administrative Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Administrative Agent or such counsel may reasonably request.

(f)     <u>Legality</u>.  The making of such Loan shall not contravene any law, rule or regulation applicable to the Administrative Agent or any Lender.

(g)     <u>Notices</u>.  The Administrative Agent shall have received a Borrowing Request pursuant to <u>Section 2.03</u>.

(h)     <u>Revolving Availability; Commitment</u>. After giving effect to (i) any Revolving Loan, the Revolving Availability then in effect is not less than zero and (i) any Term Loan, the outstanding principal amount of the Term Loans shall not exceed the total Term Loan Commitments then in effect.

## ARTICLE 5    AFFIRMATIVE COVENANTS

From the Closing Date until the date that all Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in cash (such date, the "**Termination Date**"), the Loan Parties hereby covenant and agree with the Lenders that:

**Section 5.01    <u>Approved Budget, Financial Statements, Borrowing Base and Other Reports</u>**.  The Borrower Representative will deliver to the Administrative Agent for delivery to each Lender:

(a)     The Loan Parties will furnish to the Administrative Agent:

(i)     After each four-week period following the Petition Date, an updated cash flow forecast extending out through and including the 13th week after delivery, shall be delivered, in accordance with the definition thereof (in each case, once approved, such approved updated cash flow forecast shall be the "Approved Budget"); and

(ii)     Beginning with the third Business Day after the first full week following the Petition Date and on the third Business Day of each week thereafter, no later than 5:00 p.m. (Eastern time) on such day (A) a variance and compliance report (the "**Variance Report**"), in substantially the form attached hereto as Exhibit H showing the comparison of, and the variances between, actual performance to projections for each line item of the Approved Budget and reconciling the sources, uses and disbursements of cash, for the Measurement Period most recently ended and (B) a certificate from the CRO (1) certifying the calculation and compliance of the variances and other requirements under <u>Section 6.18</u> for the Measurement Period most recently ended  and (2) including explanations for all unfavorable variances in excess of fifteen percent (15%); provided that in the event the Approved Budget applicable to such Measurement Period has been updated

and approved such that it is the "Approved Budget", the Variance Report shall be determined with reference to such updated Approved Budget;

(b)      [reserved];

(c)      <u>Monthly Financial Statements</u>.  As soon as available, and in any event within 30 days after the end of each of the first two fiscal months of each fiscal quarter, the consolidated balance sheet of Bluestem and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of operations and cash flows of Holdings and its Subsidiaries for such fiscal month and for the period from the beginning of the then current Fiscal Year to the end of such fiscal month, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer Certification with respect thereto; <u>provided</u>, that any comparison to a prior period will be a comparison between the entity or entities, as applicable, that issued the financial statements at the applicable time;

(d)      [Reserved];

(e)      <u>Borrowing Base Certificate</u>.  Within 3 Business Days after the end of each calendar week, a Borrowing Base Certificate to the Administrative Agent;

(f)      <u>Collateral Reporting</u>.  Within 3 Business Days after the end of each calendar week, to the Administrative Agent:

(i)      a schedule detailing the Loan Parties' Inventory, in form reasonably satisfactory to the Administrative Agent, (1) by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Administrative Agent has previously indicated to the Borrower Representative are deemed by the Administrative Agent to be necessary in its Permitted Discretion, (2) including a report of any variances or other results of Inventory counts performed by the Loan Parties since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Loan Parties and complaints and claims made against the Loan Parties), and (3) reconciled to the Borrowing Base Certificate delivered as of such date;

(ii)      a worksheet of calculations prepared by the Borrower Representative to determine Eligible Inventory and Eligible In-Transit Inventory, such worksheets detailing the Inventory excluded from Eligible Inventory and Eligible In-Transit Inventory and the reason for such exclusion;

(iii)      a reconciliation of the Loan Parties' Inventory between the amounts shown in the Borrowers' general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above;

(iv)    a reconciliation of the loan balance per the Borrowers' general ledger to the loan balance under this Agreement;

(v)    a trial balance showing Credit Card Receivables and Other Receivables outstanding aged from stated date as follows: 1 to 30 days, 31 to 60 days, 61 to 90 days, and 91 days or more, accompanied by a comparison to the prior month's trial balance and inclusive of a reconciliation to the general ledger and such supporting detail and documentation as shall be required by the Administrative Agent; and

(vi)    such other reports, reconciliations as the Administrative Agent may reasonably request, including, without limitation, copies of Account Debt invoices, evidence of shipment or delivery, trial balances and test verifications.

(g)    <u>Accounts</u>.    Upon reasonable request by the Administrative Agent, a schedule and aging of the Borrowers' accounts payable and intercompany accounts, delivered electronically in a text formatted file acceptable to the Administrative Agent;

(h)    <u>Inventory; Intercompany Accounts</u>.    Promptly upon the Administrative Agent's reasonable request copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory purchased by any Loan Party;

(i)    <u>[Reserved]</u>;

(j)    <u>Notice of Default</u>.    Promptly upon any Responsible Officer of a Loan Party obtaining knowledge of (i) any Default or Event of Default or (ii) the occurrence of any event or change that has caused or evidences or would reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, a reasonably-detailed notice specifying the nature and period of existence of such condition, event or change and what action the Loan Parties have taken, is taking and proposes to take with respect thereto;

(k)    <u>Notice of Litigation</u>.    Promptly upon any Responsible Officer of a Loan Party obtaining knowledge of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Borrower Representative to the Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either <u>clause (i)</u> or <u>(ii)</u>, could reasonably be expected to have a Material Adverse Effect, written notice thereof from the Borrower Representative together with such other non-privileged information as may be reasonably available to the Loan Parties to enable the Lenders to evaluate such matters;

(l)    <u>ERISA</u>.    Promptly upon any Responsible Officer of a Loan Party becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof;

(m)    <u>Taxes</u>.    Promptly, upon obtaining knowledge of the  filing of any Lien for material unpaid Taxes against any Loan Party.

(n)    <u>Information Regarding Collateral</u>.    Prompt (and, in any event, within 15 days of the relevant change) written notice of any change (i)  any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties;

(ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization;

(o)    [Reserved];

(p)    Material Losses.  Promptly upon any Responsible Officer of a Borrower becoming aware, notice of (i) any loss, damage, or destruction, whether or not covered by insurance, to; (ii) any casualty or other insured damage to; or (iii) the commencement of any action or proceeding for the taking by power of eminent domain, condemnation or similar proceeding of; in each case, the Collateral in the amount of $2,500,000 or more;

(q)    Certain Reports.  Promptly upon their becoming available and without duplication of any obligations with respect to any such information that is otherwise required to be delivered under the provisions of any Loan Document, copies of all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by a Borrower or Holdings with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities;

(r)    Other Information.  Such other certificates, reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time in connection with the financial condition or business of Holdings, the Borrowers and their Subsidiaries; provided, however, that none of Holdings, the Borrowers nor any of their Subsidiaries shall be required to disclose or provide any information (i) that constitutes non-financial trade secrets or non-financial proprietary information of Holdings, the Borrowers or any of their subsidiaries or any of their respective customers and/or suppliers, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is prohibited by applicable Requirements of Law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which Holdings, the Borrowers or any Subsidiary thereof owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.01(r)); provided, further to the extent any certificates, reports or other information are withheld or otherwise not provided in reliance on any of the foregoing clauses (i)-(iv), the Borrower Representative will provide notice to the Administrative Agent that such information is being withheld and the Borrowers shall use commercially reasonable efforts to obtain the relevant consents under such obligations of confidentiality to permit the provision of such information;

(s)    Other Notices.  Promptly after furnishing thereof, copies of any material notice of default furnished pursuant to the Prepetition Term Loan Agreement, the SCUSA Sale Agreement, any Related Agreement or any Replacement WebBank/SCUSA Sale Agreement

(t)    Net Proceeds.  Promptly following actual knowledge by a Loan Party, a detailed summary of the estimated Net Proceeds to be received from any proposed Disposition, Extraordinary Receipts or any other mandatory prepayment event as set forth in this Agreement;

(u)      [Reserved];

(v)      Chapter 11 Documents.  Promptly and in any event within three (3) Business Days after the filing thereof and to the extent the same is not publicly available on the Bankruptcy Court's electronic docket, copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Loan Party in the Chapter 11 Cases, which papers and documents shall also be given or served on the Administrative Agent's counsel;

(w)      Committee Reports.  Promptly and in any event within three (3) Business Days after the sending thereof, copies of all written reports given by any Loan Party to any official or unofficial Committee;

(x)      Sale Process.  Promptly and in any event within three (3) Business Days after receipt thereof, copies of all letters of intent, commitment letters, written offers and purchase agreements (in each case, with such redactions as deemed reasonably necessary by the Loan Parties) received by any Loan Party or any of their advisors with respect to, in connection with, or in response to, the proposed Sale, the Asset Purchase Agreement or pleadings seeking approval of the same; and

Documents required to be delivered pursuant to this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower Representative (x) posts such documents or (y) provides a link thereto at the website address listed on Schedule 9.01; provided that, other than with respect to items required to be delivered pursuant to Section 5.01(q) above, the Borrower Representative shall promptly notify (which notice may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents at the website address listed on Schedule 9.01 and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; (ii) on which such documents are delivered by the Borrower Representative or the Borrowers to the Administrative Agent for posting on behalf of the Borrowers on IntraLinks/SyndTrak or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); (iii) on which such documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) in respect of the items required to be delivered pursuant to Section 5.01(q) above in respect of information filed by a Borrower or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q Reports and Form 10-K Reports described in Sections 5.01(a) and (b), respectively), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority or securities exchange.

**Section 5.02  Existence**.  Except as otherwise permitted under Section 6.07, the Loan Parties will, and the Loan Parties will cause each of their Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business except, other than with respect to the preservation of the existence of the Loan Parties, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.03   Payment of Taxes and Other Obligations**.  Subject to the provisions of the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, each Loan Party will, and will cause its Subsidiaries to, pay its material post-petition tax liabilities, and all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers and carriers) which, if unpaid, would by law become a Lien upon its property, except (a) where the validity or amount thereof is being contested in good faith by appropriate proceedings, or (b) Taxes in an aggregate amount not to exceed $500,000 at any time.  For the avoidance of doubt, nothing in this Agreement requires payment of any Prepetition Liabilities subject to the automatic stay of the Bankruptcy Code.

**Section 5.04   Maintenance of Properties**.  The Loan Parties will, and the Loan Parties will cause each of their Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all property reasonably necessary to the normal conduct of business of the Loan Parties and their Subsidiaries and from time to time will make or cause to be made all needed and appropriate repairs, renewals and replacements thereof except as expressly permitted by this Agreement or where the failure to maintain such properties or make such repairs, renewals or replacements could not reasonably be expected to have a Material Adverse Effect.

**Section 5.05   Insurance**.  Each Loan Party will maintain or cause to be maintained, with financially sound and reputable insurers, such insurance coverage with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Loan Parties and their Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, including flood insurance with respect to each Flood Hazard Property, in each case in compliance with the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973 (where applicable).  Each such policy of insurance maintained shall, subject to Section 5.15, (i) name the Administrative Agent on behalf of the Secured Parties as an additional insured thereunder as its interests may appear and (ii) to the extent available from the relevant insurance carrier, in the case of each casualty insurance policy (excluding any business interruption insurance policy, workers' compensation policy or employee liability policy), contain a lenders loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders as the lenders loss payee thereunder and, to the extent available, provide for at least 30 days' prior written notice (or 10 days' prior written notice for any cancellation due to non-payment of premiums) to the Administrative Agent of any modification or cancellation of such policy or the failure to pay any premiums thereunder.

**Section 5.06   Inspections**.  The Loan Parties will, and the  Loan Parties will cause each of their Subsidiaries to, permit any authorized representative designated by the Administrative Agent to visit and inspect any of the properties of the Loan Parties or any of their Subsidiaries at which the principal financial records and executive officers of the applicable Person are located, to inspect, copy and take extracts from its and their respective financial and accounting records, and to discuss its and their respective affairs, finances and accounts with its and their Responsible Officers and independent public accountants (provided that the Loan Parties (or any of their Subsidiaries) may, if they so choose, be present at or participate in any such discussion), all upon reasonable notice and at reasonable times during normal business hours; provided, that

notwithstanding anything to the contrary herein, neither the Loan Parties nor any Subsidiary shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information of the Loan Parties and their Subsidiaries and/or any of its customers and/or suppliers, (B) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable Requirements of Law, (C) that is subject to attorney-client or similar privilege or constitutes attorney work product or (D) in respect of which Holdings, the Borrowers or any Subsidiary owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.06); provided, to the extent any documents, information or other matters are withheld or otherwise not made available for inspection in reliance on any of the foregoing clauses (A)-(D), the Borrower Representative will provide notice to the Administrative Agent that such information is being withheld and the Loan Parties shall use commercially reasonable efforts to obtain the relevant consents under such obligations of confidentiality to permit the provision or inspection of such documents, information or other matters.

Section 5.07    **Maintenance of Book and Records**.  The Loan Parties will, and the Loan Parties will cause each of their Subsidiaries to, maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Loan Parties and their Subsidiaries that are full, true and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP.

Section 5.08    **Compliance with Laws**.  The Loan Parties will, and the Loan Parties will cause each of their Subsidiaries to, comply with the requirements of (i) all applicable Requirements of Law (including all applicable Environmental Laws and ERISA, but excluding OFAC, the USA PATRIOT Act and the FCPA), except to the extent the failure of the Borrowers to comply could not reasonably be expected to have a Material Adverse Effect and (ii) OFAC, the USA PATRIOT Act and the FCPA in all material respects.

Section 5.09    **Environmental**.

(a)    Environmental Disclosure.  The Borrower Representative will deliver to the Administrative Agent:

(i)    as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of the Loan Parties or any of their Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to significant environmental matters at the Loan Parties' or their Subsidiaries' real property or with respect to any Environmental Claims or Environmental Liabilities that, in each case might reasonably be expected to have a Material Adverse Effect;

(ii)    promptly upon the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported by the Loan Parties or any of their subsidiaries to any Governmental Authority under any Environmental Laws if such Release could reasonably be expected to have a Material Adverse Effect, (B) any action

taken by the Loan Parties or any of their subsidiaries or any other Persons of which the Loan Parties have knowledge in response to (1) any Hazardous Materials Activities, (2) any Environmental Claim or (3) any Environmental Liability that in each case could reasonably be expected to have a Material Adverse Effect, or (C) discovery by the Loan Parties or any of their Subsidiaries of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that reasonably could be expected, individually or in the aggregate, to have a Material Adverse Effect;

(iii)    as soon as practicable following the sending or receipt thereof by the Loan Parties or any of their Subsidiaries, a copy of any and all written communications with respect to any of the following that could reasonably be expected to give rise to a Material Adverse Effect: (A) any Environmental Claim, (B) any Release, (C) any Environmental Liability and (D) any request made to the Loan Parties or any of their Subsidiaries for information from any Governmental Authority that suggests such Governmental Authority is investigating whether the Loan Parties or any of their Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)    prompt written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by the Loan Parties or any of their Subsidiaries that could reasonably be expected to expose the Loan Parties or any of their Subsidiaries to, or result in, Environmental Claims against the Loan Parties or any of their subsidiaries or any Environmental Liability that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (B) any proposed action to be taken by the Loan Parties or any of their Subsidiaries to modify current operations in a manner that could subject the Loan Parties or any of their Subsidiaries to any additional material obligations or requirements under any Environmental Law or Environmental Liability that could reasonably be expected to have a Material Adverse Effect; and

(v)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(a).

(b)    Hazardous Materials Activities, Etc.  The Loan Parties shall promptly take, and shall cause each of their Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by the Loan Parties or their subsidiaries, and address with appropriate corrective or remedial action any Release or threatened Release of Hazardous Materials at or from any Facility, in each case, that could reasonably be expected to have a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against the Loan Parties or any of their Subsidiaries and discharge any obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10    **Sale Milestones**.  The Loan Parties shall comply with and achieve the Sale Milestones.

Section 5.11    **Use of Proceeds**.  The Loan Parties shall use the proceeds of the Loans in accordance with the Approved Budget (within the variances from budgeted amounts permitted

under this Agreement) to (a)  repay the outstanding Prepetition ABL Obligations, (b) pay fees and expenses related to this Agreement and the other Loan Documents, and (c) fund working capital in the ordinary course of business of the Loan Parties (and out of the ordinary course as approved by the Administrative Agent and the Bankruptcy Court and to the extent expressly set forth in the Approved Budget subject to permitted variances) and for other general corporate purposes.  None of the proceeds of the Loans, portion of the Carve-Out, cash collateral or other Collateral proceeds may be used for any purpose prohibited by the Interim Order or the Final Order, as applicable, including to challenge, as opposed to investigate, the validity, perfection, priority, extent or enforceability of this Agreement and any other Loan Documents, the Prepetition Term Loan Documents, or the liens or security interests securing the obligations under this Agreement and any other Loan Documents, the Prepetition  Term Loan Documents or to pursue any causes of action of any kind against the Administrative Agent, any Lender, or the Prepetition Term Loan Agent or any Prepetition Term Loan Lender solely in their respective capacities as agent or lenders under this Agreement and any other Loan Documents and the Prepetition Term Loan Documents, or to object to or to oppose any action authorized hereunder or under the Interim Order and the Final Order, as applicable, and the Loan Parties waive their right to challenge and investigate each of the foregoing.  No more than $50,000 of any proceeds hereunder, any Collateral (including cash collateral) or the Carve-Out may be used by any Person to investigate (but not to prosecute) the validity, perfection, priority, extent or enforceability of the Prepetition Term Loan Documents or the liens or security interests securing the obligations under the Prepetition Term Loan Documents; provided that (x) if a Committee is appointed by the U.S. Trustee within twenty (20) days following the Petition Date, such Committee (and no other party) shall, to the extent requisite standing is granted or otherwise exists as a matter of law, have the right to commence any action against the Prepetition Term Agent and/or the Prepetition Term Loan Lenders within sixty (60) days from the date of such appointment, or (y) in the event no Committee is appointed within twenty (20) days following the Petition Date, any party in interest with requisite standing shall have the right to commence any action against the Prepetition Term Agent and/or the Prepetition Term Loan Lenders within seventy five (75) days from the date of entry of the Interim Order, in each of clauses (x) and (y), as may be extended, in writing, by the Prepetition Term Agent in its sole discretion. No part of the proceeds of the Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the regulations of the Board of Governors, including Regulations T, U and X.

Section 5.12    [Reserved].

Section 5.13    Status Calls; Financial Advisors.  The Loan Parties shall arrange for the CRO and any other officers and executives of the Loan Parties (as requested by the Administrative Agent) and the financial advisors of the Loan Parties to participate in, weekly conference calls with the Administrative Agent, the Lenders and/or their financial advisors to review and discuss the Sale Milestones, variances from the Approved Budget and related matters.  In addition, the Administrative Agent and the financial advisors of the Administrative Agent shall have reasonable access to the Loan Parties' officers, executives and financial advisors.  The Administrative Agent shall also have reasonable access to the CRO, chief financial officer, such other officers and executives of the Loan Parties and the financial advisors of the Loan Parties, as any Administrative Agent may require from time to time.

**Section 5.14    Further Assurances**. Promptly upon request of the Administrative Agent, subject to the terms of the Loan Documents:

(a)    the Loan Parties will, and will cause each other Loan Party to, execute any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions (including the filing and recordation of financing statements, fixture filings, Mortgages and/or amendments thereto and other documents), that may be required under any applicable Requirements of Law and which the Administrative Agent may request to cause to ensure the creation, perfection and priority of the Liens created or intended to be created under this Agreement or any other Loan Documents, all at the expense of the relevant Loan Parties.

(b)    The Loan Parties will, and will cause each other Loan Party to, promptly (i) correct any jointly identified material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments, in each case under this clause (b), as the Administrative Agent may reasonably request from time to time to create, perfect and maintain the priority of the security interests intended to be granted under the relevant Loan Documents.

**Section 5.15    Post-Closing Obligations**. No later than the applicable time periods after the Closing Date set forth on Schedule 5.15 (or such longer period as the Administrative Agent may reasonably agree), the items set forth on Schedule 5.15 shall be satisfied.

**Section 5.16    Appraisals; Field Exams**.

(a)    At the discretion of the Administrative Agent, but not more than once during the term of this Agreement, the Loan Parties will provide the Administrative Agent with appraisals or updates thereof of their Inventory, from an Acceptable Appraiser, such appraisals and updates to include, without limitation, information required by applicable law and regulations at the sole expense of the Loan Parties.

(b)    At the discretion of the Administrative Agent, but not more than once during the term of this Agreement, field examinations will be conducted (which exams may be conducted by third-party examiners acceptable to the Administrative Agent) to ensure the adequacy of Collateral reflected in the Borrowing Base and related reporting and control systems at the sole expense of the Loan Parties.

**Section 5.17    Cash Management; Collection of Accounts**.

(a)    Each Loan Party shall (i) assist the Administrative Agent in continuing (and to the extent necessary, establishing) and maintaining the Controlled Accounts during the term of this Agreement, with respect to such Loan Party's deposit accounts with the financial institutions set forth on Schedule 3.18 or other deposit accounts opened after the Closing Date with the prior written consent of the Administrative Agent (such banks, the "**Controlled Account Bank**s"), (ii) deposit or cause to be deposited promptly and in any event within two (2) Business Days after the receipt thereof, all proceeds in respect of any Collateral and all available cash receipts received by

any Loan Party (including payments made by the Account Debtors directly to any Loan Party, the "**Cash Receipts**") into a Controlled Account and (iii) with respect to each Controlled Account, use commercially reasonable efforts to deliver to the Administrative Agent within forty-five (45) days after the Closing Date an amendment to each Existing Control Agreement with respect to such Controlled Account providing for the addition of the Administrative Agent as the "first priority" agent, in form and substance reasonably satisfactory to the Administrative Agent.

(b)    The Controlled Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment in such accounts securing payment of the Obligations, and in which the Loan Parties are hereby deemed to have granted a Lien to Administrative Agent for the benefit of the Administrative Agent and the Lenders.  All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by any Loan Party from any of its Account Debtors, as proceeds from Accounts of such Loan Party or as proceeds of any other Collateral shall be held by such Loan Party in trust for the benefit of Administrative Agent and the Lenders and if of a nature susceptible to a deposit in a bank account, upon receipt be deposited by such Loan Party in original form promptly and in any event within two (2) Business Day after receipt thereof into a Controlled Account.

(c)    The Loan Parties may also maintain one or more Deposit Accounts (the "**Disbursement Accounts**") to be used by the Loan Parties for disbursements and payments (including payroll) in the ordinary course of business or as otherwise permitted hereunder.  The only Disbursement Accounts as of the Petition Date are those described in <u>Schedule 3.18</u>.

(d)    The Loan Parties shall not close any Deposit Accounts or Controlled Accounts and/or open any new Deposit Accounts or Controlled Accounts without the prior written consent of the Administrative Agent and, with respect to any new Deposit Accounts, subject to the execution and delivery to the Administrative Agent of appropriate Control Agreements reasonably satisfactory to the Administrative Agent.

(e)    [Reserved].

(f)    [Reserved].

(g)    During a Cash Dominion Period, upon delivery of a written notice thereof to the Borrower Representative from the Administrative Agent, the Administrative Agent shall have the right to require that all amounts on deposit in Controlled Accounts  be swept in accordance with the instructions of the Administrative Agent pursuant to the applicable Control Agreement. The Administrative Agent shall have the right during any Cash Dominion Period to cause all amounts swept by the Administrative Agent to be applied on a daily basis to reduce the principal amount of the other Loans outstanding at such time on a ratable basis (without, at the election of the Required Lenders, a permanent reduction of the Revolving Commitment).

**Section 5.18    <u>Freight Forwarding Agreements</u>**. The Loan Parties shall not claim any Inventory as Eligible In-Transit Inventory unless they have entered into Freight Forwarding Agreements or otherwise satisfied the requirements of clause (d) of the definition of "Eligible In-Transit Inventory" with respect to Inventory; <u>provided,</u> that during the 45 day post-closing period set forth in <u>Schedule 5.15</u> with respect to entering into Freight Forwarding Agreements, Inventory

may be deemed Eligible In-Transit Inventory and included in the Borrowing Base whether or not that clause (d) has been satisfied, so long as such Inventory otherwise constitutes Eligible In-Transit Inventory.  For the avoidance of doubt, after such 45 day post-closing period, Eligible In-Transit Inventory shall not be included in the Borrowing Base until such time as the Administrative Agent has received all relevant Freight Forwarding Agreements or such clause (d) has otherwise been satisfied with respect thereto.

**Section 5.19    Existing Credit Card Agreements**.  Each of the Loan Parties shall:  (a) observe and perform in all material respects all material terms, covenants, conditions and provisions of the Existing Credit Card Agreements to be observed and performed by it at the times set forth therein, other than where the failure to do so could not reasonably be expected to result in a Material Adverse Effect, (b) not do, permit, suffer or refrain from doing anything, as a result of which there could reasonably be expected to be a material default under or material breach of any of the terms of any of the Existing Credit Card Agreements that could reasonably be expected to result in a Material Adverse Effect, (c) at all times maintain in full force and effect the Existing Credit Card Agreements and not terminate, cancel, surrender, or materially modify, amend, waive or release any of the Existing Credit Card Agreements, or consent to or permit to occur any of the foregoing; except that any such Loan Party may modify, terminate or cancel any of the Existing Credit Card Agreements with the consent of the Administrative Agent, other than where such actions could not reasonably be expected to result in a Material Adverse Effect, and (d) furnish to the Administrative Agent, promptly upon the request thereof, such information and evidence as the Administrative Agent may reasonably require from time to time concerning the observance, performance and compliance by such Loan Party or the other party or parties thereto with the terms, covenants or provisions of the Existing Credit Card Agreements, other than where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

## ARTICLE 6    NEGATIVE COVENANTS

From the Closing Date and until the Termination Date has occurred, each Loan Party covenants and agrees with the Lenders that:

**Section 6.01    Indebtedness**.  The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness of (i) a Loan Party to any other Loan Party and (ii) any Foreign Subsidiary to a Loan Party, not to exceed under this clause (ii), at any time outstanding, $1,000,000 in the aggregate;

(c)    Indebtedness pursuant to (i) that certain Guaranty dated as of April 18, 2013 by Bluestem for the benefit of WebBank delivered in connection with the Program Agreement and (ii) any similar Guarantees by any Loan Party in connection with any Replacement WebBank/SCUSA Agreement;

(d)    Indebtedness of the Loan Parties or any Subsidiary existing on the Petition Date and described on Schedule 6.01; provided that no increase to the amount of such Indebtedness or modification to the terms thereof shall be permitted;

(e)    Indebtedness of any Loan Party (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and consistent with past practice and (ii) in respect of any letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items, not to exceed under this clause (e), at any time outstanding, $2,500,000 in the aggregate;

(f)    Indebtedness of a Borrower in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and Deposit Accounts, including incentive, supplier finance or similar programs, not to exceed under this clause (e), at any time outstanding, $2,500,000 in the aggregate, which such cap shall be in excess of any deposits held by the other party;

(g)    (i) Guarantees by a Borrower or any of its Subsidiaries of the obligations of suppliers, customers and licensees in the ordinary course of business and consistent with past practice, (ii) Indebtedness incurred in the ordinary course of business and consistent with past practice in respect of obligations of a Borrower to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business and consistent with past practice;

(h)    Indebtedness of a Borrower and/or Subsidiary consisting of obligations owing under dealer incentive, supply, license or similar agreements entered into in the ordinary course of business and consistent with past practice;

(i)    Indebtedness of a Borrower consisting of (i) the financing of insurance premiums, (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice and/or (iii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business and consistent with past practice;

(j)    Indebtedness of a Borrower with respect to Capital Leases and purchase money Indebtedness incurred prior to or within 270 days of the acquisition, lease, completion of construction, repair of, replacement, improvement to or installation of the assets acquired, leased, constructed, repaired, replaced, improved or installed in connection with the incurrence of such Indebtedness in an aggregate outstanding principal amount not to exceed at any time $750,000;

(k)    Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred by the Loan Parties and/or any Subsidiary in respect of workers compensation claims, unemployment insurance (including premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits consistent with past practice;

(l)    Indebtedness of the Borrowers and/or any Subsidiary representing deferred compensation to current or former directors, officers, employees, members of management, managers, and consultants of Holdings, the Borrowers and/or any Subsidiary in the ordinary course of business not to exceed $500,000 in the aggregate at any time;

(m)    unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Borrowers and/or any Subsidiary in the ordinary course of business to the extent that the unfunded amounts would not otherwise cause an Event of Default under Section 7.01(g);

(n)    customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(o)    Indebtedness with respect to the Related Agreements and any Replacement WebBank/SCUSA Sale Agreement;

(p)    (i) the Prepetition Term Loan Obligations and (ii) only for the period from the Petition Date to the Closing Date, the Prepetition ABL Obligations;

(q)    without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrowers or any Subsidiary permitted under this Section 6.01;

(r)    Indebtedness incurred by the Loan Parties in connection with the Carve-Out; and

(s)    Indebtedness of the Borrowers and/or Subsidiary in an aggregate outstanding principal amount not to exceed $1,000,000 at any time outstanding.

**Section 6.02  Liens**.  The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, create, incur, assume or permit or suffer to exist any Lien on or with respect to any property of any kind owned by it, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)    Liens securing the Obligations in favor of the Secured Parties  or otherwise permitted by the Interim Order or Final Order, as applicable;

(b)    Liens for Taxes which are (i) not then due, (ii) if due, such Taxes are not at such time required to be paid pursuant to Section 5.03, (iii) being contested in accordance with

Section 5.03, (iv) attributable to Taxes the nonpayment of which is permitted or required pursuant to the Bankruptcy Code or (v) such Taxes do not exceed $500,000 in the aggregate at any time;

(c)    statutory Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by applicable Requirements of Law, in each case incurred in the ordinary course of business and consistent with past practice (i) for amounts not yet overdue by more than 30 days, (ii) for amounts that are overdue by more than 30 days and that are being contested in good faith by appropriate proceedings, so long as any reserves or other appropriate provisions required by GAAP have been made for any such contested amounts, (iii) are stayed by the Bankruptcy Court in connection with the Chapter 11 Cases or (iv) for amounts that do not exceed $500,000 in the aggregate at any time;

(d)    Liens incurred (i) in the ordinary course of business and consistent with past practice in connection with workers' compensation, unemployment insurance and other types of social security laws and regulations, (ii) in the ordinary course of business and consistent with past practice to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, utilities, government contracts, leases, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) pursuant to pledges and deposits of cash or Cash Equivalents in the ordinary course of business and consistent with past practice securing (x) any liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty, liability or other insurance to Holdings, the Borrowers and their Subsidiaries or (y) leases or licenses of property otherwise permitted by this Agreement and (iv) to secure obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e)    Liens consisting of easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not, in the aggregate, materially interfere with the ordinary conduct of the business of the Loan Parties and their Subsidiaries, taken as a whole, or the use of the affected property for its intended purpose;

(f)    Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g)    purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the ordinary course of business and consistent with past practice;

(h)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods arising in the ordinary course of business and consistent with past practice in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with

GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(i)       Liens in connection with any zoning, building or similar Requirement of Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of real property or the structure thereon, including Liens in connection with any condemnation or eminent domain proceeding or compulsory purchase order;

(j)       Liens on any property of asset of any Loan Party described on Schedule 6.02 but not the extension of coverage thereof to other property or the extension of maturity, refinancing or other modification of the terms thereof or the increase of the Indebtedness secured thereby;

(k)       (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Borrowers and/or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers and/or any Subsidiary, (C) purchase orders and other agreements entered into with customers of the Borrowers and/or any Subsidiary in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to Deposit Accounts and (iv) Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction;

(l)       leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any Indebtedness;

(m)       Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business and consistent with past practice of the Loan Parties and/or their Subsidiaries;

(n)       Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(o)       Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(p)       Liens with respect to the Related Agreements and any Replacement WebBank/SCUSA Sale Agreement;

(q)       Liens securing permitted Capital Leases pursuant to Section 6.01(j);

(r)    Liens consisting of the prior rights of consignees and their lenders under consignment arrangements entered into in to ordinary course of business;

(s)    Liens created pursuant to the Prepetition Term Loan Documents securing the Prepetition Term Loan Obligations; so long as such Liens are and remain junior and subordinate in all respects to the Liens securing the Obligations with respect to all Collateral pursuant to this Agreement and the Interim Order and the Final Order, as applicable;

(t)    only for the period from the Petition Date to the Closing Date, the Liens created pursuant to the Prepetition ABL Loan Documents securing the Prepetition ABL Obligations;

(u)    the Adequate Protection Replacement Liens;

(v)    (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith and not constituting an Event of Default under Section 7.01(h), (ii) any pledge and/or deposit securing any settlement of litigation in an aggregate principal amount at any time outstanding not to exceed $1,000,000; and (iii) Liens or deposits into escrow in connection with any Investments permitted under Section 6.06;

(w)    other Liens on assets securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed $1,000,000; and

(x)    Permitted Priority Liens to the extent not covered in clauses (a) though (w) above.

**Section 6.03    No Further Negative Pledges; Burdensome Agreements**. No Loan Party will, or will permit any Subsidiary to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any material condition upon (a) the ability of such Loan Party to create, incur or permit to exist any Lien upon any of its property or assets or (b) the ability of any Subsidiary thereof to pay dividends or other distributions with respect to any of its Capital Stock to such Loan Party or to make or repay loans or advances to a Loan Party or any other Subsidiary of a Loan Party or to guarantee Indebtedness of the Loan Parties or any other Subsidiary of the Loan Parties, provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or any Prepetition Term Loan Document, (ii) the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) the foregoing shall not apply to customary provisions restricting assignments, subletting or other transfers (including the granting of any lien) contained in leases, subleases, licenses, sublicenses or other agreements and/or the property or assets secured by such Liens or the property or assets subject to such leases, subleases, licenses, sublicenses or other agreements, as the case may be, (iv) the foregoing shall not apply to licenses or contracts which by the terms of such licenses and contracts prohibit the granting of Liens on the rights contained therein, (vi) the foregoing shall not apply to any restriction in existence on the Petition Date, so long as such restriction was permitted under the Prepetition Term Loan Documents or is set forth on Schedule 6.03, (vii) the foregoing shall not

apply to specific property to be sold pursuant to any Disposition permitted by <u>Section 6.07</u>, (viii) the foregoing shall not apply to restrictions contained in the documentation governing Indebtedness permitted by Section 6.01, (ix) the foregoing shall not apply to Permitted Liens and restrictions in the agreements relating thereto that limit the right of the Borrowers and/or any Subsidiary to Dispose of, or encumber the assets subject to such Liens, and (x) the foregoing shall not apply to restrictions set forth in any Related Agreement or any agreements with respect to any Replacement WebBank/SCUSA Agreement or Other Receivables Facility.

### Section 6.04   <u>Restricted Payments; Other Payments</u>.

(a)     The Loan Parties shall not pay or make, directly or indirectly, any Restricted Payment, except that:

(i)     the Borrowers and the Subsidiary Guarantors may make Restricted Payments to Holdings solely for the purpose of paying professional and other shared expenses (including, without limitation, the costs of preparing financial statements and related materials) incurred in the ordinary course of business due and payable by such Loan Party and to pay customary fees to the independent directors of Holdings:

(ii)     the declaration and payment of a dividend by any Subsidiary of a Loan Party to a Loan Party;

(iii)     provided no Event of Default then exists or would arise therefrom, the Borrowers and the Subsidiary Guarantors may make Restricted Payments to Holdings solely for the purpose of paying (A) post-Petition Date taxes of Holdings and its Subsidiaries and (B) pre-Petition Date taxes constituting "responsible person" payments as provided by Section 6.18(e); and

(iv)     to the extent constituting Restricted Payments, Investments permitted by <u>Section 6.06</u> and (B) transactions with Affiliates expressly permitted by this Agreement.

(b)     No Loan Party will make or agree to pay or make, directly or indirectly, any voluntary payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness or) or make any payment in violation of any subordination terms of any subordinated Indebtedness, except (i) the Obligations, (ii) the Prepetition ABL Loan Obligations in accordance with the terms and conditions in this Agreement and the Interim Order, (iii) the Prepetition Term Loan Obligations in accordance with the terms and conditions of this Agreement and the Interim Order and the Final Order, as applicable, (iv) with respect to the Prepetition Term Loan Obligations, any adequate protection payments provided for in the Interim Order and the Final Order, as applicable, (v) as expressly set forth in the Approved Budget (including permitted variances), and (vi) refinancing of Indebtedness permitted by <u>Section 6.01</u>.

### Section 6.05   <u>Subsidiaries</u>.   The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create or acquire in any manner any additional Subsidiary.

**Section 6.06   <u>Investments</u>**. The Loan Parties shall not, nor shall the Loan Parties permit any Subsidiary to, make or own any Investment in any other Person except:

(a)      cash or Investments that constitute Cash Equivalents;

(b)      (i) Investments made after the Closing Date solely among the Borrowers and/or one or more Loan Parties, (ii) Investments made after the Closing Date by any Loan Party in a Foreign Subsidiary, with amounts under this clause (b)(i) not to exceed $1,000,000 in the aggregate at any time outstanding and (iii) Investments made by any Foreign Subsidiary in any Loan Party and/or other Foreign Subsidiary;

(c)      Investments existing on the Petition Date and set forth on <u>Schedule 6.06</u>, but not any increase in the reserved amount of any such Investment, as set forth in such Schedule;

(d)      Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business, consistent with past practice and as expressly set forth in  the Approved Budget (including permitted variances);

(e)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, consistent with past practice and as expressly set forth in the Approved Budget (including permitted variances);

(f)      Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practice;

(g)      to the extent constituting Investments, (i) purchases of rights to payment (however evidenced) from WebBank (x) which are simultaneously sold to SCUSA or (y) which constitute "Non-Standard Accounts" (as such term is defined in the Program Agreement), in each case under this <u>clause (f)</u>, pursuant to the applicable Related Agreement and (ii) purchases of similar assets or rights in connection with any Replacement WebBank/SCUSA Sale Agreement or Other Receivables Facility;

(h)      Investments constituting Dispositions permitted under <u>Section 6.07</u>; and

(i)      Investments made after the Closing Date by the Borrowers and/or any of its Subsidiaries in an aggregate amount at any time outstanding not to exceed $1,000,000.

**Section 6.07   <u>Fundamental Changes; Disposition of Assets</u>**.  The Loan Parties shall not, nor shall the Loan Parties permit any of their Subsidiaries to merge, consolidate, amalgamate or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or make any Disposition of any assets in a single transaction or in a series of related transactions, except:

(a)      (i) any Borrower may be merged, consolidated or amalgamated with or into another Borrower, (ii) any Guarantor may be merged, consolidated or amalgamated with or into

another Loan Party and (iii) any Subsidiary that is not a Loan Party may be merged, consolidated, amalgamated liquidated or dissolved with or into another Loan Party or a Subsidiary that is not a Loan Party;

(b)     Dispositions (including of Capital Stock) solely among the Loan Parties and/or any Subsidiary; provided that any such Disposition made by any Loan Party to a Person that is not a Loan Party shall only be in respect of Dispositions of Inventory in the ordinary course of business and 100% of the consideration for any such Disposition shall consist of cash;

(c)     (x) Dispositions of inventory in the ordinary course of business and (y) the leasing or subleasing of real property in the ordinary course of business;

(d)     Dispositions of surplus, obsolete, used or worn out equipment or other property that, in the reasonable judgment of a Loan Party, are no longer useful in its business (or in the business of any Subsidiary); provided that the fair market value of all such Dispositions shall not exceed $500,000 during the term of this Agreement;

(e)     Dispositions of cash and/or Cash Equivalents in exchange for cash and/or Cash Equivalents;

(f)     Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), which (i) do not materially interfere with the business of the Borrowers and their Subsidiaries or (ii) relate to closed facilities or the discontinuation of any product line;

(g)     (i) any termination of any lease in the ordinary course of business, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business;

(h)     sales, transfers and other Dispositions approved pursuant to an order of the Bankruptcy Court, in all cases, with the consent of the Administrative Agent;

(i)     Dispositions of property subject to casualty, eminent domain, foreclosure or condemnation proceedings (including in lieu thereof or any similar proceeding);

(j)     Dispositions of Receivables and related assets in connection with (i) the SCUSA Sale Agreement (or made pursuant to the terms of any other Related Agreement) or (ii) any Replacement WebBank/SCUSA Sale Agreement;

(k)     Dispositions for fair market value in an amount not to exceed $1,000,000; provided that (i) 100% of the consideration for such Disposition shall consist of Cash or Cash Equivalents and (ii) that immediately prior to and after giving effect to such Disposition, as determined on the date on which the agreement governing such Disposition is executed, no Event of Default exists;

(l)     Dispositions (other than Dispositions of Inventory included in the Borrowing Base) to the extent that (i) the relevant property is exchanged for credit against the

purchase price of similar replacement property or (ii) the proceeds of the relevant Dispositions are promptly applied to the purchase price of such property; provided that the fair market value of all such Dispositions shall not exceed $500,000 during the term of this Agreement;

(m)     Dispositions listed on Schedule 6.07; and

(n)     Dispositions constituting (i) Investments permitted under Section 6.06 and (ii) Restricted Payments permitted under Section 6.04.

**Section 6.08    Transactions with Affiliates**.  No Loan Party will, or will permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions to the extent permitted hereunder, (b)(i) any collective bargaining agreement, employment agreement, severance agreement or compensatory (including profit sharing) arrangement entered into by a Borrower or any of its Subsidiaries with their respective current or former officers, directors, members of management, managers, employees, consultants or independent contractors, in each case in existence on the Closing Date and (ii) transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any health, disability or similar insurance plan which covers current or former officers, directors, members of management, managers, employees, consultants or independent contractors or any employment contract or arrangement, in each case in existence on the Closing date, (c) transactions in existence on the Closing Date and described on Schedule 6.08 and any amendment, modification or extension thereof to the extent such amendment, modification or extension, taken as a whole, is not adverse to the Lenders, (d) Guarantees permitted by Section 6.01 or Section 6.06, (e) transactions contemplated by the Related Agreements or any agreements relating to any Replacement WebBank/SCUSA Agreement or A/R Facility, (f) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the board of directors (or similar governing body), officers, employees, members of management, managers, consultants and independent contractors of a Borrower and/or any of its Subsidiaries in the ordinary course of business, and (g) the payment of rent obligations arising after the Petition Date under that certain Lease Agreement, dated as of September 1, 2017, between Bluestem and Sponsor, but solely to the extent expressly permitted in the Approved Budget.

**Section 6.09    Amendments or Waivers of Organizational Documents**.  The Loan Parties shall not, nor shall they permit any Subsidiary to, amend or modify their respective Organizational Documents, in each case in a manner that is adverse to the Administrative Agent or the Lenders (in their capacities as such) without obtaining the prior written consent of the Administrative Agent.

**Section 6.10    Amendments of or Waivers with to Material Contracts**.  No Loan Party will, or will permit any Subsidiary to, amend, modify or waive any of its rights under any Material Contract, in each case to the extent that such amendment, modification or waiver would be adverse to the Lenders and the Administrative Agent without obtaining the prior written consent of the Administrative Agent.

**Section 6.11    Fiscal Year**.  Holdings shall not change its Fiscal Year-end.

**Section 6.12    Permitted Activities of Holdings**.  Holdings shall not:

(a)    incur any Indebtedness for borrowed money other than (i) the Indebtedness permitted to be incurred by Holdings under this Agreement, (ii) Guarantees of Indebtedness or other obligations of the Borrowers and/or any Subsidiary that are otherwise permitted hereunder and (iii) Guarantees with respect to the Related Agreements;

(b)    create or suffer to exist any Lien on any asset now owned or hereafter acquired by it other than (i) the Liens created hereunder, (ii) any Lien permitted under Section 6.02(b) and (f); or

(c)    engage in any business activity or own any material assets other than (i) holding the Capital Stock of its subsidiaries and, indirectly, any Subsidiary of any such Subsidiary; (ii) performing its obligations under the Loan Documents, the Prepetition Term Loan Documents, the SCUSA Sale Agreement, any Related Agreement, any Replacement WebBank/SCUSA Sale Agreement and other Indebtedness, Liens (including the granting of Liens) and Guarantees permitted hereunder; (iii) [reserved]; (iv) filing Tax reports and paying Taxes and other customary obligations in the ordinary course (and contesting any Taxes); (v) preparing reports to Governmental Authorities and to its shareholders; (vi) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable Requirements of Law; (vii) [reserved]; (viii) holding cash, Cash Equivalents and other assets received in connection with Restricted Payments received from the Borrowers and/or any Subsidiary pending the application thereof; (ix) providing indemnification for its officers, directors, members of management, managers, employees and advisors or consultants; (x) participating in tax, accounting and other administrative matters; (xi) making payments of the type permitted under <u>Section 6.08(c)</u> ; (xii) complying with applicable Requirements of Law (including with respect to the maintenance of its existence); and (xiii) activities incidental to any of the foregoing or effecting any transaction permitted under this Agreement.

**Section 6.13    Minimum Liquidity Covenant**.  The Loan Parties shall not permit Liquidity to be less than $42,000,000 at any time; provided that every second week, together with delivery of the Borrowing Base Certificate under Section 5.01(e), the Loan Parties shall report to the Administrative Agent whether such Liquidity has been maintained at all times during the immediately preceding two-week period.

**Section 6.14    Conduct of Business**.  From and after the Closing Date, the Loan Parties shall not, nor shall they permit any of their Subsidiaries to, engage in any material line of business other than (a) the businesses engaged in by the Loan Parties or any of their Subsidiaries on the Petition  Date and similar, complementary, ancillary or related businesses and (b) such other lines of business as may be consented to by the Administrative Agent and the Required Lenders.

**Section 6.15    Amendments to the SCUSA Sale Agreement**.  The Loan Parties shall not, nor shall they permit any of their Subsidiaries to, amend or otherwise modify the terms of the SCUSA Sale Agreement without the prior written consent of the Administrative Agent and the Required Lenders (in their capacities as such).

**Section 6.16   CRO**.  The CRO shall be engaged by the Loan Parties during the term of this Agreement and the scope of services and duties thereof (as set forth in the definition of CRO herein) shall not be modified unless such modifications are acceptable to the Administrative Agent and the Required Lenders.  In the event the CRO is no longer engaged by the Loan Parties for any reason, the Loan Parties shall not, nor shall they permit their Subsidiaries to, appoint a replacement CRO, unless such replacement, and scope of services and duties thereof, in each case, is acceptable to the Administrative Agent and Required Lenders, and such appointment is made within 5 days thereof.

**Section 6.17   Bankruptcy Provisions**.  The Loan Parties will not, and will not permit any Subsidiary to:

(a)     At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacatur of any of the Interim Order and the Final Order, as applicable, any of the other Loan Documents, any of the Prepetition Term Loan Documents or any obligations outstanding under any of the foregoing, or assert that any Lien granted by any Loan Party in any of the Collateral hereunder or under any other Loan Document, or under any Prepetition Term Loan Document, does not have the validity, perfection or priority set forth herein, in the Interim Order and the Final Order, as applicable, or the other Loan Documents, (subject to any rights of the Committee set forth herein), in each case, except for modifications and amendments agreed to by the Administrative Agents and the Required Lenders.

(b)     Subject to the terms of the Interim Order and the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any way the exercise of rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default; provided that the Loan Parties (A) may contest or dispute whether an Event of Default has occurred and (B) shall be entitled to any notice provisions provided in the Interim Order and the Final Order, as applicable.

(c)     At any time, suffer to exist a priority for any administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising of any kind or nature whatsoever), including any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except as provided in Section 2.23 and for the Carve-Out and Permitted Priority Liens.

(d)     At any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Administrative Agent for the benefit of the Secured Parties in respect of the Collateral, except for Permitted Priority Liens and the Carve-Out.

(e)     Prior to the date on which all the Obligations have been paid in full in cash, pay any administrative expense claims except (A) the Carve-Out, (B) Obligations due and payable hereunder, (C) administrative expense claims expressly permitted by the First Day Orders and up to the amounts expressly set forth in the Approved Budget (so long as such payments are not expressly prohibited by this Agreement) and (D) other administrative expense and professional claims, consented to by the Administrative Agent, approved by order of the Bankruptcy Court and expressly set forth in the Approved Budget.

(f)      (i) Make any payment or prepayment on or redemption or acquisition for value (including by way of depositing with any trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Liabilities without the consent of the Administrative Agent and the Required Lenders, or (ii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, however, that the Loan Parties may repay the Prepetition ABL Obligations and make payments expressly permitted by the First Day Orders (so long as such payments are not otherwise prohibited under this Agreement) and the assumption of executory contracts and unexpired leases, in each case, as specifically approved by the Administrative Agent and the Required Lenders and the Interim Order and the Final Order, as applicable, and in the amounts set forth in the Approved Budget (including permitted variances). For the avoidance of doubt, the payment of any fees, expenses and other amounts due by the Loan Parties to the Administrative Agent and the Lenders under this Agreement, including under Section 9.03 that may be constituted as Prepetition Liabilities, will not be prohibited hereunder.

Section 6.18    **Budget Compliance**.  The Loan Parties shall not:

(a)      Disbursements.  Permit (i) commencing with the Measurement Period ending on Friday of the second full week following the Petition Date, (x) the unfavorable variance between actual disbursements for any line item during any Measurement Period, to be greater than 20% of the projected disbursements for such line item (excluding fees and expenses for the professionals of the Loan Parties and any Committee, for which no upward variance shall be permitted) for such period in the Approved Budget plus the amounts as described (and limited) in the provisos hereto and (y) the unfavorable variance between actual disbursements for total disbursements during any Measurement Period, to be greater than 15% of the projected total disbursements (excluding fees and expenses for the professionals of the Loan Parties and any Committee, for which no upward variance shall be permitted) for such period in the Approved Budget plus the amounts as described (and limited) in the provisos hereto and (ii) amounts set forth in any line item under the Approved Budget to be expended for a purpose in another line item thereunder; provided, that any unused amounts contained in a line item for a given week (without giving effect to the 15% variance set forth in clause (i) above) may be carried forward for the same line item in three successive weekly periods; provided further, that no unused amounts for the fees and expenses of such professionals shall be carried forward to be applied to such fees and expenses incurred after the occurrence of the Carve-Out Trigger Date.  Notwithstanding the foregoing, payments to the Administrative Agent and its professionals shall not be subject to the limitations set forth above and shall not be included in determining compliance with the permitted variances under clause (i) above.

(b)      Receipts.  Permit, commencing with the Measurement Period ending on Friday of the second full week following the Petition Date, the unfavorable variance between actual receipts during any Measurement Period, to be greater than 15% of the projected receipts for such period in the Approved Budget.

(c)      Compliance with Budget.  Make any payment or incur any obligation that is not provided for in the Approved Budget (within the variances from budgeted amounts permitted by this Agreement).

(d)    <u>Critical Vendors and Other Payments</u>.  Make (i) any pre-petition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claims, (ii) payments (including deposits) on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, and (iii) payments to any vendors who may be entitled to assert various Lien claims against the Loan Parties, their property or other assets, on account of any such vendor's prepetition claims, if the Loan Parties fail to pay for prepetition goods and services, except, in each case, as otherwise permitted by "first day orders" and in amounts and on terms and conditions that are approved by both the Administrative Agent, in its discretion, and by order of the Bankruptcy Court..

(e)    <u>Responsible Person Payments</u>.  Notwithstanding anything herein to the contrary, payments in an aggregate amount not to exceed $5,000,000 shall be permitted with respect to Taxes that would otherwise give rise to so-called "responsible person" liability solely for Barry L. Kasoff, Timothy D. Boates, Thomas L. Fairfield and Robert Warshauer in the respective capacities as an officer or manager of a Loan Party in the event such Tax is unpaid.

## ARTICLE 7    EVENTS OF DEFAULT

**Section 7.01    <u>Events of Default</u>**.  If any of the following events (each, an "**Event of Default**") shall occur:

(a)    <u>Failure To Make Payments When Due</u>.  Failure by a Borrower to pay  any principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, in each case when and as the same shall become due and payable; or any interest on any Loan or any fee or any other amount due hereunder, in each case when and as the same shall become due and payable; or

(b)    <u>Defaults in Other Agreements</u>.  Any Loan Party or any of its Subsidiaries (i) fails to pay when due or within any applicable grace period any principal or interest on any Indebtedness incurred after the Petition Date having an aggregate principal amount in excess of Threshold Amount(other than the Obligations) or (ii) breaches or defaults with respect to any Indebtedness incurred after the Petition Date (other than the Obligations) (A) having an aggregate principal amount in excess of Threshold Amount and (B) if the effect of such breach or default is to cause, or to permit the holder or holders then to cause, such Indebtedness to become or be declared due prior to their stated maturity; <u>provided</u>, that clause (ii) of this paragraph (b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; <u>provided</u>, further, that clauses (i) and (ii) of this paragraph (b) shall not apply if such underlying failure to pay, breach or default is amended or waived prior to acceleration of the Obligations; or

(c)    <u>Breach of Certain Covenants</u>.  Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in <u>Section 2.11(b), 2.22, 2.23, 5.01, 5.02, 5.05, 5.06, 5.07, 5.10, 5.13</u> or <u>Article 6</u>; or

(d)    <u>Breach of Representations, Etc</u>.  Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate

required to be delivered in connection herewith or therewith being untrue in any material respect as of the date made or deemed made; or

(e)    Other Defaults Under Loan Documents.  Default by any Loan Party in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this Article 7, which default has not been remedied or waived within 15 days after the earlier of (i) the date on which a Responsible Officer of any Loan Party becomes aware of such failure and (ii) receipt by the Borrower Representative of written notice thereof from the Administrative Agent; or

(f)    Judgments and Attachments.  One or more final judgments, awards or orders for the payment of money exceeding the Threshold Amount in the aggregate shall be rendered against any Loan Party or any of its Subsidiaries and remain unsatisfied and either: (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment or order, or (ii) there shall be a period of fifteen (15) consecutive days after entry thereof during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment or order shall not give rise to an Event of Default under this subsection (f) if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance between the defendant and the insurer covering payment thereof subject to standard and customary deductibles and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order; or

(g)    Employee Benefit Plans.  The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, a Borrower or any of its Subsidiaries in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect and the same shall remain undischarged for a period of thirty (30) consecutive days during which period any action shall not be legally taken to attach or levy upon any material assets of any Loan Party to enforce any such liability; or

(h)    Change of Control.  The occurrence of a Change of Control; or

(i)    Guaranties, Liens and Other Loan Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the occurrence of the Termination Date, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate in writing its obligations thereunder (other than as a result of the discharge of such Guarantor in accordance with the terms thereof), (ii) any Lien purported to be created under any Loan Document in Collateral shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any such Collateral, with the priority required by the applicable Loan Document except as a result of the sale, release or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents) or (iii) any Loan Party shall contest in writing the validity or enforceability of any Loan Document or any material provision of any Loan Document or deny in writing that it has any further liability (other than by reason of the occurrence of the Termination Date), including with respect to future advances by the Lenders, under any Loan Document to which it is a party; it being understood and agreed that the failure of the Administrative Agent to maintain possession of any Collateral actually delivered to it or file any UCC (or equivalent) continuation statement

shall not result in an Event of Default under this underline(k) or any other provision of any Loan Document; or

(j)    Collateral. Any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect; or

(k)    Related Agreement Defaults.  Any event or condition occurs that enables or permits (with or without the giving of notice) SCUSA or WebBank to terminate any Related Agreement prior to its scheduled termination (or otherwise results in a termination of any Related Agreement), and, to the extent the relevant Related Agreement permits the cure of such event or condition, such event or condition shall continue uncured for a period of 30 consecutive days (any such period, a "**SCUSA/WebBank Grace Period**"); provided, however, that no Event of Default shall occur if within the applicable SCUSA/WebBank Grace Period (or prior to or simultaneously with such termination) the Related Agreements are replaced by a Replacement WebBank/SCUSA Sale Agreement; provided further that no SCUSA/WebBank Grace Period shall apply to this clause (m) if at any time prior to or during a SCUSA/WebBank Grace Period either SCUSA or WebBank shall cease to purchase Receivables pursuant to the relevant Related Agreements; or

(l)    Credit Card Issuers and Processors.  Any credit card issuer or credit card processor withholds payment of amounts otherwise payable to any Loan Party to fund a reserve account or otherwise hold as collateral, or shall require any Loan Party to pay funds into a reserve account or for such credit card issuer or credit card processor to otherwise hold as collateral, or any Loan Party shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such credit card issuer or credit card processor such that in the aggregate all of such funds in the reserve account, other amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed $3,000,000;

(m)    Business Impaired.  The imposition of any stay or other order, the effect of which restrains in the conduct by the Loan Parties, taken as a whole, of their business in the ordinary course in a manner which results in, or could reasonably be expected to have a Material Adverse Effect;

(n)    Subordination.  The failure of any Loan Party or any of its Subsidiaries to comply with the terms of any subordination, lien priority or intercreditor agreement or any subordination or lien priority provisions of any note or other document running to the benefit of the Administrative  Agent or the Lenders or the Prepetition Term Loan Agent or Prepetition Term Loan Lenders under the Prepetition Term Loan Documents, or if any such document becomes null and void or any Loan Party denies in writing further liability under any such document or provides notice to that effect;

(o)    Suits and Claims.  Any Loan Party asserts or prosecutes any claim or cause of action against any of the Administrative Agent, the Lenders, the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders; or

(p)    Bankruptcy Matters.  The occurrence of any of the following in the Chapter 11 Cases:

(i)      the Interim Order shall not have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date;

(ii)      the Final Order shall not have been entered by the Bankruptcy Court within thirty-five (35) days after the Petition Date;

(iii)      the Interim Order or the Final Order, as the case may be, shall have been revoked, reversed, vacated, stayed, modified, extended, supplemented or amended without the express prior written consent of the Administrative Agent and the Required Lenders;

(iv)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) a responsible officer or an examiner with enlarged powers relating to the operating of the Loan Parties' business (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106 of the Bankruptcy Code;

(v)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Required Lenders, other than with respect to Permitted Priority Liens and the Carve-Out, (A) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties pari passu or superior to the priority of (1) the Administrative Agent and the Lenders in respect of the Obligations, or (2) the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders in respect of the Adequate Protection Replacement Liens or Adequate Protection Claim, or (B) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(vi)      an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(vii)      an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Commitments and payment in full in cash of (A) all Obligations of the Loan Parties hereunder and under the other Loan Documents and (B) all outstanding Prepetition Term Loan Obligations on or before the effective date of such plan or plans upon entry thereof (unless on terms otherwise approved in advance in writing by the Administrative Agent) and (ii) provide for the continuation of the Liens and security interests granted to the Administrative Agent for the benefit of the Secured Parties, and the priority thereof until such plan effective date;

(viii)      an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitments and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other Loan Documents;

(ix)     an order shall be entered by the Bankruptcy Court terminating, or the termination, of the exclusivity period of the Loan Parties under Section 1121 of the Bankruptcy Code to file a plan in the Chapter 11 Cases;

(x)     any Loan Party shall file an application, motion or other pleading, in support of any of the events or actions set forth under clauses (i) through (ix) above, or any other Person (other than any of the Loan Parties) shall do so and such application, motion or pleading is not contested in good faith by the Loan Parties;

(xi)     an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor of any Loan Party with respect to any claim (other than a claim for personal injury that is covered by liability insurance) against one or more of the Loan Parties in an amount equal to or exceeding the Threshold Amount in the aggregate;

(xii)     if any material property of any Loan Party, other than Dispositions permitted under Section 6.07, is sold without the express written consent of the Administrative Agent and the Required Lenders;

(xiii)     without the prior written consent of the Administrative Agent and the Required Lenders, any Loan Party shall take any action, including the filing of an application, motion or other pleading, requesting or seeking authority for any Loan Party (A) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon any Collateral; (C) except as provided in the Interim Order and the Final Order or herein, as applicable, to use, or grant any Lien on (other than Permitted Liens), cash collateral of the Administrative Agent and the Lenders under Section 363(c) of the Bankruptcy Code; or (D) the entry of any order by the Bankruptcy Court in any Chapter 11 Case granting relief as described in subclauses (A) through (C) of this clause (xiii);

(xiv)     (A) any Loan Party, or representative of the Loan Parties, shall attempt to (1) invalidate, reduce or otherwise impair the Liens or security interests of the Administrative Agent and/or any Lender's claims or rights against any Loan Party or (2) subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (B) any Collateral becoming subject to surcharge, to marshaling or to assessment pursuant to Section 506(c) of the Bankruptcy Code, (C) any Lien or security interest created by this Agreement, the Interim Order and the Final Order or herein, as applicable, or any other Loan Document shall, for any reason, cease to be a valid first priority Lien, subject only to Permitted Priority Liens and the Carve-Out or (D) any action is commenced by any Loan Party which contests the validity, perfection, enforceability or priority of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by this Agreement, any of the Interim Order and the Final Order, as applicable, or any other Loan Document;

(xv)     if any Loan Party, or representative of the Loan Parties, commences, or seeks leave to commence, any action against any of the Prepetition Term Loan Agent, Prepetition Term Loan Lenders or their respective agents, advisors or employees,

challenging the validity, perfection, priority, extent or enforceability of any Prepetition Term Loan Document or claims that arose in connection with the Prepetition Term Loan Documents, or seeking to avoid, modify, dispute, challenge or subordinate any Lien or claim thereunder;

(xvi)    the determination of any Loan Party, whether by vote of such Loan Party's Board of Directors or otherwise, to employ an agent or other third party to conduct any sales of all or substantially all of such Loan Party's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do the foregoing, in each case without the prior written consent of the Administrative Agent and the Required Lenders; provided, the appointment of an investment banker will not result in an Event of Default pursuant to this clause (xvi);

(xvii)  any Loan Party shall fail to timely achieve any Sale Milestone in accordance with each of the terms therein;

(xviii)  immediately upon consummation of the Sale, the Obligations are not paid in full;

(xix)    any Loan Party makes any disbursement not in accordance with or set forth in the Approved Budget;

(xx)    an order shall be entered by the Bankruptcy Court amending, supplementing or otherwise modifying, or the filing by any Loan Party of an application, motion, pleading or notice seeking the amendment, supplement or other modification of or appeal against, in each case, the Interim Order and the Final Order, as applicable, or any of the First Day Orders in respect of cash management or critical vendors or suppliers, in each instance, without the consent of the Administrative Agent and the Required Lenders;

(xxi)    except with respect to payments as permitted by any order of the Bankruptcy Court approving a "first day" motion (and expressly included in the Approved Budget), an order shall be entered by the Bankruptcy Court permitting the payment of, or granting adequate protection with respect to, the Prepetition Term Loan Obligations (other than the Adequate Protection Claim) or the filing of any motion seeking the same by any of the Loan Parties, in each case, without the consent of the Administrative Agent and the Required Lenders;

(xxii)  this Agreement, the Interim Order and the Final Order, as applicable, or any other Loan Document, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Administrative Agent for the benefit of the Secured Parties on any Collateral purported to be covered thereby; or

(xxiii)  any other "Event of Default" under and as defined in the Interim Order or the Final Order, as the case may be, shall have occurred;

then, subject in all respects to the Interim Order and the Final Order, as applicable, and in every such event, and at any time thereafter during the continuance of such event, the

Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower Representative, take any of the following actions, at the same or different times: (i) terminate the Commitments and thereupon such Commitments shall terminate immediately, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the principal of the Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately with respect to the Commitments so terminated and the Loans so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party, (iii) as applicable, exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents, in each case, as directed by the Required Lenders; and (iv) after delivery of the Enforcement Notice as provided under Interim Order and the Final Order, as applicable, the automatic stay provisions of section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise all rights and remedies provided for in the Loan Documents upon the expiration of the five (5) Business Day notice period.

**Section 7.02    Remedies on Default**.  In case any one or more Events of Default shall have occurred and be continuing, subject in all respects to the Interim Order and Final Order, as applicable, and whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, the Agents may (and at the direction of the Required Lenders, shall) proceed to protect and enforce their rights and remedies under this Agreement or any of the other Loan Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.  No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

## ARTICLE 8    THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints CBF (or any successor appointed pursuant hereto) as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, unless the context otherwise requires or unless such Person is in fact not a Lender, include each Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any subsidiary of any Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder.  The Lenders acknowledge that, pursuant to such activities, the

Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default exists and  the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law; it being understood that such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary power, except discretionary rights and powers that are expressly contemplated by the Loan Documents and which the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the relevant circumstances as provided in Section 9.02); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings or the Borrowers or any of its Subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable to the Lenders or any other Secured Parties for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is necessary, or as the Administrative Agent believes in good faith shall be necessary, under the relevant circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Borrower Representative or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any covenant, agreement or other term or condition set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of any Lien on the Collateral or the existence, value or sufficiency of the Collateral, (vi) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or (vii) any property, book or record of any Loan Party or any Affiliate thereof.

Each Lender agrees that, except with the written consent of the Administrative Agent, it will not take any enforcement action hereunder or under any other Loan Document, accelerate the

Obligations under any Loan Document, or exercise any right that it might otherwise have under applicable Requirements of Law or otherwise to credit bid at any foreclosure sale, UCC sale, any sale (including a sale under Section 363 and/or Section 1129 of the Bankruptcy Code) or any other similar Disposition of Collateral, whether under other Debtor Relief Laws or otherwise. Notwithstanding the foregoing, a Lender may take action to preserve or enforce its rights against a Loan Party where a deadline or limitation period is applicable that would, absent such action, bar enforcement of the Obligations held by such Lender, including the filing of a proof of claim in a case under the Bankruptcy Code.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Borrowers, the Administrative Agent and each Secured Party agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty; it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the other Loan Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or in the event of any other Disposition (including pursuant to Section 363 and/or Section 1129 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply all or any portion of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of all or any portion of such Collateral at any such Disposition.

Each of the Lenders hereby irrevocably authorizes the Administrative Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)        consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof or any similar provision in any other Debtor Relief Laws;

(b)        credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof;

(c)        credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC;

(d)        credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure or other Disposition conducted in accordance with applicable

Requirements of Law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)     estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amount in connection with any purchase of all or any portion of the Collateral by the Administrative Agent pursuant to the foregoing clauses (b), (c) or (d) without its prior written consent.

Each Secured Party agrees that the Administrative Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the Collateral; provided that, in connection with any credit bid or purchase described under clauses (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) may be, and shall be, credit bid by the Administrative Agent on a ratable basis.

With respect to each contingent or unliquidated claim that is an Obligation, the Administrative Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph. In the event that the Administrative Agent, in its sole and absolute discretion, elects not to estimate any such contingent or unliquidated claim, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Each Secured Party whose Obligations are credit bid under clauses (b), (c) or (d) of the third preceding paragraph is entitled to receive interests in the Collateral or any other asset acquired in connection with such credit bid (or in the Capital Stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

In addition, in case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, each Secured Party agrees that the Administrative Agent (irrespective of whether the principal of any Loan is then due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts to the

extent due to the Lenders and the Administrative Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

        (ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amount to the extent due to the Administrative Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) that it believes to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent has received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

The Administrative Agent may resign at any time by giving ten days written notice to the Lenders and the Borrowers. If the Administrative Agent is a Defaulting Lender or an Affiliate of a Defaulting Lender, either the Required Lenders or the Borrowers may, upon ten days' notice to

the Lenders and the Administrative Agent, remove the Administrative Agent. Upon receipt of any such notice of resignation or delivery of any such notice of removal, the Required Lenders shall have the right, with the consent of the Borrower Representative (not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent; provided that during the existence and continuation of an Event of Default no consent of the Borrower Representative shall be required. If no successor shall have been so appointed as provided above and accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or the Administrative Agent receives notice of removal, then (a) in the case of a retirement, the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including, for the avoidance of doubt, consent of the Borrower Representative) or (b) in the case of a removal, the Borrower Representative may, after consulting with the Required Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that (x) in the case of a retirement, if the Administrative Agent shall notify the Borrower Representative and the Lenders that no qualifying Person has accepted such appointment or (y) in the case of a removal, the Borrower Representative notifies the Required Lenders that no qualifying Person has accepted such appointment, then, in each case, such resignation or removal shall nonetheless become effective in accordance with such notice and (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent in its capacity as collateral agent for the Secured Parties for purposes of maintaining the perfection of the Lien on the Collateral securing the Obligations, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations required to be made by, to or through the Administrative Agent shall instead be made by or to each Lender (and each Lender will cooperate with the Borrowers to enable the Borrowers to take such actions), until such time as the Required Lenders or the Borrowers, as applicable, appoint a successor Administrative Agent, as provided for above in this Article 8. Upon the acceptance of its appointment as Administrative Agent hereunder as a successor Administrative Agent, the successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder (other than its obligations under Section 9.13). The fees payable by the Borrowers to any successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor Administrative Agent. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Administrative Agent (including for this purpose holding collateral security following retirement or removal of the Administrative Agent). Notwithstanding anything to the contrary herein, no Disqualified Institution may be appointed as a successor Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and

without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any of its Related Parties.

Each Lender irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall release any Lien on any property granted to or held by Administrative Agent under any Loan Document (i) upon the occurrence of the Termination Date, (ii) that is sold or to be sold or transferred as part of or in connection with any Disposition permitted under the Loan Documents to a Person that is not a Loan Party, (iii) that does not constitute (or ceases to constitute) Collateral, (iv) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from the Guaranty otherwise in accordance with the Loan Documents, or (v) if approved, authorized or ratified in writing by the Required Lenders (or by each Lender in the case of the release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 hereof)) in accordance with Section 9.02.

Upon the request of the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Guaranty pursuant to this Article 8.  In each case as specified in this Article 8, the Administrative Agent will (and each Lender hereby authorizes the Administrative Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Loan Documents or to subordinate its interest therein, or to release such Loan Party from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Article 8.

To the extent that the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Borrowers in accordance with and to the extent required by Section 9.03(b), the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective applicable Pro Rata Share (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

# ARTICLE 9    MISCELLANEOUS

**Section 9.01    Notices**.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(i)    if to any Loan Party, to such Loan Party in the care of the Borrower Representative at:

Bluestem Brands, Inc.
7075 Flying Cloud Drive
Eden Prairie, MN 55344
Attn:  Chief Executive Officer
Tel.: (952) 656-3989
Email: bruce.cazenave@bluestembrands.com

with copy to (which shall not constitute notice to any Loan Party):

Bluestem Brands, Inc.
7075 Flying Cloud Drive
Eden Prairie, MN 55344
Attn:  Executive Vice President, General Counsel & Secretary
Tel.: (952) 656-3805
Email: neil.ayotte@bluestembrands.com

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention: Patrick J. Nash, Jr., P.C.
            Michelle Kilkenney, P.C.
Tel: (312) 862-2290
     (312) 862-2487
Fax: (312) 862-2200
Email: patrick.nash@kirkland.com
        mkilkenney@kirkland.com

(ii)    if to the Administrative Agent, at:

Cerberus Business Finance, LLC
875 Third Ave
New York, NY 10022
Attn: Joseph Naccarato
Tel.: (212) 909-1455
Fax: (212) 284-7906
Email: jnaccarato@cerberus.com

with copy to (which shall not constitute notice to the Administrative Agent)

KTBS Law LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Attention:  Maria Sountas-Argiropoulos and Michael Tuchin
Tel:  (310) 407-4095 and (310) 407-4040
Fax: (310)407-9090
Email: msargiropoulos@ktbslaw.com
        mtuchin@ktbslaw.com

(iii)    if to any Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01 or (B) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in clause (b) below shall be effective as provided in such clause (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the Administrative Agent.  The Administrative Agent or the Borrower Representative (on behalf of any Loan Party) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that any such notice or communication not given during the normal business hours of the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Any party hereto may change its address or facsimile number for notices and other communications hereunder by written notice to the other parties hereto.

**Section 9.02    Waivers; Amendments**.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any party hereto therefrom shall in any event be effective unless the same is permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, to the extent permitted by applicable Requirements of Law, the making of any Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)     Subject to clauses (A) and (B) of this Section 9.02(b) and Section 9.02(d) below, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by the Administrative Agent and each Loan Party that is party thereto, with the consent of the Required Lenders; provided that, notwithstanding the foregoing:

(A)     the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:

(1)     increases the Commitment of such Lender; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation or warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender;

(2)     reduces the principal amount of any Loan owed to such Lender;

(3)     (x) extends the scheduled final maturity of any Loan or (y) postpones any Interest Payment Date with respect to Loans held by

such Lender or the date of any scheduled payment of any fee payable to such Lender hereunder (in each case, other than any extension for administrative reasons agreed by the Administrative Agent);

(4)     reduces the rate of interest (other than to waive any Default or Event of Default or any obligation of the Borrowers to pay interest to such Lender at the default rate of interest under Section 2.13(d), which shall only require the consent of the Required Lenders) or the amount of any fee owed to such Lender; it being understood that no change in the definition of "Revolving Availability", "Revolving Availability Cap", or "Revolving Availability Percentage" used in the calculation of any interest or fee due hereunder (including any component definition thereof) shall constitute a reduction in any rate of interest or fee hereunder;

(5)     extends the expiry date of such Lender's Commitment; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of any Commitment shall constitute an extension of any Commitment of any Lender; and

(6)     waives, amends or modifies the provisions of Sections 2.18(b) or 2.18(c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments or priority of payments required thereby (except as otherwise provided in this Section 9.02);

(B)     no such agreement shall:

(1)     change any of the provisions of Section 9.02(a) or (b), the definition of "Required Lenders" or any other provision specifying the number or percentage of Lenders required to act, in each case, to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender;

(2)     release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 hereof), without the prior written consent of each Lender; or

(3)     release all or substantially all of the value of the Guarantees under the Guaranty, without the prior written consent of each Lender;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder in a manner directly and adversely affecting such Person, without the prior written consent of the Administrative Agent (it being understood that (x) any change to Section 2.21 shall require the consent of the Administrative Agent.

(c)     [reserved].

(d)     Notwithstanding anything to the contrary contained in this <u>Section 9.02</u> or any other provision of this Agreement or any provision of any other Loan Document:

(i)     the Borrowers and the Administrative Agent may, without the input or consent of any Lender, amend, supplement and/or waive any guaranty, collateral security agreement, pledge agreement and/or related document (if any) executed in connection with this Agreement to (A) comply with any Requirement of Law or the advice of counsel or (B) cause any such guaranty, collateral security agreement, pledge agreement or other document to be consistent with this Agreement and/or the relevant other Loan Documents,

(ii)     [reserved],

(iii)     if the Administrative Agent and the Borrowers have jointly identified any ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable technical change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Borrowers shall be permitted to amend such provision solely to address such matter as reasonably determined by them acting jointly without any further action or consent of any other party if the same is not objected to in writing by the Required Lenders to the Administrative Agent within five Business Days following receipt of notice thereof,

(iv)     [reserved],

(v)     the Administrative Agent may amend <u>Schedule 1.01(a)</u> to reflect assignments entered into pursuant to <u>Section 9.05</u> and Commitment reductions or terminations pursuant to <u>Section 2.09</u>, and

(vi)     no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except as permitted pursuant to <u>Section 2.21</u> and except that the Commitment of any Defaulting Lender may not be increased without the consent of such Defaulting Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from any vote hereunder that requires the consent of any Lender, except as expressly provided in <u>Section 2.21</u>).

**Section 9.03     <u>Expenses; Indemnity</u>**.

(a)     The Borrowers jointly and severally shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with the preparation, execution, delivery and administration of the Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any Loan Document (whether or not the transactions contemplated thereby are consummated), (ii) [reserved] and (iii) all reasonable

and documented out-of-pocket expenses incurred by the Administrative Agent or the Lenders or any of their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with the enforcement, collection or protection of their respective rights in connection with the Loan Documents, including their respective rights under this Section, or in connection with the Loans.  Other than to the extent required to be paid on the Closing Date, all amounts due under this paragraph (a) shall be payable by the Borrowers promptly on written demand after receipt of an invoice setting forth such expenses in summary format. Expenses being reimbursed by the Borrowers under this Section include (subject to cost reimbursement provisions set forth herein), without limiting the generality of the foregoing, all reasonable and documented out-of-pocket costs and expenses incurred in connection with:

(i)    appraisals and insurance reviews;

(ii)    subject to Section 5.16, field examinations, field reviews and the preparation of Reports based on the fees charged by a third party retained by the Administrative Agent or the internally allocated fees (at a rate of $1,000 per day (plus out-of-pocket expenses) for each Person employed by the Administrative Agent with respect to each field examination, together with the reasonable fees and expenses associated with collateral monitoring services), Collateral reviews and appraisals, all to the extent provided in Section 5.16;

(iii)    background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Administrative Agent;

(iv)    taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue the Administrative Agent's Liens;

(v)    sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take;

(vi)    (A) the preservation and protection of the Administrative Agent's or any of the Lenders' rights under this Agreement or the other Loan Documents including through participation in the Chapter 11 Cases, any successor cases under Chapter 11 or Chapter 7 of the Bankruptcy Code, (B) the defense of any claim or action asserted or brought against the Administrative Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (C) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, including any contested matters or adversary proceedings in or related to any of the Chapter 11 Cases, (D) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this

Agreement or any other Loan Document, (E) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (F) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, including through participation in the Chapter 11 Cases, (G) any attempt to collect from any Loan Party, including through participation in the Chapter 11 Cases, (H) the preparation, delivery and review of pleadings, documents and reports related to the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, and (I) the receipt by the Administrative Agent or any Lender of any advice from professionals with respect to any of the foregoing; and

(vii)    forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

(b)    The Borrowers jointly and severally shall indemnify the Administrative Agent, each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**"), in each case, against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities to which such Indemnitee may become subject arising out of or in connection with (i) the preparation, execution, delivery or administration of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of any other transactions contemplated hereby or thereby, (ii) the use of the proceeds of the Loans, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any Facility, or any Environmental Liability related in any way to any Loan Party or any of their respective subsidiaries or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (a "**Proceeding**"), regardless of whether such matter is initiated by a third party or by a Borrower, any other Loan Party or any of their respective Affiliates, and to reimburse each Indemnitee within 30 days following written demand therefor (together with reasonable backup documentation supporting such reimbursement request) for any reasonable and documented legal or other out-of-pocket expenses incurred in connection with investigating or defending a Proceeding (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of, any of the foregoing; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability (i) is determined by a final and non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or, to the extent such judgment finds that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents

or (ii) arises out of any claim, litigation, investigation or proceeding brought by such Indemnitee solely against one or more other Indemnitees (other than any claim, litigation, investigation or proceeding that is brought by or against the Administrative Agent, acting in its capacity as the Administrative Agent) that does not involve any act or omission of Holdings, the Borrowers or any of their respective subsidiaries.  Each Indemnitee shall be obligated to refund or return any and all amounts paid by the Borrowers pursuant to this Section 9.03(b) to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is found by a final non-appealable judgment of a court of competent jurisdiction to not be entitled to payment of such amounts in accordance with the terms hereof.  All amounts due under this paragraph (b) shall be payable by the Borrowers within 30 days (x) after written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Borrowers of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.  This Section 9.03(b) shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(c)    The Borrowers shall not be liable for any settlement of any proceeding effected without its written consent (which consent shall not be unreasonably withheld or delayed), but if any proceeding is settled with the written consent of the Borrowers, or if there is a final judgment against any Indemnitee in any such proceeding, the Borrowers agree to indemnify and hold harmless each Indemnitee to the extent and in the manner set forth above.  No Borrower shall, without the prior written consent of the affected Indemnitee (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened proceeding in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) such settlement does not include any statement as to any admission of fault or culpability.

**Section 9.04    Waiver of Claim**.  To the extent permitted by applicable Requirements of Law, no party to this Agreement shall assert, and each hereby waives, any claim against any other party hereto, any Loan Party and/or any Related Party of any thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby, any Loan or the use of the proceeds thereof, except, in the case of any claim by any Indemnitee against the Borrowers, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 9.03.

**Section 9.05    Successors and Assigns**.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including, except for the right to request and receive Loans, any trustee succeeding to the rights of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided that (i) except as provided under Section 6.07, the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void) and (ii) no Lender may assign or otherwise

transfer its rights or obligations hereunder except in accordance with the terms of this Section (any attempted assignment or transfer not complying with the terms of this Section 9.05 shall be null and void except as otherwise provided herein).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and permitted assigns, to the extent provided in paragraph (e) of this Section, Participants and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement with the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed).

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of any assignment to another Lender or any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's Loans or Commitments, the principal amount of Loans or Commitments of the assigning Lender subject to the relevant assignment (determined as of the date on which the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds or by Related Funds) shall not be less than $5,000,000, unless the Administrative Agent otherwise consents;

(B)        any partial assignment shall be made as an assignment of a proportionate part of all the relevant assigning Lender's rights and obligations under this Agreement;

(C)        the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(D)        the relevant Eligible Assignee, if it is not a Lender, shall deliver on or prior to the effective date of such assignment, to the Administrative Agent (1) an Administrative Questionnaire and (2) any Internal Revenue Service form or other document required under Section 2.17.

(iii)        Subject to the acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in any Assignment and Assumption, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned pursuant to such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender

thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (A) entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 with respect to facts and circumstances occurring on or prior to the effective date of such assignment and (B) subject to its obligations thereunder and under Section 9.13). If any assignment by any Lender holding any Promissory Note is made after the issuance of such Promissory Note, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender such Promissory Note to the Administrative Agent for cancellation, and, following such cancellation, if requested by either the assignee or the assigning Lender, the Borrowers shall issue and deliver a new Promissory Note to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and their respective successors and assigns, and the commitment of, and principal amount of and stated interest on the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). Failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' obligations in respect of such Loans. The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire and any tax certification required by Section 9.05(b)(ii)(D)(2) (unless the assignee is already a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, if applicable, and any written consent to the relevant assignment required by paragraph (b) of this Section, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)     By executing and delivering an Assignment and Assumption, the assigning Lender and the Eligible Assignee thereunder shall be deemed to confirm and agree with each other and the other parties hereto as follows: (A) the assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that the amount of its commitments, and the outstanding balances of its Loans, in each case without giving effect to any assignment thereof which has not become effective, are as set forth in such Assignment and Assumption, (B) except

as set forth in <u>clause (A)</u> above, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statement, warranty or representation made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrowers or the performance or observance by the Borrowers of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (C) such assignee represents and warrants that it is an Eligible Assignee, legally authorized to enter into such Assignment and Assumption; (D) the assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in <u>Section 4.01(c)</u> or the most recent financial statements delivered pursuant to <u>Section 5.01</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (E) the assignee will independently and without reliance upon the Administrative Agent, the assigning Lender or any other Lender and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (F) the assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, by the terms hereof, together with such powers as are reasonably incidental thereto; and (G) the assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)    (i) Any Lender may, without the consent of the Borrowers, the Administrative Agent or any other Lender, sell participations to any bank or other entity (other than to any natural Person or the Borrowers or any of their Affiliates) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its commitments and the Loans owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) <u>clause (A)</u> of the first proviso to <u>Section 9.02(b)</u> that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) <u>clauses (B)(1)</u>, <u>(2)</u> or <u>(3)</u> of the first proviso to <u>Section 9.02(b)</u>. Subject to <u>paragraph (c)(ii)</u> of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of <u>Sections 2.15</u>, <u>2.16</u> and <u>2.17</u> (subject to the limitations and requirements of such Sections and <u>Section 2.19</u>) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>paragraph (b)</u> of this Section (it being understood that the documentation required under <u>Section 2.17(f)</u> shall be delivered to the participating Lender, and if additional amounts are required to be paid pursuant to <u>Section 2.17(a)</u> or <u>Section 2.17(c)</u>, to the Borrowers and the Administrative Agent).  To the extent permitted by applicable Requirements of

Law, each Participant also shall be entitled to the benefits of Section 9.09 as though it were a Lender; provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.

(ii)    No Participant shall be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower Representative's prior written consent expressly acknowledging such Participant may receive a greater benefit.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and their respective successors and registered assigns, and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (a "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and each Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to any Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 9.05 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release any Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    (i) In the event of any assignment or participation by a Lender without the Borrower Representative's consent (A) to any Disqualified Institution (unless the Borrower Representative has expressly consented thereto) or (B) to the extent the Borrower Representative's consent is required under this Section 9.05, to any other Person, the Borrowers shall be entitled to seek specific performance to unwind any such assignment or participation in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedies available to the Borrowers at law or in equity; it being understood and agreed that Holdings, the Borrowers and their subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this Section 9.05 as it relates to any assignment, participation or pledge of any Loan or Commitment to any Disqualified Institution or any Affiliate thereof or any other Person to whom the Borrower Representative's consent is required but not obtained. Upon the request of any Lender, the Administrative Agent shall make available to such Lender the list of Disqualified Institutions at the relevant time and such Lender may provide the list to any potential assignee or participant on a confidential basis in accordance with Section 9.13 hereof for the purpose of verifying whether such Person is a Disqualified Institution.

(ii)    If any assignment or participation under this <u>Section 9.05</u> is made to any Affiliate of any Disqualified Institution (other than any Competitor Debt Fund Affiliate) without the Borrower Representative's prior written consent (any such person, a "Disqualified Person"), then, such assignment shall not be null and void, but the Borrower Representative may, at the Borrowers' sole expense and effort, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitment of such Disqualified Person and repay all obligations of the Borrowers owing to such Disqualified Person and/or (B) require such Disqualified Person to assign, without recourse (in accordance with and subject to the restrictions contained in this <u>Section 9.05)</u>, all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the Borrowers shall be liable to the relevant Disqualified Person under <u>Section 2.16</u> if any Eurocurrency Rate Loan owing to such Disqualified Person is repaid or purchased other than on the last day of the Interest Period relating thereto and (II) in the case of clause (B), the relevant assignment shall otherwise comply with this <u>Section 9.05</u> (except that no registration and processing fee required under this <u>Section 9.05</u> shall be required with any assignment pursuant to this paragraph). Nothing in this <u>Section 9.05(f)</u> shall be deemed to prejudice any right or remedy that Holdings or the Borrowers may otherwise have at law or equity.

(iii)    Notwithstanding anything to the contrary contained in this Agreement, Disqualified Persons (A) will not (x) have the right to receive information, Reports or other materials provided to Lenders by the Borrowers, the Administrative Agent or any other Lender, (y) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (z) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) (x) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (y) for purposes of voting on any Bankruptcy Plan, each Disqualified Institution party hereto hereby agrees (1) not to vote on such Bankruptcy Plan, (2) if such Disqualified Institution does vote on such Bankruptcy Plan notwithstanding the restriction in the foregoing <u>clause (1)</u>, such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Bankruptcy Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (3) not to contest any request by any party for a determination by the Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing <u>clause (2)</u>.

**Section 9.06    <u>Survival</u>**. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loan, regardless of any investigation made by any

such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date.  The provisions of <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u>, <u>9.03</u> and <u>9.13</u> and <u>Article 8</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, the occurrence of the Termination Date or the termination of this Agreement or any provision hereof but in each case, subject to the limitations set forth in this Agreement.

**Section 9.07  <u>Counterparts; Integration; Effectiveness</u>**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it has been executed by Holdings, the Borrowers and the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including, except for the right to request and receive Loans, any trustee succeeding to the rights of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code).  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by email as a "<u>.pdf</u>" or "<u>.tif</u>" attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 9.08  <u>Severability</u>**.  To the extent permitted by applicable Requirements of Law, any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 9.09  <u>Right of Setoff</u>**.  At any time when an Event of Default exists, upon the written consent of the Administrative Agent, the Administrative Agent and each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (in any currency) at any time owing by the Administrative Agent or such Lender (including by branches and agencies of the Administrative Agent or such Lender, wherever located) to or for the credit or the account of the Borrowers or any Loan Party against any of and all the Obligations held by the Administrative Agent or such Lender, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different than the branch or office holding such deposit or obligation on such Indebtedness.  Any applicable Lender shall promptly notify the Borrowers and the Administrative Agent of such set-off or application;

provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender and the Administrative Agent under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender or the Administrative Agent may have.

**Section 9.10**    **Governing Law; Jurisdiction; Consent to Service of Process**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, AND, AS MAY BE APPLICABLE, THE BANKRUPTCY CODE.

(b)    EACH OF THE PARTIES HERETO AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURTS OF THE STATE OF DELAWARE, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 9.10, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS; PROVIDED, THAT NOTHING IN THIS SECTION 9.10 SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY OR ANY COLLATERAL IN ANY OTHER JURISDICTION.

(c)    EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES, AND DOCUMENTS IN ANY SUIT, ACTION, OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS BY THE MAILING (BY REGISTERED MAIL OR CERTIFIED MAIL, POSTAGE PREPAID) OR DELIVERING OF A COPY OF SUCH PROCESS TO SUCH LOAN PARTY C/O THE BORROWERs AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 9.01.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(d)     EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

**Section 9.11    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN   ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND WAIVES THE RIGHT TO ASSERT ANY SETOFF, COUNTERCLAIM OR CROSS-CLAIM IN RESPECT OF, AND ALL STATUTES OF LIMITATIONS WHICH MAY BE RELEVANT TO, SUCH ACTION OR PROCEEDING; AND WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.12    Headings**.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 9.13    Confidentiality**.   Each of the Administrative Agent and each Lender agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its Affiliates' directors (or equivalent managers), officers, employees, independent auditors or other experts and advisors, including accountants, legal counsel and other advisors (collectively, the "**Representatives**") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; provided that such Person shall be responsible for its Affiliates' and their Representatives' compliance with this paragraph, (b) upon the demand or request of any regulatory or governmental authority (including any self-regulatory body) purporting to have jurisdiction over such Person or its Affiliates (in which case such Person shall, (i) except with respect to any audit or examination conducted by bank

accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, to the extent permitted by law, inform the Borrowers promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable Requirements of Law, rule or regulation (in which case such Person shall (i) to the extent permitted by law, inform the Borrowers promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (d) to any other party to this Agreement, (e) subject to an acknowledgment and agreement by the relevant recipient that the Confidential Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as otherwise reasonably acceptable to the Borrower Representative and the Administrative Agent) in accordance with the standard syndication process of the Administrative Agent or market standards for dissemination of the relevant type of information, which shall in any event require "<u>click through</u>" or other affirmative action on the part of the recipient to access the Confidential Information and acknowledge its confidentiality obligations in respect thereof, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, and (ii) any pledgee referred to in <u>Section 9.05</u>, (f) with the prior written consent of the Borrower Representative, and (g) to the extent the Confidential Information becomes publicly available other than as a result of a breach of this Section by such Person, its Affiliates or their respective Representatives.  For purposes of this Section, "**Confidential Information**" means all information relating to Holdings, the Borrowers and/or any of their subsidiaries and their respective businesses or the transactions contemplated hereby (including any information obtained by the Administrative Agent, any Lender, or any of their respective Affiliates or Representatives, based on a review of the books and records relating to Holdings, the Borrowers and/or any of their subsidiaries and their respective Affiliates from time to time, including prior to the date hereof) other than any such information that is publicly available to the Administrative Agent or Lender on a non-confidential basis prior to disclosure by Holdings, the Borrowers or any of their subsidiaries.  In addition, the Administrative Agent may disclose the existence of this Agreement and the information consisting of the Closing Date, the identity of the Borrowers, the structure, type and amount of the Credit Facility and the allotted roles to market data collectors and similar service providers to the lending industry.  For the avoidance of doubt, in no event shall any disclosure of the Confidential Information be made to any Disqualified Institution (which was a Disqualified Institution at the time such disclosure was made).

Section 9.14   **No Fiduciary Duty**.  Each of the Administrative Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their respective affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its respective stockholders or its respective affiliates, on the other.  Each Loan Party acknowledges and agrees that:  (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender, in its capacity as such, has assumed an advisory or fiduciary

responsibility in favor of any Loan Party, its respective stockholders or its respective affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its respective stockholders or its respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender, in its capacity as such, is acting solely as principal and not as the agent or fiduciary of such Loan Party, its respective management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that such Loan Party has consulted its own legal, tax and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.15   **Several Obligations**.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.

Section 9.16   **USA PATRIOT Act**.  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.17   **Disclosure of Agent Conflicts**.  Each Loan Party and each Lender hereby acknowledge and agree that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.18   **Appointment for Perfection**.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  If any Lender (other than the Administrative Agent) obtains possession of any Collateral, such Lender shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.19   **Interest Rate Limitation**.   Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charged Amounts**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charged Amounts payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charged Amounts that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charged Amounts payable to such Lender in

respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.20 **Conflicts**. Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of any conflict or inconsistency between this Agreement and any other Loan Document, the terms of the Interim Order or Final Order, as applicable, shall govern and control.

Section 9.21 **Reinstatement; Certain Payments**. If any claim is ever made upon the Administrative Agent or any Lender for repayment or recovery of any amount or amounts received by the Administrative Agent or such Lender in payment or on account of any of the Obligations, the Administrative Agent or such Lender shall give prompt notice of such claim to the Administrative Agent and each other Lender, as applicable, and the Borrower Representative, and if the Administrative Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Administrative Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Administrative Agent or such Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Administrative Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Administrative Agent or such Lender. The provisions of this Section 9.21 shall survive the repayment of the Obligations and release of the Liens granted under the Loan Documents.

Section 9.22 **Parties Including Trustees; Bankruptcy Court Proceedings**. Subject to the Interim Order and Final Order, as applicable, this Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or other successor in interest of any Loan Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code. Subject to the Interim Order and Final Order, as applicable, this Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and Lenders and their respective assigns, transferees and endorsees. Subject to the Interim Order and the Final Order, as applicable, the Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent or the Lenders file financing statements or otherwise perfect their security interests or Liens under applicable law.

## ARTICLE 10  BORROWER REPRESENTATIVE

**Section 10.01 <u>Appointment; Nature of Relationship</u>**. Bluestem is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "**Borrower Representative**") hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this <u>Article 10</u>.  Additionally, the Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the applicable deposit account, at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower(s); <u>provided</u>, that a Borrower may elect, directly or through the Borrower Representative, to have Loan proceeds remitted to it directly via its designated deposit account. The Administrative Agent and the Lenders, and their respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or the Borrowers pursuant to this <u>Section 10.01</u>.

**Section 10.02 <u>Powers</u>**.  The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto.  The Borrower Representative shall have no implied duties to the Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

**Section 10.03 <u>Employment of Agents</u>**.  The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

**Section 10.04 <u>Notices</u>**.    Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default or Event of Default hereunder referring to this Agreement describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to the Administrative Agent and the Lenders.  Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

**Section 10.05 <u>Successor Borrower Representative</u>**.  Upon the prior written consent of the Administrative Agent, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative.  The Administrative Agent shall give prompt written notice of such resignation to the Lenders.

**Section 10.06 <u>Execution of Loan Documents; Borrowing Base Certificates</u>**.    The Borrowers hereby empower and authorize the Borrower Representative, on behalf of the Borrowers, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including, without

limitation, Borrowing Base Certificates.  Each Borrower agrees that any action taken by the Borrower Representative or the Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

Section 10.07  **Reporting**.  Each Borrower hereby agrees that such Borrower shall furnish promptly after each calendar week to the Borrower Representative its information required to be included in the applicable Borrowing Base Certificate and any other certificate or report required hereunder or requested by the Borrower Representative on which the Borrower Representative shall rely to prepare the Borrowing Base Certificate and other certificates required pursuant to the provisions of this Agreement.

## ARTICLE 11  GUARANTY

Section 11.01  **Guaranty**.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including all interest that accrues after the commencement of the Chapter 11 Cases, whether or not a claim for post-filing interest is allowable or allowed in the Chapter 11 Cases), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "**Guaranteed Obligations**"), and agrees to pay, subject to the expense reimbursement provisions herein, any and all reasonable and documented out-of-pocket costs, fees and expenses (including reasonable counsel fees and expenses) incurred by the Administrative Agent and the Lenders in enforcing any rights under the guaranty set forth in this Article 11.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Administrative Agent and the Lenders under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of the Chapter 11 Cases.

Section 11.02  **Guaranty Absolute**.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or the Lenders with respect thereto.  Each Guarantor agrees that this Article constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Administrative Agent or any Lender to any Collateral.  The obligations of each Guarantor under this Article 11 are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Article shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives (to the fullest extent permitted by law) any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)      any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)      any taking, exchange, release, subordination or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)      the applicability of Section 509(c) of the Bankruptcy Code to the claims of any Guarantor against any Loan Party in the Chapter 11 Cases;

(e)      the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including the Administrative Agent, or any Lender;

(f)      any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(g)      any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

(h)      This Article 11 shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent, the Lenders, or any other Person for any reason (and whether as a result of any demand, settlement, litigation or otherwise), all as though such payment had not been made.

**Section 11.03  Waiver.**

(a)      Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article and any requirement that the Administrative Agent or  the Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct the Administrative Agent or any Lender to seek payment or recovery of any amounts owed under this Article 11 from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that the Administrative Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Administrative Agent and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 10.03

is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this <u>Article 11</u>, and acknowledges that this Article is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)    Without limiting the generality, scope or meaning of any of the foregoing or any other provision hereof, each Guarantor:

(i)    waives all rights of subrogation, reimbursement, indemnification, and contribution and all other rights and defenses that are or may become available by reason of Applicable Law;

(ii)    waives all rights and defenses arising out of an election of remedies by the Administrative Agent or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the Borrower by the operation of Applicable Law or otherwise;

(iii)    waives all rights and defenses that a Guarantor may have because Borrowers' debt is or may be secured by real property. This means, among other things:

(A)    the Administrative Agent and Lenders may collect from Guarantor without first foreclosing on any real or personal property collateral pledged any Borrower;

(B)    if Collateral Agent forecloses on any real property collateral pledged by any Borrower: (1) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (2) the Administrative Agent or any Lender may collect from Guarantor even if the Collateral Agent, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrowers;

(iv)    waives all rights regarding and defenses to the application of Section 509(c) of the Bankruptcy Code to claims of Guarantor; and

(v)    acknowledges this is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have because the Borrowers' debt is secured by real property, including any rights or defenses based upon Applicable Law.

**Section 11.04 <u>Continuing Guaranty; Assignments</u>**. This Article is a continuing guaranty and shall (a) remain in full force and effect until the later of (i) the cash payment in full of the Guaranteed Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this Article and (ii) the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Lenders and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including all or any portion of its Commitments or its Loans) to any other Person, and such other Person shall

thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in <u>Section 9.04</u>.

       **Section 11.05 <u>Subrogation</u>**. No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this <u>Article 11</u>, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Administrative Agent and the Lenders against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this <u>Article 11</u> shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of the Administrative Agent and the Lenders and shall forthwith be paid to the Administrative Agent and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this <u>Article 11</u>, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this <u>Article 11</u> thereafter arising.  If (i) any Guarantor shall make payment to the Administrative Agent and the Lenders of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this <u>Article 11</u> shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Administrative Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

[Signature Pages Follow]