# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BLUESTEM BRANDS, INC., *et al.*,[1] | ) Case No. 20-10566 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF ORDERS (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (III) SCHEDULING AN AUCTION AND SALE HEARING, (IV) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, (V) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion for the relief set forth herein.

## **Preliminary Statement**

1.     The Debtors commenced these chapter 11 cases to implement a value-maximizing transaction through a sale of substantially all of their assets.  The Debtors file these proposed bidding procedures with a "stalking horse" bid in hand to set the floor and approve a marketing

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Bluestem Brands, Inc. (5164); Appleseed's Holdings, Inc. (9117); Blair LLC (1670); Bluestem Enterprises, Inc. (1237); Bluestem Fulfillment, Inc. (5931); Bluestem Sales, Inc. (1539); Draper's & Damon's LLC (2759); Gold Violin LLC (0873); Haband Company LLC (8496); Home Forever LLC (2324); Johnny Appleseed's, Inc. (5560); Norm Thompson Outfitters LLC (8344); Northstar Holdings Inc. (6823); Orchard Brands Corporation (6322); Orchard Brands International, Inc. (8962); Orchard Brands Sales Agency, LLC (8855); Value Showcase LLC (2920); WinterSilks, LLC (0688).  The service address for each of the above Debtors is 7075 Flying Cloud Drive, Eden Prairie, Minnesota 55344.

[2]   A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Thomas L. Fairfield in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the Bidding Procedures (as defined herein), the DIP Order (as defined herein), or the First Day Declaration.

and auction process that will yield the highest or otherwise best bid.  Importantly, the Stalking Horse Bid contemplates a going-concern transaction, which will inure to the benefit of all stakeholders.

2.      In order to capitalize on the opportunity presented by the proposed going-concern transaction and avoid the value-destructive consequences of a protracted stay in chapter 11, the Debtors believe it is critical that the sale process be consummated on the timeline set forth herein. Completion of the sale process on the contemplated timeline is also essential to preserve the Debtors' access to their debtor-in-possession financing, which contains sale milestones that would cause defaults if not satisfied or waived.  Moreover, the sale timeline was specifically designed to balance the two goals of (a) running a robust marketing process and (b) minimizing any potential business disruption.  No retailers benefit from a protracted stay in chapter 11.

3.      The proposed sale process is the product of substantial discussion and planning by the Debtors.  As more fully described in the First Day Declaration, facing increasingly dire liquidity challenges, and the operational difficulties following therefrom, the Debtors engaged with their stakeholders regarding possible restructuring alternatives to right-size the balance sheet.  The Debtors' prepetition secured lenders, ultimate parent Bluestem Group, Inc., and other key stakeholders agreed to amendments, forbearances, waivers, payment holidays, and the like to help provide a more stable platform from which the Debtors could pursue a value-maximizing transaction.  Those good faith efforts culminated in the negotiation of $125 million of postpetition financing and entry into a stalking horse purchase agreement, against which higher or otherwise better offers may be sought, providing a clear path to consummate a transaction.

4.      The Debtors and the Stalking Horse Bidder have memorialized the terms of the Stalking Horse Purchase Agreement to be a market-tested sale process.  The Debtors have already

begun engaging with interested parties and will market test the Stalking Horse Bid to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the business or some or all of their assets.  The key dates associated with the sale process follow, provided the Debtors may pursue confirmation of a chapter 11 plan in parallel with the competitive sale process.

- **May 7, 2020**:  Bid Deadline

- **May 12, 2020**:  Auction

- **May 22, 2020**:  Sale Hearing

5.    To the extent that the Debtors and their advisors secure a higher or otherwise better offer, they reserve their rights to pursue an alternative sale transaction, in accordance with their fiduciary duties.   If approved, the proposed Bidding Procedures will enable the Debtors to expeditiously sell their assets and emerge from chapter 11 shortly after.  As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this motion.

### Relief Requested

6.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (a) approving the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"),[3] (b) approving the manner of the notice of the Auction, if any, and Sale (the "Sale Notice") attached to the Bidding Procedures Order as Exhibit 2, (c) establishing certain dates and deadlines, including the Bid Deadline and

---

[3]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures.

26132025.1

3

Auction Date (each as defined below), (d) approving the assumption and assignment procedures, and (e) granting related relief.

7.      Additionally, the Debtors intend to seek entry of an order (the "Sale Order") at the conclusion of the Sale Hearing (as defined below) (a) approving the Sale and entry into that certain asset purchase agreement, dated as of March 9, 2020 between the Debtors the Stalking Horse Bidder, attached hereto as **Exhibit B** (the "Stalking Horse Purchase Agreement"), or a similar agreement with the Successful Bidder (if other than the Stalking Horse Bidder), (b) authorizing the sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interest to the extent set forth in the Successful Bid, (c) authorizing and approving assumptions and assignment of the Debtors' applicable executory contracts and unexpired leases, and (d) granting related relief.  The Debtors will file a proposed form of Sale Order in advance of the hearing to consider the relief requested herein.

## Jurisdiction and Venue

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

26132025.1

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

## Background

11.      The Debtors are a direct-to-consumer retailer that offers fashion, home, and entertainment merchandise through internet, direct mail, and telephonic channels under the Orchard and Northstar brand portfolios.  The Debtors have approximately two million customers, the majority of which are U.S. based and transact at less than $250 on a per order basis.  Headquartered in Eden Prairie, Minnesota, the Debtors employ approximately 2,200 individuals and own and/or lease warehouses, distribution centers, and call centers in 10 other states, including New Jersey, Massachusetts, Georgia, and California.  The Debtors' supply chain consists of name-brand vendors—*e.g.*, Michael Kors, Samsung, Keurig, and Dyson—as well as private label and non-branded sources based in the United States and abroad.  For fiscal year 2019, the Debtors reported gross revenue of approximately $1.8 billion.

12.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Sale Process Overview

### I.      Key Dates and Deadlines.

13.      Below is a summary of the proposed key dates and deadlines.

| Event | Date | Description |
|---|---|---|
| Bidding Procedures Objection Deadline | Seven days before the hearing on the Bidding Procedures at 4:00 a.m., prevailing Eastern Time | Deadline by which objections to the Bidding Procedures must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "Objection Deadline") |
| Bidding Procedures Hearing | At the second day hearing set by the Court. | Date for the hearing to consider the approval of the Bidding Procedures |
| Bid Deadline | May 7, 2020 at 5:00 p.m. prevailing Eastern Time | Deadline for when the Debtors must ***actually receive*** binding bids from parties |
| Auction (if Necessary) | May 12, 2020 at 10:00 a.m., Prevailing Eastern Time | Date for when an Auction for the Assets will be conducted, if necessary. The Auction will be conducted at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (or at such other location as the Debtors may hereafter designate on proper notice) |
| Objection Deadline | May 19, at 5:00 p.m., prevailing Eastern Time | Deadline by which objections to the sale must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "Sale Objection Deadline") |
| Sale Hearing | May 22, 2020 | Date and time for a hearing (the "Sale Hearing") at which the Court will consider approving the Sale of the Assets to one or more prospective purchasers, pursuant to a sale order or a chapter 11 plan |

14.     The Debtors believe that the proposed timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates. To further ensure that the Debtors' proposed sale process maximizes value to the benefit of the Debtors'

estates, the Debtors will use the time following entry of the Bidding Procedures Order to actively

market their businesses in an attempt to solicit higher or otherwise better bids. The Debtors believe

the relief requested in this Motion is in the best interests of their creditors, their other stakeholders,

and all other parties in interest, and should be approved.

## II.    Key Terms of the Stalking Horse Purchase Agreement.

15.    Pursuant to the Local Rules, the key terms and conditions of the Stalking Horse

Purchase Agreement are listed below.[4]

| Agreement Provision | Summary Description |
| --- | --- |
| **Parties** | Sellers: the Debtors<br><br>Buyer: BLST Acquisition Company LLC |
| **Purchase Price** | Total consideration consisting of:<br>• the assumption of the Assumed Liabilities by the Stalking Horse Bidder at Closing;<br>• an amount equal to $300,000,000, which such amount will be satisfied by way of an offset against the Prepetition Term Loan Obligations held by the Prepetition Term Loan Lenders pursuant to section 363(k) of the Bankruptcy Code;<br>• cash in an amount equal to the DIP Repayment Amount; and<br>• cash in an amount such that Excluded Cash is not less than the total amount of in the Wind-Down Budget, if any.<br>**See Stalking Horse Purchase Agreement, at § 2.1.** |
| **Purchased Assets** | Each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, on the Closing Date, the Purchased Assets, including the following assets, properties, rights and interests of such Seller:<br>• all Accounts Receivable;<br>• all Documents used in or relating to the Business or in respect of the Purchased Assets or the Assumed Liabilities (including customer data and including emails); provided, however, that subject to the limitations contained in Section 8.6, the Sellers shall have continued access to such Documents as are necessary to administer the Chapter 11 Cases;<br>• All Assigned Contracts, subject to the right of the Purchaser to cause any Assigned Contract to be a Non-Assigned Contract in accordance with |

---

[4]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Purchase Agreement.

26132025.1

| Agreement Provision | Summary Description |
|---|---|
| | Section 1.5 of the Stalking Horse Purchase Agreement;
• all deposits and all prepaid charges and expenses of such Seller, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, in each case to the extent that any of the foregoing relate to any Purchased Asset (including any Assigned Contract) or Assumed Liability;
• all Furniture and Equipment;
• all Purchased Names;
• All Assumed Leased Real Property, subject to the right of the Purchaser to cause any Assumed Real Property Lease to be a Non-Assigned Contract in accordance with Section 1.5 of the Stalking Horse Purchase Agreement;
• to the extent transferable (and such non-transferability is not overridden or canceled by the Sale Order or other order of the Bankruptcy Court), all Permits and all pending applications or filings therefor and renewals thereof and all rights and incidents of interest therein, subject to the right of the Purchaser to cause any Permit or pending applications or filings therefor or renewals thereof to be a Designation Rights Asset or Excluded Asset in accordance with Section 1.5 of the Stalking Horse Purchase Agreement;
• all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to which such Seller is a party with current or former directors, officers, employees or agents, or with third parties, or any such agreement to which such Seller is a beneficiary, in each case, if such agreement is an Assigned Contract;
• (i) all rights, claims, credits, settlement proceeds, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under the Assigned Contracts) or the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' warranties, indemnities and guarantees; and (ii) all Avoidance Actions;
• any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that such Seller may have with respect to any Assumed Liabilities;
• except as contemplated by Section 1.2(e) and Section 1.2(j) of the Stalking Horse Purchase Agreement (and only to the extent transferable (and such non-transferability is not overridden or canceled by the Sale Order or other order of the Bankruptcy Court) all of such Seller's insurance policies and rights and benefits thereunder (including (i) all rights pursuant to and proceeds from such insurance policies, (ii) all claims, demands, proceedings and causes of action asserted by such Seller under such insurance policies relating to any Purchased Asset or Assumed Liability, (iii) all proceeds payable to such Seller in respect of life insurance policies that are owned by such Seller or for which such Seller is a beneficiary and (iv) any letters of credit related thereto);
• any claim, right or interests of such Seller in or to any refund, rebate, abatement or other recovery for Taxes with respect to the Business, the Purchased Assets or the Assumed Liabilities, in each case, together with any interest due thereon or penalty rebate arising therefrom; |

26132025.1

| Agreement Provision | Summary Description |
|---|---|
| | • (i) Contracts of the Seller Plans set forth on Schedule 1.1(n) of the Stalking Horse Purchase Agreement and (ii) any other Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Seller Plans and any applicable insurance policies;<br><br>• all Seller Intellectual Property and IT Assets;<br><br>• all Inventory;<br><br>• except to the extent that any transfer or assignment is prohibited by applicable Law, all personnel files for Transferred Employees;<br><br>• all goodwill and other intangible assets associated with, or relating to, the Business or the Purchased Assets;<br><br>• ownership interests in other entities (except for equity of any Seller), including joint ventures;<br><br>• subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the websites, domain names, telephone and facsimile numbers and e-mail addresses used by such Seller, as well as rights to receive mail and other communications addressed to such Seller (including mail and communications from customers, vendors, suppliers, distributors and agents);<br><br>• all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or insurance policies, or any obligations with respect thereto, except that the foregoing shall not include any Cash and Cash Equivalents (i) in the Bankruptcy Deposit Accounts or (ii) in the total amount of "Total Disbursements" in the wind-down budget set forth on Annex II hereto, as may be amended from time to time with the prior written consent of Purchaser in its sole discretion (the aggregate amount of such Cash and Cash Equivalents pursuant to this clause (ii), the "Excluded Cash" and, such wind-down budget, the "Wind-Down Budget");<br><br>• the Surplus Cash; and<br><br>• all owned real property set forth on Schedule 1.1(w) of the Stalking Horse Purchase Agreement.<br><br>**See Stalking Horse Purchase Agreement, at § 1.1.** |
| **Excluded Assets** | Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, the following Excluded Assets:<br><br>• Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, the following Excluded Assets:<br><br>• all Non-Assigned Contracts, subject to Schedule 1.5 of the Stalking Horse Purchase Agreement;<br><br>• all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) to the extent they relate to (A) |

| Agreement Provision | Summary Description |
|---|---|
| | any employees of such Seller who are not Transferred Employees or (B) any Transferred Employees where the Documents do not satisfy Section 1.1(q) of the Stalking Horse Purchase Agreement;<br><br>• all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities;<br><br>• all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;<br><br>• all of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;<br><br>• all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price);<br><br>• all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of such Seller as a corporation or other legal entity, as applicable (together with analogous documentation);<br><br>• any retainers or similar amounts paid to third party advisors or other professional service providers, and any deposits and prepaid charges and expenses of such Seller in each case to the extent related to any Excluded Asset (including a Non-Assigned Contract) or Excluded Liability, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes, and (v) pre-payments;<br><br>• any claims, counterclaims, setoffs, rights of recoupment, equity rights, defenses, or other rights or interests of such Seller in or to any refund, rebate, abatement or other recovery or otherwise to the extent related to any Excluded Liability;<br><br>• all claims or causes of action (other than Avoidance Actions) that relate solely to any Excluded Asset or Excluded Liability;<br><br>• all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies;<br><br>• all Tax Returns of any of the Sellers and all Documents (including working papers) related thereto;<br><br>• all Excluded Cash except to the extent constituting Surplus Cash;<br><br>• all cash deposits in cash collateral, indemnity or other accounts solely to the extent comprising professional fee retainers, professional fee escrows, and indemnity accounts funded in accordance with the order approving the DIP Credit Agreement, held by or on behalf of the Sellers' or the bankrupt estates' professionals ("Bankruptcy Deposit Accounts") except to the extent constituting Surplus Cash;<br><br>• all assets expressly excluded from the definition of Purchased Assets |

| Agreement Provision | Summary Description |
|---|---|
| | pursuant to Section 1.1; and |
| | • the properties and assets set forth on Schedule 1.2(p).all Non-Assigned Contracts, subject to Section 1.5 of the Stalking Horse Purchase Agreement. |
| | • all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser or (iii) to the extent they relate to (A) any employees of such Seller who are not Transferred Employees or (B) any Transferred Employees where the Documents do not satisfy Section 1.1(q) of the Stalking Horse Purchase Agreement; |
| | • all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities; |
| | • all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests; |
| | • all of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder; |
| | • all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price); |
| | • all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of such Seller as a corporation or other legal entity, as applicable (together with analogous documentation); |
| | • any retainers or similar amounts paid to third party advisors or other professional service providers, and any deposits and prepaid charges and expenses of such Seller in each case to the extent related solely to any Excluded Asset (including a Non-Assigned Contract) or Excluded Liability, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes, and (v) pre-payments; |
| | • any claims, counterclaims, setoffs, rights of recoupment, equity rights, defenses, or other rights or interests of such Seller in or to any refund, rebate, abatement or other recovery or otherwise to the extent solely related to any Excluded Liability; |
| | • all claims or causes of action (other than Avoidance Actions) that relate solely to any Excluded Asset or Excluded Liability; |
| | • all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies; |
| | • all Tax Returns of any of the Sellers and all Documents (including working |

26132025.1

| Agreement Provision | Summary Description |
|---|---|
| | papers) related thereto; |
| | • all Excluded Cash except to the extent constituting Surplus Cash; |
| | • all Bankruptcy Deposit Accounts, except to the extent constituting Surplus Cash; and |
| | • all assets expressly excluded from the definition of Purchased Assets pursuant to the Stalking Horse Purchase Agreement; and the properties and assets set forth in the Stalking Horse Stalking Horse Purchase Agreement. |
| | <u>See</u> **Stalking Horse Purchase Agreement, at § 1.2.** |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Assumed Liabilities: |
| | • all Liabilities of any of the Sellers under each Assigned Contract arising after the Closing Date (excluding any Liabilities not expressly assumed in this Agreement arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such breach or default); |
| | • all Determined Cure Costs with respect to any Assigned Contract; |
| | • the sponsorship of and all Liabilities arising under or otherwise in respect of the Assumed Seller Plans arising after the Closing Date (excluding any Liabilities not expressly assumed in this Agreement arising out of any breach or default of the Assumed Seller Plans on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default); |
| | • Liabilities of any of the Sellers with respect to Specified Accrued Liabilities incurred prior to the Closing (but only to the extent any such Specified Accrued Liability is not paid by the Sellers at or prior to the Closing) not in excess (on a line item basis for each type of Liability set forth on Annex I) of the amounts set forth on Annex I; |
| | • all Liabilities arising from the operation of the Purchased Assets by Purchaser from and after the Closing Date, but solely to the extent that such Liabilities relate to events occurring after the Closing Date; |
| | • all labor- and employment-related Liabilities with respect to Transferred Employees arising on or following the Closing; |
| | • all Liabilities related to Purchaser's selection of employees, including any decisions not to extend offers of employment, pursuant to Section 6.1 of the Stalking Horse Purchase Agreement and any Liabilities for severance or under the WARN Act, in each case, that (i) constitute bankruptcy administrative expenses of the Sellers and (ii) result directly from or arise out of Purchaser's determination not to make an offer of employment to any employees and Sellers' subsequent termination of such employee's employment in connection therewith, but expressly excluding (x) any Liabilities, including for severance, under employment agreements or other arrangements entered into or established by any Affiliate of the Sellers (other than the Sellers) or (y) termination for any reason other than as specified in clause (ii) of this paragraph; |
| | • Liabilities in respect of administrative claims arising under section |

| Agreement Provision | Summary Description |
| --- | --- |
| | 503(b)(9) of the Bankruptcy Code (but only to the extent any such administrative claims is not paid by the Sellers at or prior to the Closing) not in excess of an amount equal to (i) $11,112,000 less (ii) any amounts paid by Sellers at or prior to the Closing with respect to administrative claims arising under section 503(b)(9) of the Bankruptcy Code; and<br><br>• all Liabilities with respect to (i) earned and accrued wages, salaries and Seller 401(k) match (per terms as in effect as of the Execution Date), in the aggregate not in excess of an amount equal to $6,212,000, (ii) IBNR claims under Seller Plans not in excess of an amount equal to $1,500,000, and (iii) workers' compensation not in excess of an amount equal to $500,000, in each case with respect to the items described in this Section 1.3(i), that are either or both earned and accrued in the Ordinary Course of Business from the Petition Date until the Closing with respect to the Transferred Employees as of the Closing Date, but expressly excluding any Liabilities of each Seller for any and all claims by or on behalf of such Seller's current or former employees arising under or relating to employment practices, labor relations, union organizing, employee safety and health, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), or any other employee health, welfare or other benefit plans, other than as contemplated by Section 1.3(c) of the Stalking Horse Purchase Agreement; and<br><br>• Assumed Taxes Cap.<br><br>Notwithstanding anything to the contrary herein, the Purchaser's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against the Purchaser as compared to the rights and remedies that such parties would have had against Sellers had this Agreement not been consummated.<br><br>**See Stalking Horse Purchase Agreement, at § 1.3.** |
| **Excluded Liabilities** | Except for the Assumed Liabilities expressly set forth in Section 1.3 of the Stalking Horse Purchase Agreement, the Purchaser shall not assume, or become liable for the payment or performance of, the Excluded Liabilities, including the following Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable:<br><br>• all Liabilities of any of the Sellers relating to any of the Excluded Assets (including the Non-Assigned Contracts);<br><br>• all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law), arising out of or relating to any Seller's operation of its business or its leasing, ownership, use or operation of real property prior to the Closing Date, no matter when raised;<br><br>• all Liabilities of any Seller in respect of Indebtedness, whether or not relating to the Business, except for the Liabilities expressly set forth in Section 1.3(e) of the Stalking Horse Purchase Agreement;<br><br>• all Liabilities of any Seller to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities |

| Agreement Provision | Summary Description |
|---|---|
| | of such Seller, including all Liabilities of such Seller related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities; |
| | • all Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default, other than any Determined Cure Costs; |
| | • all Liabilities of any Seller for Taxes, other than Assumed Taxes; |
| | • all Liabilities of any Seller with respect to current or former employees that are not Transferred Employees, regardless of when arising; |
| | • all Liabilities (other than with respect to Assumed Taxes) of any Seller for pending or threatened Actions against such Seller or any of its assets or properties, the Business, or such Seller's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date; |
| | • all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of such Seller or its Affiliates, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed violation of any Law at any time; |
| | • except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(i), all Liabilities of such Seller for any and all claims by or on behalf of such Seller's current or former employees relating to periods ending on or prior to the Closing Date, including employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans; |
| | • all Liabilities for any legal, accounting, investment banking, financial advisory, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by such Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; |
| | • all Liabilities incurred in connection with charitable contributions from customers and amounts owed to charitable organizations; and |
| | • all Liabilities relating to or arising under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction; |
| | • provided that, in the event of any conflict between the terms of this Section 1.4 and the terms of Section 1.3 of the Stalking Horse Purchase Agreement, the terms of Section 1.3 will control |

26132025.1

| Agreement Provision | Summary Description |
|---|---|
| | <u>See</u> **Stalking Horse Purchase Agreement, at § 1.4.** |
| **Employee Matters** | On or prior to the Closing Date, the Purchaser shall offer Selected Employees: |
| | • employment (on an "at-will" basis) with the Purchaser or one of its Affiliates to such employees of the Sellers or its Affiliates as determined by the Purchaser in its sole and absolute discretion; |
| | • For each individual who is not a Union Employee, each such offer of employment shall be for a substantially comparable position and at the substantially same hourly wage rate or salary level (excluding performance-based or incentive compensation, bonuses and equity-based compensation, as applicable) in effect immediately prior to the Execution Date; *provided, however*, that with respect to New Employment Contracts, the terms of such New Employment Contracts shall govern such Transferred Employee's employment; |
| | • In addition, any offer of employment to any such employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon a termination of employment by such Seller will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing such employee's right to receive such severance from the Sellers and the Purchaser; *provided, however*, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver. |
| | Notwithstanding the foregoing, subject to the CBA, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates |
| | <u>See</u> **Stalking Horse Purchase Agreement, at § 6.1(a).** |
| **Conditions Precedent to Obligations of Purchaser** | The obligations of the Purchaser to consummate the Closing are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law and Section 11.3 of the Stalking Horse Purchase Agreement): |
| | • (i) except as set forth in clause (ii) below, the representations and warranties of each Seller contained in the Stalking Horse Purchase Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct as of such date), except for such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) the representations and warranties of each Seller contained in Section 4.1, Section 4.3, and Section 4.10 of the Stalking Horse Purchase Agreement shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for any such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date) and, in each case, the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect; |
| | • Since the Execution Date, there shall not have occurred any event, circumstance, change, occurrence or state of facts that, individually or together with all other event, circumstance, change, occurrence or state of |

| Agreement Provision | Summary Description |
|---|---|
| | facts, has had, or would reasonably be expected to have, a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect; |
| | • each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Sellers on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect; |
| | • the Sellers shall have delivered, or caused to be delivered, to the Purchaser or the other applicable parties all of the items set forth in Section 3.2 of the Stalking Horse Purchase Agreement; |
| | • no "Default" under the DIP Credit Agreement or "Event of Default" under the DIP Credit Agreement shall have occurred and be continuing; |
| | • Purchaser and Prepetition Term Loan Agent shall have completed their legal, tax, accounting and business due diligence of the Sellers and the results thereof shall be satisfactory to Purchaser and the Prepetition Term Loan Agent in their sole discretion; provided, the condition in this Section 9.3(g) of the Stalking Horse Purchase Agreement shall be deemed satisfied if Purchaser has not terminated this Agreement pursuant to Section 3.4(o) of the Stalking Horse Purchase Agreement by the hearing on the Bid Procedures; |
| | • the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders and their respective Related Parties shall have received full and final releases from the Sellers' estates by virtue of the Sale Order, the Final Order (as defined in the DIP Credit Agreement) or otherwise; and |
| | • the period to challenge or contest the validity, amount, perfection, or priority of the claims and liens of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders under the Prepetition Term Loan Agreement shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Purchaser in its sole and absolute discretion. |
| | • (i) except as set forth in clause (ii) below, the representations and warranties of each Seller contained in the Stalking Horse Purchase Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct as of such date), except for such failures to be true and correct as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) the representations and warranties of each Seller contained in Section 4.1, Section 4.3, and Section 4.10 of the Stalking Horse Purchase Agreement shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for any such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date) and, in each case, the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect; |

| Agreement Provision | Summary Description |
|---|---|
|  | • Since the Execution Date, there shall not have occurred any event, circumstance, change, occurrence or state of facts that, individually or together with all other event, circumstance, change, occurrence or state of facts, has had, or would reasonably be expected to have, a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect; |
|  | • each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by the Sellers on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect; |
|  | • the Sellers shall have delivered, or caused to be delivered, to the Purchaser or the other applicable parties all of the items set forth in Section 3.2 of the Stalking Horse Purchase Agreement; |
|  | • no "Default" under the DIP Credit Agreement or "Event of Default" under the DIP Credit Agreement shall have occurred and be continuing; |
|  | • Purchaser and Prepetition Term Loan Agent shall have completed their legal, tax, accounting and business due diligence of the Sellers and the results thereof shall be satisfactory to Purchaser and the Prepetition Term Loan Agent in their sole discretion; provided, the condition in Section 9.3 of the Stalking Horse Purchase Agreement shall be deemed satisfied if Purchaser has not terminated this Agreement pursuant to Section 3.4(o) of the Stalking Horse Purchase Agreement by the hearing on the Bid Procedures; |
|  | • the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders and their respective Related Parties shall have received full and final releases from the Sellers' estates by virtue of the Sale Order, the Final DIP Order (as defined in the DIP Credit Agreement) or otherwise; and |
|  | • the period to challenge or contest the validity, amount, perfection, or priority of the claims and liens of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders under the Prepetition Term Loan shall have expired with no such challenge or contest having been asserted, or any such challenge or contest having been resolved to the satisfaction of the Purchaser in its sole and absolute discretion. |
|  | <u>See</u> **Stalking Horse Purchase Agreement, at § 9.3.** |
| **Conditions Precedent to Obligations of Sellers** | The obligations of the Sellers to consummate the Closing are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law and Section 11.3 of the Stalking Horse Purchase Agreement): |
|  | • the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date), and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect; |
|  | • the Purchaser shall have performed and complied in all material respects |

| Agreement Provision | Summary Description |
|---|---|
| | with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect; <br><br> • the Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) or the applicable third party, as applicable, all of the items set forth in Section 3.3 of the Stalking Horse Purchase Agreement; <br><br> • the Purchaser shall have delivered the Credit Bid Amount in accordance with Sections 2.1 and 3.3(a) of the Stalking Horse Purchase Agreement; and <br><br> • the Purchaser shall have delivered the Excluded Cash Deficiency Amount, if any, and the DIP Repayment Amount in accordance with Sections 2.1, 3.3(f), and 3.3(g) of the Stalking Horse Purchase Agreement. <br><br> **See Stalking Horse Purchase Agreement, at § 9.2.** |
| **Representations and Warranties of Sellers** | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authority relative to the Stalking Horse Purchase Agreement; (c) conflicts; consents and approvals; (d) ordinary course of business; (e) litigation; (f) Intellectual Property; (g) material contracts; (h) permits; (i) brokers and finders; (j) title to assets; (k) real property; (l) compliance with law; (m) tax returns; taxes; (n) benefit plans; (o) labor matters; (p) insurance policies; (q) environmental matters; (r) inventory, (s) financial statements; (t) gift cards; and (u) affiliate transactions. **See Stalking Horse Purchase Agreement, at § 4.** |
| **Representations and Warranties of Purchaser** | The Stalking Horse Purchase Agreement contains customary representations and warranties by the Buyer, including representations of Buyer regarding: (a) organization and qualification; (b) authority relative to the Stalking Horse Purchase Agreement; (c) conflicts; consents and approvals; (d) litigation; (e) brokers and finders; (f) financing and adequate assurance; (g) certain arrangements, and (h) investigation. **See Stalking Horse Purchase Agreement, at § 5.** |
| **Other Covenants** | The Stalking Horse Purchase Agreement requires, among other things, Sellers to: conduct Sellers' Business in the ordinary course of business; (b) maintain in full force and effect the insurance policies; (c) use commercially reasonable efforts to consummate the Transactions. <br><br> The Stalking Horse Purchase Agreement also contains customary provisions regarding, among other things, access, publicity, responsibility for tax liability, commercially reasonable efforts, preservation of rights, delivery of certain financial information, and confidential information. **See Stalking Horse Purchase Agreement, at § 8.1–8.15.** |

## II.    The Bidding Procedures.

16.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as

**Schedule 1** to the Bidding Procedures Order.  The following describes the salient points of the

Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[5]

    (a)    **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).**  Any bid by an Acceptable Bidder must be submitted in writing and satisfy the following requirements, in each case, to the satisfaction of the Debtors:

    (i)    *Purpose*.  The Bid must clearly identify the following:  (i) the particular Assets, or the portion thereof identified with reasonable specificity to be acquired; and (ii) the liabilities and obligations to be assumed, including any debt to be assumed.

    (ii)    *Deposit*.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate cash portion of the purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); *provided* that the Stalking Horse Bidder will not be required to provide a deposit with respect to the Stalking Horse Purchase Agreement.

    (iii)    *Total Consideration*.  Each Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash and non-cash components to be paid, including assumed liabilities (the "Bid Value").

    (iv)    *Minimum Bid*.  The Bid Value proposed by each Bid (or sum of Bids for different assets) must be equal to, or exceed, the sum of (i) $300,000,000; plus (ii) the DIP Repayment Amount; plus (iii) cash consideration in an amount sufficient, together with cash and cash equivalents that are Excluded Assets, to fund the Wind-Down Budget attached as Exhibit A to the Stalking Horse Purchase Agreement; plus (iv) cash or assumption of those Assumed Liabilities in the Stalking Horse Purchase Agreement that the Stalking Horse Bidder has agreed to pay or assume (including all Cure Costs with respect to any Assigned Contract; and plus (v) the minimum overbid amount of $250,000; *provided*, *however*, that in determining the Bid Value, the Debtors will not be limited to evaluating the dollar amount of a Bid, but may also consider factors including, but not limited to, the liabilities and other obligations to be performed or assumed by the Potential Bidder, the additional administrative and prepetition claims likely to be created by such

---

[5] This summary is qualified in its entirety by the Bidding Procedures attached as Schedule 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

Bid in relation to other Bids, the proposed revisions to the Stalking Horse Purchase Agreement, and other factors affecting the speed, certainty and value of the proposed transactions.

(v)  ***Marked Agreement.***  Each Bid must include a signed asset purchase agreement, together with all exhibits and schedules thereto, the form of which will be provided to any Potential Bidder before the Bid Deadline, along with a redline version of such agreement relative to the Stalking Horse Purchase Agreement, pursuant to which the Qualified Bidder proposes to effectuate the Transaction (collectively, the "<u>Transaction Documents</u>").

(vi)  ***Tax Structure.***  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities.  The Bid must also identify the structure proposed for undertaking the Transaction, including the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(vii)  ***Sources of Financing.***  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the proposed Transaction(s) set forth in its Bid with cash on hand, each Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction) satisfactory to the Debtors in their reasonable discretion, after consultation with the Consultation Parties, with appropriate contact information for such financing sources.

(viii)  ***No Financing Approval or Diligence Outs.***  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

(ix)  ***Authorization.***  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of

directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

(x) ***Disclaimer of Fees***.  Each Bid must disclaim any right to receive a fee analogous to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(xi) ***Identity***.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

(xii) ***Consent to Jurisdiction***.  The Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Transaction documents and the closing, as applicable.

(xiii) ***No Collusion***.  The Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Transaction, specifying that it did not agree with any Acceptable Bidders, Potential Bidders, or other interested third parties to control price or exert undue influence process; and (ii) agree not to engage in any such collusion or undue influence with respect to any Bids, the Auction, the Transaction, or the sale process

(xiv) ***Good Faith Offer***.  The Bid must constitute a good faith, *bona fide* offer to effectuate the Transaction.

(xv) ***As-Is, Where-Is***.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (3) did not rely upon any written or oral statements,

representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Documents

(b)     **Right to Credit Bid.**  The Stalking Horse Bidder shall be entitled to credit bid.

(c)     **The Auction.**  If one or more Qualified Bids is received by the Bid Deadline, the Debtors will conduct an auction (the "<u>Auction</u>") to determine the highest or otherwise best bid with respect to the Purchased Assets.  The Auction will commence on **May 12, 2020 at 10:00 a.m. (prevailing Eastern Time)** or on such other date and/or at such other location as determined by the Debtors, in consultation with the Committee, the DIP Agent, and the Stalking Horse Bidder (the "<u>Auction Date</u>").

(d)     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the Initial Minimum Overbid or following any subsequent Prevailing Highest Bid (as defined herein) shall be in increments of at least $250,000 in cash; *provided*, *however*, that the Stalking Horse Bidder may satisfy the minimum bid increment requirement by credit bidding at least $250,000 of outstanding Prepetition Term Loan Obligations that do not already form a part of the purchase price under the Stalking Horse Purchase Agreement.

(e)     **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable backup bidder (the "<u>Backup Bidder</u>") without the need for an additional hearing or order of the Court.

(f)     **Highest or Otherwise Best Bid.**  The determination of which Qualified Bid constitutes the Baseline Bid, and which Qualified Bid constitutes the highest or otherwise best bid such that it is the Winning Bid, shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the projected percentage recovery to general unsecured creditors pursuant to

such Qualified Bid, (f) whether administrative, priority, and secured claims will be paid in full; (g) the tax consequences of such Qualified Bid; (h) the assumption of obligations, including contracts and leases; (i) the cure amounts to be paid; and (j) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements

(g)  **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).**  The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Bid Procedures, to alter or modify any Auction rules or procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefor, in each case in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets; *provided* that the Debtors shall only be permitted to modify or amend the terms of the Stalking Horse Purchase Agreement in accordance with the applicable Stalking Horse Purchase Agreement.

17.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

## III.    Form and Manner of Sale Notice.

18.    Upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known:  (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) counterparties to the executory contracts and unexpired leases of nonresidential property (the "Contract Counterparties"), if known; (d)  all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) all the Debtors'

26132025.1

23

other creditors; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will also publish an abbreviated version of the Sale Notice on their restructuring website, https:// https://cases.primeclerk.com/bluestem/ (the "Case Website").

19.    The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including:  (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).

20.    The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Cure Notice (where applicable), as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Sale shall be required.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

IV.    **Summary of the Assumption Procedures.**

21.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "Assumption Procedures").  Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (a) outline the process by which the Debtors may serve notice to certain Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

**Basis for Relief**

I.    **The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

22.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Culp*, 550 .R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999));  *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed

according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

23.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

24.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Dura Auto, Sys.,* 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

25.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

26.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

27.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District and others.  *See e.g., In re Forever 21, Inc.*, No. 19-12122 (MFW) (Bankr. D. Del. Feb. 4, 2020); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019);  *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 6, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019).[6]

---

[6]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.

28.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the assets; (b) are consistent with other procedures previously approved by courts in this District; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

## II.     The Form and Manner of the Sale Notice Should Be Approved.

29.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

30.     As noted above, upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) the Committee; (c) the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtors' other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors shall also publish an abbreviated version of the Sale Notice on the Case Website.

---

Copies of these orders are available upon request of the Debtors' counsel.

31.    The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

## III.    The Debtors Intend to Seek Approval of the Sale as an Exercise of Sound Business Judgment at the Sale Hearing.

32.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."    A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.    *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *In re Abbotts Dairies of Pennsylvania, Inc.*,788 F.2d 143 (3rd Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)).    The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the

> proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

33.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

34.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith,' and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

35.    At the Sale Hearing, the Debtors intend to demonstrate that a sound business purpose exists for the Sale free and clear of all encumbrances, due and adequate notice has been provided, the purchase price reflects fair value, and the transaction has been proposed in good faith without collusion or undue influence, and relief under Bankruptcy Rules 6004(h) and 6004(d),

among other things.  The Debtors reserve the right to submit supplemental materials, including declarations, in connection with the Sale Hearing.

### Notice

36.    The Debtors will provide notice of this motion to:  (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent; (d) counsel to the Term Loan Agent; (e) counsel to Bluestem Group, Inc.; (f) SCUSA; (g) WebBank; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; and (l) any party that requests service pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required or necessary.

*[Remainder of page intentionally left blank.]*

26132025.1

**WHEREFORE**, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this motion and such other relief as is just and proper.

Dated:  March 9, 2020  
Wilmington, Delaware

*/s/ Joseph M. Mulvihill*

M. Blake Cleary (DE Bar No. 3614)  
Jaime Luton Chapman (DE Bar No. 4936)  
Joseph M. Mulvihill (DE Bar No. 6061)  
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**  
Rodney Square  
1000 North King Street  
Wilmington, Delaware 19801  
Telephone:   (302) 571-6600  
Facsimile:    (302) 571- 1253  
Email:        mbcleary@ycst.com  
              jchapman@ycst.com  
              jmulvihill@ycst.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:   (212) 446-4800  
Facsimile:    (212) 446-4900

-and-

Patrick J. Nash, P.C. (*pro hac vice* admission pending)  
W. Benjamin Winger (*pro hac vice* admission pending)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:   (312) 862-2000  
Facsimile:    (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*