# EXHIBIT A

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT is made this          15th day of February 2006, by and between ICG Telecom Group, Inc. a Colorado corporation ("ICG"), Corporate Services and Events, LLC. Dba Bright Future Solutions a Colorado corporation ("Assignor") and Orchard Holdings, Inc. a Colorado corporation ("Assignee").

A.       WHEREAS, ICG and Assignor entered into that certain Business Partner Agreement together with all appendices (the "Agreement"), dated March 3, 2003, copies of which are attached hereto, copies of which are attached hereto;

B.       WHEREAS, Assignor desires to assign and Assignee desires to assume all of Assignor's rights, interest and obligations set forth in the Agreement;

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.       Assignment and Assumption

Assignor does hereby assign, convey, transfer and deliver and Assignee does hereby assume all rights, title, obligations and interest in and to the Agreement and all amendments to the Agreement. Assignee agrees to be bound by each and all of the terms and provisions of the Agreement as though the Agreement had originally been made, executed, and delivered by Assignee.

2.       Successors and Assigns

This Assignment and Assumption Agreement applies to, inures to the benefit of, and binds all parties and their respective successors, assigns and legal representatives.

3.       Effective Date

This Assignment and Assumption Agreement shall be effective as of 2/15/06.

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives on the day and year first above written.

**CORPORATE SERVICES AND EVENTS, LLC DBA BRIGHT FUTURE SOLUTIONS**

By: _____

Name: _Rob Scott_____

Title: _Member / President_____

**ORCHARD HOLDINGS, INC**

By: _____

Name: _Rob Scott_____

Title: _President_____

**ICG TELECOM GROUP, INC.**

By: _____

Name: Scott E. Beer
          V.P. and General Counsel

Title: _____

£27437

# Level(3)

## MASTER SERVICE AGREEMENT

This Agreement ("Agreement") is made as of this **28** day of **MARCH**, 2014 ("Effective Date"), by and between **LEVEL 3 COMMUNICATIONS, LLC** ("Level 3") and **ORCHARD BRANDS CORPORATION** ("Customer"), and contains the general terms and conditions applicable to purchases of services ("Services") from Level 3.

**1. Service Delivery.** Requests for Services will be on Level 3 orders ("Orders") stating the pricing and term ("Service Term") for which Services are requested. The Service will continue on a month to month basis at the expiration of the Service Term at Level 3's then current rates until terminated by either party on a minimum of thirty (30) days' written notice. Level 3 will notify Customer electronically or in writing (a) of acceptance of the Customer Order by delivering the date by which Level 3 will install Service (the "Customer Commit Date") and (b) when Service is installed (a "Connection Notice"), at which time billing will commence ("Service Commencement Date"). Unless Customer notifies Level 3 within 3 days of the Service Commencement Date that Service is not working properly, the Service will be deemed accepted and billing will commence on the Service Commencement Date. If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer for the Service and Customer shall pay such charges which will appear and power for the installation, maintenance, upgrade and/or removal of Level 3 network and equipment and Level 3 shall comply with applicable reasonable on Customer's first invoice following the Service Commencement Date. Customer will at its expense timely provide suitable access to non-Level 3 facilities security requirements as communicated in advance by Customer to Level 3. If third party local access services are obtained by or for Customer, Customer will cooperate with Level 3 by providing: (i) information (including firm order commitments (FOC)) to enable cross-connects to Level 3 Service(s), (ii) necessary authorizations and other information respecting circuit grooming, and (iii) written third party disconnection FOCs where a related Service is disconnected. Title to all equipment and software provided by Level 3 remains with Level 3. Level 3's then current Acceptable Use and Privacy Policies (available at www.level3.com) apply to Customer's use of Service.

**2. Charges.** Invoices are delivered monthly and due 30 days after the invoice date. Fixed charges are billed in advance and usage-based charges are billed in arrears, partial months being prorated. Level 3's standard charges apply to moves, adds or changes agreed to by Level 3. Past due amounts bear interest at the lesser of 1.5% per month or the highest rate allowed by law. Customer agrees to pay all Service charges, even if incurred as the result of unauthorized use. If Customer disputes an invoice, Customer will pay the undisputed amount by the due date and submit written notice of the disputed amount detailing the nature of the dispute and the invoices disputed. Disputes must be submitted within 90 days of the date of the invoice or the right to dispute is waived. If a dispute is resolved against Customer, Customer will pay the disputed amounts plus interest from the due date within 30 days. Level 3 may require a security deposit of up to 2 months estimated charges as a condition to accepting an order or, for a) usage-based Services at any time; or b) non-usage based Service if Customer fails to timely pay Level 3 hereunder or Level 3 reasonably determines that Customer has had an adverse change in financial condition. If any change in applicable law or regulation affects the delivery of Service, Level 3 may pass any increased costs through to Customer and Customer may terminate the affected Service without termination liability by delivering written notice to Level 3 within 30 days.

**3. Taxes and Tax Like Fees.** Except for Level 3's net income tax, Customer is responsible for all taxes, fees, surcharges, license fees, foreign withholding (which will be grossed up) and other tax like charges imposed on or incident to the provision, sale or use of Service (whether imposed on Level 3 or its affiliates). Level 3 may recover taxes, fees, and certain costs of administering the same through a percentage surcharge(s) on the Services. Valid exemption certificates will be given prospective effect upon receipt by Level 3.

**4. Termination.** If (i) Customer fails to pay Level 3 any undisputed charges when due and such failure continues for 5 business days after written notice from Level 3 or (ii) either party fails to observe any other material term of this Agreement and such failure continues for 30 days after written notice from the other party, then the non-defaulting party may terminate this Agreement or any Order, in whole or in part, and subject to the limitations of this Agreement, pursue any remedies it may have at law or in equity. If Customer cancels or terminates Service for convenience or Level 3 terminates Service for cause, Customer will pay Level 3 a termination charge equal to the sum of: (A) if prior to delivery of a Connection Notice, (i) for "off-net" Service, third party termination charges for the cancelled Service; (ii) for "on-net" Service, 1 month's monthly recurring charges for the cancelled Service; (iii) the non-recurring charges for the cancelled Service; and (iv) Level 3's out of pocket costs (if any) incurred in constructing facilities necessary for Service delivery or (B) following delivery of a Connection Notice, (i) all unpaid amounts for Service actually provided; (ii) 100% of the remaining monthly recurring charges (if any) for months 1-12 of the Service Term; (iii) 50% of the remaining monthly recurring charges for month 13 through the end of the Service Term; and (iv) to the extent not recovered by the foregoing, any termination liability payable to third parties by Level 3 resulting from the termination and any out of pocket costs incurred in constructing facilities to the extent such construction was undertaken to provide the Services. In lieu of installation Service Level credits, if installation of Service is delayed by more than 30 business days beyond the Customer Commit Date, Customer may terminate the affected Service without liability upon written notice to Level 3, provided (i) such notice is delivered prior to delivery of a Connection Notice for the affected Service and (ii) this right shall not apply where Level 3 is constructing facilities.

**5. LIABILITY LIMITATIONS.** NEITHER PARTY WILL BE LIABLE FOR ANY DAMAGES FOR LOST PROFITS, LOST REVENUES, LOSS OF GOODWILL, LOSS OF ANTICIPATED SAVINGS, LOSS OF DATA, THE COST OF PURCHASING REPLACEMENT SERVICES, OR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES IN ANY WAY RELATED TO THIS AGREEMENT OR ANY ORDER. LEVEL 3 WILL HAVE NO LIABILITY FOR ANY CLAIMS RELATING TO 911 OR OTHER EMERGENCY REFERRAL CALLS. LEVEL 3 MAKES NO WARRANTIES OR REPRESENTATIONS RESPECTING THE SERVICE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**6. Service Levels.** The Service level commitments ("Service Levels") are stated in the applicable Service Schedules for each Service. Maintenance of the Service may, but ordinarily will not, result in limited Service interruptions. Periods of force majeure and maintenance are "Excused Outages". If Level 3 does not meet a Service Level (based on Level 3's records) applicable service credits will be issued upon Customer's request to Level 3 Customer Service. Credits must be requested within 60 days after the event giving rise to the credit. Customer's sole remedies for any outages, failures to deliver or defects in Service are contained in the Service Levels (if any).

**7. Assignment.** Customer may not assign its rights or obligations under this Agreement or any Order without the prior written consent of Level 3, not to be unreasonably withheld. Customer may not resell Service provided pursuant to this Agreement but Customer may use such Service in the normal course of its business. Customer will indemnify and defend Level 3, its affiliates and their agents against any claims arising from or related to Customer's use of the Service. Nothing in this Agreement, express or implied, confers upon any third party any right, benefit or remedy under this Agreement.

**8. Indemnity.** Each party agrees to indemnify, defend and hold harmless the other party from third party claims for damage to tangible property, personal injury or death caused by the gross negligence or willful misconduct of such party. This indemnification obligation shall not apply to Level 3 when Level 3 is providing 911 Service.

**9. Miscellaneous.** The terms of this Agreement and all information of a confidential nature acquired in performing this Agreement is confidential and shall not be disclosed to third parties. Notices will be made in writing to the address below. If no Customer address is provided below, Level 3 may provide notices

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

# MASTER SERVICE AGREEMENT

under this Agreement to any address identified in an Order. Services may be provided by Level 3 or its affiliates and Level 3 may use third parties to provide Services. This Agreement is the entire agreement between the parties respecting the subject matter hereof and can only be modified in a writing signed by both parties. Neither party will be liable, nor will any remedy provided by this Agreement be available, for any failure to perform due to causes beyond such party's reasonable control. If either party fails to enforce any right or remedy under this Agreement, such failure will not waive the right or remedy. This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws provisions. Each party shall comply with all applicable laws, rules and regulations associated respectively with Level 3's delivery or Customer's use of the Services under the Agreement. With respect to Services provided in Latin America, Customer agrees that it (or its local affiliate) will enter into a separate local country addendum/agreement (as approved by local authorities) ("LCA") with the respective Level 3 affiliate which provides the local Service(s), and such Level 3 affiliate will invoice the Customer (or its local affiliate) party to the LCA for the respective local Service(s).

**LEVEL 3 COMMUNICATIONS, LLC ("Level 3")**
1025 Eldorado Blvd.
Broomfield, Colorado 80021
Attn: General Counsel

By _____

Name      **Jonathan F. Kilburn**

Title      **Senior Corporate Counsel**

**ORCHARD BRANDS CORPORATION ("Customer")**
138 Conant Street
Beverly, MA 01915 USA
Attn: Rob Cote

By _____

Name      William Nixon

Title      C IO

# MASTER SERVICE AGREEMENT
SERVICE SCHEDULE
### LEVEL 3® MPLS (IPVPN, VPLS and EVPL) VPN SERVICE
(Version Issue Date: February 12, 2014)

**1.  Service Descriptions.**  MPLS VPN Service includes 3 virtual private network ("VPN") services, IPVPN, VPLS and EVPL, providing private site-to-site communications over Level 3's MPLS network. IPVPN utilizes Internet Protocol; VPLS and EVPL are provided using Ethernet. Customer must purchase at least 2 ports (IPVPN or Ethernet, as applicable) in order to set up private site-to-site connections. The Service is connected to each site, including additional sites designated by Customer (together "Customer Sites") through the Customer port at either a Circuit location address or a Level 3 Point of Presence (PoP) as specified in the Order. Customer Sites will be connected to a port at 1 or more Level 3 MPLS Network PoPs at a fixed data transmission rate. Standard network management web tools are also provided in conjunction with the MPLS VPN Services.

Where available, Application Performance Management with the IP VPN service may be ordered (at additional cost) by Customer. Application Performance Management service provides near real-time information for live monitoring and historical data for analysis and reporting on all network traffic end-to-end, including advanced statistics on latency, jitter and packet loss, as well as general utilization by way of an inline Analysis Service Element ("ASE") for use in connection with the IP VPN Service. The provision of Applications Performance Management service is subject to the Service Schedule for Application Performance Management Services, a copy of which will be made available to Customer upon request.

For VPN services with Ethernet access in the domestic U.S. and for only EVPL and VPLS services with Ethernet access outside of the U.S., Level 3 provides 'Smart Demarcetion' which is the supply and installation of a smart demarcation device used for Ethernet connectivity fault management for up to 1 Gbps port speeds at Customer Sites. As an optional Service feature, Customer may (at additional cost) subscribe to Performance Assurance for intercity VPLS or EVPL. This feature provides end to end reporting and SLA's for the following statistics: data delivery, latency and jitter via the customer portal.

**2.  Class of Service (CoS).**  Customer may purchase CoS providing the ability to prioritize certain identifiable traffic flows between MPLS network ports. Customer is solely responsible for the selection of classes of service and the distribution of bandwidth percentages by class as stated in the Order.

**3.  Customer Responsibilities.**  Customer is responsible for providing the network design specifications including pre-existing LAN/WAN IP addressing schemes, MAC addresses and circuit designs. Customer is solely responsible for all equipment and other facilities used in connection with the Service which are not provided by Level 3.

For installation of the Smart Demarcation at Customer's Site, Customer shall (i) provide access at each Site for installation, implementation and maintenance ("Work") at scheduled times, (ii) make appropriate contact personnel available on-Site for such Work, (iii) provide all necessary power distribution boxes, conduits, telco backboard space for equipment mounting, grounding, surge and lightning protection and associated hardware and power outlets which are within 4 feet (1 meter) of the location at which a Smart Demarcation is to be installed, (iv) provide all required extended demarcation inside wiring, including any necessary building alterations to meet wiring and any other site requirements, (v) ensure that Smart Demarcation can be installed within 6 feet (2 meters) of the customer provided equipment and the customer provided or third party provided extension of the local access circuit demarcation (vi) clearly marking each telecommunications extended local access circuit demarcation point to allow the installer to connect the correct circuit to the correct Smart Demarcation interface, and (vii) connection of Smart Demarcation to the Customer LAN.

**4.  Charges.**  Non-recurring and monthly recurring charges apply to MPLS VPN Services as stated in the Order. Non-recurring charges include applicable local access circuit charges and installation charges for each port. Monthly recurring charges include local-access charges, port connection charges and bandwidth charges. Other charges may apply as stated in the Order.

**5.  Service Levels and Service Credits.**  The following service levels apply as set forth below.

    A.  **Service Availability - All Regions.**  Level 3's Service Availability service levels are as set forth below, as further explained in subsection C.

| SLA Boundary | Measurement Parameter | Service Availability |
|---|---|---|
| On-Net<br>Off-Net | Average Availability | 99.99%<br>99.9% |

"On-Net" is service provided entirely on Level 3's owned and operated network whether the service configuration is PoP to PoP or End to End. "Off-Net" is service which is provided using third party circuits not owned and operated by Level 3. For IPVPN and VPLS, Service Availability is on a per site basis. For EVPL, Service Availability is on a per circuit basis.

    B.  **Data Delivery, Latency and Jitter.**  Level 3's service levels for Data Delivery, Latency and Jitter are set forth below, as further explained in subsection C.

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

# MASTER SERVICE AGREEMENT

### Table A: PoP to PoP

| SLA Boundary | Measurement Parameter | Class of Service | | |
|---|---|---|---|---|
| | | Premium Plus/ Premium (e.g. Voice/Video) | Enhanced Plus/Enhanced (e.g. Critical/Preferred Data) | Basic Plus/ Basic (e.g. Default/Bulk Data) |
| Intra US | Average Data Delivery | 99.99% | 99.95% | 99.9% |
| | Average Round Trip Latency | 50 ms | 50 ms | 50 ms |
| | Jitter (one way) | 3 ms | N/A | N/A |
| Intra EU and EU -US | Average Data Delivery | 99.99% | 99.95% | 99.9% |
| | Average Round Trip Latency | City Pair | City Pair | City Pair |
| | Jitter (one way) | <10 ms | N/A | N/A |
| Rest of World | Average Data Delivery | 99.9% | 99.8% | 99.5% |
| | Average Round Trip Latency | City Pair | City Pair | City Pair |
| | Jitter (one way) | Regional | N/A | N/A |

### Table B: End to End*

| SLA Boundary | Measurement Parameter | Class of Service | | |
|---|---|---|---|---|
| | | Premium Plus/ Premium (e.g. Voice/Video) | Enhanced Plus/Enhanced (e.g. Critical/Preferred Data) | Basic Plus/ Basic (e.g. Default/Bulk Data) |
| Intra US | Average Data Delivery | 99.9% | 99.5% | 99.0% |
| | Average Round Trip Latency** | 50 ms | 50 ms | 50 ms |
| | Jitter (one way) | 3 ms | N/A | N/A |
| Intra EU and EU -US | Average Data Delivery | 99.9% | 99.5% | 99.0% |
| | Average Round Trip Latency** | City Pair | City Pair | City Pair |
| | Jitter (one way) | <10 ms | N/A | N/A |
| Rest of World | Average Data Delivery | 99.9% | 99.0% | 99.0% |
| | Average Round Trip Latency ** | City Pair | City Pair | City Pair |
| | Jitter (one way) | Regional | N/A | N/A |

*The above End to End Data Delivery, Jitter and Round Trip Latency SLAs apply only If Customer has ordered Performance Assurance for EVPL and VPLS or APM for IPVPN

*For sites with DSL, microwave or satellite access, PoP to PoP SLAs apply

** For an end to end latency SLA, the Loop factor table applies per Appendix 1

Appendix 1 sets forth the "City Pair" Average Round Trip Latency in the *MPLS VPN PoP to PoP Roundtrip Latency SLA Matrix*.

For city pairs that are not listed in Appendix 1: *MPLS VPN PoP to PoP Roundtrip Latency SLA Matrix* the following regional metrics apply per Table C.

### Table C: Regional Latency and Jitter

| Description | Average Roundtrip Latency (milliseconds) | Average Jitter (one-way) (milliseconds) |
|---|---|---|
| Trans-Atlantic (London/Amsterdam – New York) | ≤    95 ms | ≤   3 ms |
| Intra–United Kingdom | ≤    25 ms | ≤   3 ms |
| European network | ≤    45 ms | ≤   3 ms |
| North American Network * | ≤    65 ms | ≤   3 ms |
| Pacific (Tokyo – Sacramento, CA) | ≤    150 ms | ≤   3 ms |
| Sydney – US West (Sacramento, CA) | ≤    270 ms | ≤   3 ms |
| Sydney – Asia (Tokyo) | ≤    200 ms | ≤   3 ms |
| Asia – US West (Sacramento, CA) | ≤    210 ms | ≤   3 ms |
| South America (Buenos Aires, Sao Paolo, Panama City, Santiago, and Miami) | ≤    170 ms | ≤   3 ms |
| Intra–Asia ** | ≤    140 ms | ≤   3 ms |
| Intra–India (Tier II PoPs)*** | ≤    70 ms | ≤   15 ms |
| Intra–India (Tier II PoPs) | ≤    150 ms | ≤   25 ms |
| Hong Kong – India (Tier I Po Ps) | ≤    140 ms | ≤   15 ms |
| London – India (Tier I PoPs) | ≤    190 ms | ≤   20 ms |
| New York – South Africa | ≤    295 ms | ≤   20 ms |
| London – South Africa | ≤    230 ms | ≤   20 ms |
| Intra–South Africa | ≤    80 ms | ≤   15 ms |

*    Add 90ms from/to the Mexico PoP

** 'Intra-Asia' is defined as: Hong Kong, Kuala Lumpur, Manila, Jakarta, Taipei, Tokyo, Seoul and Singapore; excluding Australia

*** India Tier I Cities are: Delhi, Mumbai, Chennai, Bangalore, Hyderabad, Gurgoan, Pune and Cochin, all others are Tier 2

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

# MASTER SERVICE AGREEMENT

C. **Service Credits.**

   (i)    **Availability Service Level.** In the event that Service becomes Unavailable for reasons other than an Excused Outage, Customer will be entitled to a service credit off of the MRC for the affected Service locations based on the cumulative Unavailability of the Service in a given calendar month as set forth below. In the tables below, if a Service contains no Off-Net aspects and is entirely On-Net, the SLA and credits in Table D will apply. For any Service which contains any Off-Net aspects, the SLA and credits in Table E will apply. "Unavailable" means the inability of the Customer port on the MPLS Network to pass traffic. Service Unavailability is calculated from the timestamp Level 3 opens a trouble ticket following the report of a problem by the Customer until the time the ticket is closed.

**Table D: Fully On-Net MPLS VPN Service:**

| | |
|---|---|
| 00:00:01 – 00:04:18 (99.99%) | No Credit |
| 00:04:19 – 00:43:00 (99.9%) | 10% |
| 00:43:01 – 04:00:00 | 15% |
| 04:00:01 – 12:00:00 | 30% |
| 12:00:01 or greater | 50% |

**Table E: Services with any Off-Net MPLS VPN Service:**

| | |
|---|---|
| 00:00:01– 00:43:00 (99.9%) | No Credit |
| 00:43:01 – 04:00:00 | 10% |
| 04:00:01 – 12:00:00 | 30% |
| 12:00:01 or greater | 50% |

For the avoidance of doubt, where a Customer Site is provisioned without Smart Demarcation at the Customer's request:(i) any outages attributed to a local access circuit or other cabling beyond the edge router port in the Level 3 PoP will be excluded from the calculation of Unavailability for that service and (ii) Customer shall pay any dispatch or operational costs at the applicable hourly rate.

In the event of the failure of Level 3 equipment providing the Performance Assurance or Application Performance Management, Level 3 will remotely troubleshoot the issue to establish if the equipment requires repair or replacement. Level 3 or its agent will contact the Customer's designated contact person to assist with troubleshooting, and, if necessary, use commercially reasonable efforts to dispatch an engineer to repair or replace the faulty equipment within (3) business days. In the event that such equipment failure has caused Unavailability, Level 3 will restore service by removing the device within 1 business day. Customer shall be entitled to the service credits stated above   Customer's sole remedy for the failure to achieve repair within this timeframe for Performance Assurance will be limited to availability service credit above, and, for Application Performance Management, in addition to the Availability Service Level, Customer may also be entitled to the service credit available under the Service Schedule for Application Performance Management.

   (ii)    **Data Delivery, Latency and Jitter Service Levels.** The PoP to PoP Service Levels are based on monthly average performance between nodes on Level 3's MPLS network. Where End to End Service Levels apply, the monthly average performance is measured between the Level 3 Equipment deployed for Application Performance Management or Performance Assurance, as applicable. Customer will be entitled to a service credit off of the MRC for the affected Service locations as set forth below for the Service Parameter(s) not met for reasons other than an Excused Outage. Customer will not be entitled to credits under the Latency, Data Delivery or Jitter SLAs for the affected Service where such failure is related to Unavailability under the Availability Service Level.

| | |
|---|---|
| Data Delivery | 10% |
| Latency | 10% |
| Jitter | 10% |

   (iii)    **Credits.** All SLA credits are calculated after deduction of all discounts and other special pricing arrangements, and are not applied to governmental fees, taxes, surcharges and similar additional charges. For the avoidance of doubt, credit percentages are, unless otherwise expressly provided for in these terms, applied to the MRC for Committed data rate and port charges for applicable Sites only, and excludes the MRC for the local access circuit(s). In no event will SLA credits in any calendar month exceed 100% of the total MRCs (excluding local access) of the affected Site(s). All approved SLA credits for a given month will be totaled and applied to Customer's next following invoice for the Service, or as promptly thereafter as is practical in the event of a dispute. SLA credits must be requested within 30 calendar days of the end of the month in which entitlement to an SLA credit arose.

6. **Chronic Outage.** As its sole remedy, Customer may elect to terminate an affected MPLS VPN Service prior to the end of the Service Term without termination liability if, for reasons other than an Excused Outage, such MPLS Service is Unavailable (as defined in Section 5 above) more than 6 consecutive hours in each of 3 consecutive calendar months, or for more than 42 hours in aggregate in any calendar month. The termination right must be exercised within 30 days of the event giving rise to it.

7. **Secure Access – Site and Mobility; Secure Internet Access.**

   A.    Secure Access – Site VPN Access: Enables IP VPN Customers to set up a network connection and establish a secure tunnel across the Public Internet between their remote location and their IP VPN network, via configuration and deployment of Level

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

## MASTER SERVICE AGREEMENT

3-provided software clients or the deployment of managed routers. Service Availability for the Remote VPN Access Gateway is 99.9% (<44 minutes of total Service Unavailability in a month). For Remote VPN Access Service Unavailability in excess of 44 minutes (for reasons other than an Excused Outage), Level 3 will credit Customer in accordance with Table E of Section 5(C) on Service Credits. For the purpose of this Section, 'MRC' means the monthly recurring charge for the purchased bandwidth amount on the Remote VPN Access Gateway. The Service Levels in Section 5(B), Tables A, B and C and in Section 5(C), Table D do not apply to Remote VPN Access.

B.  Secure Access – Mobility: If this option is selected by Customer, Level 3 will provide end user authentication for Remote VPN Access (Mobility). End user configuration is performed by Customer through secure, private access to these servers via Level 3'smyLevel3 web based portal.

C.  Secure Internet Access ("SIA"): If SIA is ordered by Customer, Level 3 will provide Customer a secure method of accessing the Public Internet. SIA is implemented on a Level 3 network security device (the "SIA Node") and facilitates outbound Internet browsing from within the IP VPN network. The Order will specify the amount of bandwidth requested to be dedicated on one or more SIA Nodes. Service Availability for SIA is 99.9% (<44 minutes of total Service Unavailability in a month), where SIA Unavailability means the inability of Customer to send data packets through the SIA Node and across the Level 3 network. For SIA Unavailability in excess of 44 minutes in a month (for reasons other than an Excused Outage), Level 3 will credit Customer in accordance with Table E of Section 5(C) on Service Credits.

D.  To the extent available and selected by Customer, Secure Access features and associated pricing will be set forth in a Customer Order.

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

**MASTER SERVICE AGREEMENT**

Appendix 1: MPLS VPN PoP to PoP Roundtrip Latency SLA Matrix



# MASTER SERVICE AGREEMENT

**SLA Matrix Notes:**

1. This latency table applies to Level 3 customers who have ordered services under the Level 3 MPLS VPN Service Schedule (Version, June 10, 2013). Level 3 reserves the right to change the figures in this table at any time.
2. All Round-Trip latency figures in Appendix 1 are Provider Edge (PE) to Provider Edge (PE), exclude local loop performance, and are shown in milliseconds (ms). Provider Edge is the MPLS network PoP that Customer will connect into where the VPN configuration is applied.
3. Latency SLA applies to the Premium and Enhanced classes of service only.
4. South Africa I PoPs include the following: Rosebank, Bryanston, Cape Town, Durban
5. South Africa II PoPs include the following: Pretoria, Port Elizabeth, Bloemfontein, Krugersdorp
6. India Tier II PoPs include any other cities not identified in the list of sites.
7. If two or more customer locations are provisioned via the same VPN PoP, the PoP to PoP latency guarantee between those locations is 5ms, except for PoPs in U.S. where the regional SLA applies.

**Loop Addition:**

The below Loop Factor Table is required to calculate End to End latency. An End-to-End Latency SLA is only applicable for those customers who have Performance Assurance or Application Performance Management services.

| 0-10miles | +0ms | 401-600 miles | +40ms |
|---|---|---|---|
| 11-50 miles | +5ms | 601-800 miles | +50ms |
| 51-100 miles | +10ms | 801-1000 miles | +60ms |
| 101-200 miles | +15ms | 1000-1200 miles | +80ms |
| 201-400 miles | +30ms | 1200+ miles | ICB |

a. The loop factor table values are added to the PoP to PoP values for the total round-trip end to end latency SLA
b. The loop factor is calculated as the combined total loop distance Level 3 Equipment associated with Application Performance Management or Performance Assurance (Relevant Equipment") to PoP + Relevant Equipment to PoP, inclusive of any backhaul within network

© 2014 Level 3 Communications, LLC, 1025 Eldorado Blvd., Broomfield, CO 80021 Proprietary and Confidential

## Addendum to
## Customer Order 2193943

This Addendum is entered into this _30_ day of _APRIL_____, 2015 ("Addendum") by and between **LEVEL 3 COMMUNICATIONS, LLC** ("Level 3") and **ORCHARD BRANDS CORPORATION** ("Customer") and modifies Quote No. 2193943 prepared on April 23, 2015 ("Customer Order 2193943"), a copy of which is attached hereto.

**WHEREAS,** the parties wish to modify Customer Order 2193943 so that the service term will expire on October 30, 2017.

**NOW THEREFORE**, the parties agree to modify Customer Order 2193943 as follows:

1.      Notwithstanding that Customer Order 2193943 states that it is for a two year term, the Parties hereby agree that the service term will expire on October 30, 2017.  Thereafter, the service term will continue on a month to month basis unless terminated upon thirty (30) days' written notice by either Party, or as otherwise extended upon written agreement of the parties.

2.      Except as amended herein, all other terms and conditions of Customer Order 2193943 remain in full force and effect.  If there is a conflict between this Addendum and Customer Order 2193943, the terms of this Addendum shall govern.

These terms and conditions have been read, are understood, and are hereby accepted.

**LEVEL 3 COMMUNICATIONS, LLC**                    **ORCHARD BRANDS CORPORATION**

By: _____                     By: _____
        John J. McCarthy
Name: _____                     Name: _Scott MCKIBBIN_____
        Vice President &
Title: __Asst. General Counsel__                  Title: _DIRECTOR OF IT_____

Date: ___4/30/2015_____                     Date: ___4/30/15_____

**Addendum to**
**Customer Order 2193943**

Proposal prepared for Orchard Brands Corporation - Quote# 2193943 - S



## Quote # 2193943

| Proposal | | | | | | |
|---|---|---|---|---|---|---|
| Pricing Prepared For | | Prepared On | Price Valid Until | Currency | Total Mrc | Total Nrc |
| Orchard Brands Corporation | | 04/23/2015 | 06/28/2015 | USD | 484.50 | 0.00 |

| Security - Secure Access | | | | |
|---|---|---|---|---|
| Term | Total Mrc | | Total Nrc | # Sites |
| 2 Years | 484.50 | | .00 | 1 |
| Service | Mrc | | Nrc | |
| Security - Secure Access | 484.50 | | .00 | |

| Product Details | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Qty | Mrc | Nrc | Priced Amount | Mrc Per | Nrc Per | Usage Mrc | Usage Nrc | Vendor | Pop | Distance(km) |
| Secure Site Access - [Bandwidth (Mb) = 6.000] | 1 | 484.50 | 0.00 | 6.000 | 80.75Mb | | | | | | |

## Addendum to
## Customer Order 2193943

Proposal prepared for Orchard Brands Corporation - Quote# 2193943 - S

| Order Terms and Conditions |
|---|
| 1. This confidential Customer Order may not be disclosed to third parties and is non-binding until accepted by Level 3 as set forth in section 4. 2. Pricing is generally valid for 90 calendar days from the date indicated unless a different time period is otherwise specified herein. Prior to installation Level 3 may give written notice to Customer (which may be via e-mail) of price increases due to price changes by off-net suppliers. Customer has 2 business days following such notice to terminate this Customer Order (without liability) otherwise Customer is deemed to accept the increase. Services may be provided by Level 3 or its affiliates. If any aspect of the Services set forth herein is to be provided internationally, a Local Country Agreement may be required. 3. If a generic demarcation point (such as a street address) is provided, the demarcation point for on net services shall be Level 3's Minimum Point of Entry (MPOE) at such location (as determined by Level 3) and off-net demarcation points shall be the off-net vendor's MPOE. If this Customer Order identifies aspects of services which are procured by Customer directly from third parties, Level 3 is not liable for such services. 4. Customer places this Customer Order by signing (including electronic or digital signature) or otherwise acknowledging (in a manner acceptable to Level 3) this document and returning it to Level 3. The Service identified in this Customer Order shall be governed by and subject to the Master Service Agreement(s) and Service Schedule(s) (if any) between Level 3 and Customer (or its affiliate if expressly provided for under such affiliate Master Service Agreement) applicable to such Service. If Customer has not executed a Master Service Agreement with Level 3 but has executed a services agreement with an affiliate of Level 3 ("Affiliate Agreement"), then the terms of the most recent such Affiliate Agreement shall apply to the Service herein (to the extent not inconsistent with this Customer Order) provided that in such cases, the current standard Level 3 Service Schedule applicable to the Services shall apply. In the event that Level 3 and Customer have not executed a Master Service Agreement and/or applicable Service Schedule(s) with respect to such Service and have not executed an Affiliate Agreement, then Level 3's standard Master Service Agreement/Service Schedule(s) (as of the date of this Customer Order) shall govern, a copy of which are available upon request. Notwithstanding anything in any Affiliate Agreement to the contrary, Level 3's acceptance of this Order will be evidenced by (and this Order will be binding on both parties upon) the earlier of Level 3's written delivery of a Customer Committed Delivery Date (i.e. the projected installation date) or Level 3's delivery of the requested Service. 5. Neither party shall be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Customer Order. Customer's sole remedies for any outages, failures to deliver or defects in Service are contained in the service levels applicable to the affected Service. 6. All transport services ordered from Level 3 will be treated as interstate for regulatory purposes. Customer may certify transport service as being intrastate (for regulatory purposes only) in a format as required by Level 3, but only where the transport services are sold on a stand-alone basis, the end points for the service are located in the same state and neither end point is a Level 3 provided IP port ("Intrastate Services"). Where Customer requests that services be designated as Intrastate Services, Customer certifies to Level 3 that not more than 10% of Customer's traffic utilizing the Intrastate Services will be originated or terminated outside of the state in which the Intrastate Services are provided. Such election will apply prospectively only, and will apply to all Intrastate Services stated in this Customer Order. 7. Charges for certain Services are subject to (a) a property tax surcharge of 4.25% and (b) a cost recovery fee of 3% per month to reimburse Level 3 for various governmental taxes and surcharges. Such charges are subject to change by Level 3 and shall be applied regardless of whether Customer has delivered a valid tax exemption certificate. For additional details on taxes and surcharges that are assessed, visit www.level3.com/taxes. 8. Customer will pay Level 3's standard: (i) expedite charges (added to the NRC) if Customer requests a delivery date inside Level 3's standard interval duration (which will be provided by Level 3 upon request and is currently available at https://MyLevel3.net ) and (ii) ancillary charges for additional activities, features or options as set forth in Level 3's ancillary charge summary, a copy of which is available upon request. If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer for the Service and Customer shall pay such charges which will appear on Customer's first invoice following the Service Commencement Date. 9. For colocation, data center and/or hosting services, at certain locations pre-arranged escorted access may be required. |

| Declaration and Signatures | |
|---|---|
| Customer submits this document as a Customer Order: | |
| Authorized Signature: | *[signature]* |
| Name: | SCOTT MCKIBBIN |
| Title: | DIRECTOR OF TECH SVCS |
| Date: | 4/30/15 |

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNOR:                    Orchard Brands Corporation
                             138 Conant Street, Ste. 3
                             Beverly, MA  01915

ASSIGNEE:                    Bluestem Brands, Inc.
                             6509 Flying Cloud Drive
                             Eden Prairie, MN  55344

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made effective as of the 1st day of May, 2016 ("Effective Date"), between **Orchard Brands Corporation** ("Assignor"), and **Bluestem Brands, Inc.** ("Assignee").

## W I T N E S S E T H

WHEREAS, Assignor is a party to Product Instance/Circuit Identification Numbers listed on Exhibit A attached hereto  for service with Level 3 Communications, LLC an affiliate of Level 3 Telecom Holdings, LLC (successor in interest to tw telecom holdings, inc.) ("Level 3") (the "Assigned Service(s)"); and

WHEREAS, Assignor desires to assign all of its right, title and interest in the Assigned Service(s) to Assignee as provided herein; and

WHEREAS, Assignee desires to accept the assignment of all the right, title and interest of Assignor in the Assigned Service(s), and to assume and agree to comply with all the obligations that were undertaken by Assignor thereunder as provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Assignor hereby assigns and transfers to Assignee all of the right, title and interest of Assignor in, to and under the Assigned Service(s) effective as of the Effective Date.

2.    Assignee hereby accepts the foregoing assignment of the Assigned Service(s) and does hereby assume and agree to comply with all the obligations that were undertaken by Assignor thereunder.  From and after the Effective Date, the Assigned Service(s) identified in this Agreement shall be governed by and subject to the Master Service Agreement(s) and Service Schedule(s) (if any) between Level 3 and Assignee applicable to such Assigned Service(s).  In the event that Level 3 and Assignee have not executed a Master Service Agreement and/or applicable Service Schedule(s) with respect to such Assigned Service(s), then Level 3's standard Master Service Agreement/Service Schedule(s) (as of the date of this Agreement) shall govern, a copy of which are available upon request.  As a result of the assignment, the Circuit Identification Numbers, Product

Page 1 of 3
© 2011 Level 3 Communications, LLC. All rights reserved.                    Proprietary and Confidential

Orchard Brands Corporation to Bluestem Brands, Inc.

Identification Numbers or other service identifiers may change and such new identifier information will be set forth on invoices for the Assigned Services thereafter.

3.      This Agreement may be executed in counterparts, which together shall constitute a single agreement. This Agreement may be executed and transmitted to any other party by facsimile, and such facsimile shall be deemed to be, and utilized in all respects, as an original, manually executed document.

4.      Assignor and Assignee acknowledge and agree that in the event that either such party does not have an executed Master Service Agreement with Level 3 or any of its affiliates, then any notices, requests, claims, demands and other communications under this Agreement shall be in writing and sent to the address(es) set forth above.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ASSIGNOR:                                      ASSIGNEE:
**Orchard Brands Corporation**                 **Bluestem Brands, Inc.**

By: _____                     By: _____

Printed Name: William Nixon                     Printed Name: Wayne Arnold

Title: VP Technology                            Title: Director of Contracts

## CONSENT TO ASSIGNMENT AND ASSUMPTION AGREEMENT

The undersigned, Level 3 Communications, LLC, hereby consents to the foregoing assignment and transfer by Assignor to Assignee of Assignor's right, title and interest in, to and under the Assigned Service(s) and assumption and agreement by Assignee to comply with all the obligations that were undertaken by Assignor thereunder, relating to the period from and after the Effective Date.

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the _____ day of ___Apr 5, 2016___, 2016.

LEVEL 3 COMMUNICATIONS, LLC

By: _Samantha Leapley (Apr 5, 2016)_____

Printed Name: ___Samantha Leapley_____

Title: ___Vice President, Legal_____

Page 2 of 3
© 2011 Level 3 Communications, LLC. All rights reserved.                      Proprietary and Confidential

Orchard Brands Corporation to Bluestem Brands, Inc.

## EXHIBIT A

| |
|---|
| FRO2005460505CA5 |
| FRO2005460511VCB |
| FRO2005460511VCB |
| FRO2005460511VCE |
| FRO2005460511VCP |
| FRO2005460511VRP |
| FRO2005460535VCB |
| FRO2005460535VCE |
| FRO2005460535VCP |
| FRO2005460535VCP |
| FRO2005460535VRP |
| FRO2005460555CA5 |
| FRO2005460558VCB |
| FRO2005460558VCE |
| FRO2005460558VCP |
| FRO2005460558VCP |
| FRO2005460558VCE |
| FRO2005460505CA5 |
| FRO2005460511VCE |
| FRO2005460511VCP |
| FRO2005460511VRP |
| FRO2005460533CA5 |
| FRO2005460533CA5 |
| FRO2005460535VCB |
| FRO2005460535VCE |
| FRO2005460535VRP |
| FRO2005460555CA5 |
| FRO2005460558VCB |
| FRO2005460558VRP |
| FRO2005460558VRP |
| FRO2005762521SHO |
| FRO2005762521SHO |

© 2011 Level 3 Communications, LLC. All rights reserved.                    Proprietary and Confidential

## ADDENDUM TO CUSTOMER ORDER

This Addendum to Customer Order ("Addendum") is entered into as of the last execution date set forth below (the "Addendum Effective Date") by and between **LEVEL 3 COMMUNICATIONS, LLC** ("Level 3") and **BLUESTEM BRANDS, INC.** ("Customer") and modifies that certain Level 3 Co-location Service Order Form, a copy of which is attached hereto as **Attachment 1** (the "Customer Order"). Capitalized terms used but not defined herein shall have the meanings set forth in the Customer Order or that certain Master Service Agreement referenced therein (as amended or otherwise modified to date, the "Agreement").

**WHEREAS**, the parties desire to revise certain terms of the Customer Order as set forth in this Addendum.

**NOW, THEREFORE**, in consideration of the mutual agreements, covenants and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that the following terms shall apply to the Customer Order as follows:

1. Execution. Contemporaneously with the execution of this Addendum, Customer shall execute and submit to Level 3 the Customer Order.

2. Power. Customer may, upon at least thirty (30) days' written notice to Level 3, reduce the "Total Power MRCs," as noted on the Customer Order, by up to ten percent (10%), but not to exceed a reduction of US $3,574.88, during the Service Term.

3. Remaining Terms in Effect. All remaining terms and conditions set forth in the Customer Order and the Agreement between Level 3 and Customer relating to the Services shall remain in full force and effect, except as modified by the terms of this Addendum.

4. Entire Agreement. This Addendum sets forth the parties complete and final agreement with respect to the matters addressed herein and can only be modified in a writing signed by both parties.

5. Counterparts. This Addendum may be executed in one or more counterparts, all of which taken together shall constitute one instrument. Digital signatures and electronically exchanged copies of signed documents shall be sufficient to bind the parties to this Addendum.

The terms and conditions contemplated herein have been read, are understood, and are hereby accepted as of the Addendum Effective Date.

| **LEVEL 3 COMMUNICATIONS, LLC** ("Level 3") | **BLUESTEM BRANDS, INC.** ("Customer") |
|---|---|
| By _Samantha Leapley (Nov 30, 2016)_ | By _(signature)_ |
| Name  Samantha Leapley | Name  Wayne Arnold |
| Title  Vice President, Legal | Title  Director of Contracts |
| Date  Nov 30, 2016 | Date  11-28-16 |

**ATTACHMENT 1**

THE CUSTOMER ORDER

[*See Attached on Next Page*]



## Co-location Service Order Form

| | | |
|---|---|---|
| Licensee Name: | Bluestem Brands, Inc. | Creation Date  22-Nov-2016 |
| Billing Address: | 7075 Flying Cloud Drive | Account #:  253022 |
| City/State/Zip: | Eden Prairie/MN/55343 | |

| | | | | | |
|---|---|---|---|---|---|
| Market: | Minneapolis, MN | | Site Address: | 5480 Feltl Rd, Minnetonka, MN  55343 | |
| Order Type: | Renewal | | Service Term: | Special Term | Special Term Duration:  18 months |

### Requested Physical Space

| Space Options: | Qty | | | Per Cab/Rack / Sq Ft MRC | | Per Cab/Rack/Sq Ft NRC | Total Space MRC | Total Space NRC |
|---|---|---|---|---|---|---|---|---|
| Common Area Rack/Cabinet(s) | | | | | | | | |
| Sq Ft (Cage) | | | | | | | | |
| LVLT Racks in Caged Space | | | | | | | | |
| Customer Racks in Caged Space | | | | | | | | |

### Requested Power

| Power Options: | Qty Primary AC Power Circuits | Qty Redundant AC Power Circuits | Primary Per Amp MRC | Per Amp NRC | Primary Per Circuit MRC | Redundant Per Circuit MRC | Per Circuit NRC | Total Power MRC | Total Power NRC |
|---|---|---|---|---|---|---|---|---|---|
| 120V 15 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 120V 20 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 120V 30 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 120V ☐ Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| **220V AC Power a.k.a. 208V AC Single Phase Power** | | | | | | | | | |
| 220V 15 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 220V 20 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 220V 30 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 220V ☐ Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| **3-Phase AC Power Circuits:** | | | | | | | | | |
| 208V 15 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 208V 20 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 208V 30 Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| 208V ☐ Amps AC ☐LVLT UPS ☐Customer UPS | | | | | | | | | |
| **DC Power Circuits:** | | | | | | | | | |
| -48V 10 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 15 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 20 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 30 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 40 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 50 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 60 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 70 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 80 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 90 Amps DC (A & B Feed) | | | | | | | | | |
| -48V 100 Amps DC (A & B Feed) | | | | | | | | | |
| **Cross-Connect:** | | | | | | | | | |
| Additional Equipment Charge | | | | | | | | | |

| | | | |
|---|---|---|---|
| Requested Service Total Costs: | | $0.00 | $0.00 |
| Affected Existing Service & Requested Service Total Costs: | | $45,711.80 | |

| Licensee's Allowable Maximum Power Draw Within Co-location Space for Primary Power: | Maximum Allowable Per Square Foot Power Density: | 244 Watts | Maximum Allowable Per Rack / Cabinet Power Density: | 6859 Watts |
|---|---|---|---|---|

**Requested Service Description** *(Requested Colocation service is not an indicator of available inventory)*:

**Sales Notes (Optional):**



## Co-location Service Order Form
### Affected Existing Services Addendum

| Licensee's Existing Space | Qty | | Per Cab/ Rack / Sq Ft MRC | | | Total Space MRC | Space Being Disconnected |
|---|---|---|---|---|---|---|---|
| | | | 5480 Feltl Rd, Minnetonka, MN 55343 | | | | |
| **Existing Space:** | | | | | | | |
| Partial Cabinet | | | | | | | |
| Common Area Rack/Cabinet(s) | | | | | | | |
| Sq Ft (Cage) | 900 | | $11.07 | | | $9,963.00 | |
| LVLT Racks in Caged Space | | | | | | | |
| Customer Racks in Caged Space | 32 | | | | | | |

| | Qty Primary AC Power Circuits | Qty Redundant AC Power Circuits | Primary Per Amp MRC | | Primary Per Circuit MRC | Redundant Per Circuit MRC | Total Power MRC | Circuit Being Disconnected |
|---|---|---|---|---|---|---|---|---|
| Licensee's Existing Power at | | | | 5480 Feltl Rd, Minnetonka, MN 55343 | | | | |
| **Existing Power:** | | | | | | | | |
| 120V 15 Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| 120V 20 Amps AC ☐ LVLT UPS ☐ Customer UPS | 3 | 3 | $12.23 | | $244.56 | $100.00 | $1,033.68 | |
| 120V 30 Amps AC ☐ LVLT UPS ☐ Customer UPS | 2 | 2 | $12.23 | | $230.72 | $100.00 | $681.44 | |
| 120V ☐ Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| 120V ☐ Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| **220V AC Power a.k.a. 208V AC Single Phase Power** | | | | | | | | |
| 220V 15 Amps AC ☐ LVLT UPS ☐ Customer UPS | 1 | 1 | $20.47 | | $307.32 | $100.00 | $407.32 | |
| 220V 20 Amps AC ☐ LVLT UPS ☐ Customer UPS | 2 | 2 | $20.49 | | $409.76 | $100.00 | $1,019.52 | |
| 220V 30 Amps AC ☐ LVLT UPS ☐ Customer UPS | 7 | 7 | $32.58 | | $651.52 | $100.00 | $5,260.64 | |
| 220V 30 Amps AC ☑ LVLT UPS ☐ Customer UPS | 3 | 3 | $30.73 | | $614.64 | $100.00 | $2,143.92 | |
| 220V 60 Amps AC ☐ LVLT UPS ☐ Customer UPS | 1 | 1 | $21.72 | | $1,303.04 | $100.00 | $1,403.04 | |
| 220V 60 Amps AC ☐ LVLT UPS ☐ Customer UPS | 2 | 2 | $21.72 | | $1,465.92 | $112.50 | $3,156.84 | |
| 220V 60 Amps AC ☑ LVLT UPS ☐ Customer UPS | 3 | 3 | $21.72 | | $1,229.28 | $100.00 | $3,987.84 | |
| **3-Phase AC Power Circuits:** | | | | | | | | |
| 208V 15 Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| 208V 20 Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| 208V 30 Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| 208V 60 Amps AC ☐ LVLT UPS ☐ Customer UPS | 8 | 8 | $40.46 | | $1,984.32 | $100.00 | $16,674.56 | |
| 208V ☐ Amps AC ☐ LVLT UPS ☐ Customer UPS | | | | | | | | |
| -48V 10 Amps DC (A & B Feed) | | | | | | | | |
| -48V 15 Amps DC (A & B Feed) | | | | | | | | |
| -48V 20 Amps DC (A & B Feed) | | | | | | | | |
| -48V 30 Amps DC (A & B Feed) | | | | | | | | |
| -48V 40 Amps DC (A & B Feed) | | | | | | | | |
| -48V 50 Amps DC (A & B Feed) | | | | | | | | |
| -48V 60 Amps DC (A & B Feed) | | | | | | | | |
| -48V 70 Amps DC (A & B Feed) | | | | | | | | |
| -48V 80 Amps DC (A & B Feed) | | | | | | | | |
| -48V 90 Amps DC (A & B Feed) | | | | | | | | |
| -48V 100 Amps DC (A & B Feed) | | | | | | | | |
| **Cross-Connect:** | | | | | | | | |
| Additional Equipment Charge | | | | | | | | |
| **Affected Existing Co-location Total Cost:** | | | | | | | $45,711.80 | |

### Existing Service Description:
900 Sq Ft (Cage) , 2-220V 20 Amps AC Primary Circuit w/o UPS, 2-220V 20 Amps AC Redundant Circuit w/o UPS, 3-220V 30 Amps AC Primary Circuit w/ UPS, 3-220V 30 Amps AC Redundant Circuit w/ UPS, 3-220V 60 Amps AC Primary Circuit w/ UPS, 3-220V  Amps AC Redundant Circuit w/ UPS, 8-208V 60 Amps AC Primary 3-Phase Circuit w/o UPS, 8-208V 60 Amps AC Redundant 3-Phase Circuit w/o UPS

### Sales Notes (Optional):

### Terms and Conditions
1. This confidential Customer Order may not be disclosed to third parties and is non-binding until accepted by Level 3 as set forth in section 4.

2. Pricing is generally valid for 90 calendar days from the date indicated unless a different time period is otherwise specified herein.  Prior to installation Level 3 may give written notice to Customer (which may be via e-mail) of price increases due to price changes by off-net suppliers.  Customer has 2 business days following such notice to terminate this Customer Order (without liability) otherwise Customer is deemed to accept the increase. Services may be provided by Level 3 or its affiliates. If any aspect of the Services set forth herein is to be provided internationally, a Local Country Agreement may be required.



**3.** If a generic demarcation point (such as a street address) is provided, the demarcation point for on net services shall be Level 3's Minimum Point of Entry (MPOE) at such location (as determined by Level 3) and off-net demarcation points shall be the off-net vendor's MPOE. If this Customer Order identifies aspects of services which are procured by Customer directly from third parties, Level 3 is not liable for such services.

**4.** Customer places this Customer Order by signing (including electronic or digital signature) or otherwise acknowledging (in a manner acceptable to Level 3) this document and returning it to Level 3. The Service identified in this Customer Order shall be governed by and subject to the Master Service Agreement(s) and Service Schedule(s) (if any) between Level 3 and Customer (or its affiliate if expressly provided for under such affiliate Master Service Agreement) applicable to such Service. If Customer has not executed a Master Services Agreement with Level 3 but has executed a services agreement with an affiliate of Level 3 ("Affiliate Agreement"), then the terms of the most recent such Affiliate Agreement shall apply to the Service herein (to the extent not inconsistent with this Customer Order) provided that in such cases, the current standard Level 3 Service Schedule applicable to the Services shall apply. In the event that Level 3 and Customer have not executed a Master Service Agreement and/or applicable Service Schedule(s) with respect to such Service and have not executed an Affiliate Agreement, then Level 3's standard Master Service Agreement/Service Schedule(s) (as of the date of this Customer Order) shall govern, a copy of which are available upon request. Notwithstanding anything in any Affiliate Agreement to the contrary, Level 3's acceptance of this Order will be evidenced by (and this Order will be binding on both parties upon) the earlier of Level 3's written delivery of a Customer Committed Delivery Date (i.e. the projected installation date) or Level 3's delivery of the requested Service.

**5.** Neither party shall be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Customer Order. Customer's sole remedies for any outage, failures to deliver or defects in Service are contained in the service levels applicable to the affected Service.

**6.** All transport services ordered from Level 3 will be treated as Interstate for regulatory purposes. Customer may certify transport service as being Intrastate (for regulatory purposes only) in a format as required by Level 3, but only where the transport services are sold on a stand-alone basis, the end points for the service are located in the same state and neither end point is a Level 3 provided IP port ("Intrastate Service"). Where Customer requests that services be designated as Intrastate Services, Customer certifies to Level 3 that not more than 10% of Customer's traffic utilizing the Intrastate Services will be originated or terminated outside of the state in which the Intrastate Services are provided. Such election will apply prospectively only, and will apply to all Intrastate Services stated in this Customer Order.

**7.** Charges for certain Services are subject to (a) a property tax surcharge of 4.25% and (b) a cost recovery fee of 3% per month to reimburse Level 3 for various governmental taxes and surcharges. Such charges are subject to change by Level 3 and shall be applied regardless of whether Customer has delivered a valid tax exemption certificate. For additional details on taxes and surcharges that are assessed, visit www.level3.com/taxes.

**8.** Customer will pay Level 3's standard: (i) expedite charges (added to the NRC) if Customer requests a delivery date inside Level 3's standard interval duration (which will be provided by Level 3 upon request and is currently available at https://MyLevel3.net ) and (ii) ancillary charges for additional activities, features or options as set forth in Level 3's ancillary charge summary, a copy of which is available upon request.   If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer for the Service and Customer shall pay such charges which will appear on Customer 's first invoice following the Service Commencement Date.

**9.** For colocation, data center and/or hosting services, pre-arranged escorted access may be required at certain locations, and cross connect services are subject to whether facilities are available at the particular location to complete the connection.

Licensee: **Blumthorn Brands, Inc.**

Signature: _____

Name (printed): _____

Title: _____

Date: 11-28-16



# Bluestem Brands, Inc.-Addendum to Customer Order

Adobe Sign Document History                                    11/30/2016

| | |
|---|---|
| Created: | 11/30/2016 |
| By: | Level 3 Legal Signature (contractcountersignature@level3.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAARE9ou0UQ2Ruf1ABxVByl_0WR-tIQnd5j |

## "Bluestem Brands, Inc.-Addendum to Customer Order" History

Document created by Level 3 Legal Signature (contractcountersignature@level3.com)
11/30/2016 – 8:36:44 AM MST- IP address: 209.244.4.106

Document emailed to Samantha Leapley (samantha.leapley@level3.com) for signature
11/30/2016 – 8:37:17 AM MST

Document viewed by Samantha Leapley (samantha.leapley@level3.com)
11/30/2016 – 8:55:06 AM MST- IP address: 209.244.4.106

Document e-signed by Samantha Leapley (samantha.leapley@level3.com)
Signature Date: 11/30/2016 – 8:56:12 AM MST - Time Source: server- IP address: 209.244.4.106

Signed document emailed to Samantha Leapley (samantha.leapley@level3.com) and Level 3 Legal Signature (contractcountersignature@level3.com)
11/30/2016 – 8:56:12 AM MST

Level (3)

POWERED BY
Adobe Sign

DocuSign Envelope ID: C6A3CC0E-7491-4683-B52A-F89E202F6A9B

## CUSTOMER ORDER ADDENDUM

10/29/2018

This Addendum to Customer Order ("Addendum") is entered into this _____ day of _____, 2018 (the "Addendum Effective Date") by and between **LEVEL 3 COMMUNICATIONS, LLC** ("Level 3") and **BLUESTEM NETWORK, LLC** ("Customer") to reflect additional terms which the parties have agreed shall be applicable to Level 3 Customer Order DID-0000568340 attached hereto as <u>Attachment 1</u> (the "Relevant Customer Order"). The parties agree as follows:

1.  Customer has executed the Relevant Customer Order.

2.  Customer has agreed to pay a flat rate of $6,399.80 (the "Monthly Recurring Charge" or "MRC") for Level 3 HSIP Service. During the first three (3) months of the Service Term, there will be a ramp period (the "Ramp Period"). During the Ramp Period, Level 3 will charge Customer for usage only at $0.64 Mbps ("Usage Charges"). After subtracting that month's aggregate Usage Charges, Level 3 will credit the remaining balance of the Monthly Recurring Charge.

3.  By way of example, if Customer uses 1000 Mbps of bandwidth in month 1 of the Ramp Period, Customer's invoice will look as follows:

    i.   Level 3 will bill a MRC of $6,399.80 to the customer.
    ii.  Level 3 will apply a credit of $5759.80 to the bill
    iii. This credit is calculated as follows: 1000 Mbps of usage x $.64/Mbps equals $640; $6,399.80 minus $640.00 equals a credit of $5759.80.

4.  After month three (3) of the Service Term, the Ramp Period is over and Customer will be responsible for entire $6,399.80 MRC invoiced each month for the balance of the Service Term and during any month to month extension of the Service Term.

5.  All terms and conditions set forth in the Relevant Customer Order shall remain in full force and effect, except as modified by the terms of this Addendum.

These terms and conditions have been read, are understood, and are hereby accepted.

**LEVEL 3 COMMUNICATIONS, LLC ("Level 3")**     **BLUESTEM NETWORK, LLC ("Customer")**

By: _Jeff Knauf_                                 By: _____
    A65294CFAD8C496...

Name: Jeff Knauf                                 Name: Bluestem Network LLC

Title: Sr. Manager, Offer Management             Title: CEO

10/29/2018

Level 3 Communications, L.L.C. Proprietary and Confidential. All rights reserved.

Attachment 1

Document No. DOC-0000568340
Scenario:    SM777231

 CenturyLink·

## Customer Information and Contract Specifications

Customer Name:  Bluestem Network, LLC
Account Number: 2-JHDKWT

Currency:                    USD
Monthly Recurring Charges (MRC): $6,399.80
Non Recurring Charges (NRC):     0

### Service Order

| Service Address | Description | Order Type | Term (Months) | Qty | Unit MRC | Unit NRC | Total MRC | Total NRC |
|---|---|---|---|---|---|---|---|---|
| 208 S 13TH ST, LINCOLN, NE 68508 USA | HSIP Service | New | 66 | 1 | $5,900.00 | | $5,900.00 | |
| | Related Packages Wavelength - IOC | | | | | | | |
| | - Peak Data Rate = 10000 Mbps | | | | | | | |
| | - Routing Type = Standard Full Routes | | | | | | | |
| | - Billing Type = Flat Rate | | | | | | | |
| | - Service Role = Primary | | | | | | | |
| | Subtotal | | | | | | $5,900.00 | $0.00 |
| 208 S 13TH ST, LINCOLN, NE 68508 USA | Wavelength - IOC | New | 66 | 1 | $499.80 | $0.00 | $499.80 | $0.00 |
| | - Bandwidth = 10GIG-E LAN | | | | | | | |
| | - Protection = Unprotected | | | | | | | |
| | A-Side Access | | | 1 | $0.00 | $0.00 | $0.00 | $0.00 |
| | Z-Side Access | | | 1 | $0.00 | $0.00 | $0.00 | $0.00 |
| | IP Port | | | 1 | $0.00 | $0.00 | $0.00 | $0.00 |
| | Subtotal | | | | | | $499.80 | $0.00 |
| | Totals | | | | | | $6,399.80 | $0.00 |

## Terms and Conditions Governing This Order

1. This confidential Order may not be disclosed to third parties and is non-binding until accepted by Level 3 Communications, LLC ("Level 3"), a CenturyLink affiliate, as set forth in section 4.

2. Pricing is valid for 90 calendar days from the date indicated unless otherwise specified herein.  Prior to installation Level 3 may notify Customer in writing (including by e-mail) of price increases due to off-net vendors.  Customer has 2 business days following notice to terminate this Order without liability or otherwise Customer is deemed to accept the increase.  Level 3 provides Services in the United States. Services provided internationally may require a Local Country Agreement that will identify the CenturyLink affiliate providing Services.

3. If a generic demarcation point (such as a street address) is provided, the demarcation point for on-net services will be Level 3's Minimum Point of Entry (MPOE) at such location (as determined by Level 3). Off-net demarcation points will be the off-net vendor's MPOE.  If this Order identifies aspects of services that are procured by Customer directly from third parties, Level 3 is not liable for such services.

Service Order Confidential Page 1 of 3

Level 3 Communications, L.L.C.  Proprietary and Confidential.  All rights reserved.

Document No. DOC-0000568340
Scenario:    SM777231



4. Customer places this Order by signing (including electronically or digitally) or otherwise acknowledging (in a manner acceptable to Level 3) this document and returning it to Level 3.

(a) The Service in this Order is subject to the CenturyLink Master Service Agreement entered into after March 16, 2018 and any applicable Service Schedule(s) between CenturyLink Communications, LLC and Customer. If Customer has not executed a CenturyLink Master Service Agreement but has executed a services agreement (including Standard Terms and Conditions) with Level 3 or an affiliate of Level 3 ("Affiliate Agreement"), then the terms of the most recent Affiliate Agreement will govern this Order. If there are any inconsistencies between the Affiliate Agreement and this Order, the current standard Level 3 Service Schedule will apply. If Level 3 and Customer have not executed a CenturyLink Master Service Agreement or applicable Service Schedule(s) with respect to such Service and have not executed an Affiliate Agreement, CenturyLink's standard Master Service Agreement and Service Schedule(s) as of the date of this Order will govern this Order. Copies are available upon request. The Level 3 entity invoicing the Services is the contracting party.

(b) Notwithstanding anything in any Affiliate Agreement to the contrary, Level 3 will notify Customer of acceptance of requested Service in this Order by delivering (in writing or electronically) the date by which Level 3 will install Service (the "Customer Commit Date"), by delivering the Service, or by the manner described in a Service Schedule. Service will continue month-to-month at the expiration of the Service Term. Rates are subject to change upon 30 days' notice from Level 3.

(c) "Affiliate Agreement" for CenturyLink Communications, LLC or any companies that were affiliates of CenturyLink Communications, LLC before the merger between CenturyLink and Level 3 means only an applicable Interexchange Carrier (IXC) network agreement, e.g. CenturyLink Total Advantage Agreement, CenturyLink Total Advantage Express Agreement, or CenturyLink Wholesale Services Agreement, for non-government customers (each, a CenturyLink Affiliate Agreement). In the event of a CenturyLink Affiliate Agreement, (i) Level 3 will deliver a written or electronic notice that the Service is installed (a "Connection Notice"), at which time billing will commence, and (ii) if Customer cancels or terminates Service for any reason other than Level 3's uncured default or if Level 3 terminates due to Customer's uncured default, Customer will pay Level 3's standard early termination liability charges as identified in Level 3's ancillary charge summary, a copy of which is available upon request.

5. Neither party will be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Order. Customer's sole remedies for any nonperformance, outages, failures to deliver or defects in Service are contained in the service levels applicable to the affected Service.

6. All transport services ordered from Level 3 will be treated as interstate for regulatory purposes. Customer may certify transport service as being intrastate (for regulatory purposes only) in a format as required by Level 3, but only where the transport services are sold on a stand-alone basis, the end points for the service are located in the same state and neither end point is a Level 3 provided IP port ("Intrastate Services"). Where Customer requests that services be designated as Intrastate Services, Customer certifies to Level 3 that not more than 10% of Customer's traffic utilizing the Intrastate Services will be originated or terminated outside of the state in which the Intrastate Services are provided. Such election will apply prospectively only, and will apply to all Intrastate Services stated in this Order.

7. Charges for certain Services are subject to (a) a property tax surcharge of 3.75% and (b) a cost recovery fee of 4.25% per month to reimburse Level 3 for various governmental taxes and surcharges. Such charges are subject to change by Level 3 and shall be applied regardless of whether Customer has delivered a valid tax exemption certificate. For additional details on taxes and surcharges that are assessed, visit www.level3.com/taxes.

8. Customer will pay Level 3's standard: (a) expedite charges (added to the NRC) if Customer requests a delivery date inside Level 3's standard interval duration (available upon request or at https://MyLevel3.net) and (b) ancillary charges for additional activities, features or options as set forth in Level 3's ancillary charge summary, a copy of which is available

Service Order Confidential Page 2 of 3

Level 3 Communications, L.L.C.  Proprietary and Confidential.  All rights reserved.

Document No. DOC-0000568340
Scenario:   SM777231



upon request.  If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer and Customer shall pay such charges.

9. Equipment provided by Level 3 to be located in Customer's premises ("CPE") is subject to the terms of the Customer Premise Equipment Addendum, a copy of which is available upon request.  For colocation, data center and/or hosting services, pre-arranged escorted access may be required at certain locations, and cross connect services are subject to whether facilities are available at the particular location to complete the connection.

10. For Level 3 Internet Services provided in certain countries in the Asia-Pacific region where Level 3 does not currently hold a license to provide such Services Customer consents to Level 3 providing Service by procuring services of third-party carriers as Customer's agent, and Customer appoints Level 3 as its agent to the extent necessary to obtain such Service.  Level 3 is licensed in Hong Kong, Japan, Singapore and Australia.

### Additional Order Terms

**Invoices**
Single prices shown above for bundled Services, or for Services provided at multiple locations, will be allocated among the individual services for the purpose of applying Taxes and regulatory fees and also may be divided on the Customer's invoice by location served.

**Activation Support**
If requested by Customer, and for an additional charge assistance with activating and/or configuring equipment on Customer's side of the Demarcation Point may be provided ("Activation Support").

### Signature Block

| Customer: Bluestem Network, LLC |
| --- |
| Total MRC: $6,399.80 <br> Total NRC: 0 |
| Signature: |
| Name: Gregory A. Dynek |
| Title: CEO |
| Date: 9-28-18 |

Customer and the individual signing above represent that such individual has the authority to bind Customer to this Agreement.

Document Generation Date: 09-06-2018

Service Order  Confidential  Page 3 of 3

Level 3 Communications, L.L.C.  Proprietary and Confidential.  All rights reserved.

**ADDENDUM TO**
**Renewal Order Transaction ID 67943-36-01**

This Addendum to Renewal Order Transaction ID 67943-36-01 ("Addendum") is entered into by and between CenturyLink Communications, LLC ("CenturyLink") and Bluestem Brands, Inc. ("Customer") and is effective upon execution by both Parties. CenturyLink and Customer may be referred to collectively as the "Parties" and individually as a "Party." Capitalized terms that are not defined in this Addendum shall have the meaning set forth in the governing agreement between the Parties.

WHEREAS, contemporaneously with its execution of this Addendum, Customer is executing and delivering Renewal Order Transaction ID 67943-36-01 to CenturyLink in the form attached as Exhibit A (the "Renewal"), and the Parties wish to modify the Service Term for the Renewal Contract as set forth below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties modify the Order as follows:

1.    Notwithstanding the Service Term that is set forth in the Renewal Contract, the Service Term for the Contract Renewal shall be **Twelve (12) Months**. Upon expiration of the 12-month Service Term, Services shall continue on a month-to-month basis at their existing rates for up to thirty-six (36) months. After 36 months, CenturyLink may adjust its rates upon thirty (30) days' written notice. Either Party may terminate any or all Services upon thirty (30) days' notice once they are being provided on a month-to-month basis.

2.    Except as modified above, all other terms and conditions of the Renewal Contract remain in full force and effect. This Addendum shall only apply to the Renewal Contract and shall not apply to any other orders or contracts. If there is a conflict between this Addendum and the Renewal Contract, the terms of this Addendum shall govern. By signing below, each Party acknowledges that it has read, understood, and accepts the terms and conditions set forth in this Addendum.

IN WITNESS WHEREOF, the Parties have executed this Addendum through their respective and duly authorized representatives as of the dates indicated below.

**CenturyLink Communications, LLC**

By: *Jeff Hardegger*
    Jeff Hardegger (Oct 15, 2019)

Name: Jeff Hardegger

Title: Manager, Offer Management

Date: Oct 15, 2019

**Bluestem Brands, Inc.**

By: Marc Kermisch
    CA5BA246A4314F9...

Name: Marc Kermisch

Title: CIO

Date: 10/11/2019

**EXHIBIT A**
**Renewal Order Transaction ID 67943-36-01**

R061549

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

# ✳ CenturyLink

# Renewal Order Form

**Company Name:** Bluestem Brands, Inc.

**BusOrg ID:** 2-YCYZR

**Transaction ID:** 67943-36-01

**Requestor:** Ehlert, Karie (Karie)

**Billing Account Number:** 5-FDNJW2FR

**Currency:** USD

| A Location Address (SCID) | Z Location Address (SCID) | Line Item Description | Product | PIID | SCID | Current Pricing Term Expiration | New Pricing Term Length (months) | On Net/ Off Net | Current Burstable | New Burstable | Current MRC | New MRC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 333771343**SW | 12-May-17 | 36 | | | | $1,228.20 | $1,080.8 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 333771344**SW | 12-May-17 | 36 | | | | $200.00 | $176.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Co-location | Colocation | 1769984 | 5687302**SW | 12-May-17 | 36 | | | | $11,457.45 | $10,082.5 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5919807**SW | 12-May-17 | 36 | | | | $18,255.74 | $16,065.0 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5919862**SW | 12-May-17 | 36 | | | | $1,213.80 | $1,068.0 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927107**SW | 12-May-17 | 36 | | | | $843.73 | $742.48 |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

CenturyLink

| Address | Address | Type | Service | Number | ID | Date | Term | | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927111**SW | 12-May-17 | 36 | | $345.00 | $303.60 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927122**SW | 12-May-17 | 36 | | $530.66 | $466.98 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927142**SW | 12-May-17 | 36 | | $240.00 | $211... |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927230**SW | 12-May-17 | 36 | | $337.50 | $297 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927251**SW | 12-May-17 | 36 | | $112.50 | $99... |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927283**SW | 12-May-17 | 36 | | $942.45 | $829.36 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927354**SW | 12-May-17 | 36 | | $240.00 | $211... |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927505**SW | 12-May-17 | 36 | | $5,244.74 | $4,615.37 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927588**SW | 12-May-17 | 36 | | $805.00 | $708... |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927724**SW | 12-May-17 | 36 | | $2,120.51 | $1,866.05 |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

| Address | Service | Category | Number | Code | Date | Term | | | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927855**SW | 12-May-17 | 36 | | | $316.80 | $360.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927964**SW | 12-May-17 | 36 | | | $1,188.00 | $1,350.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5928168**SW | 12-May-17 | 36 | | | $396.00 | $450.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5928463**SW | 12-May-17 | 36 | | | $2,967.00 | $3,371.62 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5929525**SW | 12-May-17 | 36 | | | $396.00 | $450.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5929607**SW | 12-May-17 | 36 | | | $3,732.10 | $4,241.02 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5933433**SW | 12-May-17 | 36 | | | $396.00 | $450.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Co-location | Colocation | 48/JAGS/108851/ TWICS | 259993**SW | 20-Aug-16 | 36 | | | $4,731.10 | $5,376.25 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | | | | | | | | | **$60,166.17** | **$52,946.2?** |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48



## Summary of Monthly Recurring Charges

**Billing Account Number:**    5-FDNJW2FR

**Total New MRC:**    $52,946.23

**Total Savings:**    $7,219.94

**Currency:**    USD

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

CenturyLink®

## Terms and Conditions

1. This confidential Order may not be disclosed to third parties and is non-binding until accepted by CenturyLink, as set forth in section 2. Customer places this Order by signing (including electronically or digitally) or otherwise acknowledging (in a manner acceptable to CenturyLink) this renewal order and returning it to CenturyLink. Pricing is valid for 90 calendar days from the date indicated unless otherwise specified. The Services identified in this renewal order are renewed subject to the terms and conditions of the Master Service Agreement or Affiliate Agreement governing the Services during their initial term, to the extent not in conflict with these terms. At the expiration of the Service Term, Service will continue month-to-month and rates are subject to change upon 30 days' notice from CenturyLink.

2. Customer-signed renewal order must be received by CenturyLink at least 15 calendar days prior to the start of the next full invoice cycle for the rates to be effective on that following invoice. Otherwise, rates will be effective as of the second full monthly invoice for such Services following receipt by CenturyLink. Acceptance of this renewal order will be evidenced by CenturyLink's implementation of rates or other changes set forth herein.

3. Neither party will be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary, or punitive damages arising out of the performance or failure to perform under this renewal order. Customer's sole remedies for any nonperformance, outages, failures to deliver or defects in Service are contained in the service levels applicable to the affected Service.

4. This renewal order is confidential and may not be disclosed to third parties.

Customer Name: _Marc Kermisch_

Customer Signature: _Marc Kermisch_
C456A346A434F9...

Date: _10/11/2019_

Renewal  Pricing Expires On:        11-Nov-19

67943-36-01

# Agreement Document from CenturyLink

Final Audit Report                                    2019-10-15

| | |
|---|---|
| Created: | 2019-10-14 |
| By: | Nick Gorzek (nick.gorzek@centurylink.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAf9CPpo6BTIRmQFpWc1QmCxJM5e0ix2_M |

## "Agreement Document from CenturyLink" History

📝 Document digitally presigned by DocuSign\, Inc. (techops@docusign.com)
  2019-10-11 - 7:50:11 PM GMT- IP address: 209.244.4.106

📄 Document created by Nick Gorzek (nick.gorzek@centurylink.com)
  2019-10-14 - 8:34:47 PM GMT- IP address: 13.108.254.8

📧 Document emailed to Jeff Hardegger (pomdirectorsignature@centurylink.com) for signature
  2019-10-14 - 8:35:36 PM GMT

📄 Email viewed by Jeff Hardegger (pomdirectorsignature@centurylink.com)
  2019-10-15 - 4:12:10 PM GMT- IP address: 168.215.47.12

📝 Document e-signed by Jeff Hardegger (pomdirectorsignature@centurylink.com)
  Signature Date: 2019-10-15 - 5:46:21 PM GMT - Time Source: server- IP address: 155.70.39.45

✅ Signed document emailed to Jeff Hardegger (pomdirectorsignature@centurylink.com) and Nick Gorzek
  (nick.gorzek@centurylink.com)
  2019-10-15 - 5:46:21 PM GMT

 

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is between Wide Range Broadband ("Assignor"), Bluestem Network, LLC ("Assignee"), and Level 3 Communications, LLC ("CenturyLink"), collectively referred to herein as the "Parties." This Assignment, which will be effective as of June 1, 2020 ("Assignment Effective Date").  Electronic signatures on this Assignment will be accepted only in the form and manner prescribed by CenturyLink.

1.  **Assignment.**  The Assignor transfers and assigns to Assignee all of Assignor's interest in the CenturyLink services identified below ("Assigned Services") commencing as of the Assignment Effective Date.  Assignor will be responsible for payment of all charges due under or related to the Assigned Services until the Assignment Effective Date; Assignor agrees that all such charges have been paid to CenturyLink. Commencing as of the Assignment Effective Date, the Assigned Services will no longer be governed by the service agreement identified below between CenturyLink and Assignor ("Assignor Agreement").

2.  **Assumption.**  Assignee accepts and assumes all of Assignor's interest in the Assigned Services and will be responsible for payment of all charges due under or arising from the Assigned Services as of the Assignment Effective Date. The Assigned Services will be governed by the Master Services Agreement identified below ("Assignee Agreement') upon the Assignment Effective Date. In the event that CenturyLink and Assignee have not executed a Master Service Agreement and/or applicable Service Exhibit(s) or applicable Service Schedule(s) with respect to such Assigned Service(s), then CenturyLink's standard Master Service Agreement/Service Exhibit(s) or Service Schedule(s) as of the Assignment Effective Date will govern the Assigned Services, copies of which are available upon request.  Assignee understands and acknowledges that as a result of the Assignment the account numbers, Circuit Identification Numbers, Product Identification Numbers or other identifiers associated with the Assigned Services may change and that new identifier information may be set forth on invoices for the Assigned Services after the Assignment Effective Date.

3.  **Consent by CenturyLink.**  CenturyLink consents to the assignment of the Assigned Services to Assignee in accordance with the terms and conditions of this Assignment and joins in this Assignment solely for the purpose of acknowledging its consent and approval.

4.  This Assignment may be executed in several counterparts and constitutes one agreement binding on all parties.

| **Assignor:**<br>**Wide Range Broadband** | **Assignee:**<br>**Bluestem Network, LLC** | **CenturyLink:**<br>Level 3 Communications, LLC |
|---|---|---|
| *Aaron Whyrick*<br><span style="color:teal">Aaron Whyrick (May 12, 2020)</span> | *Gregory A. Dynek*<br><span style="color:teal">Gregory A. Dynek (May 12, 2020)</span> | *Kelly Novak*<br><span style="color:teal">Kelly Novak (May 13, 2020)</span> |
| Authorized Signature | Authorized Signature | Authorized Signature |
| Aaron Whyrick | Gregory A. Dynek | Kelly Novak |
| Name Typed or Printed | Name Typed or Printed | Name Typed or Printed |
| President | CEO | Billing Manager |
| Title | Title | Title |
| May 12, 2020 | May 12, 2020 | May 13, 2020 |
| Date | Date | Date |
| **Address for Notices:**<br>7830 Lillybridge Street<br>Lincoln, NE 68506 | **Address for Notices:**<br>1320 P Street<br>Lincoln, NE 68508 | **Address for Notices:**<br>Attn: Credit Department<br>4250 N Fairfax Dr<br>Arlington, VA 22203 |

<u>**ASSIGNMENT AND ASSUMPTION AGREEMENT**</u>

**Assigned Services:**
 BDJJ4841
 BBSJ20200
 BBSJ20201
 BBSJ20202
 BBSJ20204
 BDJJ4842
 BDFZ6451
 BBRK63690
 BBRK63691
 BBRK63692
 BBRK63695
 BDFZ6453

# Wide Range Broadband to Bluestem Network LLC A&A

Final Audit Report                                        2020-05-13

| | |
|---|---|
| Created: | 2020-05-12 |
| By: | Lyndsay Fritchell (lyndsay.fritchell@centurylink.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAqgtmrZj9pjGZmW3AheMV7QDuQ_g3k5Cz |

## "Wide Range Broadband to Bluestem Network LLC A&A" History

Document created by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-12 - 8:32:25 PM GMT- IP address: 4.68.55.116

Document emailed to Aaron Whyrick (akwhyrick@gmail.com) for signature
2020-05-12 - 8:34:26 PM GMT

Email viewed by Aaron Whyrick (akwhyrick@gmail.com)
2020-05-12 - 9:08:14 PM GMT- IP address: 66.102.6.19

Document e-signed by Aaron Whyrick (akwhyrick@gmail.com)
Signature Date: 2020-05-12 - 11:31:59 PM GMT - Time Source: server- IP address: 104.218.66.59

Document emailed to Gregory A. Dynek (greg.dynek@bluestemnetwork.com) for signature
2020-05-12 - 11:32:01 PM GMT

Email viewed by Gregory A. Dynek (greg.dynek@bluestemnetwork.com)
2020-05-13 - 2:29:41 AM GMT- IP address: 66.102.6.17

Document e-signed by Gregory A. Dynek (greg.dynek@bluestemnetwork.com)
Signature Date: 2020-05-13 - 2:30:16 AM GMT - Time Source: server- IP address: 104.218.69.127

Document emailed to Lyndsay Fritchell (lyndsay.fritchell@centurylink.com) for delegation
2020-05-13 - 2:30:18 AM GMT

Email viewed by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-13 - 12:40:44 PM GMT- IP address: 168.215.47.12

Document signing delegated to Kelly Novak (kelly.novak@centurylink.com) by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-13 - 12:41:12 PM GMT- IP address: 168.215.47.12

 

Document emailed to Kelly Novak (kelly.novak@centurylink.com) for signature
2020-05-13 - 12:41:12 PM GMT

Email viewed by Kelly Novak (kelly.novak@centurylink.com)
2020-05-13 - 1:17:34 PM GMT- IP address: 4.68.55.116

Document e-signed by Kelly Novak (kelly.novak@centurylink.com)
Signature Date: 2020-05-13 - 1:17:46 PM GMT - Time Source: server- IP address: 4.68.55.116

Signed document emailed to all eligible parties.
2020-05-13 - 1:17:46 PM GMT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is between Wide Range Broadband ("Assignor"), Bluestem Network, LLC ("Assignee"), and Level 3 Communications, LLC ("CenturyLink"), collectively referred to herein as the "Parties." This Assignment, which will be effective as of June 1, 2020 ("Assignment Effective Date"). Electronic signatures on this Assignment will be accepted only in the form and manner prescribed by CenturyLink.

1. **Assignment.** The Assignor transfers and assigns to Assignee all of Assignor's interest in the CenturyLink services identified below ("Assigned Services") commencing as of the Assignment Effective Date. Assignor will be responsible for payment of all charges due under or related to the Assigned Services until the Assignment Effective Date; Assignor agrees that all such charges have been paid to CenturyLink. Commencing as of the Assignment Effective Date, the Assigned Services will no longer be governed by the service agreement identified below between CenturyLink and Assignor ("Assignor Agreement").

2. **Assumption.** Assignee accepts and assumes all of Assignor's interest in the Assigned Services and will be responsible for payment of all charges due under or arising from the Assigned Services as of the Assignment Effective Date. The Assigned Services will be governed by the Master Services Agreement identified below ("Assignee Agreement') upon the Assignment Effective Date. In the event that CenturyLink and Assignee have not executed a Master Service Agreement and/or applicable Service Exhibit(s) or applicable Service Schedule(s) with respect to such Assigned Service(s), then CenturyLink's standard Master Service Agreement/Service Exhibit(s) or Service Schedule(s) as of the Assignment Effective Date will govern the Assigned Services, copies of which are available upon request. Assignee understands and acknowledges that as a result of the Assignment the account numbers, Circuit Identification Numbers, Product Identification Numbers or other identifiers associated with the Assigned Services may change and that new identifier information may be set forth on invoices for the Assigned Services after the Assignment Effective Date.

3. **Consent by CenturyLink.** CenturyLink consents to the assignment of the Assigned Services to Assignee in accordance with the terms and conditions of this Assignment and joins in this Assignment solely for the purpose of acknowledging its consent and approval.

4. This Assignment may be executed in several counterparts and constitutes one agreement binding on all parties.

| **Assignor:** | **Assignee:** | **CenturyLink:** |
|---|---|---|
| **Wide Range Broadband** | **Bluestem Network, LLC** | Level 3 Communications, LLC |

| *Aaron Whyrick* | *Gregory A. Dynek* | *Kelly Novak* |
|---|---|---|
| Aaron Whyrick (May 12, 2020) | Gregory Dynek (May 12, 2020) | Kelly Novak (May 13, 2020) |
| Authorized Signature | Authorized Signature | Authorized Signature |
| Aaron Whyrick | Gregory A. Dynek | Kelly Novak |
| Name Typed or Printed | Name Typed or Printed | Name Typed or Printed |
| President | CEO | Billing Manager |
| Title | Title | Title |
| May 12, 2020 | May 12, 2020 | May 13, 2020 |
| Date | Date | Date |
| **Address for Notices:** | **Address for Notices:** | **Address for Notices:** |
| 7830 Lillybridge Street | 1320 P Street | Attn: Credit Department |
| Lincoln, NE 68506 | Lincoln, NE 68508 | 4250 N Fairfax Dr |
| | | Arlington, VA 22203 |

<u>**ASSIGNMENT AND ASSUMPTION AGREEMENT**</u>

**Assigned Services:**
BDJJ4841
BBSJ20200
BBSJ20201
BBSJ20202
BBSJ20204
BDJJ4842
BDFZ6451
BBRK63690
BBRK63691
BBRK63692
BBRK63695
BDFZ6453

# Wide Range Broadband to Bluestem Network LLC A&A

Final Audit Report                                                2020-05-13

| | |
|---|---|
| Created: | 2020-05-12 |
| By: | Lyndsay Fritchell (lyndsay.fritchell@centurylink.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAqgtmrZj9pjGZmW3AheMV7QDuQ_g3k5Cz |

## "Wide Range Broadband to Bluestem Network LLC A&A" History

Document created by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-12 - 8:32:25 PM GMT- IP address: 4.68.55.116

Document emailed to Aaron Whyrick (akwhyrick@gmail.com) for signature
2020-05-12 - 8:34:26 PM GMT

Email viewed by Aaron Whyrick (akwhyrick@gmail.com)
2020-05-12 - 9:08:14 PM GMT- IP address: 66.102.6.19

Document e-signed by Aaron Whyrick (akwhyrick@gmail.com)
Signature Date: 2020-05-12 - 11:31:59 PM GMT - Time Source: server- IP address: 104.218.66.59

Document emailed to Gregory A. Dynek (greg.dynek@bluestemnetwork.com) for signature
2020-05-12 - 11:32:01 PM GMT

Email viewed by Gregory A. Dynek (greg.dynek@bluestemnetwork.com)
2020-05-13 - 2:29:41 AM GMT- IP address: 66.102.6.17

Document e-signed by Gregory A. Dynek (greg.dynek@bluestemnetwork.com)
Signature Date: 2020-05-13 - 2:30:16 AM GMT - Time Source: server- IP address: 104.218.69.127

Document emailed to Lyndsay Fritchell (lyndsay.fritchell@centurylink.com) for delegation
2020-05-13 - 2:30:18 AM GMT

Email viewed by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-13 - 12:40:44 PM GMT- IP address: 168.215.47.12

Document signing delegated to Kelly Novak (kelly.novak@centurylink.com) by Lyndsay Fritchell (lyndsay.fritchell@centurylink.com)
2020-05-13 - 12:41:12 PM GMT- IP address: 168.215.47.12

 

Document emailed to Kelly Novak (kelly.novak@centurylink.com) for signature
2020-05-13 - 12:41:12 PM GMT

Email viewed by Kelly Novak (kelly.novak@centurylink.com)
2020-05-13 - 1:17:34 PM GMT- IP address: 4.68.55.116

Document e-signed by Kelly Novak (kelly.novak@centurylink.com)
Signature Date: 2020-05-13 - 1:17:46 PM GMT - Time Source: server- IP address: 4.68.55.116

Signed document emailed to all eligible parties.
2020-05-13 - 1:17:46 PM GMT

⇒ To avoid processing delays, a completed <u>OM Contract Cover Sheet</u> must be included w/ 2 customer-signed original contracts, including all exhibits, when sent to Contract Management. Please be sure to select your Director for proper contract return.

⇒ In addition to sending this Cover Sheet and Order Package to OM, a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

❑ Sales Executive complete this information (**REQUIRED** INFORMATION IS IN THE FIRST COLUMN):

| Customer Name | OMR # / OM Analyst | Contract # | TERM/Monthly $ value of contract | Must list Customer Acct # if available | Opportunity ID # | iLink Content ID # |
|---|---|---|---|---|---|---|
| Appleseed's Topco, Inc. | 128380/ Eric Grieger | 195027 | 2 yr/ $44k commit, $150k revenue | 58623945 (multiple) | 5596792 | |

| Sales Executive Information | Sales Executive Address & Phone # |
|---|---|
| Name: Kevin Lambert          Sales ID#ASZP<br>Sales office code:    **NAMAEDIS**    (see list below and choose one)<br>e-mail address: kevin.lambert@qwest.com | Office Address:379 Thornall Street, 12th Floor, Edison NJ 08837<br>Telephone No: 732.767.5668 |

❑ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.** Choose the appropriate Sales Office Codes described on the list attached to this coversheet (page 2).

❑ **Sales Executive** check appropriate Director with an **X** from address list below in OM Group "Step A".

❑ **Sales Office Admin or Sales Executive Task** Overnight this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". Before sending the contract, review for hand written changes (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the overnight tracking number below on Page 2. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit.

| Step A: Select Your Director | | | | Step B: Overnight to this Director's Admin | |
|---|---|---|---|---|---|
| Sales Place "X" Here | Director | VP | | OMR Admin Name & Phone | Admin's Address |
| ❑<br>❑<br>❑<br>❑ | Chris Hansen<br>Lezlee Nuesca<br>Beverly McGill<br>Kevin Watson | Richard McGuire | ➡ | Sherry Roman<br>847.318.4051 | Qwest Communications Corp.<br>6250 N River Rd, Suite 12-100<br>Rosemont, IL 60018 |
| ❑<br>❑<br>❑<br>❑<br>❑ | Frank Bowdon<br>Kathy Sullivan - PA<br>Kathy Sullivan - NJ<br>Gary Phillips<br>Jim Intoccio | Richard McGuire | ➡ | Stacey Mehlhose<br>248.223.5851 | Qwest Communications Corp.<br>20750 Civic Center Dr, Suite 600<br>Southfield, MI 48076 |
| ❑<br>❑<br>❑ | Bill Hooper<br>Hector Grado<br>Jeff Waters | Richard McGuire | ➡ | Sylvia Duque<br>713.479.5944 | Qwest Communications Corp.<br>1 E Greenway Plz<br>Houston, TX 77046 |
| ❑<br>❑<br>❑<br>❑ | John Dinneny<br>Chris Cella<br>Souza (JP Morgan)<br>Open (AOL) | Richard McGuire | ➡ | Dorine Temple<br>212.692.6663 | Qwest Communications Corp.<br>546 – 5th Avenue, 11th Floor<br>New York, NY 10036 |
| ❑<br>❑<br>❑<br>❑<br>❑<br>❑<br>❑ | Tyler Middleton<br>IBM<br>Rick Christensen<br>Ken Smith<br>Tina Smith<br>Marjorie Fredd<br>Mike Stepan<br>Ann Newton Cane | Chris Ancell | ➡ | Victoria Rasho<br>303.391.8589 | Qwest Communications Corp.<br>1801 California St., 17th Floor<br>Denver, CO 80202 |
| ❑ | Kim Baker | Chris Ancell | ➡ | Judy Campo<br>206.224.1170 | Qwest Communications Corp.<br>Room 1914<br>1600 7th Ave, Suite 2000<br>Seattle, WA 98191 |
| ❑ | Dave Hogan | Chris Ancell | ➡ | Michelle Schaefer<br>206.224.1125 | Qwest Communications Corp.<br>3245 – 146th Place SE<br>Suite 130<br>Bellevue, WA 98007 |
| ❑<br>❑<br>❑ | Jason Childs<br>Tom Robone<br>John Cataldo | Chris Ancell | ➡ | Karima Samuel<br>213.996.7517 | Qwest Communications Corp.<br>707 Wilshire Blvd, 15th Floor<br>Los Angeles, CA 90017 |

Date sent (and overnight tracking number if applicable – regular mail is fine in most cases) :

# QWEST TOTAL ADVANTAGE® AGREEMENT – Option Z
## Annual Assessment

This Qwest Total Advantage Agreement ("Agreement") is between Qwest Communications Corporation including its subsidiaries ("Qwest" or "QCC") and Appleseeds Topco, Inc. ("Customer") and is effective on the date QCC signs it ("Effective Date"). If Qwest Interprise America, Inc.'s ("QIA") Select Advantage™ are attached to this Agreement, the QCC signature on this Agreement means that QCC is acting as QIA's agent for those terms. The offer contained in this document is only valid through May 31, 2007 and will expire if Customer does not execute and deliver the Agreement to QCC on or before that date. This Agreement replaces and supersedes the Qwest Total Advantage by and between Qwest and Haband originally signed by Haband on October 28, 2004 (the "Haband Agreement") and all services provided by Qwest pursuant to the Haband Agreement shall, as of the Effective Date, be provided pursuant to the terms and conditions of this Agreement

| CUSTOMER: Appleseeds Topco, Inc/ | QWEST COMMUNICATIONS CORPORATION |
|---|---|
| By: _Margaret M Donahue_ | By: _Dorine Temple_ |
| Name: _Margaret M Donahue_ | Name: _Dorine Temple on behalf of Stephen Brinkmann_ |
| Title: _VP Customer Care_ | Title: ___Director – Offer Management___ |
| Date: _29 May 2007_ | Date: ___6/01/07___ |

1. Services. QCC will provide, and Customer will purchase, the services ("Services") set forth in service exhibits ("Service Exhibits") and/or the QIA Select Advantage Terms ("Select Terms") attached hereto. Customer agrees that it will not resell the Services and that its use of the Services will comply with all applicable laws. Qwest will provide Service if: (a) there is a valid, accurate, and complete Order Form submitted by Customer; (b) adequate capacity is available; and (c) Qwest accepts the Order Form. Qwest may change features or functions of its Services; for material changes, Qwest will provide 30 days prior written notice, but may provide a shorter notice period if the change is based upon Regulatory Activity. The Service Exhibits attached hereto as of the Effective Date are:

- DOMESTIC VOICE SERVICE EXHIBIT
- INTERNATIONAL VOICE SERVICE EXHIBIT
- DOMESTIC FRAME RELAY SERVICE EXHIBIT
- DOMESTIC PRIVATE LINE SERVICE EXHIBIT
- DOMESTIC QWEST iQ NETWORKING SERVICE EXHIBIT
- LOCAL ACCESS SERVICE EXHIBIT & PRICING ATTACHMENT
- QWEST INTERPRISE AMERICA, INC. SELECT ADVANTAGE™ TERMS
- INTEGRATED MANAGEMENT SERVICE EXHIBIT
- PRIVATE ROUTED NETWORK SERVICE EXHIBIT

2. Term; Commitment. Customer's "Revenue Commitment" and "Initial Term" are: $530,000/year; two years following the Ramp Period (as defined below), total for all Service Exhibits listed in Section 1; (Code: 193027). Customer may at its option extend the Agreement for two additional one (1) year terms (each a "Renewal Term") at the same terms, conditions and rates. If not terminated earlier in accordance with this Agreement by providing Qwest with written notice of such intent no later than thirty (30) days prior to the expiration of the Initial Term or Renewal Term, as applicable.

Qwest reserves the right to modify rates and charges and will provide as much prior written notice as practicable but not less than 14 calendar days' notice in order to recover amounts it is required or permitted by governmental or quasi-governmental authorities to collect on their behalf or to pay to others in support of statutory or regulatory programs ("Governmental Charges"). Any imposition of or adjustment to rates or charges under this section will be applied to Customer in a non-discriminatory manner which is consistent with other similarly-situated Qwest customers. Examples include, but are not limited to Universal Service funding and compensation payable to payphone service providers for use of their payphones to access Qwest's service. All charges are exclusive of applicable Taxes, which Customer shall pay.

The Ramp Period, Initial Term and each Renewal Term are referred to as the "Term." The parties agree that any reference to "QTA Discount" in a Service Exhibit containing Net Rates will be disregarded, and the rates set forth in the Service Exhibit are in lieu of all other rates, discounts, or promotions  If Customer terminates a Service that counts toward Customer's Contributory Charges pursuant to an express termination right in an SLA, for Cause or for an Unexpected Event or Force Majeure Event or as otherwise expressly provided in this Agreement, Service Exhibit or a separate agreement for such Service and it causes a Shortfall charge, then Qwest will deduct the Shortfall Reduction Amount from any Shortfall charge incurred after the affected Service has been terminated. This provision does not apply if Customer terminates a Service for Convenience.

3.      Contributory Charges. Following an initial 3 month ramp period from the Effective Date ("Ramp Period"), Customer's aggregate Contributory Charges must equal or exceed the Revenue Commitment during each Measurement Period. The Initial Term will begin upon the end of the Ramp Period.   Customer's aggregate Contributory Charges must equal or exceed the Revenue Commitment during each Measurement Period. Customer authorizes QCC, its Affiliates, or its agents to use billing information to measure Customer's Revenue Commitment. If Customer fails to meet its Revenue Commitment, Customer must pay QCC a Shortfall charge.

4.      Payment. Customer must pay QCC all charges within 30 days from the invoice date. Any amount not paid when due will be subject to late interest of 1% per month. Customer must also pay QCC any applicable Taxes assessed in connection with Customer's Services. Taxes are subject to change. QCC may reasonably modify the payment terms or require other assurance of payment based on Customer's payment history or a material and adverse change in Customer's financial condition. Qwest may assess a separate

| CMR#: 128380 | Page 1 of 38 | Copyright © 2007 Qwest. All Rights Reserved |
| Contract Code: 195027 | CONFIDENTIAL | CGT v1.030207 |

**ADVANTAGE® ADDENDUM**
**Annual Assessment**

dispatch fee for Customer-requested technician visits for problems not caused by Qwest facilities or equipment. Any requested repairs of Customer's facilities or equipment are not included in the dispatch fee and will be charged on a time-and-materials basis.

Portions of invoices subject to bona fide disputes that are under investigation by Qwest or subject to dispute resolution as described below shall be payable in accordance with the provisions below. The undisputed portions of any invoice may not be withheld. Any invoiced amount not Disputed within twelve (12) months of the invoice date is deemed to be correct and binding on Customer. Customer shall not be responsible for payment of amounts not invoiced within twelve months of the date charges were incurred.

In the event that Customer reasonably determines that there is a discrepancy between Qwest's invoiced charges and Customer's calculation of charges owed, Customer may withhold the disputed amount from its payment; provided, however, Customer must provide notice to Qwest (directed to Customer's Qwest account manager or Customer's Qwest regional sales director), with supporting documentation illustrating the basis for such bona fide dispute together with its partial payment for undisputed amounts. In the event of a bona fide dispute over a charge specifically identified by Customer through written notice to Qwest described above:

Payment of the identified Disputed amount will not be considered past due and no interest will be charged for non-payment of such Disputed amounts, pending investigation by Qwest. Upon completion of Qwest's investigation of such Disputed charge, Qwest will advise Customer of the results of the investigation and will make such adjustments as deemed appropriate in Qwest's reasonable discretion. Payment of any Disputed charges that are determined to be correct by the parties as a result of such investigation shall be considered past due if not paid in full promptly after completion of the Qwest investigation; and if Customer still disputes the amount and invokes the procedures for Dispute Resolution under of this Agreement, in the event that Qwest reasonably determines that the Customer's financial condition is such that the Customer's ability to pay is in reasonable doubt, Customer shall promptly submit reasonable security for payment of any withheld amounts upon demand by Qwest. The maximum amount the Customer may withhold at any point in time pursuant to this provision shall not in the aggregate exceed the greater of $100,000 or three (3) months average charges for Services whose charges are subject to dispute. Customer shall pay any disputed amounts that exceed the foregoing threshold to Qwest under protest, without waiving any of the Customer's rights to recover such disputed amounts. Provided that Customer pays all amounts that exceed the limit and provides security if reasonably requested by Qwest consistent with this provision, Qwest shall continue to provide the affected Service. Upon resolution of the dispute, the money withheld by Customer and paid under protest, shall be distributed to the parties consistent with the resolution of the dispute.

**4.1 Audit.** Not more than once each year during the Term and any Renewal Term, Customer may, at its own expense, audit Qwest's relevant billing records for purposes of ascertaining the accuracy of Qwest's invoices, and Qwest will provide reasonable cooperation with such audit. If any billing errors are discovered in the course of such an audit and confirmed by Qwest, such errors will be promptly corrected by Qwest. To the extent there are net overcharges, Qwest shall remit the overcharges to Customer. To the extent there are net undercharges, Customer shall remit the difference to Qwest. Customer may employ a third party to conduct such an audit, provided that: (a) such third party first executes an appropriate confidentiality agreement acceptable to Qwest; and (b) such third party is not a competitor of Qwest or a party reasonably suspected by Qwest of having defaulted on other confidentiality obligations owed to Qwest.

**5. Disclaimer of Warranties.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN A SERVICE EXHIBIT, QWEST DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF TITLE, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN A SERVICE EXHIBIT, CUSTOMER ASSUMES TOTAL RESPONSIBILITY FOR USE OF THE SERVICES. QCC DISCLAIMS: (A) ANY LIABILITY FOR LOSS, DAMAGE, OR INJURY TO ANY PARTY AS A RESULT OF ANY CPE; AND (B) ALL WARRANTIES FOR CPE.

**6.      Limitation of Liability.**

**6.1** NEITHER PARTY, ITS AFFILIATES, AGENTS, OR CONTRACTORS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, RELIANCE, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR FOR ANY LOST PROFITS OR REVENUES OR LOST DATA OR COSTS OF COVER RELATING TO THE SERVICES OR THIS AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH LIABILITY IS ASSERTED. WITH REGARD TO ANY SERVICE-RELATED CLAIM BY CUSTOMER FOR DAMAGES THAT IS NOT LIMITED BY THE PRECEDING SENTENCE, CUSTOMER'S EXCLUSIVE REMEDIES FOR SUCH CLAIM WILL BE LIMITED TO: (A) THOSE REMEDIES SET FORTH IN THE APPLICABLE SERVICE LEVEL AGREEMENT; OR (B) IF NO SERVICE LEVEL AGREEMENT EXISTS, THE TOTAL MRCs OR USAGE CHARGES PAID BY CUSTOMER TO QCC FOR THE AFFECTED SERVICE IN THE THREE MONTHS IMMEDIATELY PRECEDING THE OCCURRENCE OF THE EVENT GIVING RISE TO THE CLAIM. EACH PARTY'S TOTAL AGGREGATE LIABILITY RELATED TO THIS AGREEMENT WILL NOT EXCEED THE TOTAL MRCs AND USAGE CHARGES PAID BY CUSTOMER TO QCC UNDER THIS AGREEMENT IN THE THREE MONTHS IMMEDIATELY PRECEDING THE OCCURRENCE OF THE EVENT GIVING RISE TO THE CLAIM ("DAMAGE CAP"). THIS LIMITATION OF LAIBILITY AND DAMAGE CAP WILL NOT APPLY TO A PARTY'S INDEMNIFICATION OBLIGATIONS AND DOES NOT APPLY TO CUSTOMER'S PAYMENT OBLIGATION FOR CHARGES UNDER THIS AGREEMENT (E.G. SERVICE CHARGES, TAXES, SHORTFALL CHARGES, AND CANCELLATION CHARGES).

6.2 Any claim relating to this Agreement must be brought within two years after the claim arises.

**7. Personal Injury, Death, and Property Damage.** Each party will be responsible to the other party for the actual, physical damages directly caused by its negligent acts or omissions in the course of its performance under this Agreement, limited to damages resulting from personal injury or death to a party's employees and loss or damage to a party's personal tangible property. Damages under this Section will be subject to the limitation of liability in this Agreement, but not the Damage Cap.

8. **Indemnification.**

8.1     Each party will defend and indemnify the other party, its Affiliates, agents, and contractors against all third party claims, liabilities, costs, and expenses, including reasonable attorneys' fees, involving personal injury or death to persons or loss or damage to personal tangible property resulting from the gross negligence or willful misconduct of the indemnifying party.  Customer will also defend and indemnify QCC, its Affiliates, agents, and contractors against all third party claims, liabilities, costs, and expenses, including reasonable attorneys' fees, related to the modification or resale of the Services by Customer or End Users, or any AUP violation.

8.2     **Intellectual Property Indemnification by Qwest.**  As provided in this subsection, and except as provided in a Service Exhibit, Qwest will indemnify, defend and hold Customer harmless against any third party claim, allegation or suit against Customer alleging that any Qwest Service furnished under this Agreement infringes any United States patent issued as of the Effective Date, infringes any United States copyright, or misappropriates any trade secret (the "Allegation").

Qwest's entire obligation to indemnify, defend and hold customer harmless shall be limited to: (1) defending Customer against the Allegation; and (2) paying all damages and costs that by final judgment are assessed against Customer due to the Allegation.  At Qwest's option and expense, Qwest may settle the Allegation.

Qwest's obligations are expressly conditioned upon the following: (1) Customer will promptly notify Qwest in writing of the Allegation; (2) Qwest will have sole control of the defense or settlement; and (3) Customer will cooperate with Qwest in a reasonable way to facilitate the settlement or defense.

Qwest shall have no obligation under this paragraph for any Allegation that arises from: (1) modifications to the Qwest Services made by Customer or at Customer's request; (2) use of the Qwest Services except in conformance to all instructions and documentation; (3) combinations of Qwest Services with products or services provided by Customer or third parties; or (4) transmission of non-Qwest supplied content, data, or other information.

If, in Qwest's reasonable judgment, it is appropriate to mitigate potential damages which may result from the Allegation, Qwest may: (1) procure for Customer the right to continue using the Qwest Service; (2) replace or modify the Qwest Service to provide Customer with a non-infringing service of like quality and features; or (3) if (1) or (2) are not reasonably achievable, terminate provision of the affected Qwest Service.

THIS SUBSECTION SETS FORTH THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER, AND THE ENTIRE OBLIGATION AND LIABILITY OF QWEST, AS TO ANY CLAIMS OF INFRINGEMENT OR MISAPPROPRIATION OF THIRD PARTY PROPRIETARY RIGHTS IN CONNECTION WITH ANY SERVICES PROVIDED HEREUNDER.

9. **Termination.**

9.1     **Service; Service Exhibit.**  Customer may terminate an individual Service or a Service Exhibit and all Service provided under that Service Exhibit for any reason with 60 days prior written notice to QCC . If Service or a Service Exhibit is terminated prior to the expiration of any Service's minimum service period set forth in that  Service Exhibit, then Customer will pay Cancellation Charges (except if Customer terminates for Cause) .  Cancellation Charges count as Contributory Charges.  Customer will remain liable for charges accrued but unpaid as of the termination date.

9.2     **Agreement.**  Either party may terminate this Agreement and all QCC Service: (a) by providing written notice to the other party at least 60 days prior to the expiration of the then current Initial Term or at least 30 days prior to the expiration of a Renewal Term; or (b) for Cause.  If Customer terminates this Agreement for Cause, Qwest shall continue to provide the discontinued Services for at least 120 days pursuant to the rates terms and conditions herein except the Revenue Commitment shall not apply.  Cause exists to terminate this Agreement where there is Cause to terminate all or substantially all of the Services in accordance with the applicable service level agreements or Service Exhibits.  If Customer terminates an Exhibit or a Service for Cause Qwest shall continue to provide the discontinued Service for at least 120 days pursuant to the rates terms and conditions herein.  For Service terminated by Customer for Cause, the Revenue Commitment will be reduced by an amount equal to the average monthly charge  (based upon the monthly recurring charges paid by Customer in the three months prior to such termination)for the discontinued Service as appropriate  over the remaining Term. If the Customer terminates the Agreement for Convenience or QCC terminates it for Cause prior to the conclusion of the Term, then Customer will pay the Early Termination Charge (if the Agreement is terminated in the Initial Term or any Renewal Term) and any applicable Cancellation Charges described above. Cancellation Charges are deducted from the Early Termination Charge.

10.     **CPNI.**  Qwest is required by law to treat CPNI confidentially. Subject to its right to permit disclosure at a later date, Customer directs that Qwest may not share CPNI within its business operations (e.g., wireless, local, long distance, and broadband services divisions), and with businesses acting on Qwest's behalf, to determine if Customer could benefit from the wide variety of Qwest products and services, and in its marketing and sales activities.  Customer may grant authorization at any time by informing Qwest in writing  Customer's decision regarding Qwest's use of CPNI will not affect the quality of service Qwest provides Customer.

11.     **Confidentiality; Publicity.**  During the Term of this Agreement and for two years thereafter. Neither party will, without the prior written consent of the other party: (a) disclose any of the terms of this Agreement or use the name or marks of the other party or its Affiliates; or (b) disclose or use (except as expressly permitted by, or required to achieve the purposes of, this Agreement) the Confidential Information of the other party.  Qwest's consent may only be given by its Legal Department.  A party may disclose Confidential Information if required to do so by a governmental agency, by operation of law, or if necessary in any proceeding to

OMR#: 128380
Contract Code: 195027
Page 3 of 38
CONFIDENTIAL
Copyright © 2007 Qwest. All Rights Reserved
CGT v1.030207

establish rights or obligations under this Agreement, provided that the disclosing party gives the non-disclosing party reasonable prior written notice.

**12. Governing Law; Dispute Resolution.** Colorado state law, without regard to choice-of-law principles, governs all matters relating to this Agreement.

**12.1 Informal Dispute Resolution.** If a dispute arises between Customer and Qwest that cannot be resolved at the operating level of the parties involved, the disagreement will be submitted to the following dispute resolution process: the aggrieved party will provide notice of its request for informal dispute, and will explain and submit the dispute to the other party. The operating level of each party will escalate the submitted dispute to t the appropriate director or manager level (as applicable). For example, for Qwest, to the Qwest Regional Director for the appropriate administrative location ("Regional Director"). The Regional Director shall meet with Customer's Representative, who shall be a senior Corporate staff person not directly involved in the day to day administration of the Agreement, and the two parties shall work to resolve the dispute with ten (10) business days of submission of the dispute. If the these individuals cannot resolve the dispute, the dispute shall be escalated to the Vice President or Regional Vice President ("Vice President") for Qwest and a comparable corporate staff person of Customer whereby these individuals, or their fully authorized designee, of each party shall meet to resolve the dispute within ten (10) business days. If the parties determine: (a) that irreconcilable differences still exist at the end of this period; or (b) that resolution cannot be accomplished, unless both parties agree to extend the time to resolve the dispute, the parties may pursue formal proceedings.

**12.2 Formal Dispute Resolution.** Except as described in Section 15.1 above, any controversy, claim or dispute arising out of or relating to this Agreement, other than claims relating to indemnification and equitable relief, that are not resolved amicably by the parties directly, shall be settled or resolved by final and binding arbitration conducted at a mutually agreed location by a single arbitrator in accordance with this Agreement and the then current Commercial Arbitration Rules of the American Arbitration Association. The decision of the arbitrator shall be based upon this Agreement and applicable law. Each party shall bear its own expenses and the parties shall equally share the filing and other administrative fees of the AAA and the expenses of the arbitrator, except that the arbitrator shall be entitled to award a different allocation of costs and fees where the arbitrator determines that a filed claim is frivolous. The decision of the arbitrator shall be reduced to writing, shall be final and binding and may be entered in any court having jurisdiction thereof. In all arbitrations, the arbitrator must give effect to applicable statutes of limitation subject to limitation of actions terms set forth in this Agreement and shall not have authority to award relief in excess of what this Agreement provides, to award punitive damages, or to order consolidation or class arbitrations. The parties agree that any such claims arising under this Agreement must be pursued on an individual basis in accordance with the procedure noted above. Notwithstanding the foregoing, either party hereto may seek temporary or permanent injunctive relief from an administrative agency or court of competent jurisdiction to enforce any right such party may have arising under this Agreement. The parties, their representatives and participants and the arbitrator shall hold the existence, content and result of the arbitration in confidence, except to the limited extent necessary to enforce a final settlement agreement or to obtain or enforce a judgment on an arbitration decision and award

**12.3 Waiver of Jury Trial and Class Action.** Each party, to the extent permitted by law, knowingly, voluntarily, and intentionally waives its right to a jury trial and any right to pursue any claim or action relating to this Agreement on a class or consolidated basis or in a representative capacity.

**13.** Notices.

**13.1** Required Notices. Customer's current address, facsimile number, and person designated for notices are: 110 Bauer Drive, Oakland NJ, 07436; (201) 651 - 1000; Attention: General Counsel. Unless otherwise provided herein, all required notices to QCC must be in writing, sent to 1801 California St., #900, Denver, CO 80202; Fax: 888-778-0054; Attn.: Legal Dep't., and to Customer at its then current address as reflected in QCC's records; Attn.: General Counsel or other person designated for notices. Unless otherwise provided herein or in a Service Exhibit, all notices will be deemed given: (i) when delivered in person to the recipient named above; (ii) three business days after mailed via regular U.S. Mail; (iii) when delivered via overnight courier mail; or (iv) when delivered by fax if duplicate notice is also sent by regular U.S. Mail. Upon written notice, either party may change its address, facsimile number and persons designated to receiver notices hereunder.

**13.2** Service Termination Notices. Customer's notice of termination for QCC Services must be sent via mail, facsimile or e-mail to: Qwest, Attn.: Dublin Service Center, GBM Disconnects, 4650 Lakehurst, 2nd Floor Disconnect Center, Dublin, OH 43017, FAX: 866.887.6633, e-mail: GBMdisconnects@qwest.com. Such termination will be effective 30 days after QCC's receipt of the notice, unless a longer period is otherwise required.

**14. Assignment.** Either party may assign this Agreement in its entirety without the other party's prior written consent: (a) in connection with the sale of all or substantially all of its assets; (b) to the surviving entity in any merger or consolidation; (c) to an Affiliate; or (d) to satisfy a regulatory requirement imposed upon a party by a governmental body with appropriate authority; provided such party gives the other party 30 days prior written notice of such assignment. Any assignee of the Customer must have: (e) a financial standing and creditworthiness equal to or better than Customer's, as reasonably determined by Qwest, through a generally accepted, third party credit rating index (i.e. D&B, S&P, etc.). Any other assignment will require the prior written consent of the other party.

**15. Unexpected Event.**

OMR#: 128380
Contract Code: 195027

Page 4 of 38
CONFIDENTIAL

Copyright © 2007 Qwest. All Rights Reserved
CGT v1.030207

06/01/2007   9:15OM

QWEST TOTAL ADVANTAGE®
Annual Assessment

**15.1** QCC and Customer acknowledge the possibility that an Unexpected Event (as defined below) may occur during the Term of this Agreement. For purposes of this Agreement, an "Unexpected Event" means an unforeseen event results in a reduction of Customer's total Contributory Charges incurred by Customer under this Agreement. An "Unexpected Event" will be limited to the following events:

(a) a substantial decrease in demand for Customer's products or service beyond the Customer's control that significantly reduces the size or scope of Customer's operations and the volume of QCC Services required by Customer, with the result that Customer is unable to maintain its current volume of QCC Service under this Agreement ("Business Downturn");

(b) the sale or divestiture by Customer of a subsidiary, affiliate or significant operating unit that uses the Services hereunder to an unaffiliated third party and Customer is unable to assign the displaced Services to such successor despite its best efforts ("Business Divestiture"); or

(c) the introduction by QCC of a new service that is based on substantially new technology that was unavailable as of the Effective Date and that materially improves Customer's current Services and/or applications by affording more efficient communication through an increase in the speed and/or capacity of such communication or Service and thereby decreased demand for Customer's existing Service ("New Technology").

**15.2** Customer must promptly notify QCC upon the occurrence of any Unexpected Event. Following the receipt of notice and confirmation by Qwest of the conditions giving rise to the application of this provision, QCC will either: (a) deduct the Shortfall Reduction Amount from any Shortfall charge incurred after the Unexpected Event; or (b) meet with Customer in order to develop another mutually agreeable solution, including, but not limited to, revised pricing, discounts, revenue commitment, term length, or other terms based on Customer's revised, actual Contributory Charges. This provision does not constitute a waiver of any charges incurred by Customer prior to the time the parties mutually agree to amend or supersede this Agreement.

**16. Transition Clause.** If Customer provides written notice to terminate at least 60 days before the Term, or any extension thereof, expires, Qwest will provide, at the same rates, terms and conditions stated in the Agreement, up to 6 months of existing services while Customer transitions to other service providers ("Transition Period"). A minimum revenue commitment shall apply during the Transition Period in an amount equal to thirty percent (30%) of the prior year's actual Total Service Charges. To invoke this provision, Customer must be in compliance with all terms and conditions under this Agreement. If the Agreement is terminated by Customer for Cause pursuant to Section 9.2, Qwest will provide, at the same rates, terms and conditions stated in the Agreement, up to 6 months of existing services while Customer transitions to other service providers without regard to any minimum revenue commitment.

**17. General.** This Agreement is intended solely for QCC and Customer, and not to benefit any other person or entity If any term of this Agreement is held unenforceable, such term will be construed as nearly as possible to reflect the original intent of the parties and the remaining terms will remain in effect. Except for time requirements as specifically stated in a Service Exhibit or SLA, neither party's failure to insist upon strict performance of any provision of this Agreement will be construed as a waiver of any of its rights hereunder. All terms of this Agreement that should by their nature survive the termination of this Agreement will so survive. In the event of a conflict in any term of this Agreement or any documents that govern the provision of Services hereunder, the following order of precedence will apply in descending order of control: a Service Exhibit, this Agreement, and any Order Form. If Services are provided pursuant to a Tariff or RSS, as described in the applicable Service Exhibits, the order of precedence will apply in the following descending order of control: Tariff, Service Exhibit, Agreement, RSS, and Order Form. Unless there is an express statement to the contrary in a specific provision of this Agreement or a Service Exhibit, the parties exclusive rights and remedies with respect to the following subjects will be only as set forth in this Agreement, and no provision of the Services Schedule addressing the same subjects shall apply: (i)a party's defense and indemnity obligations, (ii) limitations of liability, and (iii) payment terms. If Qwest makes any changes to the Services that have a material and adverse affect on Customer's legitimate use of the Service, Customer may discontinue the affected Service without liability for Cancellation Charges or Early Termination Charges by providing written notice of its election to discontinue the Service pursuant to this Section 17, provided such notice is given to Qwest not later than sixty (60) days after such change is made; and provided further that Qwest has not reasonably cured such material and adverse change within sixty (60) days following receipt of the Customer's notice of discontinuance. Customer shall pay all charges incurred up to the time of Service discontinuance. If a Service is discontinued pursuant to the prior sentence, Customer's Revenue Commitment will be reduced, as appropriate, to accommodate the discontinuance. A "material and adverse change" does not include (i) the introduction of a new service or any new service optional feature associated with an existing Service, including all terms, conditions and prices relating thereto, or (ii) the imposition of or changes to regulatory or other Governmental Charges (iii) or the increases in rates or charges that are not fixed in the Exhibits. Neither party will be liable for any delay or failure to perform its obligations hereunder if such delay or failure is caused by a Force Majeure Event. Other than Service or price modifications permitted as described in this Agreement, all amendments to this Agreement must be in writing and signed by the parties' authorized representatives. Each Party reserves the right at any time to reject any handwritten change to this Agreement.

**18. Entire Agreement.** This Agreement, any applicable Service Exhibit, Order Forms, and QCC-issued and Customer-accepted quote forms constitute the entire agreement between Customer and QCC and supersede all prior oral or written agreements or understandings relating to this subject matter.

**19.   Related Entity Discount Group.** Qwest will agree to allow Customer to purchase Services under this Agreement for not only itself but also on behalf of its parent company, affiliates, joint ventures and/or subsidiaries. For such purposes, "Affiliates" shall be defined as an entity majority owned or any entity that controls, is controlled by, or is in common control with Customer. However, Customer shall remain primarily responsible for any and all use of Services under this Agreement, including but not limited to payment obligations and shall be Qwest's customer of record for the Services provided under this Agreement. Notwithstanding the above and

Page 5 of 38
**CONFIDENTIAL**

Copyright © 2007 Qwest. All Rights Reserved
CGT v1.030207

subject to negotiation, Qwest may on a limited, commercially reasonable basis agree to an alternate arrangement whereby such Affiliates can order and be invoiced separately for Services; however, depending on the scope , type of services, and number of Affiliates, additional administrative charges may apply.

## 20   Definitions.

"Affiliate" means any entity controlled by, controlling, or under common control with a party.

"Annual Period" is each 12 month period following the Ramp Period.

"AUP" means the Qwest Acceptable Use Policy, which is posted at http://www.qwest.com/legal/, including all future revisions.

"Cancellation Charge" means: (a) early termination charges that apply if a Service is terminated before its minimum service period described in the Service Exhibit expires; and (b) charges incurred by QCC from any third party provider as a result of an early termination.

"Cause" means the failure of a party to perform a material obligation under this Agreement, which failure is not remedied: (a) for payment defaults by Customer, within five days of separate written notice from QCC of such default; or (b) for any other material breach, within 30 days of written notice (unless a different notice period is specified in this Agreement).

"Confidential Information" means any information that is not generally available to the public, whether of a technical, business, or other nature and that: (a) the receiving party knows or has reason to know is confidential, proprietary, or trade secret information of the disclosing party; and/or (b) is of such a nature that the receiving party should reasonably understand that the disclosing party desires to protect such information against unrestricted disclosure. Confidential Information will not include information that is in the public domain through no breach of this Agreement by the receiving party or is already known or is independently developed by the receiving party.

"Contributory Charges" means: (a) all MRCs and usage charges for Services ordered under this Agreement after the Effective Date and incurred during the Term; (b) all MRCs and usage charges for QC Contributory Services, QIA Contributory Services, Qwest Wireless Contributory Service, QCC Logic™, QCC Qwest Choice™ Unlimited, and QCC Keynote Perspective™ ordered before or after the Effective Date under separate agreements and incurred during the Term; and (c) Service Cancellation Charges paid by Customer. Contributory Charges do not include local access, pass-through, CPE, and uncollectible charges; NRCs; Taxes; Conferencing advanced feature charges; worldcard® payphone surcharges; other surcharges; issued credits; or other charges not specified as Contributory Charges under this Agreement.

"Convenience" means any reason other than Cause.

"CPE" means any customer equipment, software, and/or other materials of Customer used in connection with the Service.

"CPNI" means Customer Proprietary Network Information, which includes confidential account, usage, and billing-related information about the quantity, technical configuration, type, destination, location, and amount of use of a customer's telecommunications services. CPNI reflects the telecommunications products, services, and features that a customer subscribes to and the usage of such services, including call detail information appearing in a bill. CPNI does not include a customer's name, address, or telephone number.

"Early Termination Charge" equals: (a) 100% of the Shortfall for the then current Annual Period in which the Agreement is terminated during the Initial Term less any Cancellation Charges incurred and paid due to the Agreement termination (and in the event the Agreement is terminated prior to the first Annual Period, termination will be deemed to have occurred as of the first day of the first Annual Period); plus (b) 35% of the total Revenue Commitment for any other Annual Period(s) remaining in the Initial Term. During any Renewal Term, the "Early Termination Charge" shall equal fifty percent (50%) of the Shortfall for such Renewal Term.

"End User" means Customer's members, end users, customers, or any other third parties who use or access the Services or the QCC network via the Services.

"Force Majeure Event" means an unforeseeable event beyond the reasonable control of that party, including without limitation: act of God, fire, flood, labor strike, sabotage, cable cut not caused by Qwest, acts of terror, government laws or regulations, or war or civil disorder.

"Measurement Period" means each Annual Period during the Initial Term or any Renewal Term.

"MRC" means monthly recurring charge.

"Net Rate" is in lieu of all other rates, discounts, and promotions, including the QTA Discount.

"NRC" means nonrecurring charge.

"Order Form" means order request forms issued by QCC; for QCC services that require a quote to validate the Order Form pricing, Order Form will be understood to include the quote and the quote will take precedence over the order request form, but not over the Service Exhibit.

"QC Contributory Services" means the following services provided by Qwest Corporation ("QC"):

    (a) Switched business communications services - Centrex and Centron®;

    (b) Complex access services - Analog Trunks, Digital Switched Service (DSS), ISDN Services, Uniform Access Solution, and Self Healing Alternate Route Protection (SHARP);

    (c) Access line services - Custom Choice™ Business and Business Local Exchange;

    (d) LAN/WAN services - LAN Switching Services (LSS), business DSL, ATM (IntraLATA), and Frame Relay (IntraLATA);

    (e) Private Line services - Digital Data Service (DDS) and Private Line; and

Copyright © 2007 Qwest. All Rights Reserved
CGT v1.030207

(f)  Other services - Call Reports, Contract Toll, and Directory Services.

"QIA Contributory Services" means the following services provided by Qwest Interprise America, Inc.: Desktop Management Services, Network Management Services, Telecom Management Services, and IPSec Tunnel Management.

"Qwest Wireless Contributory Service" means business wireless phone service provided by Qwest Wireless, L.L.C.

"Regulatory Activity" is a regulation or ruling, including modifications thereto, by any regulatory agency, legislative body or court of competent jurisdiction. Qwest reserves the right to amend, change, withdraw or file additional Tariffs or RSS in its sole discretion, with such updated Tariffs or RSS effective upon posting or upon fulfillment of any necessary regulatory requirements.

"RSS" means as applicable: QCC's Rates and Services Schedule posted at www.qwest.com/legal and other rate and term schedules, incorporated by this reference.

"Shortfall" is the difference between Revenue Commitment and Customer's Contributory Charges paid during a Measurement Period.

"Shortfall Reduction Amount" means an amount equal to the Contributory Charges charged for a Service (or portion of Service) that is terminated pursuant to an express termination right in an SLA or for an Unexpected Event or Force Majeure Event as measured during the monthly billing cycle prior to termination multiplied by the number of monthly billing cycles remaining in then current Measurement Period.  The Shortfall Reduction Amount will not exceed 30% of Customer's Revenue Commitment.

"Tariff" includes as applicable: QCC state tariffs, price lists, price schedules, administrative guidelines, catalogs, and rate and term schedules, incorporated by this reference.

"Taxes" means foreign, federal, state, and local excise, gross receipts, sales, privilege, or other tax (other than net income) now or in the future imposed by any governmental entity (whether such Taxes are assessed by a governmental authority directly upon QCC or the Customer) attributable or measured by the sale price or transaction amount, or surcharges, fees, and other similar charges, which are required or permitted to be assessed on the Customer.

Option Z Pricing Used (for Qwest Billing purposes)

Copyright © 2007 Qwest. All Rights Reserved
CGT v1.030207

**1. Scope and Definitions.** This International Voice Service Exhibit ("Exhibit") sets forth Qwest International Voice terms and conditions. Unless otherwise indicated, Qwest will provide International Voice Services ("Service") pursuant to the terms and conditions of the Qwest Total Advantage Agreement ("Agreement"), Services Schedule, Tariff, and this Exhibit. Except as set forth in this section or elsewhere in this Exhibit, capitalized terms will have the definitions assigned to them in the Agreement.

"Services Schedule" means the Qwest Rate and Services Schedules International No. 2 found at http://www.qwest.com and at 1801 California Street, 1st Floor Reception Area, Denver, CO.

**2. International Voice Service Description.**

2.1 International Voice Service consists of International Outbound Long Distance, International Toll Free and International worldcard®. Except where specified otherwise, for international outbound voice service, the rates specified herein will only apply to international outbound voice service originating in the U.S. (subject to availability) and terminating internationally using land-line facilities and will not apply to international outbound voice service terminating internationally using cellular facilities or, for international inbound voice service, the rates specified herein will only apply to international inbound voice service originating internationally using land-line and cellular facilities. However, airtime is charged for mobile calls.

2.2 The Services Schedule applicable to the Service is incorporated by reference and made a part of this Exhibit. Qwest may change the Services Schedule at any time and such change will be effective upon being posted in the Services Schedule. The Service is also subject to the Communications Act of 1934, as amended.

2.3 In the event of a conflict in any term of any documents that govern the provision of Service hereunder, the following order of precedence will apply in descending order of control: Agreement, Pricing Sheet, Services Schedule, and any Order Form.

**3. Ordering Service.** Qwest code 1Q04 BRP2 must be entered on the Order Form to provide the rates described below.

**4. Rates.** The Net Rates, will be used to calculate Contributory Charges. The Service is not entitled to the QTA Discount. The following per minute rates, country/mobile codes and charges are provided for informational purposes only, but should reflect the applicable rates as of the Effective Date of the underlying Agreement. The rates for International Voice Service are controlled by the Services Schedule and are subject to change. The rates set forth herein do not include costs associated with local access. All rates below are quoted in increments and will be billed in the following initial and incremental time periods based on traffic type:

| International Voice Service | Initial Billing Period | Incremental Billing Period |
|---|---|---|
| Outbound U.S. to International | 30 seconds | 6 seconds |
| Outbound Canada to U.S. | 30 seconds | 6 seconds |
| Outbound U.S. to Mexico | 60 seconds | 60 seconds |

4.1 Canada Services – To and From

| Toll Free Services to and from Canada | |
|---|---|
| **From Canada to United States** | |
| Switched Origination - Switched Termination | $0.0700 |
| Switched Origination - Dedicated Termination | $0.0500 |
| **Toll Free Service Terminating in Canada** | Switched termination service available only |
| United States Switched Origination - Canada Switched Termination | $0.0300 |
| Canada Switched Origination - Canada Switched Termination | $0.0700 |

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.062006

**DOMESTIC FRAME RELAY SERVICE EXHIBIT**

1   **Definitions.** Except as set forth in this section or elsewhere in this Service Exhibit, capitalized terms will have the definitions assigned to them in the Agreement. Qwest will provide domestic Frame Relay Service ("Service") pursuant to the terms and conditions of the Tariff, Agreement, Services Schedule, and this Service Exhibit.

"Net Rates" means the Services Schedule MRCs and NRCs for Service as of the Effective Date less all applicable discounts.

"CPE" means equipment residing on the Customer's premises.

"Services Schedule" means the Qwest Rate and Services Schedules Interstate No. 3 found at http://www.qwest.com and at 1801 California Street, 1st Floor Reception Area, Denver, CO.

2.   **Service Description; Terms of Service.**

The Service provides a high speed, low delay, networking capability that runs over Qwest's Frame Relay network with different Quality of Service (QoS) levels. The Service allows for LAN-to-LAN, LAN-to-WAN, and/or WAN-to-WAN connectivity and can integrate data, video, and voice traffic. Information is transported at the Frame Relay port across Permanent Virtual Connections (PVCs) to multiple destinations. PVCs support Variable Frame Rate-real time/non-real time (VFR-rt/VFR-nrt) and Unspecified Frame Rate (UFR) QoS levels. The Service offers interconnection with Qwest ATM Service and iQ Networking Internet Port Service. Smart PVC is available to provide network-based IP enabled functionality that provides an efficient, scalable, high performance any-to-any connectivity. The Service is available at the following speeds: DS-0, DS-1, Fractional DS-1, and DS-3. The Service is subject to the SLA in the Services Schedule that is effective as of the first day of the second month after initial installation of Service. The SLA provides Customer's sole and exclusive remedy for service interruptions or service deficiencies of any kind whatsoever for the Service.

The Services Schedule applicable to Service is incorporated by reference and made a part of this Service Exhibit. Customer represents and warrants that as of the Effective Date, Customer has accessed, read, and understands the Services Schedule. Customer represents that it has received from a Qwest competitor an offer comparable to the offer in this Service Exhibit for the Services. The Service is also subject to the Communications Act of 1934, as amended.

In the event of a conflict in any term in any documents that govern the provision of Service hereunder, the following order of precedence will apply in descending order of control: Service Exhibit, Agreement, Services Schedule, and any Order Form.

3.   **Rates.**

Customer will pay all applicable MRCs and NRCs as set forth in the pricing tables below, in the Services Schedule, or Order Form. The Net Rates MRCs will be used for calculating Contributory Charges. Charges for each component of Service commence within five days of Qwest's notification to Customer that the Service component is provisioned and ready for use ("Start of Service Date"). The rates set forth herein do not include costs associated with local access or CPE, which rates are described in the Service Exhibits specific to those services or in a separate agreement. Qwest reserves the right to modify the charges or change certain components of the Service upon not less than 60 days prior written notice to Customer; provided that Qwest may reduce the foregoing notice period, as necessary, if such modification is based upon Regulatory Activity.

The Net Rates already include all applicable discounts, and unless otherwise stated in this Service Exhibit, the Net Rates set forth herein are in lieu of any rates listed in the Services Schedule. No discounts, promotions, and/or credits (whether set forth in the Service Schedule or otherwise) apply. If Customer later selects a $0 Revenue Commitment under the Agreement, then the Net Rates in this Service Exhibit will become void, and Customer will pay the applicable Service Schedule MRCs with no discounts.

| Domestic U.S. Frame Relay Port Size (Kbps)* | Net Rate MRC per Port | Install NRC per Port | Change Charge NRC per Port |
|---|---|---|---|
| 56/64 | $100.00 | $500.00 | $25.00 |
| 1344/1536 | $475.00 | $500.00 | $50.00 |

*Regardless of the Port increment provisioned, ports are billed in 64k increments

| PVC Quality of Service (QoS) | PVC Net Rate MRC (per 8Kbps Simplex*) | Install NRC per PVC | Change Charge NRC per PVC |
|---|---|---|---|
| Variable Frame Rate real time | $6.00 | $15.00 | $15.00 |

*PVC is provisioned in symmetrical 8Kbps increments

4.   **Frame Relay Install NRC 100% Discount.** So long as Customer is not in default of any obligations under the Agreement, Qwest will apply a 100% discount to the Frame Relay Service Install NRC(s) specified above so long as each Frame Relay Service ordered hereunder and subject to this discount remains installed and used by Customer for the Minimum Service Term.

5.   **Term.** The term of this Exhibit will begin upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if Customer adds this Exhibit after the Effective Date of the Agreement) and will continue until the expiration of the

QWEST ADVANTAGE AGREEMENT
DOMESTIC FRAME RELAY SERVICE EXHIBIT

Agreement. Each Service provided pursuant to this Exhibit (including Services transferred from the Haband Agreement) will commence on the Start of Service Date and will continue for 12 months (the "Minimum Service Term"). Upon expiration of the Minimum Service Term, each Service will automatically renew on a month to month basis at the then current rates, unless Customer elects to terminate the Service by providing sixty (60) days prior written notice. If the Agreement or any Service provisioned hereunder is terminated prior to the expiration of the applicable Minimum Service Term for reasons other than by Customer for Cause (including by expiration of the Agreement's Term), then Customer will pay to Qwest: (a) all charges for Service provided through the effective date of such cancellation; (b) an early cancellation charge of 100% of the balance of MRCs that otherwise would have become due for the unexpired portion of the Minimum Service Term; and (c) the amount of any NRC discount or waiver that Qwest granted to Customer.

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.062006

QWEST TOTAL ADVANTAGE® AGREEMENT
DOMESTIC VOICE SERVICE EXHIBIT

1   **General; Definitions.** Capitalized terms not defined here are defined in the Agreement. Qwest will provide domestic Voice Services ("Service") under the terms of the Agreement, Tariff, RSS, and this Service Exhibit.

"Net Rate" is in lieu of all other rates, discounts, and promotions, including the QTA Discount.

"Pricing Attachment" means a document containing rates specific to the Service and is incorporated by reference and made a part of this Service Exhibit.

"SLA" means the service level agreement specific to the Service, located at http://www.qwest.com/legal/, which is subject to change.

2.   **Service.**

**2.1 Description.** Voice Service consists of domestic Long Distance, domestic Toll Free, domestic Virtual Network Service ("VNS"), domestic worldcard®, and domestic Directory Assistance Services. Domestic Long Distance Service is available both interstate and intrastate, through switched and dedicated facilities. Toll Free Services is also available through switched or dedicated facilities. Qwest is required by the FCC to state in this Service Exhibit that Customer is prohibited from using any Toll Free telephone number, or other telephone number advertised or widely understood to be Toll Free, in a manner that would violate FCC rule 47 CFR 64.1504. Directory Assistance offers one rate to Voice Service customers domestically. The SLA provides Customer's sole and exclusive remedy for service interruptions or service deficiencies of any kind whatsoever for the Service. worldcard offers domestic calling card services available either interstate or intrastate and is available through switched access only. worldcard is offered with three options: 1) the standard option includes Qwest's trademarks and telephone number; 2) the "cologo" option includes Qwest's and Customer's names and trademarks and/or logos and will include either Qwest's or Customer's telephone number; and 3) the "private label" option only includes Customer's names trademarks and/or logos and will include either Qwest's or Customer's telephone number. If Customer selects the cologo or private label worldcard options, then Customer grants Qwest permission to create a card using Customer's name, trademarks and/or logos as provided to Qwest by Customer. Customer further agrees that even though Customer's name, trademarks, logo and/or phone number may appear on the cards, except for Customer's rights in its name, trademarks, and/or logo, Qwest will be sole owner of all right and title in and to all intellectual property associated with the cards and the worldcard service. Furthermore, if Customer selects either the cologo or private label cards, then the Customer agrees to indemnify and hold Qwest harmless for any costs, fees, damages, or expenses of any sort incurred by Qwest as a result of claims arising from Qwest's use of the Customer's name, trademarks or logo in accordance with this Agreement. . In addition to the other worldcard charges listed herein, Customer will pay to Qwest any set-up charges associated with the design and production of the cologo and private label cards. Qwest will notify Customer of the total amount of set-up charges prior to production of the cards. If Customer objects to the set-up charges, then the parties will work together to create a less expensive design than originally requested by Customer (this sentence and the previous sentence combined constitute the "Set-up Process"). If Customer revokes the use of its mark for the cologo or private label cards or requests new cards due to its mark changing, then Customer must cease using those cards and Qwest will issue replacement cards that either do not include Customer's mark or contain the new mark, as appropriate. The Set-up Process will apply to the replacement cards and Customer will pay Qwest the set-up charges for the replacement cards.

**2.2 Domestic IP Voice.** Domestic IP Voice Service consists of OneFlex® IP intrastate and interstate dedicated Long Distance and OneFlex IP dedicated Toll Free. Domestic IP Voice accepts intrastate and interstate dedicated Long Distance traffic in IP format and converts such traffic for transmission across the telecommunications network. Domestic IP Voice also accepts domestic Toll Free traffic and converts it into VoIP format for transmission to Customer. The pricing for Domestic IP Voice services is the same as for non-IP intrastate and interstate dedicated Long Distance and non-IP dedicated Toll Free. Domestic IP Voice does not support local services, 911, E911, V911, operator services, local number portability, or directory listings. All use of Domestic IP Voice will comply with and be subject to the Service Guide, AUP, and applicable sections of the SLA which are posted at http://www.qwest.com/legal/. Qwest reserves the right to refuse to accept, suspend, or limit any or all of Customer's IP traffic not complying with the Service Guide technical specifications or that Qwest believes is adversely affecting other customers on the Qwest network. The Service Guide and AUP are incorporated into the Agreement by this reference. Qwest may reasonably modify the Service Guide, AUP, and SLA to ensure compliance with applicable laws and regulations and to protect Qwest's network and customers, and such change will be effective upon posting to the Web site, subject to Customer's rights under Section 17 of the Agreement.

**3. Disclaimer.** For Toll Free EZ Route enhanced services, Qwest is not obligated to indemnify or defend Customer, or participate in any defense or settlement on behalf of or with the Customer, with respect to any intellectual property claims. Qwest is not liable to Customer for any damage whether direct, indirect, consequential, exemplary, special, incidental, or punitive, including but not limited to loss of use or lost business, revenue, profits, or goodwill related to or arising out of any claim or suit alleging intellectual property infringement.

**4. Term.** This Service Exhibit will expire or terminate coterminous with the Agreement.

**5. Charges.** As applicable, Customer will pay the rates, Net Rates, Net Effective Rates, and all other charges set forth in the Pricing Attachment, Tariff, RSS, or Order Form. Customer is responsible for all metered usage charges and per call charges that occur from the point Service is available for Customer use, regardless of whether Qwest notifies Customer of Service availability. Domestic Long Distance calls crossing state boundaries, within the same LATA, will be billed at the interstate rate. The rates and Net Rates include the QTA discount, if any. The rates, Net Rates, and Net Effective Rates do not include costs associated with local access or CPE, which rates are described in the Service Exhibits specific to those services or in a separate agreement for such service. Unless a Net Rate or Net Effective Rate is specified in the Pricing Attachment, domestic Outbound Long Distance, domestic Toll-Free, domestic VNS, and domestic worldcard voice services will be charged at the QTA rates in the Tariff and RSS, which include the QTA Discount.

OMR#: 128380
Contract Code: 195027

Page 11 of 38
CONFIDENTIAL

Copyright © 2007. All Rights Reserved.
CGT v1.030207

DOMESTIC VOICE SERVICE EXHIBIT

Rates <u>and</u> Net Rates will be used for calculating Contributory Charges. Customer represents that it has received from a Qwest competitor an offer comparable to the offer in this Service Exhibit for the Services.

Copyright © 2007. All Rights Reserved.
CGT v1.030207

**QWEST TOTAL ADVANTAGE® AGREEMENT**
**DOMESTIC VOICE SERVICE EXHIBIT**

### PRICING ATTACHMENT

1  **Interstate.** For all Interstate Long Distance usage, Qwest will bill Customer an 18 second minimum per call and 6 second increments.

| Domestic Interstate Outbound Long Distance | Interstate Minutes of Use per Month | Per Minute Net Rate* |
|---|---|---|
| Origination – Termination | | |
| Dedicated – Switched | 0 – 4,000,000 | $0.0155 |
| | 4,000,001 – 6,000,000 | $0.0150 |
| | 6,000,001 – 8,000,000 | $0.0145 |
| | 8,000,001 and above | $0.0140 |
| Switched – Switched | 0 – 4,000,000 | $0.0350 |
| | 4,000,001 – 6,000,000 | $0.0350 |
| | 6,000,001 – 8,000,000 | $0.0350 |
| | 8,000,001 and above | $0.0350 |

| Domestic Interstate Outbound Long Distance | Interstate Minutes of Use per Month | Per Minute Net Rate* |
|---|---|---|
| Origination – Termination | | |
| Dedicated – Switched | 0 – 4,000,000 | $0.0155 |
| | 4,000,001 – 6,000,000 | $0.0150 |
| | 6,000,001 – 8,000,000 | $0.0145 |
| | 8,000,001 and above | $0.0140 |
| Switched – Switched | 0 – 4,000,000 | $0.0350 |
| | 4,000,001 – 6,000,000 | $0.0350 |
| | 6,000,001 – 8,000,000 | $0.0350 |
| | 8,000,001 and above | $0.0350 |

Tiered pricing is based on Interstate minutes of use only.
*Net Rates are subject to change if there is a change in the underlying pricing and/or applicable discount(s), with any such changes to be done in accordance with the terms of the Agreement or this Service Exhibit.

| Domestic Interstate worldcard – Option 1 | Net Rate* |
|---|---|
| Origination – Termination | |
| Per Minute Switched – Switched | $0.0350 |
| Per Call Surcharge from Non- Payphone | $0.3500 per call |
| Per Call Surcharges from Payphone | $0.3500 per call<br>$0.5500 surcharge per payphone call |

**2. Intrastate.**

**2.1.  Service Credit.** For all intrastate (which includes interLATA and intraLATA usage within a state's boundary unless specified below) inbound 8XX and outbound voice service usage, Qwest will charge Customer the applicable rate in the Tariff on the Effective Date. Customer will then receive a monthly recurring credit (the "Service Credit") equal to the product of the fixed discount listed in the table below multiplied by Customer's total intrastate inbound 8XX and outbound voice service usage (including Qwest worldcard service and worldcard surcharge, if applicable) at the applicable rates, as determined by origination and termination. The Service Credit will be applied to Customer's interstate voice usage charges and will not exceed Customer's total amount of interstate voice usage charges in any month. For Customer's convenience, the rates in effect at the time this agreement was drafted are shown below.

| Domestic Intrastate (including interLATA and intraLATA) Outbound Long Distance By State | | Per Minute Rates | Discount Basis for Service Credit | Net Effective Rate after application of Service Credit** (for illustrative purposes only) |
|---|---|---|---|---|
| State | Origination – Termination | | | |
| AL | Dedicated – Switched | $0.0404 | 0.00% | $0.0404 |
| AZ | Dedicated – Switched | $0.0402 | 0.00% | $0.0402 |
| AR | Dedicated – Switched | $0.0543 | 0.00% | $0.0543 |
| CA | Dedicated – Switched | $0.0278 | 0.00% | $0.0278 |
| CO | Dedicated – Switched | $0.0390 | 0.00% | $0.0390 |

Copyright © 2007. All Rights Reserved.
CGT v1.030207

| Domestic Intrastate (including interLATA and intraLATA) Outbound Long Distance By State | | Per Minute Rates | Discount Basis for Service Credit | Net Effective Rate after application of Service Credit** (for illustrative purposes only) |
|---|---|---|---|---|
| State | Origination – Termination | | | |
| CT | Dedicated – Switched | $0.0333 | 0.00% | $0.0333 |
| DE | Dedicated – Switched | $0.0309 | 0.00% | $0.0309 |
| DC | Dedicated – Switched | $0.0404 | 0.00% | $0.0404 |
| FL | Dedicated – Switched | $0.0325 | 0.00% | $0.0325 |
| GA | Dedicated – Switched | $0.0394 | 18.78% | $0.0320 |
| HI | Dedicated – Switched | $- | 0.00% | $- |
| ID | Dedicated – Switched | $0.0497 | 0.00% | $0.0497 |
| IL | Dedicated – Switched | $0.0278 | 0.00% | $0.0278 |
| IN | Dedicated – Switched | $0.0242 | 0.00% | $0.0242 |
| IA | Dedicated – Switched | $0.0430 | 0.00% | $0.0430 |
| KS | Dedicated – Switched | $0.0493 | 0.00% | $0.0493 |
| KY | Dedicated – Switched | $0.0449 | 0.00% | $0.0449 |
| LA | Dedicated – Switched | $0.0392 | 0.00% | $0.0392 |
| ME | Dedicated – Switched | $0.0384 | 0.00% | $0.0384 |
| MD | Dedicated – Switched | $0.0404 | 0.00% | $0.0404 |
| MA | Dedicated – Switched | $0.0455 | 0.00% | $0.0455 |
| MI | Dedicated – Switched | $0.0242 | 0.00% | $0.0242 |
| MN | Dedicated – Switched | $0.0402 | 0.00% | $0.0402 |
| MS | Dedicated – Switched | $0.0432 | 0.00% | $0.0432 |
| MO | Dedicated – Switched | $0.0630 | 0.00% | $0.0630 |
| MT | Dedicated – Switched | $0.0508 | 0.00% | $0.0508 |
| NE | Dedicated – Switched | $0.0367 | 0.00% | $0.0367 |
| NV | Dedicated – Switched | $0.0354 | 0.00% | $0.0354 |
| NH | Dedicated – Switched | $0.0480 | 0.00% | $0.0480 |
| NJ | Dedicated – Switched | $0.0412 | 0.00% | $0.0412 |
| NM | Dedicated – Switched | $0.0435 | 0.00% | $0.0435 |
| NY | Dedicated – Switched | $0.0285 | 0.00% | $0.0285 |
| NC | Dedicated – Switched | $0.0493 | 0.00% | $0.0493 |
| ND | Dedicated – Switched | $0.0650 | 0.00% | $0.0650 |
| OH | Dedicated – Switched | $0.0263 | 0.00% | $0.0263 |
| OK | Dedicated – Switched | $0.0475 | 0.00% | $0.0475 |
| OR | Dedicated – Switched | $0.0232 | 0.00% | $0.0232 |
| PA | Dedicated – Switched | $0.0350 | 0.00% | $0.0350 |
| RI | Dedicated – Switched | $0.0293 | 0.00% | $0.0293 |
| SC | Dedicated – Switched | $0.0417 | 0.00% | $0.0417 |
| SD | Dedicated – Switched | $0.0697 | 0.00% | $0.0697 |
| TN | Dedicated – Switched | $0.0417 | 0.00% | $0.0417 |
| TX | Dedicated – Switched | $0.0374 | 0.00% | $0.0374 |
| UT | Dedicated – Switched | $0.0288 | 0.00% | $0.0288 |
| VT | Dedicated – Switched | $0.0493 | 0.00% | $0.0493 |
| VA | Dedicated – Switched | $0.0526 | 0.00% | $0.0526 |
| WA | Dedicated – Switched | $0.0313 | 0.00% | $0.0313 |
| WV | Dedicated – Switched | $0.0546 | 0.00% | $0.0546 |
| WI | Dedicated – Switched | $0.0307 | 0.00% | $0.0307 |
| WY | Dedicated – Switched | $0.0239 | 0.00% | $0.0239 |

| Domestic Intrastate (including interLATA and intraLATA) Toll Free By State | | Per Minute Rates | Discount Basis for Service Credit | Net Effective Rate after application of Service Credit** (for illustrative purposes only) |
|---|---|---|---|---|
| State | Origination – Termination | | | |
| AL | Switched – Dedicated | $ 0.0404 | 0.00% | $ 0.0404 |
| AZ | Switched – Dedicated | $ 0.0482 | 0.00% | $ 0.0482 |
| AR | Switched – Dedicated | $0.0543 | 0.00% | $0.0543 |
| CA | Switched – Dedicated | $0.0278 | 28.06% | $0.0200 |
| CO | Switched – Dedicated | $0.0390 | 0.00% | $0.0390 |

Copyright © 2007. All Rights Reserved.
CGT v1.030207

**DIRECT TO ATLANTA EXHIBIT (CONT.)**
**DOMESTIC VOICE SERVICE EXHIBIT**

| Domestic Intrastate (including interLATA and intraLATA) Toll Free By State | | Per Minute Rates | Discount Basis for Service Credit | Net Effective Rate after application of Service Credit** (for illustrative purposes only) |
|---|---|---|---|---|
| State | Origination – Termination | | | |
| CT | Switched – Dedicated | $0.0333 | 0.00% | $0.0333 |
| DE | Switched – Dedicated | $0.0309 | 0.00% | $0.0309 |
| DC | Switched – Dedicated | $0.0404 | 0.00% | $0.0404 |
| FL | Switched – Dedicated | $0.0325 | 7.69% | $0.0300 |
| GA | Switched – Dedicated | $0.0394 | 18.78% | $0.0320 |
| HI | Switched – Dedicated | $- | 0.00% | $- |
| ID | Switched – Dedicated | $0.0596 | 0.00% | $0.0596 |
| IL | Switched – Dedicated | $0.0278 | 0.00% | $0.0278 |
| IN | Switched – Dedicated | $0.0242 | 0.00% | $0.0242 |
| IA | Switched – Dedicated | $0.0430 | 0.00% | $0.0430 |
| KS | Switched – Dedicated | $0.0493 | 0.00% | $0.0493 |
| KY | Switched – Dedicated | $0.0449 | 0.00% | $0.0449 |
| LA | Switched – Dedicated | $0.0392 | 0.00% | $0.0392 |
| ME | Switched – Dedicated | $0.0384 | 0.00% | $0.0384 |
| MD | Switched – Dedicated | $0.0404 | 0.00% | $0.0404 |
| MA | Switched – Dedicated | $0.0455 | 20.88% | $0.0360 |
| MI | Switched – Dedicated | $0.0242 | 0.00% | $0.0242 |
| MN | Switched – Dedicated | $0.0402 | 0.00% | $0.0402 |
| MS | Switched – Dedicated | $0.0432 | 0.00% | $0.0432 |
| MO | Switched – Dedicated | $0.0630 | 0.00% | $0.0630 |
| MT | Switched – Dedicated | $0.0508 | 0.00% | $0.0508 |
| NE | Switched – Dedicated | $0.0367 | 0.00% | $0.0367 |
| NV | Switched – Dedicated | $0.0354 | 0.00% | $0.0354 |
| NH | Switched – Dedicated | $0.0480 | 0.00% | $0.0480 |
| NJ | Switched – Dedicated | $0.0412 | 0.00% | $0.0412 |
| NM | Switched – Dedicated | $0.0435 | 0.00% | $0.0435 |
| NY | Switched – Dedicated | $0.0285 | 0.00% | $0.0285 |
| NC | Switched – Dedicated | $0.0493 | 0.00% | $0.0493 |
| ND | Switched – Dedicated | $0.0650 | 0.00% | $0.0650 |
| OH | Switched – Dedicated | $0.0263 | 0.00% | $0.0263 |
| OK | Switched – Dedicated | $0.0475 | 0.00% | $0.0475 |
| OR | Switched – Dedicated | $0.0232 | 24.57% | $0.0175 |
| PA | Switched – Dedicated | $0.0350 | 0.00% | $0.0350 |
| RI | Switched – Dedicated | $0.0293 | 0.00% | $0.0293 |
| SC | Switched – Dedicated | $0.0417 | 0.00% | $0.0417 |
| SD | Switched – Dedicated | $0.0697 | 0.00% | $0.0697 |
| TN | Switched – Dedicated | $0.0417 | 0.00% | $0.0417 |
| TX | Switched – Dedicated | $0.0374 | 0.00% | $0.0374 |
| UT | Switched – Dedicated | $0.0288 | 0.00% | $0.0288 |
| VT | Switched – Dedicated | $0.0493 | 0.00% | $0.0493 |
| VA | Switched – Dedicated | $0.0526 | 18.25% | $0.0430 |
| WA | Switched – Dedicated | $0.0313 | 0.00% | $0.0313 |
| WV | Switched – Dedicated | $0.0546 | 0.00% | $0.0546 |
| WI | Switched – Dedicated | $0.0307 | 0.00% | $0.0307 |
| WY | Switched – Dedicated | $0.0239 | 0.00% | $0.0239 |

**4. LOCATIONS THRESHOLD.** The Switched Inbound and Outbound Interstate rates and Dedicated Inbound and Outbound Interstate rates described under the Agreement will be provided to no more than 25 total locations (the "Locations Threshold"). Each location in excess of the Location Threshold requiring Switched Inbound and Outbound Interstate Service or Dedicated Inbound and Outbound Interstate Service will receive standard month-to-month RSS rates in lieu of the rates, discounts and/or credits specified herein.

**5. INBOUND 8XX DISCOUNT.** Provided Customer is in compliance with its obligations under the Agreement, Qwest will apply a fixed discount of 60% to the $2.50 rate for each Qwest 8XX number in excess of the first 8XX number in which Qwest provides Service as the "Responsible Organization" (meaning the party held accountable for providing such Service). Qwest does not charge an 8XX MRC for the first 8XX in which Qwest provides Service as the Responsible Organization.
80

OMR#: 128380
Contract Code: 195027

Page 15 of 38
CONFIDENTIAL

Copyright © 2007. All Rights Reserved.
CGT v1.030207

06/01/2007   9:15PM

QWEST ADVANTAGE AGREEMENT
DOMESTIC VOICE SERVICE EXHIBIT

**6. INBOUND 8XX FEATURE(S).** Customer will pay the following NRCs, MRCs, Change Charges and Surcharges, if applicable, for the Enhanced 8XX Features listed below ("Feature(s)"). Pricing for Features listed below is subject to change without notice and is subject to applicable federal, state and local taxes, fees and surcharges.

| Feature | NRC | MRC | Change | Surcharge |
|---|---|---|---|---|
| Alternate Call Routing | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| Busy Ring No Answer (BRNA) | $150.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | $0.01 per call |
| Day of Week Routing (DOW) | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| Day of Year (Holiday) Routing (DOY) | $50.00 per 8XX | $0.00 | $50.00 per 8XX | N/A |
| Dialed Number Identification Service (DNIS) | $15.00 per 8XX | $0.00 | $15.00 per 8XX | N/A |
| Direct Termination Overflow (DTO) | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| EZ Route – Menu and Database | $150.00 each | $50.00 per 8XX | $0.00 | $0.015 per call |
| EZ Route – Speech Recognition Menu & Database Routing | $150.00 each | $50.00 per 8XX | $0.00 | $0.08 per call |
| EZ Route – Percent Allocation, Time of Day, Day of Week, Area Code & Customer – Entered Digit Routing | Included with EZ Route | Included with EZ Route | Included with EZ Route | Included with EZ Route |
| EZ Route – Intelligent Call Processing | $1,000.00 per PG link | $2,000.00 per PG link | ICB | $0.025 per minute |
| Extended Call Coverage (ECC) | $0.00 | $0.00 | $0.00 | N/A |
| Geographic Routing (GeoRouting) | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| Industry Toll Free Directory Assistance | $35.00 per 8XX (standard) $100.00 per 8XX (expedite) | $3.00 per 8XX | $35.00 per 8XX (standard) $100.00 per 8XX (expedite) | $2.00 per query |
| Menu Routing | $250.00 per 8XX | $25.00 per 8XX | $100.00 per 8XX | $0.015 per call |
| Percent Allocation Routing | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| Project Account Codes (PAC) | $15.00 per 8XX | $15.00 per 8XX | $15.00 per 8XX | N/A |
| Qwest GeoPlus™ | This advanced routing option is only offered through an alliance with AdGeo. Please contact AdGeo directly at 888-947-3100 or visit www.QwestGeoPlus.com  Log-in: qwest PIN: qwest1 | | | |
| Real Time ANI | $0.00 | $0.00 | $0.00 | N/A |
| Tailored Call Coverage (TCC) | $50.00 per 8XX | $0.00 | $50.00 per 8XX | N/A |
| Time of Day Routing (TOD) | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| Transfer and Release (TnR) | $1,000.00 per 8XX | $100.00 per 8XX | $100.00 per 8XX | $0.025 per transfer |
| Qwest Control for Toll Free (QCTF) | $0.00 | $0.00 | $0.00 | N/A |
| Super Trunk Overflow | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |
| In Switch Overflow Trunk | $50.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | N/A |

(Any feature whose name appears in all capital letters received pricing outside of the RSS.)

Provided Customer is in compliance with its obligations under this Agreement, Qwest will apply an 8xxCAPs as described below, which allows the customer to be credited any amount over the CAP amount described herein on a billing cycle to billing cycle basis.

NEW CAPS AVAILABLE! **  NRC (Installs)  MRC (Monthly)  Change
2 Year Term  $1,750  $1,750  $1,000
** (1)  TnR  and  EZ  Route  ICP  are  excluded  from  the  CAP  Promos.
** (2) All listed feature surcharges are excluded from the CAP promos.
***(3) Spending in the previous billing cycle does not count towards the current billing cycle's CAP.

OMR#: 128380
Contract Code: 195027

Page 16 of 38
CONFIDENTIAL

Copyright © 2007. All Rights Reserved.
CGT v1.030207

**QWEST TOTAL ADVANTAGE®(SM) AGREEMENT**
**DOMESTIC PRIVATE LINE SERVICE EXHIBIT**

1    **General; Definitions.** Capitalized terms not defined herein are defined in the Agreement. Qwest will provide Domestic Private Line Service ("Service") under the terms of the Agreement, RSS, and this Service Exhibit.

"Net Rate" is in lieu of all other rates, discounts, and promotions, including the QTA Discount.

"POP" means points of presence.

"Start of Service Date" for each circuit is the date Customer accepts the circuit, following notification by Qwest that the circuit is ready. Customer has five days from Qwest's ready notification in which to inform Qwest if the circuit fails to operate error-free. Within the five-day timeframe, if Customer neither informs Qwest about errors nor accepts the circuit, the circuit will be considered to have been accepted and the Start of Service Date to have commenced on the fifth day following Qwest's ready notification, regardless of whether Customer placed traffic over the circuit. If Customer informs Qwest of circuit errors within the five-day timeframe, Qwest will promptly take necessary, reasonable action to correct the errors, and upon correction, notify Customer that the circuit is ready.

2. **Service.**

2.1    **Description.** Domestic Private Line Service is a point to point, interLata, dedicated non-switched electrical and/or optical data transmission, over a physical circuit between two Qwest SONET POP located on the Qwest Domestic Network. "Qwest Domestic Network" means the Qwest operated facilities located within the 48 contiguous states which consist of transport POPs, physical media, switches, circuits, and/or ports that are operated solely by Qwest. Service extends to and includes the network equipment maintained by Qwest at the Qwest network interface points located in the Qwest POP. The Service is offered at DS-0, DS-1, DS-3, OC-3, OC-12, and OC-48 transmission rates, with OC-12 and OC-48 Service priced ICB. "SLA" means the service level agreement specific to the Service, located at http://www.qwest.com/legal/, which is subject to change. The SLA provides Customer's sole and exclusive remedy for service interruptions or service deficiencies of any kind whatsoever for Service.

2.2    **RSS.** Customer understands that Service is an interstate telecommunications service, as defined by Federal Communications Commission regulations and represents that during the Term, more than 10% of its usage will be interstate usage.

3. **Echo Cancellers.** Echo Cancellers are an optional feature on DS-0, DS-1, and DS-3 Service only. Echo Cancellers eliminate undesired signals (i.e., echoes) from a digital voice transmission. Echo Cancellers are offered on long haul circuits that may experience echoes as a result of their distance (generally 500 miles or longer) and used exclusively to support voice transmissions. Where available and for an additional charge, Qwest will install Echo Cancellers network equipment at the Qwest POPs to eliminate echoes on specified circuits as requested by Customer.

4. **Term; Cancellation.** The term of this Service Exhibit will begin upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if Customer adds this Service Exhibit after the Effective Date of the Agreement) and will continue until the expiration or cancellation of the Agreement. Each Service provided pursuant to this Exhibit (including Services transferred from the Haband Agreement) will commence on the Start of Service Date and will continue for 12 months (the "Minimum Service Term"). Upon expiration of the Minimum Service Term, each Service will automatically renew on a month to month basis at the then current rates, unless Customer elects to terminate the Service by providing sixty (60) days prior written notice. If the Agreement or any Service provisioned hereunder (including Services transferred from the Haband Agreement) is cancelled prior to the expiration of the applicable Minimum Service Term for reasons other than by Customer for Cause (including by expiration or termination of the Agreement), then Customer will pay to Qwest: (a) all charges for Service provided through the effective date of such cancellation; (b) an early cancellation charge of 100% of the balance of MRCs that otherwise would have become due for the unexpired portion of the Minimum Service Term ; and (c) the amount of any NRC discount or waiver that Qwest granted to Customer.

5. **Charges.** "Pricing Attachment" means the attached document containing Service rates, which is incorporated by reference and made a part of this Service Exhibit. Customer will pay the Net Rates set forth in the Pricing Attachment, in the RSS, or Order Form. Charges for each component of Service commence within five days of the Start of Service Date. The rates set forth herein do not include costs associated with local access, or for additional features such as multiplexing. The Net Rates will be used to calculate Contributory Charges. Customer represents that it has received from a Qwest competitor an offer comparable to the offer in this Service Exhibit for the Services.

Copyright ©2007 Qwest. All Rights Reserved.
CGT v1.030207

QWEST TOTAL ADVANTAGE® AGREEMENT
DOMESTIC PRIVATE LINE SERVICE EXHIBIT

PRICING ATTACHMENT

| PL IOC Circuit Type | Location A (by NPA/NXX) | Location Z (by NPA/NXX) | Net PL IOC MRC* (after application of all applicable discounts) | Install NRC** |
|---|---|---|---|---|
| DS3 | 212/916 | 757/827 | $2,500.00 | $2,000.00 |

*Net PL IOC MRC is subject to change if there is a change in the underlying pricing and/or applicable discount(s), with any such changes to be done in accordance with the terms of the Agreement or this Service Exhibit.

1   PL IOC Install NRC 100% Discount. So long as Customer is not in default of any obligations under the Agreement, Qwest will apply a 100% discount to the PL IOC Install NRC(s) specified above so long as each PL IOC ordered hereunder and subject to this discount remains installed and used by Customer for the Minimum Service Term.

Copyright ©2007 Qwest. All Rights Reserved.
CGT v1.030207

QWEST TOTAL ADVANTAGE® AGREEMENT
DOMESTIC QWEST iQ NETWORKING® SERVICE EXHIBIT

1    **General; Definitions.** Capitalized terms not defined herein are defined in the Agreement. Qwest will provide Domestic Qwest iQ Networking Service ("Service") under the terms of the Agreement and this Service Exhibit.

"Mail Bagging" is the process of storing e-mails for later delivery when Customer's primary mail server is unavailable.

"Net Rate" is in lieu of all other rates, discounts, and promotions, including the QTA Discount.

"Pricing Attachment" means a document containing rates specific to the Service and is incorporated by reference and made a part of this Service Exhibit.

"SLA" means the service level agreement specific to the Service, located at http://www.qwest.com/legal/, which is subject to change.

"Start of Service Date" means the date Qwest notifies Customer that the Service is provisioned and ready for use.

**2. Service.**

**2.1 Description.** Service is a data and IP solution that is designed for private communications between Customer's sites or public (dedicated) Internet connectivity. Service includes ports and features, and the rate of data transmission and features will vary depending upon the specific type of port ("Port") ordered. Service is subject to the Qwest iQ Networking® SLA, which provides Customer's sole remedy for any service interruptions or deficiencies. Qwest reserves the right to amend the SLA effective upon posting to the website or other notice to Customer. Unless the parties otherwise agree in writing, Customer has sole responsibility for ordering, securing installation and ensuring proper operation of any and all equipment required to enable Customer to receive the Service. For purposes of this Service Exhibit, "Order Form" means an electronic order confirmation process utilizing an architecture confirmation document ("ACD") that Customer and Qwest mutually agree to prior to submitting a Service order request. Each ACD must be approved by Qwest and sent via e-mail or fax to a Qwest Order Engineering Center. Subject to availability, Qwest will use commercially reasonable efforts to secure domain names and assign Internet address space for the benefit of Customer during the term. Neither Customer nor any End Users will own or route these addresses. Qwest owns all such IP addresses and, upon termination of Service, Customer's access to the IP addresses will cease.

**3. Ports and Features.** Ports are available in a variety of speeds, ranging from 56 Kbps to 2.4 Gbps, and in three unique Port types. Different features are included within each Port type. The local access connection between a Customer location and a Port is provided pursuant to the Local Access Service Exhibit. The three Port types are:

**3.1 Internet Port.** Internet Ports provide Customer locations with connectivity to the Internet. If Customer is using frame relay access to an Internet Port, the minimum Committed Information Rate ("CIR") is 25% of the selected Port speed. Customer is permitted to burst beyond the applicable CIR to full Port speed based upon bandwidth availability.

**3.2 Private Port.** Private Ports provide WAN connectivity between Customer locations. Customer may allocate traffic to point-to-point layer 2 connections or layer 3 MPLS services with template-based Quality of Service ("QoS") traffic prioritization (QoS feature description is available upon request). Private Ports may have traffic allocated to a maximum of five different point-to-point layer 2 connections, or layer 3 MPLS Closed User Groups ("CUGs"). Notwithstanding the foregoing, Customer may have up to 10 Ports within the network used by Qwest iQ Networking service that exceed this maximum, provided that the number of connections/CUGs for those Ports does not exceed the number of Ports in the network, and Customer has obtained the prior consent of Qwest.

**3.3 Enhanced Port.** Enhanced Ports provide all of the functionality of both an Internet Port and a Private Port in a consolidated communications solution. Enhanced Ports may have traffic allocated to a maximum of five different point-to-point layer 2 connections, layer 3 MPLS CUGs, or an Internet Gateway. Notwithstanding the foregoing, Customer may have up to 10 Ports within the network used by Qwest iQ Networking service that exceed this maximum, provided that the number of connections/CUGs for those Ports does not exceed the number of locations in the network, and Customer has obtained the prior consent of Qwest.

**3.4 E-mail Boxes and Mail Bagging.** Customer may order e-mail boxes in connection with Internet Ports and/or Enhanced Ports, and Mail Bagging in connection with Internet Ports. Mail Bagging automatically attempts to send any stored e-mails to Customer for up to 72 hours, after which the stored e-mail will be deleted. E-mail boxes and Mail Bagging are provided on a month to month basis and either party may cancel those services with 30 days written notice to the other party. E-mail boxes and Mail Bagging are not subject to the SLA. Qwest reserves the right to modify the e-mail box and Mail Bagging services, including without limitation, rates and charges, upon 30 calendar days prior notice to Customer.

**4. Term; Cancellation.** This Service Exhibit will commence upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date) and will remain in effect until canceled. Customer may cancel Service provided hereunder with at least 60 days prior written notice to Qwest. For any Port (including Services transferred from the Haband Agreement) that does not remain installed for 12 months from the Start of Service Date (including if such Port is terminated by the expiration of the Agreement), Customer will pay to Qwest a Cancellation Charge equal to the standard NRC rate applicable to that Port unless the Port is canceled by Customer for Cause.

**5. Charges.**

OMR#: 128380
Contract Code: 195027

Page 19 of 38
CONFIDENTIAL

Copyright © 2007 Qwest. All Rights Reserved.
CGT v1.030207

QWEST TOTAL ADVANTAGE℠ AGREEMENT
DOMESTIC QWEST iQ NETWORKING® SERVICE EXHIBIT

**5.1 Discounts.** The Net Rate MRCs set forth in the Pricing Attachment will be used to calculate Contributory Charges. No discounts apply.

**5.2 NRC Waiver.** So long as Customer is not in default of any obligations under the Agreement, Qwest will waive the Install NRCs for Internet Ports and Private Ports that remain installed for at least 12 months. Enhanced Ports are not eligible for any waiver or discount off Install NRCs.

**6. Port Pricing.** Customer may order multiple Ports with multiple pricing methodologies in accordance with the pricing methodologies set forth below. Customer may not change the pricing methodology (e.g., from Flat Rate to Precise Burstable) of a Port. Customer may, however, upgrade a Port to a higher bandwidth within the same pricing methodology (e.g., from a DS1 to a DS3) without incurring an early Cancellation Charge for the canceled Port. Customer is obligated to pay all applicable MRCs and NRCs set forth in the Pricing Attachment. Charges will commence within five days of the Start of Service Date. The rates set forth in the Pricing Attachment do not include any costs associated with local access or CPE, all of which are additional.

**7. Pricing Methodologies.** Customer understands that it cannot order international Service pursuant to this Service Exhibit. If Customer wishes to order any such international Services, Customer must execute a separate written amendment to the Agreement and this Service Exhibit.

**7.1 Flat Rate.** The Flat Rate pricing methodology bills Customer a fixed MRC regardless of Customer's actual bandwidth utilization.

**7.2 Tiered.** The Tiered pricing methodology caps Customer's bandwidth at the tier specified on an Order Form and bills the Customer a fixed MRC based on that bandwidth tier regardless of Customer's actual bandwidth utilization. No more than once per month, Customer may change its specific bandwidth tier (e.g., 192 Kbps to 384 Kbps, 384 Kbps to 256 Kbps) within the applicable Port classification (e.g., DS1, DS3), provided that Customer may not change its bandwidth from one Port classification to another (e.g., DS1 to DS3).

**7.3 Precise Burstable.** Usage samples are taken every five minutes throughout the month. Only one sample is captured for each five-minute period, even though there are actually two samples taken; one for inbound utilization and one for outbound utilization. The higher of these two figures is retained. At the end of the billing period, the samples are ordered from highest to lowest. The result is a database of over 8,000 samples. The top 5% of the samples (representing the top 5% of usage levels) are discarded. The highest remaining sample is used to calculate the usage level. This is the 95th percentile of peak usage. For each Precise Burstable Port ordered hereunder, Customer will pay an MRC calculated by multiplying Customer's 95th percentile of peak usage in a given month by the applicable MRC per Mbps.

Within each Precise Burstable Port classification (e.g., DS1, DS3), Customer will be subject to the minimum usage amount set forth in the column heading of the applicable Precise Burstable pricing table ("Precise Burstable Minimum"). Customer will be billed the greater of the Precise Burstable Minimum or the actual charges based upon its 95th percentile of peak usage.

**7.4 Data Transfer.** Usage samples are taken every five minutes throughout the month. Samples are taken for both in-bound utilization and out-bound utilization. Customer will be billed for the sum total of both inbound and outbound utilization. Charges are applied using a stepped or "metered" methodology such that Customer's traffic will be billed incrementally at each volume tier. For example, if Customer's total volume on a DS1 circuit is 10 GB, the first 7 GB of such total would be billed at the 0-7 GB tier, and the remaining 3 GB would be billed at the 7.01-17 GB tier. For each Data Transfer Port ordered hereunder, Customer will pay an MRC calculated by multiplying Customer's volume of data transferred in a given month (in GBs) by the applicable MRC per GB.

Within each Data Transfer Port classification (e.g., DS1, DS3), Customer will be subject to the minimum usage amount set forth in the column heading of the applicable Data Transfer pricing table ("Data Transfer Minimum"). Customer will be billed the greater of the Data Transfer Minimum or the actual charges based upon its actual volume of data transferred.

**8. AUP.** All use of the Services will comply with the AUP, posted at http://www.qwest.com/legal/ and incorporated by reference into this Service Exhibit. Qwest may reasonably modify the AUP to ensure compliance with applicable laws and regulations and to protect Qwest's network and customers, and such change will be effective upon posting to the website, subject to Customer's rights under Section 17 of the Agreement. Any changes to the AUP will be consistent with the purpose of the AUP to encourage responsible use of Qwest's networks, systems, services, web sites, and products.

Copyright © 2007 Qwest. All Rights Reserved.
CGT v1.030207

QWEST TOTAL ADVANTAGE AGREEMENT
DOMESTIC QWEST iQ NETWORKING® SERVICE EXHIBIT
PRICING ATTACHMENT

1   Flat Rate Net Rates.

| Flat Rate Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500.00 | $285.00 |
| 2 x DS1 (3 Mbps) | $1,000.00 | $560.00 |
| 3 x DS1 (4.5 Mbps) | $1,000.00 | $850.00 |
| 4 x DS1 (6 Mbps) | $1,000.00 | $1,100.00 |
| 5 x DS1 (7.5 Mbps) | $1,000.00 | $1,400.00 |
| 6 x DS1 (9 Mbps) | $1,000.00 | $1,650.00 |
| 8 x DS1 (12 Mbps) | $1,000.00 | $2,175.00 |
| DS3 | $2,000.00 | $2,750.00 |
| Fast Ethernet* | $1,500.00 | $3,750.00 |

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500.00 | $425.00 |
| 2 x DS1 (3 Mbps) | $1,000.00 | $850.00 |
| 3 x DS1 (4.5 Mbps) | $1,000.00 | $1,275.00 |

2   Tiered Net Rates.

| Tiered DS1 Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 56 - 64 Kbps | $500.00 | $180.00 |
| 128 Kbps | $500.00 | $230.00 |
| 256 Kbps | $500.00 | $275.00 |
| 384 Kbps | $500.00 | $290.00 |
| 512 Kbps | $500.00 | $295.00 |
| 768 Kbps | $500.00 | $305.00 |

| Tiered DS3 Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 3 Mbps | $2,000.00 | $800.00 |
| 6 Mbps | $2,000.00 | $1,320.00 |
| 9 Mbps | $2,000.00 | $1,685.00 |
| 12 Mbps | $2,000.00 | $1,985.00 |
| 15 Mbps | $2,000.00 | $2,205.00 |
| 18 Mbps | $2,000.00 | $2,370.00 |
| 21 Mbps | $2,000.00 | $2,535.00 |
| 24 Mbps | $2,000.00 | $2,650.00 |
| 27 Mbps | $2,000.00 | $2,740.00 |
| 30 Mbps | $2,000.00 | $2,815.00 |
| 33 Mbps | $2,000.00 | $2,915.00 |

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

QWEST IQ NETWORKING® SERVICE EXHIBIT
DOMESTIC QWEST IQ NETWORKING® SERVICE EXHIBIT
PRICING ATTACHMENT

| Tiered Fast Ethernet 100 Mbps Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 50 Mbps | $1,500.00 | $2,935.00 |
| 70 Mbps | $1,500.00 | $3,585.00 |

E-mail Boxes and Mail Bagging.

| Description | MRC |
|---|---|
| E-mail Boxes | $2.00 MRC per each e-mail box |
| Mail Bagging | *$50.00 MRC per Port |

*As of the Service Exhibit Effective Date, Qwest is waiving the Mail Bagging MRC so long as Customer is not in default of any obligations under the Agreement or this Service Exhibit. Qwest may discontinue waiving the MRC at any time without prior notice.

1    **General.** Except as set forth in this section and elsewhere in this Exhibit, capitalized terms will have the definitions assigned to them in the Agreement. Qwest will provide local access service ("Service") pursuant to the terms and conditions of the Agreement, the Services Schedule, and this Exhibit.

## 2.   Definitions.

"ATM Local Access" means Leased Access using ATM technology. Service is available in bandwidths of DS1, DS3, OC3, and OC12.

"Collocation" means Customer has leased space in a QPOP, a remote collocation site, or a collocation hotel per a Qwest Collocation Agreement.

"CO Meet Point" means Leased Access at a third party local access provider Central Office ("CO") when Customer has a dedicated connection to the CO.

"Construction" means the special construction that Customer requests to extend Service to a Customer demarcation point not covered by "Extended Wiring."

"CPA Dedicated Facilities" means Qwest has dedicated entrance facilities leased from a third party local access provider.

"CPA Non-Dedicated Facilities" means Qwest does not have dedicated entrance facilities with a third party local access provider.

"Cross-Connect" means an intra-POP connection between certain Customer facilities with direct access (via collocation or direct connection) to the Qwest Domestic Network (either located within Qwest's transport area or Qwest's collocation area) and the Qwest backbone access point. Customer must have a valid Collocation Agreement or a valid Direct Connect Agreement with Qwest to receive Cross-Connects.

"Customer Provided Local Access" or "CPA" means Customer orders its own local access from a third party local access provider to connect the Customer premises to the Qwest Domestic Network at a Demarcation Point specified by Qwest. Customer will pay a CPA charge to Qwest when utilizing CPA Dedicated Facilities. The CPA will be the responsibility of the customer and Qwest will not trouble shoot components of the CPA.

"Demarcation Point" means: (a) the physical interface between the Qwest Domestic Network and the Customer telecommunications equipment; or (b) the physical interface between a third party carrier connecting the Qwest Domestic Network to the Customer's telecommunications equipment.

"Direct Connect" means Qwest in its sole discretion allows Customer to bring its own fiber directly to the Qwest fiber. All Direct Connects require: (a) splicing of Customer and Qwest fibers; (b) cross-connection of individual circuits; and (c) an executed Direct Connect Agreement.

"Estimated Availability Date" means Qwest's target date for the delivery of Service.

"Ethernet Local Access" means Qwest Provided Access using Ethernet technology. Ethernet Local Access is available at bandwidths varying from 1 Mbps to 1,000 Mbps (1G).

"Extended Wiring" means additional wiring requested for orders where the Customer demarcation point is not located in the same location as the Qwest assigned Demarcation Point.

"Frame Local Access" means Leased Access using Frame Relay technology. Service is available at bandwidths varying from 56 kbps to 44,736 kbps.

"Layer 3 Expansion Site" means a third-party managed, carrier-neutral collocation facility where Customer can cross-connect with Qwest to purchase iQ Internet Ports. Customer must purchase the Service (i.e., cross-connect) directly from the Layer 3 Expansion Site manager, not Qwest.

OMR#: 128380
Contract Code: 195027

Page 22 of 38
CONFIDENTIAL

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

"Leased Access" means local backbone access circuits ordered and leased by Qwest from another carrier (specific carrier chosen is at the discretion of Qwest).

"Local Loop Expedite" means Customer requests the delivery of Service one or more days prior to the standard interval delivery date.

"Local Loop Change" means a circuit moves to a different Service Address within the same customer serving wire center.

"Multiplexing" means, at Customer's request and where available, Qwest multiplexes lower level local access circuits into a higher local access circuit or vice-versa.

"On-Net Access" means local backbone access circuits provided solely on Qwest owned and operated facilities. Service is available in bandwidths of DS1, DS3, OC3, OC12, and OC48. On-Net Access is subject to the SLA.

"Preferred Provider" means Customer requests a specific local access provider for Leased Access. Qwest will attempt to use the requested provider, but final routing will be at Qwest's sole discretion.

"Qwest Domestic Network" means the Qwest interexchange network or backbone located within the continental U.S. which is comprised only of physical media, including switches, circuits, and/or ports that are operated by Qwest.

"Qwest Point of Presence ("QPOP")" means a Qwest owned physical presence that lies directly on the Qwest Domestic Network where direct interconnection between the Qwest Domestic Network and a third party local access provider's network is possible.

"Qwest Provided Access" means either Leased Access or On-Net Access.

"Service Address" means the building where Customer receives the Service. Only a building that is classified by Qwest as a business address can be a Service Address.

"Services Schedule" means the Qwest Rate and Services Schedules Interstate No. 3 found at http://www.qwest.com and at 1801 California Street, 1st Floor Reception Area, Denver, CO, applicable to telecommunications services as defined by the Communications Act of 1934, as amended.

"Special Access" means Qwest Provided Access using TDM Technology in Digital Signal speeds DS0, DS1, and DS3 or SONET technology in Optical Carrier signal speeds OC3, OC12, OC48, and OC192.

"Start of Service Date" means the earliest to occur of: (a) the date on which Customer begins to utilize the Service; or (b) five days following the date on which Service is made available for use by Customer unless Customer notifies Qwest that the Service or the Qwest interexchange carrier service or IP service on the Qwest Domestic Network ("Dedicated Service") associated with the Service does not meet the applicable performance specifications, if any. In the event that Customer notifies Qwest that the Service or the associated Dedicated Service fails to meet the performance specifications, Qwest will use reasonable efforts to remedy such failure and will provide an updated Estimated Availability Date.

"Wavelength Access" means Qwest Provided Access using Wave Division Multiplexing technology. Local Access Service is available in 2.5G and 10G bandwidth.

2. Service Description.

2.1 Types of Service. There are three types of Service: Qwest Provided Access, Customer Provided Access, and Cross-Connect.

2.2 Types of Service Technologies. The types of Service technologies are: Special Access (TDM and SONET), Wavelength Access, Frame Local Access, ATM Local Access, and Ethernet Local Access. Some technologies or speeds may not be available in all areas or with certain types of Service.

The Service provides the physical connection between the Service Address and the Qwest Domestic Network. The Service includes any entrance cable or drop wire to that point where provision is made for termination of Qwest's outside distribution network facilities at a suitable location at a Customer designated Service Address and will be installed by Qwest to such point of termination. The Service will extend to and include the equipment maintained by Qwest at the termination point of the local loop at the applicable Service Address (i.e., Demarcation Point) but will not include CPE, Extended Wiring, inside wiring, or other equipment not maintained by Qwest at a Service Address. All equipment owned by Qwest will remain the sole property of Qwest, and Customer expressly disclaims any right, title, or interest in or to any Qwest equipment or property, or in that of any of Qwest's affiliates, Customers, agents, or licensees located within the QPOP or elsewhere. Any additional terminations beyond the Demarcation Point are the sole responsibility of Customer. Under no circumstances will Qwest provide Service to a residential address, even if business is conducted at such residential location. Customer may purchase the Service only in connection with Customer's use of a Qwest Dedicated Service for which a local loop is required.

The Services Schedule applicable to Service is incorporated by reference and made a part of this Service Exhibit. Qwest may change the Services Schedule at any time and such change will be effective upon being posted in the Services Schedule.

3. Ordering of Service. Upon acceptance of an Order Form, Qwest will notify Customer of its target date for the delivery of each Service ("Estimated Availability Date"). Qwest will use commercially reasonable efforts to install each such Service on or before the

OMR#: 128380
Contract Code: 195027

Page 23 of 38
CONFIDENTIAL

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

Estimated Availability Date, but the inability of Qwest to deliver Service by such date will not be a default under the Agreement or this Exhibit.

**4. Term.** The term of any Service (including Services transferred from the Haband Agreement) begins on the Start of Service Date and continues for a minimum of 12 months from the Start of Service Date, unless a longer term is specified ("Minimum Service Term"). Upon expiration of any Minimum Service Term, the Service will automatically renew on a month-to-month basis and following such Minimum Service Term Customer may terminate any Service without liability for cancellation charges. The Minimum Service Term and any renewal term will be referred to as the "Term." Upon written notice to Qwest at least 30 days prior to the conclusion of any Term, Customer may terminate the Service associated with this Exhibit.

**5. Cancellation.**

**5.1 On-Net Access Cancellation Prior to Start of Service Date.** If Customer cancels an On-Net Access circuit for which no Construction by Qwest is necessary, after the fifth business day of placing the order with Qwest but prior to the Start of Service Date, then Customer agrees to pay one month's MRCs for DS-1 Special Access, or six months' MRCs for DS-3 and OC-n Special Access and all Ethernet Access. At any time prior to the Start of Service Date, if Customer cancels On-Net Access for which Construction is required, Customer will pay the cancellation and other charges set forth in the Cancellation After Start of Service section.

**5.2 Leased Access Cancellation Prior to Start of Service Date.** If Customer cancels a Leased Access circuit for which no Construction by Qwest is necessary, after the fifth business day of placing the order with Qwest but prior to the Start of Service Date, then Customer agrees to pay one month's MRCs for DS-0 and DS-1 Special Access, 56 Kbps to 1.5 Mbps Frame Local Access, or 12 months' MRCs for DS-3 and OC-n Special Access, 44.7 Mbps Frame Local Access, and all Ethernet Access. At any time prior to the Start of Service Date, if Customer cancels a Leased Access circuit for which Construction is required, Customer will pay the cancellation and other charges set forth in the Cancellation After Start of Service Date section.

**5.3 Cancellation After Start of Service Date.** If this Exhibit or a particular Service is terminated for reasons other than by Customer for Cause, prior to the conclusion of the Minimum Service Term of the Service (including by expiration of the Agreement), Customer will pay: (a) all accrued and unpaid charges for the canceled Service provided through the effective date of such cancellation; (b) the amount of any nonrecurring charges that Qwest discounted or waived; (c) all installation or Construction costs and expenses incurred by Qwest to install such Service, if applicable; and (d) a cancellation charge. The cancellation charge: (e) for circuits not requiring Construction is: (i) 100% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the first 12 months of the Minimum Service Term, if any, for the canceled Service; plus (ii) 35% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the applicable Minimum Service Term, if any, beyond the first 12 months, if the Minimum Service Term is longer than 12 months; or (f) for Circuits requiring Construction, 100% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the Minimum Service Term. Notwithstanding anything to the contrary herein, Qwest will waive the cancellation and other charges referenced herein when Customer orders and receives a replacement circuit at the same Service Address and at a higher circuit speed than the cancelled Service.

**5.4 Termination of Connectivity to Customer Provided Access after Start of Service Date.** Customer must provide Qwest with the written Disconnect Firm Order Confirmation ("DFOC") notice from Customer's CPA provider in order to terminate CPA. Customer will remain liable for all applicable MRCs and charges for the connectivity to CPA (regardless of whether or not it is useable by Customer) until Customer furnishes the required DFOC to Qwest.

**6. Charges and Payment.** Customer will pay the rates and charges set forth in the Services Schedule and/or in a valid Order Form for Service, including all applicable supplemental charges: (a) Construction; (b) Extended Wiring; (c) Local Loop Expedite; (d) Local Loop Change; and (e) Multiplexing. Customer will not receive any discount for circuits ordered on a month-to-month Term. If during the provisioning of Service, Qwest incurs additional NRCs for Construction, Extended Wiring, or order supplements to provide the Service, Qwest reserves the right to charge Customer for such charges. The Service MRCs and NRCs will not be used to calculate the Contributory Charges. Qwest reserves the right to modify the rates and charges or change certain components of the Service upon not less than sixty (60) days prior written notice to Customer, provided that Qwest may reduce the foregoing notice period as necessary if such modification is based upon Regulatory Activity, subject to Customer's rights in Section 17 of the Agreement. Customer will receive the rates for Service contained herein regardless of whether an NPA/NXX split or overlay occurs.

**7. Monitoring for Frame Local Access.** When providing Frame Local Access, Customer has the option to have Qwest monitor the Service for performance and up/down stats via a management PVC. By ordering Frame Local Access with monitoring, Customer agrees to provide Qwest with access to the serial interface of Customer's CPE to allow Qwest to monitor the availability of Frame Local Access. By ordering Frame Local Access without monitoring, Customer understands that Qwest will not monitor the availability of Frame Local Access.

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

QWEST SELECT ADVANTAGE™ TERMS
PRICING ATTACHMENT

This pricing attachment ("Pricing Attachment") is appended to, and subject in all respects to, the Qwest Total Advantage Agreement between Qwest Communications Corporation and Customer ("Agreement") and the Local Access Exhibit to which this is attached. Except as set forth in this Pricing Attachment, capitalized terms will have the definitions assigned to them in the Agreement or the Local Access Exhibit.

(A) Customer will pay the MRCs and Install NRCs for the Local Access Service selected, i.e., Qwest Provided Access, Customer Provided Access, or Cross-Connect. In addition, Customer will pay all MRCs or NRCs for any supplemental Services, i.e., Construction, Extended Wiring, Local Loop Expedite, Local Loop Change Fee or Multiplexing.

(B) Subject to a valid, accurate Order Form, Customer will pay the MRCs and NRCs set forth in the below table for the particular Service at the Service Address and NPA/NXX listed. Customer will pay any additional Construction charges that arise during provisioning of a circuit. Except where specified below, all MRCs and NRCs set forth in the below table apply per circuit and not per Service Address. Any modifications to the NPA/NXX or physical address of a Service Address listed below will render the pricing below void, and Customer will pay the revised rates for the correct NPA/NXX or physical address.

| NPA/NXX | Type of Local Access | Minimum Service Term in months (per Service) | Circuit Speed | Local Access MRC | Install NRC |
|---------|---------|---------|---------|---------|---------|
| 201651 | Leased | 12 | DS-1 | $275.00 | $1.00 |
| 212916 | Leased | 12 | DS-1 | $175.00 | $275.00 |
| 212916 | Leased | 12 | DS-3 | $1,500.00 | $1.00 |
| 213629 | Leased | 12 | DS-1 | $175.00 | $250.00 |
| 213637 | Leased | 12 | DS-1 | $175.00 | $22.00 |
| 229928 | Leased | 12 | DS-3 | $3,000.00 | $955.00 |
| 304725 | Leased | 12 | DS-1 | $550.00 | $1,269.00 |
| 503614 | Leased | 12 | DS-1 | $200.00 | $540.00 |
| 503614 | Leased | 12 | DS-3 | $2,000.00 | $1,000.00 |
| 561886 | Leased | 12 | DS-0 | $110.00 | $535.00 |
| 570383 | Leased | 12 | DS-1 | $325.00 | $1.00 |
| 610530 | Leased | 12 | DS-0 | $110.00 | $200.00 |
| 614729 | Leased | 12 | DS-0 | $110.00 | $450.00 |
| 646447 | Leased | 12 | DS-1 | $175.00 | $820.00 |
| 706485 | Leased | 12 | DS-1 | $175.00 | $820.00 |
| 706613 | Leased | 12 | DS-1 | $175.00 | $820.00 |
| 757827 | Leased | 12 | DS-0 | $110.00 | $200.00 |
| 757827 | Leased | 12 | DS-1 | $250.00 | $1.00 |
| 757827 | Leased | 12 | DS-3 | $4,250.00 | $1,041.00 |
| 757896 | Leased | 12 | DS-3 | $3,000.00 | $698.00 |
| 770234 | Leased | 12 | DS-1 | $175.00 | $250.00 |
| 814726 | Leased | 12 | DS-3 | $9,000.00 | $343.00 |
| 860674 | Leased | 12 | DS-1 | $175.00 | $820.00 |
| 904645 | Leased | 12 | DS-0 | $125.00 | $535.00 |
| 904645 | Leased | 12 | DS-1 | $175.00 | $830.00 |
| 949784 | Leased | 12 | DS-1 | $175.00 | $22.00 |
| 972348 | Leased | 12 | DS-0 | $110.00 | $320.00 |
| 978922 | Leased | 12 | DS-1 | $350.00 | $275.00 |

(C) Customer may order additional Local Access Services which are not specified above for a specific NPA/NXX and/or Service Address. Each additional Service ordered during the Term must include a valid Qwest quote form that specifies the applicable Local

OMR#: 128380
Contract Code: 195027

Page 25 of 38
CONFIDENTIAL

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

Access MRC and NRC per Service. No other discounts or promotions apply. Certain types of Service have separate service or agreement requirements as defined in the Local Access Service Exhibit.

(D) Leased and On-Net Current and Future Loops Qwest Provided Access Install NRC Discount. Qwest Provided Access Install NRC(s) specified above or on a valid quote form during the Term will receive a 100% discount so long as such Service ordered hereunder and subject to this discount remains installed and used by Customer for the duration of the Minimum Service Term. Supplemental NRCs, including but not limited to: Construction, Extended Wiring, Local Loop Expedite, Local Loop Change Fee and Multiplexing, Customer Provided Access NRCs, and Cross-Connect NRCs are not eligible for any discount.

(E) Customer may cancel DS1 Leased Local Access at NPANXXs 229928, 770234, and 213637 prior to the Minimum Service Term without liability for early termination charges if: 1) the DS1's at these NPA/NXX's remain installed and used for at least 6 months of the Minimum Service Term; and 2) Customer orders new Local Access of equal or greater bandwidth than the existing DS1. The upgraded Local Access may be at different location (subject to this Agreement) but will require a 12 month Minimum Service Term.

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

**QWEST® SELECT ADVANTAGE™ TERMS**

The rights and responsibilities in these Qwest Select Advantage Terms ("Select Terms") apply to Qwest Interprise America, Inc. ("Qwest" or "QIA") and Customer. The Select Terms consist of (a) the terms set forth in this document and (b) all the terms in the following sections of the Qwest Total Advantage Agreement ("Agreement") between Qwest Communications Corporation and Customer, which are incorporated by reference to these Select Terms: Disclaimer of Warranties; Limitation of Liability; Personal Injury, Death, and Property Damage; Indemnification; Confidentiality, Publicity; Dispute Resolution, Notices; Assignment; General. Except as set forth in these Select Terms and Detailed Descriptions, capitalized terms will have the definitions assigned to them in the Agreement.

1.     Purchase. Customer agrees to purchase, and Qwest agrees to provide, Solutions by issuing a PO to Qwest. Customer's purchase of Solutions is subject to and controlled by Detailed Description(s) which are posted at www.QwestSelectAdvantage.com, and are incorporated by this reference. By issuing a PO to Qwest, Customer warrants that Customer has read and agrees to the terms and conditions of the Detailed Description(s). Qwest reserves the right to amend the Detailed Description(s) effective upon posting to the Web site. Please check such Web site regularly for changes. Customer's continued use of the Solution constitutes acceptance of those changes. If the PO issued by Customer contains any preprinted terms, the preprinted terms will not amend, modify or supplement these Select Terms in any way whatsoever, notwithstanding any provisions in a PO to the contrary. A PO must (a) reference and incorporate these Select Terms and their Effective Date, (b) contain the Customer's exact legal name, and (c) include any other requirements as may be further described in the Detailed Description(s).

2.     Term. These Select Terms will commence on the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if these Select Terms are added to the Agreement after its Effective Date), and continue until the termination or expiration of the Agreement. Termination will not affect obligations under Purchase Orders accepted prior to the effective date of termination, and these Select Terms will remain in effect as to such obligations in the event it would otherwise have terminated.

3.     Termination. Customer may terminate these Select Terms at its convenience upon 30 days prior written notice to Qwest and either party may terminate this Service Exhibit (and Service provided hereunder) for Cause. If Customer or Qwest terminates this Agreement or any PO, then Customer will remain liable for charges accrued as of the termination date. Notwithstanding the forgoing, any termination provisions governing the Solutions are set forth in the Detailed Descriptions.

4.     Payment. Charges are due and payable upon Customer's receipt of the invoice. Any payment not received within 30 days after invoice date may be subject to interest charges as permitted by applicable law. Customer must also pay Qwest any applicable Taxes assessed in connection with Customer's Service. Qwest may in its sole discretion modify the payment terms or require other reasonable assurance of payment if Customer failed to pay any invoice when due or there is a material and adverse change in Customer's financial condition.

5.     Limitation of Liability. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE AGREEMENT INCORPORTATED BY REFERENCE, QWEST'S TOTAL AGGREGATE LIABILITY ARISING FROM OR RELATED TO THESE SELECT TERMS WILL IN NO EVENT EXCEED: (A) FOR CLAIMS ARISING OUT OF PRODUCTS/MATERIALS, 10% OF THOSE PRODUCTS/MATERIALS SET FORTH IN THE PO RELATING SOLELY TO THE AFFECTED PRODUCT/MATERIAL; (B) FOR CLAIMS ARISING OUT OF NONRECURRING SERVICES, 10% OF THE SERVICE SET FORTH IN THE PO OR SOW; AND (C) FOR CLAIMS ARISING OUT OF RECURRING SERVICES, ONE MONTH'S SERVICE CHARGE FOR THE AFFECTED COMPONENT.

6.     General. These Select Terms may not be used for the purchase of voice, data or IP services. In the event of a conflict in any term of any documents that govern the provision of Solutions hereunder, the following order of precedence will apply in descending order of control: these Select Terms, the Agreement terms incorporated by reference, any Detailed Description(s), any SOW, and any PO. With respect to the Agreement terms incorporated by reference, "Service" is replaced by "Solution" as defined herein, and "Order Form" is replaced with "Purchase Order" as defined herein. The charges for Solutions under these Select Terms are not Contributory Charges under the Agreement. Customer will not be eligible for any discounts or promotional offers than those specifically set forth in an executed PO.

7.     Definitions.
"CPE" means either: (a) Customer Purchased Equipment, or (b) Customer Premise Equipment; and consists of hardware, software and materials used in the transport and/or termination/storage of data and voice transmission.

"Detailed Description(s)" means the terms and conditions of the Solution provided by Qwest which are posted at www.QwestSelectAdvantage.com.

"Force Majeure Event" means an unforeseeable event beyond the control of that party, including without limitation: act of God, fire, flood, labor strike, sabotage, cable cut not caused by Qwest, acts of terror, material shortages or unavailability, government laws and regulations, war or civil disorder, or failures of suppliers of goods and services.

"Products" means CPE and Software offerings from Qwest.

"Purchase Order" or "PO" means either (a) a written document issued by Customer for the procurement of Solutions from Qwest; or (b) a Qwest quote or service order signed by Customer.

"Services" means offerings from Qwest that (a) install, maintain or manage CPE; or (b) support Customer network management objectives.

"Software" means software license offerings.

Copyright © 2006 Qwest. All Rights Reserved.
CGT v1.122006

QWEST® SELECT ADVANTAGE™ TERMS

"Solutions" means Products and Services from Qwest.

"SOW" means a statement of work that provides specific details, agreed to by Qwest and Customer, relating to the Solution purchased under a PO. Agreement on the terms of the SOW will be satisfied by (a) Qwest sending the final version of the SOW to Customer; and (b) Customer's signature on the SOW, or an email acknowledgment from an authorized representative of Customer of its acceptance of the SOW. Customer understands and agrees that Qwest may act in reliance upon any such email acknowledgment from Customer reasonably believed to be genuine.

"SOW Change Order" means any change, submitted by Customer to Qwest, to a SOW that was previously agreed upon by Qwest and Customer. Customer will be responsible for all charges related to such SOW Change Order.

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

QWEST ADVANTAGE AGREEMENT
QWEST INTEGRATED MANAGEMENT SERVICE EXHIBIT

1.    **General; Definitions.** Except as set forth in this Service Exhibit, capitalized terms will have the definitions assigned to them in the Agreement. Qwest will provide Integrated Management Service ("Service") under the terms of the Agreement and this Service Exhibit.

"CPE" means customer premises equipment.

"MAC(s)" means moves, adds, and changes.

"Out-of-Band" means a connection between two devices that relies on a non-standard network connection, such as an analog dial modem, which must be a Qwest certified 56k external modem.

"POC" means point of contact.

"Start of Service Date" means the earliest to occur of the date on which Customer begins to utilize the Service or the date on which Service is made available to Customer.

"TCA" means total customer agency, under which Qwest will perform the work for Customer as outlined in the Attachment 1 Limited Letter of Agency.

2.    **Service.**

2.1   **Description.** Qwest Integrated Management Service is a network support service provided by Qwest, which offers monitoring and management of CPE ("Service"). The Service does not include the underlying transport service, which is provided pursuant to a separate agreement, or any lab testing, lab modeling, or on-site work of CPE. The following management types are available:

2.2   **Select Management.** Includes: (a) 24x7 remote monitoring of supported CPE listed on the Integrated Management Certified Device List ("Service Devices"); (b) 24x7 remote monitoring of Customer's transport ports; (c) a network profile, including a current inventory of managed devices and network topology map; (d) fault management services, including fault detection, isolation, diagnosis, remote repair when possible; (e) Customer notification and escalation as appropriate; and (f) configuration management services, which includes backing up the CPE configurations twice a day..

2.3   **Comprehensive Management.** Includes all of the Select Management features as well as Service engineers which act as Customer's authorized agent in resolving all network problems including devices and transport. Other optional components may be available for selected Service Devices.

2.4   **Internet Protocol Security ("IPsec") Tunnel Management.** Includes all of the Comprehensive Management features as well as management of site-to-site IPsec virtual private network ("VPN") connectivity. IPSec Tunnel Management is available on an individual case basis, including requests to switch to IPsec Tunnel Management from another type of Service.

2.5   **Qwest Responsibilities.**

(a)   Qwest will provide Customer with a non-exclusive Service engineer team, which will maintain a customer profile for the portion of the Customer's network where Qwest-managed devices reside. Qwest will work with the Customer to facilitate resolution of service-affecting issues.

(b)   Customer may submit, for no additional charge, a limited number of MAC requests via the Integrated Management web site: https://nms.qwest.com. The maximum number of requests is equal to two times the number of Service Devices comprising customer installed base (e.g., if Customer has 10 managed devices, Customer could submit a total of 20, 2 x 10 devices, MAC tickets per month across its entire base).

2.6   **Customer Responsibilities.**

(a)   Customer will, in a timely manner, provide all information and perform all actions reasonably requested by Qwest in order to facilitate installation of Service. For Out-of-Band management related to fault isolation/resolution, Customer will provide and maintain the POTS line(s) for each managed device. Additionally, Customer will provide a dedicated modem for each managed device.

(b)   For Comprehensive Management and IPsec Tunnel Management customers, Customer authorizes Qwest to act as the Customer's agent solely for the purpose of accessing Customer's transport services in order to provide the Service, pursuant to the attached Letter of Agency (attached hereto as Attachment 1). Customer must execute the Letter of Agency prior to Qwest providing the Service. Failure to do so will materially impair Qwest's ability to provide the Service and will be deemed cause for canceling the Service by Qwest. Customer must order and pay for one of these types of Service for Qwest to act as Customer's agent. Qwest will not act as Customer's agent for Select Management.

(c)   Depending on transport type, Customer's managed devices must comply with the following set of access requirements: (a) for Service delivered via IP connectivity with Qwest IQ Networking® – Internet Port and/or other public Internet service, devices must contain an appropriate version of IOS capable of establishing IPsec VPNs; and/or (b) for Service delivered with Qwest Frame Relay Service ("FRS")/Asynchronous Transfer Mode ("ATM")/Private Line, Customer will provide at least one Qwest FRS Permanent Virtual Circuit ("PVC") from one of Customer's main routers to a Qwest management point of presence to accommodate remote management and monitoring. Service charges do not include fees associated with this PVC. Customer is responsible for the underlying FRS; and/or

QWEST ADVANTAGE AGREEMENT
QWEST INTEGRATED MANAGEMENT SERVICE EXHIBIT

(c) for Service delivered with Qwest Private Routed Network ("PRN"), Customer will have the ability to route network management information to and from all other Customer devices within the Service. For large or critical networks, multiple Service management connections may be required.

(d) Customer must provide: (i) a publicly routable valid IP address in order to establish the Service connection; and (ii) a dedicated modem and dial-up line in order to receive TCA. Customer's primary technical interface person will be available during the remote installation process in order to facilitate installation of the Service. All Customer devices managed under this Agreement will be maintained under a contract from a Qwest approved on-site CPE maintenance provider. The response times for which the Customer has contracted with their CPE maintenance provider will affect Qwest's timing for resolution of problems involving Customer-provided devices. The performance of the CPE maintenance provider is Customer's responsibility. Customer will furnish all information reasonably required by Qwest prior to the remote installation phase of Service in order to enable Qwest to provide the Service.

**2.7 Availability**

(a) **Service Devices.** A current list of supported Service Devices, specific to the Service ordered, which is subject to change at Qwest's sole discretion, is available upon request from Qwest. Qwest may change such list without notice and all changes will be effective immediately.

(b) **Transport Options.** Service is available with specified Qwest transport services. Service is available in conjunction with Frame Relay, Private Line, ATM, PRN, and/or Qwest iQ Networking Service provided by Qwest and/or other providers.

**2.8 International Terms and Conditions.** International Service is available in many locations, but not all locations outside of the continental United States. Customer must verify with Qwest the availability of the Service in Customer's desired International locations. For Service outside of the continental United States, the following terms and conditions will apply.

(a) **Export Controls.** Customer will comply fully with all export and re-export controls under U.S. Export Administration Regulations and/or the relevant export control laws and regulations of any other applicable jurisdiction (collectively, "Export Controls"). Customer acknowledges that certain equipment, software, and technical data which may be provided hereunder may be subject to such Export Controls.

(b) **U.S. Foreign Corrupt Practices Act.** Customer acknowledges and agrees that certain laws of the U.S., including the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-1 et seq., prohibit any person subject to the jurisdiction of the U.S. from making or promising to make any payment of money or anything of value, directly or indirectly, to any government official, political party, or candidate for political office for the purpose of obtaining or retaining business. Customer represents and warrants that in the performance of its obligations hereunder, it has not made, and will not make, any such proscribed payment.

(c) **Export Laws.** Customer's use of the international Service, will comply in all material respects, with all international, federal, state, and local laws and regulations relating to its performance under this Service Exhibit. Customer represents and warrants that it is duly incorporated in or otherwise has all necessary permissions and authorizations required to do business in the locations in which it orders Service or otherwise does business. Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its performance hereunder and any resale of the Service.

**2.9 Indemnification.** In addition to the Indemnification in the Agreement, the following applies: Customer will defend, indemnify and hold harmless Qwest, its affiliates, and contractors from any and all damages, claims, liabilities, costs, and expenses, including reasonable attorneys' fees, arising from or related to any violation of any laws or regulations, including Export Controls or the U.S. Foreign Corrupt Practices Act.

**2.10 International Laws.** Customer acknowledges and agrees that Service will be offered hereunder subject to: (a) any applicable tariffs; (b) compliance with all applicable laws and regulations; (c) obtaining any domestic or foreign approvals and authorizations required or advisable; and (d) continued availability of any of the Service in any jurisdiction, country, or to any location. Customer acknowledges and agrees that Qwest may elect not to offer Service in or to any particular jurisdiction, location, or country if Qwest determines, in its sole discretion, that the continuation of such Service is not permitted or advisable. Any notices between the parties will be conducted in the English language.

**3. Term; Cancellation.** The term of this Service Exhibit will commence upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date) and continue until expiration or termination of the Agreement. Service provided under this Exhibit (including Services transferred from the Haband Agreement) shall have a term of 24 months (or such other period of time set forth; provided such term cannot be less than 12 months) (the "Minimum Service Term"). Upon written notice to Qwest at least 60 days prior to the conclusion of the Minimum Service Term, Customer may cancel Service provided under this Service Exhibit. In the absence of such prior written notice, the Service term will automatically renew on a month to month basis. The "Term" will include the Minimum Service Term and any automatic renewal term. If Service is canceled prior to the expiration of the Minimum Service Term for reasons other than a default by Qwest (including expiration of the Agreement), then Customer will pay to Qwest: (a) all charges for Service provided through the effective date of such cancellation, and if Customer cancels all Service and/or the Service Exhibit prior to the expiration of the Minimum Service Term; (b) an early Cancellation Charge equal to 50% of the MRCs for the highest number of devices managed by Qwest multiplied by the number of months, or portion thereof, remaining in the Minimum Service Term.

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

4. **Charges.** The rates set forth in the Integrated Management Pricing Attachment will be used to calculate Contributory Charges. The Service is not entitled to the QTA Discount.

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

QWEST TOTAL ADVANTAGE® AGREEMENT
QWEST INTEGRATED MANAGEMENT SERVICE EXHIBIT

PRICING ATTACHMENT

| • Base Service | • NRC | MRC per Device | Customer selection (place an "X" in the box to indicate the Customer is purchasing the item on that line) |
|---|---|---|---|
| Select Management | $0 | $50 | |
| Comprehensive Management | $0 | $100 | |
| • IPsec Tunnel Management | $0 | $150 | |
| • Optional Service | | | |
| Unlimited Change Requests | $0 | $10 | |
| 3 Hour MAC block | $225 | $0 | |
| MLPPP Management | $0 | $5 | |

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

**ATTACHMENT 1**

**LIMITED LETTER OF AGENCY**
between
**Appleseeds Topco, Inc. ("Customer")**
and
**Qwest Communications Corporation ("Qwest")**

This limited letter of agency ("LOA") hereby authorizes Qwest to act as the Customer's Agent for the limited purpose of contacting Customer's designated Local Exchange Carrier ("LEC"), Interexchange Carrier ("IXC"), Internet Service Provider ("ISP"), and/or Customer Premises Equipment ("CPE") Maintenance Provider in conjunction with Qwest Integrated Management ("Service"). Service activities will consist of working with Customer's LEC, IXC, ISP, and/or CPE Maintenance Provider for the purpose of: (a) extracting information concerning transmission data elements carried over Customer's network connection; (b) identifying Customer's links or data link connection identifiers ("DLCIs"); (c) opening, tracking, and closing trouble tickets with the LEC, IXC, ISP, or CPE Maintenance Provider on Customer's transport links or CPE when an alarm or fault has been detected; (d) dispatching CPE Maintenance repair personnel on behalf of Customer to CPE for which a fault has been detected; and (e) discussing fault information with the LEC, IXC or CPE Maintenance Provider on behalf of Customer to facilitate resolution of the problem.

Qwest does not assume any of Customer's liabilities associated with any of the services the Customer may use. Qwest assumes no liabilities in its performance of duties herein.

The term of this LOA will commence on the date of execution below and will continue in full force and effect until terminated with 30 days written notice by one party to the other or until the expiration or termination of the Service itself.

A copy of this LOA will, upon presentation to LEC, IXC, ISP, and/or CPE Maintenance Provider, as applicable, be deemed authorization for Qwest to proceed on Customer's behalf.

Appleseeds Topco, Inc.
Customer Company Name

_Margaret M Donahue_
Authorized Signature of Customer

_Margaret M Donahue_
Print or Type Name

_VP Customer Care_
Title

_29 May 2007_
Date

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

**PRIVATE ROUTED NETWORK SERVICE EXHIBIT**

1. **General; Definitions.** Capitalized terms not defined herein are defined in the Agreement. Qwest will provide Private Routed Network Service ("Service" or "PRN") under the terms of the Agreement and this Service Exhibit.

"Customer-Supplied CPE" means hardware, software and other tangible equipment and intangible computer code contained therein that is provided by Customer or any other third party for use with the Services by Customer.

"Net Rate" is in lieu of all other rates, discounts, and promotions, including the QTA Discount.

"Pricing Attachment" means a document containing rates specific to the Service and is incorporated by reference and made a part of this Service Exhibit.

"Qwest-Supplied CPE" means certain hardware, software and other tangible equipment and intangible computer code contained therein that is provided by Qwest for use by Customer solely in connection with the Service.

"SLA" means the service level agreement specific to the Service, located at http://www.qwest.com/legal/, which is subject to change.

2. **Service.**

2.1 **Description.** Service is an IP private routed network solution that is designed for intra- and/or intercompany communications. Service is comprised of the following service components and features that will vary depending upon what Customer orders: ports, features, and CPE Solutions (VPN Extension). Unless otherwise stated herein, Service is subject to the Qwest iQ Networking® SLA, which is effective as of the first day of the second month after initial installation of Service. The SLA provides Customer's sole and exclusive remedy for service interruptions or service deficiencies of any kind for the Service. Qwest reserves the right to amend the SLA effective upon posting to the web site or other notice to Customer. For purposes of this Service Exhibit, "Order Form" means an electronic order confirmation process utilizing an architecture confirmation document ("ACD") that Customer and Qwest mutually agree to prior to submitting an order for Service. Each ACD must be approved by Qwest and sent via e-mail or fax to a Qwest Order Engineering Center. Service is subject to availability and Qwest reserves the right to reject any order in its reasonable discretion. Customer agrees that all orders submitted hereunder will be governed by the rates, terms and conditions set forth in the Agreement and this Service Exhibit. Customer will promptly implement reasonable modifications that Qwest may make to the Service. Except as otherwise specified in this Service Exhibit, Customer will not modify any Services without Qwest's prior written approval.

2.2 **Ports and Features.** The following Port types are available: Virtual Private Network ("VPN") Port, Secure Internet Access ("SIA") Port, and Premium Port (collectively, "Ports"). Ports or specified Port speeds may not be available in all areas. Based on the Port selected, features include encryption, firewall services, Network Address Translation ("NAT"), and integrated Internet access. Customer may bundle up to eight DS-1 Ports across multiple DS-1 local loops at a specified Customer location by ordering multi-link point-to-point protocol ("MLPPP"). MLPPP is only available with Tasman Networks® or Cisco® CPE which may be managed by Qwest Integrated Management Service under a separate Agreement, by Customer. Customer-managed PRN ports enabled with MLPPP will be subject to the Reporting goal in the SLA for the MLPPP DS-1 bundle, but not for individual MLPPP DS-1 circuits.

2.3 **PRN Quality of Service.** PRN Quality of Service ("PRN QoS") prioritizes IP voice and video over other data applications. PRN QoS offers three templates that contain configuration options from which Customer may assign a priority level (Priority 1(highest), Priority 2, and Priority 3) to IP source and destination address pairs located within Customer's Private Routed Network topology. PRN QoS is supported on Qwest certified Cisco, Nortel, and ADTRAN routers. Customer may order PRN QoS for Ports with minimum access circuit speeds of 128 Kbps and maximum access circuit speeds of MLPPP 4xDS1 Mbps.

2.4 **CPE Solutions (VPN Extensions).** CPE solutions include: (a) a Qwest Managed Extension; or (b) a Customer Managed Extension.

(a) **Qwest Managed Extension.** Qwest will stage a premises-based VPN gateway (Nokia hardware/Check Point software) and ship it to Customer's location. Qwest Managed Extension includes the implementation of a Customer security policy which is submitted by Customer to Qwest on a standard Qwest template and subject to Qwest's approval. Customer's Service configuration will be updated periodically by Qwest in response to changes requested by Customer (e.g., employee changes and revisions to Customer's security policy/needs) during the Term.

(i) **Installation.** Qwest will ship the Qwest-Supplied CPE to Customer's location in plug and play mode. Customer will cooperate with Qwest by: (a) providing Qwest with all information concerning the Services reasonably requested by Qwest; (b) making available to Qwest appropriate access to Customer's systems for purposes of providing Qwest Managed Extension service; and (c) providing a primary and secondary site contact with relevant experience and expertise in Customer's network operations (the "Site Contact"). If installation of Qwest Managed Extension service is at a Qwest CyberCenter, a Qwest CyberCenter employee will act as the Customer Site Contact providing physical contact with CPE as necessary.

(ii) **Excluded Services.** Qwest is not responsible for any services other than the Qwest Managed Extension service described herein. Qwest will not: (a) debug problems on, or configure, any internal or external hosts or networks (e.g., routers, DNS servers, mail servers, WWW servers, and FTP servers, etc.); nor (b) act as an end-user help desk to Customer's employees or End Users for SecuRemote or SecureClient; rather, all communication regarding the Qwest Managed Extension service will be between Qwest and Customer's approved Site Contacts only.

Contract Code: 195027
OMR#: 128380

Page 34
CONFIDENTIAL

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

(iii) **Administrative Access.** Qwest will exclusively maintain administrative access to the Qwest Managed Extension service at all times. If Customer chooses to share administrative responsibilities with Qwest and is granted administrative access at any time, Qwest will continue to perform the Services on a commercially reasonable basis; provided however, that Customer may not be eligible for the service credits set forth in any SLA. Qwest maintains the root password for all firewalls. The Site Contact may request audit access for Customer-site firewalls on an as-needed basis. All remote administration functions occur via an encrypted session.

(iv) **Ongoing Management, Monitoring and Reporting.** Qwest performs ongoing management, monitoring and reporting as described below. After Service is installed on the Customer's network, change requests are processed on an as-needed basis. Requests must be initiated by an approved Customer Site Contact and will be submitted via web-based template.

| User/Group Accounts | Qwest will add, delete, and modify user accounts on each firewall. This includes grouping users into Customer-defined subsets. |
| --- | --- |
| Security Policy | Qwest will add, delete, and modify rules on each firewall to implement the Customer-defined security policy. If Qwest believes a Customer-requested policy change significantly impacts the level of security provided by the Qwest Managed Extension service, Qwest may contact the Customer and advise against the proposed action. In such cases, Qwest will document the identified risk and subsequent Customer exchange in a trouble ticket. |
| Reports | A set of standard management reports will be generated no more frequently than daily for each firewall. |
| System Monitoring | Qwest will monitor performance characteristics (e.g., swap space, disk full, CPU utilization) of the Qwest Managed Extension service. |
| Mail Configuration | During the initial installation, Qwest will configure the Qwest Managed Extension service to pass mail to and from SMTP hosts on the protected and unprotected networks, as requested by Customer. |
| Performance | Qwest will periodically adjust the system to increase performance or resource utilization (e.g., changes to rulebase design, HTTP proxy configuration, routing, and logging, etc.). |
| Upgrades and Site Visits | Qwest will remotely and securely install patches, bug fixes, or software upgrades on the Qwest Managed Extension service. All patches and software upgrades will be tested and approved by Qwest security engineering prior to deployment on the Managed Extension device. |

(b) **Customer Managed Extension (integrated connectivity to Service via alternative IP access).** Qwest will provide Customer with detailed configuration information for Qwest-permissible IPSec-enabled Cisco routers (more detailed information is available upon request). Customer is entirely responsible for all router configuration requirements for Customer Managed VPN Extensions. This includes all configuration of access control lists and applicable LAN/WAN interfaces. Customer will purchase and support the CPE at its location. Customer will obtain Qwest IP access or contract with selected ISP for IP connectivity. Qwest will facilitate Customer's secure connection between the CPE and a Qwest Private Routed Network gateway.

**2.5  Service Conditions.**

(a) **Internet Address Space.** Subject to availability, Qwest will use commercially reasonable efforts to secure domain names and assign Internet address space for the benefit of Customer during the Term. Neither Customer nor any End Users will own or route these addresses. Qwest owns all such IP addresses and, upon termination of Service, Customer's access to such IP addresses will cease.

(b) **Third Party End Users.** Except in accordance with this Section, Customer may not distribute the Qwest Service to third parties. Third party End Users will be bound to the same terms and conditions of this Service Exhibit as Customer, and Customer assumes total responsibility for third party End Users. Customer must notify its third party End Users of any notice provided to Customer by Qwest hereunder, and any notice delivered to Customer will be deemed delivered to such third party End User for purposes of this Service Exhibit. Customer represents and warrants that it will: (a) guarantee payment for Services ordered by any third party End Users; and (b) be fully responsible for all the obligations and liabilities under the Agreement (and all applicable addenda) of such third party End Users.

**2.6  Customer Premises Equipment.**

(a) **Qwest-Supplied CPE.** Qwest-Supplied CPE does not include CPE purchased by Customer.

(i) **Delivery and Return.** Qwest-Supplied CPE will be delivered to the Customer location in the United States as identified, in writing, by Customer. Delivery will be made F.O.B. origin, freight paid by Customer. The Qwest-Supplied CPE will be installed as designated herein, or as otherwise agreed upon by the parties. Upon termination of Service, Customer will, at its own expense, deliver all Qwest-Supplied CPE to Qwest in the same condition as it was on the Effective Date, normal wear and tear excepted, and Customer will give Qwest written notice of such return. If Customer fails to return the Qwest-Supplied CPE to Qwest in the time and manner provided by Qwest, Customer will pay to Qwest the fair market value of the Qwest-Supplied CPE, as determined by Qwest.

(ii) **Ownership and Use.** The Qwest-Supplied CPE will always remain the personal property of Qwest, its designee or a third party provider, notwithstanding that the Qwest-Supplied CPE, or any part thereof, may be affixed or attached to real property or any improvements thereon. Customer will have no right or interest in the Qwest-Supplied CPE other than as provided herein and will hold the Qwest-Supplied CPE subject and subordinate to the rights of Qwest. Customer will: (a) at its own expense, keep the Qwest-Supplied CPE free and clear of any claims, liens, and encumbrances of any kind; and (b) make no alterations or affix any additions or

Contract Code: 195027
OMR#: 128380

Page 35
CONFIDENTIAL

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

PRIVATE ROUTED NETWORK SERVICE EXHIBIT

attachments to the Qwest-Supplied CPE, except as approved by Qwest in writing. Customer will not remove, alter or destroy any labels on the Qwest-Supplied CPE and will allow the inspection of the Qwest-Supplied CPE at any time. As between Qwest and Customer, Customer will bear the entire risk of loss, theft, destruction or damage to the Qwest-Supplied CPE following delivery from any cause whatsoever (collectively, "CPE Loss"). Customer will indemnify, defend and hold harmless Qwest its affiliates, and contractors for any such CPE Loss. Customer agrees to advise Qwest in writing within five business days of any such CPE Loss. In no event will such CPE Loss relieve Customer of the obligation to pay Qwest any amounts due hereunder.

(b) **Customer-Supplied CPE.** Customer may use Customer-Supplied CPE with the Service upon approval by Qwest. All Customer-Supplied CPE must comply with the Qwest Service configurations. The Customer-Supplied CPE will be installed as designated herein, or as otherwise agreed upon by the parties. Customer will be solely responsible for the installation, operation, maintenance, use and compatibility of Customer-Supplied CPE and Qwest will have no responsibility or liability in connection therewith. Customer will cooperate with Qwest in setting the initial configuration for the Customer-Supplied CPE interface with the Service and comply with Qwest's instructions in connection therewith.

(c) **End User License.** All CPE is subject to the terms and conditions set forth in the manufacturer's or publisher's warranty or end-user license, including, if applicable, the Check Point® End User License Agreement from Check Point Software Technologies, Ltd., which is posted on Qwest's web site at www.qwest.com/checkpoint/eula/, with no warranty of any kind from Qwest. If Customer's Qwest-Supplied CPE includes Check Point software, Customer understands and agrees that Qwest will only be obligated to provide the Service so long as Customer agrees to and remains in compliance with the Check Point End User License Agreement.

**2.7 Insurance.** If the Customer utilizes Qwest-Supplied CPE, Customer will, in addition to any other insurance that Customer may be required to have in order to procure Services, provide and maintain, at Customer's own expense, at all times following delivery of the Qwest-Supplied CPE the following insurance: (i) "All-Risk" property insurance covering the Qwest-Supplied CPE for the full replacement value, naming Qwest or a third party provider designated by Qwest as a loss payee; and (ii) commercial general liability insurance with limits of not less than $1,000,000 per occurrence and aggregate and naming Qwest as an additional insured. Such insurance will be placed with insurers who have a minimum "Best's" rating of A- VII (A- 7), and will contain a provision to give Qwest thirty calendar days prior written notice before cancellation or material change thereof. Upon request, Customer will deliver to Qwest insurance certificates of evidencing such insurance.

**2.8 Additional Limitation of Liabilities.** Qwest makes no warranty, guarantee, or representation, express or implied, that all security threats and vulnerabilities will be detected or that the performance of the Services will render Customer's systems invulnerable to security breaches. Customer is responsible for Customer's own network security policy (including applicable firewall and NAT policies) and security response procedures.

**2.9 International Terms and Conditions.** International Service is available in many locations, but not all, outside the continental United States, and Customer must verify with Qwest the availability of the Service in Customer's desired locations. For Service outside of the continental United States, the following terms and conditions will apply.

(a) Qwest is able to provide IP access in numerous international locations, but not direct Port connectivity. In these locations, Qwest will provide network services in conjunction with the Qwest Managed or Customer Managed Extension. Customer will pay all applicable charges in U.S. dollars as set forth in a Final Quote Form for international Private Routed Network Service. All Final Quote Forms submitted to Qwest by Customer pursuant to this Service Exhibit will be governed by the rates, terms and conditions set forth in the Agreement and this Service Exhibit. Unless specifically set forth in a Final Quote Form, the rates set forth therein do not include any costs associated with local access or any access-related charges or CPE, all of which will be additional.

(b) Qwest reserves the right to immediately change international rates as a result of Regulatory Activity. If Regulatory Activity materially and adversely impairs Qwest's ability to provide (including the economics of providing) the Service, as reasonably determined by Qwest, Qwest reserves the right to terminate the affected Service.

(c) Customer acknowledges and agrees that Service will be offered hereunder subject to: (i) any applicable tariffs; (ii) compliance with all applicable laws and regulations; (iii) obtaining any domestic or foreign approvals and authorizations required or advisable; (iv) continued availability of any of the Service in any jurisdiction, country or to any location; and (v) continued availability of access lines in any particular jurisdiction, country or location. Customer acknowledges and agrees that Qwest may elect not to offer Service in or to any particular jurisdiction, location or country, or may block Service to or from any particular jurisdiction, location or country if Qwest determines, in its sole discretion, that the continuation of such Service is not permitted or advisable. Any arbitration or notices between the parties will be conducted in the English language.

(d) Customer's use of the international Service, will comply, in all material respects, with all international, federal, state and local laws and regulations relating to its performance under this Service Exhibit. Customer represents and warrants that it is duly incorporated in or otherwise has all necessary permissions and authorizations required to do business in the locations in which it orders Service or otherwise does business. Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its performance hereunder.

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

PRIVATE ROUTED NETWORK SERVICE EXHIBIT

(e)  Customer will comply fully with all export and re-export controls under U.S. Export Administration Regulations and/or the relevant export control laws and regulations of any other applicable jurisdiction (collectively, "Export Controls"). Customer acknowledges that certain equipment, software and technical data which may be provided hereunder may be subject to such Export Controls.

(f)  Customer acknowledges and agrees that certain laws of the U.S., including the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-1 et seq., prohibit any person subject to the jurisdiction of the U.S. from making or promising to make any payment of money or anything of value, directly or indirectly, to any government official, political party, or candidate for political office for the purpose of obtaining or retaining business. Customer represents and warrants that in the performance of its obligations hereunder, it has not made, and will not make, any such proscribed payment.

(g)  If, for regulatory or other reasons, Qwest does not provide some portion of international Service itself, Customer hereby authorizes Qwest to act as Customer's agent and sole contact with any third party as Qwest may designate, in its sole discretion, to provide any portion of the international Service directly to Customer. In such event, Qwest will present to Customer consolidated invoices for all portions of the international Service and remit such payments as are appropriate to any other entity providing any portion of the international Service. Customer agrees to direct all inquiries, issues and disputes regarding Service solely to Qwest.

(h)  Customer is providing to Qwest the names of and contact information ("Business Contact Information") for its employees ("Business Contacts") who have purchasing or other responsibilities relevant to Qwest's delivery of Service under this Service Exhibit. The Business Contact Information does not include personal data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union memberships, financial status, health or sex life. Customer consents to Qwest's and its affiliates or subcontractors' use and transfer to the United States of Business Contact Information for the purpose of: (i) fulfilling its obligations under this Service Exhibit; and (ii) providing information to Customer about Qwest's products and services via these Business Contacts. Customer represents that the Business Contact Information is accurate and that each Business Contact has consented to Qwest's processing of their Business Contact Information for the purposes set forth herein. The Business Contact Information provided by Customer has been collected, processed, and transferred in accordance with applicable laws, including, where applicable, any necessary notification to the relevant data protection authority in the territory in which Customer is established ("Authority"). Customer will notify Qwest promptly of staffing or other changes that affect Qwest's use of Business Contact Information. Qwest will have in place technical and organizational measures that ensure a level of security appropriate to the risk represented by the processing and the nature of the Business Contact Information, and that protects such information against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access. Qwest will use the information only for the express purposes set forth herein. Qwest will identify a contact authorized to respond to inquiries concerning processing of Business Contact Information, and will reasonably cooperate in good faith with Customer and the Authority concerning all such inquiries without excessive delays.

3.  **Term; Cancellation.** This Service Exhibit will commence upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date) and will remain in effect until expiration or termination of the Agreement. For any Port, or Service (including Services transferred from the Haband Agreement) associated with Qwest-Supplied CPE, that does not remain installed and used for 12 months (including by reason of expiration of the Agreement), Customer will pay to Qwest a Cancellation Charge equal to the standard NRC rate applicable to that Port or Service associated with Qwest-Supplied CPE unless canceled by Customer for Cause.

4.  **Charges.**

4.1  **Discounts.** The Net Rate MRCs set forth in the Pricing Attachment will be used to calculate Contributory Charges.

4.2  **Pricing.** Charges for each component of Service commence within five days of Qwest's notification to Customer that the Service component is provisioned and ready for use ("Start of Service Date"). The rates set forth in the Pricing Attachment do not include any costs associated with local access or CPE. All rates, charges and payments will be denominated and payable in U.S. dollars.

4.3  **Promotional Pricing.** If Customer is eligible for and accepts promotional pricing, the applicable promotional pricing will be described in the applicable Qwest promotional attachment. Promotional pricing is subject to the dates of availability as well as all other Qwest terms and conditions. If Customer receives promotional pricing, Customer will not be eligible for any other discounts, including the QTA Discount.

5.  **AUP.** All use of the Services will comply with the AUP, posted at http://www.qwest.com/legal/ and incorporated by reference into this Service Exhibit. Qwest may reasonably modify the AUP to ensure compliance with applicable laws and regulations and to protect Qwest's network and customers, and such change will be effective upon posting to the website. Any changes to the AUP will be consistent with the purpose of the AUP to encourage responsible use of Qwest's networks, systems, services, web sites, and products.

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

QWEST TOTAL ADVANTAGE

PRIVATE ROUTED NETWORK SERVICE EXHIBIT

## PRICING ATTACHMENT

1. **Port Charges.** Qwest Private Routed Network requires a minimum 64 Kbps digital local loop (which is ordered separately). Customer is responsible for any additional costs associated with upgrading its local loop to 64 Kbps or higher, plus any changes in hardware configurations including but not limited to WAN interface cards. Port charges are for Ports located in the continental United States. If Customer requests an Open Shortest Path First ("OSPF") routing change, a $350 NRC for every ten locations will apply.

### VPN Port DS-1

| Bandwidth | VPN Port Net Rate MRC | Install NRC |
|---|---|---|
| 768 Kbps | $567.00 | $500.00 |
| 1.544 Mbps (DS-1) | $623.83 | $500.00 |

### VPN Port MLPPP

| Bandwidth | VPN Port Net Rate MRC | Install NRC |
|---|---|---|
| 2x DS1 (3 Mbps) | $1,247.40 | $500.00 |
| 3x DS1 (4.5 Mbps) | $1,871.10 | $500.00 |

3. **CPE Solutions Pricing.**

3.1 **Qwest Managed Extension Service.** Qwest Managed Extension NRCs and MRCs are not eligible for any discounts, including, without exception, Qwest Total Advantage discounts. There is no extra charge for SecuRemote® software, but it must be licensed separately. There is a one-time $25 nondiscountable charge per license for utilizing SecureClient™ software. Any international shipping charges will be billed to Customer.

| Description | Minimum Hardware | NRC | MRC | Hot Spare MRC | Cold Spare MRC |
|---|---|---|---|---|---|
| Check Point 25 | Nokia® IP130 | $1,000.00 | $595.00 | $595.00 | $298.00 |
| Check Point UNL | Nokia IP350 | $1,500.00 | $995.00 | $995.00 | $498.00 |
| Management Only | Customer Provided (Nokia) | $1,000.00 | $500.00 | $500.00 | N/A |

(a) Customer may request a hardware upgrade, subject to the following monthly charges. For each upgrade Customer will also pay an increased MRC as set forth below"). This increased MRC is added to the base MRC set forth above.

| UPGRADE | NRC | Increased MRC |
|---|---|---|
| Level 1 Hardware Upgrade   (IP130 to IP350 or IP350 to IP390 or PIX 515E to PIX 525 or PIX 525 to PIX 535) | $0 | $250.00 |
| Level 2 Hardware Upgrade   (IP130 to IP390 or IP390 to IP560 or PIX 515E to PIX 535) | $0 | $500.00 |
| Level 3 Hardware Upgrade   (IP130 to IP560) | $0 | $750.00 |
| Additional Quad Ethernet Card   (requires a minimum IP390 Hardware Upgrade – Nokia only) | $0 | $100.00 |
| Gig Ethernet Card   (requires a minimum IP390 Hardware Upgrade – Nokia only) | $0 | $200.00 |
| VPN Accelerator Card   (requires a minimum IP390 Hardware Upgrade – Nokia only) | $0 | $250.00 |

3.2 **Customer Managed Extension.** This is integrated connectivity to Private Routed Network via alternative IP access.

| Description | MRC |
|---|---|
| Security Management Fee (per integrated connection) | $500.00 |

Copyright © 2006 Qwest. All Rights Reserved
v1.100906

# OM Contract Cover Sheet: Major/Global Market Accounts

➢ To avoid processing delays, a completed <u>OM Contract Cover Sheet</u> must be included w/ 2 customer-signed original contracts, including all exhibits, when sent to Contract Management. Please be sure to select your Director for proper contract return.
➢ In addition to sending this Cover Sheet and Order Package to OM, a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

☒ **Sales Executive** - complete this information:

| Customer Name: | OMR # / OM Analyst: | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Appleseed's Topco, Inc. | 132331 / Anita Turner | 24 months / $1,080,000 | 58623945 |
| **Customer Signatory Name:** | **Customer Signatory Title:** | **Term/Commitment Renewal:** | **Contract #** |
| Margaret Donahue | VP | No | 193027 |
| **Billing Cycle Cut** | **Discount Group** | **Opportunity ID#** | **(OA Use Only) iLink Content ID #** |
| 83 | 60953 | 5704338 | |

**Sales Executive Information**

Name: Kevin Lambert  Sales ID: ASZP
Sales office code: NAMAEDIS Choose the appropriate Sales Office Codes described on the list attached to this coversheet (page 2).
e-mail address: kevin.lambert@qwest.com

**Sales Executive Address & Phone #**
Office Address: 379 Thornall Street, Edison NJ 08837
Telephone No: 732 767 5668
AC / ASR / PSR Name: n/a

☒ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

☒ **Sales Executive** check appropriate Director with an X from address list below in CM Group "Step A".

☒ **Sales Office Admin or Sales Executive Task** Overnight this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". <u>Before sending the contract, review for hand written changes</u> (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the overnight tracking number below on Page 2. Please note: you must send (2) two cust omer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit.

| Step A: Select Your Director | | | Step B: Overnight to this Director's Admin | |
|---|---|---|---|---|
| **Sales Place X Here** | **Sales Director** | **Sales VP** | **OMR Admin Name & Phone** | **Admin Address** |
| ☐ | Beverly McGill | Richard McGuire | Chelsea Augstburger 312.251.4376 | 1 N. Franklin, Suite 2600 Chicago, IL 60606 |
| ☐ | Chris Rommeney | Neil Cox | | |
| ☐ | Cindy Lucaccioni | | | |
| ☐ | Kevin Watson | Richard McGuire | Michle Green 407.650.1406 | 37 N Orange Ave, 9th Floor Orlando FL 32801-0000 |
| ☐ | Vickie Rodgers | Richard McGuire | Shirley Goldsmith 770.777.5668 | 3625 Brookside Pkwy, Suite 400 Alpharetta GA 30022-0000 |
| ☐ | Frank Bowdon | Neil Cox | OPEN BOWDEN - Send to JoAnn Young until Admin is hired | 20750 Civic Center Dr, Suite 600 Southfield, MI 48076 |
| ☐ | Bill Hooper | Neil Cox | Sylvia Duque 713.479.5844 | 1 E Greenway Plz Houston, TX 77046 |
| ☐ | Hector Grado | | | |
| ☐ | Jeff Waters (KS, MO, IA, NE) | Neil Cox | JoAnn Young 913.676.3910 | 5799 Broadmoor St, Suite 700 Mission KS 66202-2403 |
| ☒ | Kathy Sullivan | Bruce Smith | Dorine Temple 212.692.6663 303-391-1745 FAX | 546 5th Avenue, 10th Fl New York, NY 10036 |
| ☐ | John Dinneny-NY/LI | | | |
| ☐ | J.Dinneny-CT/MA | | | |
| ☐ | David Ackerman (Globals) | | | |
| ☐ | Deborah Souza (JP Morgan) | Richard McGuire | | |
| ☐ | IBM | | | |
| ☐ | Mark Amico (So Cal) | Chris Ancell | Victoria Rasho 303.391.8589 | 1801 California St., 17th Floor Denver, CO 80202 |
| ☐ | Tina Smith | | | |
| ☐ | OPEN (Claudio Cipolla; Karrie Connors; John Wing) | | | |
| ☐ | Kim Baker | Chris Ancell | Judy Campo 206.224.1170 | 1600 7th Ave, Suite 1914 Seattle, WA 98191 |
| ☐ | Dennis Sherwood (No Cal) | | | |
| ☐ | Gary Phillips | Richard McGuire | Robin Nagy | 6155 Rockside Rd, Suite 308 Independence, OH 44131 |
| ☐ | John Stuart | | | |
| ☐ | Todd Torman | Chris Ancell | Kimberly Flowers-Luevano 602.865.0110 | 20 E Thomas Rd, 4th Floor Phoenix, AZ 85012 |
| ☐ | Rick Christensen | Chris Ancell | Lori Adams 801.575.1006 | 250 E 2nd S, Ste 400 Salt Lake City, UT 84111 |
| ☐ | Dave Hogan | Chris Ancell | Michelle Schaefer 206.224 1125 | 3245 – 146th Place SE Suite 130 Bellevue, WA 98007 |
| ☐ | Tyler Middleton | Neil Cox | Peggy Gawarecki 612.336.3002 | 200 S 5th St, 395 Minneapolis MN 55402-0000 |

Date sent to Sales Executive: ; **overnight tracking number:** (if applicable, US Mail is fine in most cases)

☐ **Director's Admin** make a copy for the VP's files and send the original to the Sales Executive for presentation to the customer. Sales Executive address is above at the top of the document.

**AMENDMENT TO**
**QWEST TOTAL ADVANTAGE® AGREEMENT**

**THIS AMENDMENT NO. ONE** (this "Amendment") by and between **Qwest Communications Corporation** ("Qwest") and **Appleseeds Topco, Inc.** ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID: 212249, as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before **November 6**, 2007.

| CUSTOMER: Appleseeds Topco, Inc. | QWEST COMMUNICATIONS CORPORATION |
|---|---|
| By: *Margaret M Donahue* | By: _____ |
| Name: *Margaret M Donahue* | Name: _____ |
| Title: *VP Customer Center Optimization* | Title: Director of Offer Management |
| Date: *27 September 2007* | Date: _____ |

Qwest and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment**. Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**No Changes.** Customer's existing Revenue Commitment and existing Term, which began on June 1, 2007, as set forth in the Agreement will remain in effect.

**2. New Service(s) is/are being added.** Customer requests through this Amendment to add new Service(s) and corresponding new Service Exhibit(s) (or "Select Terms" if Customer is adding the QIA Select Terms) to the Agreement. The Services set forth in the Service Exhibit(s) or Select Terms attached to this Amendment will be added to, and constitute a part of, the Agreement and the existing Services. All Net Rates set forth in the Service Exhibit(s) are in lieu of all other rates, discounts, or promotions. The definition of Services in the Agreement will include the Services in the Service Exhibits attached to this Amendment. Customer requests the following new Services:

**Conferencing Service Exhibit**
**Rental CPE Exhibit**
**Office Connect Promotion Exhibit**
**International Private Line Exhibit**

**3. Modifications.** The Agreement is amended as follows:

**3.1 Tariff.** The following Tariff information is added to the Agreement.

If Services are provided pursuant to a Tariff or RSS, as described in the applicable Service Exhibits, the order of precedence will apply in the following descending order of control: Tariff, Service Exhibit, Agreement, RSS, and Order Form. "Tariff" includes as applicable: QCC state tariffs, price lists, price schedules, administrative guidelines, catalogs, and rate and term schedules, incorporated by this reference. "RSS" means as applicable: QCC's Rates and Services Schedule posted at www.qwest.com/legal and other rate and term schedules, incorporated by this reference. Qwest reserves the right to amend, change, withdraw or file additional Tariffs or RSS in its sole discretion, with such updated Tariffs or RSS effective upon posting or upon fulfillment of any necessary regulatory requirements.

**3.2 Modifications to existing Domestic Qwest iQ Networking Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Qwest iQ Networking Service Exhibit:

**(a)** The following table will be added to the second table in Section 1 of the Domestic iQ Networking Service Exhibit Pricing Attachment:

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 4 x DS1 (6 Mbps) | $500.00 | $1,700.00 |
| 5x DS1 (7.5 Mbps) | $1,000.00 | $2,125.00 |
| 6x DS1 (9 Mbps) | $1,000.00 | $2,550.00 |
| 7 x DS1 (10.5 Mbps) | $1,000.00 | $2,975.00 |
| 8 x DS1 (12 Mbps) | $2,000.00 | $3,400.00 |

**3.3 Modifications to existing Domestic Private Line Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Private Line Service Exhibit.

**(a)** The following will be added to the existing table in the Domestic Private Line Service Exhibit Pricing Attachment:

Copyright © 2007 Qwest. All Rights Reserved.
v1.030207

09/28/2007  8:12AM

### AMENDMENT TO
### QWEST TOTAL ADVANTAGE® AGREEMENT

| PL IOC Circuit Type | Location A (by NPA/NXX) | Location Z (by NPA/NXX) | Net PL IOC MRC* (after application of all applicable discounts | Install NRC** |
|---|---|---|---|---|
| DS-1 | 757825 | 972/643 | $1,135.00 | $1,000 |
| DS-1 | 757825 | 614/751 | $617.00 | $1,000 |

**3.4 Modifications to existing Domestic Voice Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Voice Service Exhibit.

**(a)**     The Domestic Voice Service Exhibit is amended to include the following, new Section 2.3:

**2.3 Qwest 8XX Outbound Service.** Qwest 8XX Outbound Service is available only on an individual case basis. Service allows Customer to place outbound 8XX calls to Qwest owned or non-Qwest owned 8XX numbers on Customer's Qwest dedicated access lines ("DALS"). There is no Service Level Agreement ("SLA") that applies to this Service. Service may be utilized by Customer to contact Customer's vendors and suppliers by dialing a toll-free number, to dial a domestic toll-free number to join a conference call, or where Customer does not have sufficient capacity to split outbound long distance and outbound 8XX calls onto different trunk groups/circuits and Customer wants to utilize the existing Qwest trunk groups/circuits for outbound 8XX calls. Service is governed by the Qwest Services Schedules and/or Tariffs, as indicated in Section 9 of the Agreement. Qwest may modify the Service at any time, and such change will be effective upon posting to the Services Schedule or inclusion in the Tariff. Customer understands and agrees that all outbound 8XX calls will be billed to the trunk group owner, even if the dialed 8XX numbers belong to Qwest. A minimum overall monthly aggregate QTA Revenue Commitment of ten thousand dollars ($10,000) is required for this Service.

**(b)** The Domestic Voice Pricing Attachment is amended to include the following, new Section 7:

7.  Customer will be billed the same rates as outbound long distance for their outbound 8XX traffic, as set forth in the Domestic Interstate Outbound Long Distance table in Section 1 of this Pricing Attachment. In addition, Qwest reserves the right to charge MRCs for the 8XX Outbound Service. The 8XX Outbound Service will not receive QTA discounts, but will contribute toward the QTA Revenue Commitment.

**3.5 Addition to Local Access.** The following will be added to the pricing table in Section 2 of the Local Access Pricing Attachment of the Agreement:

| NPA/NXX | Type of Local Access | Minimum Service Term in Months | Circuit Speed | Local Access MRC | Install NRC |
|---|---|---|---|---|---|
| 213891 | Leased | 12 | DS-1 | $175.00 | $0 |
| 304728 | Leased | 12 | DS-1 | $550.00 | $0 |
| 757825 | Leased | 12 | DS-1 | $250.00 | $0 |
| 757825 | Leased | 12 | DS-3 | $3,000.00 | $698 |
| 757896 | Leased | 12 | DS-3 | $3,000.00 | $698 |

**3.6 Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**4. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

## QWEST TOTAL ADVANTAGE® AGREEMENT
## CONFERENCING SERVICE EXHIBIT

**1.    General; Definitions.** Capitalized terms not defined herein are defined in the Agreement. Qwest will provide Conferencing Service ("Service") under the terms of the Agreement, RSS, and this Service Exhibit.

"Custom Discount" means a competitive-response, negotiated discount off of the Rate Per Minute, Per Participant Charges set forth in the Pricing Attachment. Because it is a greater discount, the Custom Discount replaces and supersedes the QTA Discount.

"Net Effective Rate" means the Rate Per Minute, Per Participant Charges less the Custom Discount. Net Effective Rates are subject to change if there is a change in the underlying pricing and/or applicable discount(s), with any such changes to be done in accordance with the terms of the Agreement or this Service Exhibit.

"Pricing Attachment" means a document containing rates specific to the Service and is incorporated by reference and made a part of this Service Exhibit.

**2.    Service Description.** This Service provides a digital bridging network comprised of forty thousand ports that allow calls via toll or toll-free dialing options. Qwest Conferencing supports U.S.-based and international calls, along with options such as operator assistance or automated service.

**3.    Term.** The term of this Exhibit will begin upon the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement adds this Exhibit after the Effective Date of the Agreement) and will continue until the expiration or cancellation of the last to expire (or cancel) Service ordered hereunder.

**4.    Charges.** Customer will pay the Net Effective Rates set forth in the Discount Eligible section of the Pricing Attachment. The charges for each component of Service commence within five days of Qwest's notification to Customer that the Service component is provisioned and ready for use. The rates do not include costs associated with local access. The Custom Discount will apply to the Discount Eligible Conferencing Service rate per minute, per participant charges, but will not apply to any Additional Features or the Non-Discountable Conferencing Service charges, all of which are specified in the below table. The rates, before application of discounts, will be used to calculate Contributory Charges.

# QWEST TOTAL ADVANTAGE® AGREEMENT
## CONFERENCING SERVICE EXHIBIT

### PRICING ATTACHMENT

| Discount Eligible Conferencing Service Type | Rate Per Minute, Per Participant Charges | Custom Discount | Net Effective Rate Per Minute, Per Participant Charges |
|---|---|---|---|
| Automated Passcode Toll | $0.21 | 0.00% | $0.21 |
| Automated Passcode Toll-Free | $0.27 | 0.00% | $0.27 |
| Multimedia: Reservationless and Web Conferencing | $0.33 | 69.70% | $0.09 |
| Web Conferencing | $0.30 | 70.00% | $0.10 |
| Operator-Assisted Toll | $0.24 | 0.00% | $0.24 |
| Operator-Assisted Toll Free | $0.38 | 0.00% | $0.38 |
| Operator Dial Out—Domestic | $0.42 | 0.00% | $0.42 |
| Operator Dial Out—International | $0.42 + Outbound Rate for Particular Country | 0.00% | $0.42 |
| Reservationless Audio Replay | $0.22 for recording and replay charges | 0.00% | $0.22 |
| Reservationless Dial-Out—Domestic | $0.22 | 0.00% | $0.22 |
| Reservationless Dial-Out—International | $0.22 plus outbound rate for particular country | 0.00% | $0.22 |
| Reservationless Toll | $0.18 | 0.00% | $0.18 |
| Reservationless Toll-Free | $0.22 | 75.00% | $0.055 |
| Non-Discountable Conferencing Service Type | Net Effective Rates | | |
| Streaming—Live Call | $500 Minimum Charge (includes 500 participants and 2 hours' call duration) | | |
| | $500 for each additional block of 500 participants | | |
| | $500 for each additional 2 hours' call duration per block of 500 participants | | |
| | $0.50 for each 2 hour call duration per participant in excess of total number of participants scheduled at time of reservation | | |
| Additional Features | Net Effective Rates | | |
| • Web Conferencing | | | |
| Archive—CD | $100.00 per archive CD, plus shipping—3 day turnaround | | |
| Archive—Hosting | $175.00 per archive, hosted for 3 months, unlimited playbacks | | |
| Archive—Zip File | $75.00 per archive—2 hour turnaround | | |
| Hosting Renewal Option | $75.00 archive hosted for additional 3 months, unlimited playbacks | | |
| Live Streaming | $7.50 per participant, per connection | | |
| • Operator Assisted | | | |
| Cassette Recording | $15.00 per tape | | |
| CD | $25.00 per CD, plus shipping | | |
| Communication Line | $50.00 per conference per communication line | | |
| Custom Applications | Case-by-case basis | | |
| Digital Replay | $40.00 set-up fee per call | | |
| | $0.24 per minute per line | | |
| Electronic Polling | $0.15 per minute per line | | |
| Q&A | $0.15 per minute per line for the entire duration of the call | | |
| Electronic Recording—MP3/Real Media | $25.00 per emailed file | | |
| | $35.00 per emailed file, less than 2 hour turnaround | | |
| Fax Broadcast | $0.35 per minute, per participant | | |

**QWEST TOTAL ADVANTAGE® AGREEMENT**
**CONFERENCING SERVICE EXHIBIT**

| | |
|---|---|
| Notification in Advance | $3.00 per domestic notification |
| | $6.00 per international notification |
| Participant Lists | $5.00 per list |
| Recorded Tape Played During Conference | $25.00 per tape, plus access line |
| Replay Participation Report | $1.00 per name |
| RSVP line | $2.00 per conference participant reservation |
| Transcription | $35 per 15-minute increment(s) 1 hour minimum 72 hour turnaround |
| | $45.00 per 15-minute increment(s) 1 hour minimum 24 hour turnaround |
| Live Translation | $55.00 per 15 minutes, 1 hour minimum |

OMR 132311 amends OMR(s) 128380
MGM/NJ/OMR 132331

Copyright © 2007 Qwest. All Rights Reserved.
v1.030207

09/28/2007   8:12AM

## QWEST TOTAL ADVANTAGE® AGREEMENT
### RENTAL CPE SERVICE EXHIBIT

**1. General.** Qwest will provide Customer with rental customer premises equipment ("CPE") and/or software license offerings (collectively, "Products") and CPE maintenance and installation services ("Services") under (a) the terms set forth in this Service Exhibit and any Rental CPE Rate Attachment submitted hereunder and (b) the terms in the following sections of the Agreement: Payment; Disclaimer of Warranties; Limitation of Liability; Termination; Confidentiality; Publicity; Dispute Resolution; Governing Law; Notices; General; and Definitions. "Rental CPE Rate Attachment" means Product and Service order request forms issued and executed by Qwest and Customer. CPE, as defined herein, does not include CPE purchased by Customer. In order to qualify for CPE, Customer must also purchase iQ Networking Services ("iQ Service") under a separate Service Exhibit to the Agreement.

**2. Delivery and Return.** Products will be delivered to the Customer location as identified, in writing, by Customer. Delivery will be made either by F.O.B. origin, freight paid by Customer, or personal delivery by Qwest. The Products will be installed as designated herein, or as otherwise agreed upon by the parties. Upon termination of Service, Qwest will provide Customer with return instructions. Customer must return Products at its own expense. Customer will deliver Products to Qwest in the same condition as they were on the Effective Date, normal wear and tear excepted, and give Qwest written notice of such return. Customer will continue to pay all MRCs until the Products are returned to Qwest.

**3. Changes and Cancellations.** All changes and/or cancellations must be in writing, and are subject to the Rescheduling, and Cancellation sections of Qwest's Customer-Initiated Change Charge ("CICC") Policy, which is posted at http://www.qwest.com/legal/cpe.html. The CICC is incorporated by reference and made a part of this Service Exhibit. Qwest may change the CICC at any time and such change will be effective upon posting to the Web site.

**4. Ownership and Use.** The Products are the personal property of Qwest, its designee or a third party provider, notwithstanding that the Products, or any part thereof, may be affixed or attached to Customer's real property or any improvements thereon. Customer has no right or interest to the Products other than as provided herein and will hold the Products subject and subordinate to the rights of Qwest. Customer will: (a) at its own expense, keep the Products free and clear of any claims, liens, and encumbrances of any kind; and (b) make no alterations or affix any additions or attachments to the Products, except as approved by Qwest in writing. Customer will not remove, alter or destroy any labels on the Products and will allow Qwest the inspection of the Products at any time. As between Qwest and Customer, Customer will bear the entire risk of loss, theft, casualty, destruction or damage to the Products following delivery from any cause whatsoever (collectively, "Product Loss"), until returned to Qwest. Customer will indemnify, defend and hold harmless Qwest its affiliates, and contractors for any such Product Loss. Customer agrees to advise Qwest in writing within five business days of any such Product Loss. In no event will such Product Loss relieve Customer of the obligation to pay Qwest any amounts due hereunder.

**5. Software.** Software licensor has retained title to the software. To the extent possible, Qwest grants Customer a software license or sublicense in the software according to the licensing agreement accompanying such software, which extends only to Customer's own internal business use of such software and only on or with the designated CPE. Software must be held in confidence and may not be reproduced unless specifically authorized by the software licensor. Customer is prohibited from reverse engineering, decompiling or disassembling the Products or otherwise attempting to derive the source code of the software. All Products are subject to the terms and conditions set forth in the manufacturer's or publisher's warranty or end-user license.

**6. Insurance.** Customer will, provide and maintain, at Customer's own expense, at all times following delivery of the Products, the following insurance: (a) "All-Risk" property insurance covering the Products for the full replacement value, naming Qwest or a third party provider designated by Qwest as a loss payee; and (b) commercial general liability insurance with limits of not less than $1,000,000 per occurrence and aggregate and naming Qwest as an additional insured, unless such insurance is required elsewhere in this Agreement at higher limits. Such insurance will be placed with insurers who have a minimum "Best's" rating of A- VII (A- 7), and will contain a provision to give Qwest thirty calendar days prior written notice before cancellation or material change thereof. Upon request, Customer will deliver to Qwest insurance certificates evidencing such insurance.

**7. Charges.** The charges for Products and Services are set forth in the Rental CPE Rate Attachment, and will be used to calculate Contributory Charges. The Products and Services are not entitled to the QTA Discount. Charges will commence within five days of Qwest's notification to Customer that the iQ Service is provisioned and ready for use ("Start of Service Date"). Qwest may cease providing Services and demand return of Products if payment is not made when due.

**8. Term.** This Service Exhibit will commence on the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date), and will remain in effect until terminated. Either party may terminate this Service Exhibit with at least 60 days prior written notice to the other party. Termination will not affect obligations under Rental CPE Rate Attachments accepted prior to the effective date of termination, and this Service Exhibit will remain in effect as to such obligations in the event it would otherwise have terminated. Products and Services ordered during the Term will commence on the Start of Service Date and will continue for a number of months as set forth on the Rental CPE Rate Attachment ("CPE Term"). Upon expiration of the CPE Term, Products and Services will automatically renew on a month to month basis at the then current rates, unless either party elects to terminate the Products and Services by providing 60 days prior written notice of such termination to the other party. If the Agreement or any Products and Services provided hereunder are terminated prior to the expiration of the applicable CPE Term for reasons other than by Customer for Cause, then Customer will pay to Qwest: (a) all charges for Products and Services provided through the effective date of such cancellation; and (b) an early cancellation charge of 100% of the balance of MRCs that otherwise would have become due for the unexpired portion of the CPE Term.

Page 6
MGM/NJ/OMR 132331                          **CONFIDENTIAL**            Copyright © 2007 Qwest. All Rights Reserved.
                                                                                    v1.030207

09/28/2007    8:12AM

## QWEST TOTAL ADVANTAGE® AGREEMENT
### RENTAL CPE SERVICE EXHIBIT

**9.  Installation, Maintenance and Safety Compliance.**  Installation, maintenance or other labor provided to Customer pursuant to this Agreement is subject to, and controlled by, Detailed Description(s) ("Ts&Cs") which are posted at http://www.qwest.com/legal/cpe.html and are incorporated by reference and made a part of this Service Exhibit.  Qwest may change the Ts&Cs at any time and such change will be effective upon posting to the Web site.  Customer is responsible for informing Qwest of the existence, location and condition of any Hazardous Substances that may be in or around the Qwest work area. "Hazardous Substance" means a substance regulated by any safety regulation and includes, without limitation, asbestos.  Customer will indemnify and hold Qwest harmless from any fines or other liability of Qwest arising from Customer's failure to inform Qwest of hazardous substances.

**10. Miscellaneous.**  With respect to the Agreement terms incorporated by reference, "Service" is replaced with "CPE and Services" as defined herein.

Copyright © 2007 Qwest. All Rights Reserved.
v1.030207

09/28/2007  8:12AM

## QWEST COMMUNICATIONS CORPORATION
## QWEST OFFICE CONNECT & QWEST OFFICE CONNECT PRO PROMOTIONAL ATTACHMENT

| Promo Codes: | iQBundle 1 – Qwest Office Connect ( ADTRAN®) |
| | iQBundle 2 –Qwest Office Connect Pro (ADTRAN) |
| | iQBundle 3 –Qwest Office Connect (Cisco®) |
| | iQBundle 4 –Qwest Office Connect Pro (Cisco) |
| | iQBundleUPGR – Qwest Office Connect Upgrade |
| | Secure IPUPGR – Qwest Secure IP Upgrade |

This Qwest Communications Corporation ("Qwest") promotional attachment ("Attachment") is subject in all respects to the domestic Qwest iQ Networking® Service Exhibit, the Local Access Service Exhibit, the Rental CPE Service Exhibit ("Service Exhibits"), and the Qwest Total Advantage® ("QTA") or Qwest Loyal Advantage™ ("QLA") Agreement ("Agreement") between Customer and Qwest. All capitalized terms used in this Attachment that are not defined herein will have the definition as set forth in the Agreement or Service Exhibit.

**1. Scope.** The purpose of this Attachment is to offer promotional pricing ("Promotional Pricing") for the Services shown below. Unless otherwise stated in this Attachment, Promotional Pricing is exclusive of, and may not be combined with, any other promotions or discounts, including, without limitation, any QTA Discounts or Extra Value Discounts, and will only be applied in lieu of any such discounts. All other rate elements not specifically set forth in this Attachment are as stated in the Agreement and Service Exhibits.

**2. Eligibility and Restrictions.** Customer must have an Agreement Term of 24 or 36 months, and Customer must order all the applicable Services and Eligible CPE shown below at the same time. Promotional Pricing will apply only if the Eligible CPE is configured and installed specifically for use with the Qwest iQ Networking Promotional Port(s). "Eligible CPE" means the hardware listed in Section 3(c). Customer must select an Eligible CPE Term of 24 or 36 months. Qwest iQ Networking Promotional Pricing applies to Flat Rate DS1, 2xDS1, 4xDS1, and DS3 Internet Ports and Private Ports only ("Promotional Ports"). Customer must agree to use each Qwest iQ Networking Promotional Port, Local Access circuit, and Rental CPE for the minimum number of months associated with the Promotional Pricing selected below ("Promo Minimum Term"). If a Promotional Port or Rental CPE service is canceled during the Promo Minimum Term, then Customer must pay Qwest a Cancellation Charge equal to the applicable Promotional Port's Promotional Pricing MRC multiplied by the number of months remaining in the Promo Minimum Term. If Local Access Service is canceled during the Promo Minimum Term, standard Local Access Cancellation Charges will apply. Promotional Pricing may be combined with certain Qwest Long Distance and Toll Free promotions and the Local Access FLATRATE DS1 promotion if the Local Access circuit qualifies. Promotional Pricing may also be combined with the Qwest iQ Networking Transition Offer if Customer qualifies. If both the Qwest iQ Networking Transition Offer and the Qwest Office Connect or Qwest Office Connect Pro promotion apply to a particular Private Port, the applicable Eligible Service Minimum Term set forth in the Qwest iQ Networking Transition Offer will apply to that Port. If that particular Private Port is canceled before the completion of the Eligible Service Minimum Term, Customer will pay the Cancellation Charges set forth in the Qwest Office Connect and Qwest Office Connect Pro promotion. In order to receive the Promotional Pricing, Customer must sign and return this Attachment to Qwest together with the Qwest iQ Networking Service Exhibit, the Local Access Service Exhibit, and the Rental CPE Service Exhibit, and order Service during the period from January 8, 2007 through December 31, 2007 ("Promotional Period").

### 3. Promotional Pricing.

**(a) Qwest IQ Networking Service.** The Rental CPE MRC is included in the Qwest iQ Networking Port Promotional Pricing MRC.

**(b) Local Access Service.** Local Access MRC Promotional Pricing is only applicable for those Local Access circuits that Qwest's Q. pricer™ Quoting Tool specifies as Special Access are in a green location ("Green Zone Circuits"). If Customer requires a Local Access circuit that is not categorized as a Green Zone Circuit, Customer may be able to qualify for a separate Flat Rate Local Access promotion (Promo Code: FLATRATE DS1). If a Local Access circuit is not a Green Zone Circuit, the Local Access MRC Promotional Pricing shown below will not apply. The NRC waiver, however, will apply to both Green Zone Circuits and non-Green Zone Circuits.

**(c) Rental CPE.** The Rental CPE MRC is included in the applicable Qwest iQ Networking Port Promotional Pricing MRC. The following table shows the Eligible CPE that may be used with each Port speed and promotional bundle.

| Description | DS1 Eligible CPE | | 2xDS1 Eligible CPE | | 4xDS1 Eligible CPE | | DS3 Eligible CPE | |
|---|---|---|---|---|---|---|---|---|
| | Internet Port | Private Port | Internet Port | Private Port | Internet Port | Private Port | Internet Port | Private Port |
| Qwest Office Connect (ADTRAN) (iQBundle1) | ADTRAN 3430 | | ADTRAN 3430 | | ADTRAN 4305 | | ADTRAN NV5305 | |
| Qwest Office Connect Pro (ADTRAN) (iQBundle2) | ADTRAN 1335 | | ADTRAN 1335 | | ADTRAN 4305 | | ADTRAN NV5305 | |
| Qwest Office Connect (Cisco) (iQBundle3) | Cisco 1841 | | Cisco 2811 | | Cisco 3825 | | Cisco 3845 | |
| Qwest Office Connect Pro (Cisco) (iQBundle4) | Cisco 2801 | | Cisco 2821 | | Cisco 3825 | | Cisco 3845 | |

## QWEST COMMUNICATIONS CORPORATION
## QWEST OFFICE CONNECT & QWEST OFFICE CONNECT PRO PROMOTIONAL ATTACHMENT

**(d) Promotional Pricing.** The CPE Rental term and each Promotional Port and Local Access circuit receiving Promotional Pricing will be subject to the Promo Minimum Term set forth in the applicable pricing table.

| 24 Month Promo Minimum Term Internet Port | | DS1 MRC | 2xDS1 MRC | 4xDS1 MRC | DS3 MRC*** | NRC |
|---|---|---|---|---|---|---|
| Qwest Office Connect (ADTRAN) (iQBundle1) | Internet Port (including Rental CPE)* | $300.00 | $560.00 | $1,155.00 | $2,755.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $500.00 | $960.00 | $1,955.00 | $4,755.00 | Waived |
| Qwest Office Connect Pro (ATRAN) (iQBundle2) | Internet Port (including Rental CPE)* | $350.00 | $580.00 | $1,185.00 | $2,800.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $550.00 | $980.00 | $1,985.00 | $4,800.00 | Waived |
| Qwest Office Connect (Cisco) (iQBundle3) | Internet Port (including Rental CPE)* | $350.00 | $680.00 | $1,555.00 | $3,145.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $550.00 | $1,080.00 | $2,355.00 | $5,145.00 | Waived |
| Qwest Office Connect Pro (Cisco) (iQBundle4) | Internet Port (including Rental CPE)* | $450.00 | $765.00 | $1,575.00 | $3,175.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $650.00 | $1,165.00 | $2,375.00 | $5,175.00 | Waived |

*The Internet Port Promotional Pricing MRC will be used to calculate Contributory Charges.
** The Local Access MRC and the total MRC amount will be different if the Local Access circuit is not a Green Zone Circuit.
*** The Local Access DS3 Green Zone Circuit MRC will be capped at $2,000 per circuit.

| 24 Month Promo Minimum Term Private Port | | DS1 MRC | 2xDS1 MRC | 4xDS1 MRC | DS3 MRC*** | NRC |
|---|---|---|---|---|---|---|
| Qwest Office Connect (ADTRAN) (iQBundle1) | Private Port (including Rental CPE)* | $425.00 | $800.00 | $1,645.00 | $3,945.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $625.00 | $1,200.00 | $2,445.00 | $5,945.00 | Waived |
| Qwest Office Connect Pro (ADTRAN) (iQBundle2) | Private Port (including Rental CPE)* | $450.00 | $825.00 | $1,680.00 | $4,000.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $650.00 | $1,225.00 | $2,480.00 | $6,000.00 | Waived |
| Qwest Office Connect (Cisco) (iQBundle3) | Private Port (including Rental CPE)* | $475.00 | $950.00 | $2,145.00 | $4,435.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $675.00 | $1,350.00 | $2,945.00 | $6,435.00 | Waived |
| Qwest Office Connect Pro (Cisco) (iQBundle4) | Private Port (including Rental CPE)* | $575.00 | $1,055.00 | $2170.00 | $4,465.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $775.00 | $1,455.00 | $2,970.00 | $6,465.00 | Waived |

*The Private Port Promotional Pricing MRC will be used to calculate Contributory Charges.
** The Local Access MRC and the total MRC amounts will be different if the Local Access circuit is not a Green Zone Circuit.
*** The Local Access DS3 Green Zone Circuit MRC will be capped at $2,000 per circuit.

| 36 Month Promo Minimum Term Internet Port | | DS1 MRC | 2xDS1 MRC | 4xDS1 MRC | DS3 MRC*** | NRC |
|---|---|---|---|---|---|---|
| Qwest Office Connect (ADTRAN) (iQBundle1) | Internet Port (including Rental CPE)* | $275.00 | $400.00 | $960.00 | $2,280.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $475.00 | $800.00 | $1,760.00 | $4,280.00 | Waived |
| Qwest Office Connect Pro (ADTRAN) (iQBundle2) | Internet Port (including Rental CPE)* | $325.00 | $480.00 | $985.00 | $2,320.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $525.00 | $880.00 | $1,785.00 | $4,320.00 | Waived |
| Qwest Office Connect (Cisco) (iQBundle3) | Internet Port (including Rental CPE)* | $325.00 | $575.00 | $1,320.00 | $2,635.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $525.00 | $975.00 | $2,120.00 | $4,635.00 | Waived |
| Qwest Office Connect Pro (Cisco) (iQBundle4) | Internet Port (including Rental CPE)* | $425.00 | $650.00 | $1,340.00 | $2,650.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $625.00 | $1,050.00 | $2,140.00 | $4,650.00 | Waived |

*The Internet Port Promotional Pricing MRC will be used to calculate Contributory Charges.
** The Local Access MRC and the total MRC amounts will be different if the Local Access circuit is not a Green Zone Circuit.
*** The Local Access DS3 Green Zone Circuit MRC will be capped at $2,000 per circuit.

| 36 Month Promo Minimum Term Private Port | | DS1 MRC | 2xDS1 MRC | 4xDS1 MRC | DS3 MRC*** | NRC |
|---|---|---|---|---|---|---|
| Qwest Office Connect (ADTRAN) (iQBundle1) | Private Port (including Rental CPE)* | $365.00 | $600.00 | $1,400.00 | $3,350.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $565.00 | $1,000.00 | $2,200.00 | $5,350.00 | Waived |
| Qwest Office Connect Pro | Private Port (including Rental CPE)* | $385.00 | $700.00 | $1,430.00 | $3,400.00 | Waived |

## QWEST COMMUNICATIONS CORPORATION
## QWEST OFFICE CONNECT & QWEST OFFICE CONNECT PRO PROMOTIONAL ATTACHMENT

| (ADTRAN) (iQBundle2) | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
|---|---|---|---|---|---|---|
| | Total** | $585.00 | $1,100.00 | $2,230.00 | $5,400.00 | Waived |
| Qwest Office Connect (Cisco) (iQBundle3) | Private Port (including Rental CPE)* | $400.00 | $815.00 | $1,850.00 | $3,790.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $600.00 | $1,215.00 | $2,650.00 | $5,790.00 | Waived |
| Qwest Office Connect Pro (Cisco) (iQBundle4) | Private Port (including Rental CPE)* | $500.00 | $910.00 | $1,875.00 | $3,815.00 | Waived |
| | Local Access Green Zone Circuit | $200.00 | $400.00 | $800.00 | $2,000.00 | Waived |
| | Total** | $700.00 | $1,310.00 | $2,675.00 | $5,815.00 | Waived |

*The Private Port Promotional Pricing MRC will be used to calculate Contributory Charges.
** The Local Access MRC and the total MRC amounts will be different if the Local Access circuit is not a Green Zone Circuit.
*** The Local Access DS3 Green Zone Circuit MRC will be capped at $2,000 per circuit.

**(e) Upgrade Pricing.** If Customer has had Service under the Qwest Secure IP promotion (Promo Code: SECURE IP) or this Qwest Office Connect or Qwest Office Connect Pro promotion for three months or more, Customer is eligible to upgrade to a higher bandwidth level under the Qwest Office Connect or Qwest Office Connect Pro promotion. All upgrades must be to a higher bandwidth level within the same bundle type (i.e., upgrades cannot switch between Qwest Office Connect and Qwest Office Connect Pro bundles, and they cannot switch between ADTRAN and Cisco brands) and must retain the same or longer Promo Minimum Term. Customers upgrading from the Secure IP promotion may upgrade to the Qwest Office Connect package with ADTRAN equipment (iQBundle1). The Cancellation Charges associated with the original Local Access circuit(s), Qwest iQ Networking Promotional Port(s), and Rental CPE will be waived as long as an upgrade solution is purchased and the Local Access circuit remains at the same Service Address. Upgraded Local Access circuit(s), Qwest iQ Networking Promotional Port(s), and Rental CPE must begin a new 24 or 36 month Promo Minimum Term at time of upgrade. If necessary, Customer's existing Rental CPE may be replaced to support the higher bandwidth level. If there is a replacement, the existing Rental CPE associated with Customer's initial package must be returned within 15 calendar days of the new Rental CPE installation. If the Rental CPE is not returned within 15 calendar days, Customer must pay to Qwest an amount equal to the original Qwest iQ Networking Promotional Port's MRC multiplied by three months for each unreturned Rental CPE device. The NRC below will be charged in addition to the new MRC associated with the upgraded Qwest Office Connect or Qwest Office Connect Pro package.

| Promotion Code | Upgrade Options | NRC |
|---|---|---|
| iQBundleUPGR | Qwest Office Connect or Qwest Office Connect Pro<br>Upgrade from one bandwidth level to a higher bandwidth level (No bandwidth downgrades) | $275 |
| SecureIPUPGR | Secure IP Promotion to Qwest Office Connect or Qwest Office Connect Pro<br>Upgrade from Secure IP to a higher bandwidth under the Qwest Office Connect promotion (2xDS1, 4xDS1, DS3) | $425 |

**4. Miscellaneous.** All other terms not specifically set forth in this Attachment, including without limitation, any other rate elements, are as stated in the Agreement and Service Exhibit(s). This Attachment will be effective as of the date it is executed by Qwest ("Attachment Effective Date"). The Promotional Pricing will become effective as soon as practicable, but in no event later than the second bill dating cycle following the Attachment Effective Date. If Customer has an existing QTA or QLA Agreement, then the Service Exhibits are added to this Attachment and by signing this Attachment, Customer understands that the Service Exhibit Effective Date will be the same as the Attachment Effective Date and agrees to and accepts the terms of the Service Exhibits, which are hereby incorporated into the Agreement. The order of control is: this Attachment, the Service Exhibits, the Agreement, and any Order Form. All other terms set forth in the Agreement will remain in effect. This Attachment, the Qwest iQ Networking Service Exhibit, the Local Access Service Exhibit, the Rental CPE Service Exhibit and the Agreement set forth the entire understanding between the parties as to the subject matter herein and supersede any prior written or verbal statements, representations, and agreements concerning the subject matter hereof.

**Agreed to and Accepted:**

CUSTOMER: Appleseeds Topco, Inc.

By: *Margaret M Donahue*

Name: *Margaret M Donahue*

Title: *VP Customer Center Optimization*

Date: *27 September 2007*

QWEST COMMUNICATIONS CORPORATION

By: _____

Name: _____

Title: Director of Offer Management

Date: _____

Copyright © 2007 Qwest. All Rights Reserved.
v1.030207

09/28/2007  8:12AM

**QWEST TOTAL ADVANTAGE® AGREEMENT**
**INTERNATIONAL PRIVATE LINE SERVICE EXHIBIT**

**1.    General; Definitions.**  Capitalized terms not defined herein are defined in the Agreement.  Qwest will provide international private line service ("Service" or "International Private Line Service") under the terms of the Agreement, RSS, and this Service Exhibit.

"Circuit" means an international private line circuit provided by Qwest: (a) from a POP on the Qwest Domestic Network to a POP on the Qwest International Network; and/or (b) from POP to POP entirely on the Qwest International Network.

"POP" means a Qwest designated point of presence at a location where direct interconnection between the Qwest Domestic Network or the Qwest International Network and the network of another carrier is possible.

"Qwest Domestic Network" means the network located in the U.S. comprised only of facilities operated by Qwest and/or its affiliates, or other providers specifically designated by Qwest.  The Qwest Domestic Network will not include local access or tail circuits provided by any local access provider or any Customer premises equipment.

"Qwest International Network" means the network located outside of the U.S. on which Qwest will provide the Service to Customer and is comprised only of facilities operated by Qwest and/or its affiliates, or other providers specifically designated by Qwest.  The Qwest International Network will not include local access circuits provided by any local access provider or carrier or any Customer premises equipment.

"SLA" means the service level agreement specific to the Service, located at http://www.qwest.com/legal/, which is subject to change.

**2.    Service.**

**2.1    Description.**   International Private Line Service is a high-speed digital communications service using a physical fiber optic connection between either: (a) a location in the U.S. and a location outside of the U.S.; or (b) between two locations outside of the U.S. Circuits are non-switchable connections that can provide a constant and committed availability of capacity on a transmission path only between fixed, Customer-specified locations.  Customer must submit a completed Order Form and final quote form ("Final Quote") for each Circuit ordered hereunder.  Customer specifically agrees that all Order Forms relating to the Service submitted to Qwest by Customer during the Term will be governed by the terms and conditions set forth in the Agreement and this Service Exhibit.  Customer will be obligated to pay all applicable charges that are set forth on any Order Form and Final Quote accepted by Qwest.  Service is subject to availability.  The SLA provides Customer's sole and exclusive remedy for service interruptions or service deficiencies of any kind whatsoever for the Service.

**2.2    Miscellaneous Service Terms.**

**(a)**   If, for regulatory or other reasons, Qwest does not provide some portion of the Service itself, Customer hereby authorizes Qwest to act as Customer's agent and sole contact with any third party as Qwest may designate in its sole discretion to provide any portion of the Service directly to Customer.  Qwest Hong Kong Telecommunications, Ltd., Qwest Communications Japan Corporation, and Qwest Singapore Pte Ltd. may provide the Service in Hong Kong, Tokyo, and Singapore, respectively.  Qwest will present to Customer consolidated invoices for all portions of the Service and remit such payments as are appropriate to any other entity providing any portion of the Service.  Customer agrees to direct all inquiries, issues, and disputes regarding the Service solely to Qwest.

**(b)**   In the event of Regulatory Activity, Qwest reserves the right, at any time with as much advance written notice as reasonably possible and without liability, to: (i) pass through to Customer all, or a portion of, any charges or surcharges directly or indirectly related to such Regulatory Activity; (ii) modify the Service, rates, promotions, or terms and conditions of this Exhibit in order to conform to such action; or (iii) if such Regulatory Activity materially and adversely impairs the provision of Service, as reasonably determined by Qwest, terminate the affected Services.

**(c)**   Customer acknowledges and agrees that the Service will be offered hereunder subject to: (i) any applicable tariffs; (ii) compliance with all applicable laws and regulations; (iii) obtaining any domestic or foreign approvals and authorizations required or advisable; (iv) continued availability of any of the Service in any jurisdiction, country or to any location; and (e) continued availability of access lines in any particular jurisdiction, country or location.  Customer acknowledges and agrees that Qwest may elect not to offer the Service in or to any particular jurisdiction, location or country, or may block Service to or from any particular jurisdiction, location or country if Qwest determines, in its sole discretion, that the continuation of such Service is not permitted or advisable.

**(d)**   Customer's use of the Service, will comply, in all material respects, with all international, federal, state, and local laws and regulations relating to its performance under this Agreement.  Customer represents and warrants that it is duly incorporated in or otherwise has all necessary permissions and authorizations required to do business in the locations in which it orders Service or otherwise does business.   Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its performance hereunder and any resale of the Service.

**(e)**   Customer will comply fully with all export and re-export controls under U.S. Export Administration Regulations and/or relevant regulations of any other applicable jurisdiction (collectively, "Export Controls").   Customer acknowledges that certain equipment, software, and technical data which may be provided hereunder may be subject to such Export Controls.

**(f)**   Customer acknowledges and agrees that certain laws of the U.S., including the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-1 et seq., prohibit any person subject to the jurisdiction of the U.S. from making or promising to make any payment of money or anything of value, directly or indirectly, to any government official, political party, or candidate for political office for the purpose of obtaining or retaining business.  Customer represents and warrants that in the performance of its obligations hereunder, it has not made, and will not make, any such proscribed payment

**QWEST TOTAL ADVANTAGE® AGREEMENT**
**INTERNATIONAL PRIVATE LINE SERVICE EXHIBIT**

**(g)**    Customer will defend, indemnify and hold harmless Qwest, its affiliates, and contractors from any and all damages, claims, liabilities, costs and expenses, including reasonable attorneys' fees, arising from or related to any violation of the three previous sections.

**(h)**    Customer is providing to Qwest the names of and contact information ("Business Contact Information") for its employees ("Business Contacts") who have purchasing or other responsibilities relevant to Qwest's delivery of Service under this Agreement. The Business Contact Information does not include personal data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union memberships, financial status, health, or sex life. Customer consents to Qwest's and its affiliates' use and transfer to the United States of Business Contact Information for the purpose of: (i) fulfilling its obligations under this Agreement; and (ii) providing information to Customer about Qwest's products and services via these Business Contacts. Customer represents that the Business Contact Information is accurate and that each Business Contact has consented to Qwest's processing of their Business Contact Information for the purposes set forth herein. The Business Contact Information provided by Customer has been collected, processed, and transferred in accordance with applicable laws, including, where applicable, any necessary notification to the relevant data protection authority in the territory in which Customer is established ("Authority"). Customer will notify Qwest promptly of staffing or other changes that affect Qwest's use of Business Contact Information. Qwest will have in place technical and organizational measures that ensure a level of security appropriate to the risk represented by the processing and the nature of the Business Contact Information, and that protects such information against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure, or access. Qwest will use the information only for the express purposes set forth herein. Qwest will identify a contact authorized to respond to inquiries concerning processing of Business Contact Information and will reasonably cooperate in good faith with Customer and the Authority concerning all such inquiries without excessive delays.

**3.    Term; Cancellation.** The term of each Circuit will begin on the date that Qwest first makes the Service available to Customer for use or testing ("Start of Service Date") and will continue for a period of one year unless a longer period is set forth in the Final Quote ("Minimum Service Term"). Upon the expiration of a Term, each Circuit will automatically renew for consecutive one year terms unless either party provides written notice of cancellation to the other party at least 60 days prior to the end of the Term. The Minimum Service Term and any renewal term are referred to as the "Term." If the Agreement or a Circuit is canceled prior to the completion of a Minimum Service Term for reasons other than by Customer for Cause, then Customer agrees to pay Qwest: (a) all charges for Service provided through the effective date of the cancellation; (b) 100% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the first 12 months of the Minimum Service Term, if any; (c) 35% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the Minimum Service Term other than for the first 12 months; and (d) any applicable early cancellation or cancellation-related charges incurred by Qwest from any local access provider or third party provider as a result of the cancellation of the Circuit. If Qwest notifies Customer that construction is required in order to provision a circuit and Customer does not approve such construction, Qwest will not charge a cancellation charge for that circuit only.

**4.    Charges.** Customer will be obligated to pay all applicable charges in U.S. dollars as set forth in the executed Final Quote, which will commence billing as of the Start of Service Date. The rates will be used to calculate Contributory Charges. The Service is not entitled to the QTA Discount.



## Data CPE Quote Detail

**Quote ID:** 230189696

**Customer Name:** Burberry

**Date: Sep 26, 2007**                              **This quote is only valid for 30 days**

**Contract ID/CPE Agreement ID: 230189696**

## Locations

**Location 1:  ALA MOANA #18 - Honolulu, HI**

NPA-NXX: 808 - 951

**CPE (Maintenance and Installation)**

___BURBERRY_STORE_CISCO2811 (1539320)

Response Interval: NBD

Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15′; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

**GRAND TOTAL PRICE TO CUSTOMER**                                      **$2,918.28**

**Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.**

**\* Indicates installation included on this item**

Customer Signature: _ADRIEL LIZURIAGA_          Qwest Signature: _(signature)_

Job Title: _DIRECTOR OF I.T._                  Job Title: _National Mgr_

Date: _9/4/2007_                               Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



## Data CPE Quote Detail

**Quote ID:** 230190061

**Customer Name:** Burberry

**Date:** Sep 26, 2007        **This quote is only valid for 30 days**

**Contract ID/CPE Agreement ID:** 230190061

## Locations

### Location 1: Aspen #4053 - Aspen, CO

**NPA-NXX:** 970 - 920

**CPE (Maintenance and Installation)**

___BURBERRY_STORE_CISCO2811_IN (1544764)

Response Interval: Next Day

Maintenance Availability Period: 8 -5

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

| GRAND TOTAL PRICE TO CUSTOMER | $2,318.28 |
|---|---|

**Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.**

* Indicates installation included on this item

Customer Signature: _ADRIEL LUZURIAGA_      Qwest Signature: _(signature)_

Job Title: _DIRECTOR OF I.T._      Job Title: _Mgr_

Date: _9/4/2007_      Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



**Spirit of Service™**

## Data CPE Quote Detail

**Quote ID:** 230189593

**Customer Name:** Burberry

| Date: Sep 26, 2007 | This quote is only valid for 30 days |
|---|---|

**Contract ID/CPE Agreement ID:** 230189593

## Locations

### Location 1: North Georgia Outlets # 68 - Dawsonville

**NPA-NXX:** 706 - 265

**CPE (Maintenance and Installation)**

___BURBERRY_STORE_CISCO2811 (1539320)

Response Interval: NBD

Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

| GRAND TOTAL PRICE TO CUSTOMER | $2,918.28 |
|---|---|

Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.

* Indicates Installation included on this item

Customer Signature: _ADRIEL LUZURIAGA_          Qwest Signature: _Kenneth C. Qu_

Job Title: _DIRECTOR OF I.T._          Job Title: _National Mgr_

Date: _7/4/2007_          Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



## Data CPE Quote Detail

Quote ID: 230172119

**Customer Name: Burberry**

**Date: Sep 26, 2007**                    This quote is only valid for 30 days

**Contract ID/CPE Agreement ID: 230172119**

## Locations

**Location 1: HQTRS LOCATION NYC**

NPA-NXX: 212 - 207

### CPE (Maintenance and Installation)

___BURBERRY_STORE_CISCO2811 (1539320)
Response Interval: NBD
Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15/f39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

## GRAND TOTAL PRICE TO CUSTOMER                    $2,918.28

Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.

* Indicates Installation included on this item

Customer Signature: _ADRIEL AZURIAGA_          Qwest Signature: _Kenneth C____

Job Title: _DIRECTOR OF I.T._          Job Title: _National Manager_

Date: _9/4/2007_          Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



**Spirit of Service™**

## Data CPE Quote Detail

Quote ID: 230189423

**Customer Name: Burberry**

**Date: Sep 26, 2007**                    This quote is only valid for 30 days

**Contract ID/CPE Agreement ID: 230189423**

## Locations

**Location 1: RIO GRANDE #67 - Mercedes, TX**

NPA-NXX: 956 - 565

### CPE (Maintenance and Installation)

___BURBERRY_STORE_CISCO2811 (1539320)

Response Interval: NBD

Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICa2PVDMa1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5S-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $80.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

**GRAND TOTAL PRICE TO CUSTOMER**                    **$2,918.28**

**Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.**

\* Indicates installation included on this item

Customer Signature: _ADRIEL HIZURIAGA_          Qwest Signature: _____

Job Title: _DIRECTOR OF IT_          Job Title: _National Mgr_

Date: _9/4/2007_          Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.

09/28/2007  8:22PM



## Data CPE Quote Detail

**Quote ID:** 230189191
**Customer Name: Burberry**
**Date: Sep 26, 2007**                                      **This quote is only valid for 30 days**
**Contract ID/CPE Agreement ID: 230189191**

## Locations

### Location 1:  ORLANDO #60 - Orlando, FL

NPA-NXX: 407 - 238

### CPE (Maintenance and Installation)

___BURBERRY_STORE_CISCO2811 (1539320)
Response Interval: NBD
Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

## GRAND TOTAL PRICE TO CUSTOMER                                           $2,318.28

**Note:** Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.

\* Indicates installation included on this item

Customer Signature: _____      Qwest Signature: _____
                     ADRIEL LIZURIAGA

Job Title: _____                Job Title: _____
           DIRECTOR OF I.T.

Date: _____                     Date: _____
      9/4/2007                                             9/27/2007

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.


**Spirit of Service™**

## Data CPE Quote Detail

Quote ID: 230189318
**Customer Name:** Burberry

**Date: Sep 26, 2007**                    **This quote is only valid for 30 days**

**Contract ID/CPE Agreement ID: 230189318**

## Locations

### Location 1:  TANNERSVILLE #65 - Tannersville, PA

NPA-NXX: 570 - 629

#### CPE (Maintenance and Installation)

___BURBERRY_STORE_CISCO2811 (1539320)
Response Interval: NBD
Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15K39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

**GRAND TOTAL PRICE TO CUSTOMER**                                        **$2,918.28**

**Note:** Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.

\* Indicates Installation included on this item

Customer Signature: _APRIL LUZURIAGA_        Qwest Signature: _____

Job Title: _DIRECTOR OF I.T._                Job Title: _National Manager_

Date: _9/8/2007_                             Date: _8/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.

09/28/2007  8:22PM



## Data CPE Quote Detail

**Quote ID:** 230189498

**Customer Name:** Burberry

**Date: Sep 26, 2007**        **This quote is only valid for 30 days**

**Contract ID/CPE Agreement ID:** 230189498

## Locations

### Location 1: The Domain # 4047 - Austin, Texas

NPA-NXX: 512 - 836

**CPE (Maintenance and Installation)**

___BURBERRY_STORE_CISCO2811 (1539320)

Response Interval: NBD

Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

| **GRAND TOTAL PRICE TO CUSTOMER** | **$2,918.28** |
|---|---|

**Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.**

* **Indicates installation included on this item**

Customer Signature: _ADRIEL LIZURIAGA_      Qwest Signature: _Kenneth C Del_

Job Title: _DIRECTOR OF I.T._      Job Title: _National Manager_

Date: _9/4/2007_      Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



## Data CPE Quote Detail

Quote ID: 230189661

**Customer Name:** Burberry

**Date: Sep 26, 2007**                                      This quote is only valid for 30 days

**Contract ID/CPE Agreement ID: 230189661**

## Locations

### Location 1: WOODBURY COMMON #51 - Central Valley, NY

NPA-NXX: 845 - 928

CPE (Maintenance and Installation)

___BURBERRY_STORE_CISCO2811 (1539320)
Response Interval: NBD
Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15'; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| PRODUCT SUBTOTAL | | | | | $2,007.78 | | |
| SHIPPING AND HANDLING | | | | | $35.50 | | |
| LOCATION SUBTOTAL | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

| GRAND TOTAL PRICE TO CUSTOMER | $2,918.28 |
|---|---|

**Note:** Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.

* Indicates Installation included on this item

Customer Signature: _ADRIEL CIZURIAGA_     Qwest Signature: _____

Job Title: _DIRECTOR OF I.Y._     Job Title: _____

Date: _9/9/2007_     Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.



## Data CPE Quote Detail

Quote ID: 230189724

**Customer Name:** Burberry

**Date: Sep 26, 2007**        **This quote is only valid for 30 days**

**Contract ID/CPE Agreement ID: 230189724**

## Locations

### Location 1: WAIKIKI #20 - Honolulu, HI

NPA-NXX: 808 - 922

**CPE (Maintenance and Installation)**

___BURBERRY_STORE_CISCO2811 (1539320)

Response Interval: NBD

Maintenance Availability Period: 10 HR DAY

| Manufacturer | Part # | Description | Maint Term | Qty | Product | Install | Maintenance |
|---|---|---|---|---|---|---|---|
| CISCO | CISCO2811 | *2811 w/ AC PWR2FE4HWICs2PVDMs1NME2AIMSIP | 12 | 1 | $1,372.25 | $500.00 | $375.00 |
| CISCO | WIC-1DSU-T1-V2 | *Updated 1-Port T1/Fractional T1 DSU/CSU | 12 | 1 | $550.00 | $0.00 | $0.00 |
| COMSTOR | CAT5E-BLU-NB-15 | 15#39; 350mhz UTP category 5 path cable | 0 | 2 | $25.03 | $0.00 | $0.00 |
| COMSTOR | MT5656ZDX | 56K Data/Fax Modem | 0 | 1 | $60.50 | $0.00 | $0.00 |
| **PRODUCT SUBTOTAL** | | | | | $2,007.78 | | |
| **SHIPPING AND HANDLING** | | | | | $35.50 | | |
| **LOCATION SUBTOTAL** | | | | | $2,043.28 | $500.00 | $375.00 |

## Totals

| | Product | Install | Maintenance |
|---|---|---|---|
| **GRAND CPE TOTAL** | $2,043.28 | $500.00 | $375.00 |
| **GRAND MS TOTAL (yearly price for 1 year(s))** | | | $0.00 |

## GRAND TOTAL PRICE TO CUSTOMER       $2,918.28

**Note: Changes to configuration may result in pricing changes. This quote also excludes sales tax, which will be added to the invoice.**

\* Indicates Installation included on this item

Customer Signature: _ADRIEL UZURIAGA_

Qwest Signature: _Kenneth ___ / National Manager_

Job Title: _DIRECTOR OF I.T_

Job Title:

Date: _9/4/2007_

Date: _9/27/2007_

CONFIDENTIALITY NOTICE: This document, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the original message.

> TO AVOID PROCESSING DELAYS, a completed <u>OM Contract Cover Sheet</u> must be included w/ 2 customer-signed original contracts including exhibits. The OM /QInsight # must appear at bottom of each page and contracts must be in <u>"Received Signed Contract"</u> step in QInsight by OA.
> In addition to sending this Cover Sheet and Order Package to OA, a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

**CHECKLIST: please mark each ☒ with an ☒ when complete (responsible person in BOLD TYPE)**

☒ **Sales Executive - complete this information: Opportunity # must be entered**

| Customer Name: | OMR # or Q.Insight # / OM Analyst: | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Appleseed Topco, Inc. | Q25921 / Neil Grant | 24 months / $540,000 | multiple - 1 is 74696392 |
| Customer Signatory Name: | Customer Signatory Title: | Term/Commitment Renewal: | Contract # |
| Mike Korkowski | Asset & Procurement Mgr | No | 190302 |
| Billing Cycle Cut | Discount Group | Opportunity ID# *Required* | (OA Use Only) iLink Content ID # |
| 83 | 60953 | 5769102 | |

| Sales Executive Information | Sales Executive Address & Phone # |
|---|---|
| **Name: Kevin Lambert**    Sales ID: ASZP<br>**Sales office code: NAMAEDIS**    Choose the appropriate Sales Office Codes described on the list attached to this coversheet (page 2) Green-MAK /Yellow-Global.<br>e-mail address: kevin.lambert@qwest.com | Office Address: 379 Thornall Street, 12th Floor, Edison NJ 08837<br>Telephone No: 732 767 5668<br>AC / ASR / PSR Name: Kevin Lambert |

☒ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

☒ Sales Executive check appropriate Director with an X from address list below in CM Group "Step A".
Overnight this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". <u>Before sending the contract,</u> review for hand written changes (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the overnight tracking number below on Page 2 and keep for your records. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on each exhibit with OM/QInsight # at bottom of each page.

| Step A: Select Your Director | | | Step B: Overnight to this Director's Admin | |
|---|---|---|---|---|
| Sales Place<br>an "X" here | Sales Director | Sales VP | OMR Admin Name<br>& Phone | Admin Address |
| ☐ | Chris Rommeney | Neil Cox | **Chelsea Augstburger**<br>312.251.4376 | 1 N. Franklin, Suite 2600<br>Chicago, IL 60606 |
| ☐ | Cindy Lucaccioni | | | |
| ☐ | Frank Bowdon | | | |
| ☐ | Roger Preble | Richard McGuire | **Michelle Green**<br>407.650.1406 | 37 N Orange Ave, 9th Floor<br>Orlando FL 32801-0000 |
| ☐ | Beverly McGill | | | |
| ☐ | Vickie Rodgers | Richard McGuire | **Shirley Goldsmith**<br>770.777.5669 | 3625 Brookside Pkwy, Suite 400<br>Alpharetta GA 30022 |
| ☐ | Bill Hooper | Neil Cox | **Sylvia Duque**<br>713.479.5944 | 1 E Greenway Plz, Suite 150<br>Houston, TX 77046 |
| ☐ | Hector Grado | | | |
| ☐ | Jeff Waters (KS, MO, IA, NE) | Neil Cox | **JoAnn Young**<br>913.676.3910 | 5799 Broadmoor St, Suite 700<br>Mission KS 66202-2403 |
| ☒ | Kathy Sullivan | **Bruce Smith** | **Reese Withers**<br>212.692.4930<br>303-391-1793 FAX | **546 – 5th Ave, 10th Fl<br>New York, NY 10036** |
| ☐ | John Dinneny-NY/LI | | | |
| ☐ | J.Dinneny-CT/MA | | | |
| ☐ | David Ackerman (Globals) | | | |
| ☐ | Deborah Souza<br>(JP MorganChase) | Richard McGuire | | |
| ☐ | IBM | | | |
| ☐ | Mark Amico (So Cal) | Chris Ancell | **Victoria Rasho**<br>303.391.8589 | 1801 California St., 17th Floor<br>Denver, CO 80202 |
| ☐ | Tina Smith | | | |
| ☐ | OPEN (Claudio Cipolla;<br>Karrie Connors; John Wing) | | | |
| ☐ | Kim Baker | Chris Ancell | **Judy Campo**<br>206.224.1170 | 1600 7th Ave, Suite 1914<br>Seattle, WA 98191 |
| ☐ | Dennis Sherwood (No Cal) | | | |
| ☐ | Gary Phillips | Richard McGuire | **Robin Nagy** | 6155 Rockside Rd, Suite 308<br>Independence, OH 44131 |
| ☐ | John Stuart | | | |
| ☐ | Todd Torman | Chris Ancell | **Kimberly Flowers-Luevano**<br>602.865.0110 | 20 E Thomas Rd, 4th Floor<br>Phoenix, AZ 85012 |
| ☐ | Rick Christensen | Chris Ancell | **Lori Adams**<br>801.575.1006 | 250 E 2nd S, Ste 400<br>Salt Lake City, UT 84111 |
| ☐ | Dave Hogan | Chris Ancell | **Michelle Schaefer**<br>206.224.1125 | 3245 – 145th Place SE Suite 130<br>Bellevue, WA 98007 |
| ☐ | Tyler Middleton | Neil Cox | **Peggy Gawarecki**<br>612.336.3002 | 200 S 5th St, 395<br>Minneapolis MN 55402-0000 |

Date sent to SalesRep:        Return to Rep overnight tracking number:        (OA use only- UPS ground or 2 day )

☐Director's Admin sends the original to the Sales Executive for presentation to the customer. Sales Executive address is above at the top of the document.

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

**THIS AMENDMENT NO. TWO** (this "Amendment") by and between **Qwest Communications Corporation** ("Qwest") and **Appleseed Topco, Inc.** ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID: 223678 & 212249, as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before **May 30, 2008.**

| CUSTOMER: Appleseed Topco, Inc. | QWEST COMMUNICATIONS CORPORATION |
|---|---|
| By: _Michael A Kostowski_ | By: _Leue M Withers_ |
| Name: _Michael A. Kostowski_ | Name: _Lee Withers as behalf of Stephen Brinkman,_ |
| Title: _Asset & Procurement Mgr._ | Title: _Director of Offer Management_ |
| Date: _05-29-08_ | Date: _06/05/2008_ |

Qwest and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**No Changes.** Customer's existing Revenue Commitment and existing Term, which began on June 1st 2007, as set forth in the Agreement will remain in effect.

**2. Modifications.** The Agreement is amended as follows:

**2.1 Modifications to existing Domestic Voice Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Voice Service Exhibit.

**(a)** The following table will be added to Section 1 in the existing Domestic Voice Service Exhibit Pricing Attachment:

| Domestic Interstate Outbound Long Distance Origination – Termination | Per Minute Net Rate |
|---|---|
| Dedicated – Dedicated  (VNS) | $0.0150 |
| Switched – Dedicated (VNS) | $0.0150 |

**2.2 Modifications to existing Domestic Private Line Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Private Line Service Exhibit.

**(a)** The following table will be added to the table in the existing Domestic Private Line Pricing Attachment:

| PL IOC Circuit Type | Location A (by NPA/NXX) | Location Z (by NPA/NXX) | Per Circuit Term | Net PL IOC MRC* (after application of all applicable discounts) |
|---|---|---|---|---|
| DS1 | 814723 | 814836 | 12 mos. | $250.00 |
| DS1 | 814723 | 814437 | 12 mos. | $250.00 |
| DS1 | 814836 | 814563 | 12 mos. | $250.00 |
| DS1 | 757896 | 212896 | 12 mos. | $450.00 |
| DS1 | 757825 | 972643 | 12 mos | $800.00 |
| DS1 | 757825 | 614751 | 12 mos | $400.00 |
| DS3 | 757896 | 212896 | 12 mos. | $1800.00 |

**2.3 Modifications to existing Domestic IQ Networking Line Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic iQ Networking Service Exhibit.

**(a)** The following table will be added to the existing Domestic iQ Networking Service Pricing Attachment as follows (These price points will be on separate Qwest account number and valid Service order from any other Domestic iQ Networking Service Exhibit) :

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 7 x DS1 (10.5 Mbps) Valid for only 2 Circuits at the Following Address: _220 Hickory Street, Warren, PA 16366_ | $1,000.00 | $1,470.00 |

OMR Q25921 amends OMR(s) 132331 & 128380
Contract: 190302
MGM/NJ/OMR Q25921

Page 1
**CONFIDENTIAL**

Copyright © Qwest. All Rights Reserved.
v1.041708

## AMENDMENT TO
### QWEST TOTAL ADVANTAGE® AGREEMENT

| | | |
|---|---|---|
| 8 x DS1 (12.0 Mbps) Valid for only 2 Circuits at the Following Address: 220 Hickory Street, **Warren, PA 16366** | $1,000.00 | $1,680.00 |

**(b)** The following table in the existing Domestic iQ Networking Service Pricing Attachment deleted and replaced as follows:

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500.00 | $355.00 |
| 2 x DS1 (3 Mbps) | $1,000.00 | $770.00 |
| 3 x DS1 (4.5 Mbps) | $1,000.00 | $1,210.00 |
| 4 x DS1 (6 Mbps) | $1,000.00 | $1,475.00 |
| 5 x DS1 (7.5 Mbps) | $1,000.00 | $1,839.00 |
| 6 x DS1 (9 Mbps) | $1,000.00 | $2,198.00 |
| 7 x DS1 (10.5 Mbps) | $1,000.00 | $2,558.00 |
| 8 x DS1 (12 Mbps) | $1,000.00 | $2,913.00 |
| DS3 | $2,000.00 | $3,500.00 |

**(c)** The following table will be added to Section 2 in the existing Domestic iQ Networking Service Exhibit Pricing Attachment:

| Tiered DS3 Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 3 Mbps | $2,000.00 | $1,329.00 |
| 6 Mbps | $2,000.00 | $2,100.00 |
| 9 Mbps | $2,000.00 | $2,146.00 |
| 12 Mbps | $2,000.00 | $2,540.00 |
| 15 Mbps | $2,000.00 | $2,805.00 |
| 18 Mbps | $2,000.00 | $2,800.00 |
| 21 Mbps | $2,000.00 | $2,900.00 |
| 24 Mbps | $2,000.00 | $2,900.00 |
| 27 Mbps | $2,000.00 | $3,000.00 |
| 30 Mbps | $2,000.00 | $3,000.00 |
| 33 Mbps | $2,000.00 | $3,100.00 |
| 36 Mbps | $2,000.00 | $3,100.00 |
| 39 Mbps | $2,000.00 | $3,200.00 |
| 42 Mbps | $2,000.00 | $3,400.00 |
| 45 Mbps | $2,000.00 | $3,500.00 |

**(d)** The following Section will be added to the existing Domestic iQ Networking Service Pricing Attachment as follows:

### 3. Precise Burstable Pricing

| Precise Burstable DS3 (Precise Burstable Minimum = 21 Mbps) Internet Port Other Access | Install NRC | Net Rate MRC Per Mbps |
|---|---|---|
| 21.00 - 45 Mbps | $2,000.00 | $215.00 |

**2.4 Addition to Local Access.** The following will be added to the pricing table in Section 2 of the Local Access Pricing Attachment of the Agreement:

| NPA/NXX or CLLI | Service Address | Type of Local Access | Minimum Service Term in months (per Service) | Circuit Speed | Local Access Net Rate MRC | Install NRC |
|---|---|---|---|---|---|---|
| 212986 | N/A | Leased | 12 Mos. | DS1 | $200.00 | $1 |
| 212986 | N/A | Leased | 12 Mos. | DS3 | $1500.00 | $1 |
| 757896 | N/A | Leased | 12 Mos. | DS1 | $200.00 | $806 |
| 757896 | N/A | Leased | 12 Mos. | DS3 | $3000.00 | $806 |

OMR Q25921 amends OMR(s) 132331 & 128380
Contract: 190302
MGM/NJ/OMR Q25921

Page 2
**CONFIDENTIAL**

Copyright © Qwest. All Rights Reserved.
v1.041708

06/05/2008   10:05AM

# AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 757896 | N/A | Leased | 12 Mos. | OC3 | $7388.00 | $0 |
| 814437 | N/A | Leased | 12 Mos. | DS1 | $200.00 | $1000 |
| 814437 | N/A | Leased | 12 Mos. | DS3 | $1500.00 | $1000 |
| 814563 | N/A | Leased | 12 Mos. | DS1 | $500.00 | $540 |
| 814563 – PITBPALM^^ | Route 6 and 62 Irvine PA 16329 | CLEC Leased City NET | 12 Mos | DS3 | $5665.00 | $1001 |
| 814723 | N/A | Leased | 12 Mos. | DS1 | $500.00 | $540 |
| 814723 PITBALM^^ | 220 Hickory Street Warren PA 16366 | CLEC Leased City NET | 12 Mos. | DS3 | $4617.00 | $1001 |
| 814723 | N/A | Leased | 12 Mos. | OC3 | $33202 | $4 |
| 814836 | N/A | Leased | 12 Mos. | DS1 | $200.00 | $1 |
| 814836 | N/A | Leased | 12 Mos. | DS3 | $1500.00 | $806 |
| 949784 | N/A | Leased | 12 Mos. | DS1 | $200.00 | $1 |
| 949784 | N/A | Leased | 12 Mos. | DS3 | $1500.00 | $1 |

*The Leased NRC Waiver described in Section 4 of the Local Access Pricing Attachment of the Agreement will apply to the circuits listed above
^^If Citynet is not available to provide Service this Pricing is VOID.

**3. Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**4. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

OMR Q25921 amends OMR(s) 132331 & 128380
Contract: 190302
MGM/NJ/OMR Q25921

Page 3
CONFIDENTIAL

Copyright © Qwest. All Rights Reserved.
v1.041708

06/05/2008   10:05AM

I, Stephen Brinkmann, designate Reese Withers to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Reese Withers. I understand that it is the responsibility of the designate, Reese Withers, to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract: R
For the "By:" line of the signature block, you (Reese Withers) must sign your signature. Do not use the Stephen Brinkmann signature stamp.

For the "Name:" line, write " Reese Withers on behalf of Stephen Brinkmann".

Date according to today's date.

Please include this approval email with the contract in ILink.

06/05/2008   12:32PM

## OM Contract Cover Sheet: Major/Global Market Accounts

➤ **TO AVOID PROCESSING DELAYS,** a completed <u>OM Contract Cover Sheet</u> must be included w/ 2 customer-signed original contracts including exhibits. The OM /QInsight # must appear at bottom of each page and contracts must be in <u>"Received Signed Contract"</u> step in QInsight to be processed by OA.

➤ In addition to sending this Cover Sheet and Order Package to OA, a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

**CHECKLIST** Please mark each (✓) with an X when complete (responsible person in **BOLD** type)

☐ **Sales Executive - complete this information: Opportunity # must be entered**

| Customer Name: | OMR # or Q.Insight # / OM Analyst | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Appleseed Topco, Inc | 79876 / Jodi Fillmore | 24 months / $530K per year | 58-623945 |
| **Customer Signatory Name:** | **Customer Signatory Title:** | **Term/Commitment Renewal:** | **Contract #** |
| Margaret M Donahue | VP of Call Center Optimization | No | 190302 |
| **Billing Cycle Cut** | **Discount Group** | **Opportunity ID# *Required*** | **(OA Use Only) iLink Content ID #** |
| 31st | | 5892013 | |
| **Sales Executive Information** | | **Sales Executive Address & Phone #** | |

**Name:** John W Cole     **Sales ID:** AZKG
**Sales office code:** GMNEEDIS     Choose the appropriate Sales
Office Codes described on the list attached to this coversheet (page 2) Green-
MAK /Yellow-Global.
**e-mail address:** john.w.cole@qwest.com

**Office Address:** 379 Thornall St 12th Fl, Edison NJ 08837
**Telephone No:** 732 767 2454
**AC / ASR / PSR Name:**

☐ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

☐ **Sales Executive** check appropriate Director with an X from address list below in CM Group "Step A".
Overnight this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". <u>Before sending the contract,</u> review for hand-written changes (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the overnight tracking number below on Page 2 and keep for your records. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit with OM/QInsight # at bottom of each page.

| | Step A: Select Your Director | | Step B: Overnight to this Director's Admin | |
|---|---|---|---|---|
| **Sales Place "X" Here** | **Sales Director** | **Sales VP** | **OMR Admin Name & Phone** | **Admin Address** |
| ☐ | Chris Rommeney | Neil Cox | Chelsea Augstburger 312.251.4376 | 1 N. Franklin, Suite 2600 Chicago, IL 60606 |
| ☐ | Cindy Lucaccioni | | | |
| ☐ | Frank Bowdon | | | |
| ☐ | Roger Preble | Richard McGuire | Michelle Green 407.650.1406 | 37 N Orange Ave, 9th Floor Orlando FL 32801-0000 |
| | Beverly McGill | | | |
| ☐ | Vickie Rodgers | Richard McGuire | Shirley Goldsmith 770.777.5669 | 3625 Brookside Pkwy, Suite 400 Alpharetta GA 30022 |
| ☐ | Bill Hooper | Neil Cox | Sylvia Duque 713.479.5944 | 1 E Greenway Plz, Suite 150 Houston, TX 77046 |
| ☐ | Hector Grado | | | |
| ☐ | Jeff Waters (KS, MO, IA, NE) | Neil Cox | JoAnn Young 913.676.3910 | 5799 Broadmoor St, Suite 700 Mission KS 66202-2403 |
| ☒ | Kathy Sullivan | | | |
| ☐ | John Dinneny-NY/LI | Bruce Smith | **Reese Withers** **212.692.4930** **303-391-1793 FAX** | **546 – 5th Ave, 10th Fl** **New York, NY 10036** |
| ☐ | J.Dinneny-CT/MA | | | |
| ☐ | David Ackerman (Globals) | | | |
| ☐ | Deborah Souza (JP MorganChase) | Richard McGuire | | |
| ☐ | IBM | | | |
| ☐ | Mark Amico (So Cal) | Chris Ancell | Victoria Rasho 303.391.8589 | 1801 California St, 17th Floor Denver, CO 80202 |
| ☐ | Tina Smith | | | |
| ☐ | OPEN (Claudio Cipolla; Karrie Connors; John Wing) | | | |
| ☐ | Kim Baker | Chris Ancell | Judy Campo 206.224.1170 | 1600 7th Ave, Suite 1914 Seattle, WA 98191 |
| ☐ | Dennis Sherwood (No Cal) | | | |
| ☐ | Gary Phillips | Richard McGuire | Robin Nagy | 6155 Rockside Rd, Suite 308 Independence, OH 44131 |
| ☐ | John Stuart | | | |
| ☐ | Todd Torman | Chris Ancell | Kimberly Flowers-Luevano 602.865.0110 | 20 E Thomas Rd, 4th Floor Phoenix, AZ 85012 |
| ☐ | Rick Christensen | Chris Ancell | Lori Adams 801.575.1006 | 250 E 2nd S, Ste 400 Salt Lake City, UT 84111 |
| ☐ | Dave Hogan | Chris Ancell | Michelle Schaefer 206.224.1125 | 3245 – 146th Place SE Suite 130 Bellevue, WA 98007 |
| ☐ | Tyler Middleton | Neil Cox | Peggy Gawarecki 612.536.3002 | 200 S 5th St, 395 Minneapolis MN 55402-0000 |

| Date sent to SalesRep: | Return to Rep overnight tracking number: | (OA use only- UPS ground or 2 day ) |
|---|---|---|

☐Director's Admin sends the original to the Sales Executive for presentation to the customer. Sales Executive address is above at the top of the document.

# QWEST TOTAL ADVANTAGE® AGREEMENT
### AMENDMENT NO. THREE

**THIS AMENDMENT NO. THREE** (this "Amendment") by and between **Qwest Communications Corporation** ("Qwest") and **Appleseed Topco, Inc.** ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Contract ID: 223678, 212249, 251168 as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before **September 29, 2008.**

CUSTOMER: Appleseed Topco, Inc.

By: _Margaret M Donahue_

Name: _Margaret M Donahue_

Title: _V.P. Call Center Optimization_

Date: _22 August 08_

QWEST COMMUNICATIONS CORPORATION

By: _Rece Withers III_

Name: _Rece Withers III on behalf of Don Schmulo_

Title: ___Director of Offer Management___

Date: _09/08/08_

Qwest and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**No Changes.** Customer's existing Revenue Commitment and existing Term, which began on June 1, 2007, as set forth in the Agreement will remain in effect.

**2. Modifications.** The Agreement is amended as follows:

**2.1 General.**

(a) Qwest will provide Service if: (i) there is a valid, accurate, and complete Order Form submitted by Customer; (ii) adequate capacity is available; and (iii) Qwest accepts the Order Form.

(b) Qwest may change features or functions of its Services; for material changes, Qwest will provide 30 days prior written notice, but may provide a shorter notice period if the change is based upon Regulatory Activity.

(c) The definition of Contributory Charges is deleted and replaced with the following: "Contributory Charges" means: (a) all MRCs and usage charges for Services ordered under this Agreement after the Effective Date and incurred during the Term; and (b) all MRCs and usage charges for QC Contributory Services, QCC Logic™, QCC Qwest Choice™ Unlimited, Desktop Management Services, Telecom Management Services, and QCC Keynote Perspective™ ordered before or after the Effective Date under separate agreements and incurred during the Term. Contributory Charges do not include NRCs; Local Access, pass-through, and uncollectible charges; Taxes; Conferencing advanced feature charges; worldcard® payphone surcharges; other surcharges; issued credits; or other charges not specified as Contributory Charges under this Agreement.

(d) Any language in the Agreement stating that Voice or Data service new to the Agreement may be added without a Service Exhibit will be disregarded. If applicable, any attached Service Exhibit(s) for such Voice and/or Data Service, will apply to the service(s) being added.

(e) If the Agreement provides that Option Z pricing is used, the parties agree that any reference to "QTA Discount" in a Service Exhibit will be disregarded, and the rates set forth in the Service Exhibit, valid Order Form, or Qwest-approved quote form, are in lieu of all other rates, discounts, or promotions. Notwithstanding the preceding sentence, Qwest reserves the right to modify rates and charges due to Regulatory Activity and will provide as much prior written notice as practicable but not less than 14 calendar days' notice. "Regulatory Activity" means any regulation and/or ruling, including modifications thereto, by any regulatory agency, legislative body or court of competent jurisdiction.

**2.2 CPNI.** The following CPNI Section is added to the Agreement.

(a) "CPNI" means Customer Proprietary Network Information, which includes confidential account, usage, and billing-related information about the quantity, technical configuration, type, destination, location, and amount of use of a customer's telecommunications services. CPNI reflects the telecommunications products, services, and features that a customer subscribes to and the usage of such services, including call detail information appearing in a bill. CPNI does not include a customer's name, address, or telephone number.

(b) Qwest is required by law to treat CPNI confidentially. Customer agrees that Qwest may share CPNI within its business operations (e.g., wireless, local, long distance, and broadband services divisions), and with businesses acting on Qwest's behalf, to determine if Customer could benefit from the wide variety of Qwest products and services, and in its marketing and sales activities. Customer may withdraw this authorization at any time by informing Qwest in writing. Customer's decision regarding Qwest's use of CPNI will not affect the quality of service Qwest provides Customer.

**2.3 Tariff.** The following Tariff information is added to the Agreement.

If Services are provided pursuant to a Tariff or RSS, as described in the applicable Service Exhibits, the order of precedence will apply

09/08/2008   10:58AM

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

in the following descending order of control: Tariff, Service Exhibit, Agreement, RSS, and Order Form. "Tariff" includes as applicable: QCC state tariffs, price lists, price schedules, administrative guidelines, catalogs, and rate and term schedules, incorporated by this reference. "RSS" means as applicable: QCC's Rates and Services Schedule posted at www.qwest.com/legal and other rate and term schedules, incorporated by this reference. Qwest reserves the right to amend, change, withdraw or file additional Tariffs or RSS in its sole discretion, with such updated Tariffs or RSS effective upon posting or upon fulfillment of any necessary regulatory requirements.

**2.4 Modifications to existing Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Conferencing Service Exhibit.

**(a)** The following rates will be modified in the table in the existing Conferencing Service Exhibit Pricing Attachment:

| Discount Eligible Conferencing Service Type | Rate Per Minute, Per Participant Charges | Custom Discount | Net Effective Rate Per Minute Per Participant Charges |
|---|---|---|---|
| Reservationsless Toll Free | $0.22 | 77.27% | $0.050 |
| Web Conferencing | $0.30 | 68.33% | $0.095 |

**3. Billing Information.** Any new Conferencing pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**4. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

Copyright © Qwest. All Rights Reserved.
v1.041708

# POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time: 9/8/2008 @ 12:20 pm

Approval by: David Stoffle

Q.Insight Request ID: Q79876
I have received a written delegation of authority from Tom Schmuke.

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Reese Withers III to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Reese Withers III. I understand that it is the responsibility of the designate Reese Withers III to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Reese Withers III must sign your signature.
- Do not use the Tom Schmuke signature stamp.
- For the "Name:" line, write Reese Withers III on behalf of Tom Schmuke

09/08/2008   10:58AM

# OM Contract Cover Sheet: MAK/Global Market Accounts

➢ **TO AVOID PROCESSING DELAYS**, a completed OM Contract Cover Sheet must be included w/ 2 customer-signed original contracts including exhibits. The OM /Qinsight # must appear at bottom of each page and **contracts must be in**

➢ **"Received Signed Contract"** step in Qinsight to be processed by OA.

➢ In addition to sending this Cover Sheet and Contact to OA, after receiving your iLink Content ID# a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

☒ **Sales Executive - complete this information: Opportunity # must be entered .**

| Customer Name: | OM # or Q Insight # OM Analyst | TERM : Month y $ va ue of contract | Must 1st Customer Acct # |
|---|---|---|---|
| Orchard Brands (Appleseeds Topco) | 297452 / Jodi Filmore | 24 months / $1.2mil | 58703189 |
| **Customer Signatory Name** | **Customer Signatory Title** | **Term Commitment Renewal:** | **Contract #** |
| Jay Baney | VP Operations | No | 193027 |
| **Billing Cycle Cut** | **Discount Group** | **Opportunity. ID# *Required:** | *OA Use Only: iLink Content ID # |
| 83 | 60953 | 6093313 | |

**Sales Executive Information**

**Name:** Kevin Lambert        **Sales ID:** aszp

**Sales office code:GMNEEDIS**  Choose the appropriate Sales Office Codes described on page 2 Green-MAK -GMNE___ /Yellow-Global-NAMA___

**e-mail address:**  kevin.lambert@qwest.com

**Sales Executive Address & Phone #**

**Office Address: 379 Thornall Street, 12th Floor, Edison NJ 08837**

**Telephone No:** 7327104560

**AC / ASR / PSR  Name:** Tabitha Garrett

▓ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

▓ **Sales Executive check appropriate Director with an X from address list below in CM Group "Step A".**

| | | | | |
|---|---|---|---|---|
| ☐ ☐ ☐ | Chris Rommeney Cindy Lucaccioni Frank Bowdon | Neil Cox | Chelsea Augsburger 312.251.4376 | 1 N. Franklin, Suite 2600 Chicago, IL 60606 |
| ☐ ☐ | Roger Preble Beverly McGill | Richard McGuire | Michelle Green 407.850.1408 | 37 N Orange Ave, 9th Floor Orlando FL 32801-0000 |
| ☐ | Vickie Rodgers | Richard McGuire | Shirley Goldsmith 770.777.5669 | 3625 Brookside Pkwy, Suite 400 Alpharetta GA 30022 |
| ☐ ☐ | Bill Hooper Hector Grado | Neil Cox | Sylvia Duque 713.479.5944 | 1 E Greenway Plz, Suite 150 Houston, TX 77046 |
| ☐ | Jeff Waters (KS, MO, IA, NE) | Neil Cox | JoAnn Young 913.876.3910 | 5799 Broadmoor St, Suite 700 Mission KS 66202-2403 |
| ☒ | **Kathy Sullivan** | **Bruce Smith** | **Tameka Champagne** 215-521-4245 303- 391-1801 fax | **520 N Delaware Ave Philadelphia PA 19123** |
| ☐ ☐ | J.Dinneny- (NY, LI, CT, MA) Jason Bobb/ Sunny Kumar | Bruce Smith | Reese Withers 212 692-4930 303 391-1793 | 546 5th Avenue 10th Fl New York NY 10036 |
| ☐ | Deborah Souza (JP MorganChase) | Richard McGuire | | |
| ☐ | IBM | | Victoria Rasho 303.391.8589 | 1801 California St., 17th Floor Denver, CO 80202 |
| ☐ ☐ ☐ | Mark Amico (So Cal) Tina Smith OPEN (Claudio Cipolla; Karrie Connors; John Wing) | Chris Ancell | | |
| ☐ ☐ | Kim Baker Dennis Sherwood (No Cal) | Chris Ancell | Judy Campo 206.224.1170 | 1600 7th Ave, Suite 1914 Seattle, WA 98191 |
| ☐ ☐ | Gary Phillips John Stuart | Richard McGuire | Robin Nagy | 6155 Rockside Rd, Suite 308 Independence, OH 44131 |
| ☐ | Todd Torman | Chris Ancell | Kimberly Flowers-Luevano 602.885.0110 | 20 E Thomas Rd, 4th Floor Phoenix, AZ 85012 |
| ☐ | Rick Christensen | Chris Ancell | Lori Adams 801.575.1096 | 250 E 2nd S, Ste 400 Salt Lake City, UT 84111 |
| ☐ | Dave Hogan | Chris Ancell | Michelle Schaefer 206.224.1125 | 3245 – 146th Place SE  Suite 130 Bellevue, WA 98007 |
| ☐ | Tyler Middleton | Neil Cox | Peggy Gawarecki 612.336.3002 | 200 S 5th St, 995 Minneapolis MN 55402-0000 |

**Date sent to SalesRep:**        **Return to Rep overnight tracking number:**        (OA use only- UPS ground or 2 day )

☐ Director's Admin sends the original to the Sales Executive for presentation to the customer. Sales Executive address is above at the top of the document.

# AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

THIS AMENDMENT NO. THREE (this "Amendment") by and between Qwest Communications Company, LLC ("Qwest" or "QCC") f/k/a Qwest Communications Corporation and Orchard Brands f/k/a Appleseeds Topco, Inc ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID:  212249, 223678 and 251168, as may have been previously amended (the "Agreement").  Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before August 3, 2009. Electronic signatures on this Amendment will be accepted only in the form and manner prescribed by Qwest.

**CUSTOMER: ORCHARD BRANDS**

By: _____

Name: __JAN BARCY_____

Title: __NP TECHNICAL SVCS___

Date: __6/26/09_____

**QWEST COMMUNICATIONS COMPANY, LLC**

By: _Tameka Champagne_

Name: _Tameka Champagne on behalf of David Stittle_

Title: __Director of Offer Management__

Date: __6/29/2009__

Qwest and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**No Changes.**  Customer's existing Revenue Commitment and existing Term, which began on June 1, 2007, as set forth in the Agreement will remain in effect.

**2. Modifications.** The Agreement is amended as follows:

**2.1 Name Correction.** Customer's correct legal name is "Orchard Brands." and all references to Customer appearing in the Agreement as amended, are hereby corrected.

**2.2 General.**

(a) The definition of Contributory Charges is deleted and replaced with the following: "Contributory Charges" means: (a) all MRCs and usage charges for Services ordered under this Agreement after the Effective Date and incurred during the Term; and (b) all MRCs and usage charges for QC Contributory Services, QCC Logic™, QCC Qwest Choice™ Unlimited, Desktop Management Services, Telecom Management Services, and QCC Keynote Perspective™ ordered before or after the Effective Date under separate agreements and incurred during the Term. Contributory Charges do not include NRCs; Local Access, pass-through, and uncollectible charges; Taxes; Conferencing advanced feature charges; workdcard® payphone surcharges; other surcharges; issued credits; or other charges not specified as Contributory Charges under this Agreement.

(b) If Services are provided pursuant to a Tariff, RSS, or ISS, as described in the applicable Service Exhibits, the order of precedence will apply in the following descending order of control:  Tariff, Service Exhibit, Agreement, RSS, ISS, and Order Form.

(c) The Definitions Section is amended to include the following:

"ISS" means  Information   Services   Schedule  posted  at  the  following  site  and  is  subject  to  change. http://tariffs.qwest.com:8000/idc/groups/public/documents/service_agreements/qcc_info_services.pdf.

"RSS"  means  as  applicable:  QCC's  International  Rates  and  Services  Schedule  posted  at http://tariffs.qwest.com:8000/idc/groups/public/documents/rss/htmltoc_qcc_rss2.htm, QCC's Interstate Rates and Services Schedule posted at http://tariffs.qwest.com:8000/idc/groups/public/documents/rss/htmltoc_qcc_rss_no_3.htm, and other rate and term schedules, incorporated by this reference.

**2.3 Licenses; Dispatch Fee.** The following section is added to the Agreement.

If Qwest must access a building that houses Customer's premises to install, operate, or maintain Service or associated Qwest equipment, Customer will provide or secure at Customer's expense the following items: (a) appropriate space and power; and (b) rights or licenses.

Any facility or equipment repairs on Customer's side of the demarcation point are Customer's responsibility.  If Customer requests a technician visit for a problem that Qwest determines: (a) not to be caused by Qwest facilities or equipment on the Qwest side of the demarcation point; or (b) is on Customer's side of the demarcation point, Qwest will assess a separate dispatch fee.  Qwest will notify Customer and obtain Customer's authorization before dispatching a technician.

**2.4 Modifications to existing Service Exhibit:** Customer indicates below that it is adding or changing pricing elements in its existing Domestic Qwest iQ Networking Service Exhibit.

OMR 297452 amends OMR(s) 128380, 132331 and 25921      Page 1
Contract: 193027                          **CONFIDENTIAL**
07

Copyright © Qwest.  All Rights Reserved.
v1.060309

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

(a) The following table will be added to Section 2 in the existing Domestic Qwest iQ Networking Service Exhibit Pricing Attachment:

| Tiered Fast Ethernet 100 Mbps Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 20 Mbps | $1,500.00 | $1,210.00 |
| 30 Mbps | $1,500.00 | $1,647.00 |
| 40 Mbps | $1,500.00 | $2,011.00 |
| 50 Mbps | $1,500.00 | $2,317.00 |
| 60 Mbps | $1,500.00 | $2,579.00 |
| 70 Mbps | $1,500.00 | $2,806.00 |
| 80 Mbps | $1,500.00 | $3,004.00 |
| 90 Mbps | $1,500.00 | $3,179.00 |
| 100 Mbps | $1,500.00 | $3,334.00 |

**2.5 Modifications to existing Domestic Voice Service Exhibit:** A new Section 2.3, will be added to the existing Domestic Voice Service Exhibit as follows:

**2.3 Non-Completed Calls.** "Non-completed Call Percentage Threshold" means 30% of all attempted calls, both completed and non-completed. If the percentage of Customer's calls that do not complete (out of all attempted calls) meets or exceeds the Non-completed Call Percentage Threshold for any given monthly billing cycle, Qwest may, upon 30 calendar days notice to Customer, disconnect any and all circuit(s) providing Service on which the Non-completed Call Percentage Threshold was exceeded.

**2.6 Modifications to existing Local Access Service Exhibit:** A new Section 2.3, will be added to the existing Local Access Service Exhibit as follows:

**2.3 Grooming.** If Qwest finds it necessary to groom a circuit on which Service is provided, Qwest will provide a grooming notice to Customer. For CPA grooming, Customer will provide a signed LOA to Qwest so that Qwest can order the necessary changes. Within 20 calendar days of receipt of that notice, Customer will: (a) notify Qwest of its approval, which may not be unreasonably withheld; (b) state its reason for refusing; or (c) request that Qwest provide Customer with a LOA so that Customer can order the necessary changes. Customer's failure to respond within the 20-day period will constitute approval of the groom. If Customer agrees to a groom on CPA and the groom results in Customer incurring additional NRCs from their third-party local access provider and Customer provides sufficient proof of the third-party charge, Qwest will issue a credit to Customer equal to the third-party NRC for each groomed circuit. If Customer refuses the groom for On-Net Access, Qwest will, upon 20 calendar days' prior written notice, cancel the Service on that circuit and assess a Cancellation Charge. When Customer does not respond to a grooming notice or refuses a groom on CPA, Customer must either: (a) provide Qwest with a LOA/CFA so that Qwest can have the third-party local access provider cancel the circuit; or (b) work directly with the third-party local access provider to cancel the circuit. If Customer does neither of these things, Qwest will pass through to Customer any costs incurred from the third-party local access provider as a result of the circuit remaining in place. "CFA" means circuit facility assignment of the Qwest facility, as identified by Qwest, to which Customer must order local access services for connection to the Qwest Domestic Network.

**2.7 Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**3. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

Copyright © Qwest. All Rights Reserved.
v1.060309

06/29/2009   12:44PM

06/29/2009   5:08PM

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

(a) The following table will be added to Section 2 in the existing Domestic Qwest iQ Networking Service Exhibit Pricing Attachment:

| Tiered Fast Ethernet 100 Mbps Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 20 Mbps | $1,500.00 | $1,210.00 |
| 30 Mbps | $1,500.00 | $1,647.00 |
| 40 Mbps | $1,500.00 | $2,011.00 |
| 50 Mbps | $1,500.00 | $2,317.00 |
| 60 Mbps | $1,500.00 | $2,579.00 |
| 70 Mbps | $1,500.00 | $2,806.00 |
| 80 Mbps | $1,500.00 | $3,004.00 |
| 90 Mbps | $1,500.00 | $3,179.00 |
| 100 Mbps | $1,500.00 | $3,334.00 |

**2.5 Modifications to existing Domestic Voice Service Exhibit:** A new Section 2.3, will be added to the existing Domestic Voice Service Exhibit as follows:

**2.3 Non-Completed Calls.** "Non-completed Call Percentage Threshold" means 30% of all attempted calls, both completed and non-completed. If the percentage of Customer's calls that do not complete (out of all attempted calls) meets or exceeds the Non-completed Call Percentage Threshold for any given monthly billing cycle, Qwest may, upon 30 calendar days notice to Customer, disconnect any and all circuit(s) providing Service on which the Non-completed Call Percentage Threshold was exceeded.

**2.6 Modifications to existing Local Access Service Exhibit:** A new Section 2.3, will be added to the existing Local Access Service Exhibit as follows:

**2.3 Grooming.** If Qwest finds it necessary to groom a circuit on which Service is provided, Qwest will provide a grooming notice to Customer. For CPA grooming, Customer will provide a signed LOA to Qwest so that Qwest can order the necessary changes. Within 20 calendar days of receipt of that notice, Customer will: (a) notify Qwest of its approval, which may not be unreasonably withheld; (b) state its reason for refusing; or (c) request that Qwest provide Customer with a LOA so that Customer can order the necessary changes. Customer's failure to respond within the 20-day period will constitute approval of the groom. If Customer agrees to a groom on CPA and the groom results in Customer incurring additional NRCs from their third-party local access provider and Customer provides sufficient proof of the third-party charge, Qwest will issue a credit to Customer equal to the third-party NRC for each groomed circuit. If Customer refuses the groom for On-Net Access, Qwest will, upon 20 calendar days' prior written notice, cancel the Service on that circuit and assess a Cancellation Charge. When Customer does not respond to a grooming notice or refuses a groom on CPA, Customer must either: (a) provide Qwest with a LOA/CFA so that Qwest can have the third-party local access provider cancel the circuit; or (b) work directly with the third-party local access provider to cancel the circuit. If Customer does neither of these things, Qwest will pass through to Customer any costs incurred from the third-party local access provider as a result of the circuit remaining in place. "CFA" means circuit facility assignment of the Qwest facility, as identified by Qwest, to which Customer must order local access services for connection to the Qwest Domestic Network.

**2.7 Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**3. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

Copyright © Qwest. All Rights Reserved.
v1.060309

06/29/2009   12:44PM

06/29/2009   5:08PM

## POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time:

Approval by:  David Sloan

Q.Insight Request ID:
I have received a written delegation of authority from David Stoffle.

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Lori Adams to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Tameka Champagne. I understand that it is the responsibility of the designate Tameka Champagne to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Tameka Champagne must sign your signature.
- Do not use the David Stoffle signature stamp.
- For the "Name:" line, write Tameka Champagne on behalf of David Stoffle.

# OM Contract Cover Sheet: MAK/Global Market Accounts

➤ TO AVOID PROCESSING DELAYS, a completed OM Contract Cover Sheet must be included w/ 2 customer-signed original contracts including exhibits. The OM /QInsight # must appear at bottom of each page and **contracts must be in**

➤ **"Received Signed Contract" step in QInsight to be processed by OA.**

➤ In addition to sending this Cover Sheet and Contact to OA, after receiving your iLink Content ID# a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

| CHECKLIST please mark each ☐ with an X when complete (responsible person in **BOLD** type) |
|---|

☒ **Sales Executive - complete this information:** Opportunity # must be entered

| Customer Name: | OMR # or Q.Insight # / OM Analyst: | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Orchard Brands | 384599  /  Jodi Filmore | 5 months  /  $44,000 | 58623945 |
| **Customer Signatory Name:** | **Customer Signatory Title:** | **Term/Commitment Renewal:** | **Contract #** |
| Jay Baney | VP Technical Services | Yes | 190302 |
| **Billing Cycle Cut** | **Discount Group** | **Opportunity ID# *Required*** | **(OA Use only) iLink Content ID #** |
| 83 | 60953 | 6174842 | |

| Sales Executive Information | | Sales Executive Address & Phone # |
|---|---|---|
| **Name:**  Kevin Lambert      **Sales ID:** ASZP | | **Office Address:** 379 Thornall Street, 12th Floor, Edison NJ 08837 |
| **Sales office code:GMNEEDIS**  Choose the appropriate Sales Office Codes described on page 2 Green-MAK -GMNE___ /Yellow-Global-NAMA___ | | **Telephone No:** 732 710 4560 |
| **e-mail address:**  kevin.lambert@qwest.com | | **AC / ASR / PSR Name:** Tabitha Garrett |

☒ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

☒ **Sales Executive** check appropriate Director with an X from address list below in CM Group "Step A".

Overnight this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". <u>Before sending the contract, review for hand written changes</u> (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the overnight tracking number below on Page 2 and keep for your records. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit with OM/QInsight # at bottom of each page.

| Step A: Select Your Director | | | Step B:  Overnight to this Director's Admin | |
|---|---|---|---|---|
| Sales Place "X" Here | Sales Director | Sales VP | OMR Admin Name & Phone | Admin Address |
| ☐ ☐ ☐ | Chris Rommeney Cindy Lucaccioni Frank Bowdon | Neil Cox | **Chelsea Augstburger** 312.251.4376 | 1 N. Franklin, Suite 2600 Chicago, IL  60606 |
| ☐ ☐ | Roger Preble Beverly McGill | Richard McGuire | **Michelle Green** 407.650.1406 | 37 N Orange Ave, 9th Floor Orlando FL 32801-0000 |
| ☐ | Vickie Rodgers | Richard McGuire | **Shirley Goldsmith** 770.777.5669 | 3625 Brookside Pkwy, Suite 400 Alpharetta GA 30022 |
| ☐ ☐ | Bill Hooper Hector Grado | Neil Cox | **Sylvia Duque** 713.479.5944 | 1 E Greenway Plz, Suite 150 Houston, TX 77046 |
| ☐ | Jeff Waters (KS, MO, IA, NE) | Neil Cox | **JoAnn Young** 913.676.3910 | 5799 Broadmoor St, Suite 700 Mission KS 66202-2403 |
| ☒ | **Kathy Sullivan** | **Bruce Smith** | **Tameka Champagne 215-521-4245 303- 391-1801 fax** | **520 N Delaware Ave Philadelphia PA 19123** |
| ☐ ☐ | J.Dinneny- (NY, LI, CT, MA) Jason Bobb/ Sunny Kumar | Bruce Smith | **Reese Withers** 212 692-4930 303 391-1793 | 546 5th Avenue 10th Fl New York NY 10036 |
| | Deborah Souza (JP MorganChase) | **Richard McGuire** | | |
| ☐ | IBM | | | |
| ☐ ☐ ☐ | Mark Amico (So Cal) Tina Smith OPEN (Claudio Cipolla; Karrie Connors;  John Wing) | Chris Ancell | **Victoria Rasho** 303.391.8589 | 1801 California St., 17th Floor Denver, CO  80202 |
| ☐ ☐ | Kim Baker Dennis Sherwood (No Cal) | Chris Ancell | **Judy Campo** 206.224.1170 | 1600 7th Ave, Suite 1914 Seattle, WA  98191 |
| ☐ ☐ | Gary Phillips John Stuart | Richard McGuire | **Robin Nagy** | 6155 Rockside Rd, Suite 308 Independence, OH 44131 |
| ☐ | Todd Torman | Chris Ancell | **Kimberly Flowers-Luevano** 602.865.0110 | 20 E Thomas Rd, 4th Floor Phoenix, AZ  85012 |
| ☐ | Rick Christensen | Chris Ancell | **Lori Adams** 801.575.1006 | 250 E 2nd S, Ste 400 Salt Lake City, UT  84111 |
| ☐ | Dave Hogan | Chris Ancell | **Michelle Schaefer** 206.224.1125 | 3245 – 146th Place SE  Suite 130 Bellevue, WA 98007 |
| ☐ | Tyler Middleton | Neil Cox | **Peggy Gawarecki** 612.336.3002 | 200 S 5th St, 395 Minneapolis MN 55402-0000 |

| Date sent to SalesRep: | Return to Rep overnight tracking number: | (OA use only- UPS ground or 2 day  ) |
|---|---|---|

☐ **Director's Admin** sends the original to the Sales Executive for presentation to the customer. Sales Executive address is above at the top of the document.

Oct 2009

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

THIS AMENDMENT NO. FOUR (this "Amendment") by and between **Qwest Communications Company, LLC** ("Qwest" or "QCC") f/k/a Qwest Communications Corporation and **Orchard Brands** f/k/a Appleseeds Topco, Inc. ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID: 212249, 223678, 251168 and 294160, as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before **December 14**, 2009. Electronic signatures on this Amendment will be accepted only in the form and manner prescribed by Qwest.

**CUSTOMER: ORCHARD BRANDS**

By: _____

Name: _____ JAY BANEY _____

Title: _____ VP TECHNICAL SVCS _____

Date: _____ 11/20/09 _____

**QWEST COMMUNICATIONS COMPANY, LLC**

By: _____

Name: _____ Pamela Champagne on behalf of David Stofle _____

Title: _____ Director of Offer Management _____

Date: _____ 12/7/2009 _____

Qwest and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**Month to Month Extension.** At the end of the Initial Term this Agreement will automatically renew on a month to month basis at the same rates for the 150 days following the Initial Term expiration on September 1, 2009. The $530,000/year Revenue Commitment will be prorated monthly during the month to month extension. At the end of the 150 day period, this agreement will automatically renew for consecutive renewal periods equal to the 2 year Initial Term (a "Renewal Term") if not terminated earlier in accordance with this Agreement or superseded by a renegotiated Agreement. During the Renewal Term the $530,000 /year Revenue Commitment will apply.

**2. Modifications.** The Agreement is amended as follows:

**2.1 General.**

**(a)** Customer must not remit payment for the Services by funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate Qwest to provide certain information or perform certain functions unless those functions and obligations are specifically included and agreed to by the parties elsewhere in this Agreement or in an amendment to this Agreement.

**2.2 Modifications to existing Domestic Voice Service Exhibit:** A new Section 2.3, will be added to the existing Domestic Voice Service Exhibit as follows:

**2.3 Non-Completed Calls.** "Non-completed Call Percentage Threshold" means 30% of all attempted calls, both completed and non-completed. If the percentage of Customer's calls that do not complete (out of all attempted calls) meets or exceeds the Non-completed Call Percentage Threshold for any given monthly billing cycle, Qwest may, upon 30 calendar days notice to Customer, disconnect any and all circuit(s) providing Service on which the Non-completed Call Percentage Threshold was exceeded.

**2.3 Modifications to existing Local Access Service Exhibit:** A new Section 2.3, will be added to the existing Local Access Service Exhibit as follows:

**2.3 Grooming.** If Qwest finds it necessary to groom a circuit on which Service is provided, Qwest will provide a grooming notice to Customer. For CPA grooming, Customer will provide a signed LOA to Qwest so that Qwest can order the necessary changes. Within 20 calendar days of receipt of that notice, Customer will: (a) notify Qwest of its approval, which may not be unreasonably withheld; (b) state its reason for refusing; or (c) request that Qwest provide Customer with a LOA so that Customer can order the necessary changes. Customer's failure to respond within the 20-day period will constitute approval of the groom. If Customer agrees to a groom on CPA and the groom results in Customer incurring additional NRCs from their third-party local access provider and Customer provides sufficient proof of the third-party charge, Qwest will issue a credit to Customer equal to the third-party NRC for each groomed circuit. If Customer refuses the groom for On-Net Access, Qwest will, upon 20 calendar days' prior written notice, cancel the Service on that circuit and assess a Cancellation Charge. When Customer does not respond to a grooming notice or refuses a groom on CPA, Customer must either: (a) provide Qwest with a LOA/CFA so that Qwest can have the third-party local access provider cancel the circuit; or (b) work directly with the third-party local access provider to cancel the circuit. If Customer does neither of these things, Qwest will pass through to Customer any costs incurred from the third-party local access provider as a result of the circuit remaining in place. "CFA"

OMR 384599 amends OMR(s) 128380, 132331, 25921 & 297452
Contract: 190302
07

Page 1
CONFIDENTIAL

Copyright © Qwest. All Rights Reserved.
v1.090309

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

means circuit facility assignment of the Qwest facility, as identified by Qwest, to which Customer must order local access services for connection to the Qwest Domestic Network.

**2.4 Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**3. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

OMR 384599 amends OMR(s) 128380, 132331, 25921
& 297452
Contract: 190302
07

Page 2
CONFIDENTIAL

Copyright © Qwest. All Rights Reserved.
v1.090309

## POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time: 12/7/2009 9:32 AM Eastern

Approval by: Paresh Naik

Q.Insight Request ID: Q384599

I have received a written delegation of authority from David Stoffle

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Tameka Champagne to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Tameka Champagne. I understand that it is the responsibility of the designate Tameka Champagne to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Tameka Champagne must sign your signature.
- Do not use the David Stoffle signature stamp.
- For the "Name:" line, write Tameka Champagne on behalf of David Stoffle.

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

**Qwest** BUSINESS

## OM Contract Cover Sheet: MAK/Global Market Accounts

➤ **TO AVOID PROCESSING DELAYS**, a completed <u>OM Contract Cover Sheet</u> must be included w/ 2 customer-signed original contracts including exhibits. The OM /Qinsight # must appear at bottom of each page and **contracts must be in**

➤ **"Received Signed Contract"** step in Qinsight to be processed by OA.

➤ In addition to sending this Cover Sheet and Contact to OA, after receiving your iLink Content ID# a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.

**CHECKLIST** please mark each ☒ with an X when complete (responsible person in **BOLD** type)

☒ **Sales Executive** - complete this information: Opportunity # must be entered

| Customer Name: | OMR # or Q.Insight # / OM Analyst: | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Orchard Brands | 417950 / Jodi Fillmore | 36 months / $720,000/year | multiple - DG 60953 |
| Customer Signatory Name: | Customer Signatory Title: | Term/Commitment Renewal: | Contract # |
| Dale Espersen | | Yes | 190503 |
| Billing Cycle Cut | Discount Group | Opportunity ID# *Required* | (OA Use Only) iLink Content ID # |
| 83 | 60953 | | |

| Sales Executive Information | | Sales Executive Address & Phone # |
|---|---|---|
| **Name:** Kevin Lambert     **Sales ID:** aszp | | **Office Address:** 379 Thornall Street, 12th Floor |
| **Sales office code:BMG GBA NE – NJ PA** Choose the appropriate Sales Office Codes described on page 2 Green-MAK - /Yellow-Global- | | **Telephone No:** 732 710 4560 |
| **e-mail address:** kevin.lambert@qwest.com | | **AC / ASR / PSR  Name:** Heidi Erb |

☒ **Sales Executive – YOU** <u>MUST</u> **PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE** <u>REJECTED.</u>

☒ **Sales Executive** check appropriate Director with an **X** from address list below in CM Group "Step A".

UPS this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". <u>Before sending the contract, review for hand written changes</u> (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the UPS tracking number below on Page 2 and keep for your records. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit with OM/Qinsight # at bottom of each page.

| Sales Place "X" Here | Step A: Select Your Director | | | Step B: Overnight to this Director's Admin | |
|---|---|---|---|---|---|
| | Sales Director | Sales VP | | OMR Admin Name & Phone | Admin Address |
| ☒ | (PA, NJ) Kathy Sullivan | Bruce Smith | | Tameka Champagne 215-521-4245 303- 391-1801 efax   (Check with Tameka for office to mail contract) | Qwest Communications 520 N Delaware Ave Philadelphia PA 19123           Or 1010 W 8th Ave King of Prussia PA 19406 |
| ☐ ☐ | (NY, LI, CT, MA) J.Dinneny Jason Bobb/ Sunny Kumar | Bruce Smith | | Reese Withers 212 692-4930 303 391-1793 efax | Qwest Communications 646 5th Avenue 10th Fl New York NY 10036 |
| ☐ | Deborah Souza | Richard McGuire | | | |
| ☐ | **OA Coverage** (Check with Dorine to verify covering for OA) | Bruce Smith | | Dorine Temple 732-710-4539 303-391-1745 efax | Qwest Communications 379 Thornall St 12th FL Edison NJ 08837 |

| Date sent to SalesRep: 2 day ) | Return to Rep overnight tracking number; via Docusign | (OA use only- UPS ground or |
|---|---|---|

☐ **Director's Admin** sends one signed original to the Sales Executive for presentation to the customer at Sales Executive address at the top of this document.



## Certificate of Completion

Envelope Number: 227E9D5B062B4C9A8796AA7551923381
Subject: Resend - Orchard Brands Qwest Amendment with corrections made
Customer Name: Orchard Brands
Source Envelope:
Document Pages: 7                    Signatures: 2
Certificate Pages: 1                 Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled

Status: Delivered

Envelope Originator:
Lambert, Kevin
1801 California Street, 51st Floor
Denver, CO  80202
Kevin.Lambert@qwest.com
IP Address: 155.70.141.45

## Record Tracking

Status: Original
    7/14/2010 12:05:06 PM PST

Holder: Lambert, Kevin
        Kevin.Lambert@qwest.com

Location: DocuSign

## Signer Events

Mark Holmes
mholmes@orchardbrands.com
SVP & CIO
Security Level: Email, Account Authentication
(None)
Consumer Disclosure:
    Not Offered
    ID:

**Signature**

4288CBA76B084CF...
*Mark Holmes*
DocuSigned By: Mark Holmes
Using IP Address: 173.166.29.93

**Timestamp**

Sent: 7/21/2010 10:39:47 AM PT
Delivered: 7/21/2010 10:47:35 AM PT
Signed: 7/22/2010 5:02:31 AM PT

Tameka Champagne
tameka.champagne@qwest.com
Qwest BMG
Security Level: Email, Account Authentication
(None)
Consumer Disclosure:
    Not Offered
    ID:

Sent: 7/15/2010 4:51:44 AM PT
Delivered: 7/23/2010 6:07:35 AM PT

## In Person Signer Events

**Signature**

**Timestamp**

## Editor Delivery Events

**Status**

**Timestamp**

## Agent Delivery Events

**Status**

**Timestamp**

## Certified Delivery Events

**Status**

**Timestamp**

## Carbon Copy Events

Dale Espersen
dale.espersen@amo.com
Security Level: Email, Account Authentication
(None)
Consumer Disclosure:
    Not Offered
    ID:

**Status**

**COPIED**

**Timestamp**

Sent: 7/21/2010 10:39:47 AM PT
Delivered: 7/22/2010 8:51:30 AM PT

## Envelope Summary Events

Envelope Sent
Certified Delivered

**Status**

Hashed/Encrypted
Security Checked

**Timestamps**

7/21/2010 10:39:47 AM PT
7/23/2010 8:07:35 AM PT

## POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time: 7/26/2010 10:10 AM Eastern

Approval by: Paresh Naik

Q.Insight Request ID: Q417950

I have received a written delegation of authority from David Stoffle

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Tameka Champagne to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Tameka Champagne. I understand that it is the responsibility of the designate Tameka Champagne to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Tameka Champagne must sign your signature.
- Do not use the David Stoffle signature stamp.
- For the "Name:" line, write Tameka Champagne on behalf of David Stoffle.

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

**AMENDMENT TO**
**QWEST TOTAL ADVANTAGE® AGREEMENT**

**THIS AMENDMENT NO. FIVE** (this "Amendment") by and between **Qwest Communications Company, LLC** ("Qwest" or "QCC") f/k/a Qwest Communications Corporation and **Orchard Brands Corporation**, f/k/a Appleseeds Topco, Inc. ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID: 212249, 223678, 251168, 294160 & 307892 as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before July 22, 2010. Electronic signatures on this Amendment will be accepted only in the form and manner prescribed by Qwest.

**CUSTOMER: ORCHARD BRANDS CORPORATION**

By: *Mark Holmes*

Name: Mark Holmes

Title: SVP & CIO

Date: 7/22/2010

**QWEST COMMUNICATIONS COMPANY, LLC**

By: *Pamela Champagne*

Name: Pamela Champagne on behalf of David Stoffle

Title: Director of Offer Management

Date: 7/26/2010

Qwest and Customer agree to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below it is changing the length of its existing Term and changing the amount of its existing Revenue Commitment.

**New Revenue Commitment and New Initial Term.** The parties agree to modify the Revenue Commitment and start a new Initial Term that begins on the Amendment Effective Date. Customer's new Revenue Commitment and new Initial Term are $720,000.00/year and three (3) years (Code: 190503).

**2. Modifications.** The Agreement is amended as follows:

**2.1 American Recovery and Reinvestment Act.** Customer will not pay for the Services with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate Qwest to provide certain information or perform certain functions unless each of those functions end obligations is explicitly identified and agreed to by the parties in this Agreement or in an amendment to this Agreement.

**2.2 Modifications to existing Domestic Voice Service Exhibit:**

2.2.1 The following will delete and replace the tables in Section 1 in the existing Pricing Attachment to the Domestic Voice Service Exhibit:

| Domestic Interstate Outbound Long Distance | Interstate Minutes of Use Per Month | Per Minute Net Rate |
|---|---|---|
| *Origination – Termination* | | |
| Dedicated – Switched | 0 – 4,000,000 | $0.015 |
| Dedicated – Switched | 4,000,001 – 6,000.000 | $0.014 |
| Dedicated – Switched | 6,000,001 – 8,000,000 | $0.013 |
| Dedicated – Switched | 8,000,001 and above | $0.012 |
| | | |
| Switched – Switched | ALL | $0.030 |

| Domestic Interstate Toll Free | | Per Minute Net Rate |
|---|---|---|
| *Origination - Termination* | | |
| Switched – Dedicated | 0 – 4,000,000 | $0.015 |
| Switched – Dedicated | 4,000,001 – 6,000,000 | $0.014 |
| Switched – Dedicated | 6,000,001 – 8,000,000 | $0.013 |
| Switched – Dedicated | 8,000,001 and above | $0.012 |
| | | |
| Switched – Switched | ALL | $0.030 |

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

**AMENDMENT TO**
**QWEST TOTAL ADVANTAGE® AGREEMENT**

2.2.2 The following will delete and replace the corresponding rows in the table in Section 2 in the existing Pricing Attachment to the Domestic Voice Service Exhibit:

| Domestic Intrastate (including InterLATA and intraLATA) Outbound Long Distance By State | | Per Minute Rates | Maximum Discount Basis for Service Credit |
|---|---|---|---|
| **State** | **Origination – Termination** | | |
| PA | Dedicated – Switched | $0.0280 | 20% |
| GA | Dedicated – Switched | $0.0260 | 34% |
| CA | Dedicated – Switched | $0.0200 | 28% |
| NJ | Dedicated – Switched | $0.0390 | 5% |
| MA | Dedicated – Switched | $0.0290 | 36% |

| Domestic Intrastate (Including InterLATA and intraLATA) Toll Free By State | | Per Minute Rates | Maximum Discount Basis for Service Credit |
|---|---|---|---|
| **State** | **Origination – Termination** | | |
| PA | Switched – Dedicated | $0.0280 | 20% |
| GA | Switched – Dedicated | $0.0260 | 34% |
| CA | Switched – Dedicated | $0.0200 | 28% |
| NJ | Switched – Dedicated | $0.0390 | 5% |
| MA | Switched – Dedicated | $0.0290 | 36% |

2.2.3 The following will delete and replace the corresponding row in the table in Section 6 in the existing Pricing Attachment to the Domestic Voice Service Exhibit:

| Feature | NRC | MRC | Change | Surcharge |
|---|---|---|---|---|
| Transfer and Release (TnR) | $500.00 per 8XX | $50.00 per 8XX | $50.00 per 8XX | $0.025 per transfer |

2.2.4 The following will be added as a new Section 7 in the existing Pricing Attachment to the Domestic Voice Service Exhibit:

### 7. 8XX Feature CAP.

| Feature Solutions Bundle Selected | | Transaction |
|---|---|---|
| 8XX CAP: | | |
| • Alternate Call Routing | • Percent Allocation | $1,500 per account MRC |
| • Busy Ring No Answer | • Project Account Codes | $1,500 per account NRC |
| • Day of Week | • Real Time ANI | $1,500 per account Change NRC* |
| • Day of Year | • Super Trunk | |
| • Dialed Number Identification Service | • In-switch Overflow | |
| • Direct Termination Overflow | • Tailored Call Coverage | |
| • Geographical Routing | • Time of Day | |

* An NRC change fee is applicable to program feature changes not initiated via Q.Control™. No charge if initiated through Q.Control.

**2.3 Modifications to existing Qwest Domestic iQ Networking Service Exhibit:** The following will delete and replace, or be added to existing pricing, as applicable, in the Pricing Attachment to the existing Qwest Domestic iQ Networking Service Exhibit:

| Flat Rate Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500.00 | $225.00 |
| 2 x DS1 (3 Mbps) | $1,000.00 | $450.00 |

OMR Q417950 amends QMRs 128380, 132311, Q25921,
Q297452 & Q384599
Contract: 190503
Page 2
CONFIDENTIAL
Copyright © Qwest. All Rights Reserved.
v2

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

**AMENDMENT TO**
**QWEST TOTAL ADVANTAGE® AGREEMENT**

| | | |
|---|---|---|
| 3 x DS1 (4.5 Mbps) | $1,000.00 | $675.00 |
| 4 x DS1 (6 Mbps) | $1,000.00 | $900.00 |
| 5 x DS1 (7.5 Mbps) | $1,000.00 | $1,125.00 |
| 6 x DS1 (9 Mbps) | $1,000.00 | $1,350.00 |
| 7 x DS1 (10.5 Mbps) | $1,000.00 | $1,575.00 |
| 8 x DS1 (12 Mbps) | $1,000.00 | $1,800.00 |
| DS3 | $2,000.00 | $2,200.00 |
| OC3 | $4,000.00 | $5,100.00 |
| Ethernet | $1,000.00 | $600.00 |
| Fast Ethernet | $1,500.00 | $2,900.00 |
| Gigabit Ethernet | $4,000.00 | $13,500.00 |

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500.00 | $340.00 |
| 2 x DS1 (3 Mbps) | $1,000.00 | $680.00 |
| 3 x DS1 (4.5 Mbps) | $1,000.00 | $1,020.00 |
| 4 x DS1 (6 Mbps) | $1,000.00 | $1,360.00 |
| 5 x DS1 (9 Mbps) | $1,000.00 | $1,600.00 |
| 6 x DS1 (9 Mbps) | $1,000.00 | $1,830.00 |
| 7 x DS1 (9 Mbps) | $1,000.00 | $2,250.00 |
| 8 x DS1 (12 Mbps) | $1,000.00 | $2,450.00 |
| DS3 | $2,000.00 | $3245.00 |
| OC3 | $4,000.00 | $7,500.00 |
| Ethernet | $1,000.00 | $970.00 |
| Fast Ethernet | $1,500.00 | $5,000.00 |
| Gigabit Ethernet | $4,000.00 | $20,000.00 |

| Tiered DS3 Internet Port Other Access MRC | Install NRC | Net Rate MRC |
|---|---|---|
| 3 Mbps | $2,000.00 | $1,050.00 |
| 6 Mbps | $2,000.00 | $1,150.00 |
| 9 Mbps | $2,000.00 | $1,284.00 |
| 12 Mbps | $2,000.00 | $1,400.00 |
| 15 Mbps | $2,000.00 | $1,500.00 |
| 18 Mbps | $2,000.00 | $1,550.00 |
| 21 Mbps | $2,000.00 | $1,600.00 |
| 24 Mbps | $2,000.00 | $1,650.00 |
| 27 Mbps | $2,000.00 | $1,700.00 |
| 30 Mbps | $2,000.00 | $1,750.00 |
| 33 Mbps | $2,000.00 | $1,800.00 |
| 36 Mbps | $2,000.00 | $1,900.00 |
| 39 Mbps | $2,000.00 | $2,000.00 |
| 42 Mbps | $2,000.00 | $2,100.00 |
| 45 Mbps | $2,000.00 | $2,200.00 |

| Tiered Fast Ethernet 100 Mbps Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 10 Mbps | $1,500.00 | $741.00 |
| 15 Mbps | $1,500.00 | $1,052.00 |
| 20 Mbps | $1,500.00 | $1,210.00 |
| 30 Mbps | $1,500.00 | $1,600.00 |
| 40 Mbps | $1,500.00 | $1,800.00 |
| 50 Mbps | $1,500.00 | $2,000.00 |
| 60 Mbps | $1,500.00 | $2,200.00 |
| 70 Mbps | $1,500.00 | $2,400.00 |
| 80 Mbps | $1,500.00 | $2,600.00 |

OMR Q417950 amends OMRs 128380, 132311, Q25921,
Q297452 & Q384599
Contract: 190503
Page 3
CONFIDENTIAL
Copyright © Qwest. All Rights Reserved.
v2

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

**AMENDMENT TO**
**QWEST TOTAL ADVANTAGE® AGREEMENT**

| | | |
|---|---|---|
| 90 Mbps | $1,500.00 | $2,800.00 |
| 100 Mbps | $1,500.00 | $2,900.00 |

| Tiered DS3 Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 3 Mbps | $2,000.00 | $1,250.00 |
| 6 Mbps | $2,000.00 | $1,518.00 |
| 9 Mbps | $2,000.00 | $1,940.00 |
| 12 Mbps | $2,000.00 | $2,100.00 |
| 15 Mbps | $2,000.00 | $2,300.00 |
| 18 Mbps | $2,000.00 | $2,400.00 |
| 21 Mbps | $2,000.00 | $2,500.00 |
| 24 Mbps | $2,000.00 | $2,700.00 |
| 27 Mbps | $2,000.00 | $2,750.00 |
| 30 Mbps | $2,000.00 | $2,800.00 |
| 33 Mbps | $2,000.00 | $2,900.00 |
| 36 Mbps | $2,000.00 | $3,000.00 |
| 39 Mbps | $2,000.00 | $3,100.00 |
| 42 Mbps | $2,000.00 | $3,200.00 |
| 45 Mbps | $2,000.00 | $3,245.00 |

| Tiered Fast Ethernet 100 Mbps Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 10 Mbps | $1,500.00 | $1,159.00 |
| 15 Mbps | $1,500.00 | $1,645.00 |
| 20 Mbps | $1,500.00 | $2,082.00 |
| 30 Mbps | $1,500.00 | $2,834.00 |
| 40 Mbps | $1,500.00 | $3,100.00 |
| 50 Mbps | $1,500.00 | $3,400.00 |
| 60 Mbps | $1,500.00 | $3,800.00 |
| 70 Mbps | $1,500.00 | $4,200.00 |
| 80 Mbps | $1,500.00 | $4,600.00 |
| 90 Mbps | $1,500.00 | $4,800.00 |
| 100 Mbps | $1,500.00 | $5,000.00 |

**2.4. Business Affinity Discount Group.** Section 19 of the Agreement (Related Entity Discount Group) is deleted in its entirety and replaced with the following:

### 19. Business Affinity Discount Group

**19.1.** For purposes of this Section and the Agreement, the following definitions will apply:

"Affinity Customer" means any business entity owned or controlled by, or under common control with, Golden Gate Capital, including without limitation Orchard Brands Corporation and its subsidiaries.

"Business Affinity Discount Group" (or "Discount Group") means an Affinity Customer that may aggregate its purchase of Services under the terms and conditions of this Agreement.

**19.2** Business Affinity Discount Group. Affinity Customer's may, but shall not be obligated to, obtain Services under the Agreement at the same rates as other Affinity Customers. In order to become part of the Business Affinity Discount Group under this Agreement, each Affinity Customer must execute an Affinity Customer Agreement as is (i.e., without negotiation), and in such event Qwest shall accept that request by countersigning the Affinity Customer Agreement. Customer must identify an Affinity Customer that it authorizes to participate in the Discount Group by providing the potential Affinity Customer the Affinity Customer Agreement form for the Affinity Customer to execute and return to Qwest. Upon receipt of an executed form, Qwest will do one of the following: (i) deny the prospective Affinity Customer's participation in the Business Affinity Discount Group (if the Affinity Customer seeks terms different than the other members of the Business Affinity Discount Group); (ii) seek additional information from Customer regarding the prospective Affinity Customer's eligibility; or (iii) send an e-mail to Customer asking it to verify that the prospective Affinity Customer is eligible. Customer must reply to the e-mail with the requested verification for the Affinity Customer to be included. If requested in writing (including an e-mail) by Qwest, Customer will provide within ten business days of that request the information Qwest deems reasonably necessary to establish the qualifications

Copyright © Qwest. All Rights Reserved.
v2

DocuSign Envelope ID: 227E9D5B-062B-4C9A-8796-AA7551923381

## AMENDMENT TO
## QWEST TOTAL ADVANTAGE® AGREEMENT

of an entity to be an Affinity Customer. Customer's obligation to provide the requested information to Qwest is deemed to be a material obligation under this Agreement. Qwest may deny a prospective Affinity Customer from participation in the Business Affinity Discount Group if Qwest is unable to verify eligibility for the Affinity Customer. If an Affinity Customer fails to comply with the terms of the Affinity Customer Agreement (including a Service Exhibit) or ceases to meet the eligibility requirements for participation, then Qwest may discontinue an Affinity Customer's participation in the Business Affinity Discount Group. Under no circumstances may Customer use the Business Affinity Discount Group to obtain services for third party entities that do not meet one of the categories of an Affinity Customer. Affinity Customers will be billed individually and will be financially responsible to pay charges, fees, or taxes associated with the Service in addition to complying with the other obligations under the Affinity Customer Agreement.

**19.3** Relationship to Other Terms of this Agreement. The discontinuance of either a Discount Group or an individual Affinity Customer from participation in a Discount Group will not excuse Customer from fulfilling its Revenue Commitment. Any Qwest liability that relates to Services that Qwest sells to Affinity Customers participating in the Discount Group will be included in assessing Qwest's total aggregate liability under this Agreement to ensure that Qwest's total aggregate liability does not exceed the Damage Cap.

**19.4** Qwest may act in reliance upon any instruction, instrument, or signature reasonably believed by Qwest to be genuine. Qwest may assume that any employee of Customer, as well as any employee of any Affinity Customer, who gives any written notice, Service order, or other instruction in connection with this Agreement has the authority to do so. The parties will establish mutually agreeable guidelines for identifying Affinity Customers to submit Service orders placed hereunder. Notwithstanding the foregoing, the representations, warranties, covenants and agreements of the parties set forth in this Agreement are not intended for, nor will they be for the benefit of or enforceable by, any person not a party hereto, including, without limitation, any Affinity Customers or any End Users.

**3. Billing Information.** Any new pricing applicable to Customer's existing Services, if any, will become effective at Qwest's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**4. Miscellaneous.** This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and be deemed incorporated by reference into the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

**POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGATION WITH POM DIRECTOR DELEGATION OF AUTHORITY**

Approval Date and Time: 7/26/2010 10:10 AM Eastern

Approval by:  Paresh Naik

Q.Insight Request ID:  Q417950

I have received a written delegation of authority from David Stoffle

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Tameka Champagne to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Tameka Champagne. I understand that it is the responsibility of the designate Tameka Champagne to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Tameka Champagne must sign your signature.
- Do not use the David Stoffle signature stamp.
- For the "Name:" line, write Tameka Champagne on behalf of David Stoffle.

**Qwest**
Spirit of Service

**Instructions:  BMG Contract Cover Sheet for STANDARD Contracts Only**

1. Please complete the following information based on the contents or your contract.
2. Submit the cover sheet & contract for counter-signature.  Please consult the "signature level authority" information posted on the BMGQ (Policy 107) for signature authority. http://compliance.uswc.uswest.com/policies/107.html#26.3.2
3. Give to the Sales Office Administrator or Contract Manager for your office (Peggy Gawarecki) or Fax to 303-391-1743.
4. The Sales Office Administrator will check the contract into BMG ILINK contract storage & retrieval.
5. PLEASE NOTE:  Be sure to include your e-mail address on the cover sheet.  Your e-mail address ensures that you are sent the Content ID# for this contract.  *The Content ID# is required by Order Entry for all orders placed under this contract.*

| Frank Mahoney | | |
|---|---|---|
| **SALES MANAGER NAME:** | **SALES MANAGER SIGNATURE & DATE:** | 4/15/2011 |

| | **Mandatory Fields** (Fields that must be completed prior to submitting to your Sales Director Administrator/Contract Mgr) | |
|---|---|---|
| 1 * | Document Type (Select from reference list & match to contract) | Renewal |
| 2 * | Corporate Entity | QC |
| 3 * | Document Name *(Select from reference list & match to contract)* | Analog Private Line Interstate Svc Agreement-QC -- -- -- -- -- -- |
| 4 * | MUST POPULATE WITH One of the following:<br>• Master CPE Agreement ILINK Content ID #<br>• Qwest Select Advantage Agreement ILINK Content ID #<br>• Amendment's Original ILINK Content ID #<br>• If none above applies please type in New | None |
| 5* | DMT # (If Qwest Total Advantage DM) | |
| 6 * | Customer Name *(as listed EXACTLY on contract)* | ~~Bluestem Brands~~ Blustem |
| 7 * | Customer Sign Date (MM/DD/YYYY) | 04/15/2011 |
| 8 * | Qwest Accept Date (MM/DD/YYYY) | 04/15/2011 |
| 9 * | Contract Type  (This cover sheet only used for Standard Contracts) | Standard |
| 10 * | Contract Term Length (# of months) | 24 |
| 11 * | Contract Expiration Date | 04/17/2013 |
| 12 * | Sales Office | Minneapolis |
| 13 * | Sales Group ID | NBA Major Central - GMCE |
| 14 * | Sales Rep Email | brian.callahan@qwest.com |
| 15 * | Sales Rep ID | BHBM |
| 16 * | Sales Director Name | Tyler Middleton |
| 17 * | Number of pages including this cover sheet | 6 |
| 18 * | Qwest Contract # | MN60518 |
| 19 * | MRC | 948.00 |
| 20 * | NRC | 0 |
| 21 * | Account # or BTN | 612-E16-2255 |
| 22 * | QCentral Opportunity ID | 6433783 |
| 23 | Comments: | |
| | | |

*For Sales Administrators:  Cover Sheet and COMPLETE ORIGINAL Signed Hard Copy Contract must be sent to:  CD&S - 1801 California St, Suite 900, Denver, CO  80202 after BMG ILINK check in; send weekly.*

Content ID Number: _____

*Qwest confidential subject to CPNI rules*

QWEST CORPORATION
**INTERSTATE PRIVATE LINE TRANSPORT SERVICES PRICING PLAN ACKNOWLEDGMENT**

Bluestem
Customer's Legal Name ("Customer")

Customer hereby orders from Qwest Corporation ("Qwest") the Qwest Interstate Access Service ("Service") indicated below ("Acknowledgment"). Customer understands and agrees that Qwest provides Service solely under the regulations, rates, and charges of Interstate Access Tariff F.C.C. No. 1 ("Tariff"). In the event of a conflict between this Acknowledgment, Qwest Records and/or the Tariff, the Tariff prevails. Service is subject to the Credit Allowance for Service Interruptions in the Tariff which provides Customer's sole and exclusive remedy for interruptions of any kind to the Service.

| SERVICE REQUESTED |
|---|
| **(Choose one Service per form)** |

| ANALOG/DATA SERVICES | VIDEO DATA SERVICES | HIGH CAPACITY SERVICES |
|---|---|---|
| ☐ Analog Private Line Service | ☐ Broadcast Video Service | ☒ DS Level DS1/1.544 Mbps |
| ☐ Analog Voice Grade (Select Plan) | | |
| ☐ SVDS / (Select Speed) | | |
| ☐ Digital Data / (Select Speed) | | |

Provide Service between    11 McLeland Road             and     20 McLeland Road and 6250 Ridgewood, St. Cloud
(Qwest will provide and maintain the Service at the locations and quantities as requested by Customer and evidenced by Qwest records, hereby incorporated by reference.)
Billing No.  612-E16-2255 292          Circuit ID 14.HCXX.95962..NW, 14.HCXX.95963..NW, 14.HCXX.95964..NW
Optional Features:  (Insert any optional features ordered such as SHARP, COMMAND A LINK, etc.)
Comments:  (Insert any special instructions/notes)
☒ If checked, additional Service information is attached to this Acknowledgment, however, attachments will not add to or change the regulations, rates, terms, and/or charges of the Tariff.
☒ If checked, Customer hereby certifies that Service listed above qualifies for exemption of the Private Line Surcharge in accordance with the Tariff under exemption category             .  Written notification will be provided to Qwest at such time the exemption is no longer applicable due to changes or re-termination of any Service.

| RATE PLAN |
|---|

The following Monthly and Nonrecurring Rates ("Rates") for Service reflect the Rates currently in effect in the Tariff. Customer understands the actual Rates will be the Rates in effect in the Tariff on the first date of installation of Service, or for existing Service, the date the service order is completed by Qwest. Customer will also pay Qwest all applicable taxes, usual and customary surcharges, and all government imposed fees and charges that relate to the Service or installation rendered hereunder, excluding the Private Line Surcharge, if Customer qualifies, and if that box is appropriately checked on this Acknowledgment.

      **Total Monthly Rate: $948.00 as of 04/18/2011**      **Total Nonrecurring Rate: $0.00 as of 04/18/2011**

Customer has selected a Pricing Plan ("Plan") which protects the Monthly Recurring Rate from Qwest initiated Rate increases for 24 months ("Plan Term"). Customer understands that if Customer disconnects Service, in whole or in part, prior to the completion of the Plan Term, the Tariff's termination liability charges may apply. If Customer: (a) cancels an order for Service prior to the date Service is available for use; or (b) is unable to accept Service within 30 business days after the original service date, the Tariff's cancellation charges may apply. Qwest may assess a separate dispatch fee for Customer-requested technician visits for problems not caused by Qwest facilities or equipment. Any requested repairs of Customer's facilities or equipment are not included in the dispatch fee and will be charged on a time-and-materials basis. Customer will provide or secure at Customer's expense the following items necessary for Qwest to install, operate, or maintain Service and associated Qwest equipment (if any) on Customer's side of the demarcation point: (a) appropriate space and power; and (b) rights or licenses. These items may include, for example, rights to use or install pathways, shafts, risers, conduits, telephone closets, interior wiring, service areas, racks, cages, and utility connections or entries required to reach points of termination.

Customer has chosen a Plan based on a specific term commitment and as such understands the rates provided herein are based upon Customer completing an entire Plan Term for the subject Service; therefore, ANY ADDITIONS TO SERVICE WILL REQUIRE A NEW ACKNOWLEDGMENT FORM DESIGNATING THE APPLICABLE PLAN TERM.

"Construction" means when Service may not be available due to facilities limitations and it is necessary for Qwest to construct facilities. "Funding" means charges to Customer over the term of a Service contract covering Qwest's calculated costs for providing Service and it's expected rate of return when network infrastructure is not available to provide Service to Customer. Qwest may assess separate Construction charges if facilities are not available to meet an order for Service and Qwest constructs facilities under one or more of the following circumstances: (a) the amount of Customer's expected payments over the term of the Acknowledgment does not exceed Qwest's calculated cost of providing the Service plus its expected rate of return; (b) Customer requests that Service be furnished using a type of facility, or via a route that Qwest would not normally utilize in providing the requested Service; (c) more facilities are requested than would normally be required to satisfy an order; and (d) Customer requests that Construction be expedited, resulting in added cost to Qwest. Service provided under this Acknowledgment is subject to Funding approval and that approval will be evidenced in the Funding Concurrence block on this Acknowledgment. That approval will be granted at the sole discretion of Qwest. In the event contract documents are signed under which Customer is ordering Service for which Funding is not approved, Qwest will cooperate with Customer in good faith to develop an alternative service solution if Funding cannot be achieved on the contracted solution and Qwest may immediately terminate this Acknowledgment, without penalty, if Funding of the contracted and alternate Service solutions are determined to not be possible.

Copyright © Qwest. All Rights Reserved.            v1.032210

This Acknowledgment will be governed by the laws of the state of Colorado, except with regard to matters which are within the exclusive jurisdiction of the state or federal regulatory agency. Those matters alone will be governed by the laws of the appropriate jurisdiction. Any legal proceeding arising out of, or relating to this Acknowledgment, will be brought in a United States District Court, or absent federal court jurisdiction, in a state court of competent jurisdiction, in the location of the party to this Acknowledgment not initiating the action. Notwithstanding the foregoing, Qwest may initiate proceedings in Denver, Colorado to collect undisputed amounts billed.

Each party, to the extent permitted by law, knowingly, voluntarily, and intentionally waives its right to a trial by jury and any right to pursue any claim or action arising out of or relating to this Acknowledgment on a class or consolidated basis or in a representative capacity.

Customer may not assign this Acknowledgment or any of its rights or obligations under this Acknowledgment without the prior written consent of Qwest, which consent will not be unreasonably withheld. Customer may not assign to a reseller or a telecommunications carrier under any circumstances, and represents that it will not resell the Service. This Acknowledgment is intended solely for Qwest and Customer, and not to benefit any other person or entity (e.g., End User). "End User" means Customer's members, end users, customers, or any other third parties who use or access the Service or the Qwest network via the Service. If any term of this Acknowledgment is held unenforceable, such term will be construed as nearly as possible to reflect the original intent of the parties and the remaining terms will remain in effect. Neither party's failure to insist upon strict performance of any provision of this Acknowledgment will be construed as a waiver of any of its rights hereunder. All terms of this Acknowledgment that should by their nature survive the termination of this Acknowledgment will so survive. In the event of a conflict in any term or condition of any documents that govern the provision of the Service hereunder, the following order of precedence will apply in descending order of control: the Tariff, this Acknowledgment, and Qwest records. Neither party will be liable for any delay or failure to perform its obligations hereunder if such delay or failure is caused by a Force Majeure Event. "Force Majeure Event" means an unforeseeable event beyond the reasonable control of that party, including without limitation: act of God, fire, flood, labor strike, sabotage, cable cuts, acts of terror, material shortages or unavailability, government laws or regulations, war or civil disorder, or failures of suppliers of goods and services. Customer will not pay for the Services with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate Qwest to provide certain information or perform certain functions unless each of those functions and obligations is explicitly identified and agreed to by the parties in this Acknowledgment or in an amendment to this Acknowledgment. Except for Tariff or Service modifications initiated by Qwest, all amendments to this Acknowledgment must be in writing and signed by the parties' authorized representatives. However, any change in rates, charges, or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice. Each party reserves the right at any time to reject any handwritten change to this Acknowledgment. This Acknowledgment constitutes the entire agreement between Customer and Qwest and supersedes all prior oral or written agreements or understandings relating to this subject matter. Electronic signatures on this Acknowledgment will be accepted only in the form and manner prescribed by Qwest.

| Bluestem | Qwest Corporation |
|---|---|
| Authorized Signature | Authorized Signature |
| Name Typed or Printed | Name Typed or Printed |
| Title | Title |
| Date 4/15/4 | Date 4/15/2011 |

---

**FOR QWEST INTERNAL USE ONLY**
FUNDING CONCURRENCE REQUIRED PRIOR TO EXECUTION FOR NEW SERVICE (NOT REQUIRED FOR RENEWALS)

| AQCB Quote No.   MN1100094 |
|---|
| Date Concurred: |

Agreement Number: _____

## QWEST CIRCUIT INVENTORY

| BILLING TELE-PHONE NO. (BTN) | ADDRESS/CIRCUIT ID | CIRCUIT TYPE | QTY. or Channel Terminations | Surcharge Exemption Code, if applicable * |
|---|---|---|---|---|
| 612-E16-2255 292 | 11 McLeland Road- 14.HCXX.95962..NW, | Point to Point T-1 | 1 | On File |
| 612-E16-2255 292 | 11 McLeland Road- 14.HCXX.95963..NW, | Point to Point T-1 | 1 | On File |
| 612-E16-2255 292 | 11 McLeland Road- 14.HCXX.95964..NW | Point to Point T-1 | 1 | On File |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

\* Customer hereby certifies that Service qualifies for exemption of the Private Line Surcharge in accordance with the Tariff.  Written notification will be provided to Qwest at such time the exemption is no longer applicable due to changes or re-termination of any Service.

| *FOR QWEST INTERNAL USE ONLY* |
|---|
| FUNDING CONCURRENCE REQUIRED PRIOR TO EXECUTION FOR NEW SERVICE (NOT REQUIRED FOR RENEWALS) |
| AQCB Quote No. |
| Date Concurred: |



Qwest.
*Spirit of Service*

**Instructions:** BMG Contract Cover Sheet for STANDARD Contracts Only

1. Please complete the following information based on the contents or your contract.
2. Submit the cover sheet & contract for counter-signature. Please consult the "signature level authority" information posted on the BMGQ (Policy 107) for signature authority.
   http://compliance.uswc.uswest.com/policies/107.html#26.3.2
3. Give to the Sales Office Administrator or Contract Manager for your office (Peggy Gawarecki) or Fax to 303-391-1743.
4. The Sales Office Administrator will check the contract into BMG ILINK contract storage & retrieval.
5. PLEASE NOTE: Be sure to include your e-mail address on the cover sheet. Your e-mail address ensures that you are sent the Content ID# for this contract. *The Content ID# is required by Order Entry for all orders placed under this contract.*

| SALES MANAGER NAME: Frank Mahoney | SALES MANAGER SIGNATURE & DATE: 4/15/2011 |
|---|---|

| **Mandatory Fields** (Fields that must be completed prior to submitting to your Sales Director/Administrator/Contract Mgr.) | |
|---|---|
| 1 * | Document Type *(Select from reference list & match to contract)* | Renewal |
| 2 * | Corporate Entity | QC |
| 3 * | Document Name *(Select from reference list & match to contract)* | Analog Private Line Intrastate Svc Agreement-QC -- -- -- -- -- |
| 4 * | MUST POPULATE WITH One of the following:<br>• Master CPE Agreement ILINK Content ID #<br>• Qwest Select Advantage Agreement ILINK Content ID #<br>• Amendment's Original ILINK Content ID #<br>• If none above applies please type in New | None |
| 5* | DMT # (If Qwest Total Advantage DM) | |
| 6 * | Customer Name (*as listed EXACTLY on contract*) | Bluestem Brands |
| 7 * | Customer Sign Date (MM/DD/YYYY) | 04/15/2011 |
| 8 * | Qwest Accept Date (MM/DD/YYYY) | 04/15/2011 |
| 9 * | Contract Type (This cover sheet only used for Standard Contracts) | Standard |
| 10 * | Contract Term Length (# of months) | 24 |
| 11 * | Contract Expiration Date | 04/17/2013 |
| 12 * | Sales Office | Minneapolis |
| 13 * | Sales Group ID | NBA Major Central - GMCE |
| 14 * | Sales Rep Email | brian.callahan@qwest.com |
| 15 * | Sales Rep ID | BHBM |
| 16 * | Sales Director Name | Tyler Middleton |
| 17 * | Number of pages including this cover sheet | 6 |
| 18 * | Qwest Contract # | MN60525 |
| 19 * | MRC | 267.90 |
| 20 * | NRC | 0 |
| 21 * | Account # or BTN | 612-E16-2255 |
| 22 * | QCentral Opportunity ID | 6433783 |
| 23 | Comments: | |
| | | |

*For Sales Administrators:* Cover Sheet and COMPLETE ORIGINAL Signed Hard Copy Contract must be sent to: CD&S - 1801 California St, Suite 900, Denver, CO 80202 after BMG ILINK check in; send weekly.

Content ID Number: ~~████████~~

*Qwest confidential subject to CPNI rules*

**QWEST NETWORK SERVICE AGREEMENT**
**QWEST DS1 SERVICE**
Intrastate

Agreement Number: <u>MN60525</u>
Billing Number: <u>612E162435</u>

This Qwest Corporation Intrastate DS1 Service Agreement ("Agreement") is between **Bluestem** ("Customer"), and Qwest Corporation, ("Qwest") and is effective on the date Qwest signs it ("Effective Date"). Qwest will provide, and Customer will purchase, Qwest Intrastate DS1 Service provided under this Agreement ("Service"). Any Qwest tariff, price list, price schedule, administrative guideline, catalog, and other rate and term schedules (hereinafter, whether individually or together, "Tariff") applicable to the Service is incorporated into the Agreement by reference and made a part of the Agreement. The Service will be governed by: (a) the Tariff applicable to the Service; and (b) to the extent a comparable Tariff term or condition does not apply to the Service, the terms and conditions set forth in this Agreement. Qwest reserves the right to amend, change, withdraw, or file additional Tariffs in its sole discretion, with such updated Tariffs effective upon posting or upon fulfillment of any necessary regulatory requirements.

**1.    Description of Service.**

**1.1**    Qwest will provide Service up to the Standard Network Interface ("SNI") at Customer's premises. The SNI is that location where Qwest's protected network facilities end and Customer's inside wiring or network begins.

**1.2**    Service provides for the two-way transmission of 1.544 Megabits per second ("Mbit/s") on a point-to-point basis only. Service may be provisioned on copper, fiber, or other suitable facilities, at Qwest's discretion, and it may be used for the transmission of voice, data, and/or video signals. Service is available between: (a) two customer-designated premises; (b) a customer-designated premises and a Qwest serving wire center; or (c) Qwest serving wire centers. When Service is requested between two Qwest serving wire centers, Central Office Multiplexers ("COMs") must also be ordered for each serving wire center of the DS1 circuit, and Private Line Transport service must be ordered for each COM to the Customer's premises.

**1.3**    Customer understands and agrees that Qwest supplies Service as an intrastate, intraLATA telecommunications service, as defined by State and/or Federal Communications Commission ("F.C.C.") regulations, which are incorporated herein by this reference. It is Customer's responsibility to ensure that Customer uses Service as an intrastate, intraLATA telecommunications service consistent with such regulations. F.C.C. regulations permit interstate usage of Service if such usage does not exceed 10% of the total usage. If Customer should use this Service for any other purpose, or if interstate usage exceeds 10%, it is Customer's responsibility to immediately notify Qwest of such use and to place an order for appropriate service. Qwest will bill, and Customer will promptly pay, appropriate monthly recurring charges, for such use of and changes to Customer's telecommunications service including, but not limited to all applicable Qwest Access Tariff F.C.C. No. 1 interstate access charges or intrastate Tariff access charges.

**1.4**    "Construction" means when Service may not be available due to facilities limitations and it is necessary for Qwest to construct facilities. "Funding" means charges to Customer over the term of a Service contract covering Qwest's calculated costs for providing Service and it's expected rate of return when network infrastructure is not available to provide Service to Customer. Qwest may assess separate Construction charges if facilities are not available to meet an order for Service and Qwest constructs facilities under one or more of the following circumstances: (a) the amount of Customer's expected payments over the term of the Agreement does not exceed Qwest's calculated cost of providing the Service plus its expected rate of return; (b) Customer requests that Service be furnished using a type of facility, or via a route that Qwest would not normally utilize in providing the requested Service; (c) more facilities are requested than would normally be required to satisfy an order; and (d) Customer requests that Construction be expedited, resulting in added cost to Qwest. Service provided under this Agreement is subject to Funding approval and that approval will be evidenced in the Funding Concurrence block on this Agreement. That approval will be granted at the sole discretion of Qwest. In the event contract documents are signed under which Customer is ordering Service for which Funding is not approved, Qwest will cooperate with Customer in good faith to develop an alternative service solution if Funding cannot be achieved on the contracted solution and Qwest may immediately terminate this Agreement, without penalty, if Funding of the contracted and alternate Service solutions are determined to not be possible.

**2.    Term.**

**2.1**    This Agreement will commence on the date on which Qwest signs it, following Customer's execution of this Agreement ("Effective Date"), and it expires 24 months from the date Service is available to Customer, as evidenced by Qwest records ("Initial Term"). After the expiration of the Initial Term, this Agreement will continue automatically on a month-to-month basis unless a party notifies the other party in writing of its desire not to renew this Agreement at least 60 calendar days, and no more than 120 calendar days, prior to the end of the Initial Term. After the Initial Term, either party may terminate this Agreement upon 30 calendar days prior written notice. The Initial Term and any month-to-month period thereafter will be collectively referred to as the "Term."

**2.2**    After the Initial Term, Customer will pay for Service at Qwest's then-current rates. Qwest will inform Customer of its then-current rates for Service upon written request.

**3.    Service Ordered.**

**3.1**    Customer orders and Qwest will supply Service as follows.

| No. of Circuits | Address of Circuit Location 1 | Address of Circuit Location 2 |
|---|---|---|
| 1 | 20 McLeland | 6250 Ridgewood |

**3.2**    Qwest will notify Customer of the date Service ordered is available to Customer under this Agreement. In the event Customer is unable or unwilling to accept service at such time, the subject Service will be held available for Customer for a period not to exceed 30 business days from such date ("Grace Period"). If after this Grace Period, Customer still has not accepted Service Qwest may, at its

**CONFIDENTIAL**                                                    Copyright © Qwest. All Rights Reserved.
v1.032210

QWEST NETWORK SERVICE AGREEMENT
QWEST DS1 SERVICE
Intrastate

sole discretion, after consultation with Customer either: (a) commence with regular monthly billing for the subject Service; or (b) cancel the subject Service. If Customer cancels an order for Service prior to the date Service is available for use or is unable to accept the Service during the Grace Period and Qwest cancels the Service at the end of the Grace Period, the Tariff cancellation charges may apply.

**4.    Payment.** Customer must pay Qwest all charges by the payment due date on the invoice. Any amount not paid when due will be subject to a late charge as specified by the Tariff, or if there is no such late charge specified in the Tariff, the amount due will be subject to late interest at the lesser 1½% per month or the highest rate permitted by applicable law. Customer must also pay Qwest any applicable federal, state, and local taxes, surcharges, and other similar charges ("Taxes") assessed in connection with Customer's Service. Qwest may reasonably modify the payment terms or require other assurance of payment based on Customer's payment history or a material and adverse change in Customer's financial condition. Customer will pay those charges listed below. The charges for Services under this Agreement, including any and all discounts to which Customer may be entitled, will be offered and charged to Customer independently from, and regardless of, Customer's purchase of any customer premises equipment or enhanced services from Qwest. Customer will not pay for the Services with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate Qwest to provide certain information or perform certain functions unless each of those functions and obligations is explicitly identified and agreed to by the parties in this Agreement or in an amendment to this Agreement.

| | |
|---|---|
| Total Monthly Recurring Charge ("MRC"): | $267.90 |
| Total Nonrecurring Charge ("NRC"): | $0.00 |

**5.    Changes to Service.** Pursuant to the applicable Tariff, if any, Customer may move the physical location of all or part of the Service to another location within the same Qwest intrastate, intraLATA serving area, including within a building or among buildings. Customer will pay all of the then-current installation and other charges for any such move. If the move is within the same building or between buildings located on the same premises, such as between buildings in an office park, an amendment is not required. If the move is between buildings not on the same premises, an amendment to this agreement is required. The Agreement's existing Term and Minimum Service Period will not change as a result of a move.

**6.    Termination.**

**6.1**    Either party may terminate Service and/or this Agreement in accordance with the applicable Tariff or for Cause. "Cause" means the failure of a party to perform a material obligation under this Agreement, which failure is not remedied: (a) for payment defaults by Customer, within five days of separate written notice from Qwest of such default (unless a different notice period is specified in the Tariff); or (b) for any other material breach, within 30 days of written notice (unless a different notice period is specified in the Tariff or this Agreement). Customer will remain liable for charges accrued but unpaid as of the termination date. Prior to the conclusion of the Term, if Service and/or this Agreement is terminated either by Qwest for Cause or by Customer for any reason other than Cause, then Customer will also be liable for a termination charge "Termination Charge" of:

**(a)**    If during the first 12 months of Service ("Minimum Service Period"), Customer will pay all accrued and unpaid charges for Service provided through the effective date of such termination plus a Termination Charge of 100% of the MRCs for the terminated Service (or any fraction thereof), multiplied by the number of months, or portion thereof, remaining in the Minimum Service Period, plus 40% of the MRCs for the terminated Service (or any fraction thereof), multiplied by the number of months after the Minimum Service Period remaining in the Initial Term.

**(b)**    If after the Minimum Service Period, Customer will pay for all accrued and unpaid charges for Services provided through the effective date of such termination plus a Termination Charge of 40% of the MRCs for the terminated Service (or any fraction thereof), multiplied by the number of months, or portion thereof, remaining in the Initial Term.

**6.2**    A Termination Charge will be waived when all of the following conditions are met: (a) Customer discontinues Service and signs a new service agreement(s) for any other Qwest-provided service(s); (b) the new service agreement(s) have a total value equal to or greater than 115% of the remaining prorated value of the existing agreement(s) (excluding any special construction charges, applicable nonrecurring charges, or previously billed but unpaid recurring and/or nonrecurring charges); (c) Customer places the orders to discontinue Service and establish new service at the same time; and (d) a new minimum service period goes into effect when the new service agreement term begins. The waiver does not apply to changes between regulated and unregulated or enhanced products and services.

**6.3**    Qwest may: (a) immediately suspend all or any part of the Service; and/or (b) terminate this Agreement (effective after the applicable notice period): (i) for Cause (as defined herein); or (ii) upon written notice if Customer becomes or is declared insolvent or bankrupt or is the subject of any proceedings related to its liquidation, insolvency or for the appointment of a receiver or similar officer for it.

**7.    Interruptions to Service.** Tariff specifies the credit allowance due Customer, if any, for interruptions to Service which are not caused by Customer. In the absence of a Tariff, the provisions of Qwest's F.C.C.1 Access Service Tariff will apply with respect to any credit allowance due Customer for interruptions to Service.

**8.    Disclaimer Of Warranties.** QWEST DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF TITLE, NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NO ADVICE OR INFORMATION GIVEN BY QWEST, ITS AFFILIATES, AGENTS, OR CONTRACTORS OR THEIR RESPECTIVE EMPLOYEES WILL CREATE ANY WARRANTY. CUSTOMER ASSUMES TOTAL RESPONSIBILITY FOR USE OF THE SERVICE.

CONFIDENTIAL                                                    Copyright © Qwest. All Rights Reserved.
v1.032210

QWEST NETWORK SERVICE AGREEMENT
QWEST DS1 SERVICE
Intrastate

**9.    Limitation of Liability.** NEITHER PARTY, ITS AFFILIATES OR CONTRACTORS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, RELIANCE, PUNITIVE OR CONSEQUENTIAL DAMAGES OR FOR ANY LOST PROFITS OR REVENUES OR LOST DATA OR COSTS OF COVER RELATING TO THE SERVICES OR THIS AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH LIABILITY IS ASSERTED. CUSTOMER'S EXCLUSIVE REMEDIES FOR ANY AND ALL CLAIMS RELATED TO THE SERVICE WILL BE LIMITED TO:  (A) THOSE REMEDIES SET FORTH IN THE INTERRUPTIONS TO SERVICE SECTION; OR (B) IF SUCH SECTION DOES NOT APPLY, THE TOTAL MRCS PAID, OR PAYABLE, BY CUSTOMER TO QWEST FOR SERVICE IN THE MONTH IMMEDIATELY PRECEDING THE OCCURRENCE OF THE EVENT GIVING RISE TO THE CLAIM. This limitation of liability will not apply to a party's indemnification obligations or Customer's payment obligation for charges under this Agreement (e.g., Service charges, Taxes, interest, and termination or cancellation charges).

**10.    Personal Injury, Death, and Property Damage.** Each party will be responsible for the actual, physical damages it directly causes to the other party in the course of its performance under the Agreement, limited to damages resulting from personal injury or death to a party's employees and loss or damage to a party's personal tangible property arising from the negligent acts or omissions of the liable party; PROVIDED, HOWEVER, THAT NEITHER PARTY, ITS AFFILIATES, AGENTS, OR CONTRACTORS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, RELIANCE, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR FOR ANY LOST PROFITS OR REVENUES OR LOST DATA OR COSTS OF COVER.

**11.    Indemnification.** Customer will defend and indemnify Qwest, its Affiliates, agents, and contractors against all third party claims, liabilities, costs, and expenses, including reasonable attorneys' fees, arising from or related to the use, modification, or resale of the Service by Customer or End Users. "End Users" means Customer's members, end users, customers, or any other third parties who use or access the Service or the Qwest network via the Service.  "Affiliate" means any entity controlled by, controlling, or under common control with a party.

**12.    Confidentiality; Publicity.** Neither party will, without the prior written consent of the other party: (a) disclose any of the terms of this Agreement or use the name or marks of the other party or its Affiliates; or (b) disclose or use (except as expressly permitted by, or required to achieve the purposes of, the Agreement) the Confidential Information of the other party. Qwest's consent may only be given by its Legal Department. A party may disclose Confidential Information if required to do so by a governmental agency, by operation of law, or if necessary in any proceeding to establish rights or obligations under the Agreement, provided that the disclosing party gives the non-disclosing party reasonable prior written notice. "Confidential Information" means any information that is not generally available to the public, whether of a technical, business or other nature and that: (c) the receiving party knows or has reason to know is confidential, proprietary or trade secret information of the disclosing party; and/or (d) is of such a nature that the receiving party should reasonably understand that the disclosing party desires to protect such information against unrestricted disclosure.  Confidential Information will not include information that is in the public domain through no breach of this Agreement by the receiving party or is already known or is independently developed by the receiving party.

**13.    Governing Law; Dispute Resolution.**

**13.1    Governing Law; Forum.** This Agreement will be governed by the laws of the state of Colorado, except with regard to matters which are within the exclusive jurisdiction of the state or federal regulatory agency. Those matters alone will be governed by the laws of the appropriate jurisdiction. Any legal proceeding relating to this Agreement will be brought in a U.S. District Court, or absent federal jurisdiction, in a state court of competent jurisdiction, in the location of the party to this Agreement not initiating the action, as indicated in the Notices section.  But Qwest may, at its discretion, initiate proceedings in Denver, Colorado to collect undisputed amounts billed.  This provision is not intended to deprive a small claims court or state agency of lawful jurisdiction that would otherwise exist over a claim or controversy between the parties.

**13.2    Waiver of Jury Trial and Class Action.** Each party, to the extent permitted by law, knowingly, voluntarily, and intentionally waives its right to a jury trial and any right to pursue any claim or action relating to this Agreement on a class or consolidated basis or in a representative capacity.

**14.    Notices.** Unless otherwise provided herein, all required notices to Qwest must be in writing, sent to 1801 California St., #900, Denver, CO 80202; fax#: 888-778-0054; Attn.: Legal Dept., and to Customer at its then current address as reflected in Qwest's records; Attn.: General Counsel or other person designated for notices.  Unless otherwise provided herein, all notices will be deemed given: (a) when delivered in person to the recipient named above; (b) three business days after mailed via regular U.S. Mail; (c) when delivered via overnight courier mail; or (d) when delivered by fax if duplicate notice is also sent by regular U.S. Mail.

**15.    General Provisions.** Customer may not assign the Agreement or any of its rights or obligations under the Agreement without the prior written consent of Qwest, which consent will not be unreasonably withheld.  Customer may not assign to a reseller or telecommunications carrier under any circumstances and represents that it will not resell the Service. The Agreement is intended solely for Qwest, and not to benefit any other person or entity (e.g., End Users).  If any term of the Agreement is held unenforceable, such term will be construed as nearly as possible to reflect the original intent of the parties and the remaining terms will remain in effect. Neither party's failure to insist upon strict performance of any provision of the Agreement will be construed as a waiver of any of its rights hereunder. All terms of the Agreement that should by their nature survive the termination of the Agreement will so survive.  In the event of a conflict in any term or condition of any documents that govern the provision of the Service hereunder, the following order of precedence will apply in descending order of control:  the Tariff, this Agreement, and Qwest records. Neither party will be liable for any delay or failure to perform its obligations hereunder if such delay or failure is caused by a Force Majeure Event. "Force Majeure Event"

Page 3
**CONFIDENTIAL**

Copyright © Qwest. All Rights Reserved.
v1.032210

QWEST NETWORK SERVICE AGREEMENT
QWEST DS1 SERVICE
Intrastate

means an unforeseeable event beyond the reasonable control of that party, including without limitation: act of God, fire, flood, labor strike, sabotage, fiber cuts, acts of terror, material shortages or unavailability, government laws or regulations, war or civil disorder, or failures of suppliers of goods and services.  Except for Tariff or Service modifications initiated by Qwest, all amendments to the Agreement must be in writing and signed by the parties' authorized representatives.  However, any change in rates, charges, or regulations mandated by the legally constituted authorities will act as a modification of any contract to that extent without further notice. Each party reserves the right at any time to reject any handwritten change to the Agreement.

**16.    Entire Agreement.** This Agreement constitutes the entire agreement between Customer and Qwest and supersedes all prior oral or written agreements or understandings relating to this subject matter.

The parties have read, understand, and agree to all of the above terms and conditions of this Agreement and hereby execute and authorize this Agreement.  Electronic signatures on this Agreement will be accepted only in the form and manner prescribed by Qwest.

| Bluestem | Qwest Corporation |
|---|---|
| Authorized Signature | Authorized Signature |
| Name Typed or Printed    RAYMOND Fuller | Name Typed or Printed    T. Mohou |
| Title    CEO | Title |
| Date    4/15/11 | Date    4/15/Ev 11 |

**Address for Notices:**

| FOR QWEST INTERNAL USE ONLY |
|---|
| FUNDING CONCURRENCE REQUIRED PRIOR TO EXECUTION FOR NEW SERVICE (NOT REQUIRED FOR RENEWALS) |
| AQCB Quote No.    MN1100106 |
| Date Concurred: |

Copyright © Qwest. All Rights Reserved.
v1.032210

**Qwest** BUSINESS

# OM Contract Cover Sheet: Business Market Accounts

➢ **TO AVOID PROCESSING DELAYS, a completed OM Contract Cover Sheet must be included w/ 2 customer-signed original contracts including exhibits. The OM /QInsight # must appear at bottom of each page and contracts must be in**

➢ **"Received Signed Contract" step in QInsight to be processed by OA.**

➢ **In addition to sending this Cover Sheet and Contact to OA, after receiving your ILink Content ID# a complete Order Package, including amendments and conversions, must be sent to Order Entry for Order Processing to occur.**

CHECKLIST please mark each ☐ with an X when complete (responsible person in **BOLD** type)

☒ **Sales Executive - complete this information: Opportunity # must be entered**

| Customer Name: | OMR # or Q.Insight # / OM Analyst: | TERM / Monthly $ value of contract | Must list Customer Acct # if available |
|---|---|---|---|
| Orchard Brands | 572358  /  Jodi Fillmore | 36 months  /  $165,000 | 58623945 |
| **Customer Signatory Name:** | **Customer Signatory Title:** | **Term/Commitment Renewal Yes/ No:** | **Contract #** |
|  |  | Yes |  |
| **Billing Cycle Cut** | **Discount Group** | **Opportunity ID# *Required*** | **(OA Use Only) iLink Content ID #** |
| 83 | 60953 | 50395385 | 191004 |
| **Sales Executive Information** | | **Sales Executive Address & Phone #** | |

| Sales Executive Information | Sales Executive Address & Phone # |
|---|---|
| **Name:** Kevin Lambert          **Sales ID:** aszp<br>Sales office code:BMG NBA - Pittsburgh<br>e-mail address:  kevin.lambert@qwest.com | **Office Address:** 379 Thornall St, 12th Floor, Edison, NJ 08837<br><br>**Telephone No:** 732 710 4560<br>**AC / ASR / PSR  Name:** Jennifer Toal |

☒ **Sales Executive – YOU MUST PROVIDE YOUR NAME, SALES ID NUMBER, YOUR SALES OFFICE CODE AND YOUR EMAIL ADDRESS OR YOUR CONTRACT WILL BE REJECTED.**

☒ **Sales Executive** check appropriate Director with an **X** from address list below in CM Group "Step A".

UPS this coversheet and two (2) customer-signed originals to the Director's Admin contact listed below "Step B". Before sending the contract, review for hand written changes (if there are hand written changes reject and contact the OM analyst listed above to resolve). Log the UPS tracking number below on Page 2 and keep for your records. Please note: you must send (2) two customer-signed original contracts, including all exhibits regardless of whether a signature is required on such exhibit with OM/QInsight # at bottom of each page.

| Sales Place "X" Here | Step A:  Select Your Director | | OMR Admin Name & Phone | Step B:  Overnight to this Director's Admin |
|---|---|---|---|---|
| | Sales Director | Sales VP | | Admin Address |
| ☒ | (PA, NJ)<br>Jason Bobb | Richard Twilley | Tameka Champagne<br>215-521-4245<br>303- 391-1801 efax<br><br>**(Check with Tameka for office to mail contract)** | Qwest Communications<br>520 N Delaware Ave<br>Philadelphia PA 19123<br>Or<br>1010 W 8th Ave<br>King of Prussia PA 19406 |
| ☐ | (NY, LI, CT, MA)<br>J.Dinney<br>Scott Bryan/ Sunny Kumar | Richard Twilley | Reese Withers<br>212 692-4930<br>303 391-1793 efax | Qwest Communications<br>546 5th Avenue 10th Fl<br>New York NY 10036 |
| ☐ | **OA Coverage**<br>**(Check with Dorine to verify covering for OA)** | Richard Twilley | Dorine Temple<br>732-710-4539<br>303-391-1745 efax | Qwest Communications<br>379 Thornall St 12th Fl<br>Edison NJ 08837 |

| Date sent to SalesRep:          Return to Rep UPS  tracking number:          (OA use only- UPS ground or 2 day  ) |
|---|

☐ **Director's Admin** sends one signed original to the Sales Executive for presentation to the customer at Sales Executive address at the top of this document.

# AMENDMENT TO
# QWEST TOTAL ADVANTAGE® AGREEMENT

**THIS AMENDMENT NO. SIX** (this "Amendment") by and between **Qwest Communications Company, LLC** ("Qwest" or "QCC") f/k/a Qwest Communications Corporation and **Orchard Brands Corporation** f/k/a **Appleseed's Intermediate Holdings LLC** ("Customer"), hereby amends the Qwest Total Advantage Agreement, Qwest Content ID:  212249, 223678, 251168, 294160, 307892 & 328662, as may have been previously amended (the "Agreement").   Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement.   Qwest reserves the right to withdraw the offer contained herein in the event this Amendment is not executed by Customer and delivered to Qwest on or before **May 31, 2011**. Electronic signatures on this Amendment will be accepted only in the form and manner prescribed by Qwest.

| CUSTOMER:  ORCHARD BRANDS CORPORATION | QWEST COMMUNICATIONS COMPANY, LLC |
|---|---|
| By: _Daniel Ramsey_ | By: _Paresh S. Naik_ |
| Name: Daniel Ramsey | Name: Paresh S. Naik |
| Title: Secretary | Title: Director of Offer Management |
| Date: 5/24/2011 | Date: 5/25/2011 |

Qwest and Customer wish to amend the Agreement as follows:

**1.  Assignment & Assumption; Customer Name.**   Pursuant to that certain Agreement By And Among Qwest Communications Company, LLC, Qwest Corporation, Appleseed's Intermediate Holdings LLC And Affiliated Debtors, And Orchard Brands Corporation Concerning The Assumption And Assignment Of Various Executory Contracts made as of April 14, 2011 by and among QCC, Qwest Corporation, Customer and its affiliated debtors and debtors in possession and Orchard Brands Corporation ("OBC")(the "Assignment and Assumption Agreement"), OBC assigned to Customer all of OBC's interest in the Agreement and Customer accepted assignment of such interest and assumed and agreed to perform and comply with all of the obligations under the Agreement.   On April 25, 2011, Appleseed's Intermediate Holdings LLC filed a Certificate of Conversion of a Delaware Limited Liability Company changing its name from "Appleseed's Intermediate Holdings LLC" to "Orchard Brands Corporation."   Pursuant to the Assignment and Assumption Agreement, "Customer" under the Agreement shall mean Orchard Brands Corporation f/k/a Appleseed's Intermediate Holdings LLC. The Assignment and Assumption Agreement remains in full force and effect at all times including subsequent to the execution of this Amendment.

**2. Revised Initial Term and New Revenue Commitment.**   The parties agree to extend the existing Initial Term of 3 years to 4 years and increase the Revenue Commitment.   Customer's new Revenue Commitment is $1,980,000 per year.   The revised Initial Term is 4 years (the term of the Agreement will be extended so that the current expiration of July 2013 will be extended to July 2014) (Code: 191004).   The new Initial Term described in this Amendment will retain the Effective Date of 7/26/2010 as described in Amendment No. 5 dated 7/26/2010.

**3. Miscellaneous.**  This Amendment will be effective as of the date it is executed by Qwest after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement.   All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties.   This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

OMR Q652620 amends OMRs Q417950, Q297452, Q25921, Q384599, 128380, 132311
Contract: 191004 (Option Z)

Page 1
CONFIDENTIAL

Copyright © Qwest.  All Rights Reserved.
v1.042711

# EZPricing Cover Sheet

⇒ **Send one original Counter-signed contract to your Directors OA...address below.**

⇒ **To avoid processing delays, a completed <u>EZ Pricing Contract Cover Sheet</u> must be included.**

⇒ **PRINT INSTRUCTION PAGES FROM QSHARED SITE TO HELP COMPLETE COVERSHEET...**

Checklist please mark each ☐ with an X when complete (responsible person in BOLD type) ☐

**Sales Rep complete this information:**

| *Customer Name | EZPricing # / & *Analyst Name | Contract # | *TERM / Contract Revenue Commitment | Must list Customer Acct # if available | *Q. Central Opportunity ID # | iLink Content ID # OA Use ONLY |
|---|---|---|---|---|---|---|
| Orchard Brands | EZT ID#191206/ Thacker | 191004 | 3 yr / $ 1,980,000 Per yr    multiple | e - 82292825 | 50779759 | |

| Customer Signature Name date signed and Title? | Manager Name date signed and CUID? |
|---|---|
| *Name : Elvis Cernjul | *Qwest Signature Name: Patrick Purcell |
| *Title: VP Technical Services | *Qwest Signature CUID:  Click here to enter text.  purcellp |
| *Signature Date: 3/17/2012 | |
| *Original Contract Content ID# or NEW:  last one is 357224 (*If not completed contract will be rejected) | *Signature  _Patrick Purcell_  DocuSigned by: 9660875AD19D426... |
| *Renewal YES | Date: 3/21/2012 |

| *Sale Information | *Sales Executive Address & Phone # |
|---|---|
| Name: Kevin Lambert | |
| Sales ID# aszp Sales office code:  NBA- NJ PA e-mail address: kevin.lambert @centurylink.com | Office Address: 379 Thornall St, 12th Floor, Edison NJ 08837 Telephone No:  7327104560 |

☐ **Sales Rep- YOU MUST PROVIDE** Analyst Name, Oppty #, Your Name, Sales ID #, Your Sales Office Code and your email address OR YOUR CONTRACT WILL BE REJECTED.

☐ **Sales RepTask Fill-in** the appropriate information. UPS Ground this coversheet and one (1) customer-signed original to your Director's Admin contact. Before sending  the contract, review for hand written changes (if there are hand written changes reject and contact the EZ Pricing analyst listed above to resolve). Log tracking number below. Please note: you must send one (1) customer-signed original contract, including all DM exhibits regardless of whether a signature is required on such exhibit.

**Specify Your Director**

| Sales Channel | Sales Director Name | VP Name | | Office Admin | Admin's Mailing Address |
|---|---|---|---|---|---|
| | John Dinneny Eric Lamar | Richard Twilley | ➡ | Nuzhat Egan Fax/Scan signed contract: 303 391-2483 -EFAX Scan: negan@centurylink.com | Centurylink 10700 Parkridge Blvd Ste 180 Reston VA 20191 |
| | Jason Bobb Scott Bryan | Richard Twilley | ➡ | Dorine Temple Fax/Scan signed contract: 303-391-1745 EFAX Scan: dtempl@centurylink.com | CenturyLink 379 Thornall St, 12th Fl Edison,NJ 08873 |
| | COVERAGE | Richard Twilley | ⇨ | Michelle Green 303-391-1774  EFAX Scan: greenMJ@centurylink.com | CenturyLink 37 N Orange Ave Orlando FL 32801 |

**\*ALL STARRED ITEMS MUST BE COMPLETED OR WILL NOT BE PROCESSED....**

**Additional Coverage: Shirley Goldstein-303-391-1744 EFAX**
Scan: mgoldsm@centurylink.com

3625 Brookside Pkw,Alpharetta GA 30022

• If not using DocuSign a faxed or scanned email copy of contact with original signatures will be accepted for iLink processing if  original counter-signed contract is sent same day to OA.

• Date : Click here to enter text.  UPS tracking#

*After entered into iLink the OA will send original signed contract with email approval from EZ Pricing  to our Legal Department –

  *c/o Shelby Herbert, 1801 California Street, 9th Floor, Denver, CO 80202.

*If you are sending original directly to Legal Dept include coversheet with Content ID# written in and  request  approval email from OA to include with contract.



# AAAAAC7LLAA

# AAAAAC7LLAA

## Cover Page for Faxing Documents to your DocuSign Envelope

1. Write the number of pages on the line below.
2. Fax the document and cover page to the appropriate number below:

| | |
|---|---|
| U.S. and Canada: | 877-810-1296 (US and Canada) or 442033645829 (international) |
| London: | 442033645829 |
| Singapore: | 6565124501 |

| | |
|---|---|
| From: | Todd Fitch |
| Envelope Subject: | Please DocuSign these documents: OB-CTL Conferencing Amendment 3-17-12.pdf, OB EZ Cover 3-20-12.pdf |
| Attachments to Fax: | |
| Envelope ID: | ddb18cbf-7582-40ed-965d-cf99a76e20b4 |
| Sender Account Name: | CenturyLink (BMG) |
| Number of Pages: (Including cover page) | 2 |

DocuSign Customer Support: service@docusign.com | 1.866.219.4318

Note:
Fax transmissions take approximately one minute per page faxed.
This page may only be used once. If you would like to fax again, you must print a new cover page.

# AAAAAC7LLAA

# AAAAAC7LLAA

## AMENDMENT to CENTURYLINK TOTAL ADVANTAGE® AGREEMENT - EZ – Annual Assessment

**THIS AMENDMENT NO. EIGHT** (this "Amendment") by and between **Qwest Communications Company, LLC d/b/a CenturyLink QCC** ("CenturyLink") and **Orchard Brands Corporation f/k/a Appleseed's Intermediate Holdings LLC** ("Customer"), hereby amends the CenturyLink Total Advantage Agreement, or Qwest Total Advantage Agreement, as applicable, Content ID: 212249, 223678, 251168, 262593, 294160, 307892, 328662 and 357224, as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink reserves the right to withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink before **March 23, 2012**. Using CenturyLink's electronic signature process for the Amendment is acceptable.

| CUSTOMER: ORCHARD BRANDS CORPORATION | QWEST COMMUNICATIONS COMPANY, LLC D/B/A CENTURYLINK QCC |
|---|---|
| | DocuSigned by: *Patrick Purcell* |
| Authorized Signature | Authorized Signature |
| | Patrick Purcell |
| Name Typed or Printed | Name Typed or Printed |
| | Sales Manager |
| Title | Title |
| | 3/21/2012 |
| Date | Date |

CenturyLink and Customer wish to amend the Agreement as follows:

**1.     Term and Revenue Commitment.** Customer indicates whether it is increasing the length of its existing Term and/or increasing the amount of its existing Revenue Commitment as set forth in the Agreement. Customer understands and agrees that it may not decrease the length of its existing Term or reduce the amount of its existing Revenue Commitment.

**No Changes.** Customer's existing Initial Term, which began on July 26, 2010, and existing Revenue Commitment as set forth in the Agreement will remain in effect.

**2.     Modifications.** The Agreement is amended as follows:

**2.1    General.**

**(a)** Customer will not pay for the Services with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate CenturyLink to provide certain information or perform certain functions unless each of those functions and obligations is explicitly identified and agreed to by the parties in this Agreement or in an amendment to this Agreement.
**(b)** The parties agree that any reference to "QTA Discount" in a Service Exhibit will be disregarded, and the rates set forth in the Service Exhibit are in lieu of all other rates, discounts, or promotions.

**2.2 Conferencing Service Exhibit replacement:** Customer and CenturyLink agree that the existing **Conferencing** Service Exhibit will be deleted and replaced with the **Conferencing** Service Exhibit included in this Amendment.

**2.3 Billing Information.** Any new **Conferencing Service Exhibit** pricing applicable to Customer's existing Services, if any, will become effective at CenturyLink QCC's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

**3. Miscellaneous.** This Amendment will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380     Page 1 of 10
Contract Code: 191004                            **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

## CENTURYLINK TOTAL ADVANTAGE® EZ
## CONTRACT DETAILS & EZ PROMO CODES PAGE

**1.**    **General; Definitions.** Capitalized terms not defined in this Exhibit are defined in the Agreement. CenturyLink will provide Conferencing Service ("Service") under the terms of the Agreement, RSS, ISS, and this Service Exhibit.

"Net Rate" means the Rate Per Minute, Per Participant Charges and are in lieu of all other rates, discounts, and promotions.

"Pricing Attachment" means a document containing rates specific to the Service and is incorporated by reference and made a part of this Service Exhibit.

**2.**    **Service.**

**2.1**    **Description.** This Service enables customers to conduct telephone conferences with multiple parties in multiple locations. Service includes Reservationless, Passcode, Operator Assisted, Event, and CenturyLink Web Conferencing. Customer has access to CenturyLink's Service and support 24 hours a day 7 days a week. CenturyLink provides Service both domestically and internationally from select equipment locations.

**2.2**    **Types.**

**(a)**    **Reservationless.** On-demand audio conferencing product that is available to moderators and participants 24 hours a day, 7 days a week, 365 days a year, without a reservation. Moderators are provided a dedicated dial-in number and passcodes. Moderators open and close their own calls. Reservationless service is limited to 300 participant lines.

**(b)**    **Reservationless GlobalMeet Audio.** For international moderators or domestic calls with international participants requiring Reservationless services that include local access numbers (LDD) and international toll free (ITF) numbers in countries around the globe. GlobalMeet Reservationless service is limited to 300 participant lines. LoCall numbers are non-geographic numbers within a country. LoCall numbers can be dialed from any location within a country, including fixed and mobile lines.

**(c)**    **CenturyLink Web Conferencing.** An online meeting service that enables real-time interaction and sharing of data over the Web by moderators and participants during a conference. CenturyLink Web Conferencing is integrated with Reservationless Audio, and can also be used as a stand-alone product. CenturyLink Web Conferencing is limited to 125 participant lines.

**(d)**    **Passcode.** A moderator must reserve a Passcode audio conference. The call is opened automatically when the moderator enters the passcode. Passcode service is limited to 300 participant lines.

**(e)**    **Operator Assisted.** A moderator must reserve an Operator Assisted audio conference. The call is opened by an operator. The operator then leaves the conference and is available upon request by touch tone command. Call capacity may be thousands of participants.

**(f)**    **Event Auditorium.** An audio call that must be reserved and requires passcode entry. After passcode is entered, the participant is placed into conference. The call is monitored by an operator who attends the entire conference. All participant lines are muted. Audio Q&A is available and managed by the operator. Event Auditorium is limited to 4,000 participants.

**(g)**    **Event.** An audio call that must be reserved. Participants are answered by a live operator. The call is monitored by an operator who attends the entire conference. Call capacity may be thousands of participants. All participant lines are muted. Audio Q&A is available and managed by the operator.

**(h)**    **Bridge.** Equipment that mixes multiple audio inputs and feeds back composite audio to each station after removing the individual station's input. This equipment may also be called a mix-minus audio system.

**(i)**    **Transport.** The long distance portion of the call.

**(j)**    **Adobe Connect Web Conferencing.** Customer must agree to the terms of the Adobe Connect Web Conferencing Service Attachment that follows this Exhibit.

**(k)**    **ON24 Web Conferencing.** Customer must agree to the terms of the ON24 Web Conferencing Service Attachment that follows this Exhibit.

**2.3**    **Access Descriptions.** CenturyLink provides a number of domestic and international access arrangements to bridging services.

**(a)**    Access to/from bridging equipment located in the 48 contiguous U.S. states. Access locations include all U.S. states and territories and Canada.

**CENTURYLINK TOTAL ADVANTAGE® EZ**
**CONTRACT DETAILS & EZ PROMO CODES PAGE**

**(i) Toll** – A moderator or participant may access any call by dialing the assigned toll number. The moderator or participant will incur any applicable transport charges.

**(ii) Toll-free** - A moderator or participant may access a call where toll-free access is available. The moderator will incur the applicable toll-free charges. Toll-free access is available from the United States, the U.S. territories, and Canada.

**(iii) Local Access** - In-Country Local Access is a non-North American toll number assigned to a specific country and bridge intended to provide local access to participants within the specific country. Some countries may not accept new orders and some may not accept portability orders.

**(iv) ITFS** - A toll-free number dialed from a particular country, and terminating in the United States. Each country uses a unique number. ITFS is available in international locations. Some countries may not accept new orders and some may not accept portability orders.

**(v) Dial-out** - An operator or the moderator dials a moderator or participant from the bridge. The moderator will be charged appropriate domestic or international dial-out rates.

**(vi) Dial-me** - A moderator or participant dials himself or herself from CenturyLink Web Conferencing. The moderator will be charged the appropriate domestic or international dial-out rates.

**2.4     Optional Features.** Optional Features are available on request and require an additional fee.

**(a)**     Reservationless, GlobalMeet and Passcode Optional Features:

**(i) Audio Recording** – The moderator presses touchtone telephone commands to begin recording the call. The moderator presses touchtone commands again to stop recording the call. Additional line in conference per minute charge applies. The recording is provided as a .wav or mp3 file that can be downloaded and hosted by the customer or as a CD sent via normal delivery (U.S. mail) to mailing address for the account holder.

**(ii) Remote Replay** – The digital audio recording of a conference can be made available for playback 24 hours a day, 7 days a week, for as long as scheduled. Playback results in a per minute charge for each participant that accesses the recording.

**(iii) Transcription** - Conferences can be transcribed for participants in written format and delivered via email or CD.

**(iv) Custom Greetings** - Custom recordings in lieu of the generic greeting that participants hear when connecting to the conferencing service. Custom recordings may include but not limited to the company name or custom prompts. Available on Reservationless but not GlobalMeet.

**(v) Dedicated Toll & Toll Free Access Numbers** – Toll and toll free access numbers that are dedicated to the customer, and not shared with other companies. Dedicated numbers are available on Reservationless but not on GlobalMeet.

**(b)**     Web Conferencing Optional Features:

**(i) Web Recording** – A synchronized presentation with audio, public chat, Web tours, application sharing, and annotations included. Web Recording is provided as a Windows Media or Real Audio format file that can be downloaded and hosted by the customer or as a CD sent via normal delivery (U.S. mail) to mailing address for the account holder.

**(ii) Archive Hosting of Replay** – Hosted Replay for 30 days; unlimited playbacks allowed. Can be viewed from within the account and have a forward option and password protection option.

**(iii) Hosting Renewal Option** – Archive hosting may be extended for an additional 30, 60, 90, 180, or 360 days.

**(iv) SSL Encryption** – Secure Socket Layer encryption may be added to a Web account for a monthly fee.

**(c)**     Operator Assisted Optional Features:

**(i) Audio Recording** – The operator records the call. Additional line in conference, per minute charge applies. The recording is provided as a .wav or mp3 file that can be downloaded and hosted by the customer or as a CD sent via normal delivery (U.S. mail) to mailing address for the account holder.

**(ii) Remote Replay** – The digital audio recording of a conference can be made available for playback, 24 hours a day, 7 days a week, for as long as required. Playback results in a per minute charge for each participant that accesses the recording.

**(iii) No Show Fee** – A per-line charge for lines that were reserved but not used. Allows for leeway of 10% of total reserved ports/ "no-shows" per call.

**(iv) Participant List** – A list of the names of the participants that attended the conference call.

**(v) Operator Dial-out** – Allows the operator to access an outside line to call a new participant and either place the participant into the conference or disconnect the participant.

**(d)**     Event Optional Features include the Operator Assisted Optional Features in addition to the following:

**(i)** Event Auditorium:

**a. Click and Join** – Online entry into Auditorium conferencing (captures participant list). Auditorium only.

**b. Remote Replay Custom IVR** – The set up charge for the first menu on an interactive voice response system for a participant to hear a replay. There are additional charges for additional menus.

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380     Page 3 of 10
Contract Code: 191004                    **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

## CENTURYLINK TOTAL ADVANTAGE® EZ
## CONTRACT DETAILS & EZ PROMO CODES PAGE

**c.   Easy Invite / Easy ID** - A process by which the customer uploads a list of meeting participants along with pin codes in Excel format for use in sending out meeting invitations and tracking call attendance.

**d.   Communication Line** – An additional operator is on a private line with a representative of the moderator. The operator and representative can communicate about the number of participants, what participants to let in the call, and other details of the call. Additional Communication Lines may be added as required.

**e.   Host Controls** - Web based moderator controls that allow the moderator to:

   i.    Send private instructions to the operator or other support team members.

   ii.   View who has joined the audio portion of an event call.

   iii.  Screen and prioritize the queue during question and answer sessions.

   iv.   View immediate tabulations of surveys conducted during the call.

**f.   Basic RSVP Set Up** (Web-based) - The set up of a web system that allows participants to register for Event and Investor Relations calls asking a standard set of questions. It includes creation of participant confirmation emails, and question ordering and the use of customer logo on the website.

**g.   Basic RSVP** (up to 10 questions) - The use of the Basic RSVP system when a participant registers for an Event or Investor Relations call.

**h.   Enhanced RSVP** (up to 20 questions) - The use of the Enhanced or Custom RSVP system when a participant registers for an Event or Investor Relations call.

**i.   Phone RSVP support** (in addition to Basic or Enhanced) - The ability for a participant to register for an Event or Investor Relations call using the telephone. Must be used in conjunction with Basic or Enhanced RSVP per-use fee.

**j.   RSVP Reports** (CenturyLink provided) - A report containing the registration information of participants using RSVP services.

**k.   Real Time RSVP Reporting** (Web-based) - A web system to view the registration information of participants using RSVP services.

**l.   Broadcast E-Mail** – The ability to email participants before or after the call.

**m.   Broadcast Fax** – The ability to fax participants before or after the call.

**n.   Broadcast Voice** – The ability to call participants with a recorded message before or after the call.

**o.   Dedicated Dial-in Numbers** – Toll and toll free access numbers that are dedicated to Customer, and not shared with other companies.

**p.   Polling Merge Report (CenturyLink provided)** - Merging responses from a polling session during the Event or Investor Relations call with the participant information.

**q.   File Hosting** – Unlimited downloads of the Polling Merge and / or Real Time RSVP reports.

**r.   Translations** – Conference can be translated into most foreign languages with 24-hour advance notice.

**s.   Transcription** - Conferences can be transcribed for participants in written format and delivered via email or CD.

**t.   Operator Stand-by** - An additional operator who provides assistance for lost callers and/or participant assistance for callers entering incorrect passcodes.

**u.   Presentation Management** - Specialist coordinates rehearsals and provides presentation coaching and feedback

**v.   A la Carte Event Production Services** – Any additional training or rehearsal sessions needed in conjunction with preparation for an Event Call.

**w.   Creative Services** - to design physical collateral for Customers to enhance an Event call.

**x.   Product Fulfillment** -A per packet charge for producing a collection of presentation materials associated with a conference Event.

**y.   Assembly/Modification** -A per page charge for the collating and altering of the fulfillment packet associated with a conference Event.

**z.   Event Basic Reports** - Is the pricing for a basic utilization report that captures all of the participants that dial into the recorded Replay

**aa.  Event Production**

   i.    Event Monitor Package - (60 minute event) – Up to 45 minute pre-conference, up to one hour for client side web issues, total of 1 ¾ hours assistance

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380      Page 4 of 10
Contract Code: 191004                         **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

### CENTURYLINK TOTAL ADVANTAGE® EZ
### CONTRACT DETAILS & EZ PROMO CODES PAGE

    ii.   Event Assistance Package - (60 minute event) – Pre-meeting with client to gather call flow details, technology, provisioning, up to one hour pre-conference to review the structure of the event, one hour event support, total of 3 hours assistance

    iii.   Event Production Package - (60 minute event) – Planning session and timeline management, scheduling of platform instruction/training, scheduling of rehearsal, scripting and program coordination, slide load, and assistance for building audience interactivity.

    iv.   Event Production Plus Package - (60 minute event) – Includes event production padage provided within a 24 hour timeframe, total of 6 hours assistance within a 24 hour timeframe

    v.   Event Extension – Additional component associated with Event Production services for calls lasting longer than 60 minutes.

    vi.   Event Content – Event consultants assist with materials that will be utilized as part of an event conference.

    vii.   Expedite Fee – a fee charged for Event Production orders provided outside of the 15 days notice to schedule

    viii.   After-hours Support - Weekdays After 9pm and before 9am EST, weekends & holidays

    ix.   Event Reschedule Before Rehearsal – a customer charge if the event is rescheduled prior to the rehearsal.

    x.   Event Reschedule After Rehearsal - a customer charge if the event is rescheduled after the rehearsal.

    xi.   Event Cancel Before Rehearsal – a customer charge if the event is cancelled prior to the rehearsal.

    xii.   Event Cancel After Rehearsal - a customer charge if the event is cancelled after the rehearsal.

    xiii.   Event Recordnig Support – a scheduled session with customer participants and speakers intended to record a session for future use. Includes assembly of the call, editing and coordination with Audio Production.

    xiv.   Event Media Manager – an assigned Event Consultant assists during an Event call with coordination of other vendors, if used, streaming, recording, and web applications.

  **(ii)**  Event Audio Optional Features include Event Auditorium Optional Features in addition to the following:

    **a.**  **Pre-Recording Session** – A call may be recorded ahead of time and then be played into the live conference for participants.

    Speakers may attend the live call to answer questions during Q&A.

    **b.**  **Custom Hold Music** – The customer may choose music to be heard by the participants while they wait on hold for the conference to begin.

**3.**    **Term.**  The term of this Exhibit will begin on the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if Customer adds this Exhibit after the Effective Date of the Agreement) and will continue until the expiration or cancellation of the last to expire (or cancel) Service ordered under this Exhibit. The Service and any associated features do not have a Cancellation Charge; however, Customer will continue to be responsible for meeting the Revenue Commitment if Service is terminated.

**4.**    **Charges.**  Customer will pay the Net Rates, rates and charges set forth in the Pricing Attachment. Customer will be charged for Service when Customer uses the Service. The rates do not include costs associated with local access. The Net Rates will be used to calculate Contributory Charges.

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380    Page 5 of 10
Contract Code: 191004        **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

**CENTURYLINK TOTAL ADVANTAGE® EZ**
**CONTRACT DETAILS & EZ PROMO CODES PAGE**

**PRICING ATTACHMENT**

| Function | Net Rate per Function |
|---|---|
| **Reservationless Audio Conferencing** | |
| Reservationless and GlobalMeet Dial In Toll Free Domestic | |
| Reservationless Dial Out / Dial me Domestic | $0.0311 per minute per participant |
| Reservationless Audio Recording | |
| Reservationless Audio Recording Replay | |
| Reservationless and GlobalMeet Dial In | $0.0233 per minute per participant |
| Reservationless Dial Out / Dial me International | $0.0311 plus the International RSS long distance rate per minute per participant for each country |
| **Reservationless GlobalMeet** | |
| Reservationless GlobalMeet Local Access from: Canada-Montreal | $0.07 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: France-Paris, LoCall; Germany- Frankfurt, Munich, LoCall; United Kingdom-Belfast, Edinburgh, London, Reading, LoCall | $0.10 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: Austria–Vienna; Belgium–Brussels; Denmark–Copenhagen; Finland–Helsinki; Ireland-Dublin, LoCall; Italy-Milan, Rome; Japan–Tokyo; Netherlands–Amsterdam; Norway-Oslo; Poland-Warsaw; Singapore; Spain-Barcelona, Madrid; Sweden-Stockholm; Switzerland-Geneva, Zurich | $0.15 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: Australia–Melbourne, Sydney; Brazil-Rio de Jeneiro, San Paulo; Bulgaria–Sophia; Czech Republic–Prague; China-Hong Kong; Hungary-Budapest; Israel-Tel Aviv | $0.22 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: Latvia–Riga; Lithuania–Vilnius; Luxumbourg; New Zealand-Auckland; Portugal-Lisbon; Romania–Bucharest; Slovakia–Bratislava; Slovenia–Ljubljana; South Korea–Seoul | $0.25 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: Malaysia-Kula Lumpur; Mexico-Mexico City; Russia-Moscow | $0.30 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: India – Mumbai | $0.35 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: Bahrain-Manama; China–Beijing; South Africa–Johannesburg; Taiwan-Taipai | $0.45 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet Local Access from: China-LoCall; Greece–Athens | $0.55 per minute per participant (bridging fee only) |
| Reservationless GlobalMeet ITFS Access from: France, Germany, Luxembourg, United Kingdom | $0.15 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Australia, Malaysia, Singapore, Denmark, Italy, New Zealand, Poland | $0.20 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Finland, Hong Kong, Israel, Switzerland | $0.25 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Austria, Russia, Belgium, Bulgaria, Greece, Netherlands, Hungary, South Korea, Sweden | $0.30 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Mexico, Slovakia, Bahrain, Japan, Portugal, Norway, Slovenia | $0.45 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Argentina, Czech Republic, Panama, South Africa, China, Latvia, Cyprus, India, Spain, Taiwan, Thailand | $0.55 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Colombia, Iceland, Indonesia, Lithuania, Turkey, Venezuela | $0.75 per minute per participant (includes long distance and bridging fees) |

Q.Advan Z Opportunity ID# 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380

Contract Code: 191004

**CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

## CENTURYLINK TOTAL ADVANTAGE® EZ
## CONTRACT DETAILS & EZ PROMO CODES PAGE

| | |
|---|---|
| Reservationless GlobalMeet ITFS Access from: Chile, Croatia, Ireland, Peru, Ukraine | $0.90 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Saudi Arabia | $1.40 per minute per participant (includes long distance and bridging fees) |
| Reservationless GlobalMeet ITFS Access from: Romania | $2.00 per minute per participant (includes long distance and bridging fees) |
| **Reservationless and Passcode Additional Services** | |
| Audio Recording mp3, wav or CD | $100.00 per file |
| Additional CD's | $150.00 per CD (up to 75 minutes) |
| CD Split | $15.00 per split (editing charge for recordings over 75 minutes) |
| Transcription – 2 day turnaround | $55.00 per quarter hour |
| Transcription – 24 hour turnaround | $75.00 per quarter hour |
| Custom Greeting (not available with Reservationless GlobalMeet—only available with dedicated toll and toll free access numbers) | $150.00 per greeting |
| Dedicated Toll and Toll Free Access Numbers (not available with Reservationless GlobalMeet) | $150.00 per month |
| **CenturyLink Web Conferencing** | |
| Web Conferencing | $0.0512 per minute per participant |
| Desktop Video | Included in the Web Conferencing per minute charge |
| **CenturyLink Web Additional Services** | |
| Archive Hosting of a Replay - 30 days | $25.00 per archive, hosted for 30 days, unlimited playbacks |
| Hosting Renewal – additional 30 days | $35.00 per archive, hosted for additional 30 days, unlimited playbacks |
| Hosting Renewal – additional 60 days | $50.00 per archive, hosted for additional 60 days, unlimited playbacks |
| Hosting Renewal – additional 90 days | $75.00 per archive, hosted for additional 90 days, unlimited playbacks |
| Hosting Renewal – additional 180 days | $150.00 per archive, hosted for additional 180 days, unlimited playbacks |
| Hosting Renewal – additional 360 days | $200.00 per archive, hosted for additional 360 days, unlimited playbacks |
| Hosting Renewal – unlimited | $250.00 per archive, unlimited hosting, unlimited playbacks |
| SSL Encryption of Archive | $100.00 per month |
| Moderator Call Detail Report | No charge |
| **Passcode Conferencing** | |
| Maximum number of participants permitted on a reserved pass code conference is 300. Passcode is used when registration is required to join an automated call, or when a one-time-use passcode is desired. | |
| Passcode Toll Free Dial In | $0.0667 per minute per participant |
| Passcode Toll Dial In | $0.0540 per minute per participant |
| **Operator Assisted Audio Conferencing** | |
| An operator is not dedicated to the conference. Operator Assistance is available on demand by pressing *0 on your telephone key pad. Q&A is not available on Operator Assisted calls. | |
| Operator Assisted Toll Free Dial In | |
| Remote Replay Access (telephone only, also applies to Replay of Event & Event Auditorium calls) | $0.1225 per minute per participant |
| Operator Assisted Toll Dial In | $0.1114 per minute per participant |
| Operator Assisted Dial Out (North America) | $0.1225 per minute per participant |
| Operator Assisted Dial Out (International) | $0.1225 plus the International RSS long distance rate per minute per participant for each country |
| **Operator Assisted Conferencing Additional Services** | |
| Audio-only Recording - Availability/dlivery of recording 3-5 days (Formats Available: CD, WAV, MP3) | $100.00 per file |
| Audio-only Recording Rush 24 hour electronic delivery (Formats Available: WAV, MP3) | $200.00 per file |
| Audio File Editing – 5 business day turnaround | $70.00 per ¼ hour |
| Audio File Editing – 3 business day turnaround | $105.00 per ¼ hour |
| Audio File Editing – 2 business day turnaround | $140.00 per ¼ hour |
| Audio File Editing – Studio CD mastering | $105.00 premaster cd |

Q. Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380     Page 7 of 10
Contract Code: 191004                    **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

## CENTURYLINK TOTAL ADVANTAGE® EZ
## CONTRACT DETAILS & EZ PROMO CODES PAGE

| | |
|---|---|
| Audio Production rush charge | $70.00 per rush |
| Participant List 1-2 fields per participant | $1.00 per participant |
| Participant List 3-5 fields per participant | $1.50 per participant |
| Participant List 6+ fields per participant | $2.00 per participant |
| No Show Fee | $15.00 per line after leeway of 10% of total reserved lines |
| **Event Auditorium** | |
| Auditorium service requires passcode entry. At least one operator is dedicated to the Event throughout its duration. Operator-managed Q&A is included in Auditorium service. | |
| Event Auditorium Toll Free Dial In | $0.1534 per minute per participant |
| Event Auditorium Dial Out (North America) | |
| Event Auditorium Toll Dial In | $0.1415 per minute per participant |
| Event Auditorium Remote Replay | See Operator Assisted Remote Replay |
| Event Auditorium Dial Out (International) | $0.1534 plus the International RSS long distance rate per minute per participant for each country |
| **Event Audio** | |
| At least one operator is dedicated to the Event Audio throughout its duration to aid in the production of the conference. Operator-managed Q&A is included in Event service. | |
| Event Audio Toll Free Dial In | $0.1944 per minute per participant |
| Event Audio Dial Out (North America) | |
| Event Audio Toll Dial In | $0.1829 per minute per participant |
| Event Audio Remote Replay | See Operator Assisted Remote Replay |
| Event Audio Dial Out (International) | $0.1944 plus the International RSS long distance rate per minute per participant for each country |
| Event Audio ITFS access from: Australia, Austria, Belgium, Brazil, Bulgaria, Chile, Denmark, Estonia, France, Germany, Hong Kong, Hungary, Israel, Luxembourg, Malaysia, Monaco, Netherlands, New Zealand, Poland, Singapore, South Korea, Switzerland, United Kingdom | $0.80 per minute per participant (in addition to the Event Audio Toll Dial In charge) |
| Event Audio ITFS access from: Argentina, Czech Republic, Greece, India, Indonesia, Japan, Latvia, Mexico, Norway, Portugal, Russia, Slovakia, Slovenia, Spain, Sweden, Uruguay | $0.95 per minute per participant (in addition to the Event Audio Toll Dial In charge) |
| Event Audio ITFS access from: China, Columbia, Costa Rica, Ireland, Italy, Lithuania, Panama, Philippines, South Africa, Taiwan, Thailand, Trinidad & Tobago, Venezuela | $1.30 per minute per participant (in addition to the Event Audio Toll Dial In charge) |
| **Event Included Services** | |
| Click and Join | Included with Event Auditorium |
| Web Registration and Reporting | Included with Event Auditorium |
| Managed Question & Answer Sessions | Included with Event Auditorium and Event Audio |
| Polling | Included with Event Auditorium and Event Audio |
| **Event Additional Services** | |
| Remote Replay Custom IVR | $400.00 first menu |
| Remote Replay Custom IVR additional menus | $150.00 per each additional menu |
| Easy Invite / Easy ID | $150.00 per call |
| Communication Line | $20.00 per communication line |
| Additional Communication Line | $50.00 per additional communication line |
| Host Controls | $200.00 per call |
| RSVP Set Up | $120.00 per set up |
| Basic RSVP up to 10 questions | $ 10.00 per RSVP |
| Enhanced RSVP up to 20 questions | $15.00 per RSVP |
| Phone RSVP | No charge – must be used in conjunction with basic or enhanced RSVP |
| RSVP Reports provided by CenturyLink | $20.00 per report |
| Web-based RSVP Reports | $100.00 per set up |
| Broadcast Email | $0.05 per email |
| Broadcast Fax | $0.10 per page |
| Broadcast Fax or Email Rush (24 hours notice) | $70.00 per order |
| Broadcast Voice | $0.05 per message |

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380    Page 8 of 10
Contract Code: 191004    **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811

## CENTURYLINK TOTAL ADVANTAGE® EZ
## CONTRACT DETAILS & EZ PROMO CODES PAGE

| | |
|---|---|
| Dedicated Dial-in Number | $140.00 per call |
| Polling Merge report provided by CenturyLink | $ 80.00 per report |
| RSVP File Hosting | 250.00 per file |
| Translation | $75.00 per quarter hour |
| Transcription 3 hour | $150.00 per quarter hour |
| Transcription 6 hour | $100.00 per quarter hour |
| Transcription 24-48 hour | $70.00 per quarter hour |
| Translated Transcription | $0.40 per word |
| Pre-Recording Session (Event Audio only) 3-5 days | $1,000.00 per Event |
| Pre-Recording Session (Event Audio only) 1-2 days | $1,500.00 per Event |
| Pre-Recording Session (Event Audio only) 6-24 hours | $2,000.00 per Event |
| Pre-Recording Archival Fee – Storage of audio recording beyond 45 days | $100.00 per month |
| Custom Hold Music (Event Audio only) | $100.00 per call |
| Operator Stand-by (order at reservation time) | $150.00 per call |
| Presentation Management | $130.00 per ¼ hour |
| A la Carte Event Production Services (One hour minimum) | $130.00 per ¼ hour |
| Creative Services - Design physical collateral | $50.00 per ¼ hour |
| Product Fulfillment | $7.00 per packet |
| Product Fulfillment Rush charge | $105 per unit |
| Assembly/Modification | $2.25 per page |
| Black & white photocopies | $0.20 per page |
| Color photocopies | $1.40 per page |
| Product Filfilment Shipping/Handling Standard | $12.00 per unit |
| Product Filfilment Shipping/Handling Two Day | $22.50 per unit |
| Product Filfilment Shipping/Handling Priority | $30.00 per unit |
| Event Basic Reports | $45.00 per report |
| Event Data CD | $200 per CD |
| Event CD Split/Editing | $20.00 per split (editing charge for recordings over 75 minutes) |
| **Event Production Package** | |
| Event Monitor - (60 minute event) | $950.00 each |
| Event Assistance - (60 minute event) | $1,600.00 each |
| Event Production - (60 minute event) | $3,350.00 each |
| Event Production Plus - (60 minute event) | $4,800.00 each |
| Event Extension | $175.00 per 30 minutes |
| Event Content | $2,075.00 each |
| Expedite Fee | $1,400.00 each |
| After-hours Support (Weekdays After 9pm and before 9am EST, weekends & holidays) | $350.00 per event hour |
| Event Reschedule Before Rehearsal | $420.00 each |
| Event Reschedule After Rehearsal | $2,000.00 each |
| Event Cancel Before Rehearsal | $490.00 each |
| Event Cancel After Rehearsal | $2,000.00 each |
| Event Recording Support | $700.00 per event hour |
| Event Media Manager | $490.00 each |

**CENTURYLINK TOTAL ADVANTAGE® EZ**
**CONTRACT DETAILS & EZ PROMO CODES PAGE**

## For Internal Use Only; Use Product Code Q.Advan Z for all orders

Company Name: Orchard Brands Corporation
Opportunity ID#: 50779759
EZT ID#: 91206
Revenue & Term Commitment: $1980000/Year; 48 Months; (CenturyLink contract code: 191004).
Original contract iLink#: 212249, 223678, 251168, 262593, 294160, 307892, 328662 and 357224

Conferencing promo code: EZ AC2 H

Standard Service Exhibits, Promos or Attachments:

Waivers:

Clauses:

REMINDER:  All other previously existing promo codes shall remain on the account

Q.Advan Z Opportunity ID#: 50779759
Q652620A amending original Q652620, Q417950, Q384599,
Q297452, Q25921, Q79876, OMR #132331 and 128380       Page 10 of 10
Contract Code: 191004                                 **CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved
CGT v1.080811



## Certificate of Completion

Envelope Number: DDB18CBF756240ED965DCF99A76E20B4    Status: Completed
Subject: Please DocuSign these documents: OB-CTL Conferencing Amendment 3-17-12.pdf, OB EZ Cover 3-20-12.pdf
Source Envelope:
Document Pages: 13                  Signatures: 2              Envelope Originator:
Certificate Pages: 5                Initials: 0               Kevin Lambert
AutoNav: Enabled                                              930 15th Street
EnvelopeId Stamping: Enabled                                 Denver, CO  80202
                                                             kevin.lambert@centurylink.com
                                                             IP Address: 155.70.141.45

## Record Tracking

Status: Original                    Holder: Kevin Lambert          Location: DocuSign
        3/20/2012 6:33:46 PM PT             kevin.lambert@centurylink.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Todd Fitch<br>tsfitch@blair.com<br>Security Level: Email, Account Authentication (None)<br>Consumer Disclosure:<br>    Not Offered<br>    ID: | **Uploaded paper with hand signature**<br><br>Using IP Address: 255.255.255.255 | Sent: 3/20/2012 7:49:35 PM PT<br>Delivered: 3/21/2012 9:58:09 AM PT<br>Signed: 3/21/2012 9:58:09 AM PT |
| Patrick Purcell<br>patrick.purcell@centurylink.com<br>Sales Manager<br>CenturyLink (BMG)<br>Security Level: Email, Account Authentication (None)<br>Consumer Disclosure:<br>    Not Offered<br>    ID: | DocuSigned by:<br>*Patrick Purcell*<br>9860875AD19D426...<br><br>Using IP Address: 155.70.141.45 | Sent: 3/21/2012 9:58:11 AM PT<br>Delivered: 3/21/2012 12:05:09 PM PT<br>Signed: 3/21/2012 12:06:37 PM PT |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Dorine Temple<br>dorine.temple@centurylink.com<br>Director Offer Management<br>Qwest BMG<br>Security Level: Email, Account Authentication (None)<br>Consumer Disclosure:<br>    Accepted: 10/12/2011 6:08:57 AM PT<br>    ID: cf2787a3-35f9-4301-bf51-c94b9a21080b | **COPIED** | Sent: 3/21/2012 12:06:40 PM PT<br>Delivered: 3/21/2012 12:08:50 PM PT |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/21/2012 12:06:40 PM PT |
| Certified Delivered | Security Checked | 3/21/2012 12:06:40 PM PT |
| Signing Complete | Security Checked | 3/21/2012 12:06:40 PM PT |
| Completed | Security Checked | 3/21/2012 12:06:40 PM PT |

**Consumer Disclosure**

**From:** Waterhouse, Brenda
**Sent:** Friday, March 23, 2012 10:18 AM
**To:** Temple, Dorine
**Cc:** Waterhouse, Brenda
**Subject:** RE: EZT91206 Orchard Brands (Thacker) - APPROVED

APPROVED – ORCHARD BRANDS CORP

o        Please send me the I-Link number when you have it.
o        Please send the following information to BPG Contracts: a) I-Link Content ID, b) Customer name, c) OMR#, d) EZ Pricing Analyst Name, e) Customer account number (if available) and, f) Sales Rep name.
o        Please ask the Sales Rep to submits the appropriate OE paperwork to ensure pricing updates are keyed properly
o        Please load the OMR# in the footer of this agreement into I-Link.

**NOTICE:** I no longer manage the Colocation/Dark Fiber team,  please contact John.Nagel@centurylink.com 636-887-4787.

Brenda Waterhouse
Manager - EZ Pricing
720-578-3014



Stronger Connected™

**From:** Temple, Dorine
**Sent:** Wednesday, March 21, 2012 1:42 PM
**To:** Waterhouse, Brenda
**Subject:** EZT91206 Orchard Brands (Thacker)
**Importance:** High

Brenda
Please approve for ILink entry.

Thanks


*Dorine Temple*
Administrative Assistant
CenturyLink
379 Thornall St, Edison NJ 08837

dorine.temple@centurylink.com
(w) 732.710.4539
(f) 303.391.1745

Qwest is now CenturyLink.

## AMENDMENT TO
## CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

**THIS AMENDMENT NO. NINE** (this "Amendment") by and between **Qwest Communications Company, LLC d/b/a CenturyLink QCC** ("CenturyLink") and **Orchard Brands Corporation** ("Customer"), amends the CenturyLink Total Advantage Agreement, or Qwest Total Advantage Agreement, as applicable, Content ID: 212249, 223678, 251168, 262593, 294160, 307892, 328662, 357224 and 381813, as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink reserves the right to withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink before **February 7, 2014**. Using CenturyLink's electronic signature process for the Amendment is acceptable. All references to "Qwest Total Advantage" or "QTA" are replaced with "CenturyLink Total Advantage."

| CUSTOMER: ORCHARD BRANDS CORPORATION | QWEST COMMUNICATIONS COMPANY, LLC D/B/A CENTURYLINK QCC |
|---|---|
| _(signature)_ | _(signature)_ |
| Authorized Signature | Authorized Signature |
| Marc Siegel | Dorine Temple on behalf of *Brian Fisher* |
| Name Typed or Printed | Name Typed or Printed |
| COO | Director of Offer Management |
| Title | Title |
| 2/7/14 | 2/12/14 |
| Date | Date |

CenturyLink and Customer wish to amend the Agreement as follows:

1.      **Revised Initial Term and New Revenue Commitment.** The parties agree to reduce the existing Initial Term, which will retain the Agreement's existing Effective Date of July 26, 2010, and decrease the Revenue Commitment. Customer's new Revenue Commitment and revised Initial Term are $1,200,000 per anum (prorated for final 3 months) and 27 months (Code: 195027).

2.      **Competitive Credit.** If Customer is in compliance with its obligations under the Agreement, Customer will receive a Competitive Credit not to exceed $160,000 during the Initial Term in increments of $40,000 each to be applied to Customer's invoices in months 3, 5, 7 and 9. The Competitive Credits will be applied to Customer's Contributory Charges, except for charges for Qwest Corporation d/b/a CenturyLink QC ("CenturyLink QC") Contributory Services and CenturyLink QCC intrastate service. In no event will any excess Competitive Credit be carried over to the next monthly billing period. If Customer terminates the Agreement before the Initial Term is completed, then Customer must pay within 30 days of the Agreement's termination date an amount equal to the total of all Monthly Competitive Credits Customer received pursuant this Section.

3.      **New Service(s) is/are being added.** New Service(s) and corresponding contract document(s) are added to the Agreement. The attached contract document(s) associated with the addition of Service(s) may include, but is not limited to the following: Service Exhibit(s), Pricing Attachment(s), and Service Attachment(s), which will be added to, and constitute a part of, the Agreement and the existing Services. All Net Rates set forth in the contract documents are in lieu of all other rates, discounts, or promotions. The definition of Services in the Agreement will include the Services in the contract document(s) attached to this Amendment. The following new Service is added: **CENTURYLINK IQ NETWORKING DATA CENTER CONNECTIVITY OFFER.**

4.      **Modification to the existing Domestic Voice Service Exhibit and Pricing Attachment.**

(a)     The pricing tables in Section 1 of the Pricing Attachment are deleted and replaced with the following new tables.

| Domestic Interstate Outbound Long Distance | Interstate Minutes of Use Per Month | Per Minute Net Rate |
|---|---|---|
| *Origination – Termination* | | |
| Dedicated – Switched | 0 – 4,000,000 | $0.0120 |
| Dedicated – Switched | 4,000,001 – 7,000.000 | $0.0110 |
| Dedicated – Switched | 7,000,001 – 8,000,000 | $0.0100 |
| Dedicated – Switched | 8,000,001 – 10,000.000 | $0.0095 |
| Dedicated – Switched | 10,000,001 + | $.0090 |
| | | |
| Switched – Switched | ALL | $0.0250 |
| Dedicated - Dedicated | ALL | $0.0090 |

N65315 amends Q652620A, Q652620,
Q417950, Q384599, Q297452, Q25921,
Q79876, 132331 and 128380
Contract: 195027

Page 1
CONFIDENTIAL

© CenturyLink, Inc.  All Rights Reserved.
V1.081213

| Domestic Interstate Toll Free | | Per Minute Net Rate |
|---|---|---|
| *Origination – Termination* | | |
| Switched – Dedicated | 0 – 4,000,000 | $0.0120 |
| Switched – Dedicated | 4,000,001 – 7,000.000 | $0.0110 |
| Switched – Dedicated | 7,000,001 – 8,000,000 | $0.0100 |
| Switched – Dedicated | 8,000,001 – 10,000.000 | $0.0095 |
| Switched - Dedicated | 10,000,001 + | $.0090 |
| | | |
| Switched – Switched | ALL | $0.0250 |
| Dedicated – Dedicated | ALL | $0.0090 |
| | | |

(b)    The following tables are added to Section 2 in the Pricing Attachment.

| Domestic Intrastate (including interLATA and intraLATA) Outbound Long Distance By State | | Per Minute Rate | Maximum Discount Basis for Service Credit |
|---|---|---|---|
| **State** | *Origination – Termination* | | |
| OH | Dedicated – Switched | $0.0263 | 16.35% |
| VT | Dedicated – Switched | $0.0493 | 43.20% |

| Domestic Intrastate (including interLATA and intraLATA) Toll Free By State | | Per Minute Rate | Maximum Discount Basis for Service Credit |
|---|---|---|---|
| **State** | *Origination – Termination* | | |
| OH | Dedicated – Switched | $0.0263 | 16.35% |
| VT | Dedicated – Switched | $0.0493 | 43.20% |

5.    **Modification to the existing Domestic iQ Networking Service Exhibit and Pricing Attachment.**

(a)    The pricing in the tables below are added to or will replace the same in Section 1 of the Pricing Attachment. The NRC Waiver in Section 5.2 of the Service Exhibit will apply.

| Flat Rate Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 (1.5 Mbps) | $500 | $125 |
| 2 x DS1 (3 Mbps) | $1,000 | $275 |
| 3 x DS1 (4.5 Mbps) | $1,000 | $400 |
| 4 x DS1 (6 Mbps) | $1,000 | $500 |
| 5 x DS1 (7.5 Mbps) | $1,000 | $625 |
| 6 x DS1 (9 Mbps) | $1,000 | $1,040 |
| 8 x DS1 (12 Mbps) | $1,000 | $1,385 |
| DS3 | $2,000 | $1,350 |
| Ethernet | $1,000 | $250 |
| Fast Ethernet | $1,500 | $800 |

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| DS1 | $500 | $150 |
| 2 x DS1 (3 Mbps) | $1,000 | $300 |
| 3 x DS1 (4.5 Mbps) | $1,000 | $450 |

N65315 amends Q652620A, Q652620,
Q417950, Q384599, Q297452, Q25921,
Q79876, 132331 and 128380
Contract: 195027

Page 2
**CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved.
V1.081213

CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

| Flat Rate Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 4 x DS1 (6 Mbps) | $1,000 | $748 |
| 5 x DS1 (7.5 Mbps) | $1,000 | $960 |
| 6 x DS1 (9 Mbps) | $1,000 | $1,145 |
| 8 x DS1 (12 Mbps) | $1,000 | $1,520 |
| Ethernet | $1,000 | $250 |
| Fast Ethernet | $1,500 | $1,100 |

**(b)**    The pricing in the tables below are added to or will replace the same in Section 2 of the Pricing Attachment. The NRC Waiver in Section 5.2 of the Service Exhibit will apply.

| Tiered DS3 Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 9 Mbps | $2,000 | $800 |
| 15 Mbps | $2,000 | $900 |
| 24 Mbps | $2,000 | $1,050 |

| Tiered Fast Ethernet 100 Mbps Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 10 Mbps | $1,500 | $250 |
| 20 Mbps | $1,500 | $350 |
| 30 Mbps | $1,500 | $475 |
| 40 Mbps | $1,500 | $550 |
| 50 Mbps | $1,500 | $625 |
| 60 Mbps | $1,500 | $675 |
| 70 Mbps | $1,500 | $725 |
| 80 Mbps | $1,500 | $775 |
| 90 Mbps | $1,500 | $825 |
| 100 Mbps | $1,500 | $850 |

| Tiered Gigabit Ethernet (1000 Mbps) Internet Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 100 Mbps | $4,000 | $800 |

| Tiered DS3 Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 9 Mbps | $2,000 | $900 |
| 15 Mbps | $2,000 | $1,000 |
| 24 Mbps | $2,000 | $1,120 |
| 45 Mbps | $2,000 | $1,800 |

| Tiered Fast Ethernet 100 Mbps Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 10 Mbps | $1,500 | $250 |
| 20 Mbps | $1,500 | $400 |
| 30 Mbps | $1,500 | $500 |
| 40 Mbps | $1,500 | $600 |
| 50 Mbps | $1,500 | $700 |
| 60 Mbps | $1,500 | $800 |
| 70 Mbps | $1,500 | $950 |
| 80 Mbps | $1,500 | $1,000 |
| 90 Mbps | $1,500 | $1,050 |
| 100 Mbps | $1,500 | $1,100 |

N65315 amends Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331 and 128380
Contract: 195027

Page 3
CONFIDENTIAL

© CenturyLink, Inc.  All Rights Reserved.
V1.081213

**6.    Modification to the existing Local Access Service Exhibit and Pricing Attachment.**

**(a)**    Section 4 in the Service Exhibit is deleted and replaced with the following revised provision.

**4. Term.** The term of any Service (including Services transferred from the Haband Agreement) begins on the Start of Service Date and continues for a minimum of 12 months from the Start of Service Date, unless a longer term is specified ("Minimum Service Term"). Upon expiration of any Minimum Service Term, the Service will automatically renew on a month-to-month basis and following such Minimum Service Term Customer may terminate any Service without liability for cancellation charges. Notwithstanding the foregoing, upon expiration of any Minimum Service Term for DS1 Service, NxT1 Service, and 10Mb Ethernet Service, each Service will continue on a month-to-month basis until such Service is terminated and will not be required to satisfy additional Minimum Service Terms under the Agreement. The Minimum Service Term and any renewal term will be referred to as the "Term." Upon written notice to CenturyLink at least 30 days prior to the conclusion of any Term, Customer may terminate the Services associate with this Exhibit.

**(b)**    The NPA/NXXs and associated rates in the table below are added to, or replace the same in the Section (B) of the Pricing Attachment. The 100% Install NRC Discount in Section (D) of the Pricing Attachment will apply.

| NPANXX | Service Address | Tracking ID | Type of Local Access | Minimum Service Term (per Service) | Circuit Speed | Local Access Net Rate MRC | Install NRC | Notes |
|---|---|---|---|---|---|---|---|---|
| 570342 | 14 ALBERIGI DR, OLYPHANT, PA, 18434 | 130923838682 | Special Access | 12 months | DS-1 | $200 | $0 | |
| 814723 | 220 HICKORY ST, WARREN, PA, 16366 | 130923838678 | Special Access | 12 months | DS-3 | $1,500 | $0 | |
| 570342 | 14 ALBERIGI DR, OLYPHANT, PA, 18434 | 130923844660 | Special Access | 12 months | DS-1 | $200 | $0 | |
| 814723 | 220 STATE ST, WARREN, PA, 16365 | 130923844654 | Special Access | 12 months | DS-3 | $1,500 | $0 | |
| 503614 | 3188 NW ALOCLEK DR, BEAVERTON, OR, 97124 | 130923844661 | Special Access | 12 months | DS-1 | $200 | $1,620 | |
| 706484 | 229 W FORREST ST, EATONTON, GA, 31024 | 130923844663 | Special Access | 12 months | DS-1 | $150 | $1,640 | |
| 603341 | 56 ISLINGTON ST, FLR 1, PORTSMOUTH, NH, 03801 | 130923844658 | Special Access | 12 months | DS-1 | $200 | $275 | |
| 608280 | 212 E WASHINGTON AVE, MADISON, WI, 53703 | 130923844662 | Special Access | 12 months | DS-1 | $125 | $150 | |
| 814723 | 220 STATE ST, WARREN, PA, 16365 | 131215017124 | ELA - Over Sonet | 12 months | Gigabit Ethernet- 100 Mbps | $1,651 | $4 | |
| | DATA CENTER 21715 FILIGREE CT, ASHBURN, VA 20147 | | QPA - Cyber Center Access | 12 months | Gigabit Ethernet- 100 Mbps | $0 | $0 | QVO-1048871 |
| | DATA CENTER 32 6TH AVE, FLR 24, SUIT MMR, NEW YORK, NY | | QPA - Cyber Center Access | 12 months | Gigabit Ethernet- 100 Mbps | $0 | $0 | QVO-1048872 |

N65315 amends Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331 and 128380
Contract: 195027

© CenturyLink, Inc.  All Rights Reserved.
V1.081213

CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

| NPANXX | Service Address | Tracking ID | Type of Local Access | Minimum Service Term (per Service) | Circuit Speed | Local Access Net Rate MRC | Install NRC | Notes |
|---|---|---|---|---|---|---|---|---|
| | 10013 | | | | | | | |
| 706485 | 148 Industrial Blvd, EATONTON, GA, 31024 | 130923847670 | Special Access | 12 months | DS-1 | $150 | $820 | |
| 802334 | 76 LAKEMONT RD, FLR 1, SUIT TELC, NEWPORT, VT, 05855 | 130923847660 | Special Access | 12 months | DS-1 | $400 | $275 | |
| 503614 | 3188 NW Aloclek Drive, HILLSBORO, OR, 97124 | 130923847665 | Special Access | 12 months | DS-1 | $200 | $540 | |
| 814723 | 220 Hickory Ave, WARREN, PA, 16365 | 130923847658 | Special Access | 12 months | DS-3 | $1,500 | $0 | |

7.      **Billing Information.** Any new pricing applicable to Customer's existing Services, will become effective at CenturyLink QCC's earliest opportunity, but in no event later than the next billing cycle following the Amendment Effective Date ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement.

8.      **Miscellaneous.** This Amendment will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

N65315 amends Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331 and 128380
Contract: 195027

Page 5
CONFIDENTIAL

© CenturyLink, Inc. All Rights Reserved.
V1.081213

**PROMOTIONAL ATTACHMENT FOR**
**CENTURYLINK IQ NETWORKING DATA CENTER CONNECTIVITY OFFER**

This Qwest Communications Company, LLC d/b/a CenturyLink QCC ("CenturyLink") promotional attachment ("Attachment") is subject in all respects to the domestic CenturyLink IQ Networking Service Exhibit, the Local Access Service Exhibit, and the CenturyLink Total Advantage™ or CenturyLink Loyal Advantage™ Agreement ("Agreement") between Customer and CenturyLink. All capitalized terms used in this Attachment that are not defined herein will have the definition as set forth in the Agreement or Service Exhibit.

**1.    Definitions.**

"Eligible Data Center" means a data center location which has been qualified by CenturyLink as eligible to receive the offer pricing specified below. Only the service address(es) specified below are considered Eligible Data Centers.

"Eligible On-Net Circuit" means a Local Access circuit that uses a 1 Gigabit, a 2.5 Gigabit, or a 10 Gigabit handoff to connect the Eligible Data Center to CenturyLink's network.

"Eligible Port" means a CenturyLink IQ Networking Internet or Private Port of either 1 Gbps or 10 Gbps capacity that uses the Precise Burstable billing methodology and provides IP connectivity to Customer's equipment located within the Eligible Data Center location(s) specified below.

**2.    Scope.** The purpose of this Attachment is to provide offer pricing for Eligible Ports and Eligible On-Net Circuits. Unless approved by CenturyLink, offer pricing for CenturyLink IQ Networking Service and Local Access Service is exclusive of, and may not be combined with any other offers, promotions, or discounts and will only be applied in lieu of any such discounts. All other rate elements not specifically set forth in this Attachment are as stated in the Agreement and Service Exhibits.

**3.    Eligibility and Restrictions.** The minimum service term ("Service Term") for each Eligible Port and Eligible On-Net Circuit may be 12, 24 or 36 months. Customer must order the Eligible Port and related Eligible On-Net Circuit at the same time and for the same Service Term. The offer pricing set forth below is available to Customers that are: (a) purchasing a new Eligible Port and a new Eligible On-Net Circuit; or (b) restarting the same length Service Term of an existing Eligible Port and related Eligible On-Net Circuit which have no more than 25% of the months remaining in their Service Term. For example, an existing Service Term of 36 months could have no more than nine months remaining to be considered eligible and a new 36 month Service Term would be required. Eligible Ports and Eligible On-Net Circuits are subject to availability and their specific location and availability must be qualified and approved by CenturyLink at CenturyLink's sole discretion. If an Eligible Port or Eligible On-Net Circuit is canceled before its Service Term is completed, then Customer must pay CenturyLink a Cancellation Charge equal to the Eligible Port's offer pricing MRC shown below multiplied by the number of months remaining in the Service Term. After the completion of the applicable Service Term for each Eligible Port and Eligible On-Net Circuit: (c) the term will continue on a month-to-month basis until canceled by either party with 60 days' notice and (d) offer pricing will continue to apply, however CenturyLink reserves the right to modify rates or discontinue offer pricing with 60 days' notice. In order to receive the offer pricing shown below, Customer's Agreement must include all of the applicable Service Exhibits and Customer must sign and return this Attachment, and order Service before December 31, 2014.

**4.    Promotional Pricing.** The following CenturyLink IQ Networking Eligible Port promotional pricing MRCs shown below will be used to calculate Contributory Charges. Any Eligible Ports not shown below must be incorporated via an amendment. Promotional pricing does not apply to any service addresses that are not specified as Eligible Data Centers. The Service Term for existing Eligible Ports and related Eligible On-Net Circuits will restart on the Attachment Effective Date.

**4.1   Eligible Data Center locations.** The following location(s) have been qualified as Eligible Data Centers. The parties may sign another promotional attachment which specifies additional Eligible Data Center locations.

| Eligible Data Center Service Address (including Suite or Floor, if applicable) |
|---|
| 21715 Filigree Ct. Ashburn VA 20147 |
| 32 6th Ave, FLR 24, Suit MMR New York NY 10013 |

**4.2   Precise Burstable Net Rate Pricing.**

| Precise Burstable Gigabit Ethernet (1000 Mbps) Precise Burstable Minimum = 100 Mbps Private Port | 12 Month Service Term MRC per Mbps* (promo code QDCCIGEPB1) | NRC per Port** |
|---|---|---|
| 00 – 100 Mbps | $8.22 | $4,000 |
| 1001 – 150 Mbps | $8.20 | $4,000 |
| 1501 – 200 Mbps | $7.25 | $4,000 |
| 2001 – 250 Mbps | $7.65 | $4,000 |

N65315 amends Q652620A, Q652620,
Q417950, Q384599, Q297452, Q25921,
Q79876, 132331 and 128380
Contract: 195027

© CenturyLink, Inc. All Rights Reserved.
V1.081213

CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT
PROMOTIONAL ATTACHMENT FOR
CENTURYLINK IQ NETWORKING DATA CENTER CONNECTIVITY OFFER

| Precise Burstable Gigabit Ethernet (1000 Mbps) Precise Burstable Minimum = 100 Mbps Private Port | 12 Month Service Term MRC per Mbps* (promo code QDCCIGEPB1) | NRC per Port** |
|---|---|---|
| 2501 – 300 Mbps | $6.33 | $4,000 |
| 3001 – 350 Mbps | $6.89 | $4,000 |
| 3501 – 400 Mbps | $5.52 | $4,000 |
| 4001 – 500 Mbps | $4.95 | $4,000 |
| 5001 – 600 Mbps | $4.85 | $4,000 |
| 6001 – 700 Mbps | $4.75 | $4,000 |
| 7001 – 800 Mbps | $4.65 | $4,000 |
| 8001 – 900 Mbps | $4.55 | $4,000 |
| 9001 – 1000 Mbps | $4.10 | $4,000 |

* Includes On-Net Local Access 1Gbps service. Special Construction and Local Access ancillary fees not included.
** CenturyLink will waive 100% of the installation NRC.

5.    **Miscellaneous.** All other terms not specifically set forth in this Attachment, including without limitation, any other rate elements, are as stated in the Agreement and Service Exhibit(s). This Attachment will be effective as of the date it is signed by CenturyLink ("Attachment Effective Date"). The promotional pricing will become effective for existing Eligible Ports as soon as practicable, but in no event later than the first full billing cycle following the Attachment Effective Date. If Customer has an existing Agreement that does not include the CenturyLink IQ Networking or Local Access Service Exhibits, the applicable Service Exhibits are hereby added with this Attachment and by signing this Attachment, Customer understands that the respective Service Exhibit's Effective Date will be the same as the Attachment Effective Date and agrees to and accepts the terms of the Service Exhibit, which are hereby incorporated into the Agreement. If Customer has an existing Agreement that includes the applicable Service Exhibit(s), this Attachment is hereby added to the Agreement. In the event of any conflict between any of the following documents, the order of control is:  this Attachment, the Service Exhibits, the Agreement, and any CenturyLink-accepted Order Form.  All other terms set forth in the Agreement will remain in effect.  This Attachment, the CenturyLink IQ Networking Service Exhibit and the Local Access Service Exhibit, and the Agreement set forth the entire understanding between the parties as to the subject matter herein and supersede any prior written or verbal statements, representations, and agreements concerning the subject matter hereof. Electronic signatures on this Attachment will be accepted only in the form and manner prescribed by CenturyLink.

**Agreed to and Accepted:**

**CUSTOMER: ORCHARD BRANDS CORPORATION**

Authorized Signature

Marc Sgu

Name Typed or Printed

CDO

Title

2/7/14

Date

**QWEST COMMUNICATIONS COMPANY, LLC
D/B/A CENTURYLINK QCC**

Dorine Temple

Authorized Signature

Dorine Temple on behalf of BriAN Fisher

Name Typed or Printed

Director of Offer Managemet

Title

2/12/14

Date

**POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGNATION WITH POM DIRECTOR DELEGATION OF AUTHORITY**

Approval Date and Time:2/12/2014 4:08 PM

Approval by:  Paresh Naik

SFA or Q.Insight Request ID:  N65315

I have received a written delegation of authority from Brian Fisher

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Dorine Temple to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Dorine Temple. I understand that it is the responsibility of the designate Dorine Temple to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Dorine Temple must sign your signature.
- Do not use the Brian Fisher signature stamp.
- For the "Name:" line, write Dorine Temple on behalf of Brian Fisher.

# Contract Cover Sheet for all direct channels

*See current **Instructions and Reference doc** for details to enable completeion of this contract cover sheet.*
*Quick tip to allow the dropdowns to work: See **Security Warning** above, then Click the **Options** button, select "enable this content" and OK button.*

| | |
|---|---|
| Type (Refer to Document Name at top of contract page) | Agreement |
| Corporate Entity (Refer to title over CenturyLink Signature) | QCC |
| QCC Document Name (as in the header of the contract) | Amend to QTA Agmt Term & Rev Commit Add Svc-QCC |
| QC Document Name (as in the header of the contract) | |
| Customer Name (legal Name on the contract do not Abbreviate) | Orchard Brands Corporation |
| Customer Signature Date | 2/7/2014 |
| CenturyLink Signature Date (if Docusign Leave Blank) | 2/7/2014 |
| eSigned Contract | no |
| eSignature Envelope ID No | |
| If not eSigned, reason: **Required if not eSigned** | Refuse to sign or accept electronically |
| Contract Type (Any contract with a NSP# is Non-Standard) | NonStandard |
| Contract Term Length | plus 3 mos    24 |
| Expiration Date (if Docusign Leave Blank) | 4/7/2016 |
| Original Contract Content ID (for amendments and TLAs) | 128380, 132331 |
| Service_Exhibit (only if applicable) | |
| Sales Channel (see Instructions and Reference Doc) | GBA |
| Sales Office Code (GBA-NE NJPA, GBA-Reston-NAMAREST or GBA-Linthicum-NAMABALT) | GBA-NE NJPA |
| Sales Rep ID | ASZP |
| Sales Rep E-Mail Address | Kevin.Lambert@CenturyLink.com |
| Account No. or Bus. Phone # (from billing system, if existing account) | DG 60953 |
| Opportunity ID (from Salesforce) | 51659311 |
| Contract Number | 195027 |
| AQCB # (QC services) | |
| EZ Pricing # (from Salesforce) | n/a |
| NSP or SPR # (if non-standard, from Salesforce) | NSP-65315 |
| POM Analyst (if non-standard from NSP in Salesforce) | Robby Robertson |
| Customer Signatory Name: | Marc Sieger |
| Customer Signatory Title: | COO |
| Comments/Notes: | Renewal amendment for 27 months |

CTL Signer Initals _____          CTL Signer's CUID/ADID:

Resulting I-Link ID keyed by Sales Admin after loading this contract in ILink

CONFIDENTIAL FOR CENTURYLINK INTERNAL USE ONLY

# AMENDMENT TO
## CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

**THIS AMENDMENT NO. TEN** (this "Amendment") by and between **Qwest Communications Company, LLC d/b/a CenturyLink QCC** ("CenturyLink") and **Orchard Brands Corporation** ("Customer"), amends the CenturyLink Total Advantage Agreement, or Qwest Total Advantage Agreement, as applicable, Content ID: 212249, 223678, 262593, 294160, 307892, 328662, 357224, 381813 and 427509 as may have been previously amended (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink reserves the right to withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink before **May 31, 2014.** Using CenturyLink's electronic signature process for the Amendment is acceptable. All references to "Qwest Total Advantage" or "QTA" are replaced with "CenturyLink Total Advantage."

| CUSTOMER: ORCHARD BRANDS CORPORATION | QWEST COMMUNICATIONS COMPANY, LLC D/B/A CENTURYLINK QCC |
|---|---|
| *Robert E Cote* | *Dorine Temple* |
| Authorized Signature | Authorized Signature |
| Robert Cote | Dorine Temple on behalf of Brian Fisher |
| Name Typed or Printed | Name Typed or Printed |
| Director Tech Services | Director of Offer Management |
| Title | Title |
| 5/20/2014 | 5/23/2014 |
| Date | Date |

CenturyLink and Customer wish to amend the Agreement as follows:

**1. Corrections to Amendment Nine.**

**1.1 Revised Initial Term.** The Initial Term specified in Section 1 in Amendment Nine was incorrectly stated as a Revised Initial Term. The parties agree to delete the provision and replace it with the following:

> **1. New Initial Term and Revenue Commitment.** The parties agree to start a new Initial Term that begins on the February 12, 2014. Customer's Revenue Commitment and new Initial Term are $1,200,000 per anum (prorated for final 3 months) and 27 months (Code 195027).

**1.2 Revised Billing Information.** New pricing specified in Amendment Nine applicable to Customer's Services will become effective February 12, 2014 ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement. Customer will receive in the form of a credit an amount equal to the difference between the MRCs and usage charges for Services for the period between the Billing Change Date and this Amendment Effective Date ("True-up Credit"). The True-up Credit will be applied to Customer's CenturyLink QCC charges on the first invoice following the Amendment Effective Date and in the event the True-up Credit exceeds Customer's CenturyLink QCC charges the remainder will be applied to Customer's CenturyLink QCC charges in the following month's invoice.

**2. Modification to the CenturyLink iQ Networking Data Center Connectivity Offer.** The following locations are added to the Eligible Data Center Service Address table in Section 4.1 as additional Eligible Data Center locations.

> 11 GREAT OAKS BLVD, FLR 1, SAN JOSE, CA, 95119
> 2001 6TH AVE, FLR 19, SUIT MMR, SEATTLE, WA 98121

**3. Miscellaneous.** This Amendment will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

N83983

N78536 amends N65315, Q652620A,
Q652620, Q417950, Q384599, Q297452,
Q25921, Q79876, 132331 and 128380
Contract: 195027

Page 1
CONFIDENTIAL

© CenturyLink, Inc. All Rights Reserved.
V1.081213

# POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGNATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time:5/23/2014 10:48 AM

Approval by:  Paresh Naik

SFA or Q.Insight Request ID:  N83983

I have received a written delegation of authority from Brian Fisher

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Dorine Temple to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Dorine Temple. I understand that it is the responsibility of the designate Dorine Temple to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Dorine Temple must sign your signature.
- Do not use the Brian Fisher signature stamp.
- For the "Name:" line, write Dorine Temple on behalf of Brian Fisher.

## NON-STANDARD PRICING CHANGE ORDER (PCO) FORM
### for CenturyLink QCC Services Only

| CUSTOMER NAME: ORCHARDS BRAND CORPORATION | NSP #: N89258 |
| | NDC # (if applicable): N/A |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on June 1, 2007. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. **CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before September 9, 2014.**

| CUSTOMER: ORCHARD BRANDS CORPORATION | CENTURYLINK COMMUNICATIONS, LLC |
| --- | --- |
| *Robert E Cote* | *Dorine Temple* |
| Authorized Signature | Authorized Signature on behalf of *Brian Fisher* |
| *Robert Cote* | Dorine Temple |
| Name Typed or Printed | Name Typed or Printed |
| Title *Director of Tech Svc's* | Director of Offer Management |
| Date *7/31/2014* | Title |
| | Date *8/7/14* |

| Pramata ID(s): 856428, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168, 292940 | Prior NSP/Q.Insight/OMR#s: N83983, N65315, Q652620A, Q652620, Q417950, Q384599, Q297452, Q79876, Q25921, 132311, 128380 |

| Revenue Commitment/Initial Term: $1,200,000/year; 27 months; Contract Code #: 195027 |

**Initial Term is:** ☒ Existing (no changes)
**Revenue Commitment:** ☒ No Change

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☒ Add the new rates/locations set forth below to the existing rates/charges.

The Cross Connect fees below will apply to the cross-connect circuits turned up for: (1) Equinix Ashburn, VA DC. 21715 FILIGREE CT, ASHBURN, VA 20147. CTL circuit ID: ETH1000-17132072, and (2) Equinix Seattle, WA DC. 2001 6TH AVE, SEATTLE, WA 98121. CTL circuit ID: ETH1000-17132070

| Cross Connect | MRC per Cross Connect | NRC per Cross Connect |
| --- | --- | --- |
| 1Gb | $295 | $0 |

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

CONFIDENTIAL
Page 1 of 1

© CenturyLink, Inc.. All Rights Reserved
v1.042514

# POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGNATION WITH POM DIRECTOR DELEGATION OF AUTHORITY

Approval Date and Time:8/7/2014 1:09 PM

Approval by:  Paresh Naik

SFA or Q.Insight Request ID:  N89258

I have received a written delegation of authority from Brian Fisher

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Dorine Temple to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Dorine Temple. I understand that it is the responsibility of the designate Dorine Temple to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Dorine Temple must sign your signature.
- Do not use the Brian Fisher signature stamp.
- For the "Name:" line, write Dorine Temple on behalf of Brian Fisher.

AMENDMENT NO. ELEVEN
CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

THIS AMENDMENT NO. ELEVEN (this "Amendment") by and between **CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC** ("CenturyLink") and **Orchard Brands Corporation** ("Customer"), amends the CenturyLink Total Advantage Agreement, or Qwest Total Advantage Agreement, as applicable, Content ID: 865454, 856428, 866967, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168 and 292940, as may have been previously amended (the "Agreement"). For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this Amendment, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC. Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink reserves the right to withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink before **December 31, 2014**. Using CenturyLink's electronic signature process for the Amendment is acceptable. All references to "Qwest Total Advantage" or "QTA" are replaced with "CenturyLink Total Advantage."

| CUSTOMER: ORCHARD BRANDS CORPORATION | QWEST COMMUNICATIONS COMPANY, LLC D/B/A CENTURYLINK QCC |
|---|---|
| *Robert E Coté* | *Anne Temple* |
| Authorized Signature | Authorized Signature |
| *Robert Cote* | **Dorine Temple** on behalf of *Brian Fisher* |
| Name Typed or Printed | Name Typed or Printed |
| *Dir Tech Svc's* | Director of Offer Management |
| Title | Title |
| *12/18/2014* | *01/07/15* |
| Date | Date |

CenturyLink and Customer wish to amend the Agreement as follows:

1.    **Corrections to Agreement Documents Numbering.**    CenturyLink and Customer agree to correct the numbering of Agreement documents executed between the parties and to incorporate numbering for CenturyLink's current document storage system by replacing Content ID numbers with Pramata ID numbers. Going forward only Pramata IDs will be reflected in Agreement documents. The parties agree to the following numbering:

| Document Description | Correct Document Description | Effective Date | Previous CenturyLink Document Storage Number | Current CenturyLink Document Storage Number |
|---|---|---|---|---|
| PCO | PCO | 8/7/14 | | 865454 |
| Amendment 10 | Amendment 10 | 5/23/14 | | 856428 |
| Amendment 9 | Amendment 9 | 2/12/14 | 427509 | 866967 |
| Amendment 8 | Amendment 8 | 3/21/14 | 381813 | 599978 |
| Amendment 6 | Amendment 7 | 5/25/11 | 357224 | 668997 |
| Amendment 5 | Amendment 6 | 7/26/10 | 328662 | 675653 |
| Amendment 4 | Amendment 5 | 12/7/09 | 307892 | 687373 |
| Amendment 3 | Amendment 4 | 6/26/09 | 281160 | 704415 |
| Amendment 3 | Amendment 3 | 9/8/08 | 262593 | 740472 |
| Amendment 2 | Amendment 2 | 6/5/08 | 251168 | 761693 |
| Amendment 1 | Amendment 1 | 9/27/07 | 223678 | 751168 |
| CenturyLink Total Advantage Agreement | CenturyLink Total Advantage Agreement | 6/1/07 | 212249 | 292940 |

2.    **Corrections to Amendment Ten.**

2.1    **Revised Initial Term.** The parties attempted to restate the date of the Initial Term set forth in Amendment Nine by correcting it in Amendment Ten. However, the date stated in Amendment Ten was incorrect. To correct the date of the Initial Term, the parties agree to delete the provision in Amendment Ten and replace it with the following:

1.    **New Initial Term and Revenue Commitment.** The parties agree to start a new Initial Term that begins on the February 1, 2014. Customer's Revenue Commitment and new Initial Term are $1,200,000 per annum (prorated for final 3 months) and 37 months (Code 186627).

N92864 attach N92850 N92983
N68315, Q852520A, Q852820, Q417850,
Q384599, Q297452, Q25921, Q79876,
132331 and 128380

Page 1
CONFIDENTIAL

© CenturyLink Inc. All Rights Reserved.
V1.081213

## AMENDMENT TO
## CENTURYLINK® TOTAL ADVANTAGE™ AGREEMENT

**2.2**    **Revised Billing Information.** New pricing specified in Amendment Nine applicable to Customer's Services will become effective February 1, 2014 ("Billing Change Date"). The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, the pricing that Customer previously received under the Agreement. Customer will receive in the form of a credit an amount equal to the difference between the MRCs and usage charges for Services for the period between the Billing Change Date and this Amendment Effective Date ("True-up Credit"). The True-up Credit will be applied to Customer's CenturyLink QCC charges on the first invoice following the Amendment Effective Date and in the event the True-up Credit exceeds Customer's CenturyLink QCC charges the remainder will be applied to Customer's CenturyLink QCC charges in the following month's invoice.

**3.**    **Miscellaneous.**

**3.1**    On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC".

**3.2**    This Amendment will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

N92864 amends N89258, N83983,
N65315, Q652620A, Q652620, Q417950,
Q384599, Q297452, Q25921, Q79876,
132331 and 128380
Contract: 195027

Page 2
CONFIDENTIAL

© CenturyLink, Inc. All Rights Reserved.
V1.081213

**POM MANAGER COUNTER-SIGNATURE APPROVAL DESIGNATION WITH
POM DIRECTOR DELEGATION OF AUTHORITY**

Approval Date and Time:1/7/2015 9:08 AM

Approval by:  Paresh Naik

SFA or Q.Insight Request ID:  N92864

I have received a written delegation of authority from Brian Fisher

This document is approved to sign on my behalf, subject to the terms of the standard delegation language below.

I designate Dorine Temple to sign this contract. My approval and designation is evidence that I have reviewed an electronic image of the contract submitted by Dorine Temple. I understand that it is the responsibility of the designate Dorine Temple to verify that the electronic image and original are the same representation of the document as submitted by the customer and Qwest Sales for signature. Given this understanding I find no material differences in the two documents.

Please use the following format when executing this contract:

- For the "By:" line of the signature block, you Dorine Temple must sign your signature.
- Do not use the Brian Fisher signature stamp.
- For the "Name:" line, write Dorine Temple on behalf of Brian Fisher.

# NON-STANDARD PRICING CHANGE ORDER (PCO)
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

| | |
|---|---|
| **CUSTOMER NAME: Orchard Brands Corporation** | NSP #: **N 160281**<br>NDC # (if applicable):<br>2015091BXMOON2_Rev1 |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on February 1, 2014. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. **CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before October 15, 2015**

| **CUSTOMER: Orchard Brands Corporation** | **CENTURYLINK COMMUNICATIONS, LLC** |
|---|---|
| *Wayne Arnold* | *Paresh Naik* |
| Authorized Signature | Authorized Signature |
| Wayne Arnold | Paresh Naik |
| Name Typed or Printed | Name Typed or Printed |
| Director of Contracts | Director of Offer Management |
| Title | Title |
| 9-23-15 | 9/23/2015 |
| Date | Date |

| FOR INTERNAL CENTURYLINK REFERENCE | |
|---|---|
| Content ID: 882287, 865454, 856428, 866967, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168 and 292940 | Prior NSP/Q.Insight/OMR#s:N92864 ,N89258, N83983, N65315, Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331 and 128380 |

| **Revenue Commitment/Initial Term: $1,200,000/Annually Contract Code #: 195027** |
|---|
| **Initial Term is**: ☒ Existing (no changes) ☐ Restarted (new) for   months/years ☐ Extended by   months/years<br>**Revenue Commitment**: ☐ N/A ☐ No Changes ☐ New Revenue Commitment of $   per month OR year |

**Applicable CenturyLink Service Domestic CenturyLink IQ Networking Service** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace **all** existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| Precise Burstable Gigabit Ethernet<br>(Precise Burstable Minimum = 100 Mbps)<br>Internet Port Other Access | Net Rate MRC Per Mbps | Install NRC |
|---|---|---|
| 0.000 – 100 Mbps | $ 7.75 | $4,000.00 |
| 100.001 – 150 Mbps | $ 7.55 | $4,000.00 |
| 150.001 – 200 Mbps | $ 7.15 | $4,000.00 |
| 200.001 – 250 Mbps | $ 6.90 | $4,000.00 |
| 250.001 – 300 Mbps | $ 6.55 | $4,000.00 |
| 300.001 – 350 Mbps | $ 6.15 | $4,000.00 |
| 350.001 – 400 Mbps | $ 5.80 | $4,000.00 |
| 400.001 – 500 Mbps | $ 5.45 | $4,000.00 |
| 500.001 – 600 Mbps | $ 5.10 | $4,000.00 |
| 600.001 – 700 Mbps | $ 4.75 | $4,000.00 |
| 700.001 – 800 Mbps | $ 4.40 | $4,000.00 |
| 800.001 – 900 Mbps | $ 4.05 | $4,000.00 |

© CenturyLink, Inc.. All Rights Reserved
v1.111914

# NON-STANDARD PRICING CHANGE ORDER (PCO)
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

| 900.001 – 1000 Mbps | $ | 3.70 | $4,000.00 |
|---|---|---|---|

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☐ Not Applicable.

☒ Add the new rates/locations set forth below to the existing rates/charges.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace all existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| NPA/NXX or CLLI | Loop Tracking ID | Service Address | Type of Local Access | Minimum Service Term in Months (per service) | Circuit Speed | Local Access Net Rate MRC | Install NRC |
|---|---|---|---|---|---|---|---|
| 952238 | 2015091BXMOON2_Rev1 | 5480 Feltl Road Minnetonka MN 55343 | QPA - Wavelength Local Access | 12 | 1 GigE | $2,050.00 | $00.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment.

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

© CenturyLink, Inc.. All Rights Reserved
v1.111914

# PRICING CHANGE ORDER (PCO)
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

| CUSTOMER NAME: Orchard Brands Corporation | NSP #: N193725 |
|---|---|
| | NDC #: 2015112JEPIKE |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on February 1, 2014. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before March 31, 2016.*

| CUSTOMER: ORCHARD BRANDS CORPORATION | CENTURYLINK COMMUNICATIONS, LLC |
|---|---|
| *signature* | *Brett Casey* |
| Authorized Signature | Authorized Signature |
| Scott D McKibbin | Brett Casey |
| Name Typed or Printed | Name Typed or Printed |
| Sr Director, Enterprise Infrastructure | Director of Offer Management |
| Title | Title 3/21/2016 |
| Mar 18 2016 | |
| Date | Date |

| FOR INTERNAL CENTURYLINK REFERENCE | |
|---|---|
| Content ID: 882287, 865454, 856428, 866967, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168, 292940 and 971918 | Prior NSP/Q.Insight/OMR#s:N92864 ,N89258, N83983, N65315, Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331,128380 and N160281 |

| Revenue Commitment/Initial Term: $1,200,000/Annually Contract Code #: 195027 |
|---|

Initial Term is: ☒ Existing (no changes)
Revenue Commitment: ☐ N/A    ☒ No Changes

**Applicable CenturyLink Service Domestic CenturyLink IQ Networking Service ("Service").** The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

3. **10 Gigabit Ethernet Private Port Description and Pricing.** 10 Gigabit Ethernet Private Ports provide Customer with access to the Internet. A 10 Gigabit Ethernet Private Port's peak usage cannot exceed the Bandwidth Tier that is agreed upon between Customer and CenturyLink. "Bandwidth Tier" means the maximum bandwidth usage allowed on a 10 Gigabit Ethernet Private Port; CenturyLink will not deliver traffic that exceeds the Bandwidth Tier. Customer understands that the SLA does not apply to any non-delivered traffic that results from exceeding the Bandwidth Tier limit. All 10 Gigabit Ethernet Private Ports are subject to availability, and any additional 10 Gigabit Ethernet Private Ports must be ordered via an amendment.

**Tiered.**

| Tiered 10 Gigabit Ethernet (10,000 Mbps) Private Port Other Access | Install NRC | Net Rate MRC |
|---|---|---|
| 1000 Mbps | $20,000.00 | $2,500 .00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

CONFIDENTIAL
Page 1 of 2
© CenturyLink, Inc.. All Rights Reserved
v1.111914

# PRICING CHANGE ORDER (PCO)
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☒ Add the new rates/locations set forth below to the existing rates/charges.

| NPA/NXX or CLLI | Loop Tracking ID | Service Address | Type of Local Access | Minimum Service Term | Circuit Speed | Local Access Net Rate MRC | Install NRC |
|---|---|---|---|---|---|---|---|
| 952/835 | 2015112JEPIKE | 5480 Feltl Rd, Minnetonka, MN 55343 | CTL Provide OWS Ethernet Handoff | 36 Months | 10 GigE | $1,818.00 | $00.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment.

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

**AMENDMENT TO**
**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**Annual Assessment**

**THIS AMENDMENT NO. TWELVE** (this "Amendment") by and between **CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC** ("CenturyLink") and **ORCHARD BRANDS CORPORATION** ("Customer"), hereby amends the CenturyLink Total Advantage Agreement, or Qwest Total Advantage Agreement, as applicable, Content ID: 971918, 882287, 865454, 856428, 866967, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168, 292940, as may have been previously amended (the "Agreement"). For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this Amendment, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC. Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink may withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink before **April 23, 2016** ("Cutoff Date"). Using CenturyLink's electronic signature process for the Amendment is acceptable.

| **CUSTOMER: ORCHARD BRANDS CORPORATION** | **CENTURYLINK COMMUNICATIONS, LLC** |
|---|---|
| _(signature)_ | _DocuSigned by:_ Donna M McNally |
| Authorized Signature | Authorized Signature |
| SCOTT MCKIBBIN | Donna M McNally |
| Name Typed or Printed | Name Typed or Printed |
| SR DIRECTOR | Offer Management |
| Title | Title |
| 5/9/16 | 5/11/2016 |
| Date | Date |

CenturyLink and Customer wish to amend the Agreement as follows:

**1. Term and Revenue Commitment.** Customer indicates below whether it is changing the length of its existing Term and/or changing the amount of its existing Revenue Commitment as set forth in the Agreement.

**No Changes.** Customer's existing Revenue Commitment and existing Term, which began on January 7, 2015 will remain in effect.

CenturyLink reserves the right to modify rates after the conclusion of each Service's minimum service period upon not less than 30 days' prior written notice to Customer; provided that CenturyLink may reduce the foregoing notice period or modify rates or discounts prior to the conclusion of the minimum service period, as necessary, if such modification is based upon Regulatory Activity. CenturyLink also reserves the right to modify rates when the Agreement renews to the rates that are in effect at that time.

**2. New Service(s) is/are being added.** Customer requests through this Amendment to add new Service(s) and corresponding contract document(s) to the Agreement. The parties agree that with respect to new Services being added to the Agreement, any reference to a "QTA Discount" in the underlying Agreement will be disregarded. Any term and volume discounts that apply to a particular Service will be identified in the applicable Service Exhibit. The attached contract document(s) associated with the addition of Service(s) may include, but is not limited to the following: Service Exhibit(s), Pricing Attachment(s), and Service Attachment(s) which will be added to, and constitute a part of, the Agreement and the existing Services. Customer requests the following new Services:

▪ **Rental CPE Service Exhibit**
▪ **CenturyLink IQ Networking Data Center Connectivity Offer**

**3. Modifications.** To the extent that the following provisions are not already in the Agreement or in a previous amendment, they are added through this Amendment. The Agreement is amended as follows:

**3.1 General**

**(a)** Customer will not pay for the Services with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate CenturyLink to provide certain information or perform certain functions unless each of those functions and obligations is explicitly identified and agreed to by the parties in this Agreement or in an amendment to this Agreement.

**(b)** Customer may access its invoices and choose paperless invoices online through CenturyLink Control Center located at controlcenter.centurylink.com. If Customer does not choose paperless invoices through Control Center, CenturyLink may in its discretion assess a $15 MRC for each full paper invoice provided to Customer or a $2 MRC for each summary/remit only (where

Q.Advan Z Op ID #: 53171609                    Page 1 of 6                    © CenturyLink, Inc. All Rights Reserved
N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,
Q417950, Q384599, Q297452, Q79876, Q25921,
132311, 128380
Contract Code: 195027                    **CONFIDENTIAL**                    CGT v1.110514

**AMENDMENT TO**
**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**Annual Assessment**

available) paper invoice provided to Customer. Those charges will not apply to an invoice that is not available through Control Center. Customer's payments to CenturyLink must be in the form of electronic funds transfer (via wire transfer or ACH), cash payments (via previously-approved CenturyLink processes only), or paper check. CenturyLink reserves the right to charge administrative fees when Customer's payment preferences deviate from CenturyLink's standard practices.

**(c)**    CenturyLink Information Services Schedule ("ISS"), Rates and Services Schedules ("RSS") and Tariff (which includes CenturyLink state tariffs, price lists, price schedules, administrative guidelines, catalogs, and rate and term schedules) are posted at the following links and are incorporated by this reference:

- The ISS is located at http://www.centurylink.com/tariffs/clc_info_services.pdf
- The International RSS is located at http://www.centurylink.com/tariffs/fcc_clc_ixc_rss_no_2.pdf
- The Interstate RSS is located at http://www.centurylink.com/tariffs/fcc_clc_ixc_rss_no_3.pdf
- The Tariff is located at http://www.centurylink.com/tariffs

**3.2    Private Line Services.**  If Customer is amending an Agreement already containing Optical Wavelength Service (f/k/a QCC QWave®), Metro Private Line, EPL (f/k/a Ethernet Private Line), Metro EPL (f/k/a Metro Ethernet Private Line), Domestic Private Line, or E-Line Service Exhibits, the following section is added to those Service Exhibits and replaces any conflicting language in those Service Exhibits:

**RSS.**  Customer understands that Service is an interstate telecommunications service, as defined by Federal Communications Commission regulations and represents that during the Service Term, more than 10% of its traffic will be interstate traffic.

**3.3    No Resale; Compliance.**  The "No Resale; Compliance" section is replaced as follows:

**No Resale; Security**.  Customer represents that it is not a reseller of any telecommunication services provided under this Agreement as described in the Telecommunications Act of 1996, as amended, or applicable state law and acknowledges it is not entitled to any reseller discounts under any laws. CenturyLink has adopted and implemented, and will maintain, a corporate information security program designed to protect Customer information, materials and data accessed and possessed by CenturyLink from loss, misuse and unauthorized access or disclosure. Such program includes formal information security policies and procedures. The CenturyLink information security program is subject to reasonable changes by CenturyLink from time to time. CenturyLink's standard service offerings do not include managed security services such as encryption, intrusion detection, monitoring or managed firewall. Customer is responsible for selecting and using the level of security protection needed for all Customer data stored or transmitted via the Service and using reasonable information security practices, including those relating to the encryption of data. CenturyLink will not be deemed to have accessed, received, or be in the possession of Customer Confidential Information solely by virtue of the fact that Customer transmits, receives, accesses or stores such information through its use of CenturyLink's Services. CENTURYLINK MAKES NO WARRANTIES OR REPRESENTATIONS THAT ANY SERVICE WILL BE FREE FROM LOSS OR LIABILITY ARISING OUT OF HACKING OR SIMILAR MALICIOUS ACTIVITY, OR ANY ACT OR OMISSION OF THE CUSTOMER.

**3.4    Billing Information.**  Any new discounts  or pricing  for Customer's existing Domestic CenturyLink IQ Networking Services, if any, will become effective at CenturyLink QCC's earliest opportunity, but in no event later than the second full billing cycle following the Amendment Effective Date ("Billing Change Date").  The new pricing is otherwise in lieu of, and supersedes and replaces in its entirety, any discounts and/or pricing that Customer previously received under the Agreement.

**4.    Miscellaneous.**

**4.1**    On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC".

**4.2**    This Amendment will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "Amendment Effective Date") and will become part of the Agreement.  All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties.  This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter herein, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

Q.Advan Z Op ID #: 53171609
N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,
Q417950, Q384599, Q297452, Q79876, Q25921,
132311, 128380
Contract Code: 195027

Page 2 of 6

© CenturyLink, Inc. All Rights Reserved

**CONFIDENTIAL**

CGT v1.110514

## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
## RENTAL CPE SERVICE EXHIBIT

**1.      General; Definitions.**  CenturyLink QCC will provide Customer with rental customer premises equipment and software license offerings (collectively, "CPE") and CPE installation and maintenance ("Service") under the terms set forth in the Agreement, this Service Exhibit and any Rental CPE Rate Attachment submitted hereunder.  Capitalized terms not defined herein are defined in the Agreement. "Rental CPE Rate Attachment" means the CenturyLink provided order request form issued and executed by CenturyLink and Customer. CPE, as defined herein, does not include CPE purchased by Customer.  In order to qualify for CPE, Customer must also purchase either CenturyLink IQ® Networking, Analog VoIP, Integrated Access Packages, Managed VoIP, Managed VoIP Bundle Services, SIP Trunk or SIP Trunk bundles or packages, Hosted VoIP or Managed Office under a separate Service Exhibit and Bundle, Package or Promotional Attachment (if applicable) to the Agreement, or CenturyLink Corporation intrastate Metro Optical Ethernet service under a separate agreement (collectively "Underlying Service").

**2.      Delivery and Return.**  CPE will be delivered to Customer's location as identified, in writing, by Customer.  Delivery will be made either by F.O.B. origin, freight paid by Customer, or personal delivery by CenturyLink.  CPE will be installed as designated herein, or as otherwise agreed upon by the parties.  Except as otherwise provided in the Service Exhibit for the Underlying Service, upon termination of Service, or when Customer replaces CPE with upgraded models, Customer must return terminated or replaced CPE at its own expense within 15 calendar days of termination or replacement.  CenturyLink will provide Customer with return instructions.  Customer will deliver CPE to CenturyLink in the same condition it was on the Effective Date, normal wear and tear excepted, and give CenturyLink written notice of such return.  If CPE is not returned within 15 calendar days of termination, Customer will become owner of and bear all responsibility for the terminated or replaced CPE and CenturyLink may invoice Customer for the replacement cost which will be equal to the then-current value of the applicable CPE model ("Replacement Cost").

**3.      Ownership and Use.**  Except as provided in Paragraph 2, CPE is the personal property of CenturyLink, its designee or a third party provider, notwithstanding that the CPE, or any part thereof, may be affixed or attached to Customer's real property or any improvements thereon.  Customer has no right or interest to the CPE other than as provided herein and will hold the CPE subject and subordinate to the rights of CenturyLink.  Customer will: (a) at its own expense, keep the CPE free and clear of any claims, liens, and encumbrances of any kind; and (b) make no alterations or affix any additions or attachments to the CPE, except as approved by CenturyLink in writing. Customer will not remove, alter or destroy any labels on the CPE and will allow CenturyLink the inspection of the CPE at any time.  As between CenturyLink and Customer, Customer will bear the entire risk of loss, theft, casualty, destruction or damage to the CPE following delivery from any cause whatsoever (collectively, "Loss"), until returned to CenturyLink.  Customer will indemnify, defend and hold harmless CenturyLink its affiliates, and contractors for any such Loss.  Customer agrees to advise CenturyLink in writing within five business days of any such Loss.  In no event will such Loss relieve Customer of the obligation to pay CenturyLink any amounts due hereunder.

**4.      Software.**  Software licensor has retained title to the software.  To the extent possible, CenturyLink grants Customer a software license or sublicense in the software according to the licensing agreement accompanying such software, which extends only to Customer's own internal business use of such software and only on or with the designated CPE.  Software must be held in confidence and may not be reproduced unless specifically authorized by the software licensor.  Customer is prohibited from reverse engineering, decompiling or disassembling the CPE or otherwise attempting to derive the source code of the software.  All CPE is subject to the terms and conditions set forth in the manufacturer's or publisher's warranty or end-user license.

**5.      Insurance.**  Customer will, provide and maintain, at Customer's own expense, at all times following delivery of the CPE, the following insurance: (a) "All-Risk" property insurance covering the CPE for the full replacement value, naming CenturyLink or a third party provider designated by CenturyLink as a loss payee; and (b) commercial general liability insurance with limits of not less than $1,000,000 per occurrence and aggregate and naming CenturyLink as an additional insured, unless such insurance is required elsewhere in this Agreement at higher limits.  Such insurance will be placed with insurers who have a minimum "Best's" rating of A- VII (A- 7).  Upon request, Customer will deliver to CenturyLink insurance certificates evidencing such insurance.

**6.      Charges.**  The charges for CPE and Service are set forth in the Rental CPE Rate Attachment, and will be used to calculate Contributory Charges.  Charges will commence within five days of CenturyLink's notification to Customer that the Underlying Service is provisioned and ready for use ("Start of Service Date").  CenturyLink may cease providing Service and demand return of CPE if payment is not made when due.

**7.      CPE Replacement Recovery Charge.**  Where CPE rented from CenturyLink is replaced due to loss or damage not covered by maintenance under the applicable Detailed Description (for example, damage from accident, misuse or abuse), Customer will pay:  (a) the Replacement Cost for the damaged CPE, and (b) a one-time charge to cover CenturyLink's cost to ship the new CPE.  If Customer requires on-site assistance from CenturyLink to install the replacement CPE, an additional dispatch charge will apply.  CenturyLink will quote the charges in advance, obtain Customer's approval, and invoice the charges within 60 days.  Customer is responsible for any claim for reimbursement from its insurance carrier.  The terms and conditions in this Service Exhibit will continue to apply.  Replacement CPE may or may not be the same model.

**8.      Term.**  This Service Exhibit will commence on the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date), and will remain in effect until terminated.  Either party may terminate this Service Exhibit with at least 60 days prior written notice to the other party.  Termination will not affect obligations under Rental CPE Rate Attachments accepted prior to the effective date of termination, and this Service Exhibit will remain

N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,
Q417950, Q384599, Q297452, Q79876, Q25921,
132311, 128380
Contract Code: 195027

**CONFIDENTIAL**

CGT v1.060215

in effect as to such obligations if it would otherwise have terminated. CPE and Service ordered during the Term will commence on the Start of Service Date and will continue for a number of months as set forth on the Rental CPE Rate Attachment ("CPE Term"). Upon expiration of the CPE Term, CPE and Service will automatically renew on a month to month basis at the then current rates, unless either party elects to terminate the CPE and Service by providing 60 days prior written notice of such termination to the other party. If the Agreement or any CPE and Service provided hereunder are terminated prior to the expiration of the applicable CPE Term for reasons other than by Customer for Cause, then Customer will pay to CenturyLink: (a) all charges for CPE and Service provided through the effective date of such cancellation; and (b) an early cancellation charge of 100% of the balance of MRCs that otherwise would have become due for the unexpired portion of the CPE Term.

**9.    Installation, Maintenance and Safety Compliance.** Installation, maintenance or other labor provided to Customer pursuant to this Agreement is subject to, and controlled by, CenturyLink's Detailed Description(s) which are posted under CPE at http://www.centurylink.com/legal/ and are incorporated by reference and made a part of this Service Exhibit. CenturyLink may change the Detailed Descriptions at any time and such change will be effective upon posting to the Web site. Customer is responsible for informing CenturyLink of the existence, location and condition of any Hazardous Substances that may be in or around the CenturyLink work area. "Hazardous Substance" means a substance regulated by any safety regulation and includes, without limitation, asbestos. Customer will indemnify and hold CenturyLink harmless from any fines or other liability of CenturyLink arising from Customer's failure to inform CenturyLink of hazardous substances.

**10.    Additional Limitation of Liabilities.** If CPE contains a firewall or other security features, CenturyLink makes no warranty, guarantee, or representation, express or implied, that all security threats and vulnerabilities will be detected or that the performance of Service will render Customer's systems invulnerable to security breaches. Customer is responsible for Customer's own network security policy and security response procedures. If any equipment or software not provided by CenturyLink impairs Customer's use of CPE, Service or an Underlying Service: (a) Customer will nonetheless be liable for payment for all CPE, Service and Underlying Service provided by CenturyLink; and (b) any SLA generally applicable to the Service or Underlying Service will not apply.

**11.    Separate CenturyLink and Verizon Wireless Offerings.** If Customer uses CPE and Service in conjunction with Mobile Broadband Wireless Router service provided by Verizon Wireless, Customer understands that such service is provided under the terms of Customer's separate contract between Customer and Verizon Wireless. Customer is responsible for all contractual obligations to Verizon Wireless, including, but not limited to all payment obligations, including any monthly access, overage, or early termination fees.

**12.    Miscellaneous.** With respect to the Agreement terms incorporated by reference, "Service" is replaced with "CPE and Service" as defined herein.

Q.Advan Z Op ID #:53171609                                    Page 4 of 6                        © CenturyLink, inc. All Rights Reserved.
N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,
Q417950, Q384509, Q297452, Q79876, Q25921,                        **CONFIDENTIAL**                        CGT v1.060215
132311, 128380
Contract Code:  195027

## OFFER ATTACHMENT FOR
## CENTURYLINK IQ® NETWORKING DATA CENTER CONNECTIVITY OFFER

This CenturyLink QCC ("CenturyLink") offer attachment ("Attachment") is subject in all respects to the domestic CenturyLink IQ Networking Service Exhibit, the Local Access Service Exhibit, and the CenturyLink® Total Advantage® or CenturyLink® Loyal Advantage® Agreement ("Agreement") between Customer and CenturyLink.  All capitalized terms used in this Attachment that are not defined herein will have the definition as set forth in the Agreement or Service Exhibit.

**1.    Definitions.**

"Eligible Data Center" means a data center location which has been qualified by CenturyLink as eligible to receive the offer pricing specified below.  Only the service address(es) specified below are considered Eligible Data Centers.

"Eligible Access" means (a) an On-Net Local Access circuit that uses a 1 Gigabit, a 2.5 Gigabit, or a 10 Gigabit handoff to connect the Eligible Data Center to CenturyLink's network, or (b) Data Center Access when used with a CenturyLink IQ + Cloud Port.

"Eligible Port" means a CenturyLink IQ Networking Internet Port, Private Port, or CenturyLink IQ + Cloud Port of either 1 Gbps or 10 Gbps capacity that uses the Precise Burstable billing methodology and provides IP connectivity to Customer's equipment located within the Eligible Data Center location(s) specified below.

**2.    Scope.**  The purpose of this Attachment is to provide offer pricing for Eligible Ports and Eligible Access. Unless approved by CenturyLink, offer pricing for CenturyLink IQ Networking Service and Local Access Service is exclusive of, and may not be combined with any other offers, promotions or discounts and will only be applied in lieu of any such discounts.  All other rate elements not specifically set forth in this Attachment are as stated in the Agreement and Service Exhibits. If a CenturyLink IQ + Cloud Port is used, the domestic CenturyLink IQ Networking Service Exhibit must include CenturyLink IQ + Cloud Port terms and conditions, which were added on January 12, 2016.

**3.    Eligibility and Restrictions.**  The minimum service term ("Service Term") for each Eligible Port and Eligible Access may be 12, 24 or 36 months. Customer must order the Eligible Port and related Eligible Access at the same time and for the same Service Term. The offer pricing set forth below is available to Customers that are: (a) purchasing a new Eligible Port and new Eligible Access; or (b) restarting the same length Service Term of an existing Eligible Port and related Eligible Access which have no more than 25% of the months remaining in their Service Term. For example, an existing Service Term of 36 months could have no more than nine months remaining to be considered eligible and a new 36 month Service Term would be required.  Eligible Ports and Eligible Access are subject to availability and their specific location and availability must be qualified and approved by CenturyLink at CenturyLink's sole discretion. If an Eligible Port or Eligible Access is canceled before its Service Term is completed, then Customer must pay CenturyLink a Cancellation Charge equal to the Eligible Port's offer pricing MRC shown below multiplied by the number of months remaining in the Service Term. After the completion of the applicable Service Term for each Eligible Port and Eligible Access: (c) the term will continue on a month-to-month basis until canceled by either party with 60 days' notice and (d) offer pricing will continue to apply, however CenturyLink reserves the right to modify rates or discontinue offer pricing with 60 days' notice.  In order to receive the offer pricing shown below, Customer must sign and return an Agreement or Amendment that includes this Attachment and all of the applicable Service Exhibits. This offer is only valid through the Cutoff Date.  However, CenturyLink may, in its sole discretion, accept orders and quotes beyond that date, and any such orders and quotes will be subject to the terms of this offer.

**4.    Offer Pricing.**  The following CenturyLink IQ Networking Eligible Port offer pricing MRCs shown below will be used to calculate Contributory Charges.  Any Eligible Ports not shown below must be incorporated via an amendment.  Offer pricing does not apply to any service addresses that are not specified as Eligible Data Centers.  The Service Term for existing Eligible Ports and related Eligible Access will restart on the Agreement or Amendment Effective Date, as applicable.

**4.1    Eligible Data Center locations.**  The following location(s) have been qualified as Eligible Data Centers.  Some Eligible Data Centers require an additional Local Access MRC for Cross Connect Access ("Cross Connect MRC").  The parties may sign another promotional attachment which specifies additional Eligible Data Center locations.

| Eligible Data Center Service Address (including Suite or Floor, if applicable) |
|---|
| 300 LONG MEADOW RD, 1st FLOOR, BLDG 1, STERLING FOREST, NY 10987 |

**4.2    Precise Burstable Net Rate Pricing.**

| Private Port or CenturyLink IQ + Cloud Port Precise Burstable Gigabit Ethernet (1000 Mbps) Precise Burstable Minimum = 100 Mbps ($822 MRC) | 12 Month Service Term MRC per Mbps* (promo code QDC2PGEPB1) | NRC per Port** |
|---|---|---|
| 0.000 – 100 Mbps | $8.22 | $4,000 |
| 100.001 – 150 Mbps | $8.22 | $4,000 |
| 150.001 – 200 Mbps | $8.22 | $4,000 |
| 200.001 – 250 Mbps | $7.25 | $4,000 |

Q.Advan Z Op ID #:53171609
N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,
Q417950, Q384599, Q297452, Q79876, Q25921,
132311, 128380
Contract Code: 195027

Page 5 of 6

© CenturyLink, inc. All Rights Reserved.

**CONFIDENTIAL**

v1.011216

OFFER ATTACHMENT FOR
CENTURYLINK IQ® NETWORKING DATA CENTER CONNECTIVITY OFFER

| | | |
|---|---|---|
| 250.001 – 300 Mbps | $7.25 | $4,000 |
| 300.001 – 350 Mbps | $6.33 | $4,000 |
| 350.001 – 400 Mbps | $6.33 | $4,000 |
| 400.001 – 500 Mbps | $5.52 | $4,000 |
| 500.001 – 600 Mbps | $4.95 | $4,000 |
| 600.001 – 700 Mbps | $4.10 | $4,000 |
| 700.001 – 800 Mbps | $4.10 | $4,000 |
| 800.001 – 900 Mbps | $4.10 | $4,000 |
| 900.001 – 1000 Mbps | $4.10 | $4,000 |

\* Includes Eligible Access.  Special Construction and Local Access ancillary fees not included.
\*\* CenturyLink will waive 100% of the installation NRC.

**5.      Miscellaneous.**  All other terms not specifically set forth in this Attachment, including without limitation, any other rate elements, are as stated in the Agreement and Service Exhibit(s). The offer pricing will become effective for existing Eligible Ports as soon as practicable, but in no event later than the second full billing cycle following the Agreement or Amendment Effective Date.  In the event of any conflict between any of the following documents, the order of control is:  this Attachment, the Service Exhibits, the Agreement, and any CenturyLink-accepted Order Form. All other terms set forth in the Agreement will remain in effect. This Attachment, the CenturyLink IQ Networking Service Exhibit and the Local Access Service Exhibit, and the Agreement set forth the entire understanding between the parties as to the subject matter herein and supersede any prior written or verbal statements, representations, and agreements concerning the subject matter hereof.

Q.Advan Z Op ID #:53171609                    Page 6 of 6                    © CenturyLink, inc. All Rights Reserved.
N194842 amending OMR #: N160281, N92864,
N89258, N83983, N65315, N652620A, N652620,        **CONFIDENTIAL**
Q417950, Q384599, Q297452, Q79876, Q25921,                                                          v1.011216
132311, 128380
Contract Code: 195027

# PRICING CHANGE ORDER (PCO) TO CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
## for CenturyLink QCC Services Only

| CUSTOMER NAME: Orchard Brands Corporation | NSP #: N201570 |
| | NDC #: 2015112JEPIKE_REV2 |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on February 1, 2014. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before April 15, 2016.*

| CUSTOMER: ORCHARD BRANDS CORPORATION | CENTURYLINK COMMUNICATIONS, LLC |
| --- | --- |
| *Wayne Arnold* (signature) | *Irina Khanin* (signature) |
| Authorized Signature | Authorized Signature |
| Wayne Arnold | Irina Khanin |
| Name Typed or Printed | Name Typed or Printed |
| Director of Contracts | Manager - Offer Management |
| Title | Title |
| July 11, 2016 | 7/15/2016 |
| Date | Date |

| FOR INTERNAL CENTURYLINK REFERENCE | |
| --- | --- |
| Content ID: 882287, 865454, 856428, 866967, 599978, 668997, 675653, 687373, 704415, 740472, 761693, 751168, 292940 and 971918 | Prior NSP/Q.Insight/OMR#s:N92864 ,N89258, N83983, N65315, Q652620A, Q652620, Q417950, Q384599, Q297452, Q25921, Q79876, 132331,128380 and N160281 |

| Revenue Commitment/Initial Term: $1,200,000/Annually Contract Code #: 195027 |
| --- |

| Initial Term is: ☒ Existing (no changes) |
| Revenue Commitment: ☐ N/A  ☒ No Changes |

Applicable CenturyLink Service Domestic CenturyLink IQ Networking Service ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

**3.        10 Gigabit Ethernet Private Port Description and Pricing.** 10 Gigabit Ethernet Private Ports provide Customer with access to the Internet.   A 10 Gigabit Ethernet Private Port's peak usage cannot exceed the Bandwidth Tier that is agreed upon between Customer and CenturyLink. "Bandwidth Tier" means the maximum bandwidth usage allowed on a 10 Gigabit Ethernet Private Port; CenturyLink will not deliver traffic that exceeds the Bandwidth Tier. Customer understands that the SLA does not apply to any non-delivered traffic that results from exceeding the Bandwidth Tier limit. All 10 Gigabit Ethernet Private Ports are subject to availability, and any additional 10 Gigabit Ethernet Private Ports must be ordered via an amendment.

Tiered.

| Tiered 10 Gigabit Ethernet (10,000 Mbps) Private Port Other Access | Install NRC | Net Rate MRC |
| --- | --- | --- |
| 1000 Mbps | $20,000.00 | $2,500 .00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

**CONFIDENTIAL**
Page 1 of 2

© CenturyLink, Inc.. All Rights Reserved
v1.111914

# NON-STANDARD PRICING CHANGE ORDER (PCO) TO
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☒ Add the new rates/locations set forth below to the existing rates/charges.

| NPA/NXX or CLLI | Loop Tracking ID | Service Address | Type of Local Access | Minimum Service Term | Circuit Speed | Local Access Net Rate MRC | Install NRC |
|---|---|---|---|---|---|---|---|
| 952/835 | 2015112JEPIKE_REV2 | 5480 Feltl Rd, Minnetonka, MN 55343 | CTL Provide OWS Ethernet Handoff | 36 Months | 10 GigE | $1,818.00 | $00.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment.

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

**CONFIDENTIAL**
Page 2 of 2

© CenturyLink, Inc.. All Rights Reserved
v1.111914

DocuSign Envelope ID: F2C8C986-366D-4A1D-BA5E-9BF0F2D0BA1

# K® TOTAL ADVANTAGE®
## NON-STANDARD PRICING CHANGE ORDER (PCO) FORM
### for CenturyLink QCC Services Only

| CUSTOMER NAME: Orchard Brands Corporation | NSP #: **N216899** |
|---|---|
| | NDC # (if applicable): |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on **May 25, 2011**. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or August 2, 2016.*

| CUSTOMER: ORCHARD BRANDS CORPORATION | CENTURYLINK COMMUNICATIONS, LLC |
|---|---|
| *Wayne Arnold* | *Irina Khanin* |
| Authorized Signature | Authorized Signature |
| Wayne Arnold | Irina Khanin |
| Name Typed or Printed | Name Typed or Printed |
| Director of Contracts | Offer Management |
| Title | Title |
| 7-21-16 | 7/21/2016 |
| Date | Date |

| FOR INTERNAL CENTURYLINK REFERENCE | |
|---|---|
| Content ID(s): 599978, 668997, 675653, 687373, 704415, 740472, 751168, 761693, 292940 | Prior NSP/Q.Insight/OMR#s: Q652620A, Q652620, Q417950, 384599, 297452, Q79876, 132311, Q25921, 195027 |

**Revenue Commitment/Initial Term: $1,000 month/36 month Contract Code #: 190013**

**Initial Term is:** ☒ No Changes
**Revenue Commitment:** ☒ No Changes

**Amendment Number Correction.** Customer indicates below that it is changing elements in its previous amendment(s). Customer indicates below that it is changing elements in its previous amendment(s).

- CID 668997 is now renumbered as amendment seven.
- CID 675653 is now renumbered as amendment six.
- CID 687373 is now renumbered as amendment five.
- CID 704415 is now renumbered as amendment four.
- CID 751168 is now renumbered as amendment two.
- CID 761693 is now renumbered as amendment one.

**Applicable CenturyLink Service: Domestic CenturyLink IQ** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace all existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| Tiered Fast Ethernet 100 Mbps Private Port | Install NRC | Net Rate MRC |
|---|---|---|
| 30 Mbps | $1,500.00 | $325.00 |
| 50 Mbps | $1,500.00 | $400.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

© CenturyLink, Inc.. All Rights Reserved
v1.042516

# K® TOTAL ADVANTAGE®
## NON-STANDARD PRICING CHANGE ORDER (PCO) FORM
### for CenturyLink QCC Services Only

**Applicable CenturyLink Service:  Local Access** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace **all** existing rates and charges with the table below.  All previous rates/locations are deleted and replaced.

| Address | Product Pricer Tracking ID | NPANXX | Circuit Speed | Loop Type | Class of Service | Term | Approved MRR | Approved NRR |
|---------|---------------------------|--------|---------------|-----------|------------------|------|--------------|--------------|
| 14 Alberigi Dr. Jessup, PA 18434 | 160610490522 | 570/383 | 50 Mbps | ELA Native | Single CoS High | 36 Months | $650.00 | $600.00 |
| 14 Alberigi Dr. Jessup, PA 18434 | 160614563726 | 570/383 | 30 Mbps | ELA Native | Single CoS High | 36 Months | $600.00 | $600.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties.  All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement.  This PCO amends the Agreement as of the PCO Effective Date.  Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date").  All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties.  This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC".  For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

**CONFIDENTIAL**
Page 2 of 2

© CenturyLink, Inc..  All Rights Reserved
v1.042516

CPEaaS Rate Quote

**Customer:** Orchard Brands Corporation
**Quote #:**
**Project Name:** Sterling Forest Router
**Created On:** 9/8/2016
**Quote Expires On:** 11/7/2016
**Account Manager:** Chad Johnson
**Sales Engineer:** Patrick Sullivan
**Customer Notes**



| Catalog Number | Description | Unit Price | Qty | Total Price |
|---|---|---|---|---|
| **LOCATION: Main Site** | | | | |
| **Materials** | | | | |
| ISR4331/K9 | Cisco ISR 4331 (3GE,2NIM,1SM,4G FLASH,4G DRAM,IPB) | Included | 1 | Included |
| SL-4330-IPB-K9 | IP Base License for Cisco ISR 4330 Series | Included | 1 | Included |
| FL-4330-PERF-K9 | Performance on Demand License for 4330 Series | Included | 1 | Included |
| GLC-LH-SMD | 1000BASE-LX/LH SFP transceiver module, MMF/SMF, 1310nm, DOM | Included | 1 | Included |
| PWR-4330-AC | AC Power Supply for Cisco ISR 4330 | Included | 1 | Included |
| CAB-AC | AC Power Cord (North America), C13, NEMA 5-15P, 2.1m | Included | 1 | Included |
| NIM-BLANK | Blank faceplate for NIM slot on Cisco ISR 4400 | Included | 2 | Included |
| SM-S-BLANK | Removable faceplate for SM slot on Cisco 2900,3900,4400 ISR | Included | 1 | Included |
| MEM-4300-4G | 4G DRAM (2G+2G) for Cisco ISR 4330, 4350 | Included | 1 | Included |
| MEM-FLSH-4G | 4G Flash Memory for Cisco ISR 4300 (Soldered on motherboard) | Included | 1 | Included |
| SISR4300UK9-313S | Cisco ISR 4300 Series IOS XE Universal | Included | 1 | Included |
| **Support Services** | | | | |
| CON-OSP-ISR4331K | SNTC-24X7X4OS  Cisco ISR 4331 (2GE,2NIM,1SM,4G FLASH,4G | Included | 1 | Included |
| **Implementation** | | | | |
| QINTR-CISCO | Integration | Included | 1 | Included |
| **Shipping and Handling** | | | | |
| Shipping & Handling | Shipping & Handling | Included | 1 | Included |

**Total MRC**          **$164.54**

Service Term 36 Months

Note:  Changes to configuration may result in pricing changes.  This quote also excludes sales tax, which will be added to the invoice.  Any expedite fees incurred after quote acceptance will be added to the invoice.

By signing below you agree that CenturyLink can submit this order for the items in this Quote and that the items ordered hereunder are subject to the CPEaaS terms and conditions incorporated in the agreement for CenturyLink Select Advantage Products and Services signed by Orchard Brands Corporation  on 6/1/2007 Contract Number: 292940.

© CenturyLink, Inc. All Rights Reserved.

CPEaaS Rate Quote

Customer Representative:      *Wayne Arnold*

Customer Signature:          *Wayne Arnold*

Job Title:                   *Director of Contracts*

Date:                        *10-18-16*

CenturyLink Representative:   Jay Gregerson

CenturyLink Signature:
                             DocuSigned by:
                             *Jay Gregerson*
                             89AD89EB53F44C9...

Job Title:                   Director

Date:                        10/18/2016

**CONFIDENTIAL**

© CenturyLink, Inc. All Rights Reserved.

## AMENDMENT TO
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT

**THIS AMENDMENT NO. THIRTEEN** (this "Amendment") is between **CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC** ("CenturyLink") and **Orchard Brands Corporation** ("Customer") and amends the CenturyLink Total Advantage Agreement as applicable, identified in the table below (the "Agreement"). Except as set forth in this Amendment, capitalized terms will have the definitions assigned to them in the Agreement. CenturyLink may withdraw this offer if Customer does not execute and deliver the Amendment to CenturyLink on or before **October 15, 2016** ("Cutoff Date"). Using CenturyLink's electronic signature process for the Amendment is acceptable.

| Document Name | Contract ID | Effective Date |
|---|---|---|
| Qwest Total Advantage | 292940 | 1-Jun-2007 |
| Amendment 2 | 751168 | 27-Sep-2007 |
| Amendment 1 | 761693 | 5-Jun-2008 |
| Amendment 3 | 740472 | 8-Sep-2008 |
| Amendment 4 | 704415 | 29-Jun-2009 |
| Amendment 5 | 687373 | 7-Dec-2009 |
| Amendment 6 | 675653 | 26-Jul-2010 |
| Amendment 7 | 668997 | 25-May-2011 |
| Amendment 8 | 599978 | 21-Mar-2012 |
| Amendment 9 | 866967 | 12-Feb-2014 |
| Amendment 10 | 856428 | 23-May-2014 |
| Pricing Change Order | 865454 | 7-Aug-2014 |
| Amendment 11 | 882287 | 7-Jan-2015 |
| Pricing Change Order | 971918 | 23-Sep-2015 |
| Pricing Change Order | 1014921 | 21-Mar-2016 |
| Amendment 12 | 1026688 | 11-May-2016 |
| Pricing Change Order | 1039542 | 15-Jul-2016 |
| Pricing Change Order | 1040527 | 21-Jul-2016 |

**CUSTOMER: ORCHARD BRANDS CORPORATION**

Authorized Signature

Wayne Arnold
Name Typed or Printed

Director of Contracts
Title

10-19-16
Date

**CENTURYLINK COMMUNICATIONS, LLC**

DocuSigned by:
Jeff Hardegger - POM Manager
Authorized Signature

Jeff Hardegger - POM Manager
Name Typed or Printed

Director of Offer Management
Title

10/20/2016
Date

1. **New Services.** The Service Exhibit(s) and Offer Attachments listed below are attached and incorporated into the Agreement to describe the addition of new Service(s) to the Agreement. All Net Rates set forth in this Amendment are in lieu of all other rates, discounts, or promotions.

   • **NETWORK MANAGEMENT SERVICE EXHIBIT**

2. **Miscellaneous.** This Amendment will be effective on the date the last party signs (the "Amendment Effective Date") and will become part of the Agreement. All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This Amendment and the Agreement set forth the entire understanding between the parties as to the subject matter, and in the event there are any inconsistencies between the two documents, the terms of this Amendment will control.

NSP: N226490
Contract Code: 195027

Page 1
CONFIDENTIAL

© CenturyLink. All Rights Reserved.
V1.032116

**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**NETWORK MANAGEMENT SERVICE EXHIBIT**

**1.    General.** CenturyLink QCC will provide Network Management Service ("NMS" or "Service") under the terms of the Agreement and this Service Exhibit.

**2.    Service.**

**2.1    Description.**    NMS provides performance reporting, change management, configuration management, fault monitoring, management and notification of customer premises equipment ("CPE") and network related issues. NMS does not include transport or Local Access, which may be separately purchased from CenturyLink. The following management types are available:

**(a)    Select Management.** Select Management includes: 24x7x365 remote performance monitoring, reporting, and ticketing via NMS online portal for devices supported by CenturyLink. Select Management also includes complete fault monitoring, management, and notification (detection, isolation, diagnosis, escalation and remote repair when possible) change management supported by CenturyLink, (up to 12 changes per year), asset management (device inventory), and configuration management (inventory of customer physical and logical configuration). Customer may submit change management requests via Control Center at https://controlcenter.centurylink.com. Select Management only supports basic routing functions. Please reference the NMS Supported Device List to determine which devices qualify for NMS Select. NMS does not include new CPE initial configuration, lab testing, lab modeling, or on-site work of CPE. The NMS supported device list and a standard change management list are available on request and are subject to change without notice.

**(b)    Comprehensive Management.** Comprehensive Management includes all of the Select Management features as well as total customer agency and change management (up to 24 configuration changes per year) of complex routing functions within routers, switches, and Firewall modules. This includes configuration and management of complex routing, switching, device NIC cards, Firewall module configurations, and basic router internal Firewall functions. "Firewall" means a set of related programs, located at a network gateway server that is designed to allow or deny certain hosts or networks to speak to each other, based on a set security policy. CenturyLink acts as the Customer's single point of contact in managing the resolution of all service, device, and transport faults covered by Comprehensive Management and will work with any third party hardware and/or transport providers the Customer has under contract until all network issues are successfully resolved. With Internet security protocol ("IPSec"), CenturyLink can configure full mesh, partial mesh, or hub-and-spoke topologies with secure tunnels for remote communication between Customer locations. IPSec is only available on approved Cisco and Adtran devices. IPSec opportunities greater than 25 devices or with other manufacturer's devices require CenturyLink approval before submitting an order.

**(c)    Monitor and Notification.** CenturyLink will monitor Customer device 24x7x365 for up/down status and notify Customer of faults. This feature does not include any of the Select Management or Comprehensive Management features.

**(d)    CenturyLink Responsibilities.**

**(i)**    CenturyLink will provide Customer with a non-exclusive service engineer team, which will maintain a Customer profile for the portion of the Customer's network where the CenturyLink-managed devices reside. CenturyLink will work with the Customer to facilitate resolution of service-affecting issues as long as Customer chooses either Select Management or Comprehensive Management.

**(e)    Customer Responsibilities.**

**(i)**    Customer must provide all information and perform all actions reasonably requested by CenturyLink in order to facilitate installation of Service. For Out-of-Band management related to fault isolation/resolution, Customer will provide and maintain a POTS line(s) for each managed device. "Out-of-Band" means a connection between two devices that relies on a non-standard network connection, such as an analog dial modem, which must be a CenturyLink certified 56k external modem. Additionally, Customer will provide a dedicated modem for each managed device. It is not mandatory that Customer have a POTS line but Customer must understand that CenturyLink will not be able to troubleshoot issues if the device under management cannot be reached.

**(ii)**    For Comprehensive Management, Customer must execute the attached Letter of Agency (Attachment 1) to authorize CenturyLink to act as Customer's agent solely for the purpose of accessing Customer's transport services.

**(iii)**    Depending on transport type, Customer's managed devices must comply with the following set of access requirements: (a) for Service delivered via IP connectivity with CenturyLink IQ® Networking Internet Port or other public Internet service, devices must contain an appropriate version of OS capable of establishing IPsec VPNs; (b) for Service delivered with CenturyLink IQ Networking Private Port, CenturyLink will configure a virtual circuit to access Customer device at no additional charge. CenturyLink will add the CenturyLink NMS network operations center to the Customer user group to manage the devices within the customer's network. With CenturyLink IQ Networking Private Port, the Customer device does not need to be IPSec-capable unless customer is requesting an added layer of security; (c) for Private Line, both A and Z locations must be under management and accessible via a valid routable IP address.

**(iv)**    Customer must provide: A routable valid IP address to establish the Service connection. Customer's primary technical interface person must be available during the remote installation process in order to facilitate installation of the Service. All Customer devices managed under NMS must be maintained under a contract from a CenturyLink approved on-site CPE maintenance provider. The

NSP: N226490
Contract Code: 195027

Page 2
CONFIDENTIAL

© CenturyLink. All Rights Reserved.
V1.032116

**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**NETWORK MANAGEMENT SERVICE EXHIBIT**

response times for which the Customer contract with its CPE maintenance provider will affect CenturyLink's timing for resolution of problems involving Customer-provided devices. The performance of the CPE maintenance provider is Customer's responsibility.

**2.2     International Terms and Conditions.** International Service is available in many locations, but not all locations outside of the continental United States. Customer must verify with CenturyLink the availability of the Service in Customer's desired International locations. For Service outside of the continental United States, the following terms and conditions will apply.

**(a)     Export Controls.** If equipment, software, or technical data is provided under this Service Exhibit, Customer's use of such items must comply fully with all applicable export and re-export controls under U.S. Export Administration Regulations and/or the relevant export control laws and regulations of any other applicable jurisdiction.

**(b)     Anti-Corruption.** Each party acknowledges and agrees that certain anti-bribery and anti-corruption laws, including the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-1 et seq. and the UK Bribery Act, prohibit any person from making or promising to make any payment of money or anything of value, directly or indirectly, to any government official, political party, or candidate for political office for the purpose of obtaining or retaining business. Each party represents and warrants that in the performance of its obligations hereunder, it has not offered, made, or accepted and will not offer, make, or accept, any bribe or facilitation payment, and will otherwise comply with the requirements of applicable anti-bribery laws.

**(c)     Business Contact Information.** Customer is providing to CenturyLink the names of and contact information ("Business Contact Information") for its employees ("Business Contacts") who have purchasing or other responsibilities relevant to CenturyLink's delivery of Service under this Service Exhibit. The Business Contact Information does not include personal data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union memberships, financial status, health or sex life. Customer consents to CenturyLink's and its affiliates or subcontractors' use and transfer to the United States of Business Contact Information for the purpose of: (i) fulfilling its obligations under this Service Exhibit; and (ii) providing information to Customer about CenturyLink's products and services via these Business Contacts. Customer represents that the Business Contact Information is accurate and that each Business Contact has consented to CenturyLink's processing of their Business Contact Information for the purposes set forth in this Service Exhibit. The Business Contact Information provided by Customer has been collected, processed, and transferred in accordance with applicable laws, including, where applicable, any necessary notification to the relevant data protection authority in the territory in which Customer is established ("Authority"). Customer will notify CenturyLink promptly of staffing or other changes that affect CenturyLink's use of Business Contact Information. CenturyLink will have in place technical and organizational measures that ensure a level of security appropriate to the risk represented by the processing and the nature of the Business Contact Information, and that protects such information against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access. CenturyLink will use the information only for the express purposes set forth in this Service Exhibit. CenturyLink will identify a contact authorized to respond to inquiries concerning processing of Business Contact Information, and will reasonably cooperate in good faith with Customer and the Authority concerning all such inquiries without excessive delays.

**(d)     International Laws.** CenturyLink will provide the International Service in compliance with applicable international laws and tariffs. Customer agrees to cooperate with CenturyLink in obtaining necessary domestic or foreign approvals. CenturyLink may elect to not offer International Service, or to terminate International Service, in or to any particular jurisdiction, location or country if CenturyLink determines that the provision of such International Service is not commercially reasonable or is not lawfully permitted. Any arbitration or notices between the parties will be conducted in the English.

**3.     Term; Cancellation.** The term of this Service Exhibit will commence on the Effective Date of the Agreement (or, if applicable, an amendment to the Agreement if this Service Exhibit is added to the Agreement after its Effective Date) and continue for 36 months ("Service Term"). The first 12 months of the Service Term will be referred to as the "Minimum Service Term." Each subsequent location added will have its own Minimum Service Term and Service Term. Upon expiration of the Service Term, each Service will automatically renew for the same Service Term as originally selected by Customer, unless either party elects to cancel the Service by providing 60 days prior written notice of such cancellation to the other party. If the Agreement or any Service provisioned under this Service Exhibit is canceled prior to the expiration of the applicable Service Term for reasons other than by Customer for Cause, then Customer will pay to CenturyLink: (a) all accrued and unpaid charges for the canceled Service provided through the effective date of such cancellation; (b) the amount of any nonrecurring/installation charges that CenturyLink discounted or waived; and (c) a Cancellation Charge (the Cancellation Charge only applies during the initial Service Term and will not apply to any renewal Service Term). The Cancellation Charge applicable to the portion of the Service being canceled during the Minimum Service Term will be 100% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the Minimum Service Term, if any, plus 35% of the balance of the MRCs that otherwise would have become due for the unexpired portion of the Service Term beyond the Minimum Service Term, if any.

**4.     Charges.** Customer will pay all applicable charges in the attached pricing attachment. Charges will commence within five days after the date CenturyLink notifies Customer that Service is provisions and ready for use ("Start of Service Date"). The MRCs set forth in the pricing attachment will be used to calculate Contributory Charges. Location additions will be at CenturyLink's then-current rate.

**5.     AUP.** All use of the Service must comply with the AUP, posted at http://www.qwest.centurylink.com/legal/, which is subject to change. CenturyLink may reasonably change the AUP to ensure compliance with applicable laws and regulations and to protect CenturyLink's network and customers. Any changes to the AUP will be consistent with the purpose of the AUP to encourage responsible use of CenturyLink's networks, systems, services, Web sites, and products.

DocuSign Envelope ID: BB2906A3-7890-4303-8803-CEC919F60B9A

**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**NETWORK MANAGEMENT SERVICE EXHIBIT**

**6.    SLA**.  Service is subject to the NMS service level agreement ("SLA"), located at http://www.qwest.centurylink.com/legal/, which is subject to change.  The SLA is effective as of the first day of the second month after initial installation of Service.  For Customer's claims related to Service or NMS feature deficiencies, interruptions or failures, Customer's exclusive remedies are limited to those remedies set forth in the applicable SLA.

NSP: N226490
Contract Code: 195027

Page 4
CONFIDENTIAL

© CenturyLink.  All Rights Reserved.
V1.032116

DocuSign Envelope ID: BB2906A3-7890-4304-8903-CEC219F60B9A

# CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
## NETWORK MANAGEMENT SERVICE EXHIBIT
### Pricing Attachment

**Network Management Service Pricing**

| Base Service | NRC | MRC per Device |
|---|---|---|
| Monitor and Notification – Any Device | $0 | $35 |
| Select Management – Routers only | $0 | $60 |
| Comprehensive Management – Any Device | $0 | $74 |
| Hardware not included | | |

NSP: N226490
Contract Code: 195027

Page 5
CONFIDENTIAL

© CenturyLink. All Rights Reserved.
V1.032116

# CENTURYLINK INTER-COMPANY AGREEMENT

This inter-company agreement ("Agreement") is between Orchard Brands Corporation ("Customer"), IQor US, Inc ("Company"), and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink").

**1. Scope.**

**1.1** Customer purchased CenturyLink voice services under CenturyLink agreement number 882287 and Company purchased CenturyLink voice services under CenturyLink agreement number 871689 (individually "Underlying Agreement").

**1.2** Customer and Company utilize the following CenturyLink voice service(s) as part of their respective Underlying Agreement: Toll Free ("Service").

**1.3** Customer chooses to utilize Service as an inter-company offering, rather than as an intra-company offering.

**1.4** Company agrees to permit CenturyLink to provision Customer's Service as an inter-company offering between Customer and Company.

**1.5** Company agrees to permit CenturyLink to share certain Company Service information with Customer, so long as such sharing is limited to what is required in order to configure and provision Service as an inter-company offering.

**1.6** Company understands that the inter-company traffic may impact Company's existing Service capacity.

**2. Lawfulness.** This Agreement and the parties' actions under this Agreement will comply with all applicable federal, state, and local laws, rules, and regulations. Any provision not in compliance is void. If a provision of the Agreement is void but the parties can continue the Agreement legally, commercially, and practicably without the voided provision, the remainder of the Agreement will continue in effect.

**3. Disclosures.** Neither party will, without the prior written consent of the other party: (a) disclose any of the terms of this Agreement or use the name or marks of the other party or its Affiliates; or (b) disclose or use (except as expressly permitted by, or required to achieve the purposes of, this Agreement) the Confidential Information of the other party. Each party will use reasonable efforts to protect the other's Confidential Information, and will use at least the same efforts to protect such Confidential Information as the party would use to protect its own. CenturyLink's consent may only be given by its Legal Department. A party may disclose Confidential Information if required to do so by a governmental agency, by operation of law, or if necessary in any proceeding to establish rights or obligations under this Agreement, provided that the disclosing party gives the non-disclosing party reasonable prior written notice. "Confidential Information" means any information that is not generally available to the public, whether of a technical, business, or other nature, (including Customer information or CPNI), and that: (a) the receiving party knows or has reason to know is confidential, proprietary, or trade secret information of the disclosing party; and/or (b) is of such a nature that the receiving party should reasonably understand that the disclosing party desires to protect such information against unrestricted disclosure. Confidential Information will not include information that is in the public domain through no breach of this Agreement by the receiving party or is already known or is independently developed by the receiving party.

**4. Governing Law; Dispute Resolution.**

**4.1 Governing Law; Forum.** Colorado state law, without regard to choice-of-law principles, governs all matters relating to this Agreement. Any legal proceeding relating to this Agreement will be brought in a U.S. District Court, or absent federal jurisdiction, in a state court of competent jurisdiction, in the location of the party to this Agreement not initiating the action. But CenturyLink may, at its discretion, initiate proceedings in Denver, Colorado to collect undisputed amounts billed.

© CenturyLink, Inc. All Rights Reserved.
090914.v1

**4.2  Waiver of Jury Trial and Class Action.** Each party, to the extent permitted by law, knowingly, voluntarily, and intentionally waives its right to a jury trial and any right to pursue any claim or action relating to this Agreement on a class or consolidated basis or in a representative capacity.

The undersigned parties have read and agree to the terms and conditions set forth in this Agreement. Using CenturyLink's electronic signature process for the Agreement is acceptable.

Agreed To By:  Orchard Brands Corporation

Signature

Name Printed/Typed

Title

Date  10-11-16

Agreed To By:  IQor US, Inc

Signature  Shannon Tan

Name Printed/Typed  VP, Chief Commercial Counsel

Title  October 12, 2016

Date

Agreed To By:  Embarq Corporation By:  CenturyLink Communications, LLC

*Sheelagh Greene*
DocuSigned By: Sheelagh Greene

Signature  Sheelagh Greene                    8/11/2016

Name Printed/Typed

Title  10/21/2016

Date

© CenturyLink, Inc. All Rights Reserved.
090914.v1

**NON-STANDARD PRICING CHANGE ORDER (PCO) FORM**
**for CenturyLink QCC Services Only**

| CUSTOMER NAME: **Orchard Brands Corporation** | NSP #: **310703** |
| | NDC # (if applicable): |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on **May 25, 2011**. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or October 31, 2017.*

| CUSTOMER: **ORCHARD BRANDS CORPORATION** | CENTURYLINK COMMUNICATIONS, LLC |
| --- | --- |
| *[signature]* | *Brett Casey [signature]* |
| Authorized Signature | Authorized Signature |
| *Pete Michielutti* | Brett Casey |
| Name Typed or Printed | Name Typed or Printed |
| *EVP/CFO* | Offer Management |
| Title | Title |
| *10/23/17* | 10/24/2017 |
| Date | Date |

| FOR INTERNAL CENTURYLINK REFERENCE | |
| --- | --- |
| Content ID(s): 292940,751168,761693,740472,704415, 687373,675653,668997,599978,866967,856428,865454,882287, 971918,1014921,1026688,1039542,1040527 | Prior NSP/Q.Insight/OMR#s: Q652620A, Q652620, Q417950, 384599, 297452, Q79876, 132311, Q25921, 195027, 216899, 226490 |

| Revenue Commitment/Initial Term: $1,600,000 term/24 month Contract Code #: 190502 |
| --- |

**Initial Term is:** ☐ No Changes ☒ Restarted (new) for 24 months/years
**Revenue Commitment:** ☐ No Changes ☒ New Revenue Commitment of $1,600,000 per term

**Applicable CenturyLink Service: LD Voice - Domestic** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☐ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

☒ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace all existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| Domestic Interstate Outbound Long Distance | Per Minute Net Rate |
| --- | --- |
| *Origination – Termination* | |
| Dedicated – Switched | $0.0086 |
| Switched – Switched | $0.0220 |

| Domestic Interstate Toll Free | Per Minute Net Rate |
| --- | --- |
| *Origination - Termination* | |
| Switched – Dedicated | $0.0086 |
| Switched – Switched | $0.0220 |

**Intrastate.** For all intrastate (which includes interLATA and intraLATA usage within a state's boundary unless specified below) inbound 8XX and outbound voice service usage, CenturyLink will charge Customer the below Net Rate per Minute unless otherwise noted.

© CenturyLink, Inc.. All Rights Reserved
v1.042516

**NON-STANDARD PRICING CHANGE ORDER (PCO) FORM**
**for CenturyLink QCC Services Only**

| DEDICATED INTRASTATE | | | |
|---|---|---|---|
| **State** | | | **2 Year Term** |
| New Jersey | | | $0.0200 |
| Ohio | | | $0.0200 |
| Pennsylvania | | | $0.0200 |
| Vermont | | | $0.0290 |

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective at CenturyLink's earliest opportunity, but in no event later than the second full billing cycle following the PCO Effective Date ("Billing change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

© CenturyLink, Inc.. All Rights Reserved
v1.042516

# PRICING CHANGE ORDER (PCO) TO
## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

*Contract 7438*

| CUSTOMER NAME: ORCHARD BRANDS CORPORATION | NSP #: 326489 |
|---|---|
| | NDC # (if applicable): |

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on May 25, 2011. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before January 10, 2018.*

| CUSTOMER: ORCHARD BRANDS CORPORATION | CENTURYLINK COMMUNICATIONS, LLC |
|---|---|
| *VP Technology* | DocuSigned by: Dave Stahly |
| Authorized Signature | Authorized Signature 9E6AAC7647E466... |
| Scott Aksamit | Dave Stahly |
| Name Typed or Printed | Name Typed or Printed |
| Title | Title Director - Offer Management |
| Date 1/18/2018 | Date 1/24/2018 |

| FOR INTERNAL CENTURYLINK REFERENCE | |
|---|---|
| Contract ID(s): 292940,751168,761693,740472,704415, 687373,675653,668997,599978,866967,856428,865454,882287, 971918,1014921,1026688,1039542,1040527, 1058133, 1126477 | Prior NSP/Q.Insight/OMR#s: Q652620A, Q652620, Q417950, 384599, 297452, Q79876, 132311, Q25921, 195027, 216899, 226490 , N310703 |

| Revenue Commitment/Initial Term: $1,600,000 term/24 month    Contract Code #: 190502 |
|---|
| **Initial Term is:** ☒ Existing (no changes) |
| **Revenue Commitment:** ☐ N/A   ☒ No Changes |
| **New QTA Discount:  N/A** |

**Applicable CenturyLink Service: Domestic CenturyLink IQ Networking Service** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

☐ Delete/Replace **all** existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| Tiered Gigabit Ethernet (1000 Mbps) Private Port | Net Rate MRC | Install NRC |
|---|---|---|
| 200 Mbps | $550.00 | $4,000.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

---

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☐ Not Applicable.

☒ Add the new rates/locations set forth below to the existing rates/charges.

☐ Delete/Replace individual rates only with those set forth below. All other existing pricing/rates remain unchanged.

**CONFIDENTIAL**                    © CenturyLink. All Rights Reserved

# BILLING CHANGE ORDER (PCO) TO

## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
## for CenturyLink QCC Services Only

☐ Delete/Replace all existing rates and charges with the table below. All previous rates/locations are deleted and replaced.

| NPA/NXX/CLLI | Loop Tracking ID | Address | Type of Local Access | Term (in months) | Circuit Speed | Local Access Circuit MRC Net Rate Local Loop | Local Access Circuit NRC Net Rate Local Loop |
|---|---|---|---|---|---|---|---|
| 706484 | XXXXX | 148 INDUSTRIAL BLVD., EATONTON, GA 31024 | ELA Native - Single CoS High | 36 | Gigabit Ethernet - 250 Mbps | $2,300.00 | $0.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment.

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective on the second full billing cycle following the PCO Effective Date ("Billing Change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

On April 1, 2014, CenturyLink completed an internal reorganization resulting in the merger of multiple CenturyLink owned companies into Qwest Communications Company, LLC. Simultaneously with the merger, Qwest Communications Company, LLC d/b/a CenturyLink QCC changed its name to CenturyLink Communications, LLC. The term "CenturyLink QCC" refers to the former "d/b/a CenturyLink QCC" company and not to any other CenturyLink owned companies now a part of CenturyLink Communications, LLC. References in the Agreement to "Qwest Communications Corporation," "Qwest Communications Company, LLC," or "QCC" are replaced with "CenturyLink Communications, LLC". For an interim period of time until all work is completed to update the Service Exhibits, Tariffs and other terms and conditions incorporated by attachment or reference into this PCO, all references to Qwest Communications Company, LLC mean CenturyLink Communications, LLC.

*Contract 7101*

AMENDMENT TO
STANDARD TERMS AND CONDITIONS

This Amendment to Standard Terms and Conditions ("Amendment") is entered into by and between Level 3 Telecom Holdings, LLC, successor in interest to tw telecom holdings inc. ("Level 3") and Bluestem Brands, Inc. ("Customer") and is effective upon execution by both Parties ("Amendment Effective Date").  This Amendment modifies the Standard Terms and Conditions entered into by and between Level 3 and Customer dated May 17, 2010 (the "Agreement"). Level 3 and Customer may be referred to collectively as the "Parties" and individually as a "Party."  Capitalized terms that are not defined in this Amendment shall have the meaning set forth in the Agreement.

WHEREAS, the Parties entered into the Agreement to govern communications services being provided by Level 3 to Customer, and the Parties wish to revise the Agreement so that Service Terms will automatically renew on month to month terms.

NOW THEREFORE, for good and valuable consideration, the Parties amend the Agreement as follows:

1.   Notwithstanding anything in the Agreement to the contrary, upon the expiration of a Service Term, Services will continue on a month-to-month basis at the existing rates, subject to adjustment by Level 3 on thirty (30) days' written notice.  The foregoing shall not modify Service Terms that automatically renewed prior to the Amendment Effective Date or that have been extended by the Parties as the result of a written agreement to renew.  Services provided on a month to month basis may be terminated by either Party upon thirty (30) days' written notice.

2.   Except as modified above, all other terms and conditions of the Agreement remain in full force and effect.   If there is a conflict between this Amendment and the Agreement, the terms of this Amendment shall govern.  By signing below, each Party acknowledges that it has read, understood, and accepts the terms and conditions set forth in this Amendment.

IN WITNESS WHEREOF, the Parties have executed this Amendment through their respective and duly authorized representatives as of the dates indicated below.

Level 3 Communications, LLC

DocuSigned by:
*Chris Abbott*
80605654B00445E...

By: _____

Chris Abbott
Name: _____

Manager of Offer Management
Title: _____

9/7/2018
Date: _____

Bluestem Brands, Inc.

By: *Karen Locks*

Name: *Karen Locks*

Title: *VP Technology*

Date: *8/16/18*

**CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT**
**for CenturyLink QCC Services Only**

| CUSTOMER NAME: ORCHARD BRANDS CORPORATION | OMR #: R037662 |
|---|---|

By executing this Pricing Change Order ("PCO") the parties agree to modify the pricing and rates under the existing CenturyLink Total Advantage Agreement or Qwest Total Advantage Agreement ("Agreement") between Customer and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink") executed between the parties on May 25, 2011. This Pricing Change Order authorizes additions or changes to pricing and Service locations only for the specific CenturyLink services below and will not modify any other pricing, term or condition. The rates set forth in this PCO are net rated and not eligible for any other additional discounts or promotions. Using CenturyLink's electronic signature process for the Agreement is acceptable. *CenturyLink reserves the right to withdraw the offer contained herein in the event this PCO is not executed by Customer and delivered to CenturyLink on or before July 25, 2019.*

**CUSTOMER: ORCHARD BRANDS CORPORATION**

*Karen Locks*
Karen Locks
Authorized Signature

Name Typed or Printed
VP Technology

6/12/2019
Title

Date

**CENTURYLINK COMMUNICATIONS, LLC**

*Chris Abbott*
Chris Abbott (Jun 20, 2019)
Chris Abbott
Authorized Signature

Name Typed or Printed
Manager Offer Management

Jun 20, 2019
Title

Date

| *FOR INTERNAL CENTURYLINK REFERENCE* | |
|---|---|
| Contract ID(s): 292940,751168,761693,740472,704415, 687373,675653,668997,599978,866967,856428,865454,882287, 971918,1014921,1026688,1039542,1040527, 1058133, 1126477 | Prior NSP/Q.Insight/OMR#s: Q652620A, Q652620, Q417950, 384599, 297452, Q79876, 132311, Q25921, 195027, 216899, 226490 , N310703 |

**Revenue Commitment/Initial Term: $1,600,000 term/24 month    Contract Code #: 190502**

**Initial Term is**: ☒ Existing (no changes)
**Revenue Commitment**: ☐ N/A  ☒ No Changes
**New QTA Discount: N/A**

**Applicable CenturyLink Service: Domestic CenturyLink IQ Networking Service** ("Service"). The rates for Service set forth in the Service Exhibit or Pricing Attachment are amended to:

☒ Add the new rates/locations set forth below. All other existing pricing/rates remain unchanged. (NOTE: By checking this box, the new rates will apply *only* to the locations set forth below and all other existing and future locations will remain priced in accordance with the terms of Agreement.)

| Tiered Gigabit Ethernet (1000 Mbps) Private Port | Net Rate MRC | Install NRC |
|---|---|---|
| 1000 Mbps | $1,580.00 | $4,000.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment

**CONFIDENTIAL**                                    © CenturyLink. All Rights Reserved

## CENTURYLINK® TOTAL ADVANTAGE® AGREEMENT
### for CenturyLink QCC Services Only

**The CenturyLink Local Access Service Exhibit and Pricing Attachment is amended to:**

☒ Add the new rates/locations set forth below to the existing rates/charges.

| NPA/NXX/CLLI | Loop Tracking ID | Address | Type of Local Access | Term (in months) | Circuit Speed | Local Access Circuit MRC | Local Access Circuit NRC |
|---|---|---|---|---|---|---|---|
| 571223 | 190606515270 | 21715 Filigree Ct Ashburn VA 20147 | ELA-Native Single CoS High | 36 | Gigabit Ethernet – 1000 Mbps | $1,334.00 | $1,000.00 |

*NRCs above are waived in accordance with the Service Exhibit or applicable Pricing Attachment.

This PCO is not valid unless a valid CenturyLink Total Advantage Agreement with the proper Service Exhibit(s) has been executed by both parties. All terms and conditions of this PCO are governed by the Agreement. This PCO will be effective as of the date it is executed by CenturyLink after the Customer's signature (the "PCO Effective Date") and be deemed incorporated by reference into the Agreement. This PCO amends the Agreement as of the PCO Effective Date. Pricing modifications will become effective on the second full billing cycle following the PCO Effective Date ("Billing Change Date"). All other terms and conditions in the Agreement will remain in full force and effect and be binding upon the parties. This PCO and the Agreement set forth the entire understanding between the parties as to the pricing contained herein, and in the event there are any inconsistencies in pricing between the two documents, this PCO will control.

**ADDENDUM TO**
**Renewal Order Transaction ID 67943-36-01**

This Addendum to Renewal Order Transaction ID 67943-36-01 ("Addendum") is entered into by and between CenturyLink Communications, LLC ("CenturyLink") and Bluestem Brands, Inc. ("Customer") and is effective upon execution by both Parties. CenturyLink and Customer may be referred to collectively as the "Parties" and individually as a "Party." Capitalized terms that are not defined in this Addendum shall have the meaning set forth in the governing agreement between the Parties.

WHEREAS, contemporaneously with its execution of this Addendum, Customer is executing and delivering Renewal Order Transaction ID 67943-36-01 to CenturyLink in the form attached as Exhibit A (the "Renewal"), and the Parties wish to modify the Service Term for the Renewal Contract as set forth below.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties modify the Order as follows:

1. Notwithstanding the Service Term that is set forth in the Renewal Contract, the Service Term for the Contract Renewal shall be **Twelve (12) Months**. Upon expiration of the 12-month Service Term, Services shall continue on a month-to-month basis at their existing rates for up to thirty-six (36) months. After 36 months, CenturyLink may adjust its rates upon thirty (30) days' written notice. Either Party may terminate any or all Services upon thirty (30) days' notice once they are being provided on a month-to-month basis.

2. Except as modified above, all other terms and conditions of the Renewal Contract remain in full force and effect. This Addendum shall only apply to the Renewal Contract and shall not apply to any other orders or contracts. If there is a conflict between this Addendum and the Renewal Contract, the terms of this Addendum shall govern. By signing below, each Party acknowledges that it has read, understood, and accepts the terms and conditions set forth in this Addendum.

IN WITNESS WHEREOF, the Parties have executed this Addendum through their respective and duly authorized representatives as of the dates indicated below.

| **CenturyLink Communications, LLC** | **Bluestem Brands, Inc.** |
|---|---|
| By: _Jeff Hardegger_ | By: _Marc Kermisch_ |
| Jeff Hardegger (Oct 15, 2019) | CA5BA246A4314F9... |
| Name: Jeff Hardegger | Name: Marc Kermisch |
| Title: Manager, Offer Management | Title: CIO |
| Date: Oct 15, 2019 | Date: 10/11/2019 |

R061549

**EXHIBIT A**
**Renewal Order Transaction ID 67943-36-01**

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

# Renewal Order Form

**Company Name:** Bluestem Brands, Inc.

**BusOrg ID:** 2-YCYZR

**Transaction ID:** 67943-36-01

**Requestor:** Ehlert, Karie (Karie)

**Billing Account Number:** 5-FDNJW2FR

**Currency:** USD

| A Location Address (SCID) | Z Location Address (SCID) | Line Item Description | Product | PIID | SCID | Current Pricing Term Expiration | New Pricing Term Length (months) | On Net/Off Net | Current Burstable | New Burstable | Current MRC | New MRC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 333771343**SW | 12-May-17 | 36 | | | | $1,228.20 | $1,080.82 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 333771344**SW | 12-May-17 | 36 | | | | $200.00 | $176.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Co-location | Colocation | 1769984 | 5687302**SW | 12-May-17 | 36 | | | | $11,457.45 | $10,082.41 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5919807**SW | 12-May-17 | 36 | | | | $18,255.74 | $16,065.05 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5919862**SW | 12-May-17 | 36 | | | | $1,213.80 | $1,068.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927107**SW | 12-May-17 | 36 | | | | $843.73 | $742.48 |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

CenturyLink

| Address | Service | Type | Number | Circuit | Date | Term | Amount 1 | Amount 2 |
|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927111**SW | 12-May-17 | 36 | $303.60 | $345.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927122**SW | 12-May-17 | 36 | $466.98 | $530.66 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927142**SW | 12-May-17 | 36 | $211.xx | $240.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927230**SW | 12-May-17 | 36 | $297. | $337.50 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927251**SW | 12-May-17 | 36 | $99. | $112.50 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927283**SW | 12-May-17 | 36 | $829.36 | $942.45 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927354**SW | 12-May-17 | 36 | $211. | $240.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927505**SW | 12-May-17 | 36 | $4,615.32 | $5,244.74 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927588**SW | 12-May-17 | 36 | $708. | $805.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927724**SW | 12-May-17 | 36 | $1,866.05 | $2,120.51 |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

CenturyLink

| Address | Service | | ID | SW Number | Date | Term | | Amount | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5927855**SW | 12-May-17 | 36 | | $360.00 | $316.80 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5927964**SW | 12-May-17 | 36 | | $1,350.00 | $1,188.00 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5928168**SW | 12-May-17 | 36 | | $450.00 | $396 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5928463**SW | 12-May-17 | 36 | | $3,371.62 | $2,967 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5929525**SW | 12-May-17 | 36 | | $450.00 | $396 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Primary | Colocation | 1769984 | 5929607**SW | 12-May-17 | 36 | | $4,241.02 | $3,732.10 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Power - Redundant | Colocation | 1769984 | 5933433**SW | 12-May-17 | 36 | | $450.00 | $396 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | Co-location | Colocation | 48/JAGS/108851/TWICS | 259993**SW | 20-Aug-16 | 36 | | $5,376.25 | $4,731.10 |
| 5480 FELTL ROAD, MINNETONKA, MN, UNITED STATES, 55343 | | | | | | | | **$60,166.17** | **$52,946.25** |

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48



## CenturyLink

## Summary of Monthly Recurring Charges

**Billing Account Number:**   5-FDNJW2FR

**Total New MRC:**   $52,946.23

**Total Savings:**   $7,219.94

**Currency:**   USD

67943-36-01

DocuSign Envelope ID: FC56C441-E4EC-407A-8941-8BD77164DF48

**≋ CenturyLink·**

## Terms and Conditions

1. This confidential Order may not be disclosed to third parties and is non-binding until accepted by CenturyLink, as set forth in section 2. Customer places this Order by signing (including electronically or digitally) or otherwise acknowledging (in a manner acceptable to CenturyLink) this renewal order and returning it to CenturyLink. Pricing is valid for 90 calendar days from the date indicated unless otherwise specified. The Services identified in this renewal order are renewed subject to the terms and conditions of the Master Service Agreement or Affiliate Agreement governing the Services during their initial term, to the extent not in conflict with these terms. At the expiration of the Service Term, Service will continue month-to-month and rates are subject to change upon 30 days' notice from CenturyLink.

2. Customer-signed renewal order must be received by CenturyLink at least 15 calendar days prior to the start of the next full invoice cycle for the rates to be effective on that following invoice. Otherwise, rates will be effective as of the second full monthly invoice for such Services following receipt by CenturyLink. Acceptance of this renewal order will be evidenced by CenturyLink's implementation of rates or other changes set forth herein.

3. Neither party will be liable for any damages for lost profits, lost revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement service, or any indirect, incidental, special, consequential, exemplary, or punitive damages arising out of the performance or failure to perform under this renewal order. Customer's sole remedies for any nonperformance, outages, failures to deliver or defects in Service are contained in the service levels applicable to the affected Service.

4. This renewal order is confidential and may not be disclosed to third parties.

Customer Name: ___Marc Kermisch___

Customer Signature: *Marc Kermisch*    Date: ___10/11/2019___

Renewal Pricing Expires On:    11-Nov-19

67943-36-01

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is between **Orchard Brands Corporation f/k/a Appleseed's Topco, Inc** ("Assignor"), **Bluestem Brands, Inc** (Assignee"), and CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC ("CenturyLink"), collectively referred to herein as the "Parties". Qwest Communications Company, LLC d/b/a CenturyLink QCC completed a name change to CenturyLink Communications, LLC on April 1, 2014. References in supporting agreements or other documents, to Qwest Communications Company, LLC or its predecessors are replaced with "CenturyLink Communications, LLC."

Whereas, Assignor agreed to assume, perform and accept all of the terms, conditions and obligations for products and services (the "Services") as set forth in the CenturyLink Total Advantage Agreement, which was entered into by Assignor and CenturyLink on **June 1st, 2007 (Pramata ID 292940)** including all exhibits, attachments, addenda, rate change notifications and amendments thereto (the "Agreement"), and the Assignor has agreed to assign all of its interest in the Agreement to the Assignee, and the Assignee has agreed to accept assignment of such interest and all of the obligations under the Agreement,  the Parties agree as follows:

1.   The Assignor hereby transfers, assigns and sets over to the Assignee all of the Assignor's interest in the Agreement commencing as of the Assignment Effective Date (as hereinafter defined). This Assignment and CenturyLink's consent to this Assignment shall not release Assignor from any and all obligations of Assignor under the Agreement up to and including the Assignment Effective Date. Any obligations of Assignor, including amounts owing from Assignor to CenturyLink based upon Services rendered to Assignor by CenturyLink shall still be the responsibility of the Assignor in accordance with the terms and conditions of the Agreement; however, if Assignor fails to fulfill its obligations or liabilities arising prior to the Assignment Effective Date, then Assignee agrees to assume and fulfill those obligations or liabilities. This Assignment shall not extinguish or release any claims by CenturyLink or Assignor under the Agreement.

2.   The Assignee hereby accepts this Assignment and the assignment of the Agreement, including all obligations, terms and conditions thereof, and assumes and agrees to perform and comply with all of the Assignor's obligations under the Agreement from and after the Assignment Effective Date including, without limitation, financial responsibility for any minimum revenue or usage commitments and terms, if any, under the Agreement and any special credit or payment terms applicable to Assignor's use of the Services, unless such terms are explicitly waived in writing by CenturyLink's Credit Department. The Assignee hereby represents and warrants to CenturyLink that it has received and reviewed a copy of the Agreement.

3.   CenturyLink hereby consents to the assignment of the Agreement to the Assignee in accordance with the terms and conditions of this Assignment and of the Agreement and joins in this Assignment solely for the purpose of acknowledging its consent and approval thereto.

4.   The Parties hereby agree to execute such further assurances or documents of this Assignment as may be necessary or required to affect the purposes of this Assignment.

5.   This Assignment may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto

## ASSIGNMENT AND ASSUMPTION AGREEMENT

The Parties hereto have read and agree to the terms and conditions set forth in this Assignment, which will be effective on the CenturyLink signature date ("Assignment Effective Date").  Electronic signatures on this Assignment will be accepted only in the form and manner prescribed by CenturyLink.

| Assignor: | Assignee: | CenturyLink Communications, LLC |
|---|---|---|
| **Orchard Brands Corporation f/k/a Appleseed's Topco, Inc** | **Bluestem Brands, Inc** | |
| **138 Conant Street Suite 3 Beverly, MA 01915** | **6509 Flying Cloud Drive Eden Prairie, MN 55344** | |

| | | *Tom Hains* |
|---|---|---|
| | | Tom Hains (Nov 27, 2019) |
| Authorized Signature | Authorized Signature | Authorized Signature |
| Marc Kunisch | Marc Kunisch | Tom Hains |
| Name Typed or Printed | Name Typed or Printed | Name Typed or Printed |
| CEO | CIO | Manager |
| Title | Title | Title |
| 11/22/19 | 11/22/19 | Nov 27, 2019 |
| Date | Date | Date |
| **Address for Notices:**<br>Attn: General Counsel<br>7075 Flying Cloud Drive<br>Eden Prairie, MN 55433 | **Address for Notices:**<br>Attn: General Counsel<br>7075 Flying Cloud Drive<br>Eden Prairie, MN 55433 | **Address for Notices:**<br>Attn: Credit Department<br>4250 N. Fairfax Dr.<br>Mail code:4th Floor<br>Arlington, VA 22203 |